UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

JESSIE J. BARNES,

                            Plaintiff,

v.

JOHN G. TATRO, Lieutenant, Upstate Corr.                    9:23-CV-0578
Facility; TREVOR N. DUNNING, Sergeant,                      (ML)
Upstate Corr. Facility; DARREN E. BASFORD,
Sergeant, Upstate Corr. Facility; JASON A.
PAIGE, Correction Officer, Upstate Corr.
Facility; NATHAN T. LOCKE, Correction
Officer, Upstate Corr. Facility; JOSHUA T.
BARNES, Correction Officer, Upstate Corr.
Facility; ROBERT J. LAMICA, II, Correction
Officer, Upstate Corr. Facility; TY MAILLOUX,
Correction Officer, Upstate Corr. Facility; and
DARRIN JEFFREY, Correction Officer, Upstate
Corr. Facility,

                            Defendants.

———————————————————————————

APPEARANCES:                                               OF COUNSEL:

JESSIE J. BARNES
  *Pro Se* Plaintiff
Lakeview Shock Incarceration Correctional Facility
Post Office Box T
Brocton, New York 14716

LETITIA A. JAMES                                          AIMEE COWAN, ESQ.
Attorney General for the State of New York               Assistant Attorney General
  Counsel for Defendants
300 South State Street, Suite 300
Syracuse, New York 13202

MIROSLAV LOVRIC, United States Magistrate Judge

**DECISION & ORDER**

Currently before the Court, in this civil rights action filed by Jessie J. Barnes ("Plaintiff") against John G. Tatro, Trevor N. Dunning, Darren E. Basford, Jason A. Paige, Nathan T. Locke, Joshua T. Barnes, Robert J. Lamica, Ty Mailloux, and Darrin Jeffrey (collectively "Defendants"), are (1) Defendants' motion for summary judgment (Dkt. No. 115), and (2) Plaintiff's cross-motion for summary judgment and motion to compel or to defer consideration of Defendants' motion for summary judgment (Dkt. No. 149). For the reasons set forth below, Defendants' motion is granted, Plaintiff's cross-motion for summary judgment is denied, and Plaintiff's motion to compel or to defer consideration of Defendants' motion for summary judgment is denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

At this procedural posture, Plaintiff asserts the following two claims: (1) claims of excessive force and failure to intervene against Defendants pursuant to the Eighth Amendment and 42 U.S.C. § 1983 related to a cell extraction that took place on May 18, 2020, and (2) claims of retaliation against Defendants Basford, Dunning, Locke, and Lamica pursuant to the First Amendment and 42 U.S.C. § 1983. (Dkt. Nos. 1, 6, 70, 73, 76, 77.)

### B.    Parties' Briefing on the Pending Motions for Summary Judgment

#### 1.    Defendants' Motion for Summary Judgment

Generally, in support of their motion for summary judgment, Defendants assert the following two arguments: (1) Plaintiff's Eighth Amendment excessive force and failure to intervene claims should be dismissed, and (2) Plaintiff's First Amendment retaliation claims should be dismissed. (*See generally* Dkt. No. 115, Attach. 1.)

More specifically, with respect to their first argument, Defendants assert that all excessive force claims against Defendants Mailloux and Dunning should be dismissed because Plaintiff testified that they did not use any force on him on May 18, 2020. (Dkt. No. 115, Attach. 1 at 9 n.1.)

Defendants argue that Plaintiff's excessive force claims regarding the use of a chemical agent—which are only asserted against Defendants Tatro and Basford—should be dismissed because administering two, 1-second bursts of chemical agent on an incarcerated individual who is refusing direct orders is not malicious or sadistic. (Dkt. No. 115, Attach. 1 at 13-17.) In addition, Defendants argue that if Plaintiff's underlying excessive force claim related to the use of a chemical agent is dismissed, then the failure to intervene claims must be dismissed as well. (Dkt. No. 115, Attach. 1 at 17-19.) In the alternative, Defendants argue that even if the Court declines to dismiss the underlying excessive force claim, the failure to intervene claims should be dismissed because the record lacks evidence from which a jury could conclude that Defendants had an opportunity to intervene where the chemical agents were deployed in two, 1-second bursts. (*Id*. at 18.) Moreover, Defendants argue that in the alternative, they are entitled qualified immunity because under the circumstances, it was objectively reasonable for Defendants Basford and Tatro to believe that their conduct did not violate a clearly established right. (*Id*.)

Defendants argue that Plaintiff's excessive force claims regarding the handcuffs should be dismissed against all Defendants except Defendant Lamica for lack of personal involvement. (Dkt. No. 115, Attach. 1 at 20.) Defendants argue that Plaintiff's excessive force handcuff claim against Defendant Lamica fails because (a) Plaintiff did not complain about his handcuffs or wrists until the nurse arrived to evaluate him, and (b) examination of Plaintiff's wrists revealed a

full range of motion, sufficient blood flow, and no noted swelling, bruising, lacerations, or marks. (*Id*. at 21.)  Defendants argue that Plaintiff's failure to intervene claims regarding the tight handcuffs should be dismissed because the underlying excessive force claim should be dismissed. (*Id*. at 22-23.)  Moreover, Defendants argue that in the alternative, Plaintiff's failure to intervene claim against Defendant Paige should be dismissed because he did not have a realistic opportunity to intervene to prevent the harm. (*Id*. at 23.)  Finally, Defendants argue that, in the alternative, they are entitled to qualified immunity because under the circumstances, it was objectively reasonable for them to believe that their actions did not violate clearly established law. (*Id*. at 24.)

Defendants argue that Plaintiff's excessive force claim regarding the decontamination shower should be dismissed because the video is clear that Plaintiff was able to speak to the officers the entire time that he was in the decontamination room and he was not dropped on the floor. (Dkt. No. 115, Attach. 1 at 24-25.)  Further, Defendants argue that Defendant Paige was not present in the decontamination room and thus, cannot be liable for any excessive force or failure to intervene claim related to conduct that took place there. (*Id*. at 25.)  Defendants argue that Plaintiff's failure to intervene claims regarding the decontamination shower should be dismissed because the underlying excessive force claim should be dismissed. (*Id*. at 25-26.)

With respect to their second argument, Defendants assert that Plaintiff's retaliation claims against Defendants Basford, Locke, Lamica, and Dunning should be dismissed because they are premised on the underlying excessive force claims, which should be dismissed and thus, Plaintiff cannot demonstrate that Defendants took an adverse action against him. (Dkt. No. 115, Attach. 1 at 27.)  Defendants argue in the alternative that Plaintiff's retaliation claim against Defendant Locke should be dismissed because (a) Plaintiff cannot show that Defendant Locke took an

4

adverse action against him, (b) Plaintiff cannot show that the incident on May 18, 2020, deterred him from exercising his First Amendment rights, (c) Plaintiff cannot show a causal connection between his alleged protected conduct in filing a lawsuit in January 2019, and the incident on May 18, 2020, (d) Plaintiff cannot show a causal connection between the unidentified grievances he filed against Defendant Locke and the incident on May 18, 2020, and (e) Plaintiff cannot show that his prior grievances or lawsuit were a substantial or motivating factor in Defendant Locke's alleged retaliation.  (*Id*. at 28-31.)  Defendants argue that in the alternative, Plaintiff's retaliation claim against Defendant Basford should be dismissed because Plaintiff fails to establish a causal connection between his alleged protected conduct and the adverse action in that (a) Plaintiff cannot show that the incident on May 18, 2020, deterred him from exercising his First Amendment rights, (b) even though Plaintiff filed a grievance on May 6, 2020, that Defendant Basford responded to, it had "no bearing on the incident that took place on May 18, 2020," and (c) Plaintiff testified that he filed claims against Defendant Basford only after the incident on May 18, 2020.  (*Id*. at 31-33.)  Defendants assert that in the alternative, Plaintiff's retaliation claim against Defendant Dunning should be dismissed because (a) Plaintiff admits that Defendant Dunning did not use any force against him on May 18, 2020, and thus he cannot demonstrate that Defendant Dunning took an adverse action against him, (b) Plaintiff cannot show that the incident on May 18, 2020, deterred him from exercising his First Amendment rights, and (c) Plaintiff cannot establish a causal connection between his alleged protected conduct and the adverse action where the only lawsuit that Defendant Dunning was aware of was filed seven years before the subject incident.  (*Id*. at 33-35.)  Defendants assert that in the alternative, Plaintiff's retaliation claim against Defendant Lamica should be dismissed because (a) Plaintiff cannot establish that the retaliatory action was adverse enough to deter him from

exercising his constitutional rights, (b) Plaintiff cannot show a causal connection between the alleged protected conduct and the alleged adverse action where (i) the only lawsuits that Defendant Lamica was aware of were filed either (A) after the subject incident, or (B) approximately sixteen months before the subject incident, and (ii) Defendant Lamica does not recall responding to grievances that Plaintiff filed against him.  (*Id*. at 35-36.)

### 2.    Plaintiff's Response and Cross-Motion for Summary Judgment

Generally, in opposition to Defendants' motion for summary judgment and in support of his cross-motion for summary judgment, Plaintiff asserts the following sixteen arguments: (1) Defendant Basford's conduct on May 18, 2020, was in close temporal proximity to Plaintiff's protected conduct of filing grievance UST-0295-20 on May 15, 2020; (2) Defendant Dunning filed a false official reports, refused to answer Plaintiff's interrogatories, and withheld critical fixed surveillance camera footage; (3) Defendant Locke filed questionable reports that are tailor-made based on Defendants' video, while withholding unfavorable evidence from May 18, 2020; (4) Defendant Lamica admitted that he handcuffed and escorted Plaintiff to the decontamination room only based on the doctored videotape from May 18, 2020, while failing to provide the fixed surveillance; (5) Plaintiff demonstrated that Defendant Basford's actions on May 18, 2020, were premeditated and done maliciously and sadistically to cause harm; (6) Plaintiff adequately stated a claim against Defendant Tatro who ordered the use of a chemical agent on Plaintiff unrelated to any correctional goals; (7) Plaintiff sufficiently stated a claim against Defendant Locke for his malicious and sadistic use of excessive force; (8) Plaintiff presented ample proof to establish that Defendant Lamica applied control of the handcuffs maliciously and sadistically to cause harm; (9) Plaintiff demonstrated that Defendants Barnes, Paige, and Jeffreys filed obscure reports to cover up the excessive force used against Plaintiff based on the hand-held video tape while

withholding the fixed surveillance from May 18, 2020; (10) Plaintiff has presented ample evidence to sustain his failure to intervene claim against Defendant Basford; (11) Plaintiff has presented ample evidence to sustain his failure to intervene claim against Defendant Dunning for his coverup like the incident that occurred on June 18, 2019; (12) Plaintiff has submitted ample evidence to support his motion for summary judgment against Defendants Mailloux and Basford based on their failure to intervene and camera angling to cover up the excessive force used against Plaintiff on May 18, 2020, and withholding critical evidence; (13) Plaintiff has demonstrated sufficient evidence to sustain a failure to intervene claim against Defendants Barnes, Paige, and Jeffrey for filing false reports to cover up the excessive force that they or their co-Defendants used against Plaintiff relying on a sham videotape and withholding damaging fixed videotape from May 18, 2020; (14) Defendants lack credibility because (a) Defendant Basford's papers are fantasy and bonehead insanity, (b) Defendants Lamica and Locke make a partial admission five years after the subject incident, (c) Defendant Dunning fails to acknowledge being a party to *Barnes v. Dominic*, 9:22-CV-0062, (d) Defendants Tatro, Paige, Barnes, and Jeffrey filed questionable reports, and (e) Defendants Tatro, Basford, Dunning, Paige, Barnes, Jeffrey, Locke, Lamica, and Maillouix, and Attorney Cowan have withheld the fixed camera footage from the incident on May 18, 2020 willfully; (15) Defendants are not entitled to qualified immunity; and (16) discovery issues remain and must be addressed before trial because Plaintiff seeks (a) sick callout request slips from May 19, 2020, to July 1, 2020, (b) the Log Book for May 18, 2020, (c) fixed surveillance videotape, (d) an in camera review of Defendants' employee files, and (e) complete answers to Plaintiff's interrogatories and subparts. (*See generally* Dkt. No. 149, Attach. 3.)

####    3.    Defendants' Reply in Further Support of Their Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment

Generally, in further support of their motion for summary judgment and opposition to Plaintiff's cross-motion for summary judgment, Defendants assert the following four arguments: (1) Plaintiff's cross motion for summary judgment should be denied because he failed to submit a statement of material facts in support of his motion pursuant to N.D.N.Y. L.R. 56.1(a); (2) Plaintiff's discovery disputes are untimely and improper; (3) Plaintiff's Eighth Amendment excessive force and failure to intervene claims should be dismissed; and (4) Plaintiff's First Amendment retaliation claims should be dismissed. (*See generally* Dkt. No. 161, Attach. 1.)

More specifically, with respect to their third argument, Defendants assert that Plaintiff's opposition failed to address Defendants' argument that Plaintiff is not alleging that Defendants Mailloux and Dunning did not use any force on May 18, 2020, and thus, any excessive force claim against Defendants Mailloux and Dunning should be deemed abandoned and dismissed. (Dkt. No. 161, Attach. 1 at 10.) Further, Defendants argue that the use of chemical agents to assist with extracting Plaintiff from his cell on May 18, 2020, was a constitutional and acceptable use of force against a recalcitrant incarcerated individual and Plaintiff has not demonstrated a genuine issue of material fact that the use of the chemical agent was malicious or sadistic. (*Id*. at 10-12.) Defendants argue that, in any event, the chemical agents were administered in two, 1-second bursts, which did not provide any of the other Defendants a reasonable opportunity to intervene. (*Id*. at 12-13.) Defendants assert that they are also entitled to qualified immunity because any rational juror must conclude that it was objectively reasonable for them to believe their actions did not violate clearly established law. (*Id*. at 13.)

Defendants argue that Defendant Lamica was the officer who escorted Plaintiff from his cell to the decontamination room and thus, any excessive force claims based on his handcuff

claims should be dismissed against all other Defendants and Plaintiff offered no argument to the contrary. (*Id*. at 13-14.) Defendants assert that with respect to Plaintiff's excessive force claim against Defendant Lamica, Plaintiff fails to demonstrate that his handcuffs were "unreasonably tight," and his opposition failed to address Defendants' argument that Plaintiff did not complain that his handcuffs were tight or that anyone was twisting or pulling his handcuffs. (*Id*. at 14.) Hence, Defendants argue, that Plaintiff cannot establish that the handcuffs were applied in a way that was "maliciously and sadistically to cause harm" and any alleged injury was *de minimis* and insufficient to establish an Eighth Amendment claim. (*Id*. at 14-15.) Defendants argue that Plaintiff cannot demonstrate that Defendant Paige had a realistic opportunity to intervene and prevent the alleged harm. Further, Defendants argue that Plaintiff has not established that a reasonable person in the shoes of Defendants Tatro, Basford, Barns, Mailloux, Jeffrey, Dunning, and Locke would have known that Plaintiff's constitutional rights were being violated. (*Id*. at 15.) Further, Defendants argue that they are entitled to qualified immunity. (*Id*.)

Defendants argue that the video is clear that Plaintiff was able to speak to Defendants during the entire duration that he was in the decontamination room, which was only approximately 60 seconds. (Dkt. No. 161, Attach. 1 at 15-16.) In addition, Defendants assert that the video is clear that no one lifts Plaintiff up in the air, drops him on the floor, or places him under the shower head. (*Id*. at 16.) Defendants argue that they did not intervene because Plaintiff's allegations regarding what took place in the decontamination shower are false. (*Id*. at 17.)

With respect to their fourth argument, Defendants argue that Plaintiff's retaliation claim against Defendant Locke should be dismissed because (a) Plaintiff now alleges that the retaliation was based on grievances that Plaintiff filed *after* the subject incident, (b) Plaintiff has

not demonstrated that Defendant Locke personally took any adverse action against Plaintiff, (c) Plaintiff was not deterred from exercising his constitutional rights because he filed a grievance about the incident on May 18, 2020, the very same day, and (d) Plaintiff fails to establish a causal connection between any grievances he filed or pending litigation and the incident on May 18, 2020.  (Dkt. No. 161, Attach. 1 at 17-19.)

Defendants assert that Plaintiff's retaliation claim against Defendant Basford should be dismissed because (a) Plaintiff has not demonstrated that Defendant Basford had knowledge of Plaintiff's protected conduct in filing grievances on June 14, 2019, and July 18, 2019, (b) Plaintiff has not established that Defendant Basford retaliated against him based on grievances that Plaintiff filed against other security staff, (c) Plaintiff fails to establish that Defendant Basford's alleged retaliatory action was adverse enough to deter him from exercising his constitutional rights where he continued to file dozens of grievances after the date of the incident, and (d) Plaintiff cannot show a causal connection between his alleged protected conduct and the alleged adverse action.  (Dkt. No. 161, Attach. 1 at 19-20.)

Defendants argue that Plaintif's retaliation claim against Defendant Lamica should be dismissed because (a) to the extent that Plaintiff alleges that Defendant Lamica retaliated against him on February 11, 2022, that claim was not pled in this matter and Plaintiff cannot amend his complaint via his opposition to a motion for summary judgment, (b) Plaintiff fails to establish that Defendant Lamica's alleged retaliatory action was adverse enough to deter him from exercising his constitutional rights where he continued to file dozens of grievances after the date of the incident, and (c) Plaintiff cannot establish that Defendant Lamica was aware of any other pending lawsuits against him brought by Plaintiff at the time of the subject incident and Plaintiff

himself does not recall when he filed grievances against Defendant Lamica.  (Dkt. No. 161, Attach. 1 at 21-23.)

### 4.     Plaintiff's Reply in Further Support of His Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment

Generally, in further support of his cross-motion for summary judgment and opposition to Defendants' motion for summary judgment, Plaintiff asserts the following nine arguments: (1) Defendants submitted an inauthentic hand-held videotape made by Defendant Mailloux that is spliced together and withheld the fixed surveillance videotape of the incident on May 18, 2020; (2) Plaintiff is unaware of the requirement that parties file "dual" statements of material facts not in dispute pursuant to Local Rule 56.1 but to the extent such a requirement exists, Plaintiff's may be found "intertwined with [his] declaration and memorandum of law"; (3) Defendant Lamica "has brutalized [Plaintiff] in three separate litigations," which is relevant to Defendant Lamica's motivation; (4) Defendants have failed to completely respond to Plaintiff's interrogatories, which is now "ripe for [the Court's] review"; (5) Plaintiff filed sick call slips about hand pain related to the handcuffs that Defendant Lamica placed on him on May 18, 2020; (6) Defendant Paige's declaration is contradictory with his failure to respond to interrogatories, the fixed surveillance videotape, and other evidence that Plaintiff submitted; (7) Defendants are not entitled to qualified immunity; (8) Defendant Locke admitted to being in the decontamination room with Plaintiff and Defendant Lamica; and (9) Plaintiff can be heard screaming on the video of him in the decontamination room.  (*See generally* Dkt. No. 164.)

11

### C.    Defendants' Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendants in their Statement of Material Facts and not denied by Plaintiff in his response.[1]  (*Compare* Dkt. No. 115, Attach. 2, *with* Dkt. No. 149, Attach. 1.)

1.    Plaintiff is currently incarcerated at Lakeview Shock Correctional Facility for multiple felony convictions, including burglary in the second degree, reckless endangerment in the first degree, and criminal mischief in the second degree.

2.    Plaintiff is an experienced litigator, having filed approximately thirteen actions in the Northern District of New York alone.[2]

3.    On May 5, 2020, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate C.F.").[3]

---

[1]    The Court notes that several facts asserted by Defendants were supported by citations to exhibits that were introduced by Attorney Cowan, who does not appear to possess personal knowledge sufficient to admit the exhibit into evidence.  However, "under modern summary judgment practice, documents need only be presented in a form that, if authenticated, *could* be admissible at trial."  *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2024 WL 1614327, at *5 n.1 (N.D.N.Y. Apr. 2, 2024) (Hurd, J.)

[2]    Plaintiff's response admits the statement then improperly adds words intended to controvert the facts asserted or to place them in context.  (Dkt. No. 149, Attach. 1 at ¶ 2); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) ("[T]he Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed.'"); *Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit'"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[3]    *See*, *supra*, note 2.  Defendants cite to Dkt. No. 115, Attach. 5 at 26 for support of this fact.  However, the citation should be to Dkt. No. 115, Attach. 5 at 26-27.

4.      Plaintiff received two misbehavior reports dated May 5, 2020.[4]

5.      Upstate Correctional Officer J. MacGregor issued Plaintiff a misbehavior report on May 5, 2020, for obstructing his cell window with a towel and failing to comply with direct orders to remove the towel at approximately 3:40 a.m.[5]

6.      After the area supervisor responded, Plaintiff complied and removed the towel.[6]

7.      Plaintiff was placed on a towel deprivation and his cell was searched.[7]

8.      Plaintiff was escorted back to his cell after the search and at approximately 9:30 a.m., he refused to present his hands so that Officer M. Carbone could remove his handcuffs.[8]

9.      After an extraction process was started, plaintiff agreed to have the handcuffs removed.[9]

10.      Plaintiff received a misbehavior report for that incident as well.[10]

11.      Plaintiff filed a grievance dated May 6, 2020, following the cell search on May 5, 2020.[11]

---

[4]      *See*, *supra*, note 2.

[5]      *See*, *supra*, note 2.

[6]      *See*, *supra*, note 2.

[7]      *See*, *supra*, note 2.  Defendants cite to Exhibit G of Defendant Basford's declaration in support of this fact asserted.  (Dkt. No. 115, Attach. 2 at ¶ 7.)  However, the docket only reflects Exhibits A-F attached to Defendant Basford's declaration.  (*See generally* Dkt. No. 115.)  Notwithstanding, Plaintiff admits the fact asserted and thus, it is deemed admitted.

[8]      *See*, *supra*, note 2.

[9]      *See*, *supra*, note 2.

[10]      *See*, *supra*, note 2.

[11]      *See*, *supra*, note 2.

12.     Defendant Basford responded to the grievance in a memorandum dated May 15, 2020.[12]

<u>Plaintiff's Eighth Amendment Excessive Force and Failure to Intervene Claims</u>

13.     Plaintiff alleges that on May 18, 2020, Defendants Basford and Tatro "approached plaintiff's cell" wearing gas masks, accompanied by Defendants Dunning, Mailloux, Paige, Locke, Barnes, Lamica, and Jeffery.[13]

14.     Plaintiff alleges that "without justification" Defendant Basford "sprayed the plaintiff with chemical agent excessively" while the other Defendants "intently watched."[14]

15.     Plaintiff further alleges that handcuffs were placed on him that were too tight, and that as he was escorted to the decontamination shower, the officer holding the cuffs pushed down to "inflict unnecessary pain and suffering."[15]

16.     Plaintiff alleges that the officers picked him up and held him under the shower head in the decontamination room "so that water can run directly up his nose and down [his] throat at the same time."[16]

17.     Plaintiff further alleges that Defendants dropped him on the floor twice, picked him back up, and placed him under the shower head.[17]

---

[12]     *See, supra*, notes 2, 7.

[13]     *See, supra*, note 2.

[14]     *See, supra*, note 2.

[15]     *See, supra*, note 2.

[16]     *See, supra*, note 2.

[17]     *See, supra*, note 2.

18.     On May 18, 2020, at approximately 8:30 p.m., Plaintiff refused to hand out his meal trays despite multiple orders to do so, in violation of DOCCS Directives 106.10 and 107.10.[18]

19.     At approximately 8:40 p.m., Defendant Basford was notified by staff that Plaintiff was refusing to return his mess hall items from his Ramadan evening meal.

20.     Defendant Basford reported to Plaintiff's cell and gave Plaintiff a direct order to return the items.[19]

21.     Plaintiff refused to return the items.[20]

22.     Defendant Basford observed milk cartons, sporks, and "draglines" on Plaintiff's desk.[21]

---

[18]     Plaintiff denies this fact but appears to instead place in context why he refused to hang out his tray.  (Dkt. No. 149, Attach. 1 at ¶ 18 ["Deny this because I was missing my peanut butter at 7:30 pm when Ramadan was served I beat and banged they ignored me to assemble abuse"].)  Moreover, the citations to the record that Plaintiff provides do not support his denial.  (Dkt. No. 149, Attach. 1 at ¶ 18 [citing Dkt. No. 1, Attach. 3 at 1-3, 78-79].)

[19]     Plaintiff denies this fact and cites to his Declaration at paragraphs 31-32 (Dkt. No. 141, Attach. 1 at ¶ 20 [citing Dkt. No. 141, Attach. 2 at ¶¶ 31-32]), which does not contradict the fact asserted or create a genuine dispute.  (*Id.*)

[20]     *See*, *supra*, note 19.

[21]     Plaintiff denies this allegation.  (Dkt. No. 141, Attach. 1 at ¶ 23.)  Plaintiff appears to admit that he had his two breakfast milks but that Defendant Basford "concocted the sporks and dragline story to stage a bogus cell search in retaliation."  (*Id.* [citing Dkt. No. 141, Attach. 2 at ¶¶ 28-32].)  Plaintiff's declaration states that Defendant Basford used "the plaintiff's missing peanut butter together with his religious meal as a spring board or pawn to threaten plaintiff and schedule another 'reign of terror cell search' under false pretense of a cock-and-bull-story of the two milks I had for my breakfast meal was contraband on May 18, 2020."  (Dkt. No. 141, Attach. 2 at ¶ 31.)  This does not contradict the fact asserted or create a genuine dispute of material fact.  As a result, the fact is deemed admitted.

23.      "Draglines" are a term for items constructed by incarcerated individuals out of ripped or torn materials like clothing, paper, or bedsheets.[22]

24.      Incarcerated individuals toss draglines over to an adjacent or nearby cell to drag items back to their cell.[23]

25.      Incarcerated individuals often use draglines to exchange contraband.[24]

26.      Defendant Basford directed Plaintiff to come out of his cell so that a cell frisk could be performed.

27.      Plaintiff was not permitted to keep the milk cartons, sporks, and draglines in his cell for security and safety reasons.  The items needed to be confiscated since Plaintiff refused to return them to staff.[25]

---

[22]      Plaintiff denies this fact but then indicates that he lacks knowledge, which is insufficient to create a genuine dispute.  (Dkt. No. 141, Attach. 1 at ¶ 24); *Davis v. City of Syracuse*, 12-CV-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) ("On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute."); *In re Horowitz*, 14-CV-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact . . . . Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact.").  Plaintiff also points out that there is "no documentation that the plaintiff possessed a 'dragline' on May 18, 2020."  (Dkt. No. 141, Attach. 1 at ¶ 24.)  However, the fact asserted does not relate to Plaintiff's possession of a dragline and instead is merely defining what a dragline is.

[23]      Plaintiff denies this fact as immaterial but that is the province of the Court to deem materiality.  As a result, the fact is deemed admitted.  *Zhao-Royo v. New York State Educ. Dep't*, 14-CV-0935, 2017 WL 149981, at *2, n.2 (N.D.N.Y. Jan. 13, 2017) ("As a result, where a non-movant has merely objected to the materiality of a fact, and the Court has concluded that the fact is material, the fact will be deemed admitted.").

[24]      *See*, *supra*, notes 22, 23.

[25]      Plaintiff denies this fact and argues that he was supposed to have the milks but does not address the sporks or draglines that Defendants assert also needed to be confiscated.

28.    Plaintiff continued to refuse to exit his cell.[26]

29.    DOCCS Directive 4903 states that chemical agents may be used in the extraction of incarcerated individuals from cells or rooms.[27]

30.    According to Directive 4903, section IV, a staff member must be designated to authorize the use of chemical agents.[28]

31.    Before using a chemical agent, the highest available authority present at the facility must be consulted and grant permission for the use of a chemical agent.[29]

32.    In this case, Upstate C.F. Captain Gravlin authorized the use of chemical agents on May 18, 2020.[30]

33.    In addition, on May 18, 2020, a nurse was notified before Plaintiff's cell extraction.

34.    In this case, the nurse approved the use of chemical agents as part of the extraction.

---

[26]    Plaintiff denies this fact and asserts that Defendants have not produced all of the videotapes.  (Dkt. No. 141, Attach. 1 at ¶ 29.)  However, Defendants produced admissible evidence to support this fact.  (Dkt. No. 115, Attach. 17 at ¶ 6.)  Plaintiff's citations to his declaration do not create a dispute of fact that Plaintiff refused to leave his cell.  (Dkt. No. 141, Attach. 2 at ¶¶ 32, 42, 48.)

[27]    *See*, *supra*, note 22.

[28]    *See*, *supra*, note 22.

[29]    *See*, *supra*, note 22.

[30]    Plaintiff denies this fact because "regardless [of] who authorized this use of force it was all staged by Basford in retaliation."  (Dkt. No. 194, Attach. 1 at ¶ 33.)  Plaintiff's denial does not create a dispute of fact.

35.     In accordance with Directive 4903, Defendant Basford notified the Watch Commander at approximately 8:42 p.m., that Plaintiff was refusing to exit his cell so that a cell search could be completed.[31]

36.     Defendant Tatro was notified and responded to Plaintiff's cell.

37.     Defendant Tatro gave Plaintiff several direct orders to comply with staff direction, but Plaintiff refused to comply.[32]

38.     Plaintiff testified that Defendants Basford and Tatro ordered him to exit his cell so that a search could be performed.  However, Plaintiff then testified that he could not recall if Defendants Basford and Tatro gave those orders.[33]

39.     At approximately 8:50 p.m., medical staff were notified that force may be necessary to extract Plaintiff from his cell.[34]

40.     Nurse Holcombe determined that it was safe to use chemical agents on Plaintiff to assist with the cell extraction.

41.     DOCCS's Crisis Intervention Unit was notified and spoke with Plaintiff at approximately 9:10 p.m., before any use force was utilized to extract him from his cell.[35]

---

[31]     *See*, *supra*, note 22.

[32]     Plaintiff denied this fact asserted.  However, Plaintiff's citations to his declaration do not support his assertion that he followed orders.  (Dkt. No. 149, Attach. 1 at ¶ 38 [citing Dkt. No. 149, Attach. 2 at ¶¶ 42-44, 49].)

[33]     Plaintiff denies this fact "[b]ecause they had no [l]egitimate basis to do this other than Basford[']s retaliatory motives."  (Dkt. No. 149, Attach. 1 at ¶ 39.)  I deem this fact admitted because Plaintiff's denial does not create a genuine dispute as to the fact asserted.

[34]     *See*, *supra*, note 23.

[35]     *See*, *supra*, note 22.

18

42.     Since this incident took place after business hours, other civilian staff members—such as clergy staff and Plaintiff's Offender Rehabilitation Coordinator—were unavailable to assist in communicating with Plaintiff to attempt to persuade him to exit his cell.[36]

43.     Because Plaintiff continued to refuse to exit his cell, a cell extraction team was assembled.[37]

44.     Defendant Mailloux was tasked with operating a handheld camera to record the cell extraction.

45.     Defendant Dunning was tasked with recording information for the Cell Extraction Checklist.[38]

46.     Defendant Paige was not part of the extraction team.[39]

---

[36]     Plaintiff denies this fact based on his belief that Defendants did not have "a reason to use force on [him] on May 18, 2020." (Dkt. No. 149, Attach. 1 at ¶ 43.) However, this denial does not create a genuine dispute as to the fact asserted.

[37]     *See*, *supra*, note 36.

[38]     Plaintiff denies this fact based on his opinion of Defendant Dunning's character. (Dkt. No. 149, Attach. 1 ¶ 46 ["Deny because this man is a 'vile' racist corrupt liar and they had no[ ]basis to do any of this including filing false reports."].) This denial does not create a genuine dispute as to the fact asserted. *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (explaining that a plaintiff does not create a genuine issue of fact merely by "impugning [a witness's] honesty"); *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp.2d 378, 391 (S.D.N.Y. 2012) ("Neither conclusory assertions, nor contentions that the affidavits supporting the motion are not credible, create a genuine issue of material fact."); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378 (S.D.N.Y.1979) ("[A] naked attack upon the affidavits of a moving party is, without more, insufficient to place the credibility of the affiant in issue.").

[39]     Plaintiff denies this fact because he believes that the reports from the incident are "suspect." (Dkt. No. 149, Attach. 1 at ¶ 47.) This denial does not create a genuine dispute as to the fact asserted. *See*, *supra*, note 39.

47.     Defendant Paige was directed to attend the cell extraction to open Plaintiff's cell door in the event that Plaintiff continued to refuse to exit his cell, and the extraction team was required to enter the cell to remove him.[40]

48.     Defendant Paige's role was noted on the Cell Extraction Checklist as "CO w/T Handle from Cart" at the bottom of the form.[41]

49.     Once the extraction team was assembled and gathered at Plaintiff's cell, Defendant Tatro gave Plaintiff one final direct order to comply but Plaintiff refused.[42]

50.     Plaintiff was given ample time and ample warning that a cell extraction would take place if he did not comply with staff directions.[43]

51.     Plaintiff admits that he knew an extraction team had assembled outside of his cell.

52.     At approximately 9:52 p.m., Defendant Tatro authorized Defendant Basford to administer one application of two-one second bursts of chemical agents through the cell door hatch.[44]

53.     Plaintiff complied, exited his cell, and all force ceased at that time.[45]

---

[40]     Plaintiff denies this fact because the use of force memorandum did not contain this information.  (Dkt. No. 149, Attach. 1 at ¶ 48.)  However, this denial does not create a genuine dispute as to the fact asserted.

[41]     Plaintiff denies this fact because he believes that the language used in Defendant Paige's use of force memorandum and his declaration attached to the motion for summary judgment differ.  (Dtk. No. 149, Attach. 1 at ¶ 49.)  However, this denial does not create a genuine dispute as to the fact asserted.

[42]     Plaintiff's denial does not create a genuine dispute as to the fact asserted.

[43]     *See*, *supra*, note 42.

[44]     *See*, *supra*, note 2.

[45]     *See*, *supra*, note 2.

54.     Plaintiff was escorted to the decontamination shower.

55.     Plaintiff testified that the handcuffs placed on him after the cell extraction were "real tight."[46]

56.     Plaintiff further testified that after he was handcuffed, someone was "twisting the cuffs, pulling on them.  I don't know which ones was doing it . . . . I don't know if it was Lamica, I don't know if it was Jason Paige.  I don't know if it was Joshua Barnes."[47]

57.     Defendant Lamica was the officer who escorted Plaintiff from his cell to the decontamination room.[48]

58.     At no point while Plaintiff was being handcuffed or during his escort to the decontamination room did Plaintiff complain that his handcuffs were too tight or that anyone was twisting or pulling on his handcuffs.[49]

59.     Defendant Lamica declared under penalty of perjury that Plaintiff's handcuffs were not applied in an unreasonably tight manner, were applied in accordance with DOCCS directives, and that he never twisted or pulled on them.[50]

---

[46]     *See*, *supra*, note 2.

[47]     *See*, *supra*, note 2.

[48]     *See*, *supra*, note 2.

[49]     Plaintiff denies this fact because he asserts that he has not been "afforded an opportunity to view and inspect the video tapes." (Dkt. No. 149, Attach. 1 at ¶ 59.)  On January 7, 2025, the Court directed Defendants' counsel to arrange through DOCCS for Plaintiff to view the videos concerning the events on May 18, 2020.  (Dkt. No. 93.)  Plaintiff appealed this order.  (Dkt. Nos. 96, 98.)  Plaintiff's appeal was dismissed by the Second Circuit for lack of jurisdiction because the District Court has not issued a final order as contemplated by 28 U.S.C. § 1291.  (Dkt. No. 146.)  At this juncture, the Court has no reason to believe that Defendants' counsel did not comply with the Court's directive on January 7, 2025.  (*See generally* docket sheet.)  The video is clear and supports the fact asserted.

[50]     *See*, *supra*, note 42.

60.    Defendants maintain that Plaintiff did not complain about his handcuffs while being led from his cell to the decontamination shower and that no one was twisting or pulling on his handcuffs.[51]

61.    Defendant Paige did not accompany Plaintiff to the decontamination room.[52]

62.    Defendant Paige left the area after Plaintiff exited his cell and returned to his role as a resource officer.[53]

63.    While Plaintiff alleges that he complained that his handcuffs were too tight in the decontamination room, that contention is contradicted by the video footage.[54]

64.    Plaintiff did not complain about his handcuffs or his wrists until the nurse arrived to evaluate him.[55]

65.    Upon examination of his wrists, the nurse noted a full range of motion and good capillary refill.[56]

66.    No swelling, bruising, lacerations, or marks were noted.[57]

---

[51]    *See*, *supra*, note 2.

[52]    *See*, *supra*, note 42.

[53]    *See*, *supra*, note 42. Defendants cite to Defendant Paige's declaration at paragraph 8 in support of this asserted fact. (Dkt. No. 115, Attach. 2 at ¶ 63 [citing Dkt. No. 115, Attach. 35 at ¶ 8].) However, support for this fact is found in Defendant Paige's declaration at paragraph 7. (Dkt. No. 115, Attach. 35 at ¶ 7.)

[54]    *See*, *supra*, note 42.

[55]    *See*, *supra*, note 42. Plaintiff's denial is contradicted by the video.

[56]    *See*, *supra*, note 42.

[57]    *See*, *supra*, note 2.

67.    Plaintiff's handcuffs were removed approximately seven minutes after his complaint that they were tight during which time he was examined by medical staff and photographed.[58]

68.    Plaintiff was further evaluated by medical staff on multiple occasions in the month following this incident for other medical complaints, but there is no documentation that he complained of any wrist pain or other injuries pertaining to his allegations that the handcuffs were too tight or that Defendants twisted/pulled on his handcuffs.[59]

69.    No injuries related to Plaintiff's wrists are noted in his medical records for the month following May 18, 2020.[60]

70.    Plaintiff testified that it "had to be the John Doe, Jason—Jason Paige, Lamica, and Joshua Barnes" who "picked him up" and moved him closer to the shower head in the decontamination room.[61]

---

[58]    *See*, *supra*, note 42.

[59]    Plaintiff denies this fact and asserts that he "filed numerous sick call out request slips that A[ttorney] Cowan and defendants have withheld and the plaintiff complain[ed] about pressure on [his] ear for months." (Dkt. No. 149, Attach 2 at ¶ 69.)  First, this denial does not create a genuine dispute about the fact alleged: the medical documentation does not reflect complaints about wrist pain or other injuries related to the use of handcuffs on May 18, 2020.  Second, the medical records provided by Defendants also reflect his numerous complaints about ear pressure and pain.  (*See generally* Dkt. No. 115, Attach. 9.)  Hence, the documents provided by Defendants do not reflect a withholding of records as Plaintiff contends.

[60]    The citations to the record that Plaintiff provides do not create a genuine dispute of fact. Plaintiff includes additional medical records covering dates beyond one month following May 18, 2020.

[61]    *See*, *supra*, note 2.

71.     Plaintiff alleges that Defendants dropped him on the floor twice, picked him back up, and placed him under the shower head.[62]

72.     The video is clear that Plaintiff was able to speak to Defendants while he was in the decontamination room, which lasted approximately sixty-seconds.[63]

73.     The video does not depict Plaintiff being lifted in the air or dropped on the floor.[64]

74.     Appropriate decontamination procedures were followed after the cell extraction pursuant to DOCCS Directive 4903.[65]

75.     After Plaintiff was decontaminated, he was placed in the lower holding pen where he was evaluated by medical staff and photographs were taken.[66]

76.     The force used on Plaintiff was pursuant to Directive 4903 and within department guidelines.[67]

77.     Plaintiff does not allege that Defendant Tatro used any physical force on him on May 18, 2020.  Instead, Plaintiff alleges that Defendant Tatro "gave orders" to Defendant Basford to use the chemical agents.[68]

---

[62]     *See*, *supra*, note 2.

[63]     *See*, *supra*, note 42.

[64]     *See*, *supra*, note 42; *see also* note 22.

[65]     *See*, *supra*, note 22.

[66]     *See*, *supra*, note 2.

[67]     *See*, *supra*, notes 2, 22.

[68]     *See*, *supra*, note 2.

78.     Plaintiff testified at his deposition that he is not alleging that Defendants Mailloux or Dunning used any force on him on May 18, 2020.[69]

79.     Defendants did not intervene at any point because they did not believe that any other officer was violating Plaintiff's constitutional rights.[70]

Plaintiff's First Amendment Retaliation Claims

80.     Plaintiff alleges that Defendant Locke retaliated against him based on "pending litigation" for an incident that happened in 2018, and because Plaintiff had "written him up" in the past.[71]

81.     Plaintiff filed numerous grievances after the date of this incident while still at Upstate C.F.[72]

82.     Plaintiff filed a grievance about the incident on May 18, 2020, the same day.[73]

83.     Defendant Locke denies retaliating against Plaintiff for any reason.[74]

84.     The "pending litigation" against Defendant Locke that Plaintiff filed before the incident on May 18, 2020, is *Barnes v. Annucci*, 9:19-CV-0109 ("*Barnes 1*").[75]

---

[69]     *See*, *supra*, note 2.

[70]     *See*, *supra*, note 2.

[71]     *See*, *supra*, note 2.

[72]     *See*, *supra*, note 2.

[73]     *See*, *supra*, note 2.

[74]     *See*, *supra*, note 2.

[75]     Plaintiff denies this fact "with clarification" and cites to an action that was commenced in 2023, more than three years after the incident that is the subject of this action.  (Dkt. No. 149, Attach. 1 at ¶ 85 [citing, *inter alia*, *Barnes v. Finnegan*, 9:23-CV-1490].)

85.    *Barnes I* was commenced on or about January 28, 2019, approximately sixteen months before the incident that is the subject of this action.[76]

86.    Defendant Locke was served with process for *Barnes I* on June 18, 2019, approximately eleven months before the incident on May 18, 2020.[77]

87.    Plaintiff has filed grievances against Defendant Locke but has not identified how many times, the date of the grievance(s), or the date of Defendant Locke's responses.[78]

88.    Defendant Locke avers that neither the lawsuit nor any alleged grievances had any bearing on the cell extraction, especially in light of the fact that Defendant Locke did not use any force against Plaintiff.[79]

89.    Plaintiff alleges that Defendant Basford used excessive force on May 18, 2020, in retaliation for a grievance that Plaintiff filed against him before this incident.[80]

90.    Plaintiff's Amended Complaint alleged that Defendant Basford retaliated against him based on "pending federal court litigation or settled actions."[81]

---

[76]    *See*, *supra*, note 2; the Court takes judicial notice of the fact that *Barnes v. Finnegan*, was filed on or about November 29, 2023.

[77]    *See*, *supra*, note 2.

[78]    *See*, *supra*, note 2.

[79]    *See*, *supra*, note 42; Defendants have supported this fact with a proper citation to the record.

[80]    *See*, *supra*, note 2.

[81]    Plaintiff denies this and acknowledges that he did not have any pending litigation against Defendant Basford at the time of the subject incident but asserts that "all staff of DOCCS are usually hostile against a prisoner with litigation against staff."  (Dkt. No. 149, Attach. 1 at ¶ 91.) This does not create a genuine dispute as to the fact asserted.

91. Plaintiff filed a grievance dated May 6, 2020, to which, Defendant Basford responded via memorandum on May 15, 2020.[82]

92. Defendant Basford contends that the grievance dated May 6, 2020, had no bearing on the incident that took place on May 18, 2020. In addition, the grievance was not found to have merit.[83]

93. The cell extraction on May 18, 2020, took place because a non-party staff member informed Defendant Basford that Plaintiff was refusing to return his mess hall items from his Ramadan evening meal.[84]

94. Even if Plaintiff had not filed the grievance dated May 6, 2020, Defendant Basford asserts that he still would have used the force that he did on May 18, 2020, because it was reasonable, appropriate, and within departmental guidelines.[85]

95. Defendant Basford is unaware of any litigation filed against him by Plaintiff before the incident on May 18, 2020.

96. Plaintiff testified that he filed claims against Defendant Basford after the incident on May 18, 2020.[86]

97. Plaintiff alleges that Defendant Dunning did not use any force against him during the incident on May 18, 2020, but that he was there "promoting violence."

---

[82] *See*, *supra*, note 2.

[83] Plaintiff's response that he denies this fact "because it is crazy" (Dkt. No. 149, Attach. 1 at ¶ 93) does not create a genuine dispute as to the fact asserted. *See*, *supra*, note 39.

[84] Plaintiff's citation to the record (Dkt. No. 149, Attach. 1 at ¶ 94 [citing Dkt. No. 149, Attach. 2 at ¶¶ 31-32]) do not create a genuine dispute as to the fact asserted.

[85] *See*, *supra*, note 84.

[86] *See*, *supra*, note 2.

98.   Plaintiff alleges that Defendant Dunning retaliated against him based on "pending federal court litigations or settled actions."[87]

99.   Defendant Dunning denies retaliating against Plaintiff for any pending litigation.

100.   The only lawsuit that Defendant Dunning is aware of that Plaintiff filed against him before the incident on May 18, 2020, was *Barnes v. Fischer*, 9:13-CV-0164 ("*Barnes II*").[88]

101.   *Barnes II* was commenced on or about February 12, 2013, over seven years before the incident on May 18, 2020.[89]

102.   *Barnes II* was resolved as a result of a jury trial held in September 2022.[90]

103.   The jury found in the defendants' favor in *Barnes II*.[91]

104.   Defendant Dunning avers that even if Plaintiff had not filed *Barnes II*, he still would have attended the cell extraction as directed by the watch commander and maintained the information required for the Checklist.[92]

---

[87]   *See*, *supra*, note 2.

[88]   Plaintiff denies this fact asserted and cites to an action that he filed in 2022, *Barnes v. Dominic*, 9:22-CV-0062.  As a result, Plaintiff's denial does not create a genuine dispute as to the fact asserted.

[89]   *See*, *supra*, note 2.

[90]   *See*, *supra*, note 2.

[91]   *See*, *supra*, note 2.

[92]   Plaintiff denies this fact and states that Defendant "Dunning was working in 9 building at Upstate with Basford and non-party Jarred Bulloch fro perhaps fifteen (15) years or more." (Dkt. No. 149, Attach. 1 at ¶ 105 [errors in original].)  This denial does not create a genuine dispute as to the fact asserted.

105.   Defendant Dunning contends that he did not intervene because the minimal amount of force used on Plaintiff, which was memorialized on video, was reasonable, appropriate, and within departmental guidelines.[93]

106.   Plaintiff alleges that Defendant Lamica used excessive force on May 18, 2020, in retaliation for "pending litigation against him."[94]

107.   Plaintiff alleges that Defendant Lamica used excessive force on May 18, 2020, in retaliation for filing grievances against him.[95]

108.   Defendant Lamica denies retaliating against Plaintiff based on any pending litigation.[96]

109.   Other than the instant action, the only other lawsuits that Defendant Lamica is aware of that Plaintiff filed against him are *Barnes I*, and *Barnes v. Hochul*, 9:23-CV-1490 ("*Barnes III*").[97]

110.   *Barnes I* was commenced on or about January 28, 2019, approximately sixteen months before the incident that is the subject of this action.[98]

---

[93]   Plaintiff's denies this fact asserted, which he characterizes as a "cock-and-bull story" and he objects to because Defendant Dunning does not specify which video he is referring to (Dkt. No. 149, Attach. 1 at ¶ 106 [citing Dkt. No. 117].)  This denial does not create a genuine dispute as to the fact asserted.  *See*, *supra*, note 39.

[94]   *See*, *supra*, note 2.

[95]   *See*, *supra*, note 2.

[96]   *See*, *supra*, note 2.

[97]   *See*, *supra*, note 2.

[98]   *See*, *supra*, note 2.

111.    *Barnes III* was commenced on or about November 29, 2023, over three years after the incident on May 18, 2020.[99]

112.    Defendant Lamica recalls responding to grievances Plaintiff filed against him but does not recall the exact dates of the grievances or the dates that he responded to his grievances.

113.    Plaintiff does not recall when he filed grievances against Defendant Lamica.[100]

114.    None of the grievances against Defendant Lamica were ever found to have merit.[101]

115.    Defendant Lamica avers that he did not retaliate against Plaintiff in any way because he filed grievances.[102]

116.    Defendant Lamica did not retaliate against Plaintiff by using excessive force because he did not use any force against Plaintiff on May 18, 2020, except to handcuff him in accordance with DOCCS directives.[103]

117.    Defendant Lamica avers that even if Plaintiff had not filed the grievances or prior lawsuit, he would not have intervened on May 18, 2020, because the minimal amount of force

---

[99]    Plaintiff denies this fact "because the accrual of *Barnes v. Finnegan* was actually 2020 and 2022 with Basford, Lamica and Locke." (Dkt. No. 149, Attach. 1 at ¶ 112.)  This denial does not create a genuine dispute as to the fact asserted.

[100]    *See*, *supra*, note 2.

[101]    Plaintiff denies this fact "because these grievance investigations are bias and prejudice mared with sargent culprit overseeing investigation to assure all reports are collaborated." (Dkt. No. 149, Attach. 1 at ¶ 115 [errors in original].)  This denial does not create a genuine dispute as to the fact asserted.  *See*, *supra*, note 39.

[102]    *See*, *supra*, note 42.

[103]    Plaintiff improperly denies this fact by questioning the credibility of Defendant Lamica. *See*, *supra*, note 39.

used on Plaintiff, which was memorialized on video, was reasonable, appropriate, and within departmental guidelines.[104]

118.    Plaintiff received a misbehavior ticket as a result of the incident on May 18, 2020, charging him with violating DOCCS Directives 107.10 (interference with employee), 106.10 (refusing direct order), and 115.10 (refuse search or frisk).[105]

119.    After Plaintiff was found guilty on all charges, he appealed the decision, and the punishment was modified from 90 days in the Special Housing Unit to 45 days in the Special Housing Unit.[106]

### D.       Plaintiff's Statement of Undisputed Material Facts

Plaintiff did not file a statement of material facts in support of his cross-motion for summary judgment as required by N.D.N.Y. L.R. 56.1(a).  (Dkt. No. 164 at 1-2 [acknowledging that Plaintiff filed a response to Defendants' statement of material facts but had "no knowledge" of the requirement that he file his own]; *see* Dkt. No. 149.)

## II.     RELEVANT LEGAL STANDARDS

### A.       Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."  *Anderson v. Liberty*

---

[104]    *See*, *supra*, note 103.

[105]    *See*, *supra*, note 2.

[106]    *See*, *supra*, note 2.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[107]  As for the materiality requirement, a dispute of fact is

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant.  *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ.

P. 56(a), (c), (e).  Moreover, "[i]n instances where a video indisputably establishes certain facts,

contrary evidence is insufficient to create a genuine dispute of material fact and may be

disregarded."  *I.S. by and through Disla v. Binghamton City Sch. Dist.*, 19-CV-0513, 2024 WL

3804110, at *13 (N.D.N.Y. Feb. 1, 2024) (Suddaby, J.) (citing *Scott v. Harris*, 550 U.S. 372, 380

(2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that version of

the facts for purposes of ruling on a motion for summary judgment."); *Jeffreys v. City of New*

*York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (noting that, while it is not the duty of a district court

to weigh the credibility of the parties on a summary judgment motion, a court may disregard a

version of events that is based solely on the party's own contradictory and incomplete testimony

---

[107]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

so long as there is no evidence in the record upon which a reasonable factfinder could find in the party's favor)).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[108]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[109]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[110]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

---

[108]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[109]    *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[110]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[111]–even when the non-movant was proceeding *pro se*.[112]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[113]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

---

[111]    Among other things, Local Rule 56.1 (previously contained in Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 56.1.

[112]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[113]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

    **B.**       **Standard Governing an Excessive Force or Failure to Intervene Claim Pursuant to the Eighth Amendment**

A prisoner raising an excessive force claim pursuant to 42 U.S.C. § 1983 must show that there has been a violation of the Eighth Amendment's prohibition against the use of cruel and unusual punishment. *See Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright*, 554 F.3d at 268 (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8, (1992)). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct," which, in this context, depends on "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (internal quotation marks and citations omitted). Several factors are relevant to the analysis of the subjective element, including: "the extent of the injury and the mental state of the defendant, as well as 'the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993)).

The objective component "focuses on the harm done, in light of 'contemporary standards of decency,'" and "[i]n assessing this component, the court must ask whether 'the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation.'" *Wright*,

554 F.3d at 268 (citations omitted).  However, "when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated . . . .  This is true whether or not significant injury is evident.'"  *Id.* at 268-69 (citing *Hudson*, 503 U.S. at 9).

Furthermore, "[p]rison officials can be held liable under 42 U.S.C. § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence."  *Randolph v. Griffin*, 816 F. App'x 520, 523 (2d Cir. 2020) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)).  A corrections officer may be liable under a failure-to-intervene theory if: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1998)), *aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012).

### C.    Standard Governing a Retaliation Claim Pursuant to the First Amendment

To establish a claim of retaliation under the First Amendment, a plaintiff must present evidence that: (1) he engaged in speech or conduct that was "protected;" (2) the defendants took an "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).  The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular

36

care," since "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489,491 (2d Cir. 2001), *overruled on other grounds* by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

Indeed, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." *Rucano v. Annucci*, 18-CV-0218, 2021 WL 3293504 (N.D.N.Y. May 19, 2021) (citing *Green v. Phillips*, 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006)); *see also Williams v. Goord*, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial.") (internal quotation marks and citation omitted).

"Allegations, although specific, 'may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.'" *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

It is undisputed that filing a grievance or commencement of a lawsuit constitute protected activity. *See Zimmerman v. Racette*, 17-CV-0375, 2020 WL 3038275, at *16 (N.D.N.Y. Jan. 24, 2020), *report and recommendation adopted*, 2020 WL 1329138 (N.D.N.Y. Mar. 23, 2020).

## III.   ANALYSIS

At the outset, Plaintiff's cross-motion for summary judgment (Dkt. No. 149) is denied pursuant to N.D.N.Y. L.R. 56.1(a), which states that "[f]ailure of the moving party to submit an

37

accurate and complete Statement of Material Facts shall result in a denial of the motion."

N.D.N.Y. L.R. 56.1(a) (emphasis in original).  In the alternative, Plaintiff's cross motion for

summary judgment is denied for the reasons set forth below.

### A.    Eighth Amendment Excessive Force/Failure to Intervene Claims

After carefully considering the matter, Defendants' motion for summary judgment

seeking dismissal of Plaintiff's Eighth Amendment excessive force and failure to intervene

claims is granted for the reasons stated in their memoranda of law.  (Dkt. No. 115, Attach. 1 at 9-

26.)  The following is intended to supplement—not supplant—those reasons.

### 1.    Use of Chemical Agents

The only Defendants that Plaintiff alleges used excessive force with respect to the use of

chemical agents are Defendants Tatro and Basford.  More specifically, Plaintiff alleges that

Defendant Tatro authorized the chemical agent and Defendant Basford deployed the chemical

agent.

A court's review of an officer's use of a chemical agent will depend on the manner in

which the chemical agent was used.  *See Quinones v. Rollison*, 18-CV-1170, 2020 WL 6420181,

at *4-5 (S.D.N.Y. Nov. 1, 2020) (explaining that the inquiry is "context specific'") (citations

omitted).  Courts have found that the use of a chemical agent to maintain or restore discipline

among incarcerated individuals does not amount to excessive force "if the force was applied in a

good-faith effort."  *Stinson v. City of New York*, 18-CV-0027, 2021 WL 3438284, at *13

(S.D.N.Y. July 6, 2021); *see also Beauvoir v. Falco*, 345 F. Supp. 3d 350, 369 (S.D.N.Y. 2018)

(granting defendants summary judgment in a § 1983 case because the "use of the pepper spray . .

. was permissible in the context of needing to maintain a baseline of order in the prison system,"

where "Plaintiff repeatedly resisted multiple officers' orders"); *Berry v. City of New York*, 12-

CV-7819, 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014) (granting summary judgment in favor of officer where he used pepper spray to break up violent fight between inmates); *Boomer v. Lanigan*, 00-CV-5540, 2002 WL 31413804, at *5-6 (S.D.N.Y. Oct. 25, 2002) (holding that correction officer did not use excessive force when he sprayed "chemical agent" at pre-trial detainee, after detainee refused to follow repeated orders to remove his arm from food slot in his cell).

The record is clear that Defendant Basford sprayed the chemical agent into Plaintiff's cell. (Dkt. No. 115, Attach. 17 at ¶ 10.) "He alone, therefore, could be the proper Defendant to such a claim." *Mason v. Moore*, 17-CV-1086, 2020 WL 555943, at *3 (N.D.N.Y. Jan. 13, 2020) (Stewart, M.J.), *report and recommendation adopted*, 2020 WL 554816 (N.D.N.Y. February 4, 2020) (Sharpe, J.).

The record fails to establish any degree of the wantonness required to assert an Eighth Amendment claim. The cell extraction resulted from Plaintiff's refusal to leave his cell. (Dkt. No. 115, Attach. 5 at 45 ["Q: Did -- did Sergeant Basford then order you to exit your cell so that they could search the cell? A: Right."]; Dkt. No. 117 at 00:24; Dkt. No. 115, Attach. 17 at ¶¶ 6-10; Dkt. No. 115, Attach. 15 at ¶ 6; Dkt. No. 115, Attach. 24 at ¶ 6; Dkt. No. 115, Attach. 27 at ¶ 6; Dkt. No. 115, Attach. 29 at ¶ 9; Dkt. No. 115, Attach. 31 at ¶ 7; Dkt. No. 115, Attach. 33 at ¶ 6; Dkt. No. 115, Attach. 35 at ¶ 6; Dkt. No. 115, Attach. 39 at ¶¶ 6-8.) The record establishes that security staff made numerous attempts to get Plaintiff to exit his cell before resorting to an extraction, including (1) direct orders from Defendant Tatro, (2) direct orders from other DOCCS employees, (3) DOCCS's Crisis Intervention Unit spoke with Plaintiff, and (4) the assembly of a cell extraction team. (Dkt. No. 115, Attach. 39 at ¶¶ 5-8; Dkt. No. 115, Attach. 17 at ¶ 9; Dkt. No. 115, Attach. 20; Dkt. No. 115, Attach. 5 at 48 ["Q: Were you aware that there

39

was an extraction team that was outside your cell on May 18th?  A: What you mean extraction?  Yes. . . .  Q: So, officers waiting to extract you out of your cell?  A: Right.  Q: Okay.  So you were aware that there was officers outside your cell?  A: I could see them."].)  After the incident, Plaintiff was immediately taken to a decontamination shower.  (Dkt. No. 117 at 02:15-03:12; Dkt. No. 115, Attach. 5 at 50; Dkt. No. 115, Attach. 15 at ¶ 6; Dkt. No. 115, Attach. 17 at ¶ 10; Dkt. No. 115, Attach. 24 at ¶ 6; Dkt. No. 115, Attach. 27 at ¶ 6; Dkt. No. 115, Attach. 29 at ¶ 9; Dkt. No. 115, Attach. 31 at ¶ 7; Dkt. No. 115, Attach. 33 at ¶ 6; Dkt. No. 115, Attach. 35 at ¶ 6; Dkt. No. 115, Attach. 39 at ¶ 8.)

"In evaluating the use of a chemical agent in a prison setting, courts have refused to find actionable conduct where, as here, the deployment was used in a good-faith effort to maintain or restore discipline."  *Mason v. Moore*, 2020 WL 555943, at *3 (quoting *Anderson v. Darby*, 15-CV-0635, 2017 WL 933085, at *5 (E.D.N.Y. Feb. 13, 2017), *report and recommendation adopted*, 2017 WL 927611 (E.D.N.Y. Mar. 6, 2017)).

Moreover, because Plaintiff's primary excessive force claim regarding the use of chemical agents is dismissed, the corresponding failure to intervene claim must also be dismissed.  *Posner v. City of New York*, 11-CV-4859, 2014 WL 185880, at *8 (S.D.N.Y. Jan. 16, 2014); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012).  In the alternative, as set forth in Defendants' moving memorandum of law, Plaintiff "has not and cannot present any evidence from which a jury could conclude that Defendants were in a position to prevent any harm from occurring" where the "chemical agents were deployed in two, 1-second bursts, which did not provide any of the other defendants an opportunity to intervene."  (Dkt. No. 115, Attach. 1 at 18-19.)

For each of these reasons, Defendants' motion for summary judgment is granted as to any Eighth Amendment claim regarding the use of chemical agents.

### 2. Handcuffs

"[W]hile handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008). Rather, courts have held that tight handcuffing gives rise to an Eighth Amendment claim when "1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) [there is a] degree of injury to the wrists." *Boyd v. Doe #1*, 18-CV-1333, 2019 WL 1771501, at *8 (N.D.N.Y. Apr. 23, 2019) (McAvoy, J.) (quoting *Lynch ex rel. Lynch*, 567 F. Supp. 2d at 468; *citing Benitez v. Locastro*, 04-CV-0423, 2010 WL 419999, at *1, *12 (N.D.N.Y. Jan. 29, 2010) (Mordue, C.J.) (dismissing Eighth Amendment claim based on tight handcuffing where plaintiff failed to "allege for how long the handcuffs and shackles were applied, [ ]or the circumstances of their application")).

As set forth by Defendants, at no point while being handcuffed or during his escort to the decontamination room did Plaintiff complain that his handcuffs were too tight or that anyone was twisting or pulling on the handcuffs. (Dkt. No. 117 at 01:20-03:03.) Although Plaintiff's handcuffs are not visible for the entire duration of his escort to the decontamination room, when they are out of view, it is still clear that no one was twisting or pulling on the handcuffs based on the body positioning of Defendants. (*Id.*) In addition, Plaintiff's allegation that he complained about his handcuffs while in the decontamination room is contradicted by the video footage. (*Id.* at 03:04-04:17.) It was not until Plaintiff was examined by the nurse that he complained about his handcuffs or wrists. (*Id.* at 06:58.) Plaintiff's handcuffs were removed approximately seven minutes later after he was photographed. (*Id.* at 14:38.)

41

Thus, Plaintiff fails to establish the subjective prong that the handcuffs were applied in a way that was "maliciously or sadistically to cause harm." *Harris*, 818 F.3d at 63. Moreover, Plaintiff fails to present evidence that he sustained more than a *de minimis* injury from the allegedly tight handcuffs.

Further, because Plaintiff's primary excessive force claim regarding the use of handcuffs is dismissed, the corresponding failure to intervene claim must also be dismissed. *Posner v. City of New York*, 11-CV-4859, 2014 WL 185880, at *8.

In the alternative, any claims against Defendant Paige are dismissed for lack of personal involvement. (Dkt. No. 115, Attach. 1 at 23; Dkt. No. 115, Attach. 36.) Any failure to intervene claims against Defendants Tatro, Basford, Barnes, Mailloux, Jeffrey, Dunning, and Locke are dismissed, in the alternative, because Plaintiff fails to demonstrate that a reasonable person in their position would know that Plaintiff's constitutional rights were being violated.

For each of these reasons, Defendants' motion for summary judgment is granted as to any Eighth Amendment claim regarding the use of handcuffs.

### 3.    Decontamination Shower

The video establishes that Plaintiff was able to speak to Defendants while in the decontamination room and was only in the decontamination room for approximately 60 seconds. (Dkt. No. 117 at 03:15-04:15.) Although Plaintiff is not visible in the video, he is right off screen and the video is clear that Plaintiff was not lifted in the air or dropped on the floor as he alleges. (*Id.*) Although Plaintiff complains during the video of difficulty breathing (Dkt. No. 117 at 03:20), he continues to vocalize complaints about breathing even after exiting the decontamination room (*id.* at 06:25, 7:19).

42

To the extent that Plaintiff's decontamination claim is premised on Defendants "drowning" him in the shower it must also be dismissed.  Defendants can be heard in the video instructing Plaintiff to look up at the water to flush his eyes of the chemical agent.  (Dkt. No. 117 at 03:25, 03:40, 03:53.)  Hence, the objective of the decontamination process involved Plaintiff's head being under the water.

Further, because Plaintiff's primary excessive force claim regarding the decontamination shower is dismissed, the corresponding failure to intervene claim must also be dismissed.[114] *Posner v. City of New York*, 11-CV-4859, 2014 WL 185880, at *8.

For each of these reasons, Defendants' motion for summary judgment is granted as to any Eighth Amendment claim regarding the decontamination shower.

## B.      First Amendment Retaliation Claims

After carefully considering the matter, Defendants' motion for summary judgment seeking dismissal of Plaintiff's First Amendment retaliation claims is granted.[115]

As an initial matter, the adverse action that Plaintiff asserts Defendants Locke, Basford, Lamica, and Dunning took was using excessive force.  Because Plaintiff's underlying excessive

---

[114]    In the alternative, Plaintiff's claim against Defendant Paige is dismissed for lack of personal involvement.  (Dkt. No. 115, Attach. 1 at 25; Dkt. No. 115, Attach. 36.)

[115]    To the extent that Defendants argue that Plaintiff "cannot set forth sufficient evidence that the alleged retaliatory action was adverse enough to deter him from exercising his constitutional rights," the Court rejects that argument.  (Dkt. No. 115, Attach. 1 at 28, *accord* Dkt. No. 115, Attach. 1 at 33-35; Dkt. No. 161, Attach. 1 at 18, 20, 21, 22.)  Plaintiff must demonstrate that Defendants took an adverse action against him that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)); *accord Persaud v. City of New York*, 22-CV-2919, 2024 WL 2159852, at *4 (S.D.N.Y. May 14, 2024) (citing *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021)).  "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).

force claims are dismissed, he fails to establish that Defendants Locke, Basford, Lamica, and

Dunning took any adverse action against him.

### 1.    Defendant Locke

Moreover, in the alternative, Plaintiff fails to establish a causal connection between his

alleged protected conduct—in commencing *Barnes I*—and the incident at issue in this action.

Plaintiff only raises temporal proximity as a basis for inferring a causal connection.  (Dkt. No.

149, Attach. 3.)  However, temporal proximity alone "is insufficient to defeat [a motion for]

summary judgment."[116]  *Schmiege v. Stachowski*, 22-CV-1371, 2026 WL 698799, at *5

(N.D.N.Y. Mar. 12, 2026) (Coombe, J.) (citing *Williams v. King*, 763 F. App'x 36, 38-39 (2d Cir.

2019) ("The only evidence demonstrating a retaliatory motive is temporal proximity which,

alone, is insufficient to defeat summary judgment.").

---

[116]    Moreover, even if temporal proximity alone was sufficient to defeat a motion for summary judgment, the proximity of *Barnes I* to the events on May 18, 2020, does not strongly favor an inference of causation.  While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation cases, *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009), a gap of approximately sixteen-months is longer than most that are found to support a causal connection.  *See, e.g., Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (finding five-month gap sufficiently short to support inference of causal connection); *Espinal*, 558 F.3d at 129 (finding six-month gap sufficiently short).  However, it is relevant that *Barnes I* was ongoing at the time of the incident on May 18, 2020.  *See Cruz v. Lee*, 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing).  Given that the *Barnes I* was ongoing, but Plaintiff does not identify anything relevant occurred in the lawsuit near in time to the alleged retaliatory acts, and the suit was filed approximately sixteen months prior to the alleged acts, this factor would not strongly favor an inference of causation.  *See Lewis v. Hanson*, 18-CV-0012, 2022 WL 991729, at *21 (N.D.N.Y. Mar. 31, 2022) (Kahn, J.) (finding that because the underlying lawsuit "was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.").

### 2.    Defendant Basford

In the alternative, as set forth above, in part III.B.1., temporal proximity alone is insufficient to withstand a motion for summary judgment.  Plaintiff's only purported basis for establishing a causal connection between Plaintiff's protected conduct in filing grievance UST-0295-20 and the incident on May 18, 2020, is temporal proximity.  (Dkt. No. 149, Attach. 3 at 10 ["this constitutionally protected conduct engagement on May 15, 2020 its close proximity of three(3) days after investigation of defendant Basford is eerily shocking to conscience . . ."]; Dkt. No. 149, Attach. 3 at 20 ["plaintiff engaged in constitutionally protected conduct [that] is just so chillingly shockingly eerie how close of a causal connection the proximity is of Basford retaliation and the totality of the heartlessness of his extremes."].)

### 3.    Defendant Lamica

In the alternative, as set forth above, in part III.B.1., temporal proximity alone is insufficient to withstand a motion for summary judgment.  Moreover, as set forth above in note 116, even if temporal proximity alone was sufficient to defeat a motion for summary judgment, the proximity of *Barnes I* to the events on May 18, 2020, does not strongly favor an inference of causation.  (Dkt. No. 149, Attach. 3 at 21.)  To the extent that Plaintiff attempts to assert that the filing of *Barnes III* was the protected conduct, it post-dates the alleged adverse action here and thus, cannot be causally connected.  (*Id.*)

### 4.    Defendant Dunning

As set forth above, in part III.B.1., temporal proximity alone is insufficient to withstand a motion for summary judgment.  Moreover, as set forth above in note 116, even if temporal proximity alone was sufficient to defeat a motion for summary judgment, the proximity of

*Barnes II*, which was commenced in 2013, to the events on May 18, 2020, does not strongly favor an inference of causation.

For each of these reasons, Defendants' motion for summary judgment is granted as to any First Amendment retaliation claims.

## IV.    MOTION TO COMPEL

A mandatory pretrial discovery and scheduling order was issued on October 4, 2023. (Dkt. No. 27.)  The Court ordered that discovery shall be completed by April 4, 2024.  (*Id*. at 5.) That deadline was later extended until May 20, 2024 (Dkt. No. 53), July 19, 2024 (Dkt. No. 55), September 17, 2024 (Dkt. No. 61), November 1, 2024 (Dkt. No. 65), and January 3, 2025 (Dkt. No. 72).  Local Rule 16.2 provides in relevant part that "[p]arties shall file and serve motions to compel discovery no later than fourteen (14) days after the discovery cut-off."  To the extent that Plaintiff's cross-motion for summary judgment and response in opposition to Defendants' motion for summary judgment is construed as a motion to compel pursuant to Fed. R. Civ. P. 37 (Dkt. No. 149, Attach. 3 at 16-17), it was filed more than nine months after the discovery deadline.  Plaintiff's motion is therefore untimely.[117]

Even if timely filed, Plaintiff's Fed. R. Civ. P. 37 motion to compel, which the Court treats as a motion pursuant to Fed. R. Civ. P. 56(d), is nevertheless denied.  Under Fed. R. Civ. P. 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any

---

[117]    Plaintiff's motion to compel is perplexing considering that he simultaneously filed a cross-motion for summary judgment.  (*See generally* Dkt. No. 149.)  "Having filed a motion for . . . summary judgment, logic dictates that Plaintiff must have determined that he did not require any additional information to advance his legal and/or factual arguments."  *Rodriguez v. Gusman*, 22-CV-0181, 2024 WL 4463459, at \*12 n.7 (N.D.N.Y. July 24, 2024) (Katz, M.J.)

other appropriate order." Fed. R. Civ. P. 56(d). A party resisting summary judgment on the basis that it needs discovery must submit an affidavit showing the following: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (internal quotations and citation omitted). Relatedly, a discovery schedule set by the court can only be modified for good cause, which "depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

Plaintiff has made no showing that he has been deprived of any information that is germane to the prosecution of his cross motion for summary judgment or to the defense of Defendants' motion for summary judgment. Absent from Plaintiff's submission is any plausible explanation as to how the information he seeks is relevant to the alleged deprivation of his constitutional rights and how Defendants retaliated and used excessive force. The information Plaintiff seeks production of is not material to whether Defendants used unreasonable force sadistically and maliciously on May 18, 2020.

Under these circumstances, Plaintiff has not shown good cause for reopening discovery at this late stage. Accordingly, Plaintiff's request is denied. *See Lundstedt v. JP Morgan Chase Bank, N.A.*, 853 F. App'x 704, 708 (2d Cir. 2021) (upholding the district court's decision to not reopen discovery where the *pro se* plaintiff had "ample time to identify and disclose an expert witness during the discovery period").

**ACCORDINGLY**, it is

47

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 115) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 149) is **DENIED**; and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 77) is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's motion to compel discovery (Dkt. No. 149) and motion to defer consideration of Defendants' motion for summary judgment is **DENIED**; and it is further

**ORDERED** that the Clerk of Court shall enter Judgment for Defendants and close this action; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Decision and Order on the docket of this case and serve a copy upon the parties in accordance with the local rules.[118]

Dated: March 24, 2026
        Binghamton, New York

_Miroslav Lovric_
Miroslav Lovric
U.S. Magistrate Judge

---

[118]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

48

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 49 of 427

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

🚩 KeyCite Yellow Flag

Distinguished by   Urena v. City of New York,   S.D.N.Y.,   September 10, 2024

2017 WL 933085
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Kyle D. ANDERSON, Plaintiff,

v.

DARBY, Officer Badge #3767, Ludewig,
officer, and Paz, Sgt. Badge #26, Defendants.

CV 15-0635 (JFB) (GRB)
|
Signed 02/13/2017

**Attorneys and Law Firms**

Kyle D. Anderson, Hempstead, NY, pro se.

Thomas Lai, Nassau County Attorney Office, Mineola, NY, for Defendants.

### REPORT AND RECOMMENDATION

GARY R. BROWN, United States Magistrate Judge

**\*1**  Plaintiff, KYLE D. ANDERSON, proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983, seeking redress for alleged improper treatment during his incarceration at the Nassau County Correctional Center ("NCCC"), most notably, the use of "O.C. Spray,"[1] by the defendants during an altercation. Defendants, CORRECTION OFFICER MICHAEL DALY, Shield #3076 s/h/a DARBY, Officer Badge #3767; CORRECTION OFFICER GLENN LUDEWIG, Badge #2760 s/h/a LUDEWIG, officer, and SERGEANT PAV, Shield #296 s/h/a PAZ, Sgt. Badge #26, (hereinafter referred to as the "Defendants") move for summary judgment, which motion has been referred to the undersigned for report and recommendation. For the reasons set forth herein, it is respectfully recommended that the Court grant that motion in all respects. **For avoidance of doubt or confusion, plaintiff is hereby cautioned, as discussed in the Objections section at the end of this Report and Recommendation, that failure to file objections within fourteen (14) days will preclude further review of this report and**

**recommendation either by the District Court or Court of Appeals.**

**Procedural History**

Plaintiff commenced this action by the filing of a complaint on or about February 2, 2015, seeking compensatory damages in the amount of $1.8 million.[2] DE 1. Defendants filed an answer on May 4, 2015. DE 11. Consistent with the Scheduling Order and the rules of this Court, plaintiff filed a narrative statement on June 17, 2015, which he later revised, and defendants filed a responsive statement on July 29, 2015. DEs 14-15, 21. On March 23, 2016, defendants filed the instant motion for summary judgment, which included all of the requisite notices and filings, including the mandated notice to a *pro se* as well as a 56.1 statement. DE 29. On October 6, 2016, the motion was referred to the undersigned for report and recommendation. DE 31.

On May 2, 2016, plaintiff requested an extension to respond to the summary judgment motion, which request was granted, and the Court allowed plaintiff until June 17, 2016 to file his opposition papers. DE 30; Electronic Order dated 5/4/2016. No response was filed by that date. On November 28, 2016, plaintiff filed a letter seeking a second extension of time to respond to the summary judgment motion, which extension was granted, allowing plaintiff to file a response by January 20, 2017. DEs 32-33. Notwithstanding the grant of two extensions of time, and the failure of plaintiff to comply with the first court-imposed deadline, to date no response to the motion has been received by the Court.

**Facts**

**\*2**  The uncontested facts, largely taken from defendants' statement pursuant to Local Rule 56.1, include the following:

Plaintiff was an inmate at NCCC in or around December 2014, during which time an altercation occurred resulting in the plaintiff being sprayed with pepper spray. DE 29-12, ¶ 1. Well before the incident, upon admission to NCCC, consistent with standard practice, plaintiff was issued a copy of a booklet entitled "Inmate Handbook," which is also known as the Inmate Rules and Regulations, receipt of which was acknowledged by the plaintiff. *Id.* ¶¶ 6-7 (citing Ex. C thereto). Importantly, the handbook contains instructions concerning grievance procedures at the facility. *Id.*

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 50 of 427

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

On or about December 18, 2014,[3] defendant Daly ("CO Daly") was assigned to the NCCC, working as a Patrol Officer in the E02-E housing area. *Id.* ¶¶ 9-10. CO Daly advised Plaintiff that he needed to return his shaving razor because medical unit staff was on post to distribute medication. *Id.* ¶ 11. Although plaintiff complied with CO Daly's directive to return his shaving razor, he became enraged and aggressive. *Id.* ¶¶ 12-13. CO Daly ordered Plaintiff to lock in his cell during the medication distribution, and plaintiff again complied with this directive. *Id.* ¶¶ 14-15. CO Daly escorted the nurse over to Plaintiff's cell, and opened the "feeding slot" to supervise Plaintiff receiving his medication, but plaintiff refused his medication. *Id.* ¶¶ 16-18.

At this point, according to all accounts (including the plaintiff's own characterization of his behavior), plaintiff stated "Go f**k yourself pig!" to Daly and the nurse. *Id.* ¶ 19; *cf.* DE 21. Plaintiff contends that his aggressive behavior toward the guards was incited, in part, by their use of inappropriate language with him. DE 21. After escorting the nurse from the area, Daly returned to secure the feeding slot. DE 29-12, ¶¶ 20-21. Plaintiff continued to act aggressively, stating "F**k you pigs, I don't respect you;" "I will bury all of you p*ssies on this floor;" and "I hope you open my gate." *Id.* ¶ 22. Daly directed Plaintiff to move his hands so that he could close the feeding slot. *Id.* ¶ 23. Not only did plaintiff refuse, but plaintiff proceeded to grab CO Daly's right arm and pulled CO Daly into the feeing slot and attempted to spit at CO Daly through the side crack in the cell gate. *Id.* ¶¶ 24-25.

Daly issued loud verbal commands for Plaintiff to let go of his arm. *Id.* Notwithstanding loud verbal commands to release the corrections officer, Anderson continued to pull CO Daly into the feeding slot. *Id.* ¶¶ 26-27. Still being held by the plaintiff, Daly deployed four bursts of pepper spray to Plaintiff's face, causing plaintiff to release the officer. *Id.* ¶¶ 28-29. According to medical records, Plaintiff was provided with medical treatment, and the only injury received was a burning sensation to both eyes. *Id.* ¶¶ 30-31; *see* Exhibit J. Plaintiff alleges little more injury other than this. *See* DE 1 at 4 (complaining of "burning" of face and broken skin on nose). Daly was not as fortunate, receiving injuries that required hospital treatment. *Id.* ¶¶ 32-33; *see* Exhibit G.

  **\*3**  On January 5, 2015, Plaintiff filed a grievance arguably related to this incident. DE 29-12, ¶ 34; *see* Exhibit D. The substance of that grievance related not to the use of force, but rather the fact that he had to wait nine and a half hours before a mattress was provided to him. *See* DE 29-12,

¶¶ 36-37. At the same time, the grievance also requested that unspecified "misconduct" of correction officers on E2-E block be investigated. *Id.* ¶¶ 38-39. Consistent with the facility's policy, the grievance was reviewed by a grievance coordinator, who decided to forward the grievance for the purpose of investigating Plaintiff's claims of staff misconduct. *Id.* ¶ 40. Plaintiff signed the grievance form acknowledging his acceptance of the grievance coordinator's decision. *Id.* ¶ 41. No appeal was ever taken from the grievance decision. *Id.*

## Discussion

### Standard of Review

When considering a dispositive motion made against *pro se* litigants, the Court is mindful that a *pro se* party's pleadings must be liberally construed in favor of that party and are held to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Where, as here, a party seeks summary judgment against a *pro se* litigant, the situation "demands that the Court liberally construe plaintiff's submissions to 'raise the strongest arguments that they suggest.' " *Parris v. Acme Bus Corp.*, 956 F. Supp. 2d 384, 389 (E.D.N.Y. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002).

In all other respects, this motion for summary judgment is decided under the oft-repeated and well understood standard for review of such matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd sub nom. Bartels v. Schwarz*, 643 Fed.Appx. 54 (2d Cir. 2016), which discussion is incorporated by reference herein.

### Determining the Undisputed Facts

As noted, despite repeated adjournments granted to plaintiff over many months, plaintiff has supplied no response to the instant motion. This includes the filing of a Rule 56.1 counterstatement, the absence of which may justify accepting all of the facts in defendant's statement as true. However, as the Court held in *Young v. Nassau University Medical Center*:

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 51 of 427

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

The Court notes that plaintiff has failed to file and serve a response to defendant's Rule 56.1 statement of facts, in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y. 2003) (*quoting NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 U.S. Dist. LEXIS 23397, at *4–5, 04 Civ. 2935 (E.D.N.Y. Apr. 25, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Accordingly, in the exercise of its broad discretion and given plaintiff's pro se status, the Court will overlook this defect and will deem admitted only those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504. Thus, in the instant case, although plaintiff has failed to submit any opposition to defendant's motion, the Court has carefully reviewed the evidence submitted in the moving papers and determined that the undisputed facts demonstrate that her claims create no material issues of fact and cannot survive summary judgment ....

 **\*4** No. 10-cv-00649 (JFB)(ARL), 2011 WL 6748500, at n.2 (E.D.N.Y. Dec. 22, 2011). In a similar exercise of discretion, the undersigned has carefully reviewed the factual assertions contained in defendants' 56.1 statement against all filings on record, including the complaint, various narrative statements and summary judgment exhibits. By and large, there is little dispute over the facts herein, and no material issues are apparent.

### Failure to Exhaust Administrative Remedies under the PLRA

Defendants' principal argument on this motion is that plaintiff failed to exhaust his administrative remedies, such that the claims herein are barred under the Prisoner Litigation Reform Act ("PLRA"). As this Court recently observed:

The PLRA states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) (*quoting Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings" *Woodford v. Ngo,* 548 U.S. 81, 90–91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal,* 558 F.3d at 124 (*citing Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Woodford,* 548 U.S. at 88–90, 126 S.Ct. 2378).

Prior to *Woodford,* the Second Circuit

recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result, or if the inmate has been deterred by intimidation; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance.

*Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir. 2007)(internal citations omitted); *see also Davis v. New York,* 311 Fed.Appx. 397, 399 (2d Cir. 2009) (*citing*

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 52 of 427

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

*Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004)). Initially, it was unclear whether the above-discussed considerations would be impacted by *Woodford. See, e.g., Reynoso,* 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre-*Woodford* case law."). However, even after *Woodford,* the Second Circuit has continued to hold that an inmate's failure to comply with the exhaustion requirement may be excused on these grounds. *See Messa v. Goord,* 652 F.3d 305, 309 (2d Cir. 2011) (*citing Hemphill* factors).

**\*5** *Angulo v. Nassau County*, 89 F. Supp. 3d 541, 549–50 (E.D.N.Y. 2015)(granting summary judgment for a *pro se* plaintiff's failure to exhaust administrative remedies). Applying this analysis to the instant case reveals that, like the plaintiff in *Angulo*, plaintiff has failed to exhaust his administrative remedies.

Plaintiff's administrative filing proves deficient in three ways. First, irrespective of whether counted from December 14 or 18, the filing of a grievance by plaintiff on January 5, 2015 failed to comport with the five-day deadline for filing. Thus, the grievance was not timely filed, and therefore represents an insufficient effort to exhaust state remedies. This, however, may be overlooked, as prison officials processed the grievance notwithstanding its untimeliness.

Second, the grievance filed deals only with the failure to promptly supply him with a mattress on the date in question, and makes no mention of the use of force in the body of the grievance. Thus, with respect to the principal claim here —to wit: the use of pepper spray—plaintiff did not even take the first step in pursing administrative remedies. In his complaint, plaintiff essentially acknowledges this fact: he alleges exhaustion by "writing grievance of another matter," which resulted in an "Internal Affairs Unit Investigation into defendants." DE 1 at 2.

The final procedural lapse on the part of defendant was his failure to appeal the grievance decision. Thus, even if plaintiff's oblique reference to officer "misconduct" were construed as encompassing the excessive force alleged herein, he has still failed to exhaust his administrative remedies by failing to appeal. Plaintiff reviewed and signed the grievance decision, having checked a box that notes he had "read and accept[ed]" that decision, while checking the box immediately below it would have reflected his intention to "appeal." There is no dispute that the handbook provides for a multi-step process, including appeals. DE 29-12, Ex. C; *compare Angulo,* 89 F. Supp. 3d at 546–47 (describing NCCC's "three-part grievance process" including right to appeal). "[P]roper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford*, 548 U.S. at 90) (emphasis in original). This requires a plaintiff, as a prerequisite to bringing an action "to exhaust all levels of administrative appeal of those grievances." *Angulo*, 89 F. Supp. 3d at 551.

The only remaining question, then, is whether any of the *Hemphill* factors would warrant excusing the non-exhaustion. Plaintiff makes a half-hearted attempt at such a justification: in the complaint, he mentions endeavors to justify his failures by noting "direct grievance against officers would have severe repercussions for me." DE 1 at 2. On the unusual facts of this case, this justification is unpersuasive: plaintiff grievanced requesting "misconduct of E2-E officers handling of inmates in their custody," but now claims to have feared unspecified retaliation from filing such a grievance. DE 29-5.

### The Merits

Due to plaintiffs' undisputed failure to exhaust his state administrative remedies, the action is precluded by the terms of the PLRA. However, even assuming, *arguendo*, the Court were to consider the underlying merits, summary judgment would be equally appropriate. The undisputed facts here describe a situation in which an inmate physically attacked and injured a prison guard; the defendant's use of pepper spray in this situation appears to have been more than reasonable under the circumstances, and certainly could not be construed as a violation of plaintiff's rights. In evaluating the use of a chemical agent in a prison setting, courts have refused to find actionable conduct where, as here, the deployment was used " 'in a good-faith effort to maintain or restore discipline.' " *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 501 (S.D.N.Y. 2014) (quoting *Lewis v. Clarkstown Police Dep't*, No. 11-CV-2487, 2014 WL 1364935, at \*4 (S.D.N.Y. Mar. 31, 2014)). As to the "objective" element of an excessive force claim, the injury alleged here, consisting of nothing more than "a chemical agent which cause[d] burning to [his] eyes and skin," without more, similarly fails to rise to the level of a constitutional claim. *Id.* at 500. Thus, summary judgment

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 53 of 427

in favor of defendants is warranted both because of procedural defaults under the PSRA and as a substantive matter.

## CONCLUSION

**\*6**  For the foregoing reasons, it is respectfully recommended that defendants' motion for summary judgment be GRANTED in all respects.

## OBJECTIONS

A copy of this Report and Recommendation is being provided to counsel for the defendants via ECF, and a copy is being mailed to the plaintiff. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. **Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court or Appeals.** *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

**All Citations**

Not Reported in Fed. Supp., 2017 WL 933085

## Footnotes

1    The parties' repeated references to "O.C." apparently refers to oleoresin capsicum, the active ingredient in the self-defense product commonly known as pepper spray.

2    Some time later, plaintiff filed an action against three other guards which involved, among other things, a separate incident involving use of pepper spray. DE 10, referencing 15-CV-1961. That action has been dismissed for lack of prosecution. *See generally Anderson v. Carr*, Docket 15-CV-1961 (JFB)(GRB).

3    There is some question about whether the events at issue occurred on December 14 or 18, a dispute I find immaterial for present purposes. *See id*, ¶ 8.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Anderson v. Darby, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 54 of 427

2017 WL 927611
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Kyle D. ANDERSON, Plaintiff,
v.
DARBY, Officer Badge #3767, Ludewig,
officer, and Paz, Sgt. Badge #26, Defendants.

CV 15-635 (JFB)(GRB)
|
Signed 03/06/2017

**Attorneys and Law Firms**

Kyle D. Anderson, Hempstead, NY, pro se.

Thomas Lai, Nassau County Attorney Office, Mineola, NY, for Defendants.

ORDER

Joseph F. Bianco, United States District Judge

**\*1**  Before the Court is a Report and Recommendation ("R&R," ECF No. 59) from Magistrate Judge Brown recommending that the Court grant defendants Darby, Ludewig, and Paz's ("defendants") motions for summary judgment (ECF No. 29). The R&R instructed that any objections to the R&R be submitted within fourteen (14) days of service of the R&R. (*See* R&R, dated February 13, 2017, at 10.) The Court mailed the R&R to plaintiff on February 13, 2017, and the date for filing any objections has accordingly since expired. *See Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996) ("Normally it is assumed that a mailed document is received three days after its mailing."). Plaintiff has not filed any objections to the R&R. Therefore, for the reasons set forth below, the Court adopts the thorough and well-reasoned R&R in its entirety and grants defendants' motion for summary judgment.

Where there are no objections, the Court may adopt the report and recommendation without *de novo* review. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings."); *see also Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."); *cf.* 28 U.S.C. § 636(b)(1)(c) *and* Fed. R. Civ. P. 72(b)(3) (requiring *de novo* review after objections). Because the failure to file timely objections is not jurisdictional, however, a district judge may still excuse the failure to object in a timely manner and exercise its discretion to decide the case on the merits to, for example, prevent plain error. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) ("[B]ecause the waiver rule is non jurisdictional, we 'may excuse the default in the interests of justice.' " (quoting *Thomas,* 474 U.S. at 155)).

Although plaintiff has waived any objections to the R&R and thus *de novo* review is not required, the Court has conducted a *de novo* review of the R&R in an abundance of caution. Having conducted a review of the full record and the applicable law, and having reviewed the R&R *de novo*, the Court adopts the findings and recommendations contained in the well-reasoned and thorough R&R in their entirety. Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment is granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 927611

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 419999
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,

v.

J. LOCASTRO, Lt.; Lt. Miller; D. Selsky, Dir. of Shu; J. Burns; Sgt. Martens; C. Gummerson, Capt.; J. Rourke, Capt.; M. Bradt; C. Parmiter; J. Burge; T. Eagen, Dir. of Corrections; J. Wilkinson; R. Smith; C.O. Baranska; R.N.S. Lennox; J.Porten; J. Mcnamara; John Does 1–6, C.O.s; R. Smith, R.N.; W. Chilson, Sgt.; Sergeant Colon; R. Considine, C.O.; Psych. Kneeland; V. Konecny; C.O. Clarke; S. Crozier; John Doe, XII, C.O.; Cho Wolczyk; Sergeant Smith; C.O. Miller; S. Yorkey, Sgt.; Sgt. Murley; Lt. Easterbrook; C.O. Loomis; T. Quinn; Sgt. Christopher; C.O. Roux; C.O. Leonello; C.O. Meyers; M. Kessel; G. Maccucci, C.O.; E. Amberman; and M. Melindez, Defendants.

No. 9:04–CV–423 (NAM/RET).
|
Jan. 29, 2010.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, pro se.

Hon Andrew M. Cuomo, Attorney General of the State of New York State, Ed. J. Thompson, Assistant Attorney General, Syracuse, NY.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, N.Y., for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action under 42 U.S.C. § 1983. The amended complaint (Dkt. No. 5) alleges various constitutional deprivations in connection with several incidents at Auburn Correctional Facility in 2001 and 2002. Defendants moved for summary judgment dismissing the action (Dkt. No. 118). Upon referral

pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge Randolph F. Treece issued a thorough Report and Recommendation (Dkt. No. 139) recommending that summary judgment be granted in part and denied in part. Specifically, regarding the Eighth Amendment excessive force/medical indifference claims stemming from the events of July 9, 2002, Magistrate Judge Treece finds questions of fact regarding exhaustion and recommends as follows: that the claims against Nurse R. Smith be dismissed; that summary judgment be denied as to all other July 9, 2002 excessive force claims (*i.e.,* the claims against J. Rourke and the John Doe defendants); and that plaintiff be granted leave to file a second amended complaint to substitute named defendants for the John Doe defendants. Magistrate Judge Treece recommends dismissal of plaintiff's Eighth Amendment conditions-of-confinement claims relative to the following: deprivation orders issued in November 2001 and July 2002; poor cell ventilation due to cell shield; denial of meals; and injuries from tight shackles and cuffs. Magistrate Judge Treece further recommends dismissal of plaintiff's claims that the deprivation, restraint, and cell shield orders were retaliatory. In addition, Magistrate Judge Treece recommends dismissal of plaintiff's due process claims regarding the disciplinary hearings of November 21, 2001, July 11, 2002, and July 16, 2002.

Plaintiff filed an objection (Dkt. No. 140) to certain aspects of the Report and Recommendation. As to all other portions of the Report and Recommendation, by failing to object, plaintiff waives further judicial review. *See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993).* Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of the portions of the Report and Recommendation to which plaintiff objects, specifically the recommendations that the Court dismiss plaintiff's medical indifference claim against Nurse R. Smith stemming from the July 9, 2002 incident, and his Eighth Amendment claims stemming from the deprivation orders issued in November 2001 and July 2002. Upon *de novo* review, the Court agrees with Magistrate Judge Treece's factual summary, analysis, and recommendation regarding these issues. Accordingly, the Court accepts the Report and Recommendation in its entirety.

It is therefore

ORDERED that United States Magistrate Judge Randolph F. Treece's Report and Recommendation (Dkt. No. 139) is accepted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 118) is granted to the extent of dismissing all claims except the Eighth Amendment excessive force claims against Rourke and John Does Nos. 1–6 stemming from the events of July 9, 2002; and it is further

**\*2** ORDERED that plaintiff is granted 30 days from the date of this Memorandum–Decision and Order to file a motion to amend his amended complaint in order to identify John Does Nos. 1–6, which shall include a proposed second amended complaint attached thereto.

IT IS SO ORDERED.

### REPORT–RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Henry Benitez filed this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated during several events that allegedly occurred at Auburn Correctional Facility in 2001 and 2002. Specifically, Plaintiff alleges violations of his constitutional rights as guaranteed by the First Amendment (retaliation), Eighth Amendment (excessive force and conditions of confinement), and Fourteenth Amendment (due process). Dkt. No. 5, Am. Compl. Presently before the Court is Defendants' Motion for Summary Judgment, Dkt. No. 118, which Plaintiff opposes, Dkt. Nos. 137–38.

Previously, this Court issued a Report–Recommendation and Order addressing Defendants' Motion for Judgment on the Pleadings, which was adopted in its entirety by the Honorable Norman A. Mordue, Chief United States District Judge for the Northern District of New York. Dkt. Nos. 106 & 108. Chief Judge Mordue's Order dismissed the following Defendants: Amberman, Christopher, Colon, Easterbrook, Kessel, Konecny, Lennox, Leonello, Loomis, Maccucci, McNamara, Melindez, Meyers, C.O. Miller, Murley, Parmiter, Porten, Quinn, Roux, Sgt. Smith, Wilkinson, and Yorkey. Dkt. No. 108, Order at p. 2.

Defendants' current Motion is brought on behalf of the remaining Defendants.[1] For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **GRANTED in part** and **DENIED in part.**[2]

## I. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be

tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Eighth Amendment Claims

1. *Excessive Force and the Events of July 9, 2002*

Plaintiff asserts that "[o]n July 9, 2002, [he] threw a liquid substance through the narrow food port of his cell, striking [Defendants] Lennox and Martens." Dkt. No. 5, Am. Compl. at ¶ 26. Shortly thereafter

Porten, McNamara, and various other guards approached Benitez's cell and ordered him to submit to mechanical restraints. Benitez then requested to be allowed to speak to a captain. Sergeant Vasile (not a defendant) refused, whereupon Benitez threw a liquid substance though the narrow food port on the gate of his cell.

About 10 minutes after the incident described [ ] [above], [Defendant] Rourke walked past Benitez's cell and gave Benitez the finger. Shortly thereafter, Rourke and Defendants John Does Nos. 1–6 approached Benitez's cell. Rourke then asked Benitez whether or not he would come out of his cell. Benitez responded in the affirmative. With a callous and malicious intent to subject Benitez to gratuitous humiliation and punishment, Rourke ordered John Does Nos. 1–6 to forcibly remove Benitez from his cell.

Acting on Rourke's order, John Does Nos. 1–4 rushed into Benitez's cell, whereupon John Doe No. 1 maliciously and sadistically struck Benitez on the top of his head with a large body shield [made of] plexiglas, knocking Benitez on his bed face down and breaking his eyeglasses. John Does Nos. 1–4 then maliciously and sadistically punched Benitez in his face, head, neck, back, rib cage and arms rapidly and repetitiously, and Benitez passed out.

* * *

While punching Benitez about his body, John Does Nos. 1–4 maliciously and sadistically twisted Benitez's hands, fingers, and feet while simultaneously using enormous pressure to tighten too tightly handcuffs and leg irons that had been placed on Benitez.

**\*4** John Does Nos. 1–6 forcibly removed Benitez from his cell and placed him in a strip cell.... There, John Does 1–6 cut Benitez's clothes off of his person. Benitez, who was then experiencing enormous pain about his entire body, was then "examined" by Defendant Nurse R. Smith.... Nurse Smith willfully and knowingly falsely wrote in Benitez's medical chart that he had minor injuries. Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain.

Thereafter, John Does Nos. 1–6 walked Benitez naked cuffed and shackled with a restraining strap from P3–cell into A1–cell. There, John Does 1–3 maliciously and violently slammed Benitez against a metal bed frame, causing Benitez to severely strike his face against the metal bed frame. While forcibly holding Benitez['s] face down on the metal frame, John Does Nos. 1–3 maliciously and sadistically punched Benitez on his face, head, back, rib cage, and arms, even though he did not struggle nor resist. John Does Nos. 1–3 then removed the handcuffs, shackles, and restraining strap from Benitez's person and rushed out of the cell.

*Id.* at ¶¶ 26–33.

Plaintiff alleges to have suffered several injuries as a consequence of the above incidents, including a "laceration in the front of his head," bruising all over his body, and "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." *Id.* at ¶¶ 34–35.

Defendants assert Plaintiff has failed to exhaust all of his claims arising out of the July 9, 2002 incident. The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and

whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

The New York State Department of Corrections has created a three-step grievance process known as the Inmate Grievance Program ("IGP"). *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within twenty-one (21) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(a)(1) (2007). The complaint is then submitted to the Inmate Grievance Resolution Committee (IGRC) to review the grievance. *Id.* at § 701.5(b). Second, if the inmate disagrees with the IGRC decision, then the inmate may appeal to the Superintendent. *See id.* at § 701.5(c). Third, if the inmate disagrees with the Superintendent's determination, an appeal may be taken to the Central Office Review Committee (CORC) who renders a final administrative determination. *Id.* at § 701.5(d). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)).

**\*5** The Second Circuit has suggested a three-step inquiry when, as here, the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667–68 (2d Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 676 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003)[.]

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181–82 (2d Cir.2005).

In response to Defendants' exhaustion argument, Plaintiff asserts that he was unable to exhaust these claims because (1) he was denied a pen and paper from July 9 through August 8, 2002; (2) from August 8–17, 2002, various Defendants refused to submit his outgoing mail and grievances; and (3) on September 4, 2002, he submitted a seven (7) page Grievance concerning the events of July 9th to Officer Hnatiw,[3] but Defendant Parmiter did not process that Grievance in order to obstruct his filing of a federal civil action. Dkt. No. 137, Pl.'s Mem. of Law at pp. 6–9 & Henry Benitez Decl., dated July 15, 2009, at ¶¶ 4–9; *see also* Am. Compl. at ¶¶ 51, 53, 55 & 86.

With respect to Plaintiff's first allegation, Defendants have submitted copies of Deprivation Orders indicating that Plaintiff was denied all in-cell property from, at the latest, July 14, 2002, through, at the earliest, July 25, 2002.[4] Dkt. No. 118–7, Mark L. Bradt Aff., dated Dec. 9, 2008, Ex. C, Deprivation Orders, dated July 9–25, 2002.

As per Plaintiff's second allegation, the record shows that he filed a Grievance, dated August 17, 2002, complaining that several Defendants refused to take his outgoing mail from August 8–17, 2002. Benitez Decl., Ex. B, Grievance, dated Aug. 17, 2002. The record also reflects that two of Plaintiff's Grievances, dated August 8, 2002, were not stamped received by the IGRC until August 21, 2002. Dkt. No. 118–5, Defs.' 7.1 Statement, Ex. P, Grievances, dated Aug. 8, 2002 (stamped received by the IGRC on Aug. 21, 2002). In one of those Grievances, Plaintiff asserted: "[o]n July 9, 2002, I was forcibly moved from SHU cell G–2 to SHU cell A–1 by an extraction team that, among other things, allegedly broke my glasses," and requested information about the status of the repairs to his broken glasses. *Id.,* Ex. P, Grievance, dated Aug. 8, 2002. That Grievance contains no other allegations concerning the events of July 9.

**\*6** With respect to Plaintiff's claim that Parmiter refused to process a Grievance he filed on September 4, 2002, there is no evidence presented before us by either side to support or rebut that claim. However, such allegation was arguably raised, albeit with less specificity, in Plaintiff's Amended Complaint: "from August 8, 2002 to September 12, 2002, Parmiter willfully and knowingly wrongly refused to file

numerous formal grievances submitted by Benitez." Am. Compl. at ¶ 86. [5]

Considering the above allegations about the obstruction of Plaintiff's grievances, and lack of evidence before us regarding those claims, we find that questions of fact exist with respect to whether the Defendants' own actions inhibited Plaintiff's ability to exhaust available administrative remedies, and therefore, whether they should be estopped from asserting the affirmative defense of failure to exhaust. The record shows that Plaintiff was deprived of all in-cell property for most of July 2002 and, as he points out, DOCS regulations require that grievances be submitted within twenty-one (21) days of the alleged occurrence. N.Y. CODES COMP. R. & REGS, tit. 7, § 705.1(a). Thus, it is possible that even if Plaintiff had filed a grievance after the Deprivation Orders were lifted it may have been denied as untimely. As such, there are also questions as to whether "special circumstances" exist that might justify Plaintiff's failure to exhaust. Therefore, we shall proceed to the merits of Plaintiff's claims surrounding the events of July 9, 2002.

Defendants assert that Plaintiff's excessive force claims against John Does Nos. 1–6 should be dismissed for failure to allege personal involvement on the part of any named Defendant. Defs.' Mem. of Law at p. 27. In response, Plaintiff argues that the Defendants' failure to timely respond to his discovery requests delayed the revelation of the John Doe Defendants' identities. Pl.'s Mem. of Law at pp. 2–3. We note that in an Order, dated August 29, 2006, this Court granted Plaintiff's Motions to Compel Defendants to respond to his outstanding discovery requests, some of which concerned the identities of the John Does. Dkt. No. 88 at pp. 6–7. Then, on June 12, 2007, this Court addressed Plaintiff's unopposed Motion for Sanctions against Defendants for their alleged failure to comply with our August 2006 Order; we denied Plaintiff's Motion for Sanctions, but ordered Defendants' compliance with our August 2006 Order. Dkt. No. 91, Order at p. 3.

Plaintiff now asserts that the "Defendants recently complied with the Court's June 12, 2007 Order by disclosing to Benitez the identities of the Defendants at issue." Dkt. No. 137, Pl.'s Mem. of Law at p. 3. [6] Moreover, Plaintiff asserts his intention to seek leave to file a motion to amend his Amended Complaint to assert claims against these would-be Defendants. *Id.* Given the mixed and prolonged history of discovery in this case, we believe it is appropriate to allow Plaintiff to submit a motion to amend his Amended Complaint

in order to identify John Does Nos. 1–6. [7] Therefore, Defendants' Motion is **denied** as to Plaintiff's excessive force claims against John Does Nos. 1–6. Should this Report–Recommendation and Order be adopted by the District Court, we shall afford Plaintiff ***thirty (30) days*** from the date of such adoption to file a motion to amend his Amended Complaint to include the names of John Does Nos. 1–6.

**\*7** Plaintiff's claim against Defendant Rourke should also survive the Defendants' Motion. Although Plaintiff does not allege that Rourke physically participated in the alleged use of excessive force, he claims that Rourke maliciously ordered John Does 1–6 to forcibly remove him from his cell despite his willingness to leave, and then shouted "stop resisting" in order to "encourage John Does Nos. 1–4 to continue to inflict gratuitous humiliation and extreme physical pain on Benitez, even though he knew that Benitez was not resisting John Does Nos. 1–4." Am. Compl. at ¶¶ 29–30. Liberally interpreted, Plaintiff has asserted a claim that Rourke failed to protect him once the alleged beating commenced, and then encouraged the John Does to continue in that conduct. Although the documents Defendants have attached as Exhibit C to their 7.1 Statement support their contention that Rourke had Plaintiff extracted from his cell in order to place him in a different cell with a more secure food hatch so as to prevent his continued throwing of feces on prison staff, [8] nothing in the record answers Plaintiff's allegations that Rourke allowed and encouraged the use of excessive force against him *during* that extraction. Therefore, it is recommended that the Motion be **denied** as to Plaintiff's claims against Rourke.

However, Plaintiff's claims against Defendant Nurse R. Smith should be **dismissed.** Plaintiff's Eighth Amendment claim against Defendant Nurse Smith is that after he was allegedly beaten by John Does Nos. 1–6 during the cell extraction, "Nurse Smith willfully refused to provide Benitez pain relieving medicine, even though she knew that Benitez was then suffering from extreme pain." Am. Compl. at ¶ 32. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183–84 (citing *Chance v. Armstrong,* 143 F.3d

698, 702 (2d Cir.1998) & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)).

Defendants argue that Plaintiff has failed to allege that he suffered from a serious medical injury. Defs.' Mem. of Law at pp. 28–29. Plaintiff alleges that at the time he was presented before Nurse Smith, he was suffering from "extreme pain," but he does not allege the nature of that pain, its location, nor whether he communicated to Nurse Smith the nature or location of any injury he might have suffered or his need for pain medication. Plaintiff does allege that as a result of the excessive force used against him, he suffered a "laceration to the front of his head, and abrasions and multiple areas of bright red bruising on his nose, back, chest, stomach, arms, hands, legs and feet," as well as "permanent nerve damage [to his] [ ] wrists, hands, fingers, and ankles." Am. Compl. at ¶¶ 34–35. However, Plaintiff does not allege that Nurse Smith was made aware of any of those aforementioned injuries, nor does he provide any factual basis for his conclusion that he suffered nerve damage. With respect to his claims of bruises and a laceration (the size and depth of which he does not allege), those generally pleaded injuries do not constitute serious medical conditions under the Eighth Amendment. *See, e.g., Dawes v. Coughlin,* 159 F.3d 1346 (2d Cir.1998) (holding that a small laceration on an inmate's elbow was not a serious injury under the Eighth Amendment); *see also Dallio v. Hebert,* 2009 WL 2258964, at *16 (N.D.N.Y. July 28, 2009) (holding that black eyes, bruising, red spots, kick marks, and lacerations did not constitute a serious medical need). Therefore, we agree with Defendants that Plaintiff's claim that he suffered from a serious medical injury is conclusory and for that reason his claim against Nurse Smith should be **dismissed.** [9]

## 2. *Deprivation Orders*

**\*8** Plaintiff alleges that in November 2001 and July 2002, various Defendants issued Deprivation Orders against him in violation of the Eighth Amendment. [10] Plaintiff's allegations regarding November 2001 are as follows:

> Upon Benitez's arrival at Auburn prisoner's SHU on November 14, 2001, Defendant J. Burns [ ] wantonly filed a Deprivation Order ... against Benitez in retaliation for his having sued Burns and various other Auburn prison employees in 1989. As a result, Benitez was denied the following items and services from November 14 to

November 26, 2001: all allowable in-cell property; sink and toilet water; showers; one-hour outdoor exercise period; and, among other things, law library services. Am. Compl. at ¶ 8.

As for the July 2002 allegations, we summarized those claims in our previous Report–Recommendation addressing Defendants' Motion for Judgment on the Pleadings as follows:

> Plaintiff claims that Defendants Bradt and Chilson either approved or issued unspecified deprivation orders causing Plaintiff to be without the following items and services from July 9 through July 14, 2002: all in-cell property, pen, bed sheets, mattress, toilet tissue, running water, showers, exercise periods, and law library services. Am. Compl. at ¶ 51. Plaintiff also claims that from July 14 through July 25, 2002, and from July 25 through August 8, 2002, Defendants Bradt, Chilson, and Martens approved or issued more unspecified orders depriving him of the same items and services listed above. [11] *Id.* at ¶¶ 53 & 55.

Dkt. No. 106 at pp. 12–13.

Plaintiff also claims in his Amended Complaint that the above-mentioned July 2002 Deprivation Orders were approved of by Defendants Burge, Kneeland, Rourke, Gummerson, and Wolczyk. Am. Compl. at ¶¶ 52, 54, & 56. In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297–99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)). With respect to deprivation orders, the Second Circuit has held that it is appropriate to consider whether the order in question "was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Defendants assert that the Deprivation Orders enforced against Plaintiff were issued for valid penological reasons. Mark L. Bradt was a Deputy Superintendent of Security ("DSS") at Auburn from January 7, 2002 through April 30, 2004. Bradt Aff. at ¶ 1. Bradt avers that "in order to make determinations regarding appropriate levels of security and restraint for the inmates in the prison, [he] frequently consulted the disciplinary histories of the inmates at the prison." *Id.* at ¶ 5. Prior to his arrival at Auburn, Plaintiff had a lengthy disciplinary history, which included the following violations of DOCS rules:

> **\*9** 1. creating a disturbance (5 times); 2. assault on staff (4 times); 3. lewd conduct (8 times); 4. threats (6 times); 5. unhygienic act (11 times); 6. arson (2 times); 7. flooding (2 times); 8. loss or damage to property (3 times); and 9. violent conduct (2 times).

*Id.* & Ex. A, Pl.'s Disciplinary History.

Bradt states that upon Benitez's arrival at Auburn on November 14, 2001, he was issued an order that deprived him of water, all cell property, bucket, and personal property from November 14–25,[12] 2001, because of his history of disruption and throwing things. Bradt Aff. at ¶ 7 & Ex. C, Deprivation Order, dated Nov. 22, 2001. That Deprivation Order was issued by then-DSS John Burns, who rescinded the order on November 26, 2001. *Id.*
On July 9, 2002, Bradt issued Plaintiff an order depriving him of cell water because Plaintiff had thrown "liquid substances on two (2) occasions from his cell onto Auburn C.F. staff members," and had flooded his and other cells in his section. Bradt Aff. at ¶¶ 8–9 & Ex. C, Deprivation Order, dated July 9, 2002. In his Amended Complaint, Plaintiff confirms that he engaged in such conduct. Am. Compl. at ¶¶ 26 ("Benitez threw a liquid substance through the narrow food port of his cell, striking Lennox and Martens.") & 28 ("Benitez [again] threw a liquid substance through the narrow food port on the gate of his cell."). Based on his judgment that Plaintiff continued to pose a security threat, Bradt continued the Deprivation Order until July 14th. Bradt Aff. at ¶ 9. On

July 14th, Defendant Sgt. Martens recommended that the July 9th Deprivation Order be renewed because "on 7–9–02 [Benitez] threw feces on staff/nurse" and on "7–10–02 spit on staff while being served misbehavior reports." *Id.* at ¶ 10 & Ex. C, Deprivation Order. On July 16th, Bradt authorized the renewal of the July 9th Deprivation Order, which was apparently expanded[13] to include showers, cell property, sheets and mattress, and renewed it again on July 20, 22, 23, and 24, 2002, "because plaintiff posed a continued threat to the safety and security of staff, inmates, or State property." Bradt Aff. at ¶¶ 10–11 & Ex. C, Deprivation Order, dated July 20, 2002.

For his part, Plaintiff alleges that these deprivation orders were retaliatory in nature. He points to a July 24, 2002 letter Bradt sent to Kate Rainbolt, a Staff Attorney for Prisoner's Legal Services of New York, in which he stated:

> In response to your concerns be advised that inmate Benitez ... is house[d] in "A" tank in the Special Housing Unit at Auburn. He was involved in an Unusual Incident on 7/9/02 involving aggravated harassment. The throwing of ones own human waste on another person isn't normal. He was placed in A–1 cell as it has a more secure feed up hatch. A Mental Health referral was submitted and OMH advised that *because of his agitated state that he be deprived of any item that he could use to harm himself.* He has been given all of his entitled property. Inmate Benitez was placed on a restricted diet in accordance with procedures established in Deputy Commissioner LeClaire's memo dated 4/24/00.

**\*10** Benitez Decl., Ex. D, Lt., dated July 24, 2002 (emphasis added).

Plaintiff argues that the italicized portion of the above letter undermines Bradt's statement that the Deprivation Orders were implemented due to his behavior. Pl.'s Mem. of Law at p. 11. That argument is without merit. The above letter

provides additional confirmation of Benitez's gross acts, which Bradt asserts were the basis for the Deprivation Orders. Although Bradt mentions that certain objects were removed due to concerns over Plaintiff's mental health, that does not contradict his averment that the water, sheets, and other items were removed due to Plaintiff's behavior.

It is clear from the record that the above Deprivation Orders were issued in response to Plaintiff's own actions and history of misbehavior. *See Hudson v. McMillan,* 503 U.S. 1, 6 (1992) (noting that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (internal quotation marks and citation omitted)). Plaintiff has offered no evidence beyond his own accusations to suggest otherwise. Because there is no evidence of any deliberate indifference on Defendants' part, it is recommended that these Eighth Amendment claims be **dismissed.**

### 3. *Cell Ventilation*

Plaintiff alleges he filed a Grievance on January 26, 2002, complaining about lack of ventilation in his cell that was causing him "bronchospasm and great difficulty breathing." Am. Compl. at ¶ 15. Plaintiff asserts that Defendants J. Burge and T. Eagen reviewed his Grievance and failed to remedy the situation, which caused Plaintiff to suffer, on July 1, 2002, "great difficulty breathing and lost consciousness," and a severely injured head. *Id.* at ¶¶ 16–17 & 24.

The record reflects that Plaintiff filed a Grievance, dated January 26, 2002, in which he complained that the plexiglass shield used to cover the opening in his cell did not provide adequate ventilation. Defs.' 7.1 Statement, Ex. K, Grievance, dated Jan. 26, 2002. In a Memorandum, dated April 13, 2002, Sgt. Martens noted that "[t]here are numerous holes drilled in [the] cell shield for adequate ventilation," and that he noticed upon inspection that Benitez "had piled in front of his cell shield four (4) bags of legal work—blocking his ventilation holes." *Id.,* Mem., dated Apr. 13, 2002. Plaintiff appealed the January 26th Grievance to Superintendent Burge, who denied his appeal on April 15, 2002, stating that "[a] private contractor completed a scientific survey of the air quality of all cells in SHU," and that "[a]ll cells meet or exceed air quality standards." *Id.,* Sup't Decision, dated Apr. 15, 2002. CORC also denied Plaintiff's Grievance on appeal. *Id.,* CORC Decision, dated May 15, 2002.

In another Grievance, dated July 1, 2002, Plaintiff complained that

> **\*11** [o]n July 1, 2002, at about 7[ ] p.m., I began to sweat profusely and to experience great difficulty breathing normally (I suffer from asthma). Thereafter, I "blacked out" (lost consciousness) and fell from my bed onto the floor, causing injury to my head. I have been experiencing difficulty in breathing normally and have been drifting in and out of [consciousness] for the past 6 months due to inadequate ventilation on the plexiglass which covers the entire front of my assigned cell.

Defs.' 7.1 Statement, Ex. N, Grievance, dated July 1, 2002.

That Grievance was denied after Nurse Administrator A. Driscoll reported that her examination of Plaintiff on July 3, 2002, had revealed no abnormality in Plaintiff's lungs, nor did he exhibit any difficulty breathing. *Id.,* Investigative Rep., dated July 10, 2002.

As Defendants point out, Plaintiff does not allege the nature of his alleged head injury, nor any other ventilation-related incident that occurred during the six-month period from January through July 2002 during which Plaintiff alleges to have been deprived of adequate ventilation. In addition, Plaintiff offers no evidence to substantiate his claims that he was denied adequate ventilation. The evidence available indicates that the protective plexiglass shield, which was imposed due to Plaintiff's affinity for throwing liquid substances from his cell, had holes in it, and that Plaintiff never presented to medical staff with breathing problems.

Given the evidence before us, we find that no questions of material fact exist with respect to these ventilation claims. Therefore, these claims should be **dismissed.**

### 4. *Denial of Meals*

In our previous Report–Recommendation addressing Defendants' Motion for Judgment on the Pleadings, we recommended dismissal of the majority of Plaintiff's claims regarding his alleged denial of meals. Dkt. No. 106 at pp. 11–12. However, we recommended against dismissal of Plaintiff's allegation that he was wantonly deprived breakfast and lunch on January 28, 2002, by Defendants Smith and Baranska, respectively. *Id.* at p. 12; Am. Compl. at ¶¶ 22–23.

Defendants have now submitted a Grievance, dated January 28, 2002, in which Plaintiff asserts that

> [o]n 1/28/02, Sgt. Murler informed me that he had been advised that Sgt. Cooper or Lt. Easterbrook had placed me on a so-called pre-hearing restricted diet. I informed Sgt. Murler that any such pre-hearing diet would violate Directive 4933, § 304.2(b)(1)-(4) because that section does not authorize[d] imposition of a pre-hearing diet, and because I have not engage[d] in any misconduct that would warrant imposition of a restricted or pre-hearing restricted diet. Nevertheless, *I was offered a restricted diet for breakfast and for lunch, both of which I refused.*

Defs.' 7.1 Statement, Ex. J, Grievance, dated Jan. 28, 2002 (emphasis added).

Thus, by Plaintiff's own admission, he was offered both breakfast and lunch on January 28, 2002. Therefore, it is recommended that Plaintiff's remaining meal-deprivation claims be **dismissed.**

### 5. *Tightness of Shackles and Cuffs*

 **\*12** Plaintiff alleges that on August 17, 23, 27, 28, and September 3, 2002, Defendant Considine "willfully and wantonly" placed handcuffs and shackles on his ankles and wrists too tightly, causing him "great pain and permanent nerve damage." Am. Compl. at ¶¶ 58–61. Plaintiff also alleges that on September 7, 2002, Defendant Clarke placed shackles on him too tightly, also causing him pain and nerve damage.

*Id.* at ¶ 82. Defendants assert that the above allegations are conclusory and insufficient to state a valid claim under the Eighth Amendment as a matter of law. Defs.' Mem. of Law at pp. 30–33. We agree.

Although a cause of action may lie under the Eighth Amendment for injuries caused by the wanton use of extremely tight handcuffs and/or shackles, *see, e.g., Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994), in this case, Plaintiff does not state enough facts to state a valid claim. Plaintiff does not allege for how long the handcuffs and shackles were applied, nor the circumstances of their application. He simply alleges that they were applied "wantonly" and caused severe pain and nerve damage, without any explanation as to how the nerve damage was caused or how he learned of such injury. *See Jemzura v. Public Service Com'n,* 961 F.Supp. 406, 413 (N.D .N.Y.1997) (citing *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.1987) for the proposition that "[e]ven a *pro se* Complaint must be dismissed if it contains only conclusory, vague or general allegations") (internal quotations omitted).

Therefore, it is recommended that these conclusory allegations be **dismissed** as a matter of law and pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii), which gives the Court the power to dismiss *at any time* a complaint brought by a prisoner proceeding *in forma pauperis* for failure to state a claim.

### D. Retaliation

Plaintiff alleges that the Deprivation, Restraint, and Cell Shield Orders discussed above were issued against him in retaliation for lawsuits he filed in 1989. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,*

343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

**\*13** A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138–39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at \*5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995)).

### 1. *Deprivation Orders*

Plaintiff asserts that the November 2001 and July 2002 Deprivation Orders were issued in retaliation for lawsuits he filed against Burns and other Auburn employees in 1989. Am. Compl. at ¶¶ 8–11. The filing of lawsuits is conduct protected by the First Amendment, however, Plaintiff has failed to show a causal connection between the lawsuits he filed in 1989 and the issuance of the Depravation Orders. As discussed above, Plaintiff has offered no evidence to rebut Defendants proof that the Deprivation Orders were precipitated by Plaintiff's own actions and history of misbehavior. Furthermore, there is no evidence that the Deprivation Orders issued in 2001 were motivated by lawsuits he filed in 1989. Indeed, such a significant temporal gap undermines any allegation of a causal connection. Therefore, it is recommended that these retaliation claims be **dismissed.**

### 2. *Restraint and Cell Shield Orders*

Plaintiff asserts that Defendant Burns issued retaliatory Restraint and Cell Shield Orders against him on November 14, 2001, which were renewed through June 25, 2002, by Burns, Gummerson, Rourke, and Bradt. Am. Compl. at ¶¶ 8–11. Restraint orders "designate what restraints need to be placed on inmates when they are out of their cells, including

hand cuffs and leg irons." Bradt Aff. at ¶ 20. A cell shield is "a transparent cell front covering, equipped to provide adequate ventilation," which are ordered to, *inter alia,* protect against "[s]pitting through the cell door, or the throwing of feces, urine, food, or other objects through the cell door." N.Y. COMP.CODES R. & REGS. tit. 7, § 305.6(a)-(b).

Bradt asserts that Plaintiff was issued Restraint and Cell Shield Orders upon his arrival at Auburn on November 14, 2001, due to "Benitez's extensive record of threats, violence, and unhygienic acts toward staff" and history of disruptive behavior. Bradt Aff. at ¶¶ 14, 18, 21 & Exs. D–E, Shield and Restraint Orders, dated Nov. 14, 2001 through Sept. 10, 2002. Those Orders were subsequently renewed by Defendants Burns, Rourke, Gummerson, and Bradt on a weekly basis due to Plaintiff's disciplinary history. *Id.* at ¶¶ 15 & 22.

**\*14** Thus, Defendants have provided evidence that the Shield Orders were imposed for valid penological reasons. Beyond his allegations, Plaintiff offers no proof that the Shield and Restraint Orders were issued for any improper reason. Also, as mentioned above, the fact that he sued several Defendants in 1989 is not sufficient to demonstrate a causal connection to the Shield and Restraint Orders issued in 2001 and 2002. Therefore, it is recommended that these retaliation claims be **dismissed.**

### E. Due Process Claims

Plaintiff alleges that his due process rights were violated during the course of three separate Disciplinary Hearings conducted in November 2001 and July 2002. Am. Compl. at ¶¶ 2–7 & 41–50. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Such interests are derived from the Fourteenth Amendment Due Process Clause itself or from state statute or regulations. *Id.* However, because Defendants do not challenge Plaintiff's assertion of a liberty interest, we move directly to the question of whether Plaintiff, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974).

A prisoner placed in administrative segregation must be provided (1) advanced written notice of the charges against him at least twenty-four (24) hours prior to the hearing; (2)

the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action taken. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. 460, 476 (1983)).

### 1. *November 2001 Disciplinary Hearing*

Plaintiff alleges Defendant Locastro violated his due process rights at a Disciplinary Hearing that commenced on November 21, 2001. Am. Compl. at ¶¶ 1–6. Specifically, Plaintiff alleges that (1) he was denied the right to present a video as documentary evidence; and (2) Locastro improperly took confidential testimony from Wayne Crozier and, without offering any justification, refused to disclose the substance of such testimony. *Id.*

Plaintiff was transferred from Clinton Correctional Facility to Auburn on November 14, 2001. Am. Compl. at ¶ 8. On November 8, 2001, while still incarcerated at Clinton, Plaintiff was issued a Misbehavior Report accusing him of squirting a brown liquid that smelled like feces from a toothpaste tube on C.O. R. Duprey,[14] and charging him with the following violations: assault, threats, disruptive behavior, harassment, and committing an unhygienic act. Defs.' 7.1 Statement, Ex. B, Misbehavior Rep., dated Nov. 8, 2001.

**\*15** During the Disciplinary Hearing, which was held at Auburn after Plaintiff's transfer, Plaintiff requested a copy of a security videotape from Clinton that would show the incident and allegedly prove his innocence. *Id.,* Ex. S, Disciplinary Hr'g Tr., dated Mar. 21, 2002, at p. 10. Defendant Locastro, who presided over the Hearing, adjourned the proceeding so Plaintiff could make his evidentiary requests through an assistant. *Id.* at pp. 11–12. When the Hearing resumed, Locastro read into the record a memo from Defendant Lt. Miller indicating that "there is no videotape of the incident available" because the "system which would normally record all the areas of our Special Housing Unit was not operating on 11/08/01." *Id.* at p. 13. Locastro noted that he couldn't "produce something that's unavailable." *Id.* at p. 14.

Later in the Hearing, Plaintiff asserted that in another recent Disciplinary Hearing held at Auburn concerning charges against him that also stemmed from events occurring at the SHU in Clinton on November 8, 2001, he was provided a

videotape of that incident and was able to prove his innocence therewith. *Id.* at pp. 30–33. Notwithstanding that argument and Plaintiff's production of proof of the favorable disposition he received in that Hearing, Locastro still found Plaintiff guilty of creating a disturbance, assault on staff, committing an unhygienic act, and harassment; Locastro found Plaintiff not guilty of making threats. *Id.* at p. 34. In rendering his decision, Locastro relied on the testimony of C.O. Duprey and the confidential testimony of Mr. Wayne Crozier. *Id.*

Plaintiff alleges that Locastro's failure to produce a videotape of the November 8, 2001 incident at Clinton violated his due process rights. The record shows that Locastro attempted to obtain the video, but was informed of its unavailability in a memo from Defendant Miller. Locastro did not violate Plaintiff's due process rights when he relied upon Miller's statement that the videotape was unavailable. *See, e.g., Hodges v. Jones,* 873 F.Supp. 737, 744 (N.D.N.Y.1995) ("Due Process does not require that the hearing officer's credibility assessments or weighing of the evidence be evaluated; rather, the relevant standard is whether there is some evidence in the record to support the disciplinary decision.") (citing *Superintendent, Massachusetts Corr. Inst. v. Hill,* 472 U .S. 445, 455 (1985)). After reviewing the Hearing Transcript, it is clear that Locastro's disposition was based on "some evidence," which included Officer Duprey's testimony that Plaintiff squirted liquid fecal matter at him using a toothpaste tube. Defs.' 7.1 Statement, Ex. S, Disciplinary Hr'g Tr. at pp. 26–27. Finally, Plaintiff was provided notice of the charges against him, an opportunity to present other evidence and to question witnesses, and Locastro's disposition statement that included the evidence relied upon. *Id.* at pp. 1–35.

**\*16** Plaintiff also alleges that Locastro violated his due process rights when he took confidential testimony from Wayne Crozier. With respect to that testimony, Defendant Locastro has submitted an Affidavit asserting that

> [a]fter reviewing the record and hearing from plaintiff, I decided to conduct a confidential interview, via telephone, of the Mental Health Staff at Clinton CF. I did so to determine if there were any medical or legitimate psychiatric reasons that would mitigate any penalty I might impose on Plaintiff. I excluded plaintiff from the interview as standard DOCS procedure at the time, to protect the mental health care staff from any possible retaliation and to insure their candor in relating whether or not an inmate's behavior could be excused or explained as resulting from mental illness.

I did not seek any evidence related directly to the charges in conducting the confidential interview. I only sought to determine if there were mental health concerns that might have been relevant to plaintiff's behavior.

Dkt. No. 132, Joseph Locastro Aff., dated June 1, 2009, at ¶¶ 3–4. [15]

Defendants note that pursuant to DOCS regulations, "[w]hen an inmate's mental state or intellectual capacity is at issue," the hearing officer "shall consider evidence regarding the inmate's mental condition or intellectual capacity." N.Y. COMP.CODES R. & REGS., tit. 7, § 254.6(b). Plaintiff has not offered any response to Locastro's averments. There is no evidence to suggest that Plaintiff's due process rights were in any way violated when Locastro interviewed Crozier to ascertain if there existed any mitigating circumstances occasioned by Plaintiff's mental health.

Therefore, it is recommended that these due process claims be **dismissed.**

### 2. *July 11, 2002 Disciplinary Hearing*

On July 11, 2002, Defendant Gummerson presided over a Disciplinary Hearing concerning three separate Misbehavior Reports all issued on July 9, 2002. Plaintiff alleges that on July 11, 2002, Defendants C. Clarke and S. Crozier "willfully and knowingly falsely told Gummerson that Benitez had refused to attend [the hearing]." Am. Compl. at ¶ 41. Benitez asserts that Gummerson

> wilfully and wantonly commenced the hearing ... without making an attempt to interview [him] personally in order to ascertain (a) whether Benitez had been provided a copy of the misconduct reports ...; (b) whether Benitez had made a knowing, voluntary, and intelligent waiver of his right to attend the hearing; and (c) whether Benitez had been advised of the consequences of his failure to attend the hearing.

*Id.* at ¶ 42.

Furthermore, Plaintiff asserts that after he was found guilty of charges, Clarke and Crozier refused to provide him with a copy of the hearing disposition sheet. *Id.* at ¶ 44.

Defendants have provided a copy of a Waiver Form, dated July 11, 2002, signed by Defendant Crozier, which indicates that Plaintiff refused to attend the Hearing and also refused to sign the waiver form acknowledging such refusal. Defs.' 7.1 Statement, Ex. D, Waiver Form, dated July 11, 2002. Defendants have also submitted a copy of an Inter–Departmental Communication from Clarke to Gummerson, in which Clarke states that on July 11, 2002, he delivered a copy of the disposition rendered in the July 11th Tier III Disciplinary Hearing as well as an appeal form to Benitez. *Id .,* Inter–Dep't Comm., dated July 11, 2002. Finally, a case data worksheet reflects that Plaintiff was provided copies of the three Misbehavior Reports on July 10, 2002. *Id.,* Case Data Worksheet, dated July 10, 2002.

**\*17** Beyond his own accusations, Plaintiff has offered nothing to rebut the Defendants' documentary case. *See* Pl.'s Mem. of Law at pp. 16–19. Although Plaintiff alleges that Gummerson knew that he did not have copies of the July 9th Misbehavior Reports because he was under Deprivation Orders and "that Clarke and Crozier had falsely notified him [on July 11, 2002] that Benitez had refused to attend the hearing," Pl.'s Mem. of Law at p. 17, there is nothing in the record to substantiate those claims. *See Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir.2003)* ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."). Furthermore, Plaintiff has offered no legal support for his conclusion that a hearing officer is required to personally interview an inmate in order to assure the voluntariness of his waiver of appearance, nor has the Court's research revealed any precedents supporting such conclusion. Therefore, because Plaintiff received a copy of the Misbehavior Report, waived his right to attend the Disciplinary Hearing, and was provided a copy of its disposition, it is recommended that these claims be **dismissed.** *See Dawes v. Carpenter, 899 F.Supp. 892, 897 (N . D.N.Y.1995)* (citing *Boddie v. Connecticut, 401 U.S. 371 (1971)* for the proposition that "[d]ue process requires only that an accused have an opportunity to be heard, an opportunity that can be waived").

### 3. *July 16, 2002 Disciplinary Hearing*

Plaintiff makes similar allegations concerning his July 16, 2002 Disciplinary Hearing: (1) John Doe No. 7 denied him a copy of the Misbehavior Report; (2) Clarke and Considine "falsely told Defendant Wolcyzk [ ] that Benitez had refused to attend" the Disciplinary Hearing; (3) Wolcyzk "wantonly commenced the hearing without making an attempt to interview Benitez personally" in order to determine if his waiver was voluntarily and intelligently made; and (4) Clarke and Crozier "refused to provide [him] a copy of the hearing disposition sheet." Am. Comp. at ¶¶ 45–47 & 49.

The July 16, 2002 Disciplinary Hearing concerned a Misbehavior Report issued against Plaintiff on July 10, 2002. Defs.' 7.1 Statement, Ex. E, Misbehavior Rep., dated July 10, 2002. Once again, Defendants have submitted documentary evidence that Plaintiff waived his right to be present at the Disciplinary Hearing and was provided a copy of the disposition. A "Refusal to Attend Hearing" Form, dated July 16, 2002, reflects that Plaintiff refused to attend the July 16 Tier III Hearing and also refused to sign the refusal form. *Id.,* Refusal to Attend Hr'g Form, dated July 16, 2002. Also in the record is an Inter–Departmental Communication from Clarke to Wolcyzk indicating that he delivered Plaintiff a copy of Wolcyzk's disposition on July 17, 2002, as well as an appeal form. *Id.,* Inter–Dep't Comm., dated July 16, 2002. Finally, a Case Data Worksheet shows that Plaintiff was given a copy of the July 10 Misbehavior Report. *Id.,* Case Data Worksheet, dated July 11, 2002.

**\*18** Contrariwise, Plaintiff has offered no evidence in support of his allegations. Therefore, because Plaintiff has failed to show a material question of fact exists with respect to these due process claims, it is recommended that they be **dismissed.**

### F. Failure to Serve

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m). [16] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on

its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

In this case, there is no indication that the Defendants John Does Nos. 1–7, and C.O. Smith [17] were properly served. Because Plaintiff's claims against John Doe No. 7 and C.O. Smith lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against John Doe No. 7 and C.O. Smith be **dismissed.** As previously discussed, we have recommended that Plaintiff's claims against John Does Nos. 1–6 not be dismissed. Should the District Court adopt that recommendation, we will afford Plaintiff the opportunity to file a motion to amend his Amended Complaint in order to name John Does Nos. 1–6. If such motion is submitted and granted, we would at that time direct the effectuation of service on John Does Nos. 1–6.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion for Summary Judgment (Dkt. No. 118) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that should the District Court adopt this Report–Recommendation, the only remaining Defendants will be Rourke and John Does Nos. 1–6; and it is further

**ORDERED,** that should the District Court adopt this Report–Recommendation, Plaintiff shall be afforded *thirty (30) days* from the date of such adoption to file a motion to amend his Amended Complaint in order to identify John Does Nos. 1–6, which shall include a proposed Second Amended Complaint attached thereto; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89

(2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 419999

---

**Footnotes**

1 The remaining Defendants are: Locastro, Lt. Miller, Selsky, Burns, Martens, Gummerson, Rourke, Bradt, Burge, Eagen, R. (C.O.) Smith, Baranska, (R.N.) Smith, Chilson, Kneeland, Clarke, Considine, Crozier, and Wolczyk. *See generally* Dkt.

2 Because of the volume of claims and Defendants, the Court will recite the undisputed/disputed material facts as it addresses each claim.

3 Officer Hnatiw is not a Defendant in this action.

4 The first Deprivation Order, dated July 9, 2002, indicates that Plaintiff was deprived only of cell water. Bradt Aff., Ex. C, Deprivation Order, dated July 9, 2002. On July 16, 2002, Bradt signed a Deprivation Order Renewal of the original July 9 Order, but also listed "cell property" as one of the deprivations. *Id.,* Deprivation Order, dated July 16, 2002. Thus, it is unclear if the "cell property" was omitted from the original July 9 Order, or if it was added as an additional deprivation upon renewal of that Order. Also, although Plaintiff alleges that these Deprivation Orders were continued through August 8, 2002, the copies of the Orders provided to the Court run only to July 25, 2002. Am. Compl. at ¶¶ 53 & 55; Brad Aff., Ex. C.

5 In our previous Report–Recommendation, we dismissed any due process claim Plaintiff might have intended to assert concerning the failure to process grievances as an independent constitutional violation. Dkt. No. 106 at pp. 20–21.

6 In that respect, the Court notes that documents submitted in support of the Defendants' current Motion clearly indicate the names of the correctional officers involved in the July 9, 2002 cell extraction. *See* Defs.' 7.1 Statement, Ex. C.

7 The Court is aware that any such motion to amend will face serious and possibly fatal hurdles. The Second Circuit's interpretation of the "relation back" doctrine imbedded in Federal Rule of Civil Procedure 15 may leave Plaintiff no recourse as his failure to identify the John Doe Defendants was arguably not do to a mistake, but rather, to his own lack of knowledge. *See Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 470 (2d Cir.1995) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."). However, several courts in this Circuit, including this one, have held that the aforementioned rule may not be applicable in all circumstances, particularly when a defendant has prevented the plaintiff from discovering the identity of the John Doe defendants and the plaintiff has taken reasonable affirmative steps to discover their identities. *See Jennings v. Dep't of Justice Serv.,* 2008 WL 2967533, at *5 (N.D.N.Y. Mar. 26, 2008) (Report–Recommendation and Order) *adopted in part and rejected in part on other grounds sub nom. by Jennings v. Ciciarelli,* 2008 WL 2967530 (N.D.N.Y. July 30, 2008); *see also, e.g., Byrd v. Abate,* 964 F.Supp. 140, 146 (S.D .N.Y.1997) (stating that "[t]o hold that Rule 15(c) does not permit relation back in such circumstances would permit defense counsel to eliminate claims against any John Doe defendant merely by resisting discovery requests until the statute of limitations has ended"); *Maccharulo v. Gould,* 2009 WL 2495780, at *6 (S.D.N.Y. Aug. 14, 2009) ("Where a plaintiff tries diligently during the limitations period to ascertain the

identities of the intended defendants, failure to ascertain the correct names within the period, combined with some 'John Doe' or other generic identification in the pleading, may suffice to establish a factual 'mistake' supporting relation back."). Therefore, it would be rash at this juncture for the Court to rule out the possibility that Plaintiff's forthcoming second amended complaint will not relate back to his original Complaint under Rule 15.

8    For example, in a copy of a memorandum from Rourke to Deputy Superintendent of Security Bradt dated July 9, 2002, Rourke states that he "went to SHU to help facilitate the move of [Benitez] to A–1 cell which has a more secure cell hatch. On 7/9/02 this inmate had already thrown on (4) staff members in SHU." Defs.' 7.1 Statement, Ex. C–9, Mem. dated July 9, 2002.

9    Plaintiff does not allege that Nurse Smith participated in or was witness to any of the alleged acts of excessive force taken against him.

10   Plaintiff also asserts these Deprivation Orders were motivated by retaliatory animus. We address his retaliation claims below in Part I.D.

11   In addition to the items listed, Plaintiff asserts he was denied "a water bucket" from July 25 though August 8, 2002. Am. Compl. at ¶ 55.

12   The original Deprivation Order was to last from November 14–22, but was renewed on November 23, 24, and 25, 2002. Bradt Aff., Ex. C, Deprivation Order.

13   *See supra* footnote 4.

14   R. Duprey is not a Defendant in this action.

15   In their Motion for Summary Judgment, Defendants submitted separately to Chambers for an *in camera* review a portion of the November 2001 Disciplinary Hearing Transcript that contained the confidential testimony of Wayne Crozier, which was identified as Exhibit T. Dkt. No. 118. Thereafter, the Court returned Exhibit T to Defendants' counsel and ordered that it would only approve an *in camera* review upon the submission of a formal request from Defendants. Dkt. No. 119. Thereafter, Defendants filed a Formal Application for permission to submit Exhibit T for an *in camera* review, which was denied. Dkt. Nos. 120 & 129. Subsequently, Defendants submitted Locastro's Affidavit in lieu of submitting Exhibit T. Dkt. No. 132.

16   Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b).

17   C.O. Smith is named "R. Smith" on the Docket, but we have referred to him as "C.O. Smith" in order distinguish him from Defendant Nurse R. Smith. *See* Dkt. No. 106 at p. 4 n. 3. Nurse R. Smith has been served with process, Defendant C.O. Smith has not. Dkt. Nos. 13 & 37.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.    15

KeyCite Yellow Flag

Distinguished by   Blake v. Israel Sexton, Sergeant, New York City Police Department,   S.D.N.Y.,   March 24, 2016

2014 WL 2158518
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn M. BERRY, Plaintiff,
v.
CITY OF NEW YORK DEPARTMENT OF CORRECTIONS, Co. Castro # 7800, and Co. L. Beckwith # 1983, Defendants.

No. 12 Civ. 7819(RWS).
|
Signed May 22, 2014.

**Attorneys and Law Firms**

Shawn M. Berry, Comstock, NY, pro se.

Jeffrey D. Friedlander, Acting Corporation Counsel for the City of New York, by: James Horton, Esq., New York, NY, for the Defendants.

*OPINION*

SWEET, District Judge.

**\*1** Defendants City of New York Department of Corrections (the "DOC") and Correction Officers Castro ("Castro") and Beckwith ("Beckwith") (collectively, "Defendants") have moved pursuant to Federal Rules of Civil Procedure 56 for summary judgment to dismiss the *pro se* Plaintiff Shawn M. Berry's ("Berry" or "Plaintiff") Second Amended Complaint ("SAC"). Based on the conclusions set forth below, Defendants' motion is granted.

*Prior Proceedings*

This action was initiated by Plaintiff on October 18, 2012 with the filing of the initial Complaint arising out of an incident that allegedly occurred on August 30, 2012 at the Mental Health Assessment Unit for Infracted Inmates ("MHAUII") at the George R. Vierno Center ("GRVC") at Rikers Island. (SAC ¶ II.D). The Plaintiff filed an Amended Complaint on January 2, 2013, and the SAC on March 20, 2013. The SAC alleges a 42 U.S.C. § 1983 claim against the Defendants for failing to protect him from another inmate. Defendants submitted their Answer on June 28, 2013. Plaintiff's deposition was taken on November 20, 2013, and fact discovery was ordered completed on November 25, 2013.

Defendants filed the instant motion for summary judgment on January 9, 2014. Briefing was submitted and the matter was marked fully submitted on March 12, 2014.

*The Facts*

The facts have been set forth in Defendants' Rule 56.1 Statement and Plaintiff's Statement of Undisputed Facts contained in his Declaration In Opposition to Defendants' Motion for Summary Judgment. The facts described below are undisputed except as noted.

Berry was a detainee at MHAUII. On August 30, 2012 at approximately 12:00 p.m., Plaintiff was assisting with the lunchtime food service in the MHAUII. According to Plaintiff, he was working as a Suicide Preventive Aide in the MHAUII, but was ordered to work out of his job description to assist with the lunch-time feeding.

While assisting non-party Correction Officer Velez ("Velez") with the lunch feeding, Plaintiff was punched in the head by another inmate, Oscar Punter ("Punter"). The attack on Plaintiff by Punter was a surprise attack. Upon being punched by Punter, Plaintiff began to "defend" himself by "swinging crazy," and threw three or four punches in the direction of Punter. According to Plaintiff, when he began to defend himself he was scared and in shock pain.

Additional correction officers arrived on the scene and issued orders for the two inmates to stop fighting. Plaintiff was unable to hear these commands because of the commotion, and Plaintiff continued to throw punches at Punter until he was sprayed with OC spray by Beckwith. According to Plaintiff, none of the correction officers at the scene gave Plaintiff an order to stop use of force. Plaintiff's version of the events contends that Beckwith came from behind Plaintiff and deliberately sprayed Plaintiff with OC spray in both of Plaintiff's eyes. Suicide Preventive Aid and House Infracted Inmates wear different clothing in the MHAUII (gray jumpsuit and bright orange jumper, respectively), and according to Plaintiff, Beckwith witnessed Plaintiff in gray defending himself from Punter before he chose to spray Plaintiff.

**\*2** Plaintiff was then taken to decontamination, where the OC spray residue was rinsed from his body. According to Plaintiff, he was then taken to see a doctor, but was issued eyeglasses weeks later.

At the time Plaintiff was sprayed with OC, Plaintiff was still fighting with Punter. Prior to the fight between Plaintiff and Punter, Plaintiff had never had any interaction or exchanged words with Punter.

### The Applicable Standards

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F.Supp. 1205, 1212 (S.D.N.Y.1990) (quoting *Anderson,* 477 U.S. at 249. Moreover, if the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50. A fact is "material" only if it will affect the outcome of the suit under applicable law, and such facts "properly preclude the entry of summary judgment." *Id.* at 248. Disputes over irrelevant facts will not preclude summary judgment. *Id.* The goal is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir.2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. "It is ordinarily sufficient for the movant to point to a lack of evidence ... on an essential element of the non-movant's claim.... [T]he nonmoving party must [then] come forward

with admissible evidence sufficient to raise a genuine issue of fact for trial .... " *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party ... must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

### The Motion For Summary Judgment Is Granted

*The Plaintiff's Failure To Protect Claim Against Beckwith And Castro Is Dismissed*

**\*3** The Supreme Court has found that "[a] prison official's 'deliberative indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (19994); *Avincola v. Maldonado,* No. 04–3529–pr, 2005 U.S.App. LEXIS 25423, at \*3, 2005 WL 3116760 (2d Cir. Nov. 22, 2005)). To successfully plead a failure to protect claim, a plaintiff must show that the deprivation is so sufficiently serious that it results in a denial of "the minimal civilized measure of life's necessities," *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted), and that the prison officials acted with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted); *Farmer,* 511 U.S. at 832 (prison officials must provide "humane conditions of confinement" and take "reasonable measures to guarantee the safety of the inmates.") (internal quotation marks and citation omitted)). Prison officials may neither deprive a prisoner of "basic human needs, *e.g.,* food, clothing, shelter, medical care, and reasonable safety," nor expose an inmate to conditions that "pose an unreasonable risk of serious damage to his future health." *Helling v. McKinney,* 509 U.S. 25, 32, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citation omitted); *see also Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d. Cir.2002); *Sharriff v. Coombe,* 655 F.Supp.2d 274, 297 (S.D.N.Y.2009). The deliberate indifference standard consists of both a subjective prong and an objective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *see also Buffaloe v. Fein,* No. 12 Civ. 9469(GBD) (AJP), 2013 U.S. Dist. LEXIS 153840, at \*11, 2013 WL 5815371 (S.D.N.Y. Oct. 24, 2013).

To satisfy the objective prong, plaintiff must show that the "alleged deprivation ... in objective terms, [was] sufficiently

serious." *Hathaway,* 37 F.3d at 66. The Second Circuit has defined sufficiently serious as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* "[T]he inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols,* 08 Civ. 08568(PGG), 2010 U.S. Dist. LEXIS 25652, at *11, 2010 WL 1010001 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling,* 509 U.S. at 36). Plaintiff must demonstrate that this grave harm was "actual or imminent." *Benjamin v. Fraser,* 343 F.3d 35, 51 (2d Cir.2003); *see also Carr v. Canty,* No. 10 Civ. 3829(JPO), 2012 U.S. Dist. LEXIS 117204, at *8, 2012 WL 3578742 (S.D.N.Y. Aug. 16, 2012).

The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *see Hathaway,* 99 F.3d at 553 (quoting *Farmer,* 511 U.S. at 835); *see also Cole v. Fischer,* No. 10–2548–pr, 2011 U.S.App. LEXIS 6182, at *2, 2011 WL 1086902 (2d Cir. Mar. 25, 2011) (equating the necessary state of mind to that of "criminal recklessness"); *Whitfield v. O'Connell,* 402 F. App'x 563, 565 (2d. Cir.2010) (same). To be found "sufficiently culpable," the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837; *Ventura v. Sinha,* 379 F. App'x 1, 3 (2d. Cir.2010).

**\*4** Plaintiff has failed to demonstrate either the objective or subjective prongs. With respect to the objective prong, Plaintiff cannot establish that he was incarcerated under conditions positing a substantial risk of serious harm as a matter of law. Substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker. *See Hopkins v. Allard,* No. 08–CV–0001 (DNH)(DEP), 2010 U.S. Dist. LEXIS 114368, at *74 (N.D.N.Y. Aug. 23, 2010) (citing *Desulma v. City of New York,* No. 98 Civ.2078(RMB)(RLE), 2001 U.S. Dist. LEXIS 9678, at *21, 2001 WL 798002 (S.D.N.Y. Jul. 6, 2001)). Here, Plaintiff admits that he had never spoken to his attacker prior to the incident on August 30, 2012, and there were no prior altercations between Plaintiff and Punter. Consequently, there is no genuine issue of material fact as to whether Plaintiff faced a substantial risk of harm at MHAUII on the day of the incident.

With regards to the subjective element, a reasonable jury cannot conclude from the evidence in the record that either Beckwith or Castro knew that Plaintiff faced a substantial risk of harm and disregarded that risk. Plaintiff has provided "no evidence that [the Defendants were] aware of any prior acts of violence committed against [P]laintiff or any other inmates." *Hopkins,* 2010 U.S. Dist. LEXIS 114368, at *75. Plaintiff never complained to any correction officer, expressed concern for his safety or otherwise made known of any impending danger from Punter to correction officers. Moreover, Plaintiff readily concedes that Punter's attack was a surprise. As such, the record does not allow a conclusion that Beckwith or Castro "knew of and disregarded a substantial risk of serious harm to [P]laintiff posed by" Punter. *Id.*

The evidence raises no genuine issue of fact regarding the objective and subjective prongs of deliberate indifference, and no reasonable jury could find deliberate indifference with the evidence currently in the record. There is no genuine issue of fact for trial. Given such, Plaintiff's failure to protect claim against Beckwith and Castro is dismissed.

*Plaintiff's Excessive Force Claim Is Dismissed*

To set forth a claim for excessive force, a plaintiff must sufficiently allege that, viewed subjectively, a defendant had a wanton state of mind at the time of the alleged incident and that, by objective standards, the effect of a defendant's conduct was sufficiently serious. *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000). Both the subjective and objective standards must be met. *See Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

The subjective component requires a plaintiff to show that a defendant's conduct was not "applied in a good faith effort to maintain or restore discipline" but rather "maliciously or sadistically to cause harm." *Rosales v. Fischer,* 07 Civ. 10554(LAP)(DFE), 2009 U.S. Dist. LEXIS 35033, at *23, 2009 WL 928260 (S.D.N.Y. Mar. 31, 2009) (citing *Hudson,* 503 U.S. at 7). The defendant must have acted with "a sufficiently culpable state of mind," meaning that he acted in a "wanton manner in light of the particular circumstances surrounding the challenged conduct." *McCrory v. Belden,* No. 01 Civ. 0525(MHD), 2003 WL 22271192, at *5 (S.D.N.Y. Sept.30, 2003) (internal quotation marks omitted).

**\*5** Objectively, a plaintiff must show that the harm incurred was more than *de minimis. Rosales,* 2009 U.S. Dist. LEXIS 35033, at *24, 2009 WL 928260. Not "ever malevolent touch

by a prison guard gives rise to a federal cause of action," *Hudson,* 503 U.S. at 9, and "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). However, when a prison official acts "maliciously and sadistically", the objective component is satisfied provided that the force applied was more than *de mimimis* or else was of a nature "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated whether or not significant physical injury is evident." *Hudson,* 503 U.S. at 6–7; *see Sims,* 230 F.3d at 21; *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

It is uncontroverted that Beckwith used OC spray to subdue Plaintiff. The use of pepper spray "constitutes a significant degree of force," *Tracy v. Freshwater,* 623 F.3d 90, 98 (2d Cir.2010), and can amount to an excessive use of force. *See, e.g., United States v. Praisner,* No. 3:09cr264 (MRK), 2010 WL 2574103 (D.Conn. Apr. 27, 2010) (denying motion to dismiss indictment premised on excessive force where pretrial detainee "was sprayed six times on four separate occasions over approximately 40 minutes, and was not decontaminated during that period"). However, if the force was "applied in a good-faith effort to maintain or restore discipline, it is unlikely to be repugnant to the conscience of mankind, and will not amount to excessive force under Second Circuit law." *Adilovic v. Cnty. of Westchester,* No. 08 Civ. 10971(PGG), 2011 WL 2893101, at *6 n. 12 (S.D.N.Y. July 14, 2011) (internal citation omitted) (quoting *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000).

Plaintiff has not alleged nor puts forward any evidence that suggests that the application of OC spray was done in a way other than "to ensure the compliance of an uncooperative. inmate." *Id .,* at *6. Plaintiff contends that he was "swinging crazy" when Beckwith responded to the scene and made the decision to spray the Plaintiff. Plaintiff asserts that none of the correction officers that arrived on the scene gave plaintiff an order to stop use of force, Pl. Decl. ¶ 14, but Plaintiff, in his deposition, indicated that in the middle of the fight it may have been near impossible for correction officers to verbally issue commands audible to Plaintiff. *See* Pl. Dep. Tr. 31:7–22 ("[W]hen an incident like this is going on ... that's noise on top of noise, so you could come in and say whatever you want to say, I won't hear it, nobody else will hear it ..."). Plaintiff's allegation is belied by Castro's report of the incident, made on the same day as the incident, which states that Castro "gave

several direct orders for both inmates to stop fighting" but that Punter and Plaintiff ignored Castro's orders. (SAC Ex. B).

**\*6** While no evidence has been provided to the Court as to the length or amount of OC spray applied by Beckwith on Plaintiff, Plaintiff's testimony in his deposition suggests that Beckwith's application was not excessive. Plaintiff noted in his deposition that correction officer Velez grabbed Punter at one point in the fight, incapacitating Punter's ability to defend himself, and Plaintiff became the "aggressor" as he continued to wildly throw punches at Punter. *See* Pl. Dep. Tr. 30:9–25. Beckwith applied the OC spray on Plaintiff shortly thereafter. In addition, no evidence has been presented that suggests anything excessive about the application of the OC spray. While Punter and Plaintiff were wearing different colored clothing, Plaintiff was attacking Punter at the same time as Velez was restraining Punter. Plaintiff has provided no evidence or allegations as to why Beckwith should have assumed, based on the fact that two inmates were fighting with different colored clothing, that application of OC spray was not necessary or that Plaintiff was not the "aggressor."

Nothing in the record suggests that Beckwith acted in a way other than to "ensure compliance of an uncooperative ... inmate," *Adilovic,* 2011 WL 2893101, at *6, and there is no genuine issue of material fact as to whether Beckwith acted maliciously or sadistically to cause Plaintiff harm. Accordingly, the motion to dismiss must be granted on this issue. *See, e.g., Kopy v. Howard,* Civ. No. 9:07–CV–417 (DNH/RFT), 2010 WL 3808677, at *3 (N.D.N.Y. Aug.11, 2010) ("Thus, by Plaintiff's own admission, he refused several direct orders to return to his cell and, as a consequence, was forcibly moved there by use of pepper spray. There being absolutely no evidence or indication of bad faith on the part of Defendants, this claim must fail.").

*Beckwith And Castro Are Entitled To Qualified Immunity*
Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights. *See Harlow v. Fitzgerald,* 457, U.S. 800, 818 (1982); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998); *Brown v. City of Oneonta,* N.Y., Police Dept., 106 F.3d 1125, 1130–31 (2d Cir.1997). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Spavone v. N.Y. State Dep't of Corr.,* 719 F.3d 127, 133 (2d Cir.2013) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (internal

quotation marks omitted) (emphasis removed from original). It protects government employees from civil liability where performance of their discretionary functions does not violate clearly established statutory or constitutional rights of which a reasonable person should have known, or if the official reasonably believed that her conduct did not violate those rights. *See Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1992). It protects "all but the plainly incompetent or those who knowingly violate the law." *Saucier v. Katz,* 553 U.S. 194, 202 (2001).

**\*7** In the summary judgment phase of a proceeding, dismissal will be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). "[i]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon,* 66 F.3d at 420.

Beckwith and Castro's actions were objectively reasonable. Plaintiff admits that the attack upon him by Punter was a surprise attack.[1] At one point in the fight, Velez had restrained Punter while Plaintiff continued his counterattack. No other evidence or allegation have been provided by Plaintiff that suggests that Beckwith and Castro believed that they were acting in a way that clearly violated an established federally protected right. Given the situation, no reasonable jury could find that the Defendants actions were objectively unreasonable, and Castro and Beckwith are entitled to qualified immunity.

*The Claims Against The DOC And City Are Dismissed*
DOC is an agency of the City of New York (the "City") and lacks an independent legal existence. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any laws shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter § 396. "[A]s an agency of the City of New York, the DOC is not a suable entity." *White v. Vance,* No. 10 Civ. 6142(NRB), 2011 U.S. Dist. LEXIS 67799, at *14, 2011 WL 2565476 (S.D.N.Y. June 21, 2011). Accordingly, the claims against DOC is dismissed.

Plaintiffs contend that the Court should construe the SAC as including a claim against the City given the Plaintiff's *pro se* status, citing *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A *pro se* plaintiff's complaint is "to be liberally construed." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.,* 551 U.S. at 94, 127 S.Ct. at 2200. The Court will consider the SAC as alleging a claim against the City, but even liberally construed, Plaintiff's claims must be dismissed against the City.

It is not clear from the SAC what exact claims it is bringing against the City. Liberally construed, and supported by his citation *Monell,* Plaintiff seeks to bring a *Monell* § 1983 claim against the City. In a *Monell* claim, the City can be held liable "if a plaintiff can plead and prove both (1) the existence of a municipal policy or custom, and (2) that the policy or custom directly caused the constitutional violation." *Bektic–Marrero v. Goldberg,* 850 F.Supp.2d 418, 429 (S.D.N.Y.2012). An employment relationship between an offending officer and the municipality is insufficient to establish liability. *Id.*

**\*8** Plaintiff has not alleged and the record has evidenced no facts regarding the existence of a municipal policy or custom that caused a constitutional violation. "Conclusory allegations of a municipality's pattern or policy of unconstitutional behavior are insufficient to establish a *Monell* claim, absent evidence to support such an allegation." *Jeanty v. Cnty. of Orange,* 379 F.Supp.2d 533, 545 (S.D.N.Y.2005) (quoting *McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 705 (S.D.N.Y.1999). Here, Plaintiff lacks evidence or even an allegation of pattern or practice of excessive application of OC spray. Discovery has ended and there is no evidence adduced by Plaintiff as to any such pattern or practice. Moreover, as concluded above, no constitutional violations can be found as a matter of law. Given the lack of evidence, there is no issue of material fact as to whether a pattern or practice regarding excessive application of OC spray existed, and the claim against the City must be dismissed.

*Conclusion*

Based on the conclusions set forth above, Defendants' motion for summary judgment and dismissal of the SAC is granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2158518

---

## Footnotes

1    Courts in this District have denied deliberate indifference claims based upon surprise attacks. *See Fernandez v. New York City Dep't of Corr.,* 2010 U.S. Dist. LEXIS 12499, at *5 (S.D.N.Y. Aug. 21, 2001); *Zimmerman v. Macomber,* 2001 U.S. Dist. LEXIS 12499, at *5, 2001 WL 946383 (S.D.N.Y. Aug. 21, 2001) (same); *Grant v. Burroughs,* 2000 U.S. Dist. LEXIS 12917, at *9, 2000 WL 1277592 (S.D.N.Y. Sept. 8, 2000) (same).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2026 Thomson Reuters. No claim to original U.S. Government Works.    6

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 76 of 427

2002 WL 31413804
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodney BOOMER, Plaintiff,
v.
Gary M. LANIGAN, Commissioner of N.Y.C. D.O.C.S.;
Warden Grant, OBCC/CPSU; Deputy Warden Angelo
Rivituso, OBCC/CPSU; Deputy Moran, OBCC/
CPSU; Captain Randy Wheeler "140", OBCC/
CPSU; C.O. Andre White "9256", OBCC/CPSU;
C.O. Ervin Weatherl "14416", OBCC/CPSU; C.O.
Ronnie Santana "14985", OBCC/CPSU; C.O. Elliot
Martin "122227", OBCC/CPSU; Peter Conquet
"15369", OBCC/CPSU; Dr. Patel, M.D., OBCC/
CPSU; and St. Barnabas Hospital, Defendants.

No. 00 Civ. 5540(DLC)
|
Oct. 25, 2002.

**Synopsis**
Pre-trial detainee brought pro se action against city prison
officials, physician, and hospital, alleging excessive force
and deprivation of medical treatment in violation of the
Fourteenth Amendment in connection with a cell extraction.
On defendants' motions for summary judgment, the District
Court, Cote, J., held that: (1) correction officer did not use
excessive force, in violation of due process clause of the
Fourteenth Amendment, when he sprayed chemical agent
at detainee, after detainee refused to follow repeated orders
to remove his arm from food slot in his cell; (2) cell
extraction team did not use excessive force, in violation
of the due process clause of the Fourteenth Amendment,
when extracting detainee from his cell; (3) fact questions as
to whether officials ignored requests by detainee, who was
known to be an epileptic, for medical care, and thus whether
they were deliberately indifferent to detainee's medical needs,
precluded summary judgment on detainee's due process claim
under the Fourteenth Amendment; (4) fact question as to
whether physicians were deliberately indifferent to detainee's
medical needs, precluded summary judgment on detainee's
due process claim under the Fourteenth Amendment; (5) fact
questions as to whether officials prevented detainee from
pursuing grievance, precluded summary judgment on issue
of whether detainee exhausted his administrative remedies
under Prison Litigation Reform Act (PLRA); (6) defense
of qualified immunity was not available to any defendants,

who were allegedly deliberately indifferent to detainee's
medical needs in violation of the Fourteenth Amendment;
and (7) New York statutory requirement that notice of claims
against city employee had to be filed with city comptroller,
as condition precedent to maintaining tort claims against
employees, applied only to claims against employees for
which employees had right to indemnification from city.

Motions granted in part, and denied in part.

West Headnotes (9)

**[1]**　**Constitutional Law** ⚷ Safety and security
　　**Prisons** ⚷ Use of force

　　Correction officer did not use excessive force, in
　　violation of due process clause of the Fourteenth
　　Amendment, when he sprayed chemical agent
　　at pre-trial detainee, after detainee refused to
　　follow repeated orders to remove his arm from
　　food slot in his cell; officer's actions were
　　not characterized by wantonness, in that officer
　　used minimal, one-second burst of agent, after
　　receiving authorization from physician to do so.
　　U.S.C.A. Const.Amend. 14.

　　4 Cases that cite this headnote

**[2]**　**Constitutional Law** ⚷ Safety and security
　　**Prisons** ⚷ Use of force

　　Cell extraction team did not use excessive
　　force, in violation of the due process clause
　　of the Fourteenth Amendment, when extracting
　　pre-trial detainee from his cell; video tape
　　of incident showed that team did not act
　　with wantonness and that their use of force
　　did not constitute objectively sufficient serious
　　deprivation of detainee's constitutional rights.
　　U.S.C.A. Const.Amend. 14.

　　9 Cases that cite this headnote

**[3]**　**Civil Rights** ⚷ Criminal law enforcement;
　　prisons
　　**Summary Judgment** ⚷ Prisons and jails

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 77 of 427

**Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)**

Fact questions as to whether city prison officials ignored requests by pre-trial detainee, who was known to be an epileptic, for medical care, and thus as to whether they were deliberately indifferent to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

9 Cases that cite this headnote

**[4]    Civil Rights** 👉 Criminal law enforcement; prisons

**Summary Judgment** 👉 Prisons and jails

Fact question as to whether city hospital physician's authorization of use of chemical agent on pre-trial detainee, who was an epileptic, constituted deliberate indifference to detainee's medical needs, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[5]    Civil Rights** 👉 Criminal law enforcement; prisons

**Summary Judgment** 👉 Prisons and jails

Fact question as to whether physicians were deliberately indifferent to pre-trial detainee's medical needs, in failing to treat extreme pain that detainee was experiencing following his epileptic seizure, precluded summary judgment on detainee's due process claim under the Fourteenth Amendment. U.S.C.A. Const.Amend. 14.

**[6]    Civil Rights** 👉 Criminal law enforcement; prisons

**Summary Judgment** 👉 Prisons and jails

Fact questions as to whether pre-trial detainee was unable to appeal prison official's refusal to accept his grievance, asserting that officials and physicians were deliberately indifferent to his medical needs, because of restrictions imposed on him, and as to whether prison

staff failed to handle grievance properly, precluded summary judgment on issue of whether detainee sufficiently exhausted his administrative remedies under Prison Litigation Reform Act (PLRA) before bringing due process claim under the Fourteenth Amendment against officials and physicians. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1997e(a).

1 Case that cites this headnote

**[7]    Civil Rights** 👉 Prisons, jails, and their officers; parole and probation officers

Defense of qualified immunity was not available to any prison official or physicians, who were allegedly deliberately indifferent to pre-trial detainee's medical needs in violation of the due process clause of the Fourteenth Amendment; it was clearly established at time of alleged conduct that deliberate indifference to inmate's medical needs violated inmate's constitutional rights. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

13 Cases that cite this headnote

**[8]    Health** 👉 Particular procedures

Under New York law, pre-trial detainee, who was epileptic, was required to present expert medical opinion evidence to support his medical malpractice claim against hospital and physicians, arising out of their treatment of him in connection with cell extraction.

1 Case that cites this headnote

**[9]    Municipal, County, and Local Government** 👉 Particular claims

New York statutory requirement that notice of claims against city employee had to be filed with city comptroller as condition precedent to maintaining tort claims against employees, applied only to claims against employees for which employees had right to indemnification from city. McKinney's General Municipal Law § 50-k.

1 Case that cites this headnote

**Attorneys and Law Firms**

Rodney Boomer, Elmira, NY, pro se.

Concepcion A. Montoya, Corporation Counsel of the City of New York, New York, NY, for defendants Lanigan, Grant, Rivituso, Moran, Wheeler, White, Weather, Santana, Martin, and Conquet.

Andrew Zwirling, Garbarini & Scher, New York, NY, for defendants Patel and St. Barnabas Hospital.

*OPINION AND ORDER*

COTE, J.

**\*1** Plaintiff Rodney Boomer ("Boomer"), who is proceeding *pro se,* brought this action on July 26, 2000, pursuant to 42 U.S.C. § 1983 ("Section 1983"), alleging excessive force and deprivation of medical treatment in violation of the Fourteenth Amendment in connection with a cell extraction which occurred on the night of September 14, 1999, at the Central Punitive Segregation Unit ("CPSU") of the Otis Bantum Correctional Center at Riker's Island, where Boomer was a pre-trial detainee. Boomer also alleges assault, battery, and negligence under state law. On August 29, 2001, Dr. Patel ("Patel") and St. Barnabas Hospital ("St.Barnabas") (collectively, the "Hospital Defendants") moved to dismiss. By Opinion and Order dated December 17, 2001, this Court denied that motion. *Boomer v. Lanigan,* No. 00 Civ. 5540(DLC), 2001 U.S. Dist. LEXIS 20838 (S.D.N.Y.2001). Following discovery, Gary Lanigan ("Lanigan"), L. Grant ("Grant"), Randy Wheeler ("Wheeler") and Andre White ("White"), Ervin Weatherl ("Weatherl"), Ronnie Santana ("Santana"), Elliot Martin ("Martin"), and Peter Conquet ("Conquet") (collectively, the "DOCS Defendants") moved for summary judgment. The Hospital Defendants also moved for summary judgment. For the reasons stated below, defendants' motions for summary judgment are granted in part and denied in part.

BACKGROUND

The following facts are undisputed or as described by Boomer unless noted otherwise.[1] Boomer has a history of epilepsy resulting from a head injury sometime in 1996 or 1997, and

walks with a cane because of an injury sustained during a fight with an inmate. Boomer also has a long history of back pain for which he has received physical therapy.

On September 14, 1999, Boomer was a pre-trial detainee housed in an isolation cell in the CPSU. At approximately noon on September 14, Boomer began feeling "dizzy headed," which he described in his deposition testimony as "the same feeling when I'm about to go into a seizure." In his verified second amended complaint, Boomer states that, at approximately 2:00 p.m. and again at approximately 7:00 p.m., he told corrections officers, whom he is unable to identify, of his condition. The DOCS Defendants state that they have no record that Boomer informed anyone of his condition. According to Boomer, the corrections officer to whom he spoke at approximately 7:00 p.m. left the food slot of his cell door open and told him "to get some air" until medical personnel arrived.[2] In his second amended complaint, Boomer states that no medical staff visited his cell. Boomer thereafter refused to remove his arm from the food slot of his cell door and was generally being loud and disruptive.

At approximately 9:45 p.m., a cell extraction team consisting of Captain Wheeler and Corrections Officers White, Weatherl, Santana, Martin, and Conquet (the "Extraction Team") assembled outside Boomer's cell. Boomer states that he attempted to explain to Wheeler that he was epileptic and feeling sick, but that Wheeler "swiftly cut [him] off by spraying chemical agent into [his] eyes, face and hair." A video tape made of the incident, which begins at 9:45 p.m., shows that Wheeler gave several orders to Boomer to remove his left arm from the food slot, but Boomer refused to do so. Wheeler then stated to the video camera that he received authorization from Assistant Deputy Warden Moran to remove plaintiff from his cell, and that he had received authorization from Igwe to use a chemical agent, but not an electronic immobilization shield.[3]

**\*2** According to the video tape evidence, at approximately 9:49 p.m., the Team opened the door of Boomer's cell slightly and Wheeler sprayed a one-second burst of a chemical agent. The Team then closed the door and waited for the chemical agent to take effect. Wheeler occasionally attempted to guide Boomer's arm back through the food slot. At approximately 9:53, Boomer began to slap his hand against the outside of the cell door below the food slot. At approximately 9:55 p.m., his left arm began to shake spasmodically.

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 79 of 427

In his second amended complaint, Boomer states that Wheeler ordered the Team to open and close the cell door several times while he was having convulsions and his arm was still hanging out of the food slot. According to the video tape evidence, however, the door to Boomer's cell remained closed until approximately 9:56 p.m., when the Team entered Boomer's cell, handcuffed Boomer, who was apparently unconscious, and carried him to an elevator, took him to another floor of the CPSU, and placed him on a stretcher. At approximately 10:04 p.m., the Team removed Boomer from the stretcher and carried him to a shower cell. At 10:05, the video tape of the incident temporarily stops.

Igwe states that at approximately 10:25 p.m., he examined Boomer at the shower area because Boomer refused to go to the examination room. Boomer states in his second amended complaint that although he was experiencing "severe head and neck pain and could have suffered a serious life threatening head concus[s]ion or brain damage[ ] during his extreme violent seizure attack," Igwe did not conduct an examination of him. Igwe's notes indicate that Boomer refused a "full evaluation." There is no video tape evidence of Igwe's examination.

At approximately 11:04 p.m., the video tape resumed and continued to record until 11:33 p.m. Wheeler stated to the video camera that Boomer had been examined by medical personnel and was being escorted to the "housing area." Boomer appears on the tape standing in the shower cell and does not appear to be in any pain. He waited patiently and watched through the shower cell door as the Team attempted to determine which key opened the door. Upon opening the door, the video tape shows the Team escorting Boomer to an elevator and then to another floor. Boomer walked without any apparent pain and appeared to be calm.

The video tape shows that when the Team then attempted to insert Boomer into another holding cell, Boomer became physically aggressive, threatening and spitting at a corrections officer not pictured. The tape shows that a scuffle ensued between Boomer and the Team, which consisted essentially of the Team leaning into Boomer to hold him against the wall until he settled down. While they were holding him against the wall, various Team members sought to talk Boomer into voluntarily entering the holding cell. The video tape further shows that after a few minutes, at approximately 11:12 p.m., the Team pushed him into the holding cell, and that Boomer never lost his footing when they did so. The video tape shows that inside the cell, the Team attempted to uncuff Boomer,

but he resisted. The Team responded by again leaning against Boomer, who was now seated on a bench in the cell, to hold him in place until he again settled down. The video tape shows that at approximately 11:15 p.m., the Team ceased leaning against Boomer. They stood around him with only their hands resting on his shoulders and talked with him as he said that he would not stay in the holding cell and wanted to be returned to his original cell.

**\*3** The tape shows that at 11:22 p.m., Wheeler attempted to explain to Boomer why he would remain in the holding cell. Boomer responded with aggressive language. The Team continued to stand around Boomer until 11:30 p.m., when they escorted him to the medical clinic. Boomer walked without any apparent pain or injury. At 11:33 p.m., Boomer was inserted without incident into a holding cell in the medical clinic. The tape then temporarily stops.

At 12:18 p.m., the video tape resumes. At 12:20 a.m. on September 15, Boomer was escorted out of the holding cell in the medical clinic to an examining table. The tape shows that at 12:21 a.m., Boomer was secured to the examining table. The tape then temporarily stops.

At 12:25 a.m., Boomer was examined by Patel. This examination is not recorded on tape. In his second amended complaint, Boomer states that he was "only verbally interviewed but once again obtain[ed] no medical treatment or exam" with regard to his epileptic condition.

The video tape resumes at 12:27 a.m. It shows the Team waiting for the examination to conclude. At 12:28 a.m., the tape temporarily stops. It resumes at 12:29 a.m. and shows the Team escorting Boomer to his original cell without incident. At 12:32 a.m., the tape recording concludes.

Boomer states in his second amended complaint that on September 20, 1999, he filed an "institutional grievance complaint" with respect to the cell extraction of September 14, 1999. Boomer states, however, that the grievance was returned to him and that he was "informed that [the CPSU] Grievance program do[es] not handle matters of staff assault, misuse of force and lack or denial in medical issues." Boomer does not specify who gave him this information. In this connection, Boomer has submitted an affidavit by inmate Ronald Henderson ("Henderson") in which Henderson states that DOCS' staff frequently mishandles inmate grievances.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 80 of 427

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

In his "Second Opposition," Boomer states that he is unable to submit a copy of the grievance because his legal documents were taken from him while he was an inmate at Sing Sing Correctional Facility. In connection with the St. Barnabas Defendants' Motion to Dismiss, however, Boomer did submit a copy of the grievance that he states he filed. *See Boomer,* 2001 U.S. Dist. LEXIS 20838, at *7. In that grievance, which Boomer erroneously dated September 14, *1998,* Boomer writes that he informed a corrections officer that he was epileptic and feeling ill. Thereafter,

> [t]he officer left my food slot open[ ] telling me to get some air while he contact[s the] medical unit. Medical staff never showed up, and approximately (30) minutes later a[n] unknown captain and several officers showed up in full riot gear. As I started to explain[ ] to [the] captain that I am feeling ill and that I am a[n] epileptic person, [t]his captain swiftly cut me off by spraying chemical agent in my eyes, nose and face. I immediately went into a violent seizure attack while one of my arms remained extended out of [the] food slot. I was flopping around violently during my seizure attack and one could eas[i]ly see that I was undergoing an epileptic attack. However, this captain continued to order the cell door open while one of my arms remained extended out of [the] slot. They continued their assault while I remained unconscious and undergoing my seizure attack. I was taken to CPSU clinic and verbally interviewed by [a] doctor. I received no examination despite th[e] fact that I told him my back, head, [and] neck was hurting severely.

 **\*4** The DOCS Defendants' records do not reflect any filing of a grievance by Boomer in connection with the September 14, 1999 extraction. Their records show that Boomer filed three grievances from September 1999 to August 2000, and that none of these addressed the September 14 extraction.

Boomer admits in his "Second Opposition" that he took no action to appeal the CPSU staff's refusal to accept his grievance. Boomer states, however, that he "was powerless in this matter because he was CPSU-confined (23) twenty-three hours a day with absolutely no available hands on access to IGP [Inmate Grievance Procedure] Department, committee, warden or IGP staff person."

In his second amended complaint, Boomer further states that on September 21, an "investigator from the New York City Commission Department of Investigation for DOCS" named Willoughby ("Willoughby") visited Boomer's cell to obtain a written statement regarding the cell extraction. Boomer states that Willoughby also interviewed an inmate who witnessed the extraction.

Boomer states that he contacted Jonathan Chasan ("Chasan") of the New York City Prisoners' Rights Project and that Chasan obtained the video tape recordings of the September 14 cell extraction. Boomer states that he did not thereafter receive any more information from either Willoughby or Chasan.

Standard

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 465–66 (2d Cir.), cert. denied, 534 U.S.993, 122 S.Ct. 460, 151 L.Ed.2d 378 (2001). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Fed.R.Civ.P. 56(e); *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment,

this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue. Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). [4]

DISCUSSION

**\*5** Boomer argues that the defendants used excessive force against him and were deliberately indifferent to his medical needs. Boomer further argues that defendants committed assault and battery on him and were negligent in their medical care of him. The defendants deny these claims and respond that Boomer failed to exhaust his administrative remedies, that they are immune from liability under the doctrine of qualified immunity, and, with respect to the state law claims, that Boomer failed to file a notice of claim with the Comptroller of the City of New York. Each of these issues is considered in turn.

*I. Federal Claims*

*A. Excessive Force*

 [1]    "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir.1999). In the Second Circuit, the same standard applies to excessive force claims under the Fourteenth Amendment as applies under the Eighth Amendment. *Id.* at 48. To establish a constitutional violation under either amendment, an inmate must meet both a subjective and an objective requirement. *Id.* at 48–49. "[T]he subjective requirement is satisfied if the defendant has a sufficiently culpable state of mind, shown by actions characterized by wantonness." *Id.* at 50 (citations omitted). The core of the inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). As to the objective requirement, it is well established in this Circuit that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)

(citation omitted). The plaintiff must show that the violation is "objectively sufficiently serious or harmful enough," *Walsh,* 194 F.3d at 50, and not *de minimis, id.*

Boomer argues that the DOCS Defendants used excessive force when they (1) used a chemical agent on him, (2) opened and closed his cell door repeatedly while he was experiencing a seizure, (3) entered his cell, and (4) pushed him into the holding cell. With respect to the use of the chemical agent, Boomer asserted in his second amended complaint that Wheeler used the spray as he was attempting to explain his medical problems to him. Boomer has failed to address, however, the video tape evidence that covers the approximately four minutes before the spray was used. It shows, and Boomer has not disputed, that the Wheeler used a chemical agent only after repeated orders to Boomer that he remove his arm from the food slot. In his opposition, Boomer argues that Wheeler simply ordered him to close his food slot without asking him why he refused to do so, and that this somehow constitutes excessive force. Boomer has failed to explain, however, why he should not have obeyed a repeated order of a corrections officer or why Wheeler, the commanding officer of a cell extraction team who had received authorization to extract Boomer from his cell, was obligated to listen to Boomer's complaint.

 **\*6** The DOCS Defendants have also shown, and Boomer has not disputed, that Wheeler used a minimal, one-second burst of the agent, after receiving authorization to do so from Igwe. Given these undisputed facts, Boomer has not presented evidence to raise an issue of fact that, as a subjective matter, the DOCS Defendants' actions were "characterized by wantonness."

 [2]    With respect to the other incidents which Boomer alleged in his pleadings constituted excessive force, Boomer has failed to address the video tape evidence that the Team did not open and close his cell door repeatedly, that the Team entered his cell when he was unconscious and applied no force whatsoever to him at that time, and that when the Team pushed him into the holding cell, it did so with minimal force and only after holding him in place for several minutes in an effort to settle him down. In his submissions in opposition to the motions for summary judgment, Boomer has essentially abandoned his excessive force allegations with respect to these incidents. He has presented no evidence in response to the DOCS Defendants' video tape or motion papers. Given this undisputed evidence, Boomer cannot establish that the Team acted with "wantonness" or that their use of force

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 82 of 427

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

constituted an objectively sufficiently serious deprivation of his constitutional rights. For these reasons, Boomer's claims of excessive force must be dismissed.

## B. Deliberate Indifference to Medical Needs

 **[3]**   While a convicted prisoner's right to medical care stems from the Eighth Amendment's ban on cruel and unusual punishments, *see Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), the analogous right of a pretrial detainee arises under the Due Process Clause of the Fourteenth Amendment. *Henderson v. Sheahan,* 196 F.3d 839, 845 n. 2 (7th Cir.1999); *Lopez v. LeMaster,* 172 F.3d 756, 764 (10th Cir.1999); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Ali v. Szabo,* 81 F.Supp.2d 447, 463 (S.D.N.Y.1999). "[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856.

"[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* To prove a violation, a plaintiff must show deliberate indifference under an objective and a subjective test. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). To satisfy the objective prong, the alleged deprivation must be of a "sufficiently serious" condition, one that "may produce death, degeneration, or extreme pain." *Morales v. Mackalm, et al.,* 278 F.3d 126, 132 (2d Cir.2002) (citation omitted). The subjective prong requires the plaintiff to demonstrate that the official acted with a sufficiently culpable state of mind, which must be "the equivalent of criminal recklessness," namely, when the official "knows of and disregards an excessive risk to inmate health or safety." *Hathaway,* 99 F.3d at 553 (citation omitted). Mere negligence or medical malpractice does not constitute deliberate indifference, *id.,* nor do mere differences of opinion between the prisoner and the defendants concerning the proper course of treatment. *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). Rather, officials must "intentionally deny[ ] or delay[ ] access to medical care or intentionally interfere with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05.

 **\*7**   Boomer argues that defendants were deliberately indifferent to his medical needs when they (1) failed to provide him with medical attention after he initially reported feeling dizzy, (2) used a chemical agent upon him despite his epileptic condition, (3) failed thoroughly to examine him in the shower cell, and (4) failed thoroughly to examine him at 12:25 a.m.

With respect to the first issue, Boomer has raised a material question of fact as to whether he informed corrections personnel that he was feeling dizzy at 2:00 p.m. and 7:00 p.m. on September 14, and as to whether any medical personnel visited his cell before the Team approached his cell at approximately 9:45 p.m. Ignoring requests for medical care made by a prisoner known to be an epileptic may constitute deliberate indifference to serious medical needs, particularly when it is undisputed that the inmate suffered a seizure after making those requests.

 **[4]**   As to the use of the chemical agent, it is undisputed that Igwe was aware of Boomer's history of epilepsy when he authorized the use of a chemical agent during the cell extraction. In light of the undisputed facts that Boomer experienced a seizure upon being sprayed with the agent and that he required medical attention after that seizure, Boomer has raised a question of fact as to whether the authorization to use a chemical agent on an inmate with a history of epilepsy constituted deliberate indifference to that inmate's medical needs.

 **[5]**   With respect to the final two issues, the thoroughness of the examinations, Boomer does not dispute that Igwe examined him at approximately 10:25 p.m. and that Patel examined him at approximately 12:25 a.m. Boomer's argument is that the examinations, neither of which was recorded on video tape, were not thorough enough given his epileptic condition and given the "excruciating" pain he states he was experiencing. The medical records do not reflect that Boomer was given any pain medication after his seizure. Boomer has raised a question of fact as to whether Igwe and Patel were deliberately indifferent to his medical needs in failing to treat the extreme pain he states he was experiencing. Boomer has not identified other treatment that his condition required and that he was denied during these two examinations.

## C. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 83 of 427

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (1994) (emphasis supplied). In *Nussle v. Porter,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), the Supreme Court held that "the PLRA's exhaustion requirement applies to all suits about prison life, whether they involve general circumstances or particular episodes," *id. at 532.* Because Boomer's remaining deliberate indifference to medical needs claims fall within Section 1997(e)(a)'s exhaustion requirement, Boomer must have exhausted his administrative remedies for those claims prior to filing his complaint.

**\*8  [6]**    Each of the deliberate indifference claims that has survived defendants' motions for summary judgment was sufficiently identified in the copy of the grievance Boomer asserts that he submitted to the prison. Boomer states that the grievance was returned to him and that he was told, in effect, that the CPSU grievance process did not handle the claims he was grieving. Boomer failed to appeal this refusal to accept his grievance, but contends that he was unable to do so because of the restrictions associated with his confinement in CPSU. Boomer has also presented evidence, in the form of Henderson's affidavit, that the CPSU staff often failed properly to handle grievances. Boomer presents this evidence in support of the argument that but for the CPSU staff's failure to handle his grievance properly, he would have exhausted his administrative remedies. This evidence creates issues of fact regarding Boomer's exhaustion of his administrative remedies.

### D. Qualified Immunity

**[7]**    Defendants argue that they are immune from liability under the doctrine of qualified immunity. "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were clearly established at the time." *Poe v. Leonard,* 282 F.3d 123, 132 (2d Cir.2002) (citation omitted). The first step in a qualified immunity analysis is to "determine whether the plaintiff[ ] ha[s] alleged a violation of a constitutional right." *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002); *see also Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002). The second step is to "determine whether the right was clearly established at the time of the alleged violation." *African Trade,* 294 F.3d at 359. Thus "a qualified immunity defense is established when ... the defendant's action did not violate clearly established law." *Poe,* 282 F.3d at 133 (citation omitted). Because it was clearly established at the time of the alleged conduct that deliberate indifference to an inmate's medical needs violates an inmate's constitutional rights, the defense of qualified immunity is not available to any defendant who was deliberately indifferent.

### II. State Law Claims

#### A. Assault and Battery

Under New York law, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact," and a battery is "an intentional wrongful physical contact with another person without consent." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993); *see also Johnson v. Suffolk County Police Department,* 245 A.D.2d 340, 665 N.Y.S.2d 440, 440 (N.Y.App.Div.1997). Neither tort requires a physical injury. *See Hassan v. Marriott Corp.,* 243 A.D.2d 406, 663 N.Y.S.2d 558, 559 (N.Y.App.Div.1997) ("Physical injury need not be present for an assault"); *Zgraggen v. Wilsey,* 200 A.D.2d 818, 606 N.Y.S.2d 444, 445 (N.Y.App.Div.1994) ("An action for battery may be sustained without a showing that the actor intended to cause injury as a result of the intended contact."). The DOCS Defendants have not responded to Boomer's assault and battery claim other than to argue that it is barred by his failure to file a notice of claim with the Comptroller of the City of New York, which is addressed below.

#### B. Negligence

**\*9  [8]**    Boomer's claim that the Hospital Defendants were "negligent" in their treatment of him is governed by New York's medical malpractice law. "To establish a claim of medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Milano v. Freed,* 64 F.3d 91, 95 (2d Cir.1995) (citation omitted). "New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, expert medical opinion evidence is

required to make out both of these elements." *Id.* (citing state court cases). *See also Barnes v. Anderson,* 202 F.3d 150, 259–60 (2d Cir.1999); *Einaugler v. Supreme Court,* 109 F.3d 836, 841 (2d Cir.1997). The requirement for expert medical testimony applies to *pro se* inmate plaintiffs. *See, e.g., Perez v. State of New York,* 293 A.D.2d 918, 742 N.Y.S.2d 140, 142 (3d Dep't 2002).

Boomer has failed to present any expert medical testimony in support of this claim. Since Boomer's analogous Fourteenth Amendment claims have survived summary judgment, he will be given a further opportunity to obtain expert medical testimony to support his state law claims of medical malpractice.

*C. Notice of Claim*

 **[9]**    Defendants argue that Boomer's state law claims should be dismissed because he failed to file a notice of claim with the Comptroller of the City of New York. In federal court, state law notice of claim requirements apply to pendent state law claims such as Boomer's. *Hardy v. N.Y. City Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir.1999). It is well established that a plaintiff suing a New York City employee must serve a notice of claim on the City if, at the time the alleged injury occurred, the employee was acting within the scope of his duty such that the City may be required to indemnify the employee. *See, e.g., Silverman v. City of N.Y.,* 98 Civ. 6277(ILG), 2001 WL 218943, at *8 (E.D.N.Y. Feb. 2, 2001); *Ortega v. City of N.Y.,* 95 Civ. 7206(LMM), 2000 WL 358459, at *2 (S.D.N.Y. Apr. 7, 2000); *Sussman v. N.Y. City Health & Hosp. Corp.,* 94 Civ. 8461(DBS), 1997 WL 334964, at *17 (S.D.N.Y. June 16, 1997); *D'Angelo v. City of N.Y.,* 929 F.Supp. 129, 135 (S.D.N.Y.1996); *Alifieris v. Am. Airlines, Inc.,* 63 N.Y.2d 370, 377, 482 N.Y.S.2d 453, 472 N.E.2d 303 (1984) (interpreting Section 50–j); *cf. Shakur v. McGrath,* 517 F.2d 983, 985 (2d Cir.1975) (notice of claim required in suit against employee doctors and the City "as their indemnitor"). Under New York General Municipal Law Sections 50–e and 50–i, a plaintiff may not maintain a tort claim against a municipality unless that claim has been preceded by a notice of claim served upon the municipality within ninety days of the time the cause of action arose. *See* N.Y. Gen. Mun. Law §§ 50–e, -i (McKinney 1999). A plaintiff required to file a notice of claim fails to state a cause of action if he does not plead the following in the complaint: "that (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy,* 164 F.3d at 793.

 **\*10**   While the notice of claim requirement is applicable to certain claims against municipal employees, it does not, however, apply to all such claims. Section 50–e(1) does not itself create an obligation to file a notice of claim, but sets a ninety-day time limit for filing the notice "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action ... against a public corporation ... or any ... employee thereof." N.Y. Gen. Mun. Law § 50–e(1)(a).

It appears that Section 50–k is the source of the duty to file a notice of claim when suing City employees. Section 50–k, entitled "Civil actions against employees of the city of New York," provides for the defense and indemnification of City employees for certain tort claims. Indemnification is limited to acts that

> occurred while the employee was *acting within the scope of his public employment* and in the discharge of his duties and w[ere] not in violation of any rule or regulation of his agency at the time the alleged damages were sustained; the duty to indemnify ... *shall not arise* where the injury or damage resulted *from intentional wrongdoing or recklessness* on the part of the employee.

*Id.* § 50–k(3) (McKinney 1999) (emphasis supplied). Section 50–k(6) then provides that "no action or proceeding instituted hereunder ... shall be prosecuted or maintained against the city or any agency or an employee unless notice of claim shall have been made and served upon the city in compliance with section fifty-e of this chapter." *Id.* § 50–k(6). Although Section 50–k(6) does not specify what constitutes an action "instituted hereunder," that provision is best understood to apply only to claims against a City employee for which the employee has a right to indemnification. *Int'l Shared Servs., Inc. v. County of Nassau,* 222 A.D.2d 407, 634 N.Y.S.2d 722, 724 (2d Dep't 1995); *Bardi v. Warren County Sheriff's Dep't,* 194 A.D.2d 21, 603 N.Y.S.2d 90, 92 (3d Dep't 1993); *see also Reed v. Powers,* 97 Civ. 7152(DLC), 2002 U.S. Dist. Lexis 5125, at *19 (S.D.N.Y. Mar. 28, 2002); *Hemrie v. City of N.Y.,* 96 Civ. 213(DLC), 2000 WL 1234594, at *2–3 (S.D.N.Y. Aug. 31, 2000).

Boomer v. Lanigan, Not Reported in Fed. Supp. (2002)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 85 of 427

Defendants have not cited or discussed Section 50–k(6) or shown that they may be entitled to indemnification by the City. Accordingly, summary judgment on Boomer's state law claims based on his failure to plead the filing of a notice of claim is not available without a further showing.

CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted in part and denied in part. They are granted with respect to Boomer's excessive force claim. They are denied with respect to Boomer's deliberate indifference to medical needs claims and negligence claims arising from the alleged failure timely to provide Boomer with medical attention after he reported feeling dizzy, the authorization of the use of a chemical agent, and the failure to treat his pain at the 10:25 p.m. and 12:25 a.m. examinations. They are also denied with respect to the assault and battery claims.[5] A Scheduling Order governing the further litigation of these issues will also be issued.

**\*11**  SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2002 WL 31413804

---

**Footnotes**

1    Boomer has submitted numerous papers in connection with summary judgment motions filed in the instant action as well as another action before this Court, *Boomer v. Lanigman, et al.,* 00 Civ. 4709(DLC). In connection with the instant action, Boomer has submitted two hand-written versions of his opposition under the title "Response in opposition to Defendants' Summary Judgment [motion]." The versions appear to be verbatim copies, although the pagination is different. Boomer has also submitted a sur-reply under the title "Continuation Attachment Opposition response of plaintiff[']s (3) three part response to both counsels['] Summary Judgments" and a further "Declaration of Rodney Boomer."

2    The DOCS Defendants state that at approximately 8:00 p.m., Boomer was visited by Dr. Okechukwu Igwe ("Igwe") of St. Barnabas. Igwe's notes, which are largely illegible, record that Boomer refused treatment at that time.

3    The use of an electronic immobilization shield was contraindicated because of Boomer's history of epilepsy.

4    Both the Court and the defendants provided Boomer with a formal notice of the Rule 56 requirements for opposing defendants' summary judgment motions.

5    A separate Opinion will be issued relating to St. Barnabas's claim that it cannot be held liable under Section 1983 because it lacks policymaking authority with respect to inmate health services.

---

**End of Document**                               © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 86 of 427

Boyd v. Doe #1, Not Reported in Fed. Supp. (2019)

2019 WL 1771501
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nyjee L. BOYD, Plaintiff,
v.
John DOE #1, et al., Defendants.

9:18-CV-1333 (TJM/ATB)
|
Signed 04/23/2019

**Attorneys and Law Firms**

NYJEE L. BOYD, Plaintiff, Pro Se, 15-B-2063, Clinton Correctional Facility, P.O. Box 2001, Dannemora, NY 12929.

**DECISION AND ORDER**

[Thomas J. McAvoy](), Senior, U.S. District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff Nyjee L. Boyd commenced this action pursuant to [42 U.S.C. § 1983]() ("[Section 1983]()") by filing a pro se civil rights complaint together with an application for leave to proceed in forma pauperis. Dkt. No. 1 ("Compl."); Dkt. No. 4 ("IFP Application"). By Decision and Order of this Court filed January 2, 2019, plaintiff's IFP Application was granted, and following review of the complaint pursuant to [28 U.S.C. § 1915(e)(2)(B)]() and [28 U.S.C. § 1915A(b)](), some of plaintiff's claims and some of the named defendants were dismissed and the Court directed service and a response for the claims against the named defendants that survived sua sponte review. Dkt. No. 6 (the "January 2019 Order").

Presently before this Court is plaintiff's motion to amend his complaint, together with a proposed amended complaint. Dkt. No. 18 ("Motion to Amend"); Dkt. No. 18-1 ("Am. Compl."). At the time plaintiff submitted these documents, service was not completed on all of the defendants who remained in the action following the January 2019 Order, and none of the defendants who had been served had responded to the complaint. Thus, plaintiff was not required to obtain the Court's leave or defendants' consent before amending his complaint. As a result, the Court will consider plaintiff's proposed amended complaint as an amended complaint filed as of right in accordance with [Rule 15(a)(1) of the Federal Rules of Civil Procedure](). [1]

**II. DISCUSSION**

 **A. The Complaint and January 2019 Order**
In his original complaint, plaintiff asserted claims arising while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at Clinton Correctional Facility ("Clinton C.F."). *See generally* Compl. Plaintiff named as defendants DOCCS Commissioner Anthony Annucci, Superintendent of Clinton C.F. E. Bell, as well as several corrections officials who allegedly worked at Clinton C.F. between April 2018 and August 2018. *Id.*

The complaint was construed to assert the following claims: (1) First Amendment free exercise claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, W ood, and Sgt John Doe #1; (2) First Amendment retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Sgt John Doe #1, Wood, Hunt, Young, Holland, C.O. John Doe #4, and C.O. John Doe #5; (3) Eighth Amendment conditions-of-confinement claims against defendants Baer, C.O. John Doe #2, Wood, Young, and C.O. John Doe #3; (4) Eighth Amendment excessive force and failure-to-intervene claims against defendants Hunt, Baer, Sgt John Doe #1, Sgt John Doe #2, C.O. John Doe #1, and John Doe #6; (5) Fourteenth Amendment due process claims against defendants Wood and Baer based on the issuance of false misbehavior reports; (6) a Fourteenth Amendment destruction of property claim against defendant Wood; and (7) supervisory liability claims against defendants Bell and Annucci. *See* January 2019 Order at 9-10.

 **\*2** Following review of the complaint pursuant to [28 U.S.C. § 1915(e)(2)(B)]() and [28 U.S.C. § 1915A(b),]() the following claims were found to survive sua sponte review and require a response: (1) plaintiff's free exercise claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Sgt John Doe #1, Wood, Annucci, and Bell; (2) plaintiff's retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, W ood, Hunt, Young, Holland, Annucci, and Bell; and (3) plaintiff's excessive force and failure-to-intervene claims against defendants Sgt John Doe #1, Sgt John Doe #2, C.O. John Doe #1, C.O. John Doe #6, Baer, Hunt, Annucci, and Bell. *See* January 2019 Order at 25-26. All remaining claims were dismissed without prejudice for failure to state a claim upon which relief may be granted, and defendants John Doe #4 and John Doe #5 were dismissed as defendants from the action without prejudice. *Id.* at 26.

### B. Review of the Amended Complaint

Because plaintiff is proceeding in forma pauperis and is an inmate suing government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the January 2019 Order and it will not be restated in this Decision and Order. *See* January 2019 Order at 2-4.

Plaintiff's amended complaint is substantially the same as his original complaint with a few exceptions.

First, plaintiff has withdrawn his claims against defendants John Doe #4 and John Doe #5. *See generally*, Am. Compl.

Second, plaintiff has added the following claims for relief against existing defendants based on the same allegations contained in the original complaint: (1) an Eighth Amendment failure-to-intervene claim against defendant John Doe #3 based on the alleged events that occurred on April 6, 2018; (2) an Eighth Amendment failure-to-protect claim against defendant Holland based on the alleged events that occurred on April 26, 2018; and (3) an Eighth Amendment medical indifference claim against defendant Wood based on an alleged event that occurred on May 1, 2018. *See* Am. Compl. at 13-16, 20.

Third, plaintiff has added Corrections Officer Dubrey and Corrections Officer Hill as defendants and asserted the following claims against them based on the same allegations contained in the original complaint: (1) a First Amendment free exercise claim against defendant Dubrey based on the alleged event that occurred on July 18, 2018; (2) a First Amendment retaliation claim against defendant Dubrey based on the alleged event that occurred on July 18, 2018; (3) an Eighth Amendment conditions-of-confinement claim against defendant Dubrey based on the alleged event that occurred on July 18, 2018; (4) an Eighth Amendment excessive force claim against defendant Dubrey based on the alleged event that occurred on July 18, 2018; and (5) an Eighth Amendment conditions-of-confinement claim against defendant Hill based on the alleged event that occurred on August 5, 2018. *See* Am. Compl. at 15-16.

Fourth, plaintiff has asserted new claims against defendants Baer, Bell, and Annucci, and added Corrections Officer John Doe #7 as a defendant, based on new allegations about an event that occurred on March 29, 2018. The following new facts are set forth as alleged in the amended complaint.

On March 29, 2018, at approximately 2:30 pm, plaintiff "returned from a law library call-out to Lower F-Block[.]" Am. Compl. at 8. Upon arriving at the Lower F-Block, plaintiff and another inmate were forced to wait on "two company by the A-man[,]" defendant Corrections Officer John Doe #7 ("John Doe #7"), for approximately thirty minutes before John Doe #7 gave them "a direct order" to return to their company. *Id.* Before leaving, plaintiff asked defendant John Doe #7 to place him on "the list for chow and gym[.]" *Id.* Defendant John Doe #7 cursed at plaintiff and told him to "lock in" to his cell. *Id.*

**\*3** Defendant Baer, who was standing nearby, then ordered plaintiff to "get on the ... wall." Compl. at 8. Plaintiff "obeyed" the order and defendant Baer proceeded to berate plaintiff for questioning staff. *Id.* Defendant Baer then searched plaintiff while two other unknown corrections officers stood behind him. *Id.* During the search, defendant Baer "stuck his hand in [plaintiff's] boxers" and "pulled [plaintiff's] testicles causing [him] severe pain[.]" *Id.* Plaintiff notified defendants Annucci and Bell about the events of March 29, 2018, but his complaint was "disregarded[.]" *Id.* at 10, 19.

The Court construes these allegations to assert an Eighth Amendment excessive force claim against defendant Baer, an Eighth Amendment failure-to-intervene claim against defendant John Doe #7, and supervisory liability claims against defendants Bell and Annucci.

The remainder of the amended complaint is materially similar to the original complaint, and re-asserts all of the same claims asserted in the original complaint against all of the same defendants (with the exception of defendants John Doe #4 and John Doe #5). *See generally* Am. Compl. For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### 1. Claims Based on Events of March 29, 2018

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of

pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).[2]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

**\*4** At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's excessive force claim against defendant Baer survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's claims against defendants John Doe #7, Annucci, and Bell. With respect to defendant John Doe #7, the amended complaint does not allege any facts regarding the nature or duration of defendant Baer's alleged use of force during the frisk, or where defendant John Doe #7 was physically located in relation to plaintiff, making it impossible for the Court to determine the plausibility of whether defendant John Doe #7 had a realistic opportunity to stop the alleged use of excessive force before its completion. *See Rosen v. City of New York*, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) ("In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to

himself, yet fails to intervene."); *Dean v. New York City*, No. 15-CV-8825, 2017 WL 3670036, at \*4 (S.D.N.Y. July 6, 2017) (denying as futile leave to amend to add failure-to-intervene claim against corrections official where the proposed amended complaint was "devoid of any factual allegations against P.O. Myers with respect to the failure to intervene claim, such as, for example, where P.O. Myers was located and what she was doing when P.O. Baksh pepper sprayed the plaintiff's face"); *Cusamano v. Sobek*, 604 F. Supp.2d 416, 429 (N.D.N.Y. 2009) (excusing an officer from liability "despite his presence, if the assault is 'sudden and brief,' such that there is no real opportunity to prevent it"). Moreover, the amended complaint lacks any allegations which plausibly suggest that defendant John Doe #7 knew (or had a basis for knowing) prior to the alleged use of force that plaintiff was at risk of being harmed by defendant Baer. *See Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at \*8 (S.D.N.Y. Nov. 20, 2017) ("[A]side from a conclusory allegation that '[D]efendants[ ] w[ere] fully aware of [the] unsafe condition and refused to take any measures whatsoever to protect the safety of the most vulnerable mental health offenders,' the Complaint is devoid of any allegations that any Defendant specifically knew that Ebanks was infected with HIV or Hepatits C, that he had a propensity to assault other inmates, or that Plaintiff personally was in danger of being assaulted by Ebanks.... The Complaint therefore fails to allege that Defendants were 'aware of facts from which the inference could be drawn that' Ebanks specifically posed a substantial risk of harm to Plaintiff, or that Defendants in fact drew such an inference.").

With respect to defendants Bell and Annucci, the Second Circuit held prior to Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).[3]

**\*5** Here, plaintiff alleges only that he complained to defendants Bell and Annucci about the events of March 29, 2018, and his complaints were "disregarded[.]" Am.

Compl. at 10, 19. Plaintiff has not alleged any facts which plausibly suggest that his complaints about the events of March 29, 2018, raised concerns about ongoing or continued misconduct. Nor has plaintiff attached to his amended complaint copies of his complaints regarding this alleged incident from which the Court could potentially draw such an inference. Thus, there is no basis for the Court to infer that, at the time defendants Bell and Annucci were made aware of the alleged events of March 29, 2018, they also became aware that plaintiff was experiencing an ongoing violation of his constitutional rights.

Moreover, a "failure to remedy" theory of liability is not available against a supervisor with respect to discrete and completed violations. *See Jackson*, 256 F.3d at 96 (citing *Blyden*, 186 F.3d at 259, 264 and *Wright*, 21 F.3d at 501); *see also Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) ("[T]he wrong must have been ongoing or otherwise capable of mitigation at the time the supervisory official was apprised thereof."). "If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Harnett v. Barr,* 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008).

Accordingly, plaintiff's Eighth Amendment claims against defendants John Doe #7, Bell, and Annucci based on the alleged events of March 29, 2018, are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 2. Failure-to-Intervene Claim Against Defendant John Doe #3

Plaintiff's failure-to-protect claim against defendant John Doe #3 is based on an allegation that he stood nearby while defendant Hunt subjected plaintiff to excessive force during a pat frisk. Am. Compl. at 20. Plaintiff, however, does not allege any facts regarding the nature or duration of the alleged use of force during the frisk, or defendant John Doe #3's proximity to defendant Hunt, making it impossible for the Court to determine the plausibility of whether defendant John Doe #3 had a realistic opportunity to stop the alleged use of excessive force before its completion. Moreover, the amended complaint lacks any allegations which plausibly suggest that defendant John Doe #3 knew (or had a basis for knowing) prior to the alleged use of force that plaintiff was at risk of being harmed by defendant Hunt.

Accordingly, plaintiff's Eighth Amendment failure-to-intervene claim against defendant John Doe #3 based on the alleged events of April 6, 2018, is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 3. Failure-to-Protect Claim Against Defendant Holland

Plaintiff's failure-to-protect claim against defendant Holland is based on an allegation that he refused plaintiff's protective custody request and instead threatened plaintiff for making complaints on April 26, 2018. Am. Compl. at 13-14.

In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer*, 511 U.S. at 836. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Neither mere negligence nor a prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim." *Sawyer v. New York State Depat. of Corr. Servs.*, No. 11-CV-0152, 2015 WL 6644112, at *7 (W.D.N.Y. June 30, 2015) (citing *Garcia v. Witkowski*, 988 F. Supp. 2d 360, 361 (W.D.N.Y. 2013)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Shell v. Brun*, 585 F. Supp. 2d 465, 469-70 (W.D.N.Y. 2008) ("In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. Mere negligence (for example if a prison guard should know of a risk but does not) is not enough...."); *Jones v. Kelly*, 918 F. Supp. 74, 80 (W.D.N.Y. 1995) ("[D]efendant Morrissey's April, 1993 denial of plaintiff's transfer under the 'automatic' transfer evaluation provision of DOCS Directive No. 4948, Protective Custody Status, ¶ III(A) ... does not subject Morrissey to § 1983 liability in the absence of any proof that he deliberately, rather than negligently or inadvertently, disregarded a substantial risk to plaintiff's safety.").

**\*6** Here, plaintiff does not allege any facts which plausibly suggest that, at the time he requested protective custody,

Boyd v. Doe #1, Not Reported in Fed. Supp. (2019)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 90 of 427

defendant Holland was aware of a specific threat to plaintiff's safety. Moreover, plaintiff does not allege that he requested protective custody out of fear for his safety at that time. Rather, plaintiff alleges in conclusory fashion that he requested protective custody because corrections officials were "denying [him] meals and retaliating against [him]." Am. Compl. at 13. Thus, there is no basis for the Court to infer that defendant Holland deliberately disregarded an excessive risk to plaintiff's safety in denying him protective custody.

Accordingly, plaintiff's Eighth Amendment failure-to-protect claim against defendant Holland is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [4]

### 4. Medical Indifference Claim Against Defendant Wood

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle*, 429 U.S. at 102, 104. The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing, *inter alia, Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer*, 511 U.S. at 832 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden*,

186 F.3d at 262 (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' ").

**\*7** Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. *See Banks v. No. 8932 Corr. Officer*, No. 11-CV-8359, 2013 WL 673883, at \*4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); *Davidson v. Scully*, No. 83-CV-2025, 1994 WL 669549, at \*12 (S.D.N.Y. Nov. 30, 1994) ("Evidence of deliberate indifference may be found in: a lengthy delay in arranging for medically indicated treatment for a prisoner's serious medical problem, ... deliberate interference with a prisoner's prescribed treatment, ... the refusal of prison officials to provide necessary medical care as punishment for misconduct unrelated to the prisoner's medical condition, ... and a serious failure to provide needed medical attention when prison officials are fully aware of that need...." (internal quotation marks and citations omitted)); *see also Estelle*, 429 U.S. at 104-05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

Here, plaintiff alleges that while he was "being moved to Upper F from Lower F[,]" he informed defendant Wood, "who was transporting [plaintiff] to [his] knew [sic] location[,]" that he "couldn't carry [his] bags due to medical issues with [his] lower back and left knee[.]" Am. Compl. at 15. In response, defendant Wood stated that if plaintiff did not carry his bags, he would not receive his property. *Id.* Plaintiff then reiterated his "medical issues" and was escorted to his new cell without his bags because defendant Wood "refused" to carry them. *Id.*

Plaintiff's allegations regarding his "medical issues" are entirely conclusory. Plaintiff does not allege, for example, that a medical professional diagnosed him with an injury or condition that would worsen if he lifted objects over a certain weight. Nor does he allege that he was medically excused from lifting objects over a certain weight. Thus, there is no basis for inferring either that plaintiff suffered from a sufficiently serious medical condition at the time he requested

assistance from defendant Wood, or that defendant Wood, in not agreeing to carry plaintiff's property, acted with deliberate indifference to plaintiff's serious medical needs.

Accordingly, plaintiff's Eighth Amendment medical indifference claim against defendant Wood is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [5]

### 5. Excessive Force Claim Against Defendant Dubrey

**\*8** Plaintiff's excessive force claim against defendant Dubrey is based on an allegation that defendant Dubrey placed "mechanical restraints on [him] tight." Am. Compl. at 15.

Placing an inmate in handcuffs is not a per se constitutional violation. Rather, courts have held that tight handcuffing gives rise to an Eighth Amendment claim when "1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) [there is a] degree of injury to the wrists." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal quotation marks and citations omitted); *see also Benitez v. Locastro*, No. 9:04-CV-423 (NAM/RFT), 2010 WL 419999, at *1, *12 (N.D.N.Y. Jan. 29, 2010) (dismissing Eighth Amendment claim based on tight handcuffing where plaintiff failed to "allege for how long the handcuffs and shackles were applied, [ ]or the circumstances of their application").

Here, the amended complaint lacks any allegations which plausibly suggest that defendant Dubrey applied handcuffs maliciously and sadistically to cause harm. Moreover, plaintiff does not allege that he experienced any pain or injury as a result of the "tight" restraints. Nor does he allege that he complained to defendant Dubrey about the tightness after the restraints were placed on him.

Accordingly, plaintiff's Eighth Amendment excessive force claim against defendant Dubrey is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 6. Free Exercise and Retaliation Claims Against Defendant Dubrey

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's free exercise and retaliation claims against defendant Dubrey survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 7. Conditions-of-Confinement Claims Against Defendants Dubrey and Hill

Plaintiff's conditions-of-confinement claims against defendants Dubrey and Hill are based on allegations that on one occasion, defendant Dubrey denied him access to the gym, and on a separate occasion, defendant Hill denied him access to a meal. Am. Compl. at 15-16. As noted in the January 2019 Order, such limited deprivations are insufficient to state an Eighth Amendment violation. See January 2019 Order at 17-19.

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claims against defendants Dubrey and Hill are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 8. Remaining Claims

In addition to the claims discussed above, plaintiff also reasserts the following claims in the amended complaint that he set forth in the original complaint: (1) First Amendment free exercise claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Wood, and Sgt John Doe #1; (2) First Amendment retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Sgt John Doe #1, Wood, Hunt, Young, Holland; (3) Eighth Amendment conditions-of-confinement claims against defendants Baer, C.O. John Doe #2, Wood, Young, and C.O. John Doe #3; (4) Eighth Amendment excessive force and failure-to-intervene claims against defendants Hunt, Baer, Sgt John Doe #1, Sgt John Doe #2, C.O. John Doe #1, and John Doe #6; (5) Fourteenth Amendment due process claims against defendants Wood and Baer based on the issuance of false misbehavior reports;

Boyd v. Doe #1, Not Reported in Fed. Supp. (2019)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 92 of 427

(6) a Fourteenth Amendment destruction of property claim against defendant Wood; and (7) supervisory liability claims against defendants Bell and Annucci based on the alleged wrongdoing that occurred between April 2018 and August 2018. *See generally* Am. Compl.

**\*9** The Court found in the January 2019 Order that the following claims survived sua sponte review and required a response: (1) plaintiff's free exercise claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Sgt John Doe #1, Wood, Annucci, and Bell; (2) plaintiff's retaliation claims against defendants C.O. John Doe #2, Baer, C.O. John Doe #3, Wood, Hunt, Young, Holland, Annucci, and Bell; and (3) plaintiff's excessive force and failure-to-intervene claims against defendants Sgt John Doe #1, Sgt John Doe #2, C.O. John Doe #1, C.O. John Doe #6, Baer, Hunt, Annucci, and Bell. *See* January 2019 Order at 25-26. For the reasons set forth in the January 2019 Order, these claims once again survive sua sponte review and require a response.

Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court finds that plaintiff's remaining claims are subject to dismissal for the same reasons set forth in the January 2019 Order. *See generally*, January 2019 Order.

### C. Defendants' Motion to Dismiss

In light of the Court's decision to treat the proposed amended complaint as an amended complaint filed as of right, and because certain claims in the amended complaint that were not pled in the original complaint have survived initial review, defendants' Motion to Dismiss portions of the original complaint is denied without prejudice and with leave to renew upon the completion of service on all of the named defendants who remain in this action.

The deadline for the defendants who have already been served to respond to the amended complaint is stayed pending the completion of service on all of the named defendants who remain in this action. Upon the completion of service on all of the named defendants who remain in this action, the deadline for all of the named defendants to respond to the amended complaint shall be reset in accordance with the Federal Rules of Civil Procedure.

### III. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the Clerk shall docket plaintiff's proposed amended complaint (Dkt. No. 18-1) as the amended complaint, which is accepted for filing and is the operative pleading; and it is further

**ORDERED** that the Clerk shall update the docket to add the following parties as defendants: (1) Corrections Officer Dubrey; (2) Corrections Officer Hill; and (3) Corrections Officer John Doe #7; and it is further

**ORDERED** that the following claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's free exercise claims against defendants Dubrey, C.O. John Doe #2, Baer, C.O. John Doe #3, Sgt John Doe #1, Wood, Annucci, and Bell; (2) plaintiff's retaliation claims against defendants Dubrey, C.O. John Doe #2, Baer, C.O. John Doe #3, Wood, Hunt, Young, Holland, Annucci, and Bell; and (3) plaintiff's excessive force and failure-to-intervene claims against defendants Sgt John Doe #1, Sgt John Doe #2, C.O. John Doe #1, C.O. John Doe #6, Baer, Hunt, Annucci, and Bell; and it is further

**ORDERED** that all remaining claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted;[6] and it is further

**\*10** **ORDERED** that the Clerk shall issue summonses and forward them, along with copies of the amended complaint, to the United States Marshal for service upon defendants Dubrey and Holland;[7] and it is further

**ORDERED** that the deadline for defendants Annucci, Baer, Bell, Hunt, Wood, and Young to respond to the amended complaint is **STAYED** pending the completion of service on defendants Dubrey and Holland. Upon the completion of service on defendants Dubrey and Holland, defendants Annucci, Baer, Bell, Hunt, Wood, Young, Holland, and Dubrey must respond to the amended complaint in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff take reasonable steps to ascertain the identity of the "Doe" defendants, and when identified, seek to amend the complaint to add the individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a);[8] and it is further

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 93 of 427

Boyd v. Doe #1, Not Reported in Fed. Supp. (2019)

**ORDERED** that the Motion to Dismiss (Dkt. No. 20) is **DENIED without prejudice and with leave to renew** upon the completion of service on defendants Holland and Dubrey; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is**

**also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk serve a copy of this Decision and Order on plaintiff and counsel for the defendants who have appeared in this action.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1771501

---

## Footnotes

1    One week after plaintiff's Motion to Amend was docketed, counsel for certain of the named defendants filed a motion to dismiss portions of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 20 ("Motion to Dismiss").

2    In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

3    The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*);" *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citing *Grullon*, 720 F.3d at 139)). For purposes of this Decision and Order, the Court assumes that all five categories under *Colon* remain valid.

4    To the extent plaintiff has attempted to assert an Eighth Amendment claim against defendant Holland based on alleged harassment, the law is clear that verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under Section 1983. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam); *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *see also Rivera v. Goord*, 119 F. Supp. 2d

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 94 of 427

**Boyd v. Doe #1, Not Reported in Fed. Supp. (2019)**

327, 342 (S.D.N.Y. 2000) (collecting cases). "While under extreme circumstances the Eighth Amendment's prohibition against cruel and unusual punishment may encompass intentionally inflicted psychological injury, necessarily excluded from this protection is conduct causing only de minimis psychological harm." *Johnson v. Brown*, No. 9:09-CV-0002 (GTS/DEP), 2010 WL 6243352, at *6 (N.D.N.Y. Sept. 3, 2010) (collecting cases), *report and recommendation adopted by* 2011 WL 1097864 (N.D.N.Y. Mar. 22, 2011); *see also Jermosen v. Coughlin*, No. 87-CV-6267, 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993), *aff'd*, 41 F.3d 1501 (2d Cir. 1994) (officers approaching inmate with nightsticks raised in a threatening position caused only de minimus psychological pain). In this case, the amended complaint fails to allege facts which plausibly suggest that the alleged comments made by defendant Holland subjected plaintiff to psychological harm which rises to the level of a constitutional violation.

5    Analyzing plaintiff's allegations as a conditions-of-confinement claim would fare no better for plaintiff because depriving him of unidentified personal property does not constitute a per se deprivation of a basic human need, and there are no allegations in the amended complaint that defendant Wood refused to carry plaintiff's property despite knowing that plaintiff would be deprived of a basic human need. *See Bowens v. Smith*, No. 9:11-CV-784 (GLS/ATB), 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an 'unquestioned and serious deprivation of basic human needs,' and that defendants imposed those conditions with deliberate indifference.") (quoting *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996)), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013). Furthermore, plaintiff alleges that he received his property the next day. Am. Compl. at 15. While he also alleges that his property was "damaged[,]" plaintiff does not identify what property was "damaged," or how it was "damaged." Nor does plaintiff allege any facts from which an inference could be drawn that the "damage" occurred out of deliberate indifference to one of his basic human needs.

6    Generally, when a district court dismisses a *pro se* action *sua sponte*, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend. *See Shuler v. Brown*, No. 9:07-CV-0937 (TJM/GHL), 2009 WL 790973, at *5 & n.25 (N.D.N.Y. March 23, 2009) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint."), *accord*, *Smith v. Fischer*, No. 9:07-CV-1264 (DNH/GHL), 2009 WL 632890, at *5 & n.20 (N.D.N.Y. March 9, 2009); *Abascal v. Hilton*, No. 9:04-CV-1401 (LEK/GHL), 2008 WL 268366, at *8 (N.D.N.Y. Jan. 13, 2008); *see also Yang v. New York City Trans. Auth.*, 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 384 (S.D.N.Y. 1998) (denying leave to amend where plaintiff had already amended complaint once); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading).

7    Because David A. Rosenberg, on behalf of the Office of the New York State Attorney General, has appeared in this action as counsel for defendants Annucci, Baer, Bell, Hunt, Wood, and Young, the Clerk need not issue summonses for these defendants.

8    Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 698799
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

BRIAN E. SCHMIEGE, Plaintiff,

v.

DEPUTY SECURITY
STACHOWSKI, et al., Defendants.

9:22-cv-1371 (ECC/PJE)
|
Filed 03/12/2026

**Attorneys and Law Firms**

Appearances:

Brian E. Schmiege, Pro Se Plaintiff

Aimee Cowan, Asst. Att'y Gen., for Defendants

Brian E. Schmiege, Youngstown, NY, Pro Se.

Aimee Cowan, Office of the Attorney General - Syracuse
Regional Office, Syracuse, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Elizabeth C. Coombe U.S. District Judge

## I. INTRODUCTION

**\*1** Plaintiff Brian Schmiege commenced this civil rights
action under 42 U.S.C. § 1983 asserting claims for the
violation of his constitutional rights at Auburn Correctional
Facility (C.F.). Dkt. No. 1. On August 26, 2024, Defendants
Harvey, Howard, Marren, Pflueger, Stachowski, and Vitale
filed a motion for summary judgment pursuant to Fed. R.
Civ. P. 56(a), seeking dismissal of Plaintiff's claims against
them. Dkt. No. 57. On April 28, 2025, Defendant Hamilton
filed a motion for summary judgment pursuant to Fed. R.
Civ. P. 56(a), also seeking dismissal of the claims against
him. Dkt. No. 83. This matter was assigned to United States
Magistrate Judge Paul J. Evangelista, who issued Report-
Recommendations recommending that the respective motions
for summary judgment be granted in part and denied in
part. Dkt. Nos. 80, 95. Defendants Pflueger and Harvey filed
timely objections on April 25, 2025. Dkt. No. 81.

## II. STANDARD OF REVIEW

This Court reviews de novo those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection. *Petersen v.
Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C.
§ 636(b)(1)(C). "A proper objection is one that identifies
the specific portions of the [report-recommendation] that
the objector asserts are erroneous and provides a basis for
this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F.
Supp. 2d 290, 296 (E.D.N.Y. 2013) (internal quotation marks
omitted). Properly raised objections must be "specific and
clearly aimed at particular findings" in the report. *Molefe
v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487
(S.D.N.Y. 2009). "[E]ven a pro se party's objections to a
Report and Recommendation must be specific and clearly
aimed at particular findings in the magistrate's proposal ...."
*Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920
at \*2 (S.D.N.Y. Aug. 25, 2011) (citation omitted). Findings
and recommendations as to which there was no properly
preserved objection are reviewed for clear error. *Id.*

## III. BACKGROUND

Chief U.S. District Judge Brenda K. Sannes initially reviewed
Plaintiff's pro se Complaint pursuant to 28 U.S.C. §§
1915(e) and 1915A, and determined that the following claims
survived the Court's sua sponte review under those standards:
(1) Eighth Amendment excessive force claims against
Defendants Pflueger, Marren, Vitale, Howard, Harvey, and
Hamilton, arising from (a) an alleged assault of Plaintiff in his
cell on July 27, 2022, and (b) another inmate's alleged assault
of Plaintiff on August 12, 2022; (2) Eighth Amendment
failure-to-protect claim against Defendant Stachowski; and
(3) First Amendment retaliation claims arising from (a)
Defendants Hamilton, Howard, Marren, Vitale, and Pflueger's
alleged incitement of another inmate to assault Plaintiff
in August 2022 in retaliation for Plaintiff's letters and
complaints related to a March 2020 assault, and (b) Defendant
Pflueger's alleged issuance of a false misbehavior report in
retaliation for Plaintiff's July 2022 grievance against Pflueger.
Dkt. No. 10.

**\*2** Defendants moved for summary judgment, seeking
dismissal of the Complaint in its entirety. Dkt. Nos. 57, 83.
With respect to Defendants' argument concerning Plaintiff's
failure to exhaust his administrative remedies, Magistrate
Judge Evangelista determined that Plaintiff failed to raise
a question of material fact as to whether he exhausted his
administrative remedies for the alleged assault on July 27,

2022. Dkt. Nos. 80 at 16-33; 95 at 16-31. Magistrate Judge Evangelista also found that Plaintiff failed to raise a question of material fact as to whether he exhausted his administrative remedies with respect to Defendant Stachowski's alleged failure to protect him. Dkt. No. 80 at 22-24, 30. Accordingly, Magistrate Judge Evangelista recommended dismissal of these claims. Magistrate Judge Evangelista further deemed Plaintiff's retaliation claim against Pflueger arising from an alleged false misbehavior report issued on July 27, 2022 to be abandoned. Dkt. No. 80 at 7 n. 8.

Alternatively, Magistrate Judge Evangelista determined that Plaintiff exhausted his administrative remedies with respect to his retaliation claim surrounding the August 12, 2022 assault. Dkt. Nos. 80 at 24-25; 95 at 22-24. With respect to the merits of Plaintiff's retaliation claim, Magistrate Judge Evangelista concluded that Plaintiff failed to raise a question of material fact as to Defendants Howard, Vitale, and Marren's lack of personal involvement, but that summary judgment should be denied as to Plaintiff's retaliation claims against Defendants Pflueger, Harvey, and Hamilton. Dkt. Nos. 80 at 33-42; 90 at 31-39.

## IV. DISCUSSION

### A. First Amendment Retaliation

#### 1. Failure to Exhaust Administrative Remedies

Defendants Pflueger and Harvey [1] object to Magistrate Judge Evangelista's determination that Plaintiff properly exhausted his administrative remedies with respect to the First Amendment retaliation claim arising from the August 12, 2022 assault. Dkt. No. 81 at 7. Specifically, they contend that Plaintiff's grievance did not properly alert the facility to the existence of a retaliation claim against Pflueger and Harvey, who were not specifically named in the grievance. Defendants contend that the underlying facts are analogous to the court's determination in *Solano v. Aubin*, No. 20-cv-1378 (BKS/ML), 2023 WL 5200397 (N.D.N.Y. Aug. 14, 2023).

On August 31, 2022, Plaintiff prepared a "Grievance Complaint" alleging that he was assaulted by another incarcerated individual at Auburn C.F. who was "told to kill" Plaintiff by "orders of security staff at Auburn C.F." Dkt. No. 57-15 at 4. Plaintiff did not identify the corrections officers by name in his grievance. *Id.* He did, however, provide other information, including that they were the same corrections

officers against whom he had previously been awarded a court settlement, who were facing criminal charges related to a prior assault on Plaintiff, and that the corrections officers were "caught on audio and video camera footage" inciting the "hit" on Plaintiff. *Id.*

Plaintiff's grievance was denied in a September 30, 2022 Superintendent Response, which stated in relevant part:

> The Grievant states on 8/12/22 they were violently assaulted by another [incarcerated individual] at Auburn CF. They state security told the [incarcerated individual] to kill them. They state this happened because they filed a lawsuit against staff and won.

> Per the investigation, when interviewed grievant was uncooperative, refusing to speak with the [sergeant], and no staff were identified in his grievance, therefore, based on this investigation, grievant's allegations could not be substantiated.

Dkt. No. 57-15 at 5.

Plaintiff appealed the decision of the Superintendent, indicating that the "audio [and] video camera footage" his lawyer obtained via a FOIL request depicted the security staff involved in the incident. Dkt. No. 57-15 at 5. Plaintiff further stated that "no one ever came to talk" to him about the grievance. *Id.* A memorandum in the record suggests that Plaintiff refused to speak to an investigating sergeant about this grievance because he was not of a "high enough rank." *Id.* at 6.

**\*3** On these facts, Magistrate Judge Evangelista properly denied the Defendants' motion to dismiss Plaintiff's relation claim for failure to exhaust his administrative remedies. As the court in *Solano* noted, "[A] claim may be exhausted when it is closely related to, but not explicitly mentioned in an exhausted grievance," *Barnes v. Annucci*, No. 15-cv-0777, 2019 WL 1387460, at \*10 (N.D.N.Y. March 12, 2019), and a grievance need not identify by name those accused of misconduct, *see Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009). As explained by the Second Circuit, a grievance is sufficient to "advance the benefits of exhaustion" where "prison officials had the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident." *Espinal*, 558 F.3d at 127. In this case, Plaintiff's August 31, 2022 grievance placed prison officials on notice of his claim that he had been assaulted by another incarcerated inmate at the direction

of other corrections officers because of his prior actions. Although it did not identify the corrections officers by name, it provided other information from which investigating officials could learn their identity, including notice of relevant video footage. There is also no question that the facility knew the identity of the incarcerated individual who attacked Plaintiff on August 12 th , and that Plaintiff was subject to a disciplinary hearing as a result of the assault. Dkt. No. 57-14 at 103-04. Defendants do not contend that they pursued any information other than attempting an interview with Plaintiff, and Plaintiff disputes their contention that he refused an interview regarding the grievance. Moreover, Defendants cannot meaningfully argue that the grievance did not give adequate notice of Plaintiff's retaliation claim, in light of the Superintendent's summary of the grievance explicitly noting Plaintiff's claim that the assault was because of Plaintiff's prior lawsuits.

In *Solano,* the factual allegations in plaintiff's grievance were limited to a single claim of assault against a specific corrections officer. 2023 WL 5200397, at *6. Solano subsequently filed suit against other corrections officers for excessive force and failure to intervene, allegedly related to the incident cited in the grievance. *Id.* at *7. Under those circumstances, the court found that "[p]laintiff's grievance, which does identify by name one individual and makes no mention of the presence—let alone the actions or inaction —of any others, fails to provide the requisite notice." *Id.* at *7. The court cited to caselaw suggesting that the deficiency was based in large part on plaintiff's failure to alert prison officials that his complaint in any way exceeded the scope of the isolated allegation of assault by a single corrections officer. *See id.* (citing *Thousand v. Corrigan*, No. 15-cv-1025, 2017 WL 1093275, at *4 (N.D.N.Y. Mar. 23, 2017) ("Plaintiff concedes that the grievance 'makes no mention of any other correction officer being present or taking part in the assault.' Plaintiff also conceded that his grievance made no mention of any bystander who witnessed the assault[ ] and did not mention any failure to protect or intervene by any correction official. In light of these and other admissions, ... Plaintiff's grievance was insufficient to alert 'the prison officials that he was alleging some wrongdoing beyond that alleged against the individual or individuals specifically named in the grievance.' " (citations omitted)); *Peele v. Donah*, No. 15-cv-317, 2016 WL 4400473, at *5–6 (N.D.N.Y. June 14, 2016) (recommending denial of the defendants' motion for summary judgment where the plaintiff had failed to identify some correction officer defendants by name in his grievance but had alleged that "other officers" were involved in the

incident), *report and recommendation adopted*, 2016 WL 4386019 (N.D.N.Y. Aug. 17, 2016)).

Here, however, the conduct that Plaintiff complained of – assault and retaliation – was sufficiently identified in his grievance. To the extent the defendants are not specifically identified, the grievance provided "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident." *Espinal*, 558 F.3d at 127. Defendants Pflueger and Harvey thus fail to meet their burden on summary judgment of proving failure to exhaust. Accordingly, the Court accepts Magistrate Judge Evangelista's recommendation denying summary judgment to Defendants Pflueger and Harvey on Plaintiff's First Amendment retaliation claims for failure to exhaust administrative remedies, and their motion is denied in this respect.

### 2. Merits

Defendants Pflueger and Harvey object to Magistrate Judge Evangelista's determination that a genuine issue of material fact exists regarding their retaliatory intent, precluding summary judgment on the merits of Plaintiff's retaliation claims against them. Dkt. No. 81 at 10-13. Defendants contend that Magistrate Judge Evangelista improperly expanded the scope of the alleged retaliation to include protected conduct other than the letters/complaints Plaintiff filed in August 2022 about his March 2020 assault, and that no reasonable factfinder could conclude that the assault happened as a result of Pflueger's retaliatory intent. Dkt. No. 81 at 11-13. Defendants further contend that Magistrate Judge Evangelista erred in construing a retaliation claim against Defendant Harvey, and that Harvey cannot be liable for retaliation because he was not working at the facility on the date of the assault. *Id.* at 13-15.

**\*4** The Complaint alleges that on August 8, 2022, incarcerated individual Quick approached Plaintiff and threatened him because "the C.O.'s" were complaining that Plaintiff

> was a problem [and] ... making D-Block-5 Company "hot" by dropping grievances and writing letters to Deputy Security Stachowski [and] Superintendent Corey about [Plaintiff]

being a victim of a racist hate crime [and] ... being violently assaulted by the C.O.'s back on 3/19/2020 at Auburn C.F.

Dkt. No. 1 at 7-8. The Complaint further alleges that on August 12, 2022, Defendants Howard, Hamilton, Marren, Vitale, and Pflueger "all gave [Quick] orders to assault [Plaintiff and] stab [him] to death[.]" *Id.* at 8. Quick attacked Plaintiff that morning.

At his deposition, Plaintiff testified that Quick "threatened to kill" him prior to the assault. Dkt. No. 57-14 at 76-77. Specifically, Quick told Plaintiff on August 8, 2012 that Defendants Harvey and Hamilton had approached Quick and stated that Plaintiff was "making it fucking hot." *Id.* at 78. Quick told Plaintiff, "they're telling me that I can't do what I want to do if you keep on making the block hot, and they're telling me that I got to get you the fuck out of here." *Id.* at 79.

Plaintiff further testified that he observed Defendants Hamilton and Harvey standing outside Quick's cell the morning of August 12, 2022. Dkt. No. 57-14 at 100-01. Plaintiff did not hear their conversation, and testified that the corrections officers stopped at Quick's cell every morning to "get an update or something of that nature." *Id.* at 103. Plaintiff then observed Quick come out of his cell and walk down toward the corrections officers, to have a conversation with them. *Id.* When the corrections officers subsequently announced the chow run, Plaintiff's cell was the only cell out of the forty cells on the block that opened, which was not normal. *Id.* Plaintiff testified that all of the corrections officers named in the Complaint were standing at the end of the company. Dkt. No. 57-14 at 92-93, 95. [2] During the assault, they "were just standing there, watching it. They weren't trying to help [Plaintiff] .... They stood there and let it happen." *Id.* Plaintiff testified that the assault by Quick was retaliation for his grievance complaining about Pflueger's conduct on July 27, 2022. *Id.* at 114-16; *see* Dkt. No. 57-5 at 13.

To establish a First Amendment retaliation claim, a plaintiff must show: "that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 27 (2d Cir. 2012) (citation omitted).

Moreover, he must establish the personal involvement of each defendant. *See Raspardo v. Carlone,* 770 F.3d 97, 115-16 (2d Cir. 2014). As Magistrate Judge Evangelista correctly noted, Plaintiff's grievances and letters complaining about the Defendant corrections officers' conduct constitute protected conduct. *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003). Furthermore, inciting one incarcerated individual to attack another may constitute adverse action. *Brandon v. Kinter,* 938 F.3d 21, 42 (2d Cir. 2019) ("We not doubt that exposing a prisoner to potential assault by another inmate can constitute an adverse action[.]").

**\*5** Pflueger denies ever directing or requesting that Quick assault Plaintiff, and contends that he is unaware of any complaints filed in August 2022 about an alleged March 2020 assault. Dkt. No. 57-11 ¶¶ 7-8. According to Plaintiff's testimony, Pflueger is not one of the corrections officers Quick identified on August 8th as directing the assault for retaliatory purposes, nor did Pflueger approach Quick's cell immediately before the assault on August 12th. Dkt. No. 57-14 at 78, 100-01. The only evidence linking Pflueger to the assault is Plaintiff's testimony that Pflueger was one of many corrections officers present on the block, he observed the assault take place, and failed to take any action. Even if this evidence was sufficient to maintain an Eighth Amendment claim for failure to intervene, there is nothing in the record to suggest that Pflueger's conduct – standing and watching the assault – was for retaliatory purposes beyond the temporal proximity between Plaintiff's grievances/letters about Pflueger, and the assault by another incarcerated individual to whom Pflueger has no apparent connection. This is insufficient to defeat summary judgment. *See Williams v. King*, 763 F. App'x 36, 38–39 (2d Cir. 2019) ("The only evidence demonstrating a retaliatory motive is temporal proximity which, alone, is insufficient to defeat summary judgment."). Accordingly, the Court rejects Magistrate Judge Evangelista's recommendation denying summary judgment to Defendant Pflueger on Plaintiff's First Amendment retaliation claim against him, and Defendant Pflueger's motion is granted in this respect.

The Court reaches a different conclusion with respect to Defendant Harvey. [3] Harvey denies directing or requesting that Quick assault Plaintiff on August 12, 2022. Dkt. No. 81-1 ¶ 4. Harvey also maintains, and submits evidence, indicating that he was not working at the facility on August 12th. Dkt. Nos. 81-1 at ¶ 5, 81-2 at 1-3. Nevertheless, even if Harvey has established he was not at the facility

the morning of the attack, a genuine dispute of material fact exists as to whether he instructed Quick to assault Plaintiff prior to that day. Viewing the evidence in the light most favorable to Plaintiff, Harvey and Hamilton approached Quick sometime prior to August 12th directing him to attack Plaintiff because of the effect his grievances were having on them, i.e. making the block "hot." These statements, coupled with the temporal proximity between plaintiff's grievances/letters and the assault on August 12th, are sufficient to create a genuine dispute of material fact as to the First Amendment retaliation claim against Harvey. Accordingly, the Court adopts Magistrate Judge Evangelista's recommendation denying summary judgment to Defendant Harvey on Plaintiff's First Amendment retaliation claim, and Defendant Harvey's motion is denied in this respect.

### B. Eighth Amendment Claims Premised on August 12, 2022 Assault

The Court seeks to clarify the status of Plaintiff's Eighth Amendment claims arising from the August 12, 2022 assault. Chief Judge Sannes previously determined that Plaintiff's Eighth Amendment excessive force claims against Pflueger, Marren, Vitale, Howard, Harvey, and Hamilton survived sua sponte review and require a response. Dkt. No. 10 at 11-12. Although not explicitly stated in the decision and order, this included Plaintiff's allegations arising from the Defendants' alleged incitement of an attack on Plaintiff by another incarcerated individual. Chief Judge Sannes specifically noted in her decision permitting these claims to proceed that "[a]llegations that a correctional officer made statements intending to incite others to attack an inmate may state a claim under the Eighth Amendment." *Id.* (citing *Phillips v. Cortland Cnty. Sheriff's Dep't*, No. 5:13-CV-00955, 2013 WL 5464908, at *4 (N.D.N.Y. Sept. 30, 2013), *report and recommendation adopted*, 2013 WL 6799342 (N.D.N.Y. Dec. 20, 2013)).

**\*6** Although the Defendants' motions for summary judgment seek dismissal of the Complaint in its entirety, the Defendants do not address or request relief concerning Plaintiff's Eighth Amendment claims arising from the August 12, 2022 assault. Notably, in reciting the claims surviving Chief Judge Sannes' review of the Complaint, the Defendants only refer to the Eighth Amendment excessive force claims arising from the alleged incident on July 27, 2022. Dkt. No. 57-2 at 8-9. The Court has some concerns that this oversight may have implicated Defendants' obligation to

provide mandatory disclosures relevant to this claim, which at this juncture is still posed to proceed to trial. Accordingly, Defendants are directed to provide the Court with a status update within 20 days of the date of this decision and order, indicating whether they satisfied their discovery obligations with respect to this claim. Defendants should also state their position on whether the Court should grant leave to file a motion for summary judgment limited to this claim.

### C. Remainder of the Report-Recommendations

The Court otherwise reviews the remainder of the Report-Recommendations for clear error and, having found none, adopts the remainder of the Report-Recommendations in their entirety.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Magistrate Judge Evangelista's Report-Recommendations, Dkt. Nos. 80, 95, are **ADOPTED in part** and **REJECTED in part**;[4] and it is further

**ORDERED** that Defendants' motions for summary judgment, Dkt. Nos. 57, 83, are **GRANTED in part** and **DENIED in part**;[5] and it is further

**ORDERED** that, within twenty (20) days of this Memorandum-Decision and Order, Defendants shall file a status update indicating whether they satisfied their discovery obligations with respect to Plaintiff's surviving Eighth Amendment claims stemming from an alleged assault by another incarcerated individual on August 12, 2022, as well as Defendants' position on whether the Court should grant leave to file a motion for summary judgment limited to this claim; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2026 WL 698799

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 100 of 427

## Footnotes

1     Defendant Hamilton did not submit any objections to Magistrate Judge Evangelista's recommendation that his motion for summary judgment on Plaintiff's retaliation claim based on failure to exhaust be denied.

2     When Plaintiff later responded to a question by defense counsel confirming the list of individuals standing at the end of the company during the assault, neither counsel nor Plaintiff specifically identified Defendant Howard. Dkt. No. 57-14 at 95.

3     To the extent Defendants contend there is no surviving retaliation claim against Harvey, the Complaint and evidence of record are reasonably construed to plausibly allege such a claim. The Complaint refers to "the C.O.'s" who directed Quick to assault Plaintiff on August 8, 2022, and further discovery clarifies the pro se Plaintiff's position that Harvey directed the assault on Plaintiff and was at Quick's cell immediately prior to assault. Moreover, construing such a claim against Harvey presents no prejudice to Defendants, to the extent the Court has considered the supplemental arguments and exhibits contained in their objections to address this claim.

4     The Report-Recommendations are rejected insofar as they recommend not dismissing Plaintiff's First Amendment retaliation claim against Defendant Pflueger relating to the August 12, 2022 assault, and to the extent they can be construed to limit Defendants' surviving excessive force claims as not including those arising from the August 12th assault by another incarcerated individual.

5     As a result of this Memorandum-Decision and Order, the only remaining claims are Plaintiff's First Amendment retaliation claims against Defendant Harvey and Hamilton, and Eighth Amendment claims stemming from the August 12, 2022 assault by another incarcerated individual.

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1611993
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

CA, INC., d/b/a CA Technologies, Plaintiff,
v.
NEW RELIC, INC., Defendant.

No. CV I2–5468(AKT).
|
Signed March 30, 2015.
|
Filed April 8, 2015.

**Attorneys and Law Firms**

Barry Shelton, Conor Civins, Matthew Gates, Pillsbury Winthrop Shaw Pittman LLP, Austin, TX, for Plaintiff.

Craig N. Dee, Elizabeth Mara Aboulafia, Elizabeth Usinger, Cullen and Dykman, LLP, Garden City, NY, Christa Anderson, Corey Johanningmeier, Elizabeth Egan, Elizabeth McCloskey, Jesse P. Basbaum, Matthew Mickle Werdegar, Matthias A. Kamber, Rebekah Punak, Robert A. Van Nest, Keker & Van Nest LLP, San Francisco, CA, for Defendant.

### *MEMORANDUM AND ORDER*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

### I. *PRELIMINARY STATEMENT*

**\*1** In this patent infringement action, plaintiff CA, Inc. ("CA") alleges that defendant New Relic, Inc. ("New Relic") has infringed three patents which deal with monitoring the performance of software applications, otherwise known as application performance management ("APM") software. *See generally* Compl. [DE 1]. New Relic asserted in its First Affirmative Defense that CA's three patents are invalid for failure to satisfy the conditions of patentability. *See* Answer to Compi. ¶ 62 [DE 8].

Presently before the Court is CA's motion for partial summary judgment seeking to strike New Relic's First Affirmative Defense as to two of the three patents at issue-U.S. Patent No. 7,225,361 B2 ("the ′361 Patent") and U.S. Patent No. 7,797,580 B2 ("the ′580 Patent")-and to estop New Relic

from contesting the validity of those two patents. *See* DE 116. CA's motion is premised on the equitable doctrine of assignor estoppel, which bars an inventor who assigned his or her patent to another for valuable consideration from later asserting that the patent is invalid. *See* Pl.'s Memorandum of Law in Support of its Motion For Partial Summary Judgment Based on the Doctrine of Assignor Estoppel ("Pl.'s Mem.") at 1 [DE 116–1]. The doctrine also bars companies in privity with the inventor from asserting the defense of invalidity where the company relied on the inventor's knowledge and assistance in creating products accused of infringing the inventor's patents. *See id.*

Lewis Cirne ("Cirne"), the sole founder and CEO of Defendant New Relic, is one of two named inventors of the ′361 and ′580 Patents. The parties do not dispute that Cirne would be personally estopped from asserting that the ′361 and ′580 Patents that he co-invented are invalid. *See* Defendant New Relic's Corrected Memorandum of Law in Opposition to CA's Motion for Partial Summary Judgment ("Def.'s Opp.") at 16 n. 11 [DE 119]; Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion ("Pl.'s Reply") at 2 [DE 128]. Rather, the sole issue before the Court is whether New Relic should be estopped from asserting an invalidity defense because it is in privity with Cirne under the doctrine of assignor estoppel.

Although the parties generally agree on the applicable law governing the doctrine of assignor estoppel, they dispute whether the record supports a finding, as a matter of law, of privity between New Relic and Cirne. CA argues the undisputed facts show that New Relic sufficiently availed itself of Cirne's knowledge and assistance in developing the accused products to justify finding privity between New Relic and Cirne. *See* Pl.'s Mem. at 15–16. New Relic, on the other hand, asserts that because New Relic did not rely on Cirne's knowledge or assistance in developing the specific infringing features of the accused products, there are genuine issues of material fact which preclude summary judgment on assignor estoppel grounds. *See* Def.'s Opp. at 16. Based upon a review of the parties' submissions and the relevant case law, the Court concludes that New Relic is in privity with Cirne and is therefore barred under the doctrine of assignor estoppel from asserting an invalidity defense against the ′361 and ′580 Patents. Accordingly, for reasons explained below, CA's motion for partial summary judgment is GRANTED.

### II. *BACKGROUND*

**\*2** The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motion for partial summary judgment, including: Plaintiffs Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment ("Pl.'s Rule 56.1 Stmt.") [DE 116–2]; Response to CA's Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment ("Def.'s Rule 56.1 Counterstmt.") [DE 119–1], as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Where the parties' Rule 56.1 Statements contain specific citations to the record as support, those documents are incorporated by reference and the Court cites to the Rule 56.1 Statement, rather than the underlying citation to the record. Where the facts set forth in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a, conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* E.D.N.Y. Local Rule 56.1(c); *Petito v. Puritan's Pride, Inc.,* 35 F.Supp.3d 494, 497 (S.D.N.Y.2014). The Court construes the fact in the light most favorable to New Relic as the nonmoving party. *Viacom Intern., Inc. v. YouTube, Inc.,* 676 F.3d 19, 30 (2d Cir.2012); *Petito,* 35 F.Supp.3d at 502. The following facts are undisputed unless otherwise noted.

CA is a provider of enterprise technology management software and solutions. Plaintiff's Statement of Undisputed Material Facts In Support Of Motion For Partial Summary Judgment ("Pl.'s Rule 56.1 Stmt.") ¶ 1. [1] One of its software products, Introscope, is an APM tool which customers use to monitor and manage the performance of web applications written using Java or .NET software languages. *Id.* New Relic also provides an APM service that monitors web applications written in Java and .NET, as well as the Python, Ruby, and PHP software languages, among others. *Id.* ¶ 2. CA holds a number of patents related to its products, including two patents related to Introscope which are the subject of the instant motion. *Id.* ¶ 13. As noted, the patents at issue are the ′361 Patent, entitled "Detecting a Stalled Routine," and the ′580 Patent, entitled "Determining that a Routine has Stalled" (collectively, the "Stall Detection Patents"). [2] The Stall Detection Patents were issued to Jeffrey Cobb and Lewis Cirne in 2007 and 2010, respectively. *Id.* ¶¶ 19, 25.

Cirne is the founder and Chief Executive Officer of Defendant New Relic. *Id.* ¶ 7. [3] Prior to founding New Relic, Cirne started a company in 1998 called Wily Technologies, Inc. *Id.* ¶ 9. Cirne founded Wily in connection with his invention

of a new approach to APM and is considered a pioneer and driving innovative force in the APM field. *Id.* ¶¶ 10–11. Cirne served as Wily's CEO from 1998 to 2001, and as its Chief Technology Officer until approximately 2006. *Id.* ¶¶ 8–9. During his tenure at Wily, Cirne helped develop Introscope, which became Wily's flagship APM product, although the parties dispute the scope of Cirne's role in Introscope's development. *Id.* ¶ 12; *see* Def.'s Rule 56.1 Counterstmt. ¶ 12. Wily and its Introscope product were commercially successful. Pl.'s Rule 56.1 Stmt. ¶ 27.

**\*3** CA asserts that in 2001, during the development of the Introscope product, Cirne and Jeff Cobb solved an important technical issue raised by customers by creating a solution that helped customers understand when things were slowing down and backing up in their applications. *Id.* ¶ 13. The Stall Detection Patents were implemented in Introscope to address this problem and solve it. *See id.* New Relic disputes that the technical issue purportedly solved by the Stall Detection Patents was "an important one," noting that the stall detection feature in Introscope was not one of the most important features to customers. Def.'s Rule 56.1 Counterstmt. ¶ 13. According to New Relic, the Stall Detection Patents, "at most, patented one particular method of stall detection, and were therefore not an important solution." *Id.* [4]

On February 21, 2002, Wily filed an application with the United States Patent and Trademark Office ("USPTO") entitled "Detecting a Stalled Routine," which would eventually become the ′361 Patent. Pl.'s Rule 56.1 Stmt. ¶ 14. Cirne and Cobb are the named inventors on the ′361 patent application, *id.,* and Wily submitted a "Declaration for Patent Application" in support of the ′361 Application, *id.* ¶ 16. Cirne executed the declaration on May 7, 2002 and declared his belief that he was the first and joint inventor of the invention entitled: DETECTING A STALLED ROUTINE...." *Id.* ¶ 16. On June 27, 2005, Wily filed an application with the USPTO that would eventually become the ′580 Patent. *Id.* ¶ 20. Cirne and Cobb are the named inventors on the ′580 Application, which was filed as a continuation of the ′361 Patent. *Id.* Cirne executed an assignment of his rights to the intellectual property that would eventually become the Stall Detection Patents to Wily. *Id.* ¶¶ 18, 23, n. 7. The assignment of the subject matter of the ′361 Patent to Wily was executed on May, 7, 2002. *Id.* ¶ 18. Likewise, Cirne assigned to Wily for "good and valuable consideration" his rights to the intellectual property which would eventually become the ′580 Patent. *Id.* ¶ 23. [5] After the assignment, Cirne continued to work at Wily, where he received a salary, stock and other

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

benefits. *Id.* ¶¶ 18, 24. The Stall Detection Patents were issued to Cirne and Cobb on May 29, 2007 and September 14, 2010, respectively. *Id.* ¶¶ 19, 25.

In 2006, CA purchased 100 % of the stock in Wily for approximately $375 million and merged Wily into CA. *Id.* ¶ 28. According to CA, as part of the acquisition, (i) CA acquired Introscope-which it continues to sell today-as well as Wily's intellectual property, including the ′361 and ′580 Patents, and (ii) Wily assigned all its rights in the patents to CA. *Id.* ¶¶ 29–30. New Relic points out that the Stall Detection Patents did not issue until 2007 and 2010 and thus were pending patent applications, not issued patents, at the time CA acquired Wily. Def.'s Rule 56.1 Counterstmt. ¶ 29. [Redacted]. Pl.'s Rule 56.1 Stmt. ¶ 32; Def.'s Rule 56.1 Counterstmt. ¶ 32. After the acquisition, Cirne continued to serve as the Chief Technology Officer of CA's Wily Division. Pl.'s Rule 56.1 Stmt. ¶ 33.

 **\*4**  Cirne resigned from CA on July 31, 2007. *Id.* ¶ 34. In February 2008, Cirne authorized the incorporation of New Relic and installed himself as Chief Executive Officer (CEO), a position he holds to this day. *Id.* ¶¶ 38, 53; Def.'s Rule 56.1 Counterstmt. ¶ 38. As explained below, the parties dispute, among other things, when Cirne began developing the prototype for the product that eventually became New Relic's commercial APM service and whether Cirne's initial programming contributions still survive in New Relic's commercial offerings. However, there is no dispute that Cirne was the only person involved in developing the first prototype used to launch New Relic, demonstrating the prototype to third parties, and obtaining the first round of capital to fund New Relic. Pl.'s Rule 56.1 Stmt. ¶ 51; Def.'s Rule 56.1 Counterstmt. ¶ 51. Cirne also played a key role in obtaining subsequent rounds of financing for New Relic. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Pl.'s Rule 56.1 Stmt. ¶¶ 67–68. The parties agree that Cirne [Redacted] Pl.'s Rule 56.1 Stmt. ¶¶ 64–66; Def.'s Rule 56.1 Counterstmt. ¶¶ 64–66.

The parties' generally differ in their assessment of Cirne's involvement in the creation and development of New Relic's accused Java and .NET agents. The Court will now consider the party's respective factual recitations.

### A. CA's Recitation of the Facts
CA asserts that, while Cirne was still an employee at CA and approximately two months prior to his departure, he

began experimenting with the idea of providing APM through a Software–as–a–Service, or "SaaS" delivery model, as opposed to the on-premise model used to deliver Introscope. Pl.'s Local Rule 56.1 Stmt. ¶ 35. [6] According to CA, Cirne began writing the code for his new company (New Relic) during that timeframe. *Id.* ¶ 36. Instead of disclosing his new invention to CA, Cirne resigned from CA and began demonstrating his prototype to third parties. *Id.* ¶ 37. Less than two months after leaving CA, Cirne formed an LLC in September 2007 (New Relic's predecessor) before formerly incorporating New Relic in February 2008. *Id.* ¶ 38.

CA maintains that New Relic's APM service and its accused Java and .NET agents "would not exist but for the knowledge and assistance provided to New Relic by Mr. Cirne." *Id.* if 44. In particular, CA points to the fact that Cirne alone founded New Relic, authorized the incorporation of the company, and installed himself as CEO. *Id.* ¶¶ 38, 45, 53. According to CA, Cirne conceived of the idea for New Relic and wrote the original code for the first prototype used to launch the company in approximately June 2007, while he was still employed at CA, and developed the first prototype used to launch the company. *Id.* ¶ 46. CA asserts that original code remains part of New Relic's commercial product today. *Id.* ¶ 47. CA also notes (and New Relic does not dispute) that prior to New Relic's incorporation, Cirne was the only person developing the original prototype for New Relic, demonstrating that prototype to third parties, and obtaining the first round of capital funding for New Relic. *Id.* ¶ 48–49, 51; Def.'s Rule 56.1 Counterstmt. ¶¶ 48–49, 51. The parties also do not dispute that Cirne played a key role in obtaining New Relic's second, third, fourth, and fifth rounds of financing to fund New Relic's operations. Pl.'s Rule 56.1 Stmt. ¶ 52; Def.'s Rule 56.1 Counterstmt. ¶ 52. CA contends that the funding was used, among other things, to hire engineers to build Cirne's product. *Id.* ¶ 50. Cirne did, indeed, hire New Relic's first set of engineers as well as its first business development manager. *Id.* ¶ 54. [7] Of the first seven "key" personnel hired by Cirne, six were from CA. *Id.* if 55. The engineers from CA included Saxon D′Aubin and Jim Gochee, both of whom CA contends played a "critical role" in developing New Relic's accused Java and . NET agents. *Id.* ¶¶ 56. [8]

 **\*5**  CA further asserts that, from the inception of New Relic, Cirne has been "substantially involved in developing, or managing the development of, all of New Relic's products." *Id.* ¶ 60. In particular, CA alleges that Cirne made the decision to develop the Java agent in order to expand the company's

footprint beyond a single software language agent. *Id.* ¶ 71. Cirne also conducted the early research to determine whether New Relic could develop a Java agent compatible with its APM service, and then handed the project to D'Aubin and Gochee, two engineers whom Cirne recruited directly from CA. *Id.* ¶ 72. Cirne put D'Aubin and Gochee in charge of developing and managing New Relic's Java agent, and according to CA, Cirne has acknowledged that both engineers played a critical role in the development and release of the agent. *Id.* ¶ 73. CA also asserts that Cirne wrote code for the Java agent and was directly involved in reaching out to customers to test the Java agent prior to its release. *Id.* ¶ 74. Cirne also made the decision to develop and release New Relic's .NET agent. *Id.* ¶ 75.

### B. New Relic's Recitation of the Facts

New Relic generally asserts that it did not rely on Cirne's knowledge or assistance to develop the accused functionality in the Java and .NET agents. *See* Def.'s Rule 56.1 Counterstmt. ¶ 157. New Relic describes Cirne's history and involvement with the company as follows.

#### 1. New Relic's First Product: Ruby–on–Rails Performance Monitoring

With regard to Cirne's alleged experimentation while still working at CA, New Relic contends that, in late June or early July 2007, while on an unpaid leave of absence, Cirne "began to play around with a new programming language called Ruby–on–Rails" ("Ruby"). *Id.* ¶¶ 121. Cirne taught himself Ruby on his own time and on his own computer by experimenting and trying to write code. *Id.* ¶¶ 122–23. After experimenting with Ruby for a few weeks, Cirne "realized that he might want to pursue his Ruby idea so he promptly resigned from CA." *Id.* ¶ 129.

After resigning from CA, Cirne joined Benchmark Capital ("Benchmark") as an entrepreneur in residence because he "was not certain what his next step would be." *Id.* ¶ 130. By the end of 2007, Cirne's initial experimenting with Ruby became "more directional" toward a Ruby–on–Rails performance monitoring product delivered through an SaaS model. *Id.* ¶ 132. In February 2008, after Cirne obtained funding from Benchmark, New Relic was incorporated. *Id.* ¶ 138. New Relic released its first product, Rails Performance Monitoring ("RPM"), in June 2008. *Id* . ¶ 139. New Relic's RPM product was developed for the small and medium business market and developers interested in SaaS rather than on-premises delivery. *Id.* ¶ 140. According to New Relic,

Cirne's earlier experimentation with Ruby was the beginning of research toward what, after many revisions by many people, ultimately became the New Relic RPM product. *Id.* ¶ 125.

**\*6** In New Relic's view, Cirne was not obligated to disclose his early research related to CA because he was on unpaid leave of absence, and did the work on his own time and computer. *Id.* ¶ 37. Likewise, his idea for a Ruby product did not relate to CA's business. *Id.* Moreover, New Relic asserts that Cirne voluntarily discussed his plans and ideas related to Ruby with certain CA executives over the years in an effort to be "transparent" with CA. *Id.* ¶¶ 134, 136–37. The parties do not dispute that "CA does not accuse any version of New Relic's Ruby agent of infringement." *Id.* ¶ 149; *see* Plaintiff's Reply to Defendant's Rule 56.1 Counterstatement ("Pl.'s Rule 56.1 Reply") ¶ 149. New Relic further points out that CA does not currently have a Ruby APM product in development. Def.'s Rule 56.1 Counterstmt. ¶ 144.

#### 2. New Relic's Reliance on Cirne's Knowledge or Assistance in Developing New Relic's Java or .NET agents

##### a. The Java Agent

According to New Relic, CA accuses two features of New Relic's Java agent of infringing the Stall Detection Patents: (i) a former stall detection feature; and (ii) certain functionality relating to "Apdex," including byte code instrumentation and Apdex metric data accumulation for selected transactions. *Id.* ¶ 162. According to New Relic, D'Aubin wrote the Java agent with "no assistance whatsoever from Mr. Cirne with respect to the accused Java agent functionality." *Id.* ¶ 163.

More specifically, New Relic asserts that, as CEO of New Relic, Cirne's "role with respect to product development varied depending on the product or the feature." *Id.* ¶ 158. Cirne, Gochee, and Mike Malloy were all involved in the decision to develop the Java agent; however, Cirne was "the primary decision maker." *Id* . ¶ 159. Cirne did some early research work to "enable Java code to connect to [New Relic's] Ruby on Rails data collection service." *Id.* ¶ 160 (quotation marks omitted). Cirne then handed the Java project off to D'Aubin, the engineer primarily responsible for developing the Java agent. *Id.* ¶ 161. New Relic contends that D'Aubin wrote the accused Java agent himself with no assistance from Cirne "with respect to the accused Java agent functionality," *id.* ¶ 163, and that Cirne's "early research had nothing to do with the accused Java agent functionality," *id.*

¶ 164. New Relic further maintains that Cirne: (i) "never got involved in the development of the Java agent to the level of reviewing code," *id.* at ¶ 165; (ii) "did not supervise Mr. D'Aubin," who was supervised by Gochee, *id.* ¶¶ 166, 168; and (iii) "suggested Mr. D'Aubin for the [Java agent] project," but did not make "the ultimate decision" to assign him, *id.* ¶ 167.

According to New Relic, the allegedly infringing stall detection feature was so minor that D'Aubin wrote it into the code for the Java agent without discussing it with anyone. *Id.* ¶ 169. In fact, Cirne testified at his deposition that he was not aware that the stall detection feature was in the Java agent until this lawsuit. *Id.* ¶ 172. New Relic further states that, when it received notice of this lawsuit, it removed the stall detection feature in the Java agent "because it was such an unimportant feature there was no downside to removing it." *Id.* ¶ 182. According to New Relic, removal of the stall feature has "had no impact on customers or revenues." *Id.* ¶ 183.

**\*7** With regard to the Apdex functionality of the Java agent, New Relic similarly contends that D'Aubin wrote that functionality without any assistance from Cirne. *Id.* ¶ 163. As with the stall detection feature, New Relic argues that the Apdex functionality is not an important feature of the Java agent. *Id.* ¶ 186.

#### b. The .NET Agent

With regard to the .NET agent, New Relic asserts that CA accuses certain functionality related to the Apdex, including event monitoring and Apdex metric data accumulation for selected transactions. *Id.* ¶ 176. New Relic claims that sometime in early 2010, D'Aubin suggested that he should also write a NET agent. *Id.* ¶ 173. After discussions with Gochee and D'Aubin, Cirne, as CEO, ultimately approved the decision to develop the .NET agent, but "had no other involvement in its development," according to New Relic. *Id.* ¶ 174. New Relic Points out that "Cirne has never written a program in C sharp ("C# "), the programming language for .NET, so he could not have added any value to the technical development" of the agent. *Id.* ¶ 175. New Relic also asserts that D'Aubin wrote the agent in 2010, including the accused .NET agent functionality. *Id.* ¶¶ 176–77.

Finally, with respect to the accused features of both the Java and .NET agents, New Relic asserts that it has already determined that "there are a number of non-infringing alternatives" available. *Id.* ¶ 187. New Relic contends that it could implement any of these alternatives easily with no more than one month of engineering time, *id.* ¶¶ 187, 189, and that the cost do so would be "trivial," *id.* ¶ 190.

### III. *PROCEDURAL HISTORY*

CA commenced this action against New Relic on November 12, 2012. *See* DE 1. New Relic filed its Answer asserting an affirmative defense of invalidity on January 4, 2013. *See* DE 8. On February 21, 2013, the parties consented to the jurisdiction of a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). *See* DE 28, 29. Judge Wiliam D. Wall was then assigned to this case. Upon Judge Wall's retirement, the case was referred to the undersigned for all purposes. *See* DE 93. On May 13, 2014, the parties appeared before this Court for a status conference, during which time the Court set a briefing schedule on the parties' anticipated summary judgment motions. *See* DE 103. After the instant motion was fully briefed and filed under seal on ECF, *see* DE 116–120, 128, the Court heard oral argument and reserved decision, *see* DE 142.

### IV. *LEGAL STANDARD*

#### A. Summary Judgment

"The standard for summary judgment in a patent case is the same as in any other case." *CA, Inc. v. Simple.com, Inc.,* 780 F.Supp.2d 196, 208 (E.D.N.Y.2009) (citing *Desper Prods., Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1332 (Fed.Cir.1998)). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249; *see, e.g., Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006). A fact is "material" within the meaning of Rule 56 if its resolution "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury, could return a verdict for the nonmoving party." *Id.*

**\*8** The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322–23; *see, e.g, Zalaski v. City of Bridgeport Police Dept.,* 613 F.3d 336, 340 (2d Cir.2010); *CA, Inc.,* 780 F.Supp.2d at 209 (quoting *Celotex,* 477 U.S. at 323). Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'* " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. That is, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. Thus, only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita,* 475 U.S. at 586. The court deciding a summary judgment motion must draw all reasonable inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (internal citation omitted).

### B. Assignor Estoppel

"[A]ssignor estoppel is an equitable doctrine that prohibits an assignor of a patent or patent application, or one in privity with him, from attacking the validity of that patent when he is sued for infringement by the assignee." *Semiconductor Energy Lab. Co. v. Nagata,* 706 F.3d 1365, 1369 (Fed.Cir.2013) (citing *Diamond Scientific Co. v. Amrico, Inc.,* 848 F.2d 1220, 1224 (Fed.Cir.1988) ("Assignor estoppel is an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity.")); *see Shamrock Techs., Inc. v. Med. Sterilization, Inc.,* 903 F.2d 789, 793 (Fed.Cir.1990). "Under the doctrine, an assignor sued for infringement may not defend or counterclaim that the patent he assigned is invalid or unenforceable." *Semiconductor Energy,* 706 F.3d at 1370 (citing *Diamond Scientific,* 848 F.2d at 1226). The doctrine is premised upon the "implicit representation by the assignor that the patent rights he

is assigning (presumably for value) are not worthless." *Diamond Scientific,* 848 F.2d at 1224. Thus, "the primary consideration in ... applying the doctrine is the measure of unfairness and injustice that would be suffered by the assignee if the assignor were allowed to raise defenses of patent invalidity." *Id.* at 1225; *see Pandrol USA, LP v. Airboss Railway Products, Inc.,* 424 F.3d 1161, 1166 (Fed.Cir.2005). The decision to apply assignor estoppel in a particular case "requires a balancing of the equities between the parties," a determination which is "committed to the sound discretion of the trial court." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1579 (Fed.Cir.1993); *see Checkpoint Sys., Inc. v. All–Tag Sec. S.A.,* 412 F.3d 1331, 1337 (Fed.Cir.2005); *see also Diamond Scientifc,* 848 F.2d at 1225.

**\*9** The assignor estoppel doctrine "also prevents parties in privity with an estopped assignor from challenging the validity of the patent." *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,* 150 F.3d 1374, 1379 (Fed.Cir.1998) (citing *Diamond Scientific,* 848 F.2d at 1224); *Checkpoint,* 412 F.3d at 1337 (same). "Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities" and is viewed in light of the alleged acts of infringement. *Shamrock,* 903 F.2d at 793; *see Mentor Graphics,* 150 F.3d at 1379. Privity can be found as a matter of law. *See, e.g., Shamrock,* 903 F.2d at 796 (upholding district court's grant of summary judgment on assignor estoppel); *L–3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.,* No. 10–CV–02868, 2014 WL 4695104, at \*5 (D.Colo. Sept. 22, 2014) (finding that the plaintiff is entitled to summary judgment on all but two of the defendants' "affirmative defenses of invalidity on the grounds of assignor estoppel"); *BASF Corp. v. Aristo, Inc.,* 872 F.Supp.2d 758, 774 (N.D.Ind.2012) (assignor estoppel and privity are "question[s] for the court to decide and which can be resolved through summary judgment.").

"Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement." *Mentor Graphics,* 150 F.3d at 1379; *see L–3 Commc'ns,* 2014 WL 4695104, at \*2 ("The question of privity examines the nature of the relationship between the assignor and the person sought to be estopped, in light of the alleged infringement."); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.,* No. 10–CV–03428, 2012 WL 2326064, at \*4 (N.D.Cal.2012). As the Federal Circuit explained in *Shamrock:*

> If an inventor assigns his invention to
> his employer Company A and leaves

to join Company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

*Shamrock,* 903 F.2d at 793 (emphasis added) (citation omitted); *see Mentor Graphics,* 150 F.3d at 1379. To determine if the relationship is sufficiently close, courts consider all contacts between the inventor-assignor and the defendant company. *See Mentor Graphics,* 150 F.3d at 1379; *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 838 (Fed.Cir.1991).

In making a privity determination, the central question is whether the defendant company availed itself of the inventor-assignor's "knowledge and assistance' to conduct the alleged infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794); *see. Checkpoint,* 412 F.3d at 1337 (same). "[T]he assignor's mere status as an employee of a competitor does not necessarily warrant a finding of privity," but "[p]rivity may exist in a corporation that is founded by the assignor." *L–3 Commc'ns,* 2014 WL 4695104, at *2 (citing *Shamrock,* 903 F.2d at 793); *see Nortel Networks Inc. v. Foundry Networks, Inc.,* 01–CV–10442, 2003 WL 26476584, at *8–9 (D.Mass. Mar.24, 2003); *see generally Diamond Scientific,* 848 F.2d at 1224 ("The estoppel also operates to bar other parties in privity with the assignor, such as a corporation founded by the assignor."). Moreover, "[p]rivity does not require that the assignor directly design the infringing features of the accused product What is significant is whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Brocade,* 2012 WL 2326064, at *5 (internal citations and quotation marks omitted); *see Mentor Graphics,* 150 F.3d at 1379 (finding privity between two companies, even though the assignor company did not assist in developing the accused product); *Synopsys, Inc. v. Magma Design Automation, Inc.,* No. C–04–3923, 2005 WL 1562779, at *6 (N.D.Cal. July 1, 2005) ("The Federal Circuit ... has not required that the assignor be personally involved in designing the allegedly infringing aspects of a product before finding the doctrine of assignor estoppel applicable").

## V. *DISCUSSION*

 **\*10**  Although the parties agree that Cirne himself is estopped from asserting that the Stall Detection Patents are invalid, *see* Pl.'s Mem. at 9–11; Def.'s Opp. at 16 n. 11; Pl.'s Reply at 2, they dispute whether the record evidence supports a finding of privity as a matter of law between Cirne and New Relic. In determining whether privity exists between an inventor/assignor and another entity for purposes of assignor estoppel, the Court must evaluate "all direct and indirect contacts," *see Mentor Graphics,* 150 F.3d at 1379, and evaluate the relationship between the inventor/assignor and the entity "in light of the act of infringement," *Shamrock,* 903 F.2d at 793. Critical to the determination of privity is whether the company "availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794).

Here, the following facts are undisputed. Cirne is a listed inventor on the Stall Detection Patents which were assigned to CA when it acquired Cirne's previous company Wily. Cirne resigned from CA on July 31, 2007 and went on to found New Relic. Prior to New Relic's incorporation in February 2008, Cirne alone (i) worked on developing the prototype product used to launch the company, (ii) demonstrated that prototype to third parties, and (iii) obtained the initial capital to fund New Relic. Cirne also played a critical role in obtaining subsequent rounds of financing for New Relic's operations. After founding New Relic and becoming its CEO, Cirne hired New Relic's first engineers, including former CA engineers D'Aubin and Gochee. Significantly, Cirne conducted initial research on the accused Java agent before handing that project to New Relic engineers, and he served as "primary decision maker" during the development of that agent. Cirne also approved the decision to develop the accused .NET agent. New Relic commercially released its Java agent in October 2009 and its .NET agent in October 2010. Cirne [Redacted]

In light of these undisputed facts, CA argues that New Relic sufficiently availed itself of Cirne's knowledge and assistance "in developing its APM service and its Java and .NET agents" to justify a finding of privity as a matter of law. Pl.'s Mem. at 14. CA further asserts that Cirne's role as CEO and founder of New Relic, as well as his "significant equity ownership in the company"-both now and when New Relic was developing the accused Java and .NET agents-"establishes a sufficiently close connection, in and of itself, to warrant a finding of privity." *Id.* at 13–14 (citing *Mentor Graphics,* 150 F.3d at 1379). CA therefore maintains that the doctrine of assignor

estoppel bars New Relic from challenging the validity of the Stall Detection Patents.

In response, New Relic argues that, because the record shows that New Relic did not avail itself of Cirne's knowledge or assistance to develop the allegedly infringing functionalities of the accused Java and .NET agents, a genuine issue of fact exists which precludes the application of assignor estoppel against New Relic. *See* Def.'s Opp. at 16. New Relic further argues that where, at a minimum, the parties dispute whether New Relic relied on Cirne's knowledge or assistance to develop the accused functionalities, Cirne's role as founder and CEO of New Relic, by itself, is insufficient to establish privity. *Id.* at 17. New Relic also points to certain "equitable factors" that, in its view, favor denial of CA's motion, including New Relic's assertion that the accused features are minor and could be easily removed. *See id.* at 16.

**\*11** As a preliminary matter, the Court concludes that Cirne's undisputed status as founder and CEO of New Relic, as well as his considerable ownership stake in the company, are factors that weigh in favor of finding privity between Cirne and New Relic. *See Shamrock,* 903 F.2d at 794. In *Shamrock,* the Federal Circuit enumerated several factors which justified a finding of privity in that case, including that (i) the assignor/inventor left the plaintiff company for a highlevel position at the defendant company; and (ii) the assignor/inventor owned shares in the defendant company. *Id.; see Brocade,* 2012 WL 2326064 at *5. Here, it is undisputed that Cirne left CA and founded New Relic, where he serves as CEO and has acted as the "primary decision maker" in the development of New Relic's accused Java and .NET agents. As in *Shamrock,* the fact that Cirne is "far more than a mere employee" of New Relic supports a finding of privity between the company and Cirne. 903 F.2d at 794; *see Nortel,* 2003 WL 26476584, at *9 (noting that inventor/assignor's "involvement in the founding of the [defendant] company" as a factor favoring privity under *Shamrock* ); *Eagle Comtronics,* 1991 WL 247551, at *5 (considering the undisputed fact that the inventor/assignor was a co-founder of the defendant company as a factor leading the court "to the inevitable conclusion that privity exists"); *see also L–3 Commc'ns,* 2014 WL 4695104, at *3 (finding "fairly clear evidence of privity" between the defendant company and three assignors/inventors who left the plaintiff company to serve in high-level positions with the defendant company, where they "perform the same functions" as they did for the plaintiff); *Brocade,* 2012 WL 2326064, at *5 (finding that the defendant company "failed to raise a genuine dispute of material fact as to the first *Shamrock* factor" where the

assignor/inventor left the plaintiff company to serve as the defendant's Chief Technology Officer). Moreover, the parties agree that Cirne [Redacted] Although "the Federal Circuit has not set a minimum percentage ownership threshold for a finding of privity," *Brocade,* 2012 WL 2326064, at *6, it has noted that "[e]ven a party that owns less than a majority of a company's stock can still exercise effective control over the company's operations," which may justify a finding of privity. *Mentor Graphics,* 150 F.3d at 1379; *see also Shamrock,* 903 F.2d at 794 (finding the inventor/assignor's ownership of 50,000 shares of the defendant company's stock, was a factor favoring privity without considering the percentage of ownership). In light of this precedent, the Court finds that Cirne's current and previous ownership stake in New Relic weighs in favor of finding privity between Cirne and New Relic. *See Brocade,* 2012 WL 2326064, at *6 (finding that, although inventor/assignor's "one million shares or options to purchase shares" constituted "a less than 1% ownership stake" of the defendant company, the factor still "weigh[ed] in favor of a finding of privity"); *Eagle Comtronics, Inc. v. Ne. Filter Co.,* No. 90–CV–573, 1991 WL 247551, at *5 (N.D.N.Y. Nov.22, 1991) (considering the undisputed fact that the inventor/assignor "was at all times at least a 50% shareholder" as a factor leading the court to conclude that privity exists); *see generally L–3 Commc'ns,* 2014 WL 4695104, at *3 (considering in the privity analysis the fact that the three inventors/assignors hold stock in the defendant company). [9] Accordingly, the Court concludes that, because New Relic has failed to raise a genuine issue of fact regarding Cirne's status as founder and CEO of New Relic and his ownership stake in the company, these factors support the existence of privity between Cirne and New Relic under the doctrine of assignor estoppel.

**\*12** As noted, the most "significant" factor in the privity analysis "is whether the ultimate infringer availed itself of the inventor's knowledge and assistance to conduct infringement." *Intel Corp.,* 946 F.2d at 839 (quoting *Shamrock,* 903 F.2d at 794). Here, Cirne founded New Relic, conducted initial research on the Java agent, and created the first prototype product eventually used to launch the company. After incorporating New Relic, Cirne acted as the "primary decision maker" in the development of New Relic's accused Java agent, and, as CEO, he approved the decision to develop the accused .NET agent. In other words, Cirne held a "key role" in developing New Relic's Java and .NET agents that are alleged to infringe the Stall Detection Patents. *Synopsys,* 2005 WL 1562779, at *8. In light of these undisputed facts, the Court concludes that New

Relic sufficiently availed itself of Cirne's knowledge and assistance in developing the accused Java and .NET agents so as to support a finding of privity between New Relic and Cirne.

New Relic contends that, because the parties dispute whether New Relic availed itself of Cirne's knowledge and assistance in developing the alleged infringing functionalities of the accused agents, the Court should decline to find privity between New Relic and Cirne as a matter of law. *See* Def.'s Opp. at 16. However, "[t]he Federal Circuit does not require that the assignor directly design infringing features of an accused product in order to find privity between the assignor and the defendant company." *Brocade,* 2012 WL 2326064, at *7 (citing *Mentor Graphics,* 150 F.3d at 1379); *see Synopsis,* 2005 WL 1562779, at *6. This view originates from the Federal Circuit's decision in *Mentor Graphics,* in which the court found privity between two companies even though the assignor, Mentor, had no involvement in the creation of the allegedly infringing product, but only in the marketing and distribution of the product. 105 F.3d at 1376. In that case, Mentor had assigned a patent for hardware emulation technology ("the ′473 patent") to another company, Quicktum. *See id.* Thereafter, Mentor bought a company, Meta, which had developed hardware emulation technology independent of Mentor and Quicktum. *See id.* When Quicktum asserted that Meta's technology infringed the ′473 patent Quicktum had purchased from Mentor, Mentor filed an action for a declaratory judgment of invalidity of the ′473 patent. *See id.* at 1377. The Federal Circuit applied the doctrine of assignor estoppel to bar both Mentor and Meta from challenging the ′473 patent. *See id.* at 1378–79. In doing so, the Federal Circuit found Mentor was barred because it had assigned the patent to Quicktum for value, and that Meta was also barred because it was in privity with Mentor. *See id.* at 1378–79. The court reasoned that privity existed between the two companies because: Mentor owned all of Meta's stock, "giving Mentor considerable control over Meta's operations"; the two companies shared personnel; and Mentor approved Meta's budget. *Id.* at 1379. The court also noted that Mentor acquired Meta for the purpose of marketing the allegedly infringing device in the United States. *Id.* Thus, even though Mentor had no role in creating the allegedly infringing product, other than its marketing and distribution, the Court found Mentor was in privity with Meta for purposes of assignor estoppel. *See id.*

**\*13** Courts applying *Mentor* have consistently held that "[p]rivity does not require that the assignor directly design

the infringing features of the accused product." *Brocade,* 2012 WL 2326064, at *7 (citing *Mentor Graphics,* 150 F.3d at 1379); *Synopsis,* 2005 WL 1562779, at *7 (holding that, although the defendant company "contends ... the patent assignor[ ] had little involvement in creating the precise components that are alleged to infringe, *Mentor* demonstrates that assignor estoppel may apply even where the assignor had no involvement at all in creating the infringing technology."); *see also Nortel,* 2003 WL 26476584, at *8–9 (finding privity between the assignor-founder and his company where the founder oversaw the design of the product's hardware, but the alleged infringement occurred in the product's software, where the assignor was actively involved in the design of his company's products during the relevant time period). Significantly, the district court in *Brocade* further stated that the assignor need not have written code for the infringing device to warrant a finding of privity between the assignor and his company. *See* 2012 WL 2326064, at *5 ("Moreover, whether or not [the inventor-assignor] actually wrote the code to the accused AX Series is also immaterial.") (citing *BASF Corp.,* 2012 WL 1933700, at *15 (finding privity between consultant and defendant company, even though consultant did not "actually sit down and operate the [infringing product]")).

In light of this line of cases, New Relic has failed to raise a genuine issue of material fact regarding Cirne's role in alleged infringement which would preclude a finding of privity between New Relic and Cirne. It is undisputed that Cirne, as founder and CEO of New Relic, created the prototype of New Relic's first product, obtained funding so that New Relic could develop that. product, contributed research toward the accused Java agent, and was substantially involved in the decision to develop both of the company's accused agents. Under the circumstances of this case, "[n]o more is required for the application of assignor estoppel." *Synopsys,* 2005 WL 1562779, at *8. New Relic asserts that it did not avail itself of Cirne's knowledge and assistance to develop the infringing features of the accused agents. However, the relevant case law simply does not require that Cirne be personally and directly involved in developing the infringing functionalities for assignor estoppel to apply against New Relic. Thus, even assuming as true New Relic's assertions that (i) D′Aubin wrote the code for both the stall detection and Apdex functionalities of the accused Java agent without Cirne's involvement; (ii) Cirne was not aware that the accused stall detection feature was in the Java agent until New Relic received notice of this lawsuit; and (iii) Cirne neither wrote code nor assisted D'Aubin in the development

of the .NET agent, Def.'s Opp. at 16–17 (citing Def.'s Rule 56.1 Counterstmt. ¶¶ 157–68, 172, 175, 178), these assertions do not preclude a finding of privity between New Relic and Cirne. *See, e.g., Brocade,* 2012 WL 2326064, at *5, *7. [10] In other words, even if the Court resolved the parties' dispute over Cirne's role in the development of the alleged infringing features in New Relic's favor, this issue would not "affect the outcome of the suit under the governing law" or cause a reasonable jury to return a verdict in favor of New Relic. *Anderson,* 477 U.S. at 248. Accordingly, the Court concludes that, in light of the critical and substantial role Cirne played in founding New Relic (*i.e.,* creating its first prototype and authorizing the development of the accused agents, among other undisputed facts), the record evidence provides sufficient grounds to support a finding that New Relic is in privity with Cirne under the doctrine of assignor estoppel.

**\*14** In further arguing against privity, New Relic asks the Court to consider the broader equities between Cirne and CA, and identifies facts that, in New Relic's view, "tip the equitable balance in favor of New Relic and against application of the assignor estoppel doctrine." Def.'s Opp. at 16. In particular, New Relic points out that

> (i) New Relic kept CA apprised of its product development, (ii) New Relic intentionally focused its products on a different and emerging market, (iii) the allegedly infringing features were known to CA for years before CA accused those features of infringement, and (iv) the accused features are minor and could be easily removed or redesigned[.]

*Id.; see also id.* at 21–22. However, as CA notes in its reply, the determination whether a defendant company is in privity with the inventor and therefore bound by the doctrine of assignor estoppel "depend[s] on the equities dictated *by the relationship between the inventor and [defendant] company,* not the relationship between the inventor and the plaintiff. *Shamrock,* 903 F.2d at 793 (emphasis added). Moreover, "the primary consideration" in applying the doctrine of assignor estoppel is preventing unfairness and injustice to the assignee, *i.e.,* a plaintiff company like CA. *Diamond Scientific,* 848 F.2d at 1225. Here, the Court determines that, for the reasons explained above, the balance of equities as well as the relationship between Cirne and New Relic favor the application of assignor estoppel to bar New Relic from asserting that the Stall Detection Patents are invalid.

In sum, considering the undisputed facts and drawing all reasonable inferences in favor of New Relic as the non-moving party, the Court concludes there is no genuine issue of material fact on the matter of New Relic being in privity with Cirne under the doctrine of assignor estoppel. Accordingly, CA is entitled to partial summary judgment striking New Relic's affirmative defense of invalidity with respect to the Stall Detection Patents based on the principle of assignor estoppel. [11]

## VI. *CONCLUSION*

For the foregoing reasons, CA's motion for partial summary judgment striking New Relic's First Affirmative Defense with respect to the Stall Detection Patents is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1611993

---

### Footnotes

1    Although New Relic does not dispute this statement of fact, it contends that the evidence cited by CA does not support its factual assertion. Def.'s Rule 56.1 Counterstmt. ¶ 1. New Relic makes this claim in response to several of CA's other statements of fact as well. *See id.* ¶¶ 3, 8, 14, 20. Having reviewed the evidence cited in support of these statements of fact and on the motion as a whole, the Court is satisfied that the

record supports CA's assertions. *See Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003)).

2     This litigation also concerns a third patent held by CA–U.S. Patent No. 7,512,935 B1 (the #935 patent)-which is not in dispute on the instant motion.

3     Here, and in multiple instances throughout its Rule 56.1 Counterstatement, New Relic responds to CA's statement of the facts by stating that the facts are "Undisputed" but that "New Relic objects to and asks the Court to disregard of strike" certain exhibits cited by CA to support its statement and/or certain facts contained within those exhibits. *See, e.g.,* Def.'s Rule 56.1 Counterstmt. ¶¶ 7, 9, 10, 11, 27, 30, 33, 43, 45, 62, 67, 68. Where this occurs, the Court will consider the statement provided by CA as undisputed because New Relic's initial response in each instance is, in fact, "Undisputed." *See Washington v. City of New York,* No. 05 CIV. 8884, 2009 WL 1585947, at *1 n. 2 (S.D.N.Y. June 5, 2009) (taking the statement of relevant facts provided by the defendants "as true" where the plaintiffs initial response in each instance was "Admit, but deny to the extent the statement cites to inadmissible evidence" and finding that, in any event, the challenged evidence "would undoubtedly be admissible at trial"). Furthermore, the Court observes that, to the extent New Relic objects to CA's use of printed statements from New Relic's own website as exhibits-which bear both a time-and-date stamp and URL, and which have been authenticated in a declaration by CA's counsel, *see* Decl. of Matthew K. Gates [DE 118]-those documents are admissible in evidence. *See In re Vitamin C Antitrust Li tig.,* No. 06–MD–1738, 2013 WL 504257, at *5 (E.D.N.Y. Feb. 8, 2013) ("Statements on a website can be considered business records within the scope of Rule 803(6).") (citing *Doctors Med. Ctr. of Modesto v. Global Excel Mgmt., Inc.,* No 08–CV–1231, 2009 WL 2500546, at *9 (E.D.Cal.Aug.14, 2009) (concluding that statements on a party's website were admissible, despite hearsay objections, under the business records exception and as party admissions)); *see also Langbord v. U.S. Dep't of Treasury,* No. CIV.A. 06–5315, 2011 WL 2621310, at *4 (E.D.Pa. July 5, 2011) (holding that "a 2007 printout from the Mint's website listing the 1933 Double Eagle as a circulating coin, is admissible as a statement of a party opponent, no matter what the Mint intended by posting the information.").

4     On this point, New Relic further asserts in its Rule 56.1 Counterstatement that "[t]here are many prior art methods for detecting a stall," Def.'s Rule 56.1 Counterstmt. ¶ 93, and that the Stall Detection Patents, at most, patented specific methods of stall detection, *id.* ¶ 92.

5     This assignment took place in 2002. The #580 Patent, which is a continuation of the #361 Patent, was conveyed to Wily by Cime as part of the assignment of the #361 application. Pl's Rule 56.1 Stmt. ¶ 23 n. 7.

6     According to CA, "[t]he fundamental difference between SaaS and on-premise is that SaaS allows customers to monitor their applications by downloading software agents through a remotely hosted website, whereas on-premise software must be physically installed on the customers' computers in order to monitor their web applications." Pl.'s Rule 56.1 Stmt. ¶ 35 n. 11.

7     Although the parties agree that Cime hired New Relic's first engineers, New Relic disputes CA's characterization that the engineers were "needed to develop New Relic's APM service." Pl.'s Rule 56.1 Stmt. ¶ 54; Def.'s Rule 56.1 Counterstmt. ¶ 54.

8     New Relic agrees with CA's assertion only to the extent that D'Aubin played a critical role in the development of New Relic's Java agent. Def.'s Rule 56.1 Counterstmt. ¶ 56.

9     New Relic correctly notes that Cirne's role as founder/CEO and ownership interest in New Relic alone would not be sufficient to warrant the application of assignor estoppel, which requires the balancing of multiple equitable factors. *See* Def.'s Opp. at 20 n. 17. However, as the Court discusses below, New Relic also availed

itself of Cirne's knowledge and assistance in developing the accused Java and .NET agents, which tips the equitable balance in favor of privity.

10    The Court is unpersuaded by New Relic's attempt to distinguish Cirne from one of the assignors at issue in *Brocade,* who held the title of "Chief Architect" of the defendant company. *See* Def.'s Opp. at 20 20, 20 n. 16. New Relic asserts that the court in *Brocade* found it "immaterial" that the Chief Architect-assignor did not write code for the accused product because, unlike in this case, "the defendant [company] still availed itself of [the assignor's] knowledge and assistance to develop the accused product." *Id.* at n. 16. However, the Court finds that, like the assignor in *Brocade,* New Relic did, in fact, rely on Cirne's knowledge and assistance to conduct the alleged infringement-*i.e.,* to create and develop the accused agents-despite whether Cirne himself developed the infringing features of those agents.

11    New Relic argues in the alternative that, even if it is bound by the doctrine of assignor estoppel, it may still rely on "anticipatory prior art" to defend against CA's infringement claims at trial. Def.'s Opp. at 22–25. CA responds that "[t]his argument is for another day" and notes that, should New Relic attempt to rely on prior art "as a defense to infringement (or for any other purpose), CA will file a motion in limine to exclude that evidence in accordance with the Court's schedule, and New Relic will have an opportunity to respond at that time." CA Reply at 7. Having considered these arguments, the Court concludes that the issue of whether (and to what extent) New Relic may rely on anticipatory prior art as a defense at trial is not ripe for adjudication on this motion.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.    12

2016 WL 1060330
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Herman CRUZ, Plaintiff,
v.
W. LEE, et. al, Defendants.

14 cv 4870 (NSR)(JCM)
|
Signed 03/15/2016

**Attorneys and Law Firms**

Herman Cruz, Fallsburg, NY, pro se.

Neil Shevlin, New York State Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

 **\*1** Herman Cruz ("Plaintiff") brings this action against defendants Superintendent Lee, Sergeant Valerdo, Sergeant Malark, Kiernan, and Jackson (collectively, "Defendants") for denying him protective custody status, in violation of his right to access the courts and to petition the government for the redress of grievances under the First Amendment and to be free from cruel and unusual punishment under the Eighth Amendment. Plaintiff alleges that he was the subject of improper retaliation by prison staff and personnel. Before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**BACKGROUND**

The following facts are derived from the § 1983 Complaint ("Compl." ECF No. 1) filed by Plaintiff and all relevant attached materials. [1]

On June 20, 2014, Plaintiff filed this action against Defendants. Defendant Kiernan worked in Green Haven Correctional Facility's ("GHCF") Mental Health Services Department as a member of the staff, and Defendant Jackson worked as a Counselor in GHCF.

On May 1, 2014, Plaintiff was transferred from Upstate Correctional Facility to GHCF. (Compl. at 3.) [2] At that time, Plaintiff requested protection from defendants Kiernan and Valerdo, and provided them with "enemy names." (*Id.*) Plaintiff made it known to defendants Kiernan and Valerdo that he had previously brought lawsuits against non-defendant employees of the Department of Corrections and Community Supervision ("DOCCS") for failing to place him into protective custody. (*Id.*) Plaintiff told defendants Kiernan and Valerdo about the *Cruz v. Hillman* case, in which Plaintiff brought claims against non-defendants Sergeant James Hillman and Corrections Counselor Eddie Lee for "colluding to deny him protective custody status at [GHCF], even though he had previously informed Defendants that he needed protection because his life was in danger." (*Id.*) *See Cruz v. Hillman*, No. 01 CIV.4169 (DAB) (DF), 2002 U.S. Dist. LEXIS 17705, 2002 WL 31045864 (S.D.N.Y. May 16, 2002). Plaintiff also told defendants Kiernan and Valerdo about the *Cruz v. Grosso* case, in which Plaintiff brought claims against non-defendant M. Grosso, an employee of Auburn Correctional Facility, for failing to protect him, filing a false misbehavior report, and subjecting him to unconstitutional conditions of confinement. (Compl. at 3.) *See Cruz v. Grosso*, No. 913 CV 30 (FJS) (TWD), 2015 WL 4542280 (N.D.N.Y. July 27, 2015).

 **\*2** As to the current Complaint, Plaintiff states that defendants Kiernan and Valerdo, in retaliation for him filing the aforementioned lawsuits, failed to forward to their superiors the list of "enemies" the Plaintiff provided. (Compl. at 3.) In support of this, Plaintiff states that Kiernan told him "don't expect any assistance from us because of the case against Grosso." (*Id.*) Plaintiff attempted to file a grievance regarding the incident involving defendants Kiernan and Valerdo concerning "the fact that security continues to deny me protection after I provided names of enemies." (*Id.* at 4.) However, the Grievance Clerk could not locate Plaintiff's grievance and stated that the "staff goes through [the grievances] first." (*Id.*) Plaintiff then attempted to "appeal" by speaking to his mental health doctor and guidance counselor and by writing a letter to Superintendent Lee and providing him a copy of the *Hillman* case. (*Id.*)

Following his failed attempts to resolve his issues, while Plaintiff was at the general library, he was assaulted and threatened by defendant Sergeant Malark, in retaliation for

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 114 of 427

Cruz v. Lee, Not Reported in Fed. Supp. (2016)

his writing a letter to Superintendent Lee. (*Id.* at 3.) Sergeant Malark and two John Doe officers came to the general library to transport Plaintiff to the Special Housing Unit ("SHU"). (*Id.*) Once in the hallway, Sergeant Malark "slammed Plaintiff against the wall" and "punched Plaintiff in the back." (*Id.*) Sergeant Malark threatened the Plaintiff, stating "you better not call witnesses or say anything to the Nurse" and advised him that he would not be receiving protection. (*Id.*) Finally, Plaintiff was issued a misbehavior report by Sergeant Malark and was placed in SHU. (*Id.* at 3, 5.)

After Sergeant Malark issued Plaintiff a misbehavior report, Plaintiff asked his counselor, Defendant Jackson, for assistance with regard to a disciplinary hearing and provided her with a copy of the *Hillman* case. (*Id.* at 3.) Defendant Jackson refused to assist the Plaintiff and stated, as her reason why, "we have a code." (*Id.*)

In sum, the Plaintiff claims that he was (1) denied placement into protective custody; (2) assaulted by Sergeant Malark; (3) given a false misbehavior report by Sergeant Malark; and (4) denied any assistance in preparing for a disciplinary hearing from Defendant Jackson (in connection with the misbehavior report he had received).

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) states that a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to survive a 12(b)(6) motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

When there are well-pleaded factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679. The court must "take all well-plead factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff[ ]." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996). However, the presumption of truth does not extend to "legal conclusions, and threadbare recitals of the elements of the cause of action." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678) (internal quotation marks omitted). A plaintiff must provide "more than labels and conclusions" to show he is entitled to relief. *Twombly,* 550 U.S. at 555.

*Pro se* pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). They are construed "liberally" and interpreted "to raise the strongest arguments that they suggest." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir. 2006) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)). Additionally, this Court "may consider factual allegations made by a *pro se* plaintiff in opposition papers and other additional materials." *Baskerville v. Blot,* 224 F. Supp. 2d 723 (S.D.N.Y. 2002). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Boddie v. N.Y. State Div. of Parole,* 285 F. Supp. 2d 421, 426 (S.D.N.Y. 2003) (quoting *Traguth v. Zuch,* 710 F.2d 90, 95 (2d Cir. 1983)).

**DISCUSSION**

**I. Exhaustion of Administrative Remedies**
 **\*3** Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir. 2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).

Exhausting all remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Washington v. Chaboty,* No. 09 CIV. 9199 PGG, 2015 WL 1439348, at \*6 (S.D.N.Y. Mar. 30, 2015) (quoting *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir. 2009)) (internal quotation marks and citations omitted). "[B]ecause 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion [,] ... [t]he exhaustion inquiry ... requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 115 of 427

Cruz v. Lee, Not Reported in Fed. Supp. (2016)

with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Jones v. Bock*, 549 U.S. 199, 218 (2007)). A plaintiff must invoke all available administrative mechanisms, including appeals, "through the highest level for each claim." *Varela v. Demmon*, 491 F. Supp. 2d 442, 447 (S.D.N.Y. 2007). *See also Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004). The defendants bear the burden of demonstrating that Plaintiff's claim is not exhausted. *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009). Where a prisoner has failed to exhaust some, but not all, of the claims included in the complaint, the PLRA does not require dismissal of the entire complaint. *Tafari v. Hues*, 539 F. Supp. 2d 694, 697 (S.D.N.Y. 2008) (citing *Jones,* 549 U.S. at 219-24). Instead, the court dismisses the unexhausted claims and proceeds to adjudicate the exhausted claims. *Jones*, 549 U.S. at 224.

A person detained or incarcerated at a DOCCS facility must exhaust all of the steps of the DOC Inmate Grievance Resolution Program ("IGRP"). *See Robinson v. Henschel*, No. 10 Civ. 6212 (PGG), 2014 WL 1257287, at *10 (S.D.N.Y. Mar. 26, 2014) ("the PLRA requires complete exhaustion in accordance with the administrative procedures within [DOCCS]") (internal quotation marks and citations omitted). The IGRP provides a three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the IGRC, (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Office Review Committee ("CORC"). *See Espinal*, 558 F.3d at 125 (citing N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7 (1999)).

The Second Circuit has recognized three situations in which a Plaintiff is not required to satisfy the PLRA exhaustion requirement. *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). *See also Morrison v. Parmele*, 892 F. Supp. 2d 485, 488 (W.D.N.Y. 2012), *aff'd*, 2013 WL 3214625 (2d Cir. 2013). The failure to exhaust administrative remedies may be excused or Plaintiff's claim may be deemed exhausted: (1) when administrative remedies are not available to the prisoner, (2) when the defendants waive the defense by failing to raise or preserve it, or acted in such a manner that they are estopped from raising it, or (3) when special circumstances exist to justify the prisoner's failure to comply with the exhaustion requirement. *Hemphill*, 380 F.3d at 686.

 **\*4**  With regard to situation (1), to be "available" under the PLRA, a remedy must afford "the possibility of some

relief for the action complained of." *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004). When Plaintiff lacks available remedies, the PLRA's exhaustion requirement is inapplicable. *Hemphill*, 380 F.3d at 686. In some circumstances, a defendant's behavior will render an administrative remedy unavailable. *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031 at *6 (S.D.N.Y. Oct. 31, 2006) (citing *Hemphill*, 380 F.3d at 687). For example, the exhaustion requirement is waived "in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies." *Abney*, 380 F.3d at 667 (citation omitted). *See also Hemphill*, 380 F.3d at 688-89 (determining that threats from guards which prevent the filing of a grievance would make the remedy unavailable) (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)); *Santiago v. Westchester Cty.*, No. 13 CIV. 1886 (LGS), 2014 WL 2048201, at *3 (S.D.N.Y. May 19, 2014) (holding that a factual inquiry is required where the Complaint has sufficiently alleged that if Plaintiff failed to exhaust administrative remedies, the failure resulted because administrative remedies may not have been "available" to him).

With regards to estoppel—situation (2)—a prisoner may be excused from exhausting his administrative remedies when "defendants took affirmative action to prevent him from availing himself of grievance procedures." *Amador*, 655 F.3d at 103 (citing *Ruggiero v. County of Orange*, 467 F.3d 170, 178 (2d Cir. 2006)). Such "affirmative action" includes "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers." *Id*. (internal citations omitted). *See also Ziemba*, 366 F.3d at 162-63 (estopping defendants where they had prevented exhaustion of remedies by beating and threatening the inmate, denying him grievance forms, and transferring him to another prison).

Finally, in situation (3), the Court must consider any special circumstances that may have frustrated an inmate's grievance. *Hemphill*, 380 F.3d at 686. Generally, when procedural requirements are not clear, are misleading, or are so trivial as to make exhaustion an ordeal, a prisoner's failure to comply may not be fatal to his claims. *See generally Giano*, 380 F.3d at 676; *Hemphill*, 380 F.3d at 689-90 (2d Cir. 2004). For example, in *Giano*, the Second Circuit determined that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the

prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano,* 380 F.3d at 676 (citing *Berry v. Kerik,* 366 F.3d 85, 87-88 (2d Cir. 2004)). The court in *Giano* held that plaintiff's reasonable interpretation of DOCCS' regulations constituted the "special circumstances" justifying his failure to exhaust. *Giano,* 380 F.3d at 676. Specifically, the inmate took a disciplinary appeal when, under a correct interpretation of the rules, he should have filed a grievance. *Id.* The court excused his failure, holding that prison rules "do not differentiate clearly" and that therefore the inmate was excused from precise compliance. *Id.* at 679.

As an initial matter, it is clear from the face of the Complaint that Plaintiff has not exhausted claims 2-4: that he was assaulted, given a false behavior report, and denied assistance at his disciplinary hearing. Plaintiff has not alleged that he filed a grievance or even that he attempted to file a grievance with regards to any of these claims. Therefore, these claims must be dismissed for Plaintiff's failure to exhaust his administrative remedies.

However, with regards to claim 1—that Plaintiff was not placed into protective custody—Plaintiff asserts that he filed a grievance and made efforts to appeal to the superintendent. Thus, it is not apparent on the face of the Complaint that Plaintiff failed to exhaust his administrative remedies with regard to his retaliation and denial of protection claim. (*See* Compl., at 5.) Although Plaintiff did not complete the IGRP three-step grievance procedure, and thus did not technically exhaust his administrative remedies, Plaintiff may be excused from fully complying with the PLRA requirement of exhaustion because (1) remedies may have been unavailable to him, and (2) Defendants may be estopped from asserting the exhaustion defense. *See Hemphill,* 380 F.3d at 686. *See also Amador,* 655 F.3d at 102.

 **\*5** Administrative remedies may not have been available to the Plaintiff because Plaintiff was unable to file a grievance. Though Plaintiff attempted to file a grievance with regards to his retaliation claim that he was not placed into protective custody, the grievance was never entered into the IGRP system. (Compl. at 5.) When Plaintiff inquired about his grievance, the Grievance Clerk stated that it "could not be located." (*Id.*) Plaintiff then attempted to "appeal" by writing to a Counselor, speaking to a Mental Health Doctor, and writing to Superintendent Lee, because, in his opinion, these were the only administrative remedies available to him. (*Id.* at 3.) *See also Hale v. Rao,* 768 F. Supp. 2d

367 (N.D.N.Y. 2011) (holding that a plaintiff's failure to exhaust his administrative remedies will be excused when a member of prison staff throws out a grievance and threatens to assault a plaintiff if he attempts to utilize the grievance process). Accepting all allegations as true, it is clear that Plaintiff attempted to grieve his protective custody claim. When Plaintiff reasonably believed that his grievances were not being filed, he tried to grieve his complaints by writing letters of appeal. Further, in light of the fact that Plaintiff has filed numerous grievances in the past, he is clearly familiar with the grievance process and aware of the steps he must take before availing himself of the Court's remedies. Therefore, the administrative grievance process may have been unavailable to Plaintiff, and the Court cannot dismiss his retaliation/denial of protection claim for failure to exhaust.

Additionally, Defendants may be estopped from asserting a non-exhaustion defense because their conduct—refusing to file Plaintiff's grievance that was of a serious nature—may have prevented the Plaintiff from exhausting all remedies. *See Ziemba,* 366 F.3d at 162-63 (estopping defendants from raising failure-to-exhaust-defense where they had prevented exhaustion of remedies by beating and threatening the inmate, denying him grievance forms, and transferring him to another prison). Plaintiff alleges not only that the Grievance Clerk refused to file or intentionally misplaced his grievance but also that Defendants assaulted him because he attempted to file a grievance. Therefore, assuming that Plaintiff's allegations are true—as the Court must at this stage of the litigation—Defendants may be estopped from asserting a non-exhaustion defense pursuant to the second *Hemphill* exception. *Hemphill,* 380 F.3d at 686*; Samuels v. Fischer, et. al.,* No. 13-CV-8287 (KMK), 2016 WL 827781, at \*19 (S.D.N.Y. Mar. 2, 2016) (holding that it would be premature to dismiss Plaintiff's claims for failure to exhaust his administrative remedies where Plaintiff's non-exhaustion is not clear from the face of the Amended Complaint and where Plaintiff argued that his "failed attempt to file a second grievance can be attributed to [defendants refusing] to provide [P]laintiff with ... grievance forms."). *See also McClinton v. Connolly,* No. 13-CV-2375 (KMW) (DCF), 2014 WL 5020593, at \*3 (S.D.N.Y. Oct. 8, 2014) (defendants may be estopped where Plaintiff claimed that the "Inmate Grievance Coordinator refused to file [his] grievance of improper medical care"); *Rivera v. Pataki,* No. 04–CV–1286, 2005 WL 407710, at \*10-11 (S.D.N.Y. Feb. 7, 2005) (citing *Hemphill,* 380 F.3d at 688-89) (holding that defendants were estopped from asserting their non-exhaustion defense because defendants refused to allow plaintiff to file his grievance).

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 117 of 427

Cruz v. Lee, Not Reported in Fed. Supp. (2016)

Therefore, Plaintiff's claim of retaliation and denial of protection cannot be dismissed at this stage of the litigation, as he may be excused from exhausting his administrative remedies with regards to this claim.

## II. Personal Involvement—Defendant Lee

Defendants assert that Plaintiff's claim against Defendant Lee should be dismissed because Plaintiff failed to allege Defendant Lee was personally involved in the alleged wrongdoing. Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Accordingly, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977). A supervisory defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation, including where he or she directly participated in the infraction and where, after learning of the violation, failed to remedy the wrong. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (internal citations omitted). *See also Morgan v. Ward*, No. 14 Civ. 7921, 2016 WL 427913, at *6 (S.D.N.Y. Feb. 2, 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)); *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 266 (S.D.N.Y. 2014); *Ramey v. Perez*, No. 13 Civ. 17, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014).

**\*6** In the instant case, Plaintiff alleges that he wrote a letter of "appeal" to Superintendent Lee regarding the retaliatory failure to place him into protected custody and enclosed a copy of the *Hillman* case. (*See* Compl. at 3-4.) Plaintiff states that Superintendent Lee did not inquire about whether the Plaintiff had problems, but rather merely directed the staff "to write him up and take him to SHU." (*See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, ECF No. 40, at 9.) Construing Plaintiff's *pro se* complaint liberally, as we must, Plaintiff sufficiently alleges that Superintendent Lee, after learning of a violation through Plaintiff's letter of appeal, failed to remedy the wrong. *See United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir. 1975) (holding the New York State

Corrections Commissioner liable for money damages along with the prison warden when the former was "chargeable with knowledge" of the cruel and unusual punishment of one prisoner).

The Defendants argue that "the mere receipt of a letter is not sufficient to establish the personal liability of a supervisor under *Sealy v. Giltner*, 116 F.3d 47, 51 (2d Cir. 2007) and *Lloyd*, 43 F. Supp. 3d at 268. In *Sealy*, the Court held that the plaintiff did not produce sufficient evidence of personal involvement to survive a motion for summary judgment where the plaintiff wrote a letter of appeal to the commissioner, and the commissioner referred the appeal letter to a subordinate for determination. *Sealey*, 116 F.3d at 51. Similarly, in *Lloyd*, the supervisory defendant received the letter and forwarded it to "the appropriate unit for investigation." *Lloyd*, 43 F. Supp. 3d at 268. As the *Lloyd* court explained, "[c]ourts have consistently held that, if an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter." *Id.* (collecting cases) (internal quotation marks omitted). In the instant case, Plaintiff alleges that he wrote a letter of appeal to Defendant Lee and that he received no response. There is no indication from Plaintiff's allegations that Defendant Lee took any steps to resolve the issue. Therefore, Plaintiff sufficiently alleges personal involvement of Defendant Lee at this stage of the litigation, and his claim for retaliatory failure to place Plaintiff into protective custody against Defendant Lee cannot be dismissed.

## III. First Amendment Retaliation

In order to sustain a First Amendment retaliation claim under Section 1983, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal*, 558 F.3d at 128 (2d Cir. 2009) (citing *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)). Plaintiff clearly engaged in constitutionally protected conduct, as filing and prosecuting a federal lawsuit is a constitutionally protected activity. *See Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

Plaintiff alleges that, in retaliation for filing these lawsuits (i.e. the protected activity), Defendants refused to place him into protective custody after Plaintiff provided them

with the names of his enemies. In order to adequately plead an "adverse action," Plaintiff must allege that he was subject to "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill*, 389 F.3d at 381 (internal citations omitted). The Second Circuit has explained that fear is a key aspect in whether an inmate has suffered adverse action, specifically when fear is used as a means to stifle a prisoner's ability or desire to file lawsuits or grievances. *See Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir. 2002) (reversing the dismissal of a complaint alleging that the transfer of prisoner to a psychiatric facility was an adverse action taken in retaliation for filing a grievance). Plaintiff alleges that Defendants' denial of protective custody, or even the denial of the submission of an accurate protective custody application, constitutes an adverse action because Plaintiff feared for his safety without custodial protection. (*See* Compl. at 6 ("I could be killed").) It cannot be said, as a matter of law, that this fear would not deter a similarly situated individual from filing further lawsuits or grievances. Therefore, Plaintiff has sufficiently alleged an adverse action.

**\*7** Defendants dispute whether Plaintiff has alleged a causal connection between the lawsuits and Defendants' denial of protective custody. "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). However, as the Second Circuit recently explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to

proceed to trial on a retaliation claim.

*Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (internal citations and quotation marks omitted). With regards to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001). *Compare Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's complaint, was in response to the plaintiff's protected activity) *with Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that the lapse of eight months between a complaint and retaliatory act indicated a causal connection).

In the present case, Plaintiff's earlier federal lawsuits were filed in 2002 and 2013, and the alleged adverse action occurred in May of 2014. As to the first federal lawsuit —*Cruz v. Hillman*, filed on September 19, 2000 and decided on May 16, 2002—a time period of 12-14 years between the protected activity and retaliation (the present complaint was filed May 1, 2014) is too lengthy and thus the temporal relationship here is too attenuated to establish a causal connection. *See Cruz v. Hillman,* 2002 U.S. Dist. LEXIS 17705, 2002 WL 31045864. *See also Shaw v. McDonald*, No. 14 CV 5856 (NSR), 2015 WL 8484570, at \*6 (S.D.N.Y. Dec. 8, 2015) *reconsideration denied*, No. 14-CV-5856 (NSR), 2016 WL 828131 (S.D.N.Y. Feb. 22, 2016) ("[w]ithout any alleged explanation for the delay, a one year gap is too attenuated to establish a causal relationship.). With regards to the second lawsuit, however, Plaintiff has adequately alleged a causal connection. *Cruz v. Grosso* was filed on January 9, 2013 and decided on July 27, 2015. *See Cruz v. Grosso*, 2015 WL 4542280. The *Grosso* case was pending —and the protected activity was therefore ongoing—when the alleged adverse action occurred. Defendants argue that no causal connection exists because *Grosso* did not involve any of the Defendants here or even any of the staff at GHCF. While this may be factually true, Plaintiff has also alleged that (1) he notified Defendants of the *Grosso* case, (2) Defendant Kiernan stated that Plaintiff would not get protective custody "because of the case against Grosso," and (3) Defendant Jackson refused to help Plaintiff and stated as her reason, "we have a code." (Compl. at 3-4.) Therefore,

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 119 of 427

the close temporal proximity taken together with Defendants' knowledge of the protected activity and statements tending to demonstrate a retaliatory motive sufficiently establish a causal connection. Therefore, the Court declines to dismiss Plaintiffs First Amendment Retaliation Claim.

## CONCLUSION

**\*8** For the foregoing reasons, the Defendants' motion to dismiss is GRANTED in part and DENIED in part. Defendants' motion is denied with respect to Plaintiffs retaliation claim-that Defendants denied him protective custody in retaliation for his filing of federal lawsuits. Plaintiffs remaining claims, however, are dismissed. Defendant shall have until 60 days from the date of this

Order to file responsive pleadings on the remaining claim. An initial in-person case management and scheduling conference pursuant to Fed. R. Civ. P. 16 is scheduled for May 20, 2016, at 10:30 a.m., at the United States Courthouse, 300 Quarropas Street, Courtroom 218, White Plains, New York 10601. Plaintiff shall appear via telephone. The parties shall also complete a Civil Case Discovery Plan and Scheduling Order and bring it to the conference. The Court respectfully directs the Clerk to terminate the motion at ECF No. 36.

SO ORDERED:

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1060330

---

### Footnotes

1    As a *pro se* Plaintiff, Cruz is subject to a more liberal pleading standard, which requires that the Court consider factual allegations in Cruz's opposition papers to supplement allegations in his Complaint. *See Collins v. Goord,* 438 F.Supp.2d 399, 403 n. 1 (S.D.N.Y. 2006); *Fox v. Fischer,* No. 04 Civ. 6718, 2005 WL 1423580, at \*2 n. 1 (S.D.N.Y. June 14, 2005); *Verley v. Goord,* No. 02 Civ. 1182, 2004 WL 526740, at \*5 (S.D.N.Y. Jan. 23, 2004). Therefore, the Court will consider facts alleged in the Complaint and opposition papers as long as there is no disagreement between the documents.

2    Page number references in the Complaint refer to ECF page numbers to avoid confusion.

---

**End of Document**                                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1413362
United States District Court,
N.D. New York.

K. Felicia DAVIS, Plaintiff,
v.
CITY OF SYRACUSE; and
Stephanie A. Miner, Defendants.

No. 5:12–CV–0276 (GTS/DEP).
|
Signed March 27, 2015.

**Attorneys and Law Firms**

K. Felicia Davis, Syracuse, NY, pro se.

Bond, Schoeneck & King, Plcc, Laura H. Harshbarger, Esq., Kristen E. Smith, Esq., of Counsel, Syracuse, NY, for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in his employment discrimination action filed by K. Felecia Davis ("Plaintiff") against the City of Syracuse and Stephanie A. Miner ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 63.) For the reasons set forth below, Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Summary of Plaintiff's Claims and Defendants' Counterclaims

Generally, in her Amended Complaint, Plaintiff asserts the following ten claims arising from her alleged wrongful termination from the position of Board Administrator of the City of Syracuse's Citizen Review Board on February 4, 2011, after she took maternity leave in late October of 2010:(1) a claim against Defendant City for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) a claim against Defendant City for retaliation under Title VII; (3) a claim against Defendant City for sex discrimination under the New York State Human Rights Law, New York Executive Law § 296 *et seq.* ("the Executive Law"); (4) a claim against

Defendant City for retaliation under the Executive Law; (5) a claim against Defendant Miner for aiding and abetting sex discrimination under the Executive Law; (6) a claim against Defendant Miner for aiding and abetting retaliation under the Executive Law; (7) a claim against both Defendants for violation of the right to due process under the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant Miner for violation of the right to equal protection under 42 U.S.C. § 1983 and the Fourteenth Amendment; (9) a claim against Defendant City for violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and (10) a claim against Defendant Miner for retaliation under 42 U.S.C. § 1983 and the First Amendment. (Dkt. No. 6.) Familiarity with the factual allegations supporting these claims is assumed in this Decision and Order, which is intended primarily for the review of the parties.

Generally, in their Answer, Defendants assert the following four counterclaims arising from Plaintiff's alleged practice of law using a City-paid secretary and City computer during the hours that she claimed to have worked for the City: (1) a counterclaim of fraud under New York State common law; (2) a counterclaim of negligent misrepresentation under New York State common law; (3) a counterclaim of unjust enrichment under New York State common law; and (4) a counterclaim of faithless servant under New York State common law. (Dkt. No. 8.)

### B. Undisputed Material Facts

The following facts were asserted and properly supported by Defendants in their Statement of Material Facts and were either admitted or denied without proper support by Plaintiff in her Response thereto. (*Compare* Dkt. No. 63, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response].)

 **\*2** Before reciting these facts, the Court pauses to explain the reason for certain deficiencies in Plaintiff's response to Defendants' Statement of Facts. On a motion for summary judgment, denials of fact that are based on a lack of personal knowledge, mere information or belief, and/or inadmissible evidence are insufficient to create a genuine dispute. Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to ... oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on matters stated."); *Rodriguez v. Bubnis,* 11–CV–1436, 2014 WL 6078529, at \*10, n. 25 (N.D.N.Y. Nov. 13, 2014) (Suddaby, J.) (collecting cases). Moreover,

the assertion of additional material facts by a non-movant is permitted only if the additional material facts are both (1) in dispute and (2) contained in separately numbered paragraphs. N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response may also set forth any additional material facts that the non-movant contends are *in dispute* in *separately numbered* paragraphs.") (emphasis added) . [1]

### *Plaintiff's Employment by the City*

1. Plaintiff was a full-time employee of the City of Syracuse, and served as the Administrator of the City's Citizen Review Board ("CRB"). [2]

2. Plaintiff was not employed to act as a lawyer for the City or the CRB. [3]

3. Plaintiff's employment was not covered by an individual employment contract or by any of the City's collective bargaining agreements; rather, she served at the discretion of the CRB and was able to be removed by the CRB for good cause. [4]

4. The CRB is comprised of Board members who are volunteer citizens appointed by the Syracuse Common Council and the Mayor. [5]

### *Mayor's Early Decisions Regarding the CRB*

5. Even before becoming Mayor, as a Common Councilor, Mayor Stephanie Miner heard comments about the CRB that were overwhelmingly negative, and heard story after story about citizens who went to the CRB office and found it closed or who made complaints to the CRB but did not hear back from it. [6]

6. When Mayor Miner took office, the CRB was one of the issues she wanted to address. [7]

7. In her first month in office (January of 2010), Mayor Miner denied the CRB's request for authorization to hire a new employee (to fill a vacant investigator position), because she was unwilling to devote taxpayer money to a CRB that was not producing value to the taxpayers, deciding instead that the

City's money would be better spent on commissioning a study of CRBs in other cities that were more effective. [8]

8. As a result, Mayor Miner appointed Christine Fix to conduct the study. [9]

9. After Ms. Fix completed her report of CRB models in June 2010, Mayor Miner distributed the report within her administration, with the directive that she wanted to explore a new model for the CRB that would be more effective and impactful. [10]

### *Plaintiff's Non–Appearance at the Paulk Trial*

**\*3** 10. The *Paulk* case was a federal lawsuit brought by a citizen, Martin Paulk, against two SPD officers (*Paulk v. Lester,* 06–CV–1343 [N.D.N.Y.] ). [11]

11. On October 21, 2010, a process server attempted to personally serve a subpoena on Plaintiff at her home. [12]

12. The subpoena called for CRB documents and for Plaintiff to testify at the *Paulk* trial on Monday, November 1, 2010. [13]

13. Plaintiff was not home, but her husband reached her by telephone. [14]

14. Plaintiff spoke by telephone to the gentleman attempting to deliver the papers, and instructed him to deliver the papers to the City Corporation Counsel's office. [15]

15. The process server delivered the papers to the City's Corporation Counsel office on Friday, October 22, 2010. [16]

16. The *Paulk* trial was scheduled to begin on November 1, 2010. [17]

17. Before serving the subpoena, Richard Brickwedde (Paulk's attorney), had not indicated a desire to call Plaintiff as a witness . [18]

18. On October 22, 2010, Joseph Doyle, a City attorney on the *Paulk* case, submitted a letter to the presiding judge, United States District Judge Charles Kornmann, requesting a conference to address the subpoena. [19]

19. Doyle's co-counsel, James McGinty, anticipated that Judge Kornmann would agree with the City's position that Brickwedde should not be allowed to call Plaintiff as a witness in the *Paulk* trial . [20]

20. Judge Kornmann did not address the issue of the subpoena until a pre-trial conference on October 28, 2010, during which he decided that Brickwedde would be allowed to call Plaintiff. [21]

21. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle assumed, from the fact that Plaintiff had told the process server to bring the package to their office, that Plaintiff knew that the package contained a subpoena in the *Paulk* case. [22]

22. At the time of the pre-trial conference on October 28, 2010, McGinty and Doyle were not aware that Plaintiff was pregnant or that she would be going on maternity leave. [23]

23. On Friday, October 29, 2010, McGinty called the CRB office and asked to speak with Plaintiff. [24]

24. The CRB secretary told McGinty that Plaintiff was on maternity leave. [25]

25. Plaintiff's maternity leave began on October 29, 2010. [26]

26. McGinty explained to Plaintiff's secretary that a subpoena had been issued to Plaintiff for her to testify in the *Paulk* trial on Monday at 9:00 a.m., and that whether she was on leave from work was immaterial. [27]

27. McGinty told Plaintiff's secretary that she needed to get in touch with and tell her that she needed to appear as subpoenaed or, if she could not, she needed to call the attorney who issued the subpoena, Mr. Brickwedde, to make other arrangements for her testimony. [28]

28. Plaintiff's secretary called her that day and informed her that a man from the Corporation Counsel's office had called and indicated that she should call an attorney by the name of Brickwedde . [29]

**\*4** 29. Plaintiff called Brickwedde and left a voicemail informing him that something had been received by the City for her and that she was going on maternity leave. [30]

30. Brickwedde returned Plaintiff's call but missed her and also left a voicemail. [31]

31. Brickwedde advised Plaintiff that he could not speak to her for ethical reasons and instructed her to speak to McGinty. [32]

32. Plaintiff did not call McGinty or Doyle. [33]

33. On the first day of the trial (November 1, 2010), Brickwedde called Plaintiff as a witness; however, she was not there. [34]

34. When Plaintiff did not appear, McGinty called the CRB office. [35]

35. The CRB secretary answered and told McGinty that Plaintiff had called her earlier that day to say that she was in labor and going to the hospital, which information McGinty relayed to Judge Kornmann. [36]

36. Plaintiff was not in the hospital giving birth on November 1, 2010, but was at her doctor's office; she gave birth on November 9, 2010.

37. Meanwhile, at trial, another issue was occurring: McGinty and Doyle were informed that Brickwedde had independently obtained a CRB report stating that the CRB had found his client's complaint of police misconduct "substantiated."

38. When questioned by Judge Kornmann as to why McGinty and Doyle had not produced the document during discovery, McGinty explained that the CRB had not provided it to them (after they had requested documents from the CRB during the course of the *Paulk* discovery process). [37]

39. As a result of Plaintiff's failure to appear, Judge Kornmann imposed a sanction on the police officers in the form of allowing the CRB's "substantiated" finding to come into the record without allowing any testimony to explain or minimize the impact of the detrimental document on the police officers' case. [38]

40. After a three-day trial, the jury returned a verdict in favor of the City's police officers. [39]

### New Information Emerges Concerning Plaintiff's Whereabouts

41. On November 8, 2010, Brickwedde filed a motion for a new trial and for additional sanctions in the *Paulk* case.

42. The motion was based, in large part, on Plaintiff's non-appearance at trial and the City's failure to produce all relevant CRB documents during discovery. [40]

43. On November 16, 2010, Brickwedde supplemented his motion papers on the ground that he had found out that Plaintiff had voted in an election on November 2, 2010, while the three-day *Paulk* trial was still ongoing. [41]

44. From the perspective of McGinty and City Corporation Counsel Juanita Perez–Williams, this fact called into question the information that Plaintiff's secretary had provided to McGinty on November 1, 2010, and that McGinty had, in turn, had provided to Judge Kornmann (i.e., that Plaintiff was in labor and going to the hospital on November 1, 2010). [42]

45. On November 24, 2010, Judge Kornmann issued a memorandum ordering the production of extensive documents and information about Plaintiff's whereabouts at the time of trial, as well as "all records of the office [Plaintiff] heads which deal in any way with [the *Paulk* ] case."

 **\*5** 46. To explore these issues, Judge Kornmann scheduled a hearing for January 24, 2011. [43]

47. In a letter to Perez–Williams dated December 3, 2010, Plaintiff stated, "I made a call to Mr. Brickwedde and left a voicemail informing him of my late stage of pregnancy and start of labor (I had begun to dilate), and informed [him] that I had not seen any subpoena." [44]

48. In response to Judge Kornmann's memorandum of November 24, 2010, Plaintiff provided Corporation Counsel's office with a number of CRB documents related to *Paulk* that had not been provided in response to earlier requests to her office for CRD documents related to *Paulk*. [45]

### The City's Investigation into Plaintiff and the Operation of the CRB

49. When Perez–Williams learned in late-November of the motion for a new trial and for sanctions, she informed Mayor Miner as to what was occurring; Miner first learned about the subpoena and Plaintiff's non-appearance only after Plaintiff had not appeared. [46]

50. The *Paulk* situation was deeply concerning to Mayor Miner. [47] At the time Miner took office, she believed that something had to be done about the CRB. [48] The *Paulk* matter brought the perceived problem of the CRB into a state of immediacy for her. [49] As she saw the situation, instead of merely being a waste of resources, the CRB now was creating potential liability for the City. [50]

51. Upon hearing about the *Paulk* subpoena incident, Mayor Miner asked Perez–Williams to "drill down" into what was going on with Plaintiff and the CRB and to report back to her. [51]

52. The City's investigation indicated the following:

a. As of the end of November 2010, the CRB's two employees (Plaintiff and her secretary, Carolyn Williams) had not entered time sheets into the City's timekeeping/payroll system since June; this meant that, even though Plaintiff was currently claiming to be on maternity leave, and had been (according to her) on such leave since late October, she was allowing the City to pay her as an active employee, without having to use any of accrued time-off benefits. [52]

b. On December 2, 2010, Plaintiff signed and submitted six months' worth of time sheets on a single day. [53]

c. On December 8, 2010, Plaintiff filled out an FMLA request form, which "requested" permission to take an FMLA leave that had begun six weeks earlier. [54]

d. Several CRB Board positions were vacant, other Board members had been appointed but never properly sworn in, and still other Board members' terms had expired, such that they were serving terms to which they had not been appointed; this information led Perez–Williams

to conclude that the CRB could not legally take action, because it did not have a quorum of individuals properly appointed and installed in accordance with the City charter. [55]

e. The CRB had not been forwarding citizen complaints to the Syracuse Police Department Internal Affairs Division ("IAD") on a timely basis so that the complaints could be properly investigated. [56]

**\*6** f. For example, on December 16, 2010, the CRB sent 12 citizen complaints to IAD. [57]

g. The 12 citizen complaints Plaintiff's office forwarded on December 16, 2010, had been marked as received by the CRB as much as nine months earlier; before the mass mailing to IAD on December 16, 2010, the CRB office had sent only two citizen complaints to IAD for all of 2010. [58]

h. The local law requires the CRB to forward citizen complaints to IAD upon receiving them because IAD has the first 45 days to conduct its investigation. [59]

i. While the CRB may have kept statistical reports at its office, and given those reports to the Syracuse Common Council during each budget year, the CRB had not *published monthly* and *quarterly* statistical reports, as required by the CRB ordinance. [60]

j. The last available meeting minutes were from June 2010. [61]

k. In early October of 2010, Plaintiff refused to reveal, to a Common Councilor, the current CRB Board members' names (which were considered by the Common Councilor and Perez–Williams to be public information). [62]

l. Several times Plaintiff was late in submitting her budget requests to the City's Finance Department. [63]

53. Perez–Williams shared these and the remainder of her findings with Mayor Miner. [64]

54. Based on these overall findings, including the negligent handling of the *Paulk* subpoena and the "numerous deficiencies in the operation of the CRB, caused in large part by [her] failure to exercise [her] statutory responsibilities," Mayor Miner decided to terminate Plaintiff's employment. [65]

*The City Discovers Plaintiff's Private Practice Work in Her City Office on City Time*

55. Mayor Miner reached out to the New York State Comptroller and requested an audit of the CRB office concerning the issues uncovered in the City's investigation. [66]

56. Mayor Miner made this request for an audit within days of Plaintiff's termination. [67]

57. The State Comptroller performed its audit largely in late 2011 and early 2012. [68]

58. In connection with the audit process, the City was asked to provide the State Comptroller with access to the CRB office and its paper files and electronic records, including the City computer that had been issued to Plaintiff. [69]

59. As a result of the City's review of the data and information requested in connection with the audit, it was brought to Mayor Miner's attention that Plaintiff had used the City's resources (i.e., the City's office space, the City-paid secretary, the City's fax machine, the City's computer, etc.) to engage in her private law practice, and that Plaintiff had submitted time sheets claiming to have worked for the City when she had been engaged in her private law practice, not City business. [70]

60. By the late spring of 2012, Mayor Miner believed that the City was due potentially significant recompense; this determination grew out of the documentation the City reviewed in connection with and in response to the ongoing audit, which was occurring at the time the City answered the Complaint. [71]

**\*7** 61. The Comptroller's report was published in June 2012 and stated, among other things, that "[t]he analysis found that the Administrator spent a significant amount of time during normal business hours engaging in private legal work using a City-owned computer." [72]

*The City Remakes the CRB*

62. Immediately after Plaintiff's termination, the City changed the locks on the doors of the CRB office, and the CRB ceased to function (for the time being). [73]

63. The City formed an ad hoc committee to propose reforms to the CRB and, as a result of this committee's work, the Common Council passed, and Mayor Miner signed into law, new legislation designed to ensure that the CRB would be accountable and effective going forward . [74]

64. The City started fresh with new citizens Board members (five new appointments); and the new CRB Board selected a new Administrator. [75]

### C. Summary of Parties' Arguments on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert seven arguments. (Dkt. No. 63, Attach. 13 [Defs.' Memo. of Law].)

First, Defendants argue, Plaintiff's pregnancy-discrimination claims under Title VII and the Executive Law should be dismissed for two reasons: (a) even assuming Plaintiff can meet her modest *prima facie* burden on such a claim, the City need only articulate a legitimate, non-discriminatory reason for its action (which it has done, given Plaintiff's negligence with respect to the *Paulk* matter as well as her numerous deficiencies in the operation of the CRB); and (b) the burden then shifts to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the City were not its true reasons but were a pretext for discrimination, and that intentional discrimination was the real reason for the adverse action (which she has not done, and cannot do, given that her disagreement with the City's assessment of her performance does establish pretext, her conspiracy theory is sheer speculation, McGinty is not a "similarly situated" comparator, her claim of being "scapegoated" for the *Paulk* debacle undercuts her pregnancy-discrimination theory, and no reasonable factfinder could conclude that the City completely overhauled the CRB merely because Plaintiff had a baby). (*Id.*)

Second, Defendants argue, in any event, Plaintiff's retaliation claims under Title VII and the Executive Law should be dismissed for three reasons: (a) after a plaintiff has established a *prima facie* case of retaliation (showing protected activity,

an adverse employment action, and a causal relationship), the employer can then meet its burden of articulating a legitimate, non-retaliatory reason for filing counterclaims by establishing a reasonable good-faith belief that the claims were valid, after which any presumption of retaliation drops out and the plaintiff bears a "substantial burden," pursuant to which she must show that, but-for the protected activity, the employer would not have taken the adverse action; (b) here, Plaintiff cannot even establish a *prima facie* case because a non-frivolous compulsory counterclaim is generally not, as a matter of law, an adverse employment action, and the counterclaims asserted by the City in this action are amply supported by the record; and (c) in any event, Plaintiff cannot establish pretext because the fact that the City's counterclaims were filed shortly after Plaintiff's Complaint was filed does not save Plaintiff's retaliation claims (in that such a proximity of time is necessary with counterclaims), and the City was investigating any actionable malfeasance long before Plaintiff filed her Complaint. (*Id.*)

**\*8** Third, Defendants argue, Plaintiff's aider-and-abettor claims under the Executive Law should be dismissed because there is no primary violation of the Executive Law to aid or abet. (*Id.*)

Fourth, Defendants argue, Plaintiff's "stigma plus" procedural due process claim under the Fourteenth Amendment should be dismissed for three reasons: (a) even if she could show a damage to her reputation (thus satisfying the "stigma" element), she was, as an at-will government employee, afforded all the process she was due, given the availability of an Article 78 proceeding to clear her name (which suffices to provide the requisite post-deprivation process to a terminated employee, even if that employee fails to avail herself of that process); (b) she cannot dispute that she was an at-will employee, because she was not subjected to any employment or collective bargaining agreement (and, indeed, her argument that she served at the pleasure of the CRB supports the conclusion that she was an at-will employee); and (c) to the extent Plaintiff argues that Mayor Miner lacked the authority to terminate her, that argument relates to a due process claim and thus Plaintiff was able to assert it in an Article 78 proceeding. (*Id.*)

Fifth, Defendants argue, Plaintiff's equal protection claim under the Fourteenth Amendment should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 126 of 427
Davis v. City of Syracuse, Not Reported in F.Supp.3d (2015)
2015 Wage & Hour Cas.2d (BNA) 179,902

Sixth, Defendants argue, Plaintiff's FMLA claim should be dismissed for the same reasons that her Title VII pregnancy-discrimination claim should be dismissed. (*Id.*)

Seventh, Defendants argue, Plaintiff's retaliation claim under the First Amendment should be dismissed for three reasons: (a) her testimony before Judge Kornmann during the sanctions hearing of January 24, 2011, was not "protected" (in that she was not speaking as a citizen but as an employee); (b) in any event, her termination on February 4, 2011, was not caused by that testimony but by her conduct in connection with the *Paulk* subpoena in November of 2010; and (c) at the very least, Defendant Miner is protected from liability as a matter of law by the doctrine of qualified immunity (given that the issue of whether Plaintiff was speaking as a citizen rather than as an employee was not "clearly established" during the time in question). (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff asserts seven arguments. (Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, she has established a sex-discrimination claim under Title VII (and presumably under the Executive Law) for two reasons: (a) Defendants do not dispute that she has established a *prima facie* case that she was discriminated against by the City due to her pregnancy; and (b) as a result, to avoid summary judgment, she need not show that the City's proffered reasons were false or not a factor but only that the prohibited factor (i.e., her pregnancy) was among the motivating factors (which she has done, due to Defendants' admission that her non-appearance at trial, which occurred while she was out on maternity leave, was a motivating reason for her termination). (*Id.*)

**\*9** Second, Plaintiff argues, she has established a retaliation claim under Title VII (and presumably under the Executive Law) because the City's counterclaims are baseless in that (a) she was permitted by the CRB to engage in a private legal practice and (b) Defendant Miner knew, before the events in question, that Plaintiff was engaging in that private legal practice. (*Id.*)

Third, Plaintiff argues, she has established an aiding-and-abetting claim against Defendant Miner under the Executive Law because Miner worked to develop what she knew were baseless reasons for Plaintiff's termination, which reasons

were relied on by the City of Syracuse to engage in sex discrimination and retaliation under the Executive Law. (*Id.*)

Fourth, Plaintiff argues, she has established a "stigma plus" procedural due process claim under the Fourteenth Amendment for four reasons: (a) she suffered injury to her reputation in that she was denied a job with Cornell Cooperative Extension (thus satisfying the "stigma" element); (b) she experienced defamation plus the loss of government employment (thus satisfying the "plus" element); (c) she was not afforded a pre-deprivation hearing although she had an implied employment contract with the CRB (due to the fact that CRB Board members had to determine whether to continue her employment each year) and her termination was not random and unauthorized (due to the fact that Defendant Miner was a high-ranking official with final authority over significant matters); and (d) indeed, even if she was an at-will employee, she was not afforded even a post-deprivation hearing (although she requested one). (*Id.*)

Fifth, Plaintiff argues, she has established an equal protection claim under the Fourteenth Amendment for four reasons: (a) she is a member of a protected class (in that she is female); (b) she was qualified for her position (in that she served in her capacity as CRB Administrator for 17 years, held more educational credentials than required, and had never been disciplined or reprimanded); (c) she suffered an adverse employment action (in that she was terminated from her employment); and (d) the circumstances surrounding the employment action give rise to an inference of discrimination (in that a similarly-situated male was not disciplined for conduct that Plaintiff was accused of committing but did not actually commit). (*Id.*)

Sixth, Plaintiff argues, she has established an FMLA claim for five reasons: (a) she was an eligible employee under the FMLA (in that she had worked the previous 12 months); (b) the City was a covered employer under the FMLA (in that it had the requisite number of employees); (c) she was entitled to the leave of absence (in that her maternity leave had been approved by the CRB prior to October of 2010); (d) she gave notice to the City of her intention to take leave (in that the City had such notice on or before October 6, 2010, and later when she emailed the City requesting an FMLA form); and (e) she was denied benefits to which she was otherwise entitled (in that the termination interrupted her light duty leave, and the reason for the termination was a pretext for discrimination). (*Id* .)

**\*10** Seventh, Plaintiff argues, she has established a retaliation claim under the First Amendment for four reasons: (a) her testimony at the hearing of January 24, 2011, was protected speech; (b) the subject about which she was called to testify was of public concern in that police misconduct has been recognized as being of public interest; (c) the proximity of her termination to her testimony (i.e ., 10 days) demonstrates discriminatory animus; and (d) Defendant Miner is not protected by qualified immunity (in that Plaintiff's First Amendment rights were clearly established at the time of her termination due to the fact that *Jackler v. Bryne,* 658 F.3d 225 [2d Cir.2011] was decided in February of 2011). (*Id.*)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants assert seven arguments. (Dkt. No. 72 [Defs.' Reply Memo. of Law].)

First, Defendants argue, Plaintiff has taken liberties with the record in two ways: (a) she cites to the record nowhere in her opposition memorandum of law; and (b) for the most part, her primary evidence (her own affidavit) is not based on her personal knowledge, contains inadmissible material such as hearsay, and/or sets forth legal conclusions. (*Id.*)

Second, Defendants argue, Plaintiff's denials of Defendants' statements of material fact are ineffective for four reasons: (a) she denies many facts about which she could not possibly have any firsthand knowledge or evidence (e.g., conversations or telephone calls to which she was not a party, decisions made and impressions held by Mayor Miner, pre-trial events in the *Paulk* matter), as often is evident by her reliance on her "information and belief"; (b) she denies several facts about matters that are independently verifiable based on court records or documentary evidence, and about which she has no admissible evidence to dispute (e.g., the existence and contents of the *Paulk* subpoena, the date of the *Paulk* trial, the Paulk jury verdict, and the date and contents of the State Comptroller's report); (c) she denies material facts that she plainly admitted in her own prior sworn testimony (e.g., the fact that a process server attempted to serve her at her home, the fact that she did not call McGinty or Doyle after receiving a voice mail from Brickwedde, and the fact that she was aware of the *Paulk* case prior to the trial); and (d) in many instances, she muddles Defendants' fact statements by going off in another direction she likes better, which is insufficient to call Defendants' facts into dispute). (*Id.*)

Third, Defendants argue, Plaintiff fails to save her pregnancy-discrimination claim for three reasons: (a) in her attempt to establish pretext, she relies on the incorrect legal standard (i.e., one applicable in a mixed-motive case, which this is not); (b) in any event, her conspiracy theory (i.e., that the subpoena incident was a strategic effort to adversely impact and compromise Plaintiff due to her pregnancy) is supported only by speculation and hearsay, and contradicts the testimony of McGinty, Perez–Williams and Mayor Miner; and (c) her excuses for her own ineffectiveness and the CRB's ineffectiveness do not establish pretext (and fail to show that the City's belief that she did, in fact, know that a subpoena existed, was not honestly held at the time it decided to terminate her employment). (*Id.*)

**\*11** Fourth, Defendants argue, Plaintiff fails to save her retaliation claim under Title VII and the Executive Law for two reasons: (a) to avoid dismissal of this claim, she must provide sufficient, competent evidence that Defendants' counterclaims are the product of retaliatory animus; and (b) instead, Plaintiff offers only speculation (e.g., regarding Common Councilors' knowledge of her private legal practice) and misstatements of record evidence (e.g., regarding the scope and source of Mayor Miner's knowledge of Plaintiff's private legal practice, and the nature of the City's authorization of a CLE course that Plaintiff attended). (*Id.*)

Fifth, Defendants argue, Plaintiff fails to save her due process claim under the Fourteenth Amendment for two reasons: (a) the single case that Plaintiff cites in support of her argument that she had an implied employment contract (*Potts v. City of Utica,* 86 F.2d 616 [2d Cir.1936] ) is, in addition to being old, factually distinguishable from the current case; and (b) the sole record evidence that Plaintiff adduces in support of her argument that she had an implied employment contract (i.e., the affidavit of former-CRB Board member Homer Davis) is speculative (in that the Davis ceased serving as a CRB Board member in 2008) and immaterial (in that it addresses a purported agreement to allow Plaintiff to practice law privately on City time), and in any event actually supports the fact that Plaintiff served at-will (albeit at the will of the CRB). (*Id.*)

Sixth, Defendants argue, Plaintiff fails to save her FMLA claim for two reasons: (a) her argument that Defendants interfered with her leave by terminating her while on "light duty leave" implies that *any* termination while on FMLA leave is a violation of the FMLA, which is not the law; (b) as established by Defendants earlier, Plaintiff was terminated

Davis v. City of Syracuse, Not Reported in F.Supp.3d (2015)

2015 Wage & Hour Cas.2d (BNA) 179,902

for legitimate, non-discriminatory reasons, and she has not presented sufficient evidence to rebut these reasons. (*Id.*)

Seventh, Defendants argue, Plaintiff fails to save her retaliation claim under the First Amendment for two reasons: (a) by focusing on whether her testimony at the *Paulk* hearing was protected speech, Plaintiff ignores Mayor Miner's position that there is no causal connection between that testimony and Plaintiff's termination; and (b) in any event, she has not overcome Mayor Miner's entitlement to qualified immunity because, although the case of *Jackler v. Bryne, 658 F.3d 225 (2d Cir.2011)*, was decided in July of 2011, the contrary case of *Bearss v. Hilton, 445 F. App'x 400 (2d Cir.2011)*, was decided in November of 2011, rendering the state of the law not "clearly established" when Mayor Miner acted. (*Id.*)

## II. GOVERNING LEGAL STANDARD

Under *Fed.R.Civ.P. 56*, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(a)*. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)*. In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett, 477 U.S. 317, 323–24 (1986)*. However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. *Fed.R.Civ.P. 56(a)*,(c),(e).

**\*12** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson, 477 U.S. at 248*. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)* [citation omitted]. As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts" [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986)*.

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se* . [76] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [77] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [78] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement [79]—even where the nonmoving party was proceeding *pro se* in a civil rights case. [80]

Finally, generally, special solicitude is not extended to *pro se* litigants who are attorneys. *See e.g., Harbulak v. Suffolk, 654 F.2d 194, 198 (2d Cir.1981)* ("[Plaintiff] is a lawyer and, therefore, cannot claim the special consideration which the courts customarily grant to pro se parties."); *Davey v. Dolan, 453 F.Supp.2d 749, 754 (S.D.N.Y.2006)* ("[P]laintiff here is also a member of the New York bar and his papers will be viewed accordingly .") [81]

## III. ANALYSIS

### A. Plaintiff's Sex–Discrimination Claims Against the City Under Title VII and the Executive Law

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### B. Plaintiff's Retaliation Claims Against the City Under Title VII and the Executive Law

After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. Plaintiff's reliance on the motivating-factor standard (in her

opposition memorandum of law of October 21, 2014) ignores the Supreme Court's decision (of June 24, 2013) in *Univ. of Tex. SW Med. Ctr. v. Nassar,* 133 S.Ct. 2517 (2013), in which the Court held that the level of causation that must be proved in a Title VII retaliation claim is one of but-for causation.

### C. Plaintiff's Aiding–and–Abetting Claims Against Mayor Miner Under the Executive Law

**\*13**   After carefully considering the matter, the Court dismisses these claims for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add one point. In the alternative, the Court would dismiss this claim without prejudice to refiling in state court pursuant to 28 U.S.C. § 1367 due to the fact that no federal claims survive Defendants' motion.

### D. Plaintiff's Due Process Claim Against Defendants Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

First, the Second Circuit's decision in *Potts v. City of Utica,* 86 F.2d 616 (2d Cir.1936), is distinguishable from the current case in that, in addition to not addressing a due process claim, it did not address the issue of whether an implied employment contract had been created by the fact that each year a different configuration of board members of a city agency exercised its discretion *not* to remove a city employee for good cause.

Second, in any event, there is a lack of admissible record evidence from which a rational fact-finder could conclude that the CRB Board members in fact exercised their discretion *not* to remove Plaintiff for good cause each year (especially during the years 2009 and 2010). As an initial matter, it can hardly be said that there was a *different configuration* of the Board each year. *See, supra,* Paragraphs 52(d) and 52(k) of Part I.B.of this Decision and Order. Moreover, even if there had been a different configuration each year, Plaintiff points to no record evidence establishing that the issue of her continued employment was raised annually at CRB meetings. (*See generally* Dkt. No. 67, Attach. 9 [Plf.'s Opp'n Memo. of Law].) Finally, even if the issue had been so raised, Plaintiff has adduced evidence admitting that the CRB experienced problems gathering a quorum to take official action in resolving that issue. (Dkt. No. 67, Attach. 1, at Par.

16 [Homer Davis Affid.].) *See also* Paragraph 52(d) of Part I.B.of this Decision and Order.

### E. Plaintiff's Equal Protection Claim Against Mayor Miner Under the Fourteenth Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### F. Plaintiff's FMLA Claim Against the City

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order.

### G. Plaintiff's Retaliation Claim Against Mayor Miner Under the First Amendment

After carefully considering the matter, the Court dismisses this claim for the reasons stated in Defendants' memoranda of law. *See, supra,* Part I.C. of this Decision and Order. To those reasons, the Court would only add two points.

**\*14**   First, the fact that Mayor Miner was previously aware of Plaintiff's representation of her husband in a lawsuit while she was employed as the Administrator of the CRB does not mean that Miner knew that Plaintiff was regularly engaged in a private law practice in City office space, using a City-paid secretary and City computer during the hours that she claimed to have worked for the City. The sole admissible record evidence on this subject is that Miner did not have such knowledge. (*Compare* Dkt. No. 63, Attach. 8, at ¶¶ 33–34 [Miner Decl., admitting awareness that Plaintiff had represented husband in case in which he was the plaintiff, but denying knowledge of scope of Plaintiff's legal practice] *and* Dkt. No. 67, Attach. 5, at 3–5, 6–7 [attaching pages "11," "12," "13," "47," and "48" of Miner's Dep. Tr., stating that she worked on case in which Plf.'s husband was a plaintiff, and had occasion to believe Plaintiff represented him in that case] *with* Dkt. No. 67, Attach. 1, at ¶¶ 24–25 [Homer Davis Affid., asserting "[u]pon information and belief" that Miner knew Plaintiff "was a practicing attorney"] *and* Dkt. No. 67, at ¶¶ 40–41 [Plf.'s Decl., asserting Miner's notice of case in which Plaintiff was the lead attorney "sometime in 2001–2002," and fact that "[m]any councilor's [sic] knew I was practicing"].)

Second, in any event, Plaintiff is incorrect when she argues that her First Amendment rights were clearly established at the time of her termination because *Jackler v. Bryne,* 658

2015 Wage & Hour Cas.2d (BNA) 179,902

F.3d 225 (2d Cir.2011), was decided in February of 2011. In fact, *Jackle* r was not decided until July 22, 2011. It was merely *argued* in February of 2011. Moreover, that argument did not occur until February *24,* 2011–20 days after Plaintiff's termination on February 4, 2011. Simply stated, the state of the law was not clearly established on February 4, 2011.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 63) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 6) is *DISMISSED.*

The parties are advised that remaining in this action are Defendants' four counterclaims against Plaintiff.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1413362, 2015 Wage & Hour Cas.2d (BNA) 179,902

---

### Footnotes

1   The Court notes that, under Fed.R.Civ.P. 56 and N.D.N.Y. Local Rule 7.1, there is no procedure by which a non-movant may assert a "counter statement of [undisputed] material facts" in response to a motion for summary judgment: the vehicle for such undisputed material facts would be a *cross*-motion for summary judgment (i.e., one seeking a judgment due to a *lack* of a genuine dispute of material fact). *See* Fed.R.Civ.P. 56(a); N .D.N.Y. L.R. 7.1(a)(3).

2   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 1 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 1 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

3   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 2 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 2 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

4   (Dkt. No. 63, Attach. 8, at ¶ 7 [Miner Decl.].) *See also* City of Syracuse Local Law 11 of 1993 § 6(3)(a),(b).

5   (Dkt. No. 63, Attach. 3, at 7 [attaching page "38" of Davis Dep. Tr.].) *See also* City of Syracuse Local Law 11 of 1993 §§ 1, 4(2), 5(1).

6   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 5 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 5 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

7   (*Compare* Dkt. No. 63, Attach. 1, at ¶ 6 [Defs.' Rule 7.1 Statement, citing Paragraph 9 of Miner Declaration, which supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 6 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted, and in any event that fails show personal knowledge sufficient to controvert fact asserted].)

8   (Dkt. No. 63, Attach. 8, at ¶¶ 10–11 [Miner Decl.].)

9   (Dkt. No. 63, Attach. 8, at ¶ 10 [Miner Decl.].)

10  (*Compare* Dkt. No. 63, Attach. 1, at ¶ 9 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 9 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

11      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 10 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 10 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

12      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 11 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 11 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

13      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 12 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 12 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

14      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 13 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 13 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

15      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 14 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 14 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 16–17, 70 (N.D.N.Y. filed Feb. 9, 2011).

16      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 15 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 15 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

17      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 16 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 16 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

18      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 17 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 17 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

19      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 18 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 18 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

20      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 19 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 19 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

21      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 20 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 20 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

22      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 21 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 21 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Tr. of Hrg. of Jan. 24, 2011 at 31–37 (N.D.N.Y. filed Feb. 9, 2011).

23      (*Compare* Dkt. No. 63, Attach. 1, at ¶ 22 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 22 [Plf.'s Rule 7.1 Response, citing record evidence that does not regard the awareness of McGinty and Doyle on October 28 but their awareness of October *29* when McGinty called Plaintiff's office and was told by her secretary that she was out on maternity leave].)

2015 Wage & Hour Cas.2d (BNA) 179,902

24    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 23 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 23 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

25    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 24 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 24 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

26    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 25 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 25 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

27    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 26 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

28    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 27 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 27 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

29    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 28 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 28 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

30    (Dkt. No. 67, at ¶ 15 [Plf.'s Decl.]; Dkt. No. 67, Attach. 4, at 5 [attaching page "33" of transcript of January 2010 hearing in *Paulk* ]; *cf.* Dkt. No. 63, Attach. 11, at 9 [Ex. B to Perez–Williams Decl., attaching letter from Plaintiff to Perez–Williams dated Dec. 3, 2010 stating that Plaintiff had informed Brickwedde that she "had not seen any subpoena"].)

31    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 30 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 30 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

32    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 31 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 26 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

33    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 32 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 32 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

34    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 33 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 33 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].)

35    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 34 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 34 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, and/or impugning judgment of McGinty, neither of which suffices to controvert fact asserted].)

36    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 35 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 35 [Plf.'s Rule 7.1 Response, merely denying knowledge offact asserted, which fails to controvert that fact].)

37    (Dkt. No. 63, Attach. 7, at ¶¶ 14, 21 [McGinty Decl.]; *cf.* Dkt. No. 67 [Plf.'s Decl., merely denying personal knowledge of the CRB's receipt of such a request in 2008].)

2015 Wage & Hour Cas.2d (BNA) 179,902

38    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 39 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 39 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

39    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 40 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 40 [Plf.'s Rule 7.1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].)

40    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 42 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 42 [Plf.'s Rule 7 .1 Response, merely denying knowledge of fact asserted, which fails to controvert that fact].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Memo. of Law (N.D.N.Y. filed Nov. 8, 2010).

41    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 43 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 43 [Plf.'s Rule 7.1 Response, citing to record evidence that fails to controvert fact asserted].) *See also Paulk v. Lester,* 06–CV–1343, Plf.'s Supplemental Affirm. (N.D.N.Y. filed Nov. 16, 2010).

42    (Dkt. No. 63, Attach. 7, at ¶ 18 [McGinty Decl.]; Dkt. No. 63, Attach. 10, at ¶ 8 [Perez–Williams Decl.]; *cf.* Dkt. No. 67, Attach. 10 [Plf.'s Rule 7.1 Response, citing record evidence that does not controvert fact asserted].)

43    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 46 [Defs.' Rule 7.1 Statement, citing to record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 46 [Plf.'s Rule 7 .1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

44    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 47 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 47 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

45    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 48 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 48 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

46    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 49 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 49 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

47    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 50 [Defs.' Rule 7.1 Statement, citing to record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 50 [Plf.'s Rule 7 .1 Response, citing record evidence that fails to controvert facts asserted].)

48    (*Id.*)

49    (*Id.*)

50    (*Id.*)

51    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

52    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(a) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(a) [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

53    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(b) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(b) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

54    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(c) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(c) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

55    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(d) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(d) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

56    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(e) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(e) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

57    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(f) [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(f) [Plf.'s Rule 7.1 Response, failing to either deny facts asserted or cite record evidence that controverts facts asserted].)

58    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(g) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(g) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

59    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(h) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(h) [Plf.'s Rule 7.1 Response, failing to either deny fact asserted or cite record evidence that controverts fact asserted].)

60    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(i) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(i) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

61    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(j) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(j) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

62    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(k) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(k) [Plf.'s Rule 7.1 Response, failing to cite *any* record evidence].)

63    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 51(l) [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 51(l) [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

64    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 53 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 53 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts fact asserted].)

65    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 54 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 54 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert facts asserted].)

66    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 55 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 55 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

67    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 56 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 56 [Plf.'s Rule 7.1 Response, admitting fact asserted].)

68    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 57 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 57 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

69    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 58 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 58 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

70    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 59 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 59 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

71    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 60 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 60 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

72    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 61 [Defs.' Rule 7.1 Statement, citing record evidence that supports fact asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 61 [Plf.'s Rule 7.1 Response, citing record evidence that fails to controvert fact asserted].)

73    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 62 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 62[Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

74    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 63 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 63 [Plf.'s Rule 7.1 Response, failing to cite any record evidence that controvert facts asserted].)

75    (*Compare* Dkt. No. 63, Attach. 1, at ¶ 64 [Defs.' Rule 7.1 Statement, citing record evidence that supports facts asserted] *with* Dkt. No. 67, Attach. 10, at ¶ 64 [Plf.'s Rule 7.1 Response, either admitting or denying knowledge of facts asserted].)

76    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

77    *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases). The Court notes that Plaintiff was served with such a notice in this case. (Dkt. No. 63, Attach.14.)

78    *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

79    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in

**Davis v. City of Syracuse, Not Reported in F.Supp.3d (2015)**

2015 Wage & Hour Cas.2d (BNA) 179,902

matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

80    *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

81    This is because the rationale for conferring special solicitude to *pro se* litigants is that, as non-attorneys, they are inexperienced or unfamiliar with legal procedures or terminology. *See* John C. Rothermich, "Ethical and Procedural Implications of 'Ghostwriting' for *Pro Se* Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999) ("[T]he special leniency afforded *pro se* pleadings in the courts ... is designed to compensate for *pro se* litigants' lack of legal assistance.").

---

**End of Document**                                      © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Nov. 29, 2004.

🏳 KeyCite Yellow Flag

Distinguished by Neural Magic, Inc. v. Meta Platforms, Inc., D.Mass., March 6, 2023

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant, Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion.................................................................. 4

A. Standard for Admissibility of Expert Evidence............................... 6

1. Deborah L. Sweeney.......................................................... 9

a. Qualified?................................................................ 9

2. Kevin W. George, M.D........................................................ 10

3. James T. O'Donnell.......................................................... 13

a. General Causation.......................................................... 14

i. Qualified?................................................................ 14

ii. Reliability of Testimony?................................................ 17

b. Specific Causation......................................................... 19

c. Warnings................................................................... 19

i. Qualified?................................................................ 20

ii. Reliability of Testimony?................................................ 22

II. Summary Judgment Motion...................................................................................... 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd ., No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004)* (granting defense motion to preclude testimony of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T. O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 139 of 427

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' ' because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue." ' *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts than over lay witnesses."* *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." ' *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community."

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

*Id.* (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Kuhmo,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *Amorgianos,* 303 F.3d at 265 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting

motion to preclude where plaintiff defaulted); *see also Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or

to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label*

to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp .,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis." ')

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine—general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

#### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

#### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24–25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25–26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 143 of 427

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?
**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report at 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only

(1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation
It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings
**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 144 of 427

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

### i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See*

Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 145 of 427

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmocologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil] causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert.' " *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the of doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to

Devito v. Smithkline Beecham Corp., Not Reported in Fed. Supp. (2004)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 146 of 427

Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2004 WL 3691343

---

## Footnotes

1       The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel) had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2       During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3       O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

        Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🗝 Exhaustion of other
remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.
Social Security Act, § 205(g), 42 U.S.C.A. §
405(g).

29 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 42 U.S.C. §§ 405(g)-(h) and
1383(c)(3), "because Plaintiff's claim appeared to relate to the
payment of Social Security benefits to her as representative
payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision
about her overpayment and to ask that the SSA not recover

the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of

Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is *DISMISSED.* The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

---

**Footnotes**

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1906029
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,
v.
THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK)
|
Aug. 19, 2002.

**Synopsis**
Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

**[1]**   **Summary Judgment**  ⚷ Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

75 Cases that cite this headnote

ORDER

KAPLAN, J.

**\*1** Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, \*1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.     1

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 151 of 427

**Goldstick v. The Hartford, Inc., Not Reported in Fed. Supp. (2002)**

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Declined to Follow by   Ransom v. Lee,   C.D.Cal.,   April 20, 2017

2006 WL 846272
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Shawn GREEN Plaintiff,

v.

W.E. PHILLIPS, T.G. Eagen, G. Guiney, W.
Russett, T.H. Kiernan, L. Goidel, F. Sarles, D.
Huttel, J. Tardio, and D. Osselman, Defendants.

No. 04 Civ. 10202(TPG).
|
March 31, 2006.

*OPINION*

[GRIESA](), J.

**\*1** *Pro se* plaintiff Shawn Green alleges that the defendants violated his First, Eighth and Fourteenth Amendment rights when he was a prisoner at the Green Haven Correctional Facility. Green has submitted an amended complaint that the court will treat as a motion to amend the complaint. This motion is granted.

The defendants have moved to dismiss the original complaint. The court will treat the motion to dismiss as a motion to dismiss the amended complaint. The motion to dismiss the amended complaint is granted and the case is dismissed.

THE COMPLAINT

Plaintiff, currently a prisoner at Attica Correctional Facility, filed this suit against various guards, nurses, and officers at Green Haven Correctional Facility for violations of his constitutional rights while he was an inmate there. The following facts are taken from both the original complaint and the proposed amended complaint. References to "the complaint" will be understood to refer to claims in either or both of these documents.

*Retaliation*

On March 24, 2004 eleven inmates, including Green, began a hunger strike in the Green Haven Special Housing Unit. Green alleges that defendant W.E. Phillips, a Green Haven employee, retaliated against him for exercising his constitutional rights. Green claims that Phillips ordered defendant T.H. Kiernan, a guard, to make a misbehavior report against plaintiff and that this was in retaliation for going on the hunger strike and for "submitting grievances, complaints, etc." The nature of the grievances and complaints is not described. Green alleges that after Phillips ordered Kiernan to do so, Kiernan issued the misbehavior report charging that plaintiff refused a direct order and created a "visibility obstruction". Green also claims that Kiernan had his own retaliatory motives for issuing the report, since Green had filed a grievance against him and his coworkers a few weeks before the hunger strike began. Green does not describe the grievance that Green allegedly filed against Kiernan.

Green next alleges that defendant W. Russett, a disciplinary proceeding hearing officer, misconstrued evidence to find plaintiff guilty of the charges in the aforementioned misbehavior report:

> Defendant W. Russett, disciplinary proceeding hearing officer, was aware defendant Phillips gave order for report and misconstrued testimonial evidence contradictive to report allegations the kiernan seen sign, at least, the previous day and order had not been directed toward plaintiff. Subsequently, plaintiff was found guilty of charges.

Green next alleges that he appealed and that defendant G. Guiney affirmed Russett. Green does not allege anything about the findings or decision of either Russett or Guiney.

Green next alleges that defendant L. Goidel refused to file numerous grievances that plaintiff submitted regarding the alleged retaliation and conspiracy described above. Green alleges that as a consequence, he was prevented from suing because he could not satisfy the administrative exhaustion requirement in the Prison Litigation Reform Act, [42 U.S.C § 1997e(a)](). Green further claims that defendant T.G. Eagen,

who appears to be a supervisor at Green Haven, was notified of Goidel's refusal and would not remedy it despite knowledge of an "unconstitutional custom at Green Haven". Of course, despite these alleged hindrances, Green has filed this action.

**\*2** Green alleges that the actions of Phillips, Kiernan, Russett, Guiney, and Goidel were pursuant to a conspiracy to deprive him of his constitutional rights. He also appears to allege that the conduct of the hearing officers and supervisors was related to the conspiracy as well.

*Deliberate Indifference to Plaintiff's Medical Problems*
Green next alleges that certain defendants were deliberately indifferent to a serious medical need. Plaintiff was diagnosed with diabetes at Green Haven in November 2003. Plaintiff makes allegations against D. Huttel and F. Sarles, whom he does not identify beyond stating that they were employees at Green Haven. Specifically, plaintiff alleges that Huttel and Sarles, "knew plaintiff were a diabetic prior to strike, yet disregarded an excessive risk to his health and safety once strike begun."

Green also alleges that defendants J. Tardio and D. Osselman, nurses at Green Haven, while giving Green his daily insulin injection, were informed of his request for medical attention due to the strike but "disregarded the excessive risk to his health and safety."

*Discriminatory and Unequal Treatment*
Finally, plaintiff alleges a number of acts that he describes as lacking a rational basis. He argues that these allegations demonstrate violations of the rights granted to him under the equal protection clause of the Fourteenth Amendment:

- He alleges that Huttel and Sarles did not contact the medical department after learning of the hunger strike, allegedly in violation of prison rules.

- He alleges that he was not given any medical attention after informing Tardio and Osselman that he had not eaten in seventy-two hours, in violation of prison rules. He further alleges that Osselman gave medical attention to another inmate during the strike. He also alleges that he suffered from various physical ailments during the strike.

- He again alleges his claims that Goidel intentionally withheld his grievances from being processed.

- He alleges that Phillips "selectively ordered disciplinary rules be imposed against plaintiff (and others similarly situated participating in hunger strike) with intentions of punishment for the exercise of constitutional rights and maliciously to injure" and that Phillips conspired with Kiernan to do so.

- Finally, he alleges that Phillips would not active a hunger strike team in violation of prison rules.

*Relief*
Plaintiff seeks declaratory and injunctive relief as well as damages against each defendant. Specifically, he seeks a declaratory judgment that defendants be demoted or removed from their posts and that Kiernan's misbehavior report be reversed. Green also seeks an injunction requiring the installation of grievance boxes in Green Haven and a logging system for the grievances filed in those boxes.

## DISCUSSION

A court must dismiss a case pursuant to Rule 12(b)(6) where a plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Where a lawsuit alleges violations of constitutional rights, however, a plaintiff may not rely on conclusory statements that his rights were violated. Even under the liberal reading that should be given to a *pro se* plaintiff's complaint, that complaint must still "allege sufficient facts indicating a deprivation of constitutional rights." *Locicero v. O'Connell,* No. 04 Civ. 7708, 2006 U.S. Dist. LEXIS 8958, at \*9 (S.D.N.Y. Mar. 7, 2006).

*Retaliation*
**\*3** In order for a prisoner to properly plead a claim of retaliation, a plaintiff must allege that the conduct that was the basis for the retaliation was "constitutionally protected" and that the protected conduct was a "substantial or motivating factor" in the retaliatory action. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Since retaliation claims can be easily fabricated, a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity. *See Brown v. Middaugh,* 41 F.Supp.2d 172, 191 (N.D.N.Y.1999); *Harris v. Keane,* 962 F.Supp. 397, 405 (S.D.N.Y.1997). When a prisoner files a grievance against prison officials, he is engaging in constitutionally protected

conduct. *Graham,* 89 F.3d at 80. As to the hunger strike, in the present case there has been no attempt to define the extent to which a prison hunger strike may be constitutionally protected. Nonetheless, the court will assume for the sake of argument that prison personnel do not have a right to retaliate against a prisoner who has been on a hunger strike, in the sense that retaliation is used in the cases.

Plaintiff asserts that the misbehavior report against him was in retaliation for his participation in the hunger strike and for filing grievances and complaints. The complaint must be read as claiming that the accusations in the misbehavior report were fabricated and false.

According to the cases, plaintiff is expected to allege in his complaint facts which can reasonably be expected to be within his knowledge and which give substance to the claim of retaliation by means of a concocted misbehavior report.

Plaintiff asserts that there was retaliation by Phillips in part because of plaintiff filing grievances and complaints. But plaintiff does not allege whom these complaints and grievances were against (except that one was against Kiernan), what they were about, or why they would motivate Phillips to direct Kiernan to fabricate a misbehavior charge against plaintiff.

As to the hunger strike, plaintiff does not provide any details of the strike, such as what it was about, how long it lasted, or why Phillips and/or Kiernan would wish to retaliate against plaintiff because of the strike.

Green claims that the misbehavior report charged him with refusing a direct order and with a visibility obstruction. Central to his case is that the charges were not made in good faith but to retaliate for plaintiff's exercise of his rights. Thus the requirement of particularity in pleading means that plaintiff should describe the misbehavior charges in some reasonable detail and should plead in the complaint a definite denial of the truth of those charges. Valid charges of misbehavior are inconsistent, to say the least, with the idea of allegations motivated by a desire to retaliate against plaintiff for the exercise of his rights.

Plaintiff has failed to plead anything approaching what is required. He does not say what the misbehavior report asserted about the disobeyed order-who gave it or what the order was. There is no meaningful description of what was charged by way of "visibility obstruction." It is true that

plaintiff alleges that there was some evidence in his favor at the hearing. But this does not constitute a sufficient pleading of a description of what the misbehavior report charged and a definite assertion that those charges were false.

**\*4** Plaintiff claims that the disciplinary hearing officer, Russett, and the appeal officer, Guiney, were all part of the conspiracy to retaliate against plaintiff. As to the hearing, as already noted, plaintiff alleges that there was some evidence in his favor. Plaintiff does not allege that there was no evidence *against* him. So presumably there was. Plaintiff makes no mention of such evidence. Plaintiff does not allege anything about Russett's findings other than that he found plaintiff guilty of the charges in the misbehavior report. Plaintiff does not allege that he was punished as a result or what punishment he received.

As to Guiney, plaintiff merely states that Guiney "affirm plaintiff appeal after reviewing disciplinary proceeding." This allegation, of course, does not explain what Guiney found, or why it was incorrect, if it was incorrect.

The basic theory of the complaint is that Phillips initiated a conspiracy, which produced a concocted misbehavior charge against plaintiff, made by Kiernan, followed by a baseless finding of guilt by the hearing officer, Russett, ending in another baseless finding by the appeal officer, Guiney. Presumably, if this occurred, evidence against plaintiff would have been manufactured along the way. It is on its face highly unlikely that such things occurred. Plaintiff has not provided even a modicum of particulars to lend credence to his unusual theory.

Plaintiff therefore fails to "plead with some particularity how an action was in retaliation for the plaintiff having filed grievances." *Brown,* 41 F.Supp.2d at 191. Under these circumstances, the retaliation claim against these defendants must be dismissed. *Harris,* 962 F.Supp. at 405 (dismissing a retaliation claim where plaintiff "failed to allege whether the particular Defendants even knew about Plaintiff's grievances and, beyond any conclusory statements, why there would be any retaliation .").

*Medical Issues* [1]
Plaintiff alleges that he was not given proper medical attention during the hunger strike as was necessary given his diabetes, and asserts a violation of the Eighth Amendment.

Plaintiff can assert a claim under the Eighth Amendment if he can plead facts that would demonstrate that the defendants were deliberately indifferent to his serious medical needs. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Deliberate indifference has both objective and subjective components. First, a plaintiff must prove that the alleged deprivation was, in objective terms, "sufficiently serious". *Id.* The "sufficiently serious" standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.2d 62, 66 (2d Cir.1994) (quotation omitted). The plaintiff must then prove that the defendant was had a sufficiently culpable state of mind. *Id.* "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

**\*5** Plaintiff alleges that Huttel and Sarles "knew plaintiff were a diabetic prior to strike, yet disregarded an excessive risk to his health and safety" once the strike began. But the allegation is insufficient since it fails to assert that Huttel and Sarles actually damaged plaintiff's health.

Plaintiff makes two allegations against Tardio and Osselman, two nurses at Green Haven. First, plaintiff makes the conclusory allegation that while giving plaintiff his daily insulin injection, Tardio and Osselman were told of his request for medical attention due to the hunger strike but "disregarded the excessive risk to his health and safety." Plaintiff's second allegation against Tardio and Osselman is that they refused to weigh him after he informed them that he hadn't eaten in seventy-two hours and asked to be weighed, and that he was "never given any medical attention." Plaintiff alleges that this was in violation of health policies related to hunger strikes. As a result of this alleged indifference, plaintiff claims to have suffered "headaches, sweating, confusion, disorientation, weakness, hypotension and tremors during strike."

It should be noted that plaintiff chose to go on the hunger strike. The symptoms plaintiff allegedly suffered are to be expected by someone who does not eat for three days. Second, these symptoms do not rise to the level of a "sufficiently serious" condition, i.e., "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37

F.2d at 66. Moreover, regarding the subjective portion of an Eighth Amendment claim, plaintiff does not plead any facts that would demonstrate that Tardio or Osselman subjectively believed there was a substantial risk of harm to plaintiff.[2]

Accordingly, the Eighth Amendment claims against Huttel, Sarles, Tardio and Osselman are dismissed.

*Denial of Access to Courts*
A word should be said about the allegations against Goidel and Eagen. Plaintiff alleges that Goidel refused to file numerous grievances regarding the alleged retaliation, conspiracy and discrimination already discussed. Plaintiff also alleges that Eagen is liable under a theory of "supervisor liability" because he was notified of the situation and would not remedy it, despite "learning of [an] unconstitutional custom" of such refusals at Green Haven. As a result of these actions, plaintiff alleges, he was denied access to the courts.

To state a claim for denial of access to the courts under § 1983, an inmate must demonstrate that a defendant's "deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* No. 00 Civ.2042, 2001 U.S. Dist. LEXIS at \*12 (S.D.N.Y. Mar. 29, 2001). Here, plaintiff has been heard in this court, so the claim against Goidel and Eagen is dismissed.

*Fourteenth Amendment*
Finally, Plaintiff has asserted claims against all defendants, alleging disparate treatment in violation of the Equal Protection Clause of the Fourteenth Amendment. There is simply no substance to these claims and they do not require discussion.

CONCLUSION

**\*6** Plaintiff's motion to amend the complaint is granted. For the reasons explained above, the case is dismissed pursuant to Rule 12(b)(6).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 846272

## Footnotes

1       There is some question of whether plaintiff has exhausted his administrative remedies for the medical indifference claims as required by the PLRA. Because these claims ultimately fail as pleaded, the court will assume for the sake of deciding this motion that the grievances described in the complaint included claims regarding plaintiff's medical care and that he thus satisfied the exhaustion requirement.

2       The court also notes that plaintiff's claim that he was "never given any medical attention" would appear to be in conflict with his other allegation that he received a daily insulin injection for his diabetes from Tardio and Osselman.

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1039581
Only the Westlaw citation is currently available.
*NOT FOR PUBLICATION*
United States Bankruptcy Court, S.D. New York.

IN RE: Asher HOROWITZ, Debtor.
Burberry Limited and Burberry USA, Defendant.
v.
Asher Horowitz, Defendant.

Case No. 14–36884 (CGM)
|
Adv. No. 15–09002 (CGM)
|
Signed March 14, 2016
|
Filed March 15, 2016

**Attorneys and Law Firms**

Reich Reich & Reich, P.C., 235 Main Street, Suite 450, White Plains, N.Y. 10601, Counsel for Plaintiffs, By: Jeffrey A. Reich

Eric Streich, P.C., 235 Main Street, Suite 420, White Plains, N.Y. 10601, Co-counsel for Plaintiffs, By: Eric Streich

Genova & Malin, Attorneys, The Hampton Center, 1136 Route 9, Wappingers Falls, N.Y. 12590–4332, Counsel for Defendant, By: Andrea B. Malin Thomas Genova

### MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CECELIA G. MORRIS, CHIEF UNITED STATES BANKRUPTCY JUDGE

**\*1** Before the Court is Burberry Limited and Burberry USA's (collectively "Burberry" or "Plaintiff") motion for summary judgment on Plaintiff's first, fourth and fifth causes of action, seeking determinations of dischargeability. *See* Compl. ¶¶ 54–89, Feb. 6, 2015, ECF No. 1; Pl.'s Mot. Summ. J. 1, Nov. 23, 2015, ECF No. 15 ("Pl.'s Mot."). [1] On summary judgment, Plaintiff asserts it is owed a non-dischargeable debt by Defendant Asher Horowitz ("Debtor" or "Defendant"), pursuant to 11 U.S.C. § 523(a)(6). *See* Pl.'s Mot. 1. In the alternative, Plaintiff seeks a global denial of discharge under

11 U.S.C. § 727(a)(2)(A) or § 727(a)(4)(A). *See id.* For the following reasons, the Court grants Plaintiff's motion for summary judgment on the grounds that Defendant's debt to Plaintiff is non-dischargeable under § 523(a)(6).

### *Jurisdiction*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I), "determinations as to the dischargeability of particular debts" and (J), "objections to discharges[.]"

### *Background*

On September 15, 2014, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. *See* Petition, *In re Horowitz,* No. 14–36884 (Bankr.S.D.N.Y. Sept. 15, 2014), ECF No. 1. The last day to file any objections to discharge was July 9, 2015. *See* Stip., *In re Horowitz,* No. 14–36884, ECF No. 39. On February 6, 2015, Plaintiff filed a complaint against the Defendant, seeking a determination of the dischargeability of particular debt and Defendant's eligibility for discharge. Compl. ¶¶ 54–89.

Plaintiff "is an international luxury brand involved in the design, manufacture, advertising, distribution and sale of high quality apparel and accessories under its principal trademarks...." Pl.'s Statement of Facts ¶ 1, Nov. 23, 2015, ECF No. 15–28 ("Pl.'s SMF"). [2] Before filing for bankruptcy, Defendant operated an unincorporated, online retail business under the name Designers Imports. *See* Pl.'s SMF ¶¶ 2, 4 (citing Pl.'s Mot. Ex. B, at 2, Ex. C, Ex. D, at ¶¶ 18–21). While operating Designers Imports, Defendant "violated Burberry's intellectual property rights by selling counterfeit Burberry merchandise on his website," www.designersimports.com. *Id.* at ¶¶ 2–3 (citing Pl.'s Mot. Ex. B, at 5). On March 29, 2005, Defendant, on behalf of himself and Designers, entered into a settlement agreement with Burberry. *Id.* at ¶ 5 (citation omitted); *see also* Pl.'s Mot. Ex. C, at ¶ 6.2, 10–11. In the settlement, Defendant promised that he had ceased purchasing merchandise from verified counterfeit sources and further agreed not to knowingly infringe on Burberry's trademarks in the future. *See* Pl.'s Mot. Ex. C, at ¶¶ 2.1–2.6. After Defendant executed the settlement agreement with Burberry, Defendant incorporated his retail company under

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 158 of 427

the name Designers Imports, Inc. ("Designers"). Pl.'s SMF at ¶ 7 (citing Pl.'s Mot. Ex. F, at ¶¶ 19–21). Defendant was the sole shareholder of Designers. *Id.* at ¶ 8 (citing Pl.'s Mot. Ex. F, at ¶ 18).

**\*2** Despite entering into the settlement agreement, Defendant continued to purchase and sell counterfeit Burberry goods through his website. Pl.'s SMF ¶ 6 (citing Pl.'s Mot. Ex. E, at 12); *see also* Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 7, 2007, more than two years after entering into the settlement agreement, Burberry notified Defendant that Designers was the subject of an ongoing investigation by the United States Customs and Border Protection. Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 22, 2007, Burberry filed a complaint in the United States District Court for the Southern District of New York against Designers (the "First Federal Action"). Pl.'s SMF ¶ 10 (citing Pl.'s Mot. Ex. H). Burberry made claims for trademark counterfeiting and infringement, false designation of origin and dilution, breach of the settlement agreement, trademark infringement and unfair competition under New York common law, and asserted a likelihood of injury to business reputation as well as deceptive acts and practices under the New York General Business Law. *Id.* at ¶ 11 (citing Pl.'s Mot. Ex. H).

After a trial in the First Federal Action, the court issued a decision finding Designers committed willful trademark infringement "based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise." *Burberry Ltd. v. Designers Imps., Inc.,* 2010 U.S. Dist. LEXIS 3605, at \*13 (S.D.N.Y. Jan. 19, 2010). The federal court found Designers liable for $1,500,000.00 in statutory damages, plus reasonable attorneys' fees and costs. *Id.* at \*32. In a *nunc pro tunc* Amended Final Judgment and Permanent Injunction ("Amended Final Judgment"), filed on July 29, 2010, the federal court set the final amount of damages at $2,592,070.89 and permanently enjoined Designers from infringing on Burberry trademarks. Pl.'s Mot. Ex. I.

On February 3, 2010, prior to the entry of the Amended Final Judgment, Defendant incorporated a new company, RTC Fashion Inc. ("RTC"), and created a new website. Pl.'s SMF ¶¶ 22–23 (citing Pl.'s Mot. Ex. B, at 2, Ex. J). Designers itself ceased to do business on February 26, 2010, before the federal court issued the Amended Final Judgment. *Id.* at ¶ 27 (citing Pl.'s Mot. Ex. L, at 66:2–5). Instead, on May 4, 2010, Defendant leased the old Designers' website to RTC for $500 a year. *Id.* at ¶ 29 (citing Pl.'s Mot. Ex. M). RTC continued to sell designer clothes and accessories through the new website. *Id.* at ¶ 24; *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 2 (N.Y.Sup.Ct. May 9, 2014) ("*RTC* ").

On September 16, 2011, Burberry filed a state court action (the "State Action") against RTC and Defendant personally, with its first cause of action seeking to pierce Designers' corporate veil to impose personal liability on Defendant "for the unsatisfied amount of the judgment entered in the Federal Action against Designers in the sum of $2,591,778.49." Pl.'s SMF ¶¶ 30–31 (citing Pl.'s Mot. Ex. N); *see also RTC,* 2014 N.Y. Slip Op. at 2. On May 9, 2014, the state court awarded summary judgment to Burberry on its first cause of action. *RTC,* 2014 N.Y. Slip Op. at 3. The state court saw fit to pierce the corporate veil, determining that "as a matter of law, equity will intervene to pierce the corporate veil and permit the imposition of personal liability in order to avoid fraud or injustice...." *Id.* (internal citation and quotation marks omitted).

Prior to the state court's final determination, Plaintiff filed a second federal action (the "Second Federal Action") against Defendant in his personal capacity. *See* Def.'s Mem. Law in Opp'n 7, Jan. 19, 2016, ECF No. 25; Pl.'s Reply 5, Feb. 16, 2016, ECF No. 33; Def.'s Opp'n SMF Ex. B, at 1. In the Second Federal Action, Burberry sought a judgment that Defendant had personally committed willful trademark infringement by selling the same counterfeit products from the First Federal Action. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43 (2d Cir. 2013). On appeal, the Second Circuit held that the Second Federal Action was barred on *res judicata* grounds. *Id.* at 46–47.

**\*3** Before this Court, Plaintiff alleges that Defendant's personal liability on Designers' debt to Burberry for willful trademark infringement is non-dischargeable under 11 U.S.C. § 523(a)(6), as a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Pl.'s Mot. 8–11; 11 U.S.C. § 523(a)(6). Plaintiff claims summary judgment is appropriate under 11 U.S.C. § 523(a)(6) based on collateral estoppel grounds. Pl.'s Mot. 5–10. Plaintiff asserts that the First Federal Action found Designers willfully violated the Lanham Act and further found the elements necessary to establish maliciousness in the § 523(a)(6) context. *Id.* at 8–11. Defendant contends the State Court Action holds Defendant personally liable for the debts of Designers so as to satisfy 11 U.S.C. § 523(a)(6)'s requirement that the injury be caused by the Debtor. Pl.'s Reply 7–8.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 159 of 427

In re Horowitz, Not Reported in B.R. Rptr. (2016)

In the alternative, Plaintiff seeks to deny the Debtor's discharge pursuant to § 727(a)(2)(A) for transferring, destroying, and/or concealing property within one year of filing the bankruptcy petition, and § 727(a)(4)(A) for making a false oath in connection with the case. Pl.'s Mot. 11–19. Under § 727(a)(2)(A) a discharge may be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ..., has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition;....

11 U.S.C. § 727(a)(2). Plaintiff argues that Defendant should be denied a discharge under § 727(a)(2)(A) for initially omitting the Designers website and licensing agreement from his assets listed in his bankruptcy schedules, for concealing his interests in certain real property, and for intentionally misrepresenting the nature of a $3,000 transaction. Pl.'s Mot. 11–15.

Plaintiff argues that a global denial of discharge is also warranted under § 727(a)(4)(A), pursuant to which a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account...." 11 U.S.C. § 727(a)(4)(A). Plaintiff argues Defendant failed to accurately disclose information to the estate, including failing to name certain creditors, and for misrepresenting his income and expenses, all with the intent to defraud his creditors. Pl.'s Mot. 15–19.

In opposition, Defendant states that neither the First Federal Action nor the State Action considered whether Defendant engaged in willful and malicious trademark infringement. Def.'s Mem. Law in Opp'n 2. Defendant contends the First Federal Action only considered whether Designers was liable to Burberry for Designers' willful trademark infringement. Id. at 9. Defendant argues the First Federal Action was only brought against Designers and, as such, is not applicable to Defendant on the issues litigated and decided therein. Id. at 9–10. Defendant asserts that the only action entitled to collateral estoppel is the Second Federal Action, and that it estops Plaintiff from litigating whether Defendant engaged in willful and malicious trademark infringement. Id. at 8–

9. Defendant further argues that the standard for willful trademark infringement is not the same as the standard for willful and malicious injury under § 523(a)(6). Id. at 17–18.

Defendant asserts the State Action only held Defendant personally liable for Designers' damages to the extent they arose out of Defendant's transfer of assets from Designers to RTC. Id. at 13–14. According to Defendant, the State Action's determination to pierce the corporate veil is not enough for collateral estoppel here. Id.

Defendant further opposes the entry of an order denying Defendant a global discharge on the grounds that Plaintiff has not met its burden to show by a preponderance of the evidence that Defendant intended to defraud his creditors by concealing assets, or that Defendant knowingly and fraudulently made a false oath in the Defendant's bankruptcy case. Id. at 19, 25.

### Discussion

**\*4** Federal Rule of Civil Procedure 56(a), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted).

The moving party has the initial burden to establish the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 322–23 (citations omitted). In determining whether the moving party has met this burden, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). To establish the absence of a genuine issue of material fact, the moving party need not support its motion with affidavits. Celotex, 477 U.S. at 323. This is due to the fact that Rule 56 "does not require the moving party to negate the elements of the nonmoving party's case...." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990) (quoting Celotex, 477 U.S. at 323).

Once the moving party has shown there are no genuinely disputed material facts, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). On a motion for summary judgment, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A court must grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Collateral estoppel and the related doctrine of *res judicata* "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (citations omitted). Where there is a final judgment on the merits, *res judicata* prevents the parties from asserting claims based on the same cause of action. *See Montana v. United States,* 440 U.S. 147, 153 (1979) (citations omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (citation omitted). The doctrine of offensive collateral estoppel permits "a plaintiff [to] foreclose a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *S.E.C. v. Monarch Funding Corp.,* 192 F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329 (1979)).

Where the standard of proof on the issue in question requires proof by at least a preponderance of the evidence, "a bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and that were actually litigated and determined in the prior action." *Grogan v. Garner,* 498 U.S. 279, 284 (1991). In bankruptcy, the party objecting to discharge must prove its claim by a preponderance of the evidence. *See, e.g., Grogan,* 498 U.S. at 286; *In re Renshaw,* 222 F.3d 82, 86 (2d Cir. 2000). Although the standard of proof to prevail on a claim for non-dischargeabilty is a preponderance of the evidence,

"exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman,* 502 F.3d 61, 66 (2d Cir. 2007) (citing *In re Renshaw,* 222 F.3d at 86; *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999)).

**\*5** Under 11 U.S.C. § 523(a)(6), a discharge will not be effective against any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity...." To successfully plead a claim for non-dischargeability pursuant to § 523(a)(6), a plaintiff must establish that the debtor "acted willfully in committing the injury," and that the debtor "acted maliciously in committing the injury." *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar*), 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007) (citations omitted). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). The requirement that the injury be willful "may be satisfied if the debtor had actual knowledge that he or she was violating the law and the intent to bring about injury." In re Akhtar, 368 B.R. at 127–28.

The Second Circuit has interpreted malicious to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted). Malice may be implied based on the surrounding circumstances, or found constructively. *Ball,* 451 F.3d at 69 (citations omitted); *Navistar,* 94 F.3d at 88 (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995); *First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 668 (4th Cir. 1995)).

"Malice may be found where the debtor breached a legal duty 'wilfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of a discharge.' " *Yash Raj Films (USA) v. Ahmed (In re Ahmed),* 359 B.R. 34, 42 (Bankr. E.D.N.Y. 2005) (citations omitted). Courts have found malicious conduct where the Defendant was on notice and yet "continued to infringe the plaintiffs' copyrights in spite of, and indeed in defiance of numerous warnings." *In re Ahmed,* 359 B.R. at 42. Additionally, malice may also be implied where "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 161 of 427

In re Horowitz, Not Reported in B.R. Rptr. (2016)

in the ordinary relationships among people, and injurious to another." *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotations and citations omitted).

Plaintiff alleges that the willful and malicious elements of § 523(a)(6) were decided in the First Federal Action, and that Defendant is now collaterally estopped from relitigating those issues here. "[T]he application of the collateral estoppel doctrine differs based on the forum in which first judgment was entered." *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 800 (Bankr. E.D.N.Y. 2014). The federal standard for collateral estoppel governs the preclusive effect of a federal decision resolving issues of federal law. *See Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006). Collateral estoppel under federal law requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Purdy v. Zeldes,* 337 F.3d 253, 258 (2d Cir. 2003). The party arguing for the application of collateral estoppel has the burden to establish all four elements. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir. 1995) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir. 1986)); *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (citations omitted).

**\*6**  Plaintiff has shown the identity of the issues for willful and malicious injury. To show the identity of the issues, the Court must analyze "whether the issues presented by this litigation are in substance the same as those resolved against the" Defendant previously. *Montana v. United States,* 440 U.S. 147, 155 (1979). The first element is willfulness. Under the Lanham Act, a person is liable for trademark infringement when, without the consent of the trademark holder, that person

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....

15 U.S.C. § 1114(1)(a). Although liability for trademark infringement does not require a finding of willfulness, the statutory damages for willful trademark infringement increase to $2,000,000 per infringement. *See* 15 U.S.C. § 1117(b), (c); *Hermes Int'l v. Kiernan,* 2008 U.S. Dist. LEXIS 70506, at \*10 (E.D.N.Y. Aug. 28, 2008). Willfulness requires a finding that "the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 288 (2d Cir. 1999) (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir. 1993)) (internal quotation marks omitted).

Here, the First Federal Action found Designers acted willfully based on Designers' continuing sales of counterfeit Burberry merchandise, despite the fact Burberry "repeatedly placed Defendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise." *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*13. In making a finding of willfulness, the court further found that Designers had repeatedly and knowingly violated the settlement agreement with Burberry. *Id.* at 25. Additionally, the court determined Designers "willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale," and failed to implement procedures to prevent the sale of counterfeit merchandise. *Id.* The court also found that Designers was aware Burberry had placed a test order, and instead of filling the order from its own stock, sent Defendant's wife, Mrs. Horowitz, "to an authorized Burberry store to purchase items to fill the order." *Id.* at 26.

The findings in the First Federal Action satisfy the legal definition for willfulness in bankruptcy. Pursuant to the federal standard for willfulness, Designers knew it was violating the law and intended to cause injury to Burberry. *Kawaauhau,* 523 U.S. at 61; *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),* 368 B.R. 120, 127–28 (Bankr.E.D.N.Y.2007). Burberry had repeatedly put Designers on notice of its illegal conduct, and Designers signed a settlement agreement promising to stop further violations. The federal court found Designers violated this settlement agreement knowingly, and continued to violate the law by selling counterfeit merchandise. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*25. Designers failed to implement any security measures to prevent future violations and failed to investigate its purchases of Burberry-branded goods. *Id.* The injury caused by trademark infringement is the act of infringement. *Star's Edge, Inc. v. Braun (In re Braun),* 327 B.R. 447, 451 (Bankr.N.D.Cal.2005). The Ninth

Circuit has held that in an action for trademark infringement, "intentional infringement is tantamount to intentional injury under bankruptcy law." *Smith v. Entrepreneur Media, Inc. (In re Smith),* 2009 Bankr.LEXIS 4582, at \*26 (B.A.P. 9th Cir. Dec. 17, 2009). Designers intentionally infringed on Burberry's trademark. This is sufficient to constitute a willful injury.

**\*7** Here, malice may be inferred from the First Federal Action's determination that Designers willfully, continually and deliberately infringed on Burberry's trademarks. Designers had repeated notice of its infringement. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*13. Designers knew that the infringement was "contrary to commonly accepted duties in the ordinary relationships among people," as it had signed a settlement agreement acknowledging its infringement and promising to take steps to refrain from future infringements. *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr.E.D.N.Y.2005). Even going beyond intentional infringement, Designers actively tried to deceive and mislead Burberry by falsely filling Burberry's test order with inventory purchased from a legitimate Burberry retailer. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*26. The federal court also found that "[s]ince there was willful infringement and no 'extenuating circumstances,' " Burberry was entitled to attorneys' fees and costs. *Id.* at \*30–31. In other words, Designers' conduct was "wrongful and without just cause or excuse...." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996). The elements of willful trademark infringement present the same issues required to show willful and malicious injury under § 523(a)(6). Plaintiff has satisfied its burden to show the identity of the issues for willful and malicious injury under § 523(a)(6).

The Court also finds that Plaintiff has met its burden on the second element required for collateral estoppel under federal law. The issues of willful and malicious injury were actually litigated in the First Federal Action. The Defendant participated in the litigation, and the federal court's determination was the result of a full-fledged trial. *See, e.g., Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 801 (Bankr. E.D.N.Y. 2014) (internal citations omitted).

The Court finds that Defendant had a full and fair opportunity to litigate the issues of willful and malicious injury in the First Federal Action. In the Second Federal Action, the Second Circuit dismissed the case on *res judicata*

grounds, holding that Defendant and Designers were in privity. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43–45 (2d Cir. 2013). The Second Circuit relied on several undisputed facts, including that Defendant was "the sole shareholder of, officer of and decision maker for[ ] the Designers Imports corporation," that Defendant "controlled and directed Designers[ ] Imports['] participation" in the First Federal Action, that Defendant "instructed the corporation's lawyers, made all client decisions for Designer Imports as a litigant in the case, and otherwise controlled the participation of Designers Imports in the lawsuit." *Id.* at 44 (internal citations and quotation marks omitted). It cannot be disputed that Defendant had a full and fair opportunity to litigate the issues underpinning willful and malicious injury in the First Federal Action.

The final element required for collateral estoppel on the issues of willful and malicious injury is that the federal court's findings were necessary to support the Amended Final Judgment. A finding of willful trademark infringement results in increased statutory penalties. *See* 15 U.S.C. § 1117(b), (c). The Amended Final Judgment in the First Federal Action determined the amount of liability based on a finding of willful trademark infringement. *See* Pl.'s Mot. Ex. I. Additionally, the Amended Final Judgment awarded Plaintiff reasonable attorneys' fees and costs based on the finding that there were no extenuating circumstances for Designers' conduct. *See id.*; *see also Burberry,* 2010 U.S. Dist. LEXIS 3605, at \*30–31. Defendant does not dispute this element. Accordingly, Plaintiff has met its burden to preclude the relitigation of willful and malicious injury.

Although Defendant had a full and fair opportunity to litigate whether Designers' caused willful and malicious injury in the First Federal Action, the injury must be attributable to Defendant's conduct for the debt to be non-dischargeable under 11 U.S.C. § 523(a)(6). Although Defendant's conduct prior to the settlement agreement with Burberry is not part of the debt at issue here, the First Federal Action found that Defendant, in his individual capacity, sold counterfeit Burberry merchandise through the Designers website, entered into the settlement agreement with Burberry, agreed to cease all counterfeit sales, and paid damages to Burberry. Pl.'s SMF ¶¶ 2–7; *see also* Debtor's Aff. in Opp'n to Summ. J. ¶¶ 3–7, Jan. 21 2016, ECF No. 27–5. The First Federal Action found Designers sold additional counterfeit Burberry merchandise after entering into the settlement agreement, committing willful trademark infringement. *Burberry,* 2010 U.S. Dist. LEXIS 3605, at \*10, 13–15, 25–26. To find the damages

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 163 of 427

In re Horowitz, Not Reported in B.R. Rptr. (2016)

ordered by the First Federal Action to be non-dischargeable, Plaintiff must show that the Defendant is collaterally estopped from relitigating the issue of his personal liability based on the State Action.

**\*8** Where the issues to be precluded were determined by a state court, the law of the state where the underlying proceedings took place controls the standard for collateral estoppel. *See* 28 U.S.C. § 1736; *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). In New York, "collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo,* 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.,* 482 N.E.2d 63, 67 (N.Y. 1985); *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir. 1991)). To establish the identity of the issues, the matter must have been " 'actually litigated and determined' in a prior action." *Kaufman,* 482 N.E.2d at 67 (citations omitted). Further, "the issue that was raised previously must be decisive of the present action." *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir. 2002) (internal citations and quotation marks omitted).

In New York, the proponent of collateral estoppel has the burden to establish the identity of the issues, that the issues were actually litigated and determined, and that they are decisive of the present action. *In re Dunn,* 27 N.E.3d 465, 468 (N.Y.2015) (citations omitted); *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir. 2000). The party opposing collateral estoppel has the burden "to establish the absence of a full and fair opportunity to litigate." *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.,* 564 N.E.2d 634, 636 (N.Y.1990) (citing *Kaufman,* 482 N.E.2d at 67); *see also Evans,* 469 F.3d at 281–82 (citations omitted).

The Court finds that the Plaintiff has met its burden to show Defendant's personal liability for willful and malicious injury was actually litigated and decided in the State Action, and that the issue is decisive of this non-dischargeability action under § 523(a)(6). Defendant's main argument in opposition is that Defendant's responsibility for Designers' willful and malicious conduct is an issue that has not been previously litigated. Defendant's argument is misplaced. The State Action determined that Defendant controlled Designers to such an extent that Defendant may be held liable for the acts of Designers. *Burberry Ltd. v. RTC Fashion Inc.,* No.

110615/11, 2014 N.Y. Slip Op. 31232(U), at 5 (N.Y.Sup.Ct. May 9, 2014).

The issue of Defendant's culpability for willful and malicious injury was previously litigated and decided by the state court's determination to pierce the corporate veil. As federal courts have recognized, "New York courts have made clear that the veil-piercing standard is demanding. The Court of Appeals has repeatedly emphasized that '[t]hose seeking to pierce a corporate veil ... bear a heavy burden.' " *Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 2015 U.S. Dist. LEXIS 114787, at \*29 (S.D.N.Y. Aug. 28, 2015) (internal citations and quotation marks omitted). New York law will permit disregard of the corporate form where there is either "a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders v. Resnick Developers S.,* 933 F.2d 131, 138 (2d Cir. 1991) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990)). In other words, the corporate veil may "be pierced either when there is fraud or when the corporation has been used as an alter ego...." *ITEL Containers,* 909 F.2d at 703; *see also Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir. 1979).

To pierce the corporate veil in New York based on the alter ego theory of liability, the individual to be held liable must "(1) have exercised such control that the subsidiary 'has become a mere instrumentality' of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Wm. Passalacqua Builders,* 933 F.2d at 138 (citing *Lowendahl v. Baltimore & Ohio R.R. Co.,* 287 N.Y.S. 62 (N.Y.App.Div.1936), *aff'd,* 6 N.E.2d 56 (1936). Per the very language of the standard, a determination of liability based on the alter ego theory is a determination that the party in control is the "real actor." *See id.* "By definition, an alter ego corporation possesses no independent volition." *Lisa Ng v. Adler (In re Adler),* 494 B.R. 43, 53 (Bankr.E.D.N.Y.2013).

**\*9** Here, the state court based its determination to pierce the corporate veil on the alter ego theory of liability. According to the state court, "piercing the corporate veil generally 'requires a showing that the individual defendants 1) exercised complete dominion and control over the corporation, and 2) used such dominion and control to commit a fraud or wrong against the plaintiff which resulted in injury.' " *RTC,* 2014 N.Y. Slip Op. at 3 (quoting *Damianos Reality Group, LLC v. Fracchia,* 825 N.Y.S.2d 274, 276 (N.Y.App.Div.2006)). The state court held that "[Defendant] completely dominated

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 164 of 427

and controlled [Designers], and abused the corporate form to advance his own personal interests." *RTC,* 2014 N.Y. Slip Op. at 5. The state court further held that "Plaintiffs have shown that [Defendant] exercised his control to commit a wrong against the plaintiffs by dissolving Designers assets and transferring its domain name to his new company RTC, thereby rendering Designers incapable to satisfy the Federal Action judgment." *Id.* The state court granted summary judgment on Plaintiff's first cause of action, which it summarized as "piercing the corporate veil, in order to hold [Defendant] liable for the Federal Action judgment." *Id.* at 3.

The state court's determination to pierce the corporate veil was a finding that Defendant was responsible for the prepetition actions of Designers. The State Action found Designers to be an alter ego of Defendant on May 9, 2014, prior to Defendant's bankruptcy filing. *See RTC,* 2014 N.Y. Slip Op. at 6. As a result, and for purposes of conduct attributable to the Debtor under § 523(a)(6), "the Debtor always remained inseparable from th[e] corporate fiction[ ]. The actions and property of [Designers] were thus the actions and property of the Debtor...." *Lisa Ng,* 494 B.R. at 53. The state court's determination to pierce the corporate veil is sufficient for a finding under § 523(a)(6) that Defendant was responsible for willful and malicious injury to Burberry.

Further, the Second Circuit's decision in the Second Federal Action weighs in favor of collateral estoppel on Defendant's personal liability. The Second Circuit found that the veil-piercing claim in the State Action was the appropriate means to impose liability on Defendant. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. at 46. The Second Circuit dismissed Burberry's Second Federal Case against Defendant, holding that Defendant and Designers had been in privity during the First Federal Action. *Id.* at 43–45. As previously noted, the Second Circuit relied on Defendant's extensive relationship with Designers in the First Federal Action, including the fact that Defendant directed Designers' lawyers how to proceed. *Id.* at 44. The Second Circuit reasoned that "Burberry has already filed a veil-piercing action in New York state court, through which it seeks to hold Horowitz personally liable for the outstanding federal judgment against Designers Imports. That litigation provides the appropriate vehicle for resolution of Burberry's claims against Horowitz individually." *Id.* According to the Second Circuit, the State Action would determine Defendant's personal responsibility for the injuries inflicted on Burberry. This Court finds that Plaintiff has met its burden to show the issue of Defendant's liability for the conduct at issue was previously litigated, decided, and is decisive of the current dispute under § 523(a)(6).

In the alternative to the non-dischargeability claim under § 523(a)(6), Plaintiff seeks to deny Defendant a global discharge pursuant to § 727(a)(2)(A) or § 727(a)(4)(A). Pl.'s Mot. 1. As the Court has found Defendant's debt to Plaintiff to be non-dischargeable under § 523(a)(6), the Court will not address Plaintiff's alternate arguments at this time.

### *Conclusion*

For the foregoing reasons, the Plaintiff's motion for summary judgment on its first cause of action is granted. The parties are to submit an order in conformity herewith.

**All Citations**

Not Reported in B.R. Rptr., 2016 WL 1039581

---

**Footnotes**

1    Unless otherwise indicated, references to documents filed in this case can be found on the docket of adversary proceeding 15–09002.

2    In response to Plaintiff's Statement of Facts, numbering 76 paragraphs, Defendant's Response to Plaintiff's Undisputed Material Facts ("Defendant's Response Statement"), made only four general types of denials. Defendant "denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in" certain paragraphs of the Plaintiff's Statement of Facts, "denies the allegations contained in," several other paragraphs, "neither denies or admits" paragraphs 11 and 12 of Plaintiff's Statement of Facts, and "neither denies or admits the allegations contained in" the remaining paragraphs of Plaintiff's Statement

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 165 of 427

In re Horowitz, Not Reported in B.R. Rptr. (2016)

of Facts, "as the documents speak for themselves." Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 1–4, Jan. 19, 2016, ECF No. 23 ("Def.'s Resp. SMF").

Local Bankruptcy Rule for the Southern District of New York ("Local Bankruptcy Rule") 7056–1(b) requires a party moving for summary judgment to submit a statement of material facts. Local Bankruptcy Rule 7056–1 also requires that

> (c) Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried.

> (d) Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

> (e) Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible.

S.D.N.Y. LBR 7056–1(c)–(e). On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact. *See, e.g., Cooper v. New Rochelle,* 925 F.Supp.2d 588, 605 (S.D.N.Y. 2013); *Aztar Corp. v. N.Y. Entm't, LLC,* 15 F.Supp.2d 252, 254 n.1 (E.D.N.Y. 1998) (citing *Toyomenka Pac. Petroleum, Inc. v. Hess Oil V.I. Corp.,* 771 F.Supp. 63, 67 (S.D.N.Y.1991)). Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact. *See, e.g., Universal Calvary Church v. New York,* 2000 U.S. Dist. LEXIS 15153, at *7 n.6 (S.D.N.Y. Oct. 13, 2000) (citations omitted). Statements denying allegations without a citation to any supporting evidence are also insufficient to contest a disputed fact. *See Guglielmo v. Marchon Eyewear, Inc.,* 2006 U.S. Dist. LEXIS 9146, at *1 n.1 (E.D.N.Y. Feb. 15, 2006). Here, Defendant's Response Statement contains denials without citing the record, attempts to deny based on lack of knowledge or information and neither admits nor denies a variety of factual statements. As such, these purported "denials" do not suffice to create a genuine dispute of material fact.

In addition to Defendant's Response Statement, Defendant also submitted a Statement of Undisputed Material Facts in Opposition to the Plaintiff's Request for the Entry of an Order for Summary Judgment ("Defendant's Opposition Statement"). Def.'s Statement of Facts in Opp'n, Jan. 21, 2016, ECF No. 27 ("Def.'s Opp'n SMF"). To the extend Defendant does not allege a significantly different version of facts in its Opposition Statement, supported by discernable evidence, the Court must treat Plaintiff's Statement of Facts as undisputed.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 166 of 427

2024 WL 3804110
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

I.S., a minor BY AND THROUGH her mother and next friend Anais DISLA; J.B., a minor by and through her parents and next friends Ibelyh Disla and Jose Bristol; I.M., a minor by and through her mother and next friend Zulayka McKinstry; and A.S., a minor by and through her mother and next friend Chanderlia Silva, Plaintiffs,
v.
BINGHAMTON CITY SCHOOL DISTRICT; Binghamton Board of Education; Tim Simonds, in his individual and official capacity; Michelle Raleigh, in her individual and official capacity; and Mary Ellen Eggleston, in her individual and official capacity, Defendants.

3:19-CV-0513 (GTS/MJK)
|
Signed February 1, 2024

**Attorneys and Law Firms**

MICHAEL J. DeSTEFANO, ESQ., HAIMAVATHI V. MARLIER, ESQ., JAMIE A. LEVITT, ESQ., MORRISON & FOERSTER LLP, Counsel for Plaintiffs, 250 West 55th Street, New York, NY 10019.

RACHEL KLEINMAN, ESQ., ANNE OREDEKO, ESQ., KATRINA FELDKAMP, ESQ., NAACP LEGAL DEFENSE & EDU. FUND, INC., Co-counsel for Plaintiff, 40 Rector Street, 5th Floor, New York, NY 10006, ANUJA DIWAKAR THATTE, ESQ., JENNIFER A. HOLMES, ESQ., 700 14th Street NW, Suite 6000, Washington DC 20005.

CARA McCLELLAN, ESQ., GRITTIS LEGAL CLINC, Co-counsel for Plaintiff, 3501 Sansom Street, Philadelphia, PA 19104.

SHANNON T. O'CONNOR, ESQ., WEAVER MANCUSO BRIGHTMAN PLLC, Counsel for Defendants, 16 Oswego Street, Suite 2, Baldwinsville, NY 13207, ANNA M. PATTON, ESQ., ERIN ELIZABETH ELMOUJI, ESQ., JOHN A. MANCUSO, ESQ., 150 Allens Creek Road, Suite 240, Rochester, NY 14618.

ASHLEY K. BOISVERT, ESQ., GOLDBERG SEGALLA LAW FIRM, Co-counsel for Defendants, 5786 Widewaters Parkway, Syracuse, NY 13214.

#### DECISION and ORDER

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this civil rights action pursuant to the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, filed by the above-listed minor Plaintiffs and their parents (collectively "Plaintiffs") against the Binghamton City School District, Binghamton Board of Education, (the "School Defendants"), Principal Tim Simonds, Assistant Principal Michelle Raleigh, and school nurse Mary Ellen Eggleston (collectively the "Defendants"), are the following four motions: (1) Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiffs' cross-motion for partial summary judgment pursuant to Fed. R. Civ. P. 56; (3) Plaintiffs' motion to preclude or limit the testimony of Defendants' expert witness Dr. Robert Demerath; and (4) Defendants' motion to preclude or limit the expert testimony of Plaintiffs' expert witnesses Dr. Jamilia Blake and Dr. Sarah Vinson. (Dkt. Nos. 270, 272, 273, 295.) For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part, Plaintiffs' cross-motion for partial summary judgment is denied, Plaintiffs' motion to preclude Defendants' expert is granted in part and denied in part, and Defendants' motion to preclude Plaintiffs' expert testimony is granted in part and denied in part.

### I. RELEVANT BACKGROUND

#### A. Procedural History

Plaintiffs opened this action by filing a Complaint on April 29, 2019. (Dkt. No. 1.) On October 1, 2019, Defendants filed a combined motion to dismiss for lack of subject-matter jurisdiction and for judgment on the pleadings. (Dkt. No. 44.) This Court granted that motion in part and denied it in part on September 14, 2020. (Dkt. No. 117.) Specifically, the Court found that, although it did have subject-matter jurisdiction over the claims asserted by Plaintiffs pursuant to the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act, those claims should nonetheless be dismissed with prejudice because Plaintiffs

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 167 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

had failed to state a claim upon which relief could be granted. (*Id.* at 12-21.) As to Plaintiffs' claims that they were subjected to unconstitutional searches by Defendants, the Court dismissed those claims to the extent that they allege that A.S. and J.B. were subjected to a strip search,[1] but did not dismiss the claims of those Plaintiffs to the extent they allege a less-intrusive search was performed. (*Id.* at 21-36.) As a part of the analysis of that claim, the Court concluded that Plaintiffs had plausibly alleged involvement by the individual Defendants as well as a basis for the assertion of *Monell* liability against the School Defendants. (*Id.*) The Court also dismissed without prejudice to renewal Plaintiffs' claims of intentional discrimination pursuant to the Equal Protection Clause and Title VI on the basis that the statistics and data relied on by Plaintiffs to show an inference of discrimination predated the relevant events by three or four years and did not specifically address disparate treatment in the decision to conduct searches of students, and because the other allegations regarding the individual Defendants (i.e., that Defendant Simonds noted the minor Plaintiffs were "hyper and giddy," that Defendant Eggleston made comments about some of their bodies and attitudes, and that Defendant Raleigh expressed fear of being left alone with them) were insufficient to plausibly suggest that the decision to search Plaintiffs was racially motivated. (*Id.* at 36-45.) The Court lastly dismissed with prejudice the claims against the individual Defendants in their official capacities, finding those to be duplicative of the claims against the School Defendants. (*Id.* at 45-47.)

 **\*2** Plaintiffs filed a motion for reconsideration of that decision on September 28, 2020, focusing primarily on the Court's finding that Plaintiffs had not plausibly alleged that A.S. had been subjected to a strip search. (Dkt. No. 121.) The Court denied that motion on November 13, 2020, finding that the Complaint did not explicitly state any facts that A.S.'s action of unzipping her sweater to the middle of her chest before zipping it back up revealed her bra and the skin of her torso to Defendant Eggleston's view despite Defendant Eggleston's alleged later comments about A.S. wearing only a bra, particularly in light of the fact that Defendant Eggleston would have plausibly known that A.S. was wearing only a bra underneath her sweater from previously, as Plaintiffs alleged, placing a stethoscope underneath A.S.'s sweatshirt when checking her vitals. (Dkt. No. 138.) The Court further clarified that the relevant consideration is whether the actions alleged could constitute a strip search under the standards of the Fourth Amendment, not the School District's own policy. (*Id.*)

**B. Plaintiffs' Amended Complaint**

On December 14, 2020, Plaintiffs filed a motion to amend the Complaint, which was granted on January 20, 2021. (Dkt. Nos. 156, 163.)

Generally, in their Amended Complaint, Plaintiffs assert three claims. (Dkt. No. 163.) First, Plaintiffs claim that all Defendants violated their Fourth Amendment right to be free from unlawful searches by subjecting the minor Plaintiffs to searches of their persons and belongings, variously including vital sign checks and sobriety tests, removal of clothing, shaking or pat-searching of their bodies and belongings, and, as to I.M. specifically, searching the inside of her bra and touching the sides of her breasts ("First Claim"). (*Id.* at ¶¶ 121-50.) As part of this claim, Plaintiffs argue that the actions of the individual Defendants constituted the official policy of the School Defendants, that the alleged violation of the minor Plaintiffs' Fourth Amendment rights was the result of a failure to train or supervise school staff, and that the School Defendants acted with deliberate indifference to the rights of the minor Plaintiffs. (*Id.*)

Second, Plaintiffs claim that all Defendants violated their Fourteenth Amendment right to equal protection under the law by subjecting them to searches based on prejudices and stereotypes related to the minor Plaintiffs' races and gender, which they allege is shown by (1) disparate rates of searches and out-of-school suspensions between White students and students who are Black, Latina, or multiracial, (2) Defendant Simonds' perception that the minor Plaintiffs' "giddy" and "hyper" behavior suggested drug use, (3) Defendant Raleigh's alleged statement that she was afraid to be alone with the minor Plaintiffs, and (4) Defendant Eggleston's description of the minor Plaintiffs as loud, disrespectful, and having attitudes along with her alleged statements to A.S. and I.M. about their breasts ("Second Claim"). (*Id.* at ¶¶ 151-80.) As part of this claim, Plaintiffs again assert that the actions of the individual Defendants constituted the official policy of the School Defendants, that the alleged violation was a result of a failure to train or supervise, and that the School Defendants acted with deliberate indifference to the rights of the minor Plaintiffs. (*Id.*)

Third, Plaintiffs claim that the School Defendants violated Title VI by intentionally discriminating against them on the basis of race, color, or national origin, in combination with their gender ("Third Claim"). (*Id.* at ¶¶ 181-95.)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 168 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

## C. Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

 **\*3**  Given the unusual complexity and volume of the evidence and factual issues in this case, the Court will not set forth the undisputed material facts at the beginning of this Decision and Order (as it would ordinarily do), but will discuss the relevant undisputed material facts when analyzing each of Plaintiffs' claims in the context of the parties' arguments.

## D. Parties' Arguments on Defendants' Motion for Summary Judgment

### 1. Defendants' Memorandum of Law

Generally, in their motion for summary judgment, Defendants assert seven arguments. (Dkt. No. 273, Attach. 14.) First, as to Plaintiffs' First Claim, Defendants argue that they did not conduct a search as contemplated by the Fourth Amendment (and certainly not a strip search), but rather that Defendant Eggleston's actions in taking the minor Plaintiffs' vital signs and conducting neurological function testing was a health assessment for the purposes of determining the health and well-being of the minor Plaintiffs. (*Id.* at 15-23.)

Second, Defendants argue that, if a search was conducted by any of the individual Defendants, their conduct complied with the Fourth Amendment because the search was both justified at the inception and reasonably related in scope to the circumstances that provided justification. (*Id.* at 24-52.) Specifically, Defendants argue that the search was justified at the inception based on the following facts known to Defendants Simonds and Raleigh in particular at the relevant time: (1) [Redacted]; (2) the minor Plaintiffs were walking towards the gymnasium when they left the lunchroom, which was where a [Redacted]; (3) there was a known problem of students in the District, including at East Middle School, making and using a drink containing cough syrup and/or codeine on school grounds during the 2018-2019 school year; (4) administrators were unaware of where the minor Plaintiffs had been or what they had been doing for a period of time after they left the lunchroom; (5) the minor Plaintiffs were acting abnormally when Defendants Simonds and Raleigh found them, including being off-balance, stumbling, falling, propping themselves on walls, laughing or being "giddy" in a manner inappropriate to the situation, acting in ways that were atypical for their normal demeanors, and, as to A.S. in particular, [Redacted]; and (6) the minor Plaintiffs were of an age when drug use can be a valid concern. (*Id.* at 24-44.) Defendants further argue that the scope of the search conducted was reasonably related to the purpose of the search and not excessively intrusive because assessment of vital signs, urinalysis, blood tests, and searches of shoes, bags, pockets and outer clothing have all been found to be reasonable where there is a sufficient suspicion that a student is engaging in drug use, and that even more invasive searches can be warranted if the suspicion is strong enough. (*Id.* at 44-52.)

Third, Defendants argue that the minor Plaintiffs were not intentionally treated differently based on any impermissible consideration of their race and/or gender. (*Id.* at 52.) More specifically, Defendants argue that, although the minor Plaintiffs were investigated for possible misconduct, they have stipulated that they were not subject to any discipline or disciplinary referral related to that investigation (and, as a result, any attempt to compare themselves with other students in the School District at large who were disciplined is inapposite and insufficient), and that, nonetheless, the data relied upon by Plaintiffs' expert does not contain sufficient information to show that the relevant students who were

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 169 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

searched were similarly situated to the minor Plaintiffs other than as to their race and/or gender. (*Id.* at 52-59.) Defendants further argue that, as to the individual Defendants, Plaintiffs have not provided an example of a similarly situated student that those Defendants treated in a different manner. (*Id.* at 56-57.) Defendants similarly argue that Plaintiffs cannot show that discriminatory purpose was a motivating factor behind Defendants' choice to search the minor Plaintiffs because they have offered nothing but their own belief that certain alleged actions or comments by the individual Defendants are evidence of discriminatory intent. (*Id.* at 59-64.) More specifically, Defendants argue that (1) the minor Plaintiffs themselves have presented inconsistent testimony regarding whether either Defendant Raleigh or Defendant Eggleston made a comment that she was afraid to be left alone with the minor Plaintiffs; (2) there is no evidence to support the assertions that Defendants' analysis of the impropriety of the minor Plaintiffs' conduct in the hallway and in the health office was based on racial or gender stereotypes, particularly because the video evidence corroborates the minor Plaintiffs' behavior in the hallway; (3) a comment allegedly made by Defendant Eggleston about I.M.'s breasts is not only disputed, but is insufficient to constitute evidence of discriminatory intent; and (4) Defendant Eggleston's alleged comments that the minor Plaintiffs were loud, disrespectful, and had attitudes in response to their conduct in the health office are not indicative of discrimination based on race or gender stereotypes because her assessment is corroborated by the testimony of other individuals present in the health office, including the minor Plaintiffs themselves. (*Id.*) Further, as to the School District and the data and conclusions provided by Plaintiffs' expert, the sample size of the expert's statistics is not sufficiently expansive to permit the Court to draw an inference of discrimination. (*Id.* at 64-66.) Lastly as to this claim, Defendants argue that Plaintiffs cannot assert an equal protection claim under an alternative class-of-one theory because such a claim has been found to be improper in cases where the relevant decision is subjective and individualized, as it was here. (*Id.* at 67-70.)

 **\*4**  Fourth, Defendants argue that Plaintiffs' Third Claim for intentional discrimination by the School Defendants fails as a matter of law because, as already argued, Plaintiffs have not shown a similarly situated comparator and have not even alleged facts plausibly suggesting actual knowledge by the School Defendants of any discrimination, and Title VI nonetheless does not create a private cause of action for disparate impact claims. (*Id.* at 70-74.)

Fifth, Defendants argue that Defendants Simonds, Raleigh, and Eggleston are all entitled to qualified immunity on the First and Second Claims because their actions did not violate any clearly established law, and it was objectively reasonable for them to believe that their conduct complied with the reasonableness standard. (*Id.* at 74-80.)

Sixth, Defendants argue that, in the alternative, the Court should apply the standard in *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), and *Scott v. Harris*, 550 U.S. 372 (2007), to find the minor Plaintiffs' testimony insufficient to create any genuine dispute of material fact to the extent it is inconsistent with the video evidence in this case because their testimony is contradictory and incomplete. (*Id.* at 80-87.)

Seventh, Defendants argue that Plaintiffs' *Monell* and Section 1983 claims regarding failure to train should be dismissed. (*Id.* at 87-93.) More specifically, Defendants argue that the School Defendants cannot be held legally responsible merely for being the supervisors of individuals engaged in unconstitutional actions, that decisions made by a school principal do not give rise to *Monell* liability unless they also represent the final policy of the municipality (which they do not here), and that Plaintiffs have not shown that the relevant Defendants acted with deliberate indifference given the undisputed evidence that the School Defendants provided training to staff on search policy and procedure. (*Id.*)

### 2. Plaintiffs' Opposition Memorandum of Law and Cross-Motion for Summary Judgment

Generally, in opposition to Defendants' motion for summary judgment, Plaintiffs assert seven arguments. (Dkt. No. 295, Attach. 1.) First, Plaintiffs argue that the undisputed facts establish that the minor Plaintiffs were subjected to a search by the individual Defendants because, even to the extent that actions of Defendant Eggleston and Defendant Raleigh were health-related, they were still motivated by an intent to determine if the minor Plaintiffs were engaged in activity that violated the Code of Conduct (i.e., drug use), not purely out of concern for the minor Plaintiffs' health. (*Id.* at 9-14.)

Second, Plaintiffs argue that, as to the First Claim, the record demonstrates that the searches of each of the minor Plaintiffs were unreasonable in particular because they were not justified at the inception. (*Id.* at 14-59.) More specifically, Plaintiffs argue that the minor Plaintiffs were missing for only approximately seven minutes between when Defendant

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 170 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Raleigh last saw them near the lunchroom and when Defendant Simonds found them in the hall, and that they were behaving in a manner not unusual for twelve-year-old girls with their friends in a school hallway and also not in a manner that was consistent with the symptoms of consumption of "purple drink" that were put forward in the evidence. (*Id.*) Plaintiffs assert that not only should Defendants' motion for summary judgment be denied as to this issue, but also that summary judgment should be granted to Plaintiffs given that no reasonable factfinder could conclude that the search was justified at the inception.

**\*5** Third, Plaintiffs argue that, also as to the First Claim, even if the searches were justified at the inception, the scope of such searches was not justified. (*Id.* at 20-21, 30-34, 37-38, 42-44, 46, 50-51, 53-54, 58-59.) Plaintiffs characterize the searches of the minor Plaintiffs as follows: (1) A.S. was subjected to a vitals check, a field sobriety test, a search of her shoes and pockets and their contents, instructions to remove her clothing, and a pat down, and she also unzipped her sweater halfway down before zipping it back again when she felt uncomfortable; (2) I.M. was subjected to a vitals check, a field sobriety test, a search of her shoes and pockets, a pat down of her body, and instructions to remove her clothing, as well as a physical search of the band of her bra under her armpits and contact with the sides of her breasts, and removal of both her outer pants and her leggings; (3) I.S. was subjected to a vitals check, a field sobriety test, a search of her pockets, shoes and items, a pat down, and instructions to remove her sweater; and (4) J.B. was subjected to a vitals check, a field sobriety test, and a search of her shoes. (*Id.*) Plaintiffs argue that the searches were not reasonable in scope because, if the Defendants were concerned that the minor Plaintiffs had ingested or were carrying "purple drink," it was not reasonable for them to search anywhere other than where something the size of a bottle or ingredients of that substance could be located, and they did not have sufficient belief to justify a strip search of any of the minor Plaintiffs. (*Id.* at 32, 43-44.)

Fourth, Plaintiffs argue that, as to the Second Claim, there is at least a genuine dispute of material fact as to whether Plaintiffs were discriminated against based on their race or ethnicity. (*Id.* at 59-66.) More specifically, Plaintiffs argue that they have provided statistical evidence, expert reports, and testimonial evidence that raises a genuine dispute as to whether Defendants were motivated at least in part by the minor Plaintiffs' race or ethnicity, because such evidence shows that the School District had a pattern of searching

or disciplining Black and Latino students at higher rates than White students, that Defendants acted in ways that implicate typical forms of racial bias and stereotypes of Black and Latina women and girls, and that the individual Defendants made statements that accord with such racial biases and stereotypes. (*Id.*) Plaintiffs argue that this evidence is sufficiently reliable, and constitutes evidence of similarly situated individuals given that all of the relevant students in the expert's data set were searched on suspicion of drug use or possession. (*Id.*)

Fifth, Plaintiffs argue that there are genuine disputes of material fact remaining regarding the liability of the School Defendants under *Monell* and Section 1983. (*Id.* at 67-70.) More specifically, Plaintiffs argue that Defendants Simonds and Raleigh are final policymakers regarding searches at East Middle School because they had the ultimate authority to determine whether a student should be searched, and that liability should be imputed to the School Defendants on the basis of such policy. (*Id.* at 67-70.)

Sixth, Plaintiffs argue that the individual Defendants are not entitled to qualified immunity, because they violated clearly established law indicating not only that a search of a school student must be reasonable, but also that it must be based on more than just "suspicious" behavior without further specific evidence, such as a credible tip or accusation or identifiable signs and symptoms of the use of "purple drink." (*Id.* at 70-73.) Plaintiffs also argue that, as to Defendant Eggleston, only administrators were authorized to conduct searches under the School District's rules, and that, because Defendant Eggleston was not an administrator, she acted outside the scope of her authority when searching the minor Plaintiffs. (*Id.*)

Seventh, Plaintiffs argue that the evidentiary standards applied in *Jeffreys* and *Scott* do not apply because not only are many of the facts that Defendants seek to repress irrelevant given that they address circumstances of which Defendants had no knowledge at the time they decided to conduct the search (i.e., what the minor Plaintiffs were doing between the time they left the lunchroom and when Defendant Simonds found them), but the ones that are relevant are not clearly or blatantly contradicted by the video. (*Id.* at 73-75.)

### 3. Defendants' Reply Memorandum of Law

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 171 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

**\*6** Generally, in their reply to Plaintiffs' opposition, Defendants assert eight arguments. (Dkt. No. 309, Attach. 3.) First, as to the First Claim, Defendants argue that Defendant Eggleston's performance of a health assessment did not trigger the protections of the Fourth Amendment because such actions did not constitute a search. (*Id.* 8-12.)

Second, also as to the First Claim, Defendants argue that the searches conducted by Defendant Raleigh were justified at the inception, because they were based on reasonable suspicion that the minor Plaintiffs might be under the influence of a prohibited substance when the totality of the circumstances are considered given the fact their whereabouts were unknown for a period of nearly ten minutes, there was a documented concern regarding the use of "purple drink" by students in the School District and East Middle School, and Defendants witnessed various unusual and concerning behaviors including a [Redacted], personality changes, laughter that was inappropriate to the situation, falling, and fidgeting-type behaviors. (*Id.* at 12-25.)

Third, also as to the First Claim, Defendants argue that the search was reasonable in scope. (*Id.* at 25-35.) Defendants highlight that any strip search allegations as to A.S. and J.B. have already been dismissed by the Court, and the only search allegations remaining related to those two Plaintiffs are for a less invasive investigatory search. (*Id.* at 25.) As to I.M., Defendants argue that, although she has asserted facts that conflict with the testimony of Defendants Eggleston and Raleigh regarding the search, it is undisputed that she was wearing a tank top even after she removed her sweater, her report that she was patted down is contradicted by her sworn interrogatory response, she has provided inconsistent testimony regarding the removal of her pants and leggings, and she has not asserted that Defendant Raleigh did anything more than direct I.M. to empty her pockets, remove her shoes, retrieve her bag and empty the contents of that bag, and then inspect the items produced. (*Id.* at 25-28.) As to A.S., Defendants argue that the search was limited to a check of her vital signs, a neurological assessment, and emptying her pockets and shoes, and that the alleged pat down and requests to unzip her sweatshirt are not substantiated. (*Id.* at 28-32.) As to I.S., Defendants argue that the search was limited to a check of her vital signs, a neurological assessment, and search of her pockets and shoes, and that any other allegations, such as that Defendant Eggleston told her to remove her sweater or patted her down, are not substantiated or credible. (*Id.* at 32-33.) Lastly, as to J.B., Defendants argue that the search was limited to a check of her vital signs and a check of her eyes; she admits she was not asked to remove any clothing and was made to briefly remove her shoes and shake them. (*Id.* at 33-35.)

Fourth, as to the Second Claim, Defendants argue that Plaintiffs have failed to raise a genuine dispute of material fact regarding whether Defendants engaged in intentional discrimination because they have failed to establish a prima facie case for their equal protection claim.[2] (*Id.* at 35-43.) More specifically, Defendants argue that Plaintiffs have not shown any similarly situated comparator because the statistics presented by Plaintiffs' expert are flawed and insufficient, and newly asserted comparator White students that were allegedly treated less harshly by Defendant Simonds upon being suspected of substance use were not students at East Middle School, were actually searched more thoroughly by Defendant Simonds in those instances given that he did not directly search, or order searches of, the minor Plaintiffs, and the relevant instances related to those students occurred anywhere between 2006 and 2012, well before the events in this case. (*Id.* at 37-38, 41-43.) On the issue of evidence of bias, Defendants argue that, contrary to Plaintiffs' arguments, Defendant Raleigh's concern that all of the minor Plaintiffs [Redacted] was not based on racial stereotypes of Black and Latina girls as violent, but on her awareness that [Redacted] (*Id.* at 38-39.) They further argue that the Defendants' various descriptions of Plaintiffs' behavior are not evidence of bias, but an accurate depiction that is corroborated by the minor Plaintiffs' own testimony. (*Id.* at 39-40.)

**\*7** Fifth, Defendants argue that Plaintiffs' *Monell* claim fails as a matter of law because Plaintiffs cannot show that Defendant Simonds was a final policymaker pursuant to the Second Circuit's decision in *Agosto v. New York City Dept. of Edu.*, 982 F.3d 86 (2d Cir. 2020), and the New York State Education Law, which places policymaking authority with the chancellor (or superintendent) rather than a principal or assistant principal. (*Id.* at 43-47.) Defendants also argue that, given their failure to argue it on this motion, Plaintiffs have waived their failure-to-train theory related to this claim. (*Id.* at 43-44.)

Sixth, Defendants argue that Plaintiffs have not adequately challenged their assertion that qualified immunity applies for the individual Defendants, because they have failed to adduce any clearly established law that would preclude that defense in this case. (*Id.* at 47-52.) More specifically, Defendants argue as follows: (1) Defendant Eggleston is entitled to qualified immunity because she did not act outside the scope of her

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 172 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

authority but merely performed a health assessment, and in any event the law related to searches by school nurses is so unsettled that there is no clearly established law on this point; (2) Plaintiffs' framing of the right as "the right to be free from unreasonable searches" is impermissibly broad; (3) Defendant Simonds did not directly participate in the searches and did not order Defendant Eggleston to conduct an investigatory search, and there was no clearly established law that stopping students in the hallway to inquire about their whereabouts, escorting them to the health office to be examined, and conferring with the assistant principal regarding a limited search for substances based on observations of abnormal behavior violates the Fourth Amendment; and (4) Defendant Raleigh's conducting a search of the minor Plaintiffs' shoes and belongings was objectively reasonable based on the circumstances and there was no clearly established law to indicate that such actions violate the Fourth Amendment. (*Id.*)

Seventh, Defendants argue that the Court may properly apply the principles of *Jeffreys* and *Scott* in this case because Plaintiffs have admitted that any facts shown by the video evidence are undisputed, and they are therefore not entitled to any inference in their favor as to what the video shows, and their accounts of certain events, including their own behavior in the hallway, are contradicted by the video. (*Id.* at 52.)

Eighth, Defendants argue that Plaintiffs' cross-motion for summary judgment is both untimely because it was filed well after the November 30, 2022, deadline for dispositive motions, and nonetheless fails to meet their burden on the one element of Plaintiffs' First Claim for which they seek judgment. (*Id.* at 53-56.)

### E. Parties' Arguments on Plaintiffs' Motion to Exclude Expert Testimony

#### 1. Plaintiffs' Memorandum of Law

Generally, in their motion to exclude (from consideration both of the parties' cross-motions for summary judgment and at trial) the testimony of Dr. Robert Demerath, Plaintiffs make three arguments. (Dkt. No. 270, Attach. 1.) First, Plaintiffs argue that his opinions regarding the minor Plaintiffs' credibility are inadmissible because they are irrelevant, not helpful to the factfinder, and unfairly prejudicial. (*Id.* at 23-27.) They further argue that all opinions contained in Dr.

Demerath's report that flow from his credibility assessment of the minor Plaintiffs also must be excluded. (*Id.*)

Second, Plaintiffs argue that Dr. Demerath's conclusions are unreliable because they are not based on any articulable methodology and rest on a speculation. (*Id.* at 27-32.) Specifically, Plaintiffs argue that the testing Dr. Demerath conducted provides only a snapshot of the minor Plaintiffs' functioning years removed from the January 15, 2019, incident and, even combined with his review of records, does not provide any support for his conclusion that the minor Plaintiffs' mental health concerns were caused by factors other than Defendants' conduct. (*Id.* at 28-31.) They further argue that he does not include the scaled scores related to those tests and in fact does not base his conclusions on the scaled scores, but on an inappropriate assessment of the raw data. (*Id.*) Moreover, they argue that many of his conclusions are entirely speculative and lack any discernable foundation or valid explanation. (*Id.* at 31-32.)

**\*8** Third, Plaintiffs argue that Dr. Demerath is unqualified to render opinions on matters related to racial discrimination, because (a) he has admitted that he has no specialized knowledge, training, or expertise related to racial discrimination and has not been produced as an expert in such topic, and (b) he also lacks any expertise related to statistical analysis to rebut Dr. Blake's report and has not conducted any statistical analyses of his own to support his opinions regarding Dr. Blake's conclusions. (*Id.* at 32-36.)

#### 2. Defendants' Opposition Memorandum of Law

In opposition to Plaintiffs' motion, Defendants make six arguments. (Dkt. No. 290, Attach. 22.) First, Defendants argue that Dr. Demerath is qualified by his education and experience to provide the relevant testimony regarding the Plaintiffs' claims of psychological harm and mental anguish and to rebut Dr. Blake's opinion. (*Id.* at 19-24.)

Second, Defendants argue that Plaintiffs' challenges to Dr. Demerath's testimony and opinions go to the weight rather than the admissibility of his expert testimony and therefore are improper, because they take issue with his conclusions rather than his methodology for arriving at those conclusions, and because they are incorrect that Dr. Demerath did not interpret scaled scores when writing his expert report. (*Id.* at 25-27.)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 173 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Third, Defendants argue that Dr. Demerath should be permitted to opine on whether the minor Plaintiffs are reliable, because such opinions are the product of his evaluations of the minor Plaintiffs and not, as Plaintiffs argue, opinions as to credibility. (*Id.* at 27-31.)

Fourth, Defendants argue that Plaintiffs' argument that Dr. Demerath is not qualified to testify regarding issues of racial bias is without merit, because Dr. Demerath has not been offered as an expert on that topic and, to the extent that he has made some comments in his report related to such issues, he has research and other professional experience that make him qualified to opine on racial bias to the limited extent necessary to contextualize the data and his opinions. (*Id.* at 31-32.)

Fifth, Defendants argue that Dr. Demerath's testimony and reports are reliable because they rest on an accepted methodology that involved reviewing relevant records, analyzing generally accepted test questionnaires completed by the minor Plaintiffs and their guardians, and conducting examinations of the minor Plaintiffs and their guardians via videoconferencing software, all of which is standard practice used by psychologists. (*Id.* at 34-43.)

Sixth, Defendants argue that Dr. Demerath's testimony will assist the trier of fact in determining whether the minor Plaintiffs suffered mental anguish as a result of the events that occurred on January 15, 2019, and the presentation of his testimony will not be unduly prejudicial to Plaintiffs (*Id.* at 44-45.)

### 3. Plaintiffs' Reply Memorandum of Law

Generally, in reply to Defendants' opposition, Plaintiffs make four arguments. (Dkt. No. 306.) First, Plaintiffs argue that Dr. Demerath's opinions and testimony related to the minor Plaintiffs' credibility must be excluded as an improper use of expert testimony. (*Id.* at 5-9.)

Second, Plaintiffs argue that their challenges to Dr. Demerath's methodology and conclusions go to the admissibility of his testimony because, although he may have used generally accepted evaluations and tests, there is no explanation as to how such evaluations and tests or his review of records informed or support his conclusions. (*Id.* at 10.)

 **\*9**  Third, Plaintiffs argue that Dr. Demerath is unqualified to testify regarding racial bias and discrimination or to rebut Dr.

Blake's testimony, noting that Defendants have conceded that Dr. Demerath was not offered as an expert on such matters and that his general experience in the areas of either racial bias or the use of statistics to analyze racial discrimination is insufficient to qualify him to render any opinions on those matters. (*Id.* at 11-13.)

Fourth, Plaintiffs argue that Dr. Demerath's failure to consider the impact of the events on January 15, 2019, on the minor Plaintiffs' mental states renders his testimony unreliable, because a differential diagnosis evaluation such as he applied requires that the expert must not only rule out some causes of the relevant alleged symptoms, but must also rule out the specific possibility that is asserted to be the cause, and Dr. Demerath does not rule out the events of January 15, 2019, as a potential cause of the minor Plaintiffs' mental health symptoms. (*Id.* at 13-14.)

### F. Parties' Arguments on Defendants' Motion to Exclude Expert Testimony

#### 1. Defendants' Memorandum of Law

Generally, in their motion to exclude (from consideration both of the parties' cross-motions for summary judgment and at trial) the expert testimony of Dr. Jamilia Blake and Dr. Sarah Vinson, Defendants make two arguments. (Dkt. No. 272.) First, Defendants argue that Dr. Blake fails to satisfy any of the four elements required of expert testimony under Fed. R. Evid. 702. (*Id.* at 14-31.) They specifically argue that her experience and proposed testimony are deficient in the following four respects: (a) she lacks scientific, technical or other specialized knowledge that will assist a trier or fact; (b) her testimony is not based on sufficient facts or data because the information she relied upon is both incomplete and misrepresentative; (c) her testimony is not the product of reliable principles and methods; and (d) she failed to apply the principles and methods to the facts of the case in a reliable manner. (*Id.*)

Second, Defendants argue that Dr. Vinson's proposed testimony should be excluded because it is not the product of reliable principles and methods, given that she failed to review any of the minor Plaintiffs' medical records before conducting her evaluations and did not perform any further evaluations after reviewing those records. (*Id.* at 32-33.)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 174 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

### 2. Plaintiffs' Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiffs make two arguments. (Dkt. No. 292.) First, Plaintiffs argue that Dr. Vinson is a qualified expert who used and applied recognized methods when rendering her opinions, and her testimony will be helpful to a trier of fact. (*Id.* at 9-16.) Specifically, Plaintiffs argue that her opinions were based on a review of medical literature, a review of Plaintiffs' medical and school records, and a thorough mental status examination, and that she applied reliable principles because she (a) conducted in-person psychiatric evaluations of the minor Plaintiffs, (b) considered alternative sources of their trauma, and (c) extensively reviewed Plaintiffs' records and peer-reviewed literature in a manner that is consistent with well-recognized, accepted, and reliable methodologies. (*Id.*)

Second, Plaintiffs argue that Dr. Blake's opinion meets all the requirements for admissibility under Fed. R. Evid. 702. (*Id.* at 16-34.) Specifically, Plaintiffs argue that (a) Dr. Blake has relevant experience, education, and expertise in evaluating disparate educational experiences and outcomes for Black and Latina girls in primary schools that will be helpful to the trier of fact related to Plaintiffs' equal protection and Title VI claims, (b) her opinions as to both her review of the literature and her statistics are based on sufficient facts and data, and (c) her use of empirical literature and statistical disproportionality assessments are reliable methodologies and she properly applied those to the facts of this case. (*Id.*)

### 3. Defendants' Reply Memorandum of Law

**\*10** Generally, in reply, Defendants argue that Dr. Blake's conclusions are the product of unreliable methodologies that were improperly applied to the facts of the case for the following reasons: (a) the fact that her statistical analysis has been peer-reviewed is only one factor in the analysis and other courts have found use of a similar "risk-ratio" method to be deficient; (b) her conclusions are not supported by her analysis and are based on a selective review of the relevant data; (c) her application of the methodology does not consider any of the objective factors for discipline used by New York state public schools; and (d) her analysis does not account for alternative explanations, and the numbers she reported for both school enrollment and searches are not consistent with the numbers actually contained within the relevant data on which she purported to rely. (Dkt. No. 307.)

## II. GOVERNING LEGAL STANDARDS

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [3] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [4]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

**\*11** For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 175 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [5]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [6] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### III. ANALYSIS

#### A. Whether Summary Judgment Is Appropriate on Plaintiff's First Claim

After careful consideration, the Court answers this question in the affirmative as to the Fourth Amendment claims asserted by I.S., J.B., and A.S. (such that summary judgment should be granted to Defendants on those Plaintiffs' claims), but in the negative as to the Fourth Amendment claim asserted by I.M.

The "[Fourth] Amendment's prohibition against unreasonable searches and seizures applies to searches conducted by public school officials." *New Jersey v. T.L.O.,* 469 U.S. 325, 333 (1985). However, it is well settled that, " 'while children assuredly do not shed their constitutional rights ... at the schoolhouse gate, ... the nature of those rights is what is appropriate for children in school.' " *Morse v. Frederick,* 127 S.Ct. 2618, 2627 (2007) (quoting *Veronica Sch. Dist. 47J v. Acton,* 515 U.S. 646, 655-56 [1995] [internal quotations omitted]) (omissions in original). Thus, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.,* 469 U.S. at 340. Specifically, "school officials need not obtain a warrant before searching a student who is under their authority." *Id.*

**\*12** A Fourth Amendment search or seizure is reasonable if it was (1) justified at its inception, and (2) reasonably related in scope to the circumstances with justified the seizure in the first place. *T.L.O.,* 469 U.S. at 341-42. "Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," while "[s]uch a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

This standard of reasonableness "stops short of probable cause," and is instead a "reasonable suspicion" standard. *Safford Unified School Dist. No. 1 v. Redding,* 557 U.S. 364, 370 (2009). The knowledge requirement can therefore be described as "a moderate chance of finding evidence of wrongdoing," as opposed to the "fair probability" or "substantial chance" standard applicable in other law enforcement contexts. *Redding,* 557 U.S. at 371. In determining whether a search is justified in both the inception and the extent, a court can look to the degree to which known facts imply prohibited conduct, the specificity of the information received, and the reliability of the source, but such factors do not "rigidly control" and "the relevant standards are 'fluid concepts that take their substantive content from the particular contexts' in which they are being assessed."

The Second Circuit has explicitly extended the standard outlined in *T.L.O.* to strip searches, but has found that a high level of suspicion is required before such an intrusive search can be conducted. *Phaneuf v. Fraikin,* 448 F.3d 591, 596 (2d Cir. 2006).

#### 1. Whether a Search Was Conducted

The Fourth Amendment is not triggered unless a search or seizure has occurred. Some courts within the Second Circuit have held that assessments conducted for medical purposes are not searches under the Fourth Amendment; however, those cases also recognize that medical assessments conducted for investigative purposes are considered searches. *See, e.g., Masciotta v. Clarkstown Cent. Sch. Dist.,* 136 F. Supp. 3d 527, 538-39 (S.D.N.Y. 2015) (collecting cases).

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 176 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Defendants argue, as an initial matter, that no search occurred because the examination by Defendant Eggleston was a health assessment of the safety and wellbeing of the minor Plaintiffs, not an investigative search. (Dkt. No. 273, Attach. 14, at 15-23.) It is true that at least a portion of the actions performed by Defendant Eggleston, such as checking the minor Plaintiffs' eyes and pulse and performing a neurological examination, appear directed toward the permissible purpose of conducting a medical evaluation to determine whether the minor Plaintiffs may have ingested a substance and whether any medical intervention might be necessary and appropriate. It is undisputed, however, that, in addition to the examination performed by Defendant Eggleston, Defendant Raleigh had every minor Plaintiff (with the exception of J.B.) take off their shoes and empty their pockets or bags, actions that do not reasonably have a health-related purpose. Defendants have not presented any argument as to why a search for items in the minor Plaintiffs' shoes or pockets was necessary for assessing their health and well-being, and the cases they cite, which address the performance of medical procedures such as urine or blood tests, x-rays, removal of clothes to address a flea infestation, or a visual examination of a student's genitals to address complaints of symptoms in that area, do not contemplate such actions. (Dkt. No. 273, Attach. 14, at 16-18.) Further, beyond the undisputed actions of requiring the minor Plaintiffs to take off their shoes and empty their pockets (with the exception of J.B.), there are also a number of relevant disputed facts that even more strongly suggest a search occurred in conjunction with any permissible health assessment Defendant Eggleston conducted: J.B. testified that she was directed to take off her shoes and shake them (although this is not corroborated by either Defendant Eggleston or Defendant Raleigh); I.M. testified that Defendant Eggleston directed her to pull the bottom of her tank top away from her body and shake it, that she was patted down along her arms, legs, and torso, that she was directed to take off her sweatshirt and pull down both her outer sweatpants and then her leggings (requests with which she complied), and that Defendant Eggleston touched under her bra band by her armpits and along the side of her breasts; I.S. testified that Defendant Eggleston patted her body down during the exam; and A.S. testified that Defendant Eggleston asked her to unzip her sweater, which she did briefly before closing it again, and that she was patted down along her whole body. (Exh. EE, at 243-50; Exh. GG, at 183, 213-42; Exh. II, at 128-39; Exh. KK, at 273-79, 292, 207-98, 342-43.) Thus, in addition to the fact that the undisputed actions of Defendant Raleigh in requiring the minor Plaintiffs (with the exception of J.B.) to take off their shoes and empty their pockets or

purses appear sufficient to constitute a search beyond what was required for any permissible health-assessment purposes, there are other actions that are sufficient to create a genuine dispute of material fact as to whether the actions of both Defendant Eggleston and Defendant Raleigh with all of the minor Plaintiffs constituted searches that are subject to the Fourth Amendment.

### 2. Whether the Searches Were Justified at the Inception

**\*13** Because the Court has found that the minor Plaintiffs were searched, or that at the very least there is a genuine dispute of material fact regarding whether such searches occurred, the next inquiry is whether those searches were justified at the inception. As was discussed above, this is subject to a reasonable suspicion standard that is lower than probable cause. *Redding*, 557 U.S. at 370. In determining whether a search was justified at its inception, such assessment "necessarily requires us to base our determination on only those facts known to the school officials prior to the search." *Phaneuf*, 448 F.3d at 597.

In this case there is testimony regarding what Defendants Simonds, Raleigh, and Eggleston observed, as well as video evidence from the school's hallway security cameras that shows the minor Plaintiffs at relevant times during which those sources observed them before they were sent into the nurse's office. In instances where a video indisputably establishes certain facts, contrary evidence is insufficient to create a genuine dispute of material fact and may be disregarded. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (noting that, while it is not the duty of a district court to weigh the credibility of the parties on a summary judgment motion, a court may disregard a version of events that is based solely on the party's own contradictory and incomplete testimony so long as there is no evidence in the record upon which a reasonable factfinder could find in the party's favor). The Court's analysis will therefore start with what the video evidence shows.

Footage from Camera 31 shows Defendant Simonds arriving at the corner by that camera and first seeing the minor Plaintiffs at approximately 12:58:52. At that moment, one of

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 177 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

the minor Plaintiffs (I.S.) is laying on her back approximately in the middle of the hallway with her legs up in the air. He stands in place, appearing to use his radio while observing I.S. roll over to stand up; another of the minor Plaintiffs (A.S.) moves in front of I.S. and begins to walk towards Defendant Simonds. Once I.S. is standing, all four of the minor Plaintiffs begin to walk in the direction of Defendant Simonds. As they approach, Defendant Simonds beckons them with his hand and then begins to walk down the other hall, still watching the minor Plaintiffs. Defendant Simonds steps out of the frame of the camera, and although A.S. is still in his line of sight as she walks in the opposite direction towards the D stairwell, the other three minor Plaintiffs are further down the other hallway and would not have been visible to him at this time. Those three minor Plaintiffs appear to be talking and laughing, with an instance of I.M. appearing to lean slightly against the wall while J.B. comes up behind her. I.M. walks into an alcove while J.B. and I.S. watch her, appearing to be laughing. J.B. follows I.M. into the alcove and neither are visible for a moment until I.M. emerges back into the hallway, again appearing to be laughing. While that is occurring, A.S. is walking in the direction Defendant Simonds had gone, and I.S. is walking off to the side of J.B. and I.M., looking in the direction where Defendant Simonds had gone. J.B. emerges from the alcove, smiling or laughing while looking in the direction of I.S., before following A.S. and I.M. out of view of the camera in the direction Defendant Simonds had gone. While J.B. is exiting from view of the camera, I.S. leans over, placing her left hand on her left knee; I.S. stands bent over for multiple seconds before the camera footage ends.

**\*14** Footage from Camera 30 begins at 12:59:18, approximately the time when A.S. had turned around to walk towards Defendant Simonds after walking into the D stairwell; none of the other minor Plaintiffs would be visible to Defendant Simonds from his vantage point at that time. This is also approximately the time that Defendant Raleigh appears to have seen the minor Plaintiffs (starting with only A.S. at this point), as she can be seen walking towards Defendant Simonds from the other side of the hallway. Defendant Simonds watches as A.S. walks toward him; A.S. is looking over towards the other minor Plaintiffs who are still down the other hallway. He watches A.S. walk forward past the hallway she had come from, but then take a few steps backward to again watch I.M. and J.B. (who are not yet visible on the camera). She turns back toward Defendant Simonds and begins walking in his direction, but again looks back at I.M. and J.B. while walking. Defendant Simons watches I.M., I.S., and J.B. emerge into view. Defendant Raleigh reaches

Defendant Simonds at approximately the same time as I.M. and A.S., while J.B. is slightly farther behind them and over towards the right wall and I.S. is leaning forward holding her left leg. As Defendant Raleigh appears to speak with A.S. and I.M., J.B. continues to walk along the right wall, looking away from Defendants Simonds and Raleigh and touching a poster before stopping and turning around to face them. I.S. stands up and begins to walk towards the group while J.B. is observed to be speaking with Defendants Simonds and Raleigh. While Defendant Raleigh speaks to J.B., J.B. leans her back against the wall behind her, and I.S. joins the group, between I.M. and J.B., once again leaning down to hold her left leg with her left arm. J.B. appears to adjust something around her waist while I.S. leans down further to touch her left foot with her left arm. J.B. adjusts her jacket and then her headscarf, while I.S. stands up and adjusts her hair before turning to drink at the water fountain a few steps behind her. J.B. continues to adjust her scarf while A.S. moves her hands first to her waist and then to adjust the hood of her sweatshirt; simultaneous with A.S.'s movements, I.M. swings her arms back and forth along the side of her body multiple times. I.S. walks back to the group and again leans over, this time appearing to put her hands on both knees. I.M. takes a step to the side and turns to A.S., gesticulating in A.S.'s direction and appearing to speak with A.S., to which A.S. appears to respond with speech and some gestures. I.M., swinging her arms again and then making more gestures, appears to be speaking, at which point J.B. appears to throw her head back and laugh; I.M. also appears to laugh, covering her face with one hand and moving around in place. I.M. continues to talk and gesture, and it appears that J.B. and I.S. are smiling or laughing in response; A.S. appears to be standing with her arms crossed. J.B. continues fixing her scarf, I.M. swings her arms by her side, and I.S., who has since stood up straight, appears to adjust the back of her sweatshirt. I.M. swings her arms more while A.S. and I.S. look around the hallway.

After a period where the four minor Plaintiffs stand in place and appear to be listening to either Defendant Simonds or Defendant Raleigh speaking, J.B. leans her back against the wall, followed a few seconds later by I.S. I.M. swings one of her arms and appears to speak, continuing to swing her arm as Defendant Raleigh speaks. I.M. speaks with Defendant Raleigh, moving around a few steps, scratching her head and gesturing with her arms. J.B. and I.S. look over towards something happening at the other end of the hallway. J.B. leans back against the wall, comes forward slightly, then back again, and appears to roll her back once or twice slightly against the corner of the shallow alcove while laughing. J.B.

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 178 of 427

appears to gesture in the direction of the D Stairwell, at which point everyone looks in that direction before I.M. continues to speak with Defendant Raleigh. All four minor plaintiffs look in the direction of the D stairwell, after which an unrelated person walks into the frame and past the group. I.M. begins pulling on the back and sides of her pants while J.B. and I.S. are still leaned slightly against the wall. A.S. appears to speak and J.B. throws her head back laughing. I.M. and I.S. speak as I.M. takes a few small steps around and begins pulling on the sides of her pants again. J.B. rolls her back on the corner of the wall once and I.M. gestures to A.S. as Defendant Simonds turns to speak closely with Defendant Raleigh. I.M. bends forward and she and J.B. appear to be laughing. They continue laughing as I.M. stands up with her hands on her face and J.B. turns to put her face into the shallow alcove behind her. A.S. points a hand at I.M. and appears to talk to Defendant Raleigh as I.M. continues to hold her hand to her face before beginning to speak and gesture again. J.B. has returned to leaning her back against the corner of the alcove looking in the direction of Defendant Simonds and Defendant Raleigh. As Defendant Raleigh walks toward the health office, A.S. appears to be speaking, J.B. appears to be laughing and moving a few steps down the hallway, and I.M. is moving, gesturing, and appearing to speak to A.S. J.B. and I.M. appear to laugh again. J.B. jumps slightly with her arms in the air, still laughing, and A.S. turns around and appears to also be laughing. J.B. makes more gestures and they begin to follow Defendant Simonds into the health office, J.B., I.M. and I.S. all laughing while A.S. walks behind Defendant Simonds with her arms crossed over her chest. They continue to laugh as they walk, and I.S. squats for a moment, holding her left leg before continuing to walk appearing to mime something as a joke to A.S. J.B. leans forward slightly to touch I.M.'s back before standing and laughing with I.S., after which they follow the others into the health office.

This video evidence, while certainly showing some behavior by the minor Plaintiffs that is open to interpretation, presents an objective account of what the minor Plaintiffs were doing throughout the encounter with Defendant Simonds and Defendant Raleigh. To the extent that both parties have offered their own interpretations of the minor Plaintiffs' behavior, this video evidence provides an objective view of that behavior, and any such interpretations or contrary accounts must be rejected where they are clearly inconsistent with what the video shows. *Scott*, 550 U.S. at 380.

**\*15** Further, regarding what was known to Defendants at the time the search was conducted, there is undisputed

evidence that (1) Defendant Raleigh saw the minor Plaintiffs exit from the lunchroom using a door that was other than the one they would be expected to be use for the lunchtime activity in which they were all enrolled, and that was closest to the gymnasium; (2) Defendant Raleigh was aware at that time that [Redacted]; (3) Defendant Raleigh was aware that [Redacted]; (4) Defendant Raleigh was concerned that [Redacted]; (5) Defendant Raleigh lost sight of the minor Plaintiffs and did not know where they went at that time, such that she used her radio to call other administrators to attempt to locate them; (6) through their search, Defendant Raleigh and Defendant Simonds were aware that the minor Plaintiffs had not checked in at the classroom where their lunchtime activity was being held; and (7) when Defendant Simonds finally saw Plaintiffs in the hallway at approximately 12:58:52 according to the video from Camera 31, approximately seven minutes had elapsed since when Camera 16 showed the minor Plaintiffs leaving the cafeteria at approximately 12:52.

In addition to the video evidence, the depositions and/or declarations of Defendant Simonds, Defendant Raleigh, Defendant Eggleston, the four minor Plaintiffs, and non-parties Resource Officer Arthur Williams and teacher Glenmarie Green-Gonzales all provide accounts of the minor Plaintiffs' behavior at the relevant time. [7] Defendant Simonds, Defendant Raleigh, Defendant Eggleston, Resource Officer Williams and Ms. Green-Gonzales all testified that, at various points throughout the encounter on January 15, 2019, the minor Plaintiffs were acting in a manner that was at odds with their normal presentations, were laughing excessively, and, particularly while they were in the health office, were acting in a disruptive manner. (Exh. MM., at 248-78, 319-22; Exh. NN, at 167-82, 207-08; Exh. OO, at 186-87, 193-94, 207-08, 227-33, 316-18; Exh. RR, at 48-51; Exh. VV, at 75-79, 82, 88-91.) The minor Plaintiffs admit they had been in the hallway when they were not supposed to be and were laughing and joking during the encounter with Defendant Simonds and Defendant Raleigh in the hallway and also in the health office. (Exh. EE, at 172, 197-98, 209-10, 223-24; Exh. GG, at 162-63, 189-90, 204-06; Exh. II, at 80, 82, 86, 206; Exh. KK, at 240-41, 255-56, 258-59, 262-63, 265, 267, 272, 306, 313, 319.)

Considering all of this evidence, the undisputed facts regarding the minor Plaintiffs' behavior at the relevant time as clearly substantiated by the video evidence are as follows: (1) Defendant Simonds observed I.S. lying in the hallway with her legs in the air; (2) Defendant Simonds

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 179 of 427

observed A.S. attempt to go into the D stairwell instead of following him down the hallway in the other direction; (3) Defendants Simonds and Raleigh observed the minor Plaintiffs laughing at various times throughout the encounter while those Defendants were attempting to speak with them, including an instance in which J.B. threw her head back in laughter, I.M. leaned down or "doubled over" with laughter, and J.B. turned and leaned her face into a corner while laughing; (4) Defendants Simonds and Raleigh observed I.S. bending down while standing; (5) Defendants Simonds and Raleigh observed that I.M. was, at various times, swinging her arms back and forth repeatedly and pulling at her pantlegs; (6) Defendant Simonds and Defendant Raleigh observed both J.B. and I.S. leaning their backs against the wall for a portion of the encounter; (7) Defendant Simonds and Defendant Raleigh observed that J.B., while leaning against the corner of a wall, "rolled" and bounced against the corner at times; (8) Defendant Simonds observed that, in response to something said near the end of the hallway encounter, J.B. laughed and spun around as she moved down the wall before again throwing her head back and moving in a seemingly unsteady manner; and (9) as Defendant Simonds was walking with the minor Plaintiffs to the health office, I.S., I.M., and J.B. are clearly seen to be laughing on the video.

**\*16**  Also relevant to the analysis is the evidence regarding Defendants' knowledge of substance use activity within both the District broadly and specifically within East Middle School. It is undisputed that a bulletin had been sent to parents, administrators, and faculty in December 2018 around the time of the holiday break regarding an incident in which a student displayed serious symptoms related to use of "purple drink" at Binghamton High School. (Dkt. No. 273, Attach. 8; Exh. MM, at 279-80; Exh. NN, at 173-75.) Defendant Simonds and Defendant Raleigh corroborate that, during November 2018, administrators at East Middle School had found students in possession of the ingredients to make "purple drink," empty bottles of cough syrup had been found in the building and stairwells (specifically, four or five bottles for cough syrup with codeine), Defendant Raleigh had been informed by an asset protection worker at a store near to East Middle School that cough syrup was being stolen from that store, East Middle School students were prohibited from bringing outside drinks starting in January 2019 as a result of concerns over "purple drink" in the school, and Resource Officer Williams had overheard students talking about "laced Gatorade" and he had personally found several unopened bottles of Gatorade hidden in the ceilings of the East Middle School bathrooms. (Dkt. No. 273, Attach. 6, at ¶¶ 5-7; Dkt.

No. 273, Attach. 8; Exh. MM, at 280; Exh. NN, at 173; Exh. VV, at 164-65.) This context weighs in favor of the reasonableness of Defendants' suspicion regarding the minor Plaintiffs' behavior, because the evidence unequivocally shows that there was a known concern regarding student use of "purple drink" at East Middle School during the relevant time.

By contrast, Defendants' attempt to rely on the minor Plaintiffs' [Redacted] Although a student's disciplinary history is one of the factors that might be relevant to the assessment of justification, it is not clear to the Court that those facts are relevant in the circumstances presented here. In particular, there has been no argument or evidence presented by Defendants that they had any suspicions that [Redacted] Instead, their proffered justification for conducting the search was that they suspected the minor Plaintiffs may have ingested a substance based on what Defendants Simonds and Raleigh perceived to be abnormalities in the minor Plaintiffs' behavior. [Redacted] does not, without more, lead to any reasonable inference that a student might be engaging in the use of prohibited substances and thus does not constitute a basis to justify conducting a search for such substances. [8] *See Phaneuf*, 448 F.3d at 599 (concluding that the plaintiff's past disciplinary issues, none of which related to drug use, were of little significance when determining the reasonableness of a search conducted for the sole purpose of determining whether she possessed drugs).

As to evidence that it is not apparent Defendants were aware of at the time of the search, Defendant Simonds testified that his staff had viewed the camera feeds during that time, but had not seen the minor Plaintiffs on the camera. (Exh. MM, at 254-61.) There is therefore no clear evidence that the individual Defendants were aware at the time of ordering and conducting the search that the minor Plaintiffs had gone into the bathroom or had stopped outside the gymnasium, beyond what the minor Plaintiffs may have told them before they were brought into the health office. As a result, the video evidence regarding the minor Plaintiffs' activities or behavior during the period between when they left the lunchroom and when Defendant Simonds found them is not material to the analysis here, because there is no evidence to show that the relevant Defendants were aware of any of those activities or behavior at the relevant time.

Having said that, given the video evidence of the minor Plaintiffs' behavior, the undisputed fact that administrators did not know their location for a period of time, and the known

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 180 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

problem of "purple drink" usage at East Middle School, no reasonable factfinder could conclude that Defendants lacked reasonable suspicion to initiate a search to assess whether the minor Plaintiffs might be under the influence of, or possess, a substance that violated the Code of Conduct. Again, this requires only that there be "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Phaneuf*, 448 F.3d at 596. Here, I.S.'s fall, the minor Plaintiffs' ongoing and at times seemingly uproarious laughter despite the situation, A.S.'s act of attempting to go into the stairwell rather than following Defendant Simonds, J.B. and I.S.'s leaning against the wall, and I.M.'s fidgety arm movements, even in the absence of context related to what the minor Plaintiffs were saying or how they were speaking, can all together be reasonably construed as indicating possible drug use or other violation of school rules. This is especially highlighted by the testimony from both the individual Defendants and third parties that the conduct observed was different from how those sources usually saw the minor Plaintiffs behave in school or in conversation with those sources.

**\*17** Plaintiffs' arguments to the contrary center on their assertion that laughter and horseplay behavior is age-appropriate for twelve-year old girls in the hallway with their friends. This may be entirely true; but the fact that children might generally act in ways that reasonable adults would not in the same situation does not inherently mean that their behavior cannot constitute reasonable suspicion of violating school rules under any circumstance. Plaintiffs' unsupported assertion that their behavior was typical and age-appropriate, even in conjunction with evidence that all of the minor Plaintiffs, talked, laughed, or even acted "giddy" at school on occasion, is simply insufficient to dispute Defendants' testimony that the behaviors they witnessed (which are documented on the video) were abnormal compared to how they were used to seeing the minor Plaintiffs behave. Further, Plaintiffs' arguments regarding why they believe individual components or behaviors are insufficient to raise reasonable suspicion ignore the fact that the analysis is meant to encompass the totality of the circumstances known to Defendants, not whether any potential reason for suspicion can suffice in isolation. The confluence of all of the above evidence shows that Defendants had reasonable suspicion to justify a search of all four minor Plaintiffs (based on their individual conduct and because they had all been missing for a period of time while together) related to possible drug use.

### 3. Whether the Search Was Reasonably Related in Scope and Not Excessively Intrusive

Having concluded that the search was justified at its inception, the next inquiry is whether the search that was conducted of each minor Plaintiff was reasonably related in scope to the circumstances that justified the search. As an initial matter, the Court observes that genuine disputes of material fact exist regarding this claim as to all four of the minor Plaintiffs, given that the deposition testimony as to the details or extent of the search of all of the minor Plaintiffs differs in material respects to the evidence presented particularly by Defendant Eggleston (who is the person who the minor Plaintiffs testified conducted most of the alleged examinations and searches).[9]

Further, there are two levels of searches that are implicated by Plaintiffs' allegations in this case: a more typical investigatory search involving taking the minor Plaintiffs' vital signs, searching their shoes and the contents of their pockets and bags, and alleged pat-downs over their clothes, and a more invasive search involving the removal of clothing and/or searching inside one minor Plaintiff's bra that Plaintiffs have characterized as a strip search. As was discussed above in Part I.A. of this Decision and Order, the Court previously found related to Defendants' motion to dismiss that the Fourth Amendment claims asserted by A.S. and J.B.[10] were dismissed to the extent they asserted that a strip search had occurred. To the extent that there is some lack of clarity in that previous Decision and Order as to whether that dismissal was with or without prejudice to renewal (and as such whether such claims remain viable at this stage of the action), Plaintiffs' Amended Complaint has nonetheless not cured the defects identified related to the strip-search portion of the Fourth Amendment claims asserted by A.S. and J.B. There is no allegation in the Amended Complaint that J.B. removed any article of clothing other than her shoes;[11] she instead alleged that she had taken her sweatshirt off before going into the examination room with Defendant Eggleston, as evidenced by her allegation that she had to retrieve her sweatshirt from the lobby of the health office.[12] (Dkt. No. 163, at ¶¶ 40-47.) Further, contrary to her allegation that Defendant Eggleston asked her to take off her t-shirt, J.B. testified at her deposition that Defendant Eggleston did not in fact ask her to take off her shirt. (Exh. EE, at 245-49.) It is therefore clear that neither the allegations in the Amended Complaint nor the evidence, including J.B.'s own testimony, are sufficient to plausibly suggest, much less establish, that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 181 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

J.B. was subjected to any type of strip search. As to A.S., the Court discussed in its Decision and Order on Plaintiffs' motion for reconsideration of the Decision and Order of September 14, 2020, its finding that the allegations in the original Complaint that A.S. unzipped her sweatshirt to the middle of her chest and then zipped it back up again, even in combination with alleged statements by Defendant Eggleston regarding the fact Plaintiff was wearing only a bra under her sweatshirt, were insufficient to plausibly allege that A.S. revealed her bra and the skin of her torso in a manner that would constitute a strip search. [13] (Dkt. No. 138, at 6-7.) The Amended Complaint does not appear to add any further allegations regarding this point. Therefore, even if the strip-search claim brought by A.S. had not been dismissed with prejudice by the previous Decision and Order, the allegations in the Amended Complaint related to that claim remain insufficient for all of the same reasons already elaborated in the prior Decision and Orders related to the motion to dismiss and the motion to reconsider and must again be dismissed as a matter of law. As to A.S. and J.B., there is therefore no need to assess on this motion whether there was sufficient justification to conduct a strip search, but rather only whether there was the requisite justification to conduct a more typical investigative search.

### i. J.B.

**\*18** At her deposition, J.B. testified that she removed one arm from her sweatshirt to allow Defendant Eggleston to measure her blood pressure, and that Defendant Eggleston had her look from left to right, put her hand on her eyes, asked her to count fingers, and asked her to take off her shoes, which Defendant Eggleston shook. (Exh. EE, at 243.) She was wearing a t-shirt underneath her sweatshirt, and Defendant Eggleston never asked her to take off either her shirt or leggings; she did not remove either her t-shirt or leggings. (*Id.* at 244, 249-50.) Defendant Eggleston's testimony differs slightly from J.B.'s, in that Defendant Eggleston stated that J.B. refused to submit to a neurological examination (which J.B. does not mention), and that she was not sure if Defendant Raleigh had been in the room, but she herself did not ask J.B. to remove her shoes or turn out her pockets. (Exh. OO, at 295-96.) Defendant Raleigh confirmed that she had not been in the room for any part of J.B.'s examination because she had needed to help with an injured student. (Exh. NN, at 229.)

Based on the above analysis, it is undisputed that the search of J.B. consisted of checking her vital signs, with some degree of neurological testing. Even drawing all reasonable inferences in J.B.'s favor and accepting the full extent of her testimony that she removed her shoes and those were searched, the extent of this search was reasonably related in scope to the circumstances that justified the search. As was discussed above in Part III.A.2. of this Decision and Order, Defendants had reasonable suspicion that the minor Plaintiffs might be under the influence of a prohibited substance. Checking J.B.'s vital signs [14] and searching her shoes is reasonably related to determining whether she might be under the influence of such substance and to assessing whether she possessed any such substance on her person. *See Mac Ineirghe*, 2007 WL 2445152, at \*9-10 (finding that taking of vital signs such as blood pressure and observations of eyes, search of bag and shoes, pat down of pockets, and administration of saliva-based drug test were both justified at their inception and not excessive or intrusive in context of student having left school to the parking lot in violation of rules and being observed wiping his nose and rubbing his eyes). Further, a search of a student's outer clothes and bag has been found to generally be proportional with a reasonable suspicion that the student might possess drugs. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 373-74 (2009) ("If a student is reasonably suspected of giving out contraband pills, she is reasonably suspected of carrying them on her person and in the carryall that has become an item of student uniform in most places today. If Wilson's reasonable suspicion of pill distribution were not understood to support searches of outer clothes and backpack, it would not justify any search worth making."). As a result, no reasonable factfinder could conclude that the search of J.B. violated her Fourth Amendment rights under the circumstances.

### ii. A.S.

At her deposition, A.S. testified that, upon entering the examination room, Defendant Eggleston checked her blood pressure, pulse, and eyes and had her hop on one foot and touch her nose; when Defendant Eggleston took her blood pressure, she rolled up her sleeve and did not remove her sweatshirt. (Exh. GG, at 213.) Defendant Eggleston told her to unzip her sweatshirt and remove her pants; she unzipped her sweatshirt to below her chest and then zipped it back up again, and Defendant Eggleston did not force her to either take off her sweatshirt or her pants when she did not comply. (*Id.* at 224-28.) A.S. first stated that Defendant Eggleston did not touch her other than to take her pulse, but later testified that Defendant Eggleston had in fact patted down her

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 182 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

whole body over her clothes. (*Id.* at 237, 241-43.) Defendant Raleigh came into the room and told A.S. to take off her shoes and empty her pockets, after which Defendant Raleigh took the contents of those and inspected them. (*Id.* at 229, 231.) A.S. also testified that Defendant Eggleston never made any comments about her breasts. (*Id.* at 241.) The testimony of Defendants Eggleston and Raleigh do not differ materially from A.S.'s testimony, other than in that Defendant Eggleston does not mention A.S. unzipping her sweatshirt and does not state that she asked A.S. to remove either her sweatshirt or pants. (Exhs. NN, at 204-06; OO, at 250-51.)

**\*19** As was already discussed above related to J.B., the portion of the search related to the vitals check, neurological exam, and search of A.S.'s pockets and shoes (and even the alleged pat down) was reasonably related to the circumstances justifying the search. *See Stanford v. Northmont City Sch. Dist.*, 19-CV-0399, 2023 WL 1819117, at \*5-6 (S.D. Ohio Feb. 8, 2023) (finding that a pat down would be reasonably related to the school district's interest in removing narcotics from school grounds in a case where the plaintiff alleged he was patted down in his pants and pockets based on the odor of marijuana); *Mac Ineirghe*, 2007 WL 2445152, at \*9-10; *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 725 (E.D. Va. 2014) (finding pat down of student and search of his backpack, shoes, and pockets was reasonable in scope because drugs could be hidden in those places, in the context of a tip that a student with long hair was smoking marijuana on a bus). To the extent that A.S. asserts she briefly unzipped her sweatshirt part way, revealing a portion of her bra, the Court has already found that this does not constitute a strip search. There is no evidence, even in A.S.'s testimony, to support a finding that Defendant Eggleston or anyone else searched for contraband in that area in the brief time her sweatshirt was partially open, or even to establish that Defendant Eggleston saw A.S.'s bra or breasts. Further, even if accepting, for the sake of argument, A.S.'s disputed assertion that Defendant Eggleston asked A.S. to remove her sweatshirt and pants, it is undisputed that A.S. did not remove either of those items, and that Defendant Eggleston did not continue to demand she do so or otherwise attempt to force her to do so. As a result, even accepting A.S.'s version of events, no reasonable factfinder could conclude that the search of A.S. violated her Fourth Amendment rights.

### iii. I.S.

At her deposition, I.S. testified that Defendant Eggleston asked her to remove her arm from her sweatshirt but that she eventually took off her whole sweatshirt because it was easier; she was wearing a t-shirt underneath. (Exh. II, at 130-31.) Defendant Eggleston told her to empty her pockets while she was taking off her sweatshirt and patted her down. (*Id.* at 137-39.) After I.S. removed her sweatshirt, Defendant Eggleston took her vital signs and she put her sweatshirt back on when those were done. (*Id.* at 132.) Defendant Eggleston also asked her to stand on one leg and touch her nose. (*Id.* at 128-29.) Defendant Raleigh came into the room while Defendant Eggleston was taking her vital signs and afterwards asked I.S. to take off her shoes and hand them to Defendant Raleigh, who shook them. (*Id.* at 135-36.) The testimony of Defendant Eggleston and Defendant Raleigh differ from I.S.'s account in that Defendant Eggleston testified that I.S. was not patted down, and it was Defendant Raleigh who had I.S. empty her pockets, not Defendant Eggleston. (Exhs. NN, at 222-23; OO, at 291-93.)

As was already discussed above related to J.B. and A.S., the portion of the search related to the vitals check, neurological exam, and search of A.S.'s pockets and shoes (and even the alleged pat down) was reasonably related to the circumstances justifying the search. *See Stanford*, 2023 WL 1819117, at \*5-6; *Mac Ineirghe*, 2007 WL 2445152, at \*9-10; *Gallimore*, 38 F. Supp. 3d at 725. I.S. does not provide any admissible evidence that can support a finding that there was a more invasive search, let alone a strip search. It is undisputed from her own testimony that she voluntarily took her sweatshirt off when asked to remove her arm related to checking her blood pressure, and that she did not remove any other clothing but her shoes. As a result, even accepting I.S.'s version of events, no reasonable factfinder could conclude that the search of A.S. violated her Fourth Amendment rights.

### iv. I.M.

The search of I.M. presents greater difficulties than those of the three other minor Plaintiffs. At her deposition, I.M. testified that she complied with a request by Defendant Eggleston to take her sweatshirt off, and that she was wearing a thin-strap tank top underneath. (Exh. KK, at 273, 278.) Defendant Eggleston checked her vital signs, told her to extend her limbs and jump, and had her follow a finger with her eyes. (*Id.* at 273-77.) When I.M. was standing, Defendant Eggleston told her to put her arms out to the side, at which point Defendant Eggleston swiped underneath her

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 183 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

bra below her armpits and touched the sides of her breasts. (*Id.* at 278-79.) Defendant Eggleston also had her pull out the bottom of her tank top and shake it. (*Id.* at 342-43.) At some point, Defendant Eggleston made a comment about how her breasts were large for her age and that they would get flabby when she was Defendant Eggleston's age. (*Id.* at 273.) Defendant Eggleston patted her down before telling her to pull down her sweatpants, and attempted to pat her legs down again before asking her to also pull down her leggings; I.M. complied with these requests and pulled down both her sweatpants and her leggings to her ankles. (*Id.* at 274, 290, 292.) Defendant Raleigh came into the room when she was dressed again and had I.M. take her shoes off and bang them together; both Defendant Eggleston and Defendant Raleigh inspected the items from her pockets and bag. (*Id.* at 297-98.) Defendant Eggleston denies making a statement about I.M.'s breasts, asking her to pull out her shirt and shake it, touching underneath I.M.'s bra, patting down I.M.'s legs, or asking I.M. to pull down her pants. (Exh. OO, at 279-80.)

**\*20** The search conducted, as described by I.M., greatly exceeds the scope of those that were conducted on the other three minor Plaintiffs. Although the checking of her vital signs, search of her shoes, and a pat down of her legs over her clothes would have been within the scope of the original justification of the search, the alleged touch underneath her bra and removal of her pants down to her underwear is far more intrusive, and more in line with a strip search, and thus would require a heightened level of suspicion to be justified. *Phaneuf*, 448 F.3d at 596. Because it is unlikely that the circumstances of this case would justify such an intrusive search, and because there is conflicting evidence regarding the specific details of what occurred during I.M.'s examination by Defendant Eggleston, there exists a genuine dispute of material fact, and summary judgment is not appropriate, as to the Fourth Amendment claim asserted by I.M.

However, the existence of a material fact does not mean that the evidence suggests potential liability for all three of the individual Defendants on this claim. Of note, even if a factfinder were to accept I.M.'s version of events, it was only Defendant Eggleston who conducted the portion of the search that raises questions of a constitutional violation. Even under I.M.'s version of events, Defendant Raleigh was not in the room while Defendant Eggleston performed those portions of the search; when she entered the room, I.M. was fully clothed again, and the only search she personally performed was of I.M.'s shoes and bag. As was already discussed, the

search of the shoes and bag were reasonable in scope to the circumstances that justified the search and do not themselves constitute a constitutional violation. Further, it is undisputed that Defendant Simonds was not in the exam room at any time and did not personally conduct the search of any of the minor Plaintiffs. (*See e.g.*, Exh. EE, at 251; Exh. II, at 111, 160; Exh. KK, at 266-67, 304, 313; Exh. MM, at 306-10; Exh. XX, at Nos. 119-20; Exh. YY, at Nos. 117-18; Exh. ZZ, at Nos. 140-41; Exh. AAA, at Nos. 140-41.) Nor is there any evidence to show, or even raise a genuine dispute of material fact, that either Defendant Simonds or Defendant Raleigh instructed or directed Defendant Eggleston to conduct the search of I.M. in the manner that I.M. asserts she did. (Exh. MM, at 287-89, 294-95, 298-300; Exh. NN, at 194-200, 207-08; Exh. OO, at 192-96, 214-15, 218, 234-35.) Notably, the only basis on which Plaintiffs allege liability against Defendant Simonds is that he directed Defendant Eggleston, and, as to Defendant Raleigh, that she directed Defendant Eggleston and "touched and searched the students' bodies," allegations that are not borne out in the record. (Dkt. No. 163, at ¶¶ 126, 138-39.) Both the Second Circuit and the Supreme Court have made clear that there is no "special test for supervisory liability"; instead, " 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution.' " *Tangreti v. Bachman*, 983 F.3d 609, 616, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 [2009]). Because there is no evidence to show that either Defendant Simonds or Defendant Raleigh directly conducted the relevant parts of the search of I.M., or to even create a genuine dispute of material fact regarding whether Defendants Simonds and Raleigh directed Defendant Eggleston to perform such actions as part of a search, Plaintiffs cannot show that either Defendant Simonds or Defendant Raleigh are liable for the relevant portion of this search.

For all of the above reasons, the Court grants summary judgment to Defendants on Plaintiffs' First Claim as to J.B., A.S., and I.S., and as to I.M. against Defendants Simonds and Raleigh specifically, but denies summary judgment to either party on this claim as to I.M against Defendant Eggleston.

### B. Whether Summary Judgement Is Appropriate on Plaintiff's Second Claim

**\*21** After careful consideration, the Court answers the above question in the affirmative for the reasons stated in Defendants' memoranda of law. *See* Parts I.D.1 and 3 of this Decision and Order. To those reasons, the Court adds the following analysis.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 184 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

"The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated persons alike." *O'Shea v. City of Kingston*, 22-CV-0666, 2023 WL 4105492, at \*7 (N.D.N.Y. June 21, 2023) (D'Agostino, J.) (citing *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 439 [1985]). "The Equal Protection Clause 'bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Salaam v. Stock*, 19-CV-0689, 2023 WL 3853811, at \*3 (N.D.N.Y. Feb. 27, 2023) (Dancks, M.J.) (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 86 [2d Cir. 2005]).

"To establish a denial of equal protection based on selective treatment, Plaintiffs must allege that: '(1) ... compared with others similarly situated, [they were] selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 692 (S.D.N.Y. 2011) (quoting *Zahra v. Town of Southold,* 48 F.3d 674, 683 [2d Cir. 1995]). "A showing that the plaintiff was treated different compared to others similarly situated" is a "prerequisite" and a "threshold matter" to a selective treatment claim. *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d. Cir. 2004). In order to be considered "similarly situated" for such a claim, "the plaintiff's and comparator's circumstances must bear a reasonably close resemblance," though they need not be identical. *Hu v. City of New York*, 927 F.3d 81, 96 (2d Cir. 2019) (quoting *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 [2d Cir. 2014]). "A plaintiff can prevail by showing that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Hu, 927 F.3d at 96* (quoting *Graham v. Long Island R. R.*, 230 F.3d 34, 39 [2d Cir. 2000]). "The question of 'whether parties are similarly situated is [generally] a fact-intensive inquiry' that depends heavily on the particular context of the case at hand," and "there is no precise formula to determine whether an individual is similarly situated to comparators.'" *Hu, 927 F.3d at 96* (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 [2d Cir. 2006]; *McDonald v. Vill. Of Winnetka*, 371 F.3d 992, 1002 [7th Cir. 2004]). Because of the fact-intensive nature of this inquiry, the question of

whether individuals are similarly situated is generally one that should be submitted to a jury for resolution. *Graham*, 230 F. 3d at 39. "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Incorp. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 [2d Cir. 2000]).

**\*22** As can be seen from the standards outlined above, the existence of a similarly situated comparator is an essential element that must be proven to succeed on an equal protection claim. In this case, such a comparator, in order to be similarly situated in all material respects, would be a student at East Middle School who displayed similar conduct as that which purportedly raised Defendants' suspicion that the minor Plaintiffs might be intoxicated. After all, one of Plaintiffs' arguments in support of this claim is that the conduct that Defendants relied on to justify a search was conduct that would not have been found to be suspicious in the absence of racial and/or gender bias. Plaintiffs, through their motion papers and evidence, have asserted two apparent sources for finding such comparators: (1) the expert report of Dr. Jamilia Blake, which includes an assessment of data regarding students in the Binghamton City School District who have been searched on suspicion of substance use or possession, and (2) examples of three White students that Defendant Simonds previously searched at schools earlier in his career as an administrator.

As an initial matter, the Court finds that the only relevant data from Dr. Blake's expert reports as to this specific issue is that which is related to students who were searched in response to suspected substance use or possession; her other data, which relates to students who received out-of-school suspensions, is not applicable because it is undisputed that none of the minor Plaintiffs in this case received out-of-school suspensions for the relevant incident. However, there are two issues with even that relevant data from Dr. Blake's report. First, her data includes students from both East and West Middle School, despite the fact that the relevant incident happened at East Middle School and there is no evidence to suggest that the three individual Defendants who Plaintiffs allege acted against them in a discriminatory manner had any involvement in affairs at West Middle School. Dr. Blake admits that she did not have any data regarding which of the students in the data sample attended East Middle School and which attended West Middle School. There is therefore a question as to how

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 185 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

many of the students who were documented as having been searched actually attended East Middle School.

Second, and perhaps most relevant to the analysis of whether any such students were similarly situated to the minor Plaintiffs, Dr. Blake's report contains only sparse information regarding the circumstances that led to any of these students being searched. Indeed, she admits that "there were a number of incidents in which school officials reported that the student was in possession or intoxication by a substance but did not express in the discipline incident description how school officials came to learn or knew the student was in possession of alcohol, drugs, or inhalants or was intoxicated by a substance." (Blake 2d Exp. Rep., at 6-7.) She went on to state, however, that the evidence did reveal that 37.5% of the searches were done due to the smell of a substance by a school official or a report of such smell to a school official, 25% were due to a student report that another student possessed substances or was intoxicated, and 12.5% were due to routine bag checks; she admitted that 25% of the incidents did not have a documented reason attached to the disciplinary reports. (Blake 2d Exp. Rep., at 7.) In this case, the minor Plaintiffs were searched, according to Defendants, based on a host of factors, including (1) the fact that their whereabouts had been unknown to officials for a period of at least seven minutes after they did not go to their scheduled lunchtime activity, (2) the known issue in the School District generally, but also specifically in East Middle School, regarding student use of "purple drink" at the relevant time, and (3) the fact that, when they were found by Defendants Simonds and Raleigh, they were observed to be laughing and acting in a manner that Defendants thought inappropriate to the situation and indicative of possible substance use. Thus, the students from Dr. Blake's data set who were searched based on the smell of a substance, a tip by another student, or a routine bag check all were searched for reasons other than "suspicious" conduct and thus under materially different circumstances than the minor Plaintiffs. Of the remaining 25% of the students in Dr. Blake's data set who were searched, not only is it unclear from Dr. Blake's reports which specific students those were, but there is simply no information from which a reasonable factfinder can determine that the circumstance under which they were searched are materially similar to the circumstances under which the minor Plaintiffs were searched. Without this missing information, Plaintiffs cannot show that any of these students are similarly situated to them in a legally sufficient manner to support their equal protection claim. Finally, Dr. Blake's data and report do not show any instances in which, for example, a White male or a White female student

displayed similar behaviors as those observed of the minor Plaintiffs but was not searched.

**\*23** Plaintiffs' argument that the Court has already found that their statistics are sufficient to establish the existence of similarly situated comparators is unavailing. (Dkt. No. 295, Attach. 1, at 61-62 [stating, "[a]s this Court held in its Decision and Order from September 14, 2020, 'statistics highlighting the disparate treatment of search rates, or searches themselves, among students of different races throughout the District,' would be sufficient to satisfy the similarly situated prong in the plaintiffs' case."].) Although the Court did highlight the fact that Plaintiffs had, in their original Complaint, failed to present relevant statistics regarding searches from the applicable school years and found that such statistics would be necessary to support an equal protection claims if they intended to rely primarily on statistics as their proof, it did not conclude that the provision of those statistics would automatically meet Plaintiffs' burden to show the existence of similarly situated comparators. (Dkt. No. 117, at 38-39.) The statistics, or other evidence, must still show that the students included in the dataset were searched to a lesser degree under circumstances that were materially similar to those under which the minor Plaintiffs were searched, or that they engaged in similar conduct but were not searched. However, as was discussed, Dr. Blake's report indicates that 75% of the students were searched for reasons that are not at all similar to those presented here, and that there was no information regarding the circumstances of the other 25%, and no specification as to what the races or genders were of the students in that 25% group. To say that statistics showing a potential racial disparity are sufficient in and of themselves, without evidence of the circumstances involved, to meet the similarly situated prong in effect subsumes that requirement into the requirement to show evidence of discriminatory intent.

Apart from Dr. Blake's report, Plaintiffs also raise, for the first time in their reply memorandum of law, instances of Defendant Simonds' treatment of three White students resulting from suspicion of either substance use/possession or weapons possession, as evidence of Defendants' disparate treatment of similarly situated comparators. (Dkt. No. 295, Attach. 1, at 63-64.) These three instances are documented in Defendant Simonds' deposition testimony. (Exh. MM, at 50-59, 99-104.) One of these instances occurred while Defendant Simonds worked at [Redacted], and involved his conducting a bag search of a White male after one of the school counselors had received a tip from other students that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 186 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

the student might have a firearm. (*Id.* at 50-51.) A second instance occurred also while Defendant Simonds worked at [Redacted], and involved his conducting periodic searches of the bag of a White female student with a known heroin addiction based on the faculty's observations of her condition, chiefly observations that she was groggy, unkempt, and disheveled. (*Id.* at 51-55.) He testified that he did not conduct or order vitals checks of these students or ask them to remove their clothes, although he did note that the school nurse sometimes conducted a health check of the female student. (*Id.* at 54-58.) A third instance occurred while Defendant Simonds worked as the administrator at [Redacted], and involved his searching the bag of a White male student who smelled of alcohol, was stumbling, and had difficulty speaking coherently; Defendant Simonds testified that they did not search that student's pockets because he did not believe the student would be able to hide a bottle in his clothes. (*Id.* at 99-102.) Defendant Simonds did not ask that student to remove any clothes, but a nurse was called to perform a health check because they were concerned the student might have alcohol poisoning. (*Id.* at 102-03.)

As with Dr. Blake's data, there are a number of problems with these three students as potential comparators. As an initial matter, all of these White students were searched when Defendant Simonds was given reason to believe they might possess contraband. Because they were also searched, these students clearly do not serve as similarly situated comparators to the extent Plaintiffs allege that their race was a motivating factor in the decision to conduct any type of search.

In an effort to overcome that fact, Plaintiffs argue that the disparity in treatment is the fact that the searches Defendant Simonds did conduct of those students were less invasive or less intrusive than those conducted of the minor Plaintiffs in that he searched only the bags of those students and did not order any search of their pockets or shoes or for the removal of clothing. However, the circumstances in which those students were searched are not materially similar to those in which the minor Plaintiffs were searched: one student was searched based on a tip, one was searched based not only on observations but also due to a concern of ongoing heroin addiction/use, and one was searched based not only on behavioral observations of stumbling and difficulty speaking but also the presence of the smell of alcohol. Although it may be a reasonable conclusion that the searches of these three students were more justified by the known facts than the searches of the minor Plaintiffs were in this case, that fact alone does not make these three students similarly situated

comparators who received more favorable treatment. As far as the evidence establishes, none of these students exhibited the types of behaviors the minor Plaintiffs display in the hallway camera video that were the asserted basis for conducting the search of the minor Plaintiffs. Further, in each of the three identified instances, the students were searched for a known item or substance: the first student was searched specifically for a firearm based on a tip; the second student was searched specifically for heroin and/or paraphernalia based on a known history of use of that substance; and the third student was searched for alcohol based on the scent of that being present around him. In the case of the third student, Defendant Simonds testified that he specifically did not search that student's pockets because he did not believe a container of alcohol would have fit in that student's clothing. (Exh. MM, at 99-102.)

 **\*24**  By contrast, in this case, although Defendants have stated they suspected the minor Plaintiffs might have consumed "purple drink" given the recent instances of that substance within the School District and the school itself, they did not actually know for certain whether the effects they observed were related to "purple drink," a different substance, or something else. Uncertainty regarding the substance the administrators are looking for is certainly a variable in determining what type or extent of search might be warranted. Nor does Plaintiffs' argument that a bottle of "purple drink" would be too large to be found in most of the places searched carry much weight. As Defendants argue, the liquid ingredients could have been in a more compact container like a flask, and smaller ingredients of "purple drink" such as candy or codeine pills [15] could reasonably fit within pockets or small bags.

Finally, none of these three incidents occurred at East Middle School [16] and, according to Defendant Simonds' deposition testimony, they would have occurred in 2006 or 2007 as to the first two students and 2011 or 2012 as to the third student based on the years Defendant Simonds worked at the respective schools where those happened. Moreover, none of those instances involved Defendant Raleigh or Defendant Eggleston, the two individual defendants who allegedly conducted the searches in this case, and, as was discussed previously, there is no evidence showing that Defendant Simonds directed or ordered either of those Defendants to perform the more troubling aspects of the alleged searches.

All of these differences suffice to render the three alleged White students insufficiently similar in all material respects

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 187 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

to the minor Plaintiffs to be considered proper comparators, regardless of the existence of questions of fact as to the extent of the search that was conducted on each of the minor Plaintiffs. *See Patterson v. City Univ. of New York*, 12-CV-6300, 2014 WL 3511048, at \*5 (E.D.N.Y. July 14, 2014) (finding student to be insufficiently similar to plaintiff because that student took the relevant course in a different year than did the plaintiff, and she took a different reassessment test than did plaintiff).

For all of the above reasons, Plaintiffs have not provided admissible evidence of the existence of any similarly situated comparators and therefore cannot establish a *prima facie* violation of their rights under the Equal Protection Clause. [17] Because no reasonable factfinder could conclude that the evidence presented shows similarly situated comparators, the Court need not, and does not, consider whether Plaintiffs have raised a genuine dispute of material fact regarding discriminatory intent. The Court grants summary judgment to the Defendants on their Second Claim.

### C. Whether Summary Judgment Is Appropriate on Plaintiff's Third Claim

**\*25**  After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda. *See supra* Parts I.D.1 and 3 of this Decision and Order. To those reasons, the Court adds the following analysis.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. To state a claim for discrimination under Title VI, a plaintiff must allege as follows: (1) the defendant discriminated against him or her on the basis of race, color, or national origin; (2) the discrimination was intentional; and (3) the discrimination was a substantial and motivating factor for the defendant's actions. *Smith v. Davis*, 22-CV-1202, 2023 WL 5019432, at \*6 (N.D.N.Y. Mar. 28, 2023) (Lovric, M.J.) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 [2d Cir. 2001]), *report-recommendation adopted*, 2023 WL 4346961 (D'Agostino, J.). Importantly, "Title VI itself directly reaches only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001). "Under Title VI, 'an actionable discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences ... it implies

that the decisionmaker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.' " *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 416 (N.D.N.Y. 2019) (McAvoy, J.) (quoting *Clyburn v. Shields*, 33 F. App'x 552, 555 [2d Cir. 2002]).

In some cases, the actions of a third party can be considered to be an intentional violation by the recipient of federal funds where the recipient is deliberately indifferent to the actions of the third party that causes the violation. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664-65 (2d Cir. 2012) (collecting cases). The deliberate indifference standard is a "narrow one," imposing liability only if "a plaintiff establishes: (1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference." *Zeno*, 702 F.3d at 665 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 643-50 [1999]). As most relevant to the case at hand, "[c]onstructive knowledge is not enough; only actual knowledge is a predicate to liability." *Zeno*, 702 F.3d at 666. Further, a recipient's actions are deliberately indifferent only if "they were clearly unreasonable in light of the known circumstances." *Id.*

A plaintiff can establish a prima facie case of discrimination either through direct evidence of discrimination or, where direct evidence is unavailable, through indirect evidence by demonstrating the following: "(1) she is a member of a protected class; (2) she suffered an adverse action in pursuit of her education by defendant; (3) she was treated differently from similarly situated students who were not members of the protected class; and (4) she was qualified to continue in her educational pursuit." *J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 557 (E.D.N.Y. 2012); *accord Fizulich v. Killings*, 22-CV-1190, 2023 WL 4643011, at \*3 n.3 (N.D.N.Y. July 20, 2023) (Hurd. J.); *Melgarejo v. New York Coll. of Podiatric Medicine*, 12-CV-6669, 2014 WL 1683809, at \*5 (S.D.N.Y. Apr. 28, 2014) *aff'd* 601 F. App'x 61, 62 (2d Cir. 2015).

**\*26**  If a plaintiff shows a prima facie case of discrimination as stated above, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for its conduct. *Williams v. Pace Univ.*, 192 F. Supp. 3d 415, 421 (S.D.N.Y. 2016) (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 [2d Cir. 2004]). "In order to prevent summary judgment in favor of plaintiff at this stage, that explanation must, if taken as true, permit the conclusion that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 188 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

there was a nondiscriminatory reason for the adverse action." *Williams*, 192 F. Supp. 3d at 421 (citing *Back*, 365 F.3d at 123). If the defendant can proffer such a reason, the burden then shifts back to the plaintiff "to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " *Id.* "To defeat summary judgment, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the ... decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors.' " *Id.*

The Second Circuit has suggested, admittedly in a non-precedential decision, that, "[t]o the extent that [a plaintiff] seeks to assert a traditional equal-protection claim, 'the substantive elements of [Title VI] claims are nearly identical to ... parallel claims under the Equal Protection Clause.' " *Rodrigues v. City of New York*, 835 F. App'x 615, 618 (2d Cir. 2020). This appears to be the view of the Supreme Court as well. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) (stating that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI") (quoting *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 [2003]).

Based on the above standards, Plaintiffs are unable to show a prima facie case of race discrimination under Title VI for the same reasons that their equal protection claim fails. Specifically, although there is no dispute that the minor Plaintiffs are all part of a protected class (i.e., Black and Latina persons), they cannot show, based on the evidence presented, that they were treated differently from similarly situated students who were not members of the protected class.

The Court also notes that Plaintiffs do not appear to meet the second element of a prima facie case, which is that they suffered an adverse action in pursuit of their education. Although the case law in this Circuit regarding what constitutes an adverse action in the context of a Title VI discrimination claim (as opposed to a retaliation claim) appears sparse, the standard itself indicates that the adverse action must be "in pursuit of [their] education." *See Peters v. Molloy Coll. of Rockville Ctr.*, 07-CV-2553, 2013 WL 5652503, at *10 (E.D.N.Y. Oct. 16, 2013) (finding the plaintiff had shown an adverse action where she received a failing grade as a consequence of the alleged discrimination

and was being denied the ability to graduate and receive her degree); *Jacques v. Adelphi Univ.*, 10-CV-3076, 2011 WL 6709443, at *5 (E.D.N.Y. Dec. 19, 2011) (finding that student's termination from her program was an adverse action); *Patterson*, 2014 WL 3511048, at *4 (finding that receiving a failing grade was an adverse action). In this case, it is undisputed that none of the minor Plaintiffs were given a disciplinary referral related to the events of January 15, 2019. None of them were given an out-of-school suspension; and I.M., A.S., and I.S. all corroborate Defendants' assertions that none of them were sent to either in-school suspension or any type of detention. (Exh. GG, at 291-92; Exh. II, at 173; Exh. XX, at Nos. 80-83; Exh. YY, at Nos. 80-83; Exh. ZZ, at Nos. 79-82; Exh. AAA, at Nos. 80-83.)

Granted, there is evidence, even from Defendant Simonds and Defendant Raleigh, that J.B. was sent to the Intensive Study Center ("I.S.C.") (which is not clearly established as being equivalent to disciplinary in-school suspension) for the remainder of the day on January 15, 2019; however, there is no evidence presented (even from J.B.) to dispute the testimony of Defendant Simonds and others that J.B. requested to be sent there rather than going back to class. (Exh. EE, at 261-64; Exh. GG, at 292; Exh. II, at 169; Exh. NN, at 239-40.) Evidence also reveals that I.S.C. was a room where students could be placed where they could continue to do their schoolwork during times when, for whatever reason, they were not able to function in their regular classroom. (Exh. NN, at 241.) Given this evidence, there is nothing to indicate that J.B.'s placement in I.S.C. for at most one-and-a-half periods at the end of the day would constitute an adverse action in her pursuit of education. Further, to the extent there may be a question of fact regarding whether J.B. was given lunch detention, putting aside the undisputed fact that she never attended any such detention in the following days, there is also no evidence to suggest that detention solely during the lunch period would have had an adverse impact on her pursuit of her education. (Exh. EE, at 277-78.)

 **\*27** Lastly, to the extent that Plaintiffs have attempted to argue that they received discipline for this incident in the form of being constructively suspended, such argument is not supported by the admissible record evidence. Rather, it is undisputed that it was the choice of the minor Plaintiffs and their parents to cease attending East Middle School and eventually transfer to West Middle School, and there is no evidence to suggest that the minor Plaintiffs were harassed or otherwise made to feel unwelcome by Defendants following the incident. What is also acutely important is that there does

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 189 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

not appear to be any evidence that the School Defendants had any involvement in the minor Plaintiffs' decision to leave East Middle School, despite the fact that it is against those Defendants that this claim is asserted.

In that vein, Plaintiffs have not shown that they can meet the threshold burden of showing that the School Defendants, as the relevant defendants against whom this claim is asserted, should be held liable for the actions of its employees. Plaintiffs' claim is based on the actions of Defendants Simonds, Raleigh, and Eggleston in conducting a search of the minor Plaintiffs, not on any direct actions taken by the School Defendants. As was discussed above, in order to be held liable for the conduct of third parties, a plaintiff must make multiple showings, including both that the relevant defendant had actual knowledge of the third party's conduct and that the relevant defendant acted with deliberate indifference in the face of that knowledge. *Zeno, 702 F.3d at 665*. Here, granted, evidence appears to establish that the School Defendants did possess actual knowledge of the alleged violations after the fact, given that it does not appear to be disputed that one of the minor Plaintiffs' mothers raised a formal complaint and there is evidence that Defendant Simonds contacted district offices related to the incident the following day, at which point Assistant Superintendent Mike Holly and Director of Personnel David Thon became involved. (Exh. SS, at 115-16, 123.)

However, it is also undisputed that Defendant Binghamton Board of Education conducted an investigation into that complaint, pursuant to the direction of Dr. Thompson on January 16, 2019, which included a meeting with Plaintiff Zulayka McKinstry and others on January 16, 2019, interviews between January 16 and 22, 2019, with the minor Plaintiffs, Defendant Eggleston, Defendant Raleigh, Defendant Simonds, Resource Officer Williams, Ms. Green-Gonzalez, a teacher's aide, and a youth development worker who was in the health office for part of the time the minor Plaintiffs were there, and follow-up conversations with the minor Plaintiffs' parents or guardians. (Kleinman Decl. Exh. A.) Mr. Thon completed a written summary of this investigation. (Kleinman Decl. Exh. A.) It is undisputed that Defendant Eggleston was placed on administrative leave during the investigation. (Exh. OO, at 156-57.) It is also undisputed that the District coordinated to have a "restorative practice coordinator" come to meet with the minor Plaintiffs, their parents, and the school administration, but the District was eventually notified by the Plaintiffs' legal counsel that Plaintiffs were no longer interested in participating and that

did not take place. (Exh. SS, at 162, 169.) Further, there is undisputed evidence that the School Defendants began to work to facilitate a transfer of the minor Plaintiffs to West Middle School the day after Plaintiffs' counsel informed them that they desired such transfers, although Plaintiffs admittedly spent a short period of time in the alternative school while the transfers were being facilitated. (Dkt. No. 273, Attach. 9, at ¶¶ 3-8.)

The undisputed evidence therefore shows that the School Defendants began an investigation into the incident the day after it occurred, that they removed Defendant Eggleston from her position while the investigation was being conducted, that they attempted to engage in restorative practices with the Plaintiffs (an effort which the Plaintiffs ultimately declined), and that they then quickly implemented a plan to allow the minor Plaintiffs to transfer to West Middle School after Plaintiffs informed Defendants that they wanted to transfer. No reasonable factfinder could conclude that this level of response, implemented in short order after the concerns became known to them, constituted deliberate indifference to the alleged constitutional violations based on the actions of Defendants Simonds, Raleigh, and Eggleston. As a result, Plaintiffs have not shown that the School Defendants should be held liable under Title VI for any actions taken by the individual Defendants.

**\*28** For the above reasons, the Court grants summary judgment to Defendants on Plaintiffs' Third Claim.

### D. Whether Summary Judgment Is Appropriate on Plaintiffs' *Monell* Claims

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. *See supra* Parts I.D.1 and 3 of this Decision and Order. To those reasons the Court adds the following analysis.

"The elements of a *Monell* claim are (1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) a deprivation of a constitutional right." *Agosto v. New York City Dept. of Edu.*, 982 F.3d 86, 97-98 (2d Cir. 2020) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 [2d Cir. 1983]). A municipality cannot be held liable under a theory of *respondeat superior*, but rather a plaintiff must demonstrate that " 'through its *deliberate* conduct, the municipality was the moving force behind the injury.' " *Agosto*, 982 F.3d at 98 (quoting *Bd. Of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 [1997]; *Roe v. City of Waterbury*, 542 F.3d

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 190 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

31, 40 [2d Cir. 2008]) (emphasis in original). A municipality may be held liable for the actions of a single official, "but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality." *Agosto*, 982 F.3d at 98 (quoting *Monell*, 436 U.S. at 694). The fact that an official had discretion to make a decision that is unreviewable is insufficient; the official must be sufficiently high in municipal hierarchy that he is responsible for making final policies in that area of the municipality's business under state law. *Agosto*, 982 F.3d at 98.

As was discussed above, Plaintiffs have asserted, as part of their First and Second Claims, that the School Defendants should be held liable for the actions of the individual Defendants. (Dkt. No. 163, at ¶¶ 140-48, 163-78.) They allege two apparent bases for the imposition of *Monell* liability: (1) the purported status of Defendant Simonds as a final policymaker based on his position as principal; and (2) the School Defendants' failure to properly train or supervise the individual Defendants based on deliberate indifference to students' constitutional rights. (*Id.*)

Defendants correctly point out that, although Defendants have clearly sought summary judgment as to both of these bases, Plaintiffs do not appear to mount any challenge regarding their failure-to-train theory. (Dkt. No. 295, Attach. 1, at 67-70.) Because Plaintiffs have not opposed Defendants' motion as to that theory, Defendants' burden is lightened such that they need only show that their argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See Benson v. West Coast Servicing, Inc.*, 22-CV-0904, 2023 WL 5836212, at *5 (N.D.N.Y. Sept. 8, 2023) (Suddaby, J.) (citing N.D.N.Y. L.R. 7.1[a][3]; *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1 n.1 [N.D.N.Y. Oct. 30, 2009] [Suddaby, J.]; *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & nn.2, 3 [N.D.N.Y. Aug. 7, 2009] [Suddaby, J.]).

**\*29**  They have met that burden here. It is undisputed that the School Defendants maintained written policies related to searches and interrogations of students, and that they provided various trainings to both administrators and teachers at various points during the relevant 2018-2019 school year. (Dkt. No. 273, Attach. 10, at ¶ 94; Exh. MM, at 329-330; Exh. NN, at 64-65.) Further, Plaintiffs have not made apparent any evidence that would suggest, let alone show, that the School Defendants were otherwise deliberately indifferent a risk of constitutional violations based on searches of students.

As to Plaintiffs' other theory, the Court does not agree, as an initial matter, that it has already found that Defendant Simonds in a final policy maker as a matter of law. (Dkt. No. 295, Attach. 1, at 70.) Rather, the Court's finding in its prior Decision and Order on Defendants' motion to dismiss was explicitly limited to a finding that Plaintiffs had plausibly alleged that Defendant Simonds was a final policymaker. (Dkt. No. 117, at 31-32.) As a result, the legal question of whether that plausible allegation is supported by admissible record evidence is still open and is a proper consideration on Defendants' motion for summary judgment. Further, as Defendants argue, those findings were rendered before the Second Circuit issued its decision in *Agosto*, and therefore the Court must nonetheless consider whether that newer precedent impacts the relevant law regarding this issue. [18]

As to the merit of Plaintiffs' theory, Plaintiffs' main argument is based on an erroneous premise. Plaintiffs somewhat bafflingly cite N.Y. Educ. L. § 2590-i as the basis in New York law that provides Defendant Simonds and Defendant Raleigh with final policymaking authority regarding student searches. Yet that provision is part of a set of laws under Article 52-a, which, according to N.Y. Educ. L. § 2590, applies to "the city school district of the city of New York." N.Y. Educ. L. § 2590. Because Defendants Simonds and Raleigh are administrators at a school in Binghamton, and therefore not a school within the city school district of the city of New York, this statute does not apply to this case. Article 51 of the New York Education Law applies to "the school district of each city which according to the latest federal census has less than one hundred twenty-five thousand inhabitants." N.Y. Educ. L. § 2501. The Court takes judicial notice of the information on the official government website of the U.S. Census Bureau that indicates the City of Binghamton had an estimated population of 47,376 as of April 1, 2020, and 47,115 as of July 1, 2022. [19] Such information indicates that Article 51 applies to the Binghamton City School District. Notable relevant provisions within this article include the following: (1) Section 2503, which indicates that a board of education "shall perform any duty imposed upon or exercise any power granted to boards of education of city school districts ... under this chapter or other subchapter, or the rules of the regents and regulations of the commissioner of education so far as they may be applicable," and "shall prescribe such regulations and by-laws as may be necessary to make effectual the provisions of this chapter and for the conduct of the proceeding of said board and transaction of its business affairs, for the general management, operation, control, maintenance and discipline of the schools, and all other educational, social or recreational

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 191 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

activities and other interest under its charge or direction"; and (2) Section 2508, which indicates that superintendent of a city school district shall have the powers to, subject to the bylaws of the board of education, (i) enforce all provisions of law and all rules and regulations relating to the management of the schools and other educational, social and recreational activities, (ii) supervise and direct a host of employees, including principals and teachers, and (iii) supervise and direct over the enforcement and observance of a number of activities, including medical inspection.

 *30  Further, Article 55, which broadly applies to the regulation by boards of education on school district property, vests within the board of education or the trustees, the duty to adopt and amend "a code of conduct for the maintenance of order on school property, including a social function, which shall govern the conduct of students, teachers and other school personnel as well as visitors and shall provide for the enforcement thereof." N.Y. Educ. L. § 2801. Minimum requirements for the code of conduct include, as relevant, provisions regarding conduct, dress, and language deemed appropriate and acceptable on school property, standards and procedures to assure security and safety of students and school personnel, and disciplinary measures to be taken in incidents involving the possession or use of illegal substances. *Id.*

Taken together, these relevant provisions place ultimate policymaking authority for a large swath of concerns on a city school district's board of education. In the case currently at issue, there is a written policy that is implicated by Plaintiffs' claims: Policy 7330, which addresses searches and interrogations of students. There seems to be no genuine dispute that it was Defendant Binghamton Board of Education, and not Defendant Simonds or Defendant Raleigh, that instituted this written policy. That policy states, in relevant part, the following:

> Students are protected by the Constitution from unreasonable searches and seizures. A student may be searched and contraband/prohibited items seized on school grounds or in a school building by an authorized School District official only when the School Official has reasonable suspicion to believe the student has engaged in or is engaging in proscribed activity which is in violation of the law and/or the rules of the school (i.e., the District Code of Conduct). The reasonableness of any search involves a twofold inquiry. School officials must first determine whether the action was justified at its inception, and second, determine whether the search, as

actually conducted, was reasonably related in scope to the circumstances with justified the interference in the first place.

Factors to be considered in determining whether reasonable suspicion exists to search a student include:

(a) The age of the student;

(b) The student's school record and past history;

(c) The predominance and seriousness of the problem in the school where the search is directed;

(d) The probative value and reliability of the information used as a justification for the search;

(e) The school official's prior knowledge of and experience with the student; and

(f) The urgency to conduct the search without delay.

If reasonable suspicion exists to believe that a student has violated or is violating the law and/or school rules, it is permissible to an authorized school administrator(s) to search that student's outer clothing, pockets, or property. The search may include, but is not limited to, the student's outer clothing such as a jacket or coat, pockets, backpack, and/or purse. Whenever possible, searches will be conducted by a staff member of the same sex as the student and, whenever possible, another staff member will be present as a witness.

Policy 7330. The Policy further discusses matters such as the definition of a strip search and when such a search is justified, the process for conducting searches of school property, the process of questioning students, and when school resource officers or law enforcement should be made involved. *Id.*

As a whole, this Policy provides fairly detailed, comprehensive guidance as to what procedures school officials are required to follow when conducting a search or interrogation of a student. As principal and assistant principal, Defendants Simonds and Raleigh were subject to this policy; there is no evidence to suggest that they could unilaterally institute different policies for East Middle School. Importantly, Plaintiffs do not assert that Policy 7330 itself constitutes a policy that violated of their Fourth Amendment rights. Instead, they assert that the actions the individual Defendants took, which they specifically argue deviated from Policy 7330 in some respects (particularly regarding strip

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 192 of 427

searches and/or searching the minor Plaintiffs' shoes), were the basis for the constitutional violations.

**\*31** Plaintiffs' arguments erroneously conflate a final decisionmaker with a final policymaker. That Defendant Simonds and Defendant Raleigh might possess some amount of discretion under the Policy 7330 when applying the relevant provided standards, or that they might fail to follow the policy to the letter, does not transform their actions into official municipal policies. *See Agosto*, 982 F.3d at 99-100 (noting that "the Supreme Court has held that 'when an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's [alleged] departures from them, are the act of the municipality' that must be challenged") (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 [1988]). In other words, as recognized in *Agosto*, the fact that an official might be a final decisionmaker as to how an enacted policy is implemented in a given situation does not make them also a final policymaker. *See Agosto*, 982 F.3d at 100 (recognizing that there must be some deliberate conduct by the municipality related to the injury alleged, and that equating a final decisionmaker with a final policymaker "would effectively impose *respondeat superior* liability" on a municipality in violation of *Monell*).[20] Here, although Defendant Simonds and Defendant Raleigh, as administrators, might be considered final decisionmakers on the question of whether a search of student will be conducted at East Middle School, it is clear that neither of them had final policymaking authority over the rules that were to guide such decisions or searches.

In sum, applicable New York state law and the evidence presented in this case demonstrate that it was Defendant Binghamton Board of Education who had final policymaking authority as to procedures applicable to searches of students within the District (and at East Middle School specifically), not Defendant Simonds or Defendant Raleigh. Because it is the actions of Defendant Simonds and Defendant Raleigh (along with Defendant Eggleston) in carrying out the Board of Education's written policy that is the basis of Plaintiffs' constitutional claims, rather than the written policy itself, Plaintiffs have not shown, and cannot show, that the School Defendants can be held liable for those individuals' actions under their chosen theory. The Court therefore grants summary judgment to Defendants on the *Monell* claims asserted against Defendant Binghamton City School District and Defendant Binghamton Board of Education, and

dismisses Plaintiffs' First and Second Claims as to those two defendants.

### E. Whether Defendant Eggleston is Entitled to Qualified Immunity

After careful consideration, the Court answers this question in the negative for the following reasons.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 [2009]). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Mullenix*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658 [2012]). " 'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 [2011]).

Courts within the Second Circuit find a right to be clearly established "if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). The right in question should not be defined at a "high level of generality," but rather "[t]he dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.' " *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. 742). In the specific context of school searches, "[a] school official searching a student is 'entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment.' " *Safford*, 557 U.S. at 377 (quoting *Pearson*, 555 U.S. at 243). "To be established clearly, however, there is no need that 'the very action in question [have] previously been held unlawful.' " *Safford*, 557 U.S. at 377 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 [1999]).

**\*32** Putting aside the issue of whether the specific right in this case was clearly established by the law as of January 15, 2019, Plaintiffs have argued that Defendant Eggleston is not entitled to the protection of qualified immunity because she was acting outside the scope of her authority by conducting an investigatory search. (Dkt. No. 295, Attach. 1, at 71-72.) Specifically, Plaintiffs argue that Policy 7330, discussed

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 193 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

above, permits only "an authorized school administrator" to perform searches of students. (*Id.*) It is undisputed that Defendant Eggleston, as the school nurse, was not an authorized administrator. (Exh. MM, at 216, 330-31; Exh. NN, at 56-57, 64-65; Exh. OO, at 50, 114-17, 125, 313.) Defendants' only argument in opposition to this assertion is that Defendant Eggleston did not perform a search, but rather only a health assessment, an argument that has already been rejected. *See, supra* Part III.A.1 of this Decision and Order. Further, there is a genuine dispute of material fact regarding the details of the search Defendant Eggleston performed on I.M., and I.M.'s version goes far beyond the mere checking of vital signs and performing neurological testing that could be even plausibly considered to be a health assessment. There also does not appear to be any evidence indicating that Defendant Eggleston was directed or given permission by someone with authority (i.e., Defendant Simonds or Defendant Raleigh) to conduct a search involving a patdown, the emptying of pockets or shoes, or removal of clothing. (Exh. MM, at 287-89, 294-95, 298-300; Exh. NN, at 194-200, 207-08; Exh. NN, at 192-96, 214-15, 218, 234-35.) To the extent that Defendant Eggleston may have performed an investigatory search of I.M., such actions would be outside the scope of her authority under Policy 7330.

"It is not enough that defendants-appellants were 'government officials' to establish qualified immunity. They must further demonstrate that the *specific acts at issue* were performed within the scope of their official duties." *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996). An employee performing an action that violates the employer's rules and regulations can be taken as a suggestion that the employee exceeded the scope of their authority. *See Carnelli v. Karani*, 731 F. App'x 73, 75 (2d Cir. 2018) (finding that defendant's preparing of a memorandum on a form used for internal department communication and sending it to an external source plausibly suggested he exceeded the scope of his authority where such actions violated departmental rules and regulations).

Having considered the parties' memoranda, there appears to be no genuine dispute that Defendant Eggleston was not authorized to perform searches of students. Therefore, to the extent that she did so in this case, she exceeded the scope of her authority. Further, it would not have been reasonable for Defendant Eggleston to believe that she was acting within the scope of her authority to the extent a factfinder could credit I.M.'s version of the search. As discussed above, Defendant Eggleston admitted at her deposition that she was

not authorized to perform searches under the relevant policy. (Exh. MM, at 216, 330-31; Exh. NN, at 56-57, 64-65; Exh. OO, at 50, 114-17, 125, 313.) The conduct described by I.M. could not reasonably be considered anything other than a search. While acting without authority would be insufficient to automatically render her actions unconstitutional, it is sufficient to preclude her from seeking the protection of qualified immunity for any actions that constitute a search under Policy 7330.

For all of the above reasons, the Court finds that Defendant Eggleston's affirmative defense of qualified immunity does not provide a basis for a grant of summary judgment on the remaining claim against her.

### F. Whether Any Portions of the Expert Reports Should Be Excluded

Federal Rule of Evidence 702 permits an expert to testify as to opinions if the proponent of that testimony can show that (1) the expert "is qualified as an expert by knowledge, skill, experience, training, or education," (2) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (3) "the testimony is based on sufficient facts or data," (4) "the testimony is the product of reliable principles and methods," and (5) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "Under Rule 702, an expert with 'specialized knowledge [that] will help the trier of fact' may testify so long as that testimony is 'based on sufficient facts or data' and 'is the product of reliable principles and methods' that witness has 'reliably applied ... to the facts of the case.' " *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting Fed. R. Evid. 702).

**\*33** "Expert testimony should be excluded where it is 'speculative or conjectural,' but arguments that the expert's assumptions 'are unfounded go to the weight, not the admissibility, of expert testimony.' " *Car Freshner Corp. v. Am. Covers, LLC*, 17-CV-0171, 2021 WL 4502281, at *8 (N.D.N.Y. Sept. 30, 2021) (McAvoy, J.) (quoting *Robinson v. Suffolk Cnty. Police Dep't*, 544 F. App'x 29, 32 [2d Cir. 2013]). Notwithstanding this fact, testimony may nonetheless be excluded if it is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks and citations omitted). "Additionally, the district court may consider the gap between

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 194 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017).

### 1. Dr. Jamilia Blake

Defendants have moved to preclude testimony from Dr. Blake related to racial disparities in the discipline of students within the middle schools of the Binghamton City School District. As was discussed above in Part III.B of this Decision and Order, even considering the information in Dr. Blake's expert reports for purposes of the parties' cross-motions for summary judgment, Plaintiffs have not shown any that any proffered comparators are sufficiently similar to sustain their Second or Third Claims stemming from allegations of racial bias. Furthermore, because the claims to which Dr. Blake's testimony would apply are being dismissed, the Court need not consider whether her testimony should be excluded at trial.

### 2. Dr. Sarah Vinson

Defendants have argued that the testimony of Dr. Vinson should be excluded specifically on the basis that her opinions are not the product of reliable principles and methods; they do not appear to assert that Dr. Vinson is unqualified or that her testimony would not assist a trier of fact. (Dkt. No. 272, at 32-33.) Specifically, they argue that her testimony is not the product of reliable principles or methods because she failed to review any of the minor Plaintiffs' medical records before she conducted her evaluations. (*Id.*) This argument is without merit.

Although it appears to be correct that Dr. Vinson did not review medical records specifically before evaluating the minor Plaintiffs, it is undisputed that (a) she did conduct an evaluation of the minor Plaintiffs that included an in-person assessment, which is evidenced by her mental status examination findings, and (b) she did review medical records at some time after the examinations before she wrote her expert reports. (DeStefano Decl., Exhs. 8, 10.) Defendants offer no legal authority for the point of law that reviewing medical records after conducting a physical assessment, as opposed to before, renders an expert opinion the product of unreliable principles or methods. As Plaintiffs highlight,

the case on which Defendants primarily rely explicitly states that "a physician who evaluates a patient in preparation for litigation should ... either examine the patient or review the patient's medical records." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994). Indeed, that court further clarified that "we think that generally a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 762. Because there is no dispute that Dr. Vinson's testimony and opinions are based on both an examination of the minor Plaintiffs *and* a review of at least some medical records and other information, Defendants have not shown that her testimony is based on insufficient data or unreliable principles or methodology. Defendants' motion to preclude Dr. Vinson's testimony and opinions is therefore denied. This ruling, however, is only as to the general admissibility of Dr. Vinson's testimony on the *Daubert* grounds asserted in the current motion; it does not preclude Defendants from raising further objections to Dr. Vinson's testimony during trial. The Court will not speculate at this point whether her eventual testimony is appropriate and admissible beyond the narrow finding here.

### 3. Dr. Robert Demerath

**\*34** Because the only claim remaining relates to I.M., the Court will confine its analysis of Dr. Demerath's various opinions to the report of his assessment of I.M.

As an initial matter, to the extent the parties disagree regarding whether Dr. Demerath is qualified to testify as to whether the events on January 15, 2019, constitute racial discrimination or to rebut the opinions of Dr. Blake, the Court finds that such issues are moot based on the above dismissal of Plaintiffs' race-based discrimination and equal protection claims. There will therefore be no need for Dr. Demerath to offer any testimony at trial on those issues. He should confine his testimony to his opinion regarding the cause of the mental or psychological harm suffered by I.M. rather than any assessment of whether the events of January 15, 2019, were racially motivated; in particular, because his expert report makes clear that it is his opinion that factors other than those events caused I.M.'s mental health symptoms, whether or not such events were racially motivated has no reasonable or logical bearing on his opinion. Further, to the extent he offers any opinions regarding whether I.M. was unreasonable or dishonest in perceiving the events of January 15, 2019,

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 195 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed...

to be racially motivated, such opinions are either beyond the scope of his disclosed role as an expert regarding mental harm or, as will be discussed further below, constitute assessments of her credibility that are not within the scope of permissible expert witness testimony. *See Belvin v. Electchester Mgmt., LLC*, 635 F. Supp. 3d 190, 199 (E.D.N.Y. 2022) (excluding testimony of expert psychologist questioning "the accuracy" of plaintiff's racial discrimination and emotional distress claims, because "it is the jury's province to determine whether [plaintiff's] version of events is credible, not that of an expert witness.").

Next, the Court agrees with Plaintiffs that any portions of Dr. Demerath's testimony that constitute an assessment of I.M.'s credibility must be excluded. "Even expert witnesses possessed of medical knowledge and skills that relate directly to credibility may not state an opinion as to whether another witness is credible, although such witnesses may be permitted to testify to relevant physical or mental conditions." *U.S. v. Scop*, 846 F.2d 132, 142 (2d Cir. 1988); accord *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("[T]his court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible."). Specifically, although it is within the purview of Dr. Demerath's assessments and experience to render opinions regarding whether [Redacted], it is not proper for him to opine that [Redacted] mean her account should not be believed by the factfinder; such conclusions are for the factfinder to reach if the factfinder finds those conclusions to be appropriate and supported by the evidence. Further, Dr. Demerath's statement that [Redacted] is not only an inappropriate credibility assessment, it is a generic conditional statement that has no apparent basis in any of the evidence or data presented by Dr. Demerath in the rest of his report; he does not appear to present any studies or data to support his assertion that [Redacted], nor does he attempt to explain how his experience alone might substantiate that claim. His opinion that I.M. may have been motivated to [Redacted] further represents a credibility assessment that is more properly reserved for the factfinder; he may testify regarding those facts as gleaned from his assessments, but he may not draw such conclusions for the jury. Moreover, his opinion that [Redacted] is purely speculative. A jury is capable of considering the evidence that various social advocacy groups or individuals expressed interest in the minor Plaintiffs following the events of January 15, 2019, and determine for itself whether such evidence impacts the credibility of I.M.'s version of events; Dr. Demerath's

testimony on the matter does not involve any issues beyond the ordinary knowledge of a lay juror and does not assist the factfinder in any material way.

**\*35** A related statement that I.M.'s description of Defendant Eggleston's behaviors [Redacted] presents a somewhat different question, because it has a greater connection to Dr. Demerath's expertise and the evidence and data he considered and implicates expert knowledge regarding mental health that is perhaps not within the ordinary knowledge of a juror. However, such testimony should be narrowly tailored to avoid straying into the area of making a credibility assessment or conclusion regarding I.M.'s truthfulness, i.e., he may testify that [Redacted] but he may not testify that I.M.'s version of events is unreliable or that she misrepresented the facts of what occurred. *See Belvin,* 635 F. Supp. 3d at 199; *Doe v. Hartford Sch. Dist.*, 16-CV-0206, 2018 WL 1064572, at \*5 (D. Vt. Feb. 26, 2018) ("Although an expert may testify to relevant physical or mental conditions that affect credibility and to proper or improper interviewing tactics, an expert witness is not permitted to opine on a witness's credibility based on his or her assessment of inconsistencies."); *see also Washington v. Schriver*, 255 F.3d 45, 59 (2d Cir. 2001) (noting that, under New York law, "a witness can testify about factors affecting the reliability of another witness, *as long as he or she avoids commenting directly on the credibility of a witness*") (emphasis added). The Court will permit Dr. Demerath to provide narrow testimony regarding this issue and the basis for his testimony regarding it, subject to Plaintiffs' ability to raise renewed specific objections in a motion in limine or at trial should they believe his actual testimony strays beyond the bounds of this order.

As to Dr. Demerath's other main conclusion [Redacted], the Court finds that there is no basis to exclude such opinions because his expert report discloses the purported basis for that conclusion. Notably, Dr. Demerath includes in his report a lengthy discussion of [Redacted] Whether Plaintiffs may be able to convince a factfinder that Dr. Demerath's conclusions are unfounded does not merit their exclusion; such concerns go to the weight of his testimony, rather than its admissibility. His conclusions are not without some apparent basis in the methodology he applied, and therefore he should be permitted to present them to a jury.

This is also true to the extent that Plaintiffs argue that Dr. Demerath's differential diagnosis is invalid because he did not properly examine or consider the events of January 15, 2019, when rendering his opinion. "A differential diagnosis

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 196 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) (internal quotation marks omitted). In his report, Dr. Demerath discussed his review of the evidence from various sources regarding those events and noted [Redacted] This is materially distinguishable from the situation in *Ruggiero*, where the Second Circuit found the differential diagnosis testimony to be insufficient due to the expert's failure to establish that the asserted mechanism of harm (a specific pharmaceutical) had been ruled out as a cause. Because Dr. Demerath does indeed appear to rule out Defendants' actions on January 15, 2019, as a cause of I.M.'s relevant mental health symptoms, the same difficulties do not exist in this case. Further, as was already discussed above, the evidence explicitly considered by Dr. Demerath in his report provides sufficient indication of the data and evidence he relied upon when coming to this conclusion; and this is not a situation where the analytical gap between that evidence and his opinion is so great as to be clearly inappropriate. In light of his report, the proper method of testing the extent to which Dr. Demerath considered and ruled out the events of January 15, 2019, as a contributing factor in I.M.'s mental health concerns is through cross-examination, not exclusion.

For all of the above reasons, the Court grants Plaintiffs' motion to exclude Dr. Demerath's testimony as to his opinions that improperly implicate I.M.'s credibility, his opinions regarding whether the events of January 15, 2019, were based in racial bias, and his rebuttal of Dr. Blake's testimony. The Court however denies that motion as to the other portions of Dr. Demerath's opinion as discussed above.

**\*36  ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 273) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiffs' First Claim against Defendants Simonds and Raleigh pursuant to the Fourth Amendment as to J.B., A.S., I.S., and I.M is **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' First Claim against Defendant Eggleston pursuant to the Fourth Amendment as to J.B., A.S., and I.S. is **DISMISSED**, but that claim as to I.M. **SURVIVES**; and it is further

**ORDERED** that Plaintiffs' Second Claim against Defendants Simonds, Raleigh, and Eggleston pursuant to the Equal Protection Clause and 42 U.S.C. § 1983 is **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' First and Second Claims against Defendant City of Binghamton School District and Defendant Binghamton Board of Education pursuant to *Monell* are **DISMISSED**; and it is further

**ORDERED** that Plaintiffs' Third Claim against Defendant City of Binghamton School District and Defendant Binghamton Board of Education pursuant to Title VI is **DISMISSED**; and it is further

**ORDERED** that Defendants' motion to exclude the testimony of Plaintiff's expert witnesses (Dkt. No. 272) is **DENIED** as to Dr. Vinson, and **DENIED** as moot as to Dr. Blake; and it is further

**ORDERED** that Plaintiffs' motion to exclude the testimony of Defendants' expert witness Dr. Demerath (Dkt. No. 270) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that a pretrial conference shall be scheduled in this action, at which counsel shall appear with settlement authority.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3804110

---

**Footnotes**

1    Granted, the "So Ordered" paragraph of the Decision and Order does not expressly state that the dismissal of the strip-search claims of A.S. and J.B. was with prejudice. (Dkt. No. 117, at 47.) However, the Court's analysis of this claim included the assessment that "given the breadth and detail of Plaintiffs' Complaint (which

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 197 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

was crafted with the assistance of counsel, is forty-one pages in length and has fifty pages of attachments), the Court finds that the above-described defects in Plaintiffs' Complaint are substantive in nature, such that better pleading would not cure them" (indicating that no amendment would be allowed). (*Id.* at 26.) In any event, because of the unequivocal language of Fed. R. Civ. P. 41(b), a dismissal that is silent was to whether it is with or without prejudice is on the merits and thus with prejudice. *See* Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise, ... any dismissal not under this [Rule 41]--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits."); *cf.* Kern v. Hettinger, 303 F.2d 333 (2d Cir. 1962) ("[I]n the view of the unequivocal language of Rule 41(b), and the absence of the words 'without prejudice' [in the order of dismissal on defendants' motion for summary judgment], we must and do decide that [a] dismissal [that is silent as to whether it is with or without prejudice is] on the merits and that it [is] intended to be on the merits."); *see, e.g., See* Shockley v. Vermont State Colleges, 793 F.2d 478, 488-81 (2d Cir. 1986) (relying on a Sixth Circuit case for the point of law that a "court may presume an adjudication on the merits where district court fails to specify otherwise [even where the plaintiff is *pro se*]"); *Stern v. Gen. Elec. Co.,* 942 F.2d 472, 477, n.7 (2d Cir. 1991) (relying on a Fourth Circuit case for the point of law that "A district court's dismissal under rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice").

2    As part of this argument, Defendants argue that Plaintiffs failed to oppose their argument regarding the invalidity of a class-of-one theory as to an equal protection claim, and their argument regarding the Third Claim against the School Defendants. Defendants rightly point out that Plaintiffs do not directly address either of these arguments in their opposition memorandum of law.

3    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

4    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

5    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

6    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

7    The Court notes that Resource Officer Williams and Ms. Green-Gonzales did not, by their own admissions, observe the minor Plaintiffs' behavior during the time period between when the minor Plaintiffs left the cafeteria and when they were brought into the health office by Defendant Simonds and Defendant Raleigh at approximately 1:03 p.m. (*See* Camera 30 Video [showing Defendants Simonds and Raleigh and the minor Plaintiffs entering the health office].) Rather, neither of them observed the minor Plaintiffs' behavior until after they were already in the health office and at least one of the minor Plaintiffs had already been examined

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 198 of 427

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

and searched by Defendant Eggleston and/or Defendant Raleigh. (Camera 30 Video [showing that Resource Officer Williams arrived at the health office at approximately 1:15:15; Exh. RR, at 45 [stating that Ms. Green-Gonzales was called to the health office to translate for an injured student at approximately 1:25 p.m.].) As a result, their testimony is of somewhat lesser probative value regarding the question of what was known before the search was initiated, other than to the extent it corroborates behaviors or information already known to Defendant Simonds, Defendant Raleigh, and Defendant Eggleston.

8  [Redacted] (Exh. MM, at 239, 270-71.)

9  To the extent that Defendants have asserted that the Court should apply the principle of *Scott* and *Jeffreys* to disregard the minor Plaintiffs' testimony, the Court notes that such argument was made in the context of testimony regarding the minor Plaintiffs' actions or conduct that contradicts the hallway video footage. (Dkt. No. 273, Attach. 14, at 80-87.) Because there is no video evidence of what occurred in the health office, or in the specific room where Defendant Eggleston and Defendant Raleigh conducted the health assessment and search, such argument has not been made in relation to the conflicting evidence regarding what occurred in that office, and the Court sees no independent grounds for applying those principles to such evidence.

10  Although the So Ordered paragraph of that Decision and Order listed the two relevant Plaintiffs as A.S. and I.S., that was a typographical error. The Court's analysis made clear that it was J.B., not I.S., who was the relevant Plaintiff. Further, Defendants' motion to dismiss itself asserted that judgment on the pleadings was sought for the strip search claims as to A.S. and J.B. specifically, not I.S. (Dkt. No. 44, Attach. 1, at 23.)

11  As discussed in the Decision and Order of September 14, 2020, removal of shoes has generally not been adjudged to constitute a strip search. (Dkt. No. 117, at 25.) *See Bibicheff v. Holder*, 55 F. Supp. 3d 254, (E.D.N.Y. 2014) (concluding that "searches of 'outer clothing, luggage, a purse, wallet, pockets or shoes ... do not substantially infringe on a traveler's privacy rights' " and specifically contrasting those actions with a more invasive strip search); *see also Mac Ineirghe v. Bd. Of Educ. Of East Islip Union Free Sch. Dist.*, 05-CV-4324, 2007 WL 2445152, at *9-10 (E.D.N.Y. Aug. 22, 2007) (assessing a search involving taking of vital signs, search of a bag and shoes, a pat down of pockets, and administration of an initial saliva test, specifically finding that such search did not require the high level of suspicion that would be applicable if the case involved a strip search).

12  This conflicts with the deposition testimony of both J.B. and Defendant Eggleston that J.B. did not take her sweater off at all, but merely removed one arm from it when Defendant Eggleston needed to check her blood pressure. (Exh. EE, at 243; Exh. OO, at 295.) However, this discrepancy is immaterial, as it is undisputed in either case that J.B. was not made to remove her sweatshirt by the Defendants as part of the search.

13  A.S. testified at her deposition that she zipped her sweater "halfway" down below her chest, but not as far as her belly button, before she zipped it back up again; she was not forced to remove either her sweatshirt or her pants. (Exh. GG, at 225.)

14  As was already discussed, the medical portion of the examination had, according to the evidence, a dual purpose: not only to determine whether the minor Plaintiffs had violated a school rule or law, but also to assess whether there was any possible medical concern that might require treatment.

15  Resource Officer Williams testified that, in addition to using cough syrup, codeine pills could be crushed and dissolved into a drink for the same effect. (Exh. VV, at 192-93.)

16  Indeed, none of these incidents occurred within the Binghamton City School District; [Redacted] is located in Yorktown Heights, New York, and [Redacted] is located in Round Rock, Texas. (Exh. MM, 19-20.)

I.S. by and through Disla v. Binghamton City School District, Not Reported in Fed....

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 199 of 427

17    To the extent that Plaintiffs have asserted an equal protection claim pursuant to a class-of-one theory and such claim has not been waived by their failure to oppose the various arguments related to that theory asserted in Defendants' memoranda, such claim must also fail on the basis of failure to show similarly situated individuals. Notably, in class-of-one claims, there must be "an extremely high degree of similarity" between the plaintiff and the comparators. *Victory v. Pataki*, 632 F. App'x 41, 43 (2d Cir. 2016) (quoting *Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55, 59 [2d Cir. 2010]). Because this is a more stringent requirement of similarity than that which applies to a selective enforcement claim, Plaintiffs' inability to meet the lower standard of similarity also necessarily means they cannot meet this higher requirement. Further, as Defendants have argued, decisions such as whether to search a student are highly discretionary, and the Supreme Court has indicated that, in situations involving actions "which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," the Equal Protection Clause is not violated pursuant to a class-of-one claim "because treating like individuals differently is an accepted consequence of the discretion granted." *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 603-04 (2008).

18    Indeed, *Agosto* explicitly finds to be erroneous the line of cases standing for the proposition that "a public school principal acts as a final policy maker to the extent that the ultimate harm that befell the plaintiff was under the principal's control" that this Court previously cited as part of its finding on the motion to dismiss. *Agosto*, 982 F.3d at 100-01.

19    https://www.census.gov/quickfacts/fact/table/binghamtoncitynewyork/PST045222 [last visited Jan. 12, 2024]

20    Further, the Court stated that, "Agosto's claim boils down to the theory that Ureña was a final policymaker because his decisions with respect to Agosto were essentially unreviewable. But the Supreme Court has rejected the concept of *de facto* policymaking authority, which erroneously conflates a final decisionmaker (which Ureña may have been) with a final policymaker (which Ureña was not)." *Agosto*, 982 F.3d at 91-92.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag

Distinguished by  Gunn v. Milani,   S.D.N.Y.,   September 9, 2024

2022 WL 991729
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond LEWIS, Plaintiff,
v.
Jason HANSON, et al., Defendants.

9:18-CV-0012 (LEK/DJS)
|
Signed 03/31/2022

**Attorneys and Law Firms**

Theresa M. Trzaskoma, Allegra Noonan, Sher Tremonte LLP, Yu Han, Morrison & Foerster LLP, New York, NY, for Plaintiff.

Ryan T. Donovan, Ryan E. Manley, Harris, Conway & Donovan, PLLC, Albany, NY, for Defendant Jason Hanson.

Andrew R. Safranko, Lamarche Safranko Law PLLC, Albany, NY, for Defendant Joseph Sharpe.

Cynthia E. Neidl, Katie Louise Birchenough, Greenberg Traurig, LLP, Albany, NY, for Defendant Scott Mere.

Eric Michael Soehnlein, Sean O'Brien, Lippes Mathias Wexler Friedman LLP, Buffalo, NY, Lawrence H. Schaefer, Lippes Mathias Wexler Friedman LLP, Albany, NY, for Defendant Zachary Peck.

Barry Nelson Covert, Diane M. Perri Roberts, Maxwell C. Radley, Patrick Mackey, Lipsitz Green Scime Cambria LLP, Buffalo, NY, for Defendant Craig Robideau.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants Jason Kearney, John Kingston.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

*\*1* On April 11, 2019, Raymond Lewis filed his amended complaint against several corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility in Malone, New York ("Bare Hill"), at all times relevant to this matter: Jason Hanson, Joseph Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason Kearney and John Kingston. [1] Dkt. No. 61 ("Amended Complaint"). Plaintiff's claims arise from circumstances surrounding a use of force incident that occurred at Bare Hill on April 23, 2016, and Plaintiff's subsequent requests for medical aid on April 24, 2016. See Am. Compl. at 4. Now before the Court are motions for summary judgment filed by Robideau, Peck, Mere, Kearney, and Kingston (collectively, "Defendants"). Dkt. Nos. 136 ("Robideau Motion"), 136-5 ("Robideau Memorandum"), 136-4 ("Robideau Statement of Material Facts" or "Robideau SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"), 137-1 ("Peck Memorandum"), 137-2 ("Peck Statement of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein Declaration"); 138 ("Mere Motion"), 138-2 ("Mere Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139; ("Kearney & Kingston Motion"), 139-16 ("Kearney & Kingston Memorandum"), 139-17 ("Kearney & Kingston Statement of Material Facts" or "Kearney & Kingston SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston Declaration"), 139-3 ("Mitchell Declaration"), 139-4 ("Plaintiff's Deposition"), 139-5 ("Kearney Deposition"), 139-6 ("Kingston Deposition").

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response Memorandum"), 149-3 ("Plaintiff's Response to Defendants' Statements of Material Facts and Statement of Material Facts" or "Plaintiff's SMF") [2], 149-1 ("Plaintiff's Declaration"), 149-2 ("Noonan Declaration"). And all five defendants have replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"), 154-2 ("Robideau Reply SMF"), 154 ("Roberts Reply Declaration"); 152 ("Peck Reply Memorandum"), 152-1 ("Peck Reply SMF"); 155 ("Mere Reply Memorandum"), 155-1 ("Mere Reply SMF"); 151 ("Kearney & Kingston Reply Memorandum").

For the reasons set forth below, each of Defendants' motions for summary judgment is granted in part and denied in part.

**II. BACKGROUND**

**A. Factual Background**

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 201 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

### 1. Plaintiff's Alleged Phone
### Violation and Transfer to the SHU

**\*2** The following facts are not in dispute except where noted.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing

Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

**\*3** Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 202 of 427

he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and assaulted him in retaliation for filing the lawsuit. Pl.'s SMF at 14, 31, 35. Defendants each deny any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶ 15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would "look into" it. Id. at 27. After over an hour with no word about his inhaler, Plaintiff again began kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

 **\*4**  Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF ¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions, and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only asked for his inhaler one time, after which Mere responded he would "look into" getting it, and that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶ 37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF ¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 203 of 427

### 4. Plaintiff's Hospital Treatment

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

**\*5** Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

### 6. Plaintiff's Grievance

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or questioned, and was not named in the final report. Mere SMF ¶¶ 58–61. Similarly, Robideau argues that the Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

### B. Procedural History

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and

Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

**\*6** Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

### IV. DISCUSSION

#### A. Robideau Motion for Summary Judgment

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

##### 1. Eighth Amendment Excessive Force

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious ... [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*7** Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11, 14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record, absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.

##### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that

lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G ("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.' " Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

### b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly,

2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

**\*8** Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony ... is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, ... we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited."). The Fincher court eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

### c. Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony ... is not conclusory or speculative ... because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the

driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip. [3]

**\*9** Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report at 3). [4]

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report at 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report at 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 207 of 427

statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within in the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."),

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v. Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) (Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted, No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find that corrections officers used force maliciously and sadistically ... [even where] the proof of excessive force [is] weak.").

 **\*10**  The Court thus declines to grant Robideau's motion for summary judgment regarding Plaintiff's Eighth Amendment claim of excessive force.

### *2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau*

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force under the Fourth and Fourteenth Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Robideau's motion regarding these claims.

### *3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau*

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants Robideau's motion regarding this claim.

### *4. First Amendment Retaliation Claim Against Robideau*

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

#### a. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). " 'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " Id. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.' " Id. (quoting Jones v. Bock, 549 U.S. 199, 218 (2007)).

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 208 of 427

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten ... in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

 **\*11** Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y. 2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."[5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

 **\*12** Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 209 of 427

a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence of causal connection in the form of an alleged admission of retaliatory motive by defendant prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's motion for summary judgment on this claim.

### B. Mere Motion for Summary Judgment

Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified immunity. Id.

#### 1. Eighth Amendment Excessive Force Under 42 U.S.C. § 1983 as to Mere

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly assaulted in the SHU.[6] Mere Mem. at 7–9. To

support this claim, Mere points to (1) his own deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8; Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I ("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"), Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report, which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3) Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23, 2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51, Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report created after the OSI investigation did not identify Mere as "involved staff" or present during the use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended Complaint does not allege he was involved in the use-of-force event in the SHU, and that Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–8.

**\*13** However, contrary to Mere's assertions, Mere's non-presence in the SHU during the assault is explicitly disputed on the record. Plaintiff testified several times during his deposition that Mere was present in the SHU strip-frisk room during the assault, along with Robideau, Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

Q. Okay. Was Officer Mere one of the individuals who assaulted you once you got to the SHU to the strip frisk room?

A. I believe he was.

Q. I'm sorry?

A. I believe he was because he was in the room with them.

Q. He was in the strip frisk room?

A. Yes.

...

Q. Okay. Was he one of the ones that assaulted you?

A. All of them assaulted me.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 210 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to

the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

**\*14** To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[ ] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having an asthma attack. Id. at 209:3–209:8; Pl.'s

Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

 **\*15**  Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards ... intentionally deny[ ] or delay[ ] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's

health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

#### a. SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B) (1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the

assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and that Mere participated in that assault. If believed, this is sufficient to create an inference of causation between the protected activity and the alleged assault, even if it is not conclusively established that Mere himself is the one who made the statement. See Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary judgment on retaliation claim unwarranted where evidence supported an "inference of causation" between filing of grievances and assault by multiple corrections officers because one had "mocked [plaintiff] for filing a grievance during the alleged attack").

### b. Denial of Adequate Medical Care

**\*16** A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and supported on the record, constitutes an adverse action sufficient to establish a claim for retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–200:17, a factfinder could reasonably infer that this adverse-action was similarly motivated. Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can support an inference of causation.").

### c. Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay,

No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

### 4. Qualified Immunity as to Mere

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 213 of 427

**\*17** Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id. [7]

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event ... and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably find that it was not objectively reasonable for Mere to believe his actions did not violate Plaintiff's Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542 (S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was not objectively reasonable for the individual defendants to believe that their actions did not violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331 (W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive force, that "if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate indifference to a serious medical need and retaliation stemming from his alleged failure to provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere asserts it was objectively reasonable for him to not leave his post to personally retrieve the inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage the use of other DOCCS officers such as the SHU Roundsmen ... and would rely upon their assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly after, Plaintiff claims he informed

Mere he could not breathe, thought he was having an asthma attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into" it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

**\*18** Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.' ") (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

### C. Peck Motion for Summary Judgment

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious medical need in violation of the Eight Amendment, and retaliation in violation of the First Amendment.

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 214 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

### 1. Excessive Force as to Peck

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

### 2. Deliberate Indifference to a
### Serious Medical Need as to Peck

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

### a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation ... be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280, 279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

**\*19** Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at

14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was having a hard time breathing and was having an asthma attack, but Peck did not do anything to help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff further alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44 [8]. According to Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report, which found Peck exhibited "a lack of care custody and control by departmental standards," to find Peck did not act reasonably.

**\*20** Further, the record belies Peck's assertion that he acted reasonably because he contacted a supervisor in response to Plaintiff's request. Notably, Peck does not cite to any record material to support this factual assertion. See Peck Mem. at 14. Indeed, Peck denied during his deposition that he ever requested medical attention for Plaintiff, Peck Dep. at 43:2–43:8, Peck testified that when he contacted a roundsmen about getting a supervisor, he did not recall mentioning any need for medical attention and "[t]he only thing [he] wanted to have the roundsman do was to have a sergeant come down," id. at

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 215 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

46:14–47:2, Peck also testified he did not recall ever telling Sergeant Tamer that Plaintiff had requested medical attention and did not contact medical directly at any point, id. at 57:5–57:23.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find Peck knew Plaintiff was in severe medical need due to his inability to breathe, but did not act to obtain aid, and thus did not act reasonably in response to Plaintiff's requests. Therefore, Peck is not entitled to summary judgment under the objective prong of the deliberate indifference standard.

b. Subjective Prong

The subjective prong of the deliberate indifference standard requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Hill, 657 F.3d at 122 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[ ] or fail[ ] to act 'while actually aware of a substantial risk that serious inmate harm will result.' " Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive risk to inmate health or safety because he was not informed of Plaintiff's physical condition, he did not notice any injuries upon beginning his assignment, and that Plaintiff testified that the extent of his medical request was for an inhaler because he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit Plaintiff's account and find that he informed Peck he was having an asthma attack and was unable to breathe. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Given Peck's deposition testimony, a reasonable factfinder could likewise find that Peck did not undertake any action to provide medical aid in response to Plaintiff's reports that he could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive risk to Plaintiff's health, and that Peck disregarded it by failing to take any action to provide aid. [9] See Warren v. City of New York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at *11 (E.D.N.Y. Mar. 26, 2021) (denying summary judgment where material dispute of fact existed regarding whether defendant provided plaintiff medical attention in

response to asthma attack); Ennis v. Davies, No. 87-CV-1465, 1990 WL 121527, at *3 (S.D.N.Y. Aug. 14, 1990) (holding that a jury could reasonably find that inmate's request for his asthma medication was sufficient to make the defendants aware of a serious medical need and failure to provide medication constituted deliberate indifference).

**\*21** Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

3. Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 216 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts, [10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

**\*22** Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters

of general prison administration.' " Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment ... [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

**\*23** Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 217 of 427

and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D. Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in violation of the First Amendment, and are entitled to qualified immunity. See Kearney & Kingston Mem. at 7.

### 1. Excessive Force and Personal Involvement as to Kearney and Kingston

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to Plaintiff's claim of excessive force because the record fails to establish that they were personally involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal involvement may be established by showing a defendant facilitated or attempted to cover up a constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." Tangreti v. Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a constitutional violation, that is sufficient to find that defendant personally participated in the violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to his supervisors in order to cover up' constitutional violations will 'give rise to a plausible inference' that the defendant 'was personally involved in the purported constitutional violations.' ") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)). Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No 79, that these allegations of facilitation and cover-up were sufficient to

establish personal involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, " '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

**\*24** Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish the elements of his Eighth Amendment claim for excessive force [11] directly against Kearney and Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No. 18-CV-5852, 2022 WL 888950, at *3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of the supervisory context and stating that "it is well-settled that to establish liability under Section 1983, a plaintiff must 'plead and prove that each

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 218 of 427

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Government-official defendant, through the official's own individual actions, has violated the Constitution' " (quoting Tangreti, 983 F.3d at 618)); Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at *2 (S.D.N.Y. Mar. 1, 2022) (observing that to find personal involvement and "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official." (citing Tangreti, 983 F.3d at 620)).

As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff must show both an objective and subjective component. "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency ... when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.' " Wright v. Goord, 554 F.3d 255, 268–69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

**\*25** A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly, through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. C.f. Smith v. Levine, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not write a misbehavior report for

Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

**\*26** A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

### 2. Retaliation as to Kearney and Kingston

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

#### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at \*4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL 2370295, at \*10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, Abreu, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

#### b. Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are " 'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.' " Bennett, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. See Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. See Jasco Tools, Inc. v. Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 135 (2000))); Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion ... for a jury ... would be entitled to view the evidence as a whole.").

**\*27** On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not merely that Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangreti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston [12] are granted summary judgment on any claims pressed against them based on supervisory liability.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim, 93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

**\*28** To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights ... alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 221 of 427

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

**V. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No. 136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

**ORDERED**, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

**ORDERED**, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Peck for

excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

**ORDERED**, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment and for retaliation survive Defendant Kearney's Motion; and it is further

**ORDERED**, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 991729

---

**Footnotes**

1    The Amended Complaint also contained claims against Bruce Yelich, but all such claims were dismissed pursuant to the Court's order on the Motion to Dismiss filed by Kearney, Kingston, and Yelich. See Dkt. Nos. 79, 100.

2    Because Plaintiff has set forth his response to Defendants' statements of material facts in the same document as his own statement of material facts, the Court will cite to the sections responding to Defendants SMFs (pages 1–42) by their page number, but will cite to the sections setting forth Plaintiff's own material facts

Lewis v. Hanson, Not Reported in Fed. Supp. (2022)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 222 of 427

(pages 43–54) by their paragraph designation in order to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

3    Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

4    For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

5    The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

6    It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff during his transfer to the SHU. Pl.'s SMF at 18.

7    Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

8    Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court should disregard the assertions Plaintiff makes in his declaration because they contradict Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion for summary judgment may be disregarded to the extent it contradicts past deposition testimony, the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38. 43 (2d Cir. 2000). The Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in his later declaration that he did not receive his inhaler until after Peck did not respond, when he admitted in his previous deposition that he received an inhaler before Peck even began his shift. Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the day before

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 223 of 427

**Lewis v. Hanson, Not Reported in Fed. Supp. (2022)**

while Mere was on watch, he was still short of breath the next day, and thus requested the inhaler again from Peck. Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶ 31, 38.

9    Peck argues that, to meet the subjective prong of the deliberate indifference claim against a non-medical official, "the plaintiff must establish that the official 'intentionally delayed access to medical care' " after the plaintiff made the problem known. Peck Mem. at 13. However, an examination of the higher court decisions from which this doctrine springs indicates that, while they consider showing intentional delay to be *sufficient* to establish deliberate indifference, they do not state that such a showing is *necessary* to establish deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 104–105 (1976) ("[D]eliberate indifference to serious medical needs of prisoners ... [is manifested] by prison guards in intentionally denying or delaying access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir. 1984) ("[I]f defendants did decide to delay emergency medical aid ... in order to make Archer suffer, surely a claim would be stated under Estelle."). However, to the extent such a showing is necessary, the Court finds that a reasonable jury could find intentional delay here due to Peck's alleged complete inaction in the face of Plaintiff's statements he was having an asthma attack and could not breathe. See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (finding dispute of material fact regarding whether defendants intentionally delayed care where evidence showed they ignored plaintiff's complaints and refused medical care).

10    The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

11    While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943 at *8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

12    Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

---

**End of Document**                                          © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 555943
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,
v.
M. MOORE, T. Lamica, E. Velie, D. Rondeau,
D. Gagne, and B. Truax, Defendants.

Civ. No. 9:17-CV-1086 (GLS/DJS)
|
Signed 01/13/2020

**Attorneys and Law Firms**

CHRISTOPHER MASON, Plaintiff Pro Se, 12-A-0162, Cape Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape Vincent, New York 13618.

HON. LETITIA JAMES, Attorney General of the State of New York, OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, Attorney for Defendants, The Capitol, Albany, New York 12224.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

### I. INTRODUCTION

**\*1** Plaintiff, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 alleging the violation of his constitutional rights. Dkt. No. 1, Compl. The Complaint was initially reviewed by Senior District Judge Gary L. Sharpe pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. Dkt. No. 5. Following that review, the only claims that remain in this action are Eighth Amendment excessive force and failure to intervene claims. *Id.* at p. 11.

Presently before this Court is a partial Motion for Summary Judgment seeking dismissal of any Eighth Amendment excessive force claim regarding the use of chemical agents and the dismissal of the failure to intervene claims against Defendants Moore and Truax. Dkt. Nos. 45 & 45-1, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 47. Defendants have filed a Reply in further support of the

Motion. Dkt. No. 48. For the reasons that follow, the Court recommends that the Motion be granted in part and denied in part.

### II. BACKGROUND

#### A. Plaintiff's Failure to File a Response to Defendants' Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As required by the Local Rules, Defendants' counsel advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts. Dkt. No. 45 at p. 3. Plaintiff, however, did not file a direct response to Defendants' Statement of Material Facts. Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Marino v. Watts*, 2018 WL 3121612, at \*1 (N.D.N.Y. Mar. 7, 2018), *report and recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018). The Court therefore will deem the facts as set forth in Defendants' Statement of Material Facts admitted, to the extent they are properly supported and not inconsistent with other record evidence offered by Defendants in support of their Motion.

#### B. Factual Background

This case arises out of a cell extraction that took place at Upstate Correctional Facility on October 3, 2014. On that date, Plaintiff's cellmate, an inmate named Hyatt, was to be removed from his cell, but refused. Dkt. No. 45-4, Truax Decl. at ¶ 4; Dkt. No. 45-4, Moore Decl. at ¶ 4. Inmate Hyatt was non-compliant with numerous orders from correctional staff to exit the cell. Dkt. No. 45-3, Ex. A, Pl.'s Dep. at p. 37. Correctional staff made multiple attempts to convince Hyatt to voluntarily leave his cell, including bringing five or six different staff members in to speak with him. *Id.* at p. 27. Ultimately, the use of a chemical agent was authorized by the Superintendent of Upstate, Moore Decl. at ¶ 5, and extraction teams were brought in to remove Hyatt and Plaintiff from the cell. *Id.* at ¶ 9; Truax Decl. at ¶ 6. Prior to the chemical

Mason v. Moore, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 225 of 427

agent being sprayed into the cell, Plaintiff was directed by Defendant Moore to get in the cell's shower "[t]o prevent Plaintiff's being affected by the CS aerosol." Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 41 & 107-108. Moore claims that Plaintiff refused to do so, but Plaintiff alleges that he complied with this direction. Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 94 & 108. The chemical agent was sprayed into the cell multiple times and correctional staff then entered to extract the inmates. Moore Decl. at ¶ 11. Plaintiff claims that during the extraction he was repeatedly punched and kicked by corrections officers and that neither Moore nor Truax intervened to stop the attack. Pl.'s Dep. at pp. 55-56. Defendants deny that any improper force was used and instead contend that Plaintiff was fully compliant once officers entered his cell. Moore Decl. at ¶ 13; Truax Decl. at ¶ 8. Plaintiff was brought to be decontaminated following the use of the chemical agent. Moore Decl. at ¶ 14; Truax Decl. at ¶ 9.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

**\*2** Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289

(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV. ANALYSIS

#### A. Claims Regarding the Use of Chemical Agents

Defendants first seek summary judgment on any Eighth Amendment claim that may be presented in the case regarding the use of chemical agents in Plaintiff's cell. Defs.' Mem. of Law at pp. 6-9. For the reasons that follow, it is recommended that this part of Defendants' Motion be granted.

First, the Court agrees with Defendants that the Complaint as pled does not present any excessive force claim based simply on the use of chemical agents. Plaintiff's Complaint specifically states that "*upon entry* [ ] is when the 'Excessive Force" took place. Compl. at p. 6 (emphasis added). It then discusses the actions of the Defendants who entered Plaintiff's cell and allegedly assaulted him. *Id.* There is no dispute that Defendant Moore was responsible for spraying the chemical agent into the cell and that this occurred *before* officers entered the cell. Moore Decl. at ¶¶ 12-13. As such, the Complaint's excessive force allegations do not encompass the use of the chemical agent itself.

**\*3** In the alternative, summary judgment would be appropriate on the merits of such a claim in any event. "The Eighth Amendment prohibition on cruel and unusual punishments precludes the unnecessary and wanton infliction of pain and protects inmates against the use of excessive force." *Jones v. Rock,* 2013 WL 4804500, at \*17 (N.D.N.Y. Sept. 6, 2013) (internal quotations omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 9-10 (1992); *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). Eighth Amendment excessive force claims have both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson v. McMillian,* 503 U.S. at 8). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller,* 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright v. Goord,* 554 F.3d at 268).

Viewing the evidence in the light most favorable to Plaintiff, the Court presumes, without deciding, that Plaintiff's testimony regarding the breathing difficulties and burning sensations he endured following the use of the chemical agent, *see* Pl.'s Dep. at pp. 46-47, are sufficient to establish the objective prong of the Eighth Amendment claim at this stage of the proceedings. *See*, *e.g.*, *El-Massri v. New Haven Corr. Ctr.,* 2018 WL 4604308, at \*10 (D. Conn. Sept. 25, 2018) (citing cases).

Plaintiff cannot, however, raise factual questions sufficient to withstand summary judgment with regard to the subjective component of an Eighth Amendment claim. The record is clear that Sgt. Moore was the individual who sprayed the chemical agent into Plaintiff's cell. Moore Decl. at ¶ 12. He alone, therefore, could be the proper Defendant to such a claim. As to him the record fails to establish any degree of the wantonness required to assert an Eighth Amendment claim. The cell extraction resulted from the refusal of Plaintiff's cellmate, inmate Hyatt, to leave the cell. Pl.'s Dep. at p. 24. By Plaintiff's own account, his cellmate, inmate Hyatt, was "belligerent," screaming and yelling, and "very hostile" to security staff attempting to get Hyatt to leave the cell. *Id.* at pp. 24 & 26. Plaintiff also testified that Hyatt repeatedly refused to leave the cell and told security personnel to get staff to remove him. *Id.* at p. 24. The record further establishes that security staff made numerous attempts to discuss the matter

with inmate Hyatt before resorting to an extraction, including having "roughly about five, six people" speak with Hyatt. *Id.* at p. 27. Plaintiff also testified that prior to the chemical agents being sprayed into his cell he was told by Defendant Moore to go into the cell shower. Pl.'s Dep. at pp. 41 & 107-108; *see also* Moore Decl. at ¶ 11. After the incident Plaintiff was immediately taken to a decontamination shower. Truax Decl. at ¶ 10. "In evaluating the use of a chemical agent in a prison setting, courts have refused to find actionable conduct where, as here, the deployment was used 'in a good-faith effort to maintain or restore discipline.' " *Anderson v. Darby,* 2017 WL 933085, at \*5 (E.D.N.Y. Feb. 13, 2017), *report and recommendation adopted*, 2017 WL 927611 (E.D.N.Y. Mar. 6, 2017) (quoting *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 501 (S.D.N.Y. 2014)). The fact that inmate Hyatt, not Plaintiff, was the disruptive inmate does not change the analysis. *Cruz-Droz v. Marquis,* 2018 WL 1368907, at \*3 (D. Conn. Mar. 16, 2018) ("Courts considering this issue have held that the exposure of non-disruptive inmates to a chemical agent is not cognizable under section 1983."); *White v. City of New York,* 2017 WL 3575700, at \*4 (S.D.N.Y. Aug. 17, 2017).

**\*4** For these reasons, summary judgment is appropriate as to any Eighth Amendment claim regarding the use of chemical agents.

### B. Plaintiff's Failure to Intervene Claim

The Complaint alleges that Defendants Moore and Truax failed to intervene to stop excessive force that was being used against Plaintiff. Compl. at pp. 7-8. "A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation." *Henry v. Dinelle,* 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011). A failure to intervene claim requires that Plaintiff prove that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Konovalchuk v. Cerminaro,* 2014 WL 272428, at \*23 (N.D.N.Y. Jan. 24, 2014) (quoting *Jean-Laurent v. Wilkinson,* 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

Defendants seek summary judgment on this claim on the ground that Plaintiff failed to show that either Defendant witnessed any improper use of force against Plaintiff or that, even if they had, that given the short time span of the incident

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 227 of 427

Mason v. Moore, Not Reported in Fed. Supp. (2020)

in question they had no opportunity to intervene. Defs.' Mem. of Law at pp. 10-11. On the record before the Court questions of fact preclude a grant of summary judgment.

First, there are clear questions of fact about whether any improper use of force took place at all.[1] Plaintiff alleges that despite being compliant with staff direction he was punched between seven and eight times and kicked seven or eight times by correctional staff. Pl.'s Dep. at pp. 55-56. Defendant Truax's Declaration states that Plaintiff followed staff direction and that he was not subjected to excessive physical force. Truax Decl. at ¶¶ 8 & 13. Defendant Moore similarly states that when officers entered the cell Plaintiff was compliant and was not subjected to inappropriate force. Moore Decl. at ¶¶ 13 & 19. Moore does, however, state that prior to entering the cell Plaintiff failed to comply with orders about where to go within his cell. *Id.* at ¶ 11. The declarations, therefore, establish that the Defendants were aware of what was happening inside Plaintiff's cell. As a result, viewed in the light most favorable to Plaintiff, Defendants presumably could have seen if improper force was used.

This case is thus unlike *Clark v. Gardner*, 256 F. Supp.3d 154 (N.D.N.Y. 2017) upon which Defendants rely. In *Clark*, the plaintiff was allegedly assaulted by an unknown group of individuals and the supervisory staff member of the unit where the assault allegedly took place was sued for failure to protect. 256 F.Supp.3d at 167. There, the mere allegation that that the defendant was the supervising officer was not sufficient to establish liability for failure to protect. *Id.* at 168. Here, however, Defendants are on record as having been able to witness the event in question. *See generally* Moore Decl.; Truax Decl. Given the question of fact about whether Plaintiff was punched or kicked while allegedly compliant with staff direction, *see* Pl.'s Dep. at pp. 55-56, summary judgment is inappropriate on Plaintiff's claim.

**\*5** The Court also recommends rejecting Defendants' argument that because the incident in question lasted only approximately fifteen to twenty seconds, Pl.'s Dep. at p. 81, summary judgment is appropriate on the ground that Defendants would have had not an opportunity to intervene. *See* Defs.' Mem. of Law at p. 11. The Second Circuit has rejected the notion that there is any "bright-line" for the amount of time under which a failure to intervene claim is not actionable. *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). Instead it has emphasized that:

Failure-to-intervene claims can arise out of a limitless variety of factual circumstances. In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations. Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance.

*Id.* Here, again viewing the evidence in the light most favorable to Plaintiff, the allegation is that Plaintiff, while in the view of Defendants Moore and Truax, was compliant with staff directions, but was nonetheless punched and kicked multiple times. Pl.'s Dep. at pp. 55-56; Moore Decl. at ¶ 13. This, if true, may provide a basis for failure to protect liability. Under the circumstances, this question is best left to a jury to resolve the factual dispute. *Figueroa v. Mazza*, 825 F.3d at 108; *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (discussing factual nature of inquiry into whether there was sufficient time to intercede to prevent harm).

## V. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 45) be **GRANTED as to claims regarding the use of chemical agents and DENIED as to Plaintiff's failure to intervene claim**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14)[2] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT**

**WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 555943

---

## Footnotes

1    The existence of such factual questions is perhaps best shown by the fact that the Defendants accused of improperly using force have not sought summary judgment as to that claim.

2    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 554816
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,
v.
M. MOORE et al., Defendants.

9:17-cv-1086 (GLS/DJS)
|
Signed 02/04/2020

**Attorneys and Law Firms**

FOR PLAINTIFF: Christopher Mason, Pro Se, 12-A-0162, Cape Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape Vincent, NY 13618.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: ERIK BOULE PINSONNAULT, Assistant Attorney General, The Capitol, Albany, NY 12224.

### ORDER

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order (R&R) by Magistrate Judge Daniel J. Stewart duly filed on January 13, 2020. (Dkt. No. 51.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed,[1] and the court having reviewed the R&R for clear error, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for partial summary judgment[2] (Dkt. No. 45) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** as to plaintiff *pro se* Christopher Mason's Eight Amendment excessive force claim regarding the use of chemical agents, which claims is **DISMISSED**; and

> **DENIED** as to Mason's Eight Amendment failure to intervene claim against defendants M. Moore and B. Truax; and it is further

**ORDERED** that this case is now deemed trial ready and a trial date and deadlines will be set in due course; and it is further

**ORDERED** that Mason's letter motion (Dkt. No. 52) is **REFERRED** to Magistrate Judge Daniel J. Stewart for his review and consideration; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 554816

---

**Footnotes**

1       On January 28, 2020, plaintiff *pro se* Christopher Mason filed a letter indicating that he does not have any objections to the R&R. (Dkt. No. 52.) Instead, he requests a telephone conference to settle this case. (*Id.*) The court refers this request to Judge Stewart for his review and consideration.

2       Defendants did not move for summary judgement as to Mason's Eight Amendment excessive force claim other than to the extent that it pertained to the use of chemical agents, and, accordingly, the claim survives to the extent that it pertains to the use of physical force during the cell extraction on October 3, 2014. (Dkt. No. 45, Attach. 1 at 1.)

Mason v. Moore, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 230 of 427

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Mason v. Moore, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 230 of 427

2024 WL 1614327
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kevin MURPHY, Plaintiff,
v.
ONONDAGA COUNTY, the Onondaga County
Sheriff's Department, Carl Hummel, William Fitzpatrick,
Melanie S. Carden, and Lindsey M. Luczka, Defendants.

5:18-CV-1218
|
Signed April 2, 2024

**Attorneys and Law Firms**

OFFICE OF JEFFREY R. PARRY, JEFFREY R. PARRY, ESQ., Attorneys for Plaintiff, 7030 East Genesee Street, Fayetteville, NY 13066.

OFFICE OF JARROD W. SMITH, JARROD W. SMITH, ESQ., Attorneys for Plaintiff, 11 South Main Street, P.O. Box 173, Jordan, NY 13080.

JOHN E. HEISLER, JR., ESQ., ONONDAGA COUNTY DEPARTMENT OF LAW, Attorneys for Defendants, 421 Montgomery Street, 10th Floor, Syracuse, NY 13202.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

## I. INTRODUCTION

**\*1** On October 11, 2018, plaintiff Kevin Murphy ("Murphy" or "plaintiff"), a retired sergeant with the Onondaga County Sheriff's Department, filed this 42 U.S.C. § 1983 action. Dkt. No. 1. Although plaintiff repeatedly sought to amend his pleading at various points in this litigation, Dkt. Nos. 50, 53, 56, 58, the common thread running through every iteration he has presented to this Court has been roughly the same: that high-ranking individuals in the Sheriff's Department and in other County leadership positions committed a laundry list of civil rights violations against him. Dkt. No. 60.

On March 18, 2022, Senior U.S. District Judge Gary L. Sharpe, to whom this case was initially assigned, issued a thorough, 62-page Decision & Order that substantially narrowed the claims and issues. Dkt. No. 174. As relevant here, Judge Sharpe's Order left only a few of the civil rights claims remaining against a few of the originally named defendants:

(1) § 1983 First Amendment retaliation claim(s) against the County, the Sheriff's Department, Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, Ass't Chief Gratien, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four);

(2) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine);

(3) a state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and

(4) a state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven).

*Id.*

Thus, in the wake of Judge Sharpe's March 18, 2022 Order, the remaining defendants could be broken down into two distinct camps: (a) Sheriff Conway, Captain Dickinson, Lt. Blumer, Lt. Anderson, Sgt. Peluso, and Ass't Chief Gratien (the "Sheriff's defendants"); and (b) the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (the "County defendants").

On May 5, 2023, the first camp, *i.e.*, the Sheriff's defendants, moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on the claims remaining against them; *i.e.*, the § 1983 First Amendment retaliation claims in Counts Three and Four. Dkt. No. 202. The second camp; *i.e.*, the County defendants, filed a notice of non-opposition, Dkt. No. 203, and did not participate in the briefing. Thereafter, the Sheriff's defendants' motion for summary judgment was briefed, Dkt. Nos. 206, 208–209, 211, and eventually reassigned to this Court on February 16, 2024, Dkt. No. 212.

On February 28, 2024, the Sheriff's defendants' motion was granted. Dkt. No. 213. There, the Court deemed defendants' statement of material facts admitted because plaintiff had failed to properly oppose it in accordance with the Local Rules. *Id.* at 12–17. Those undisputed facts, even when

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 232 of 427

analyzed in light of the other materials that had been offered by plaintiff, established that none of the Sheriff's defendants were "personally involved" in conduct that would be actionable under § 1983 as retaliation. *Id.* at 17–22.

**\*2** Further, to the extent that one or more of the Sheriff's defendants might have been "personally involved" in certain events identified by plaintiff, the undisputed facts established as a matter of law that he was not speaking in his capacity as a "private citizen" at the relevant time. Dkt. No. 213 at 22–26. Finally, even if plaintiff might have been speaking as a "private citizen" at the relevant time, the undisputed facts still established that he could not establish the other elements of his § 1983 claims. *Id.* at 27–30. Accordingly, the Sheriff's defendants were dismissed from this action. *Id.* at 31.

But that did not end this case. The second camp of defendants; *i.e.*, the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka, remained. These defendants have basically been bystanders to this litigation: they did not move to dismiss, *see* Dkt. No. 174, or engage in the summary judgment briefing, Dkt. No. 203. As a result, plaintiff's § 1983 retaliation claim (and some state-law claims for defamation and emotional distress) remained pending against some or all of them.

On February 28, 2024, right after granting summary judgment to the Sheriff's defendants, this Court directed plaintiff to explain why the § 1983 retaliation claims should not be dismissed against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka, too. Dkt. No. 214. As the Court explained:

> Upon review, plaintiff's § 1983 retaliation claims appear to be subject to dismissal against these defendants for substantially the reasons articulated in the February 28, 2024 Decision & Order. Plaintiff's filings indicate that DA Fitzpatrick, at Sheriff Conway's request, conducted an investigation into him. Dkt. No. 209-2. Plaintiff's amended complaint alleges this investigation was "unwarranted," Dkt. No. 60 ¶ 234, and that there was no probable cause to charge him, *id.* ¶ 236. But plaintiff's own filings tend to establish that he was not charged. Dkt. No. 209-2. In addition, plaintiff has not identified how this allegedly adverse action was causally related to any protected speech.

> Plaintiff has even less to say about the other defendants. The amended complaint alleges that defendant Hummel was notified of certain events, including plaintiff's dispute with Sgt. Peluso, which Hummel allegedly failed to

investigate. Dkt. No. 60 ¶¶129, 138, 222. The pleading mentions that defendant Carden called plaintiff's wife to discuss an investigation and a "possible arrest," *id.* ¶ 243, and alleges that defendant Luczka sent him a grand jury target letter, *id.* ¶ 235.

> But these allegations, even if true, would not establish a § 1983 retaliation claim. Plaintiff's deposition testimony barely mentions these defendants at all. And in the absence of an underlying constitutional violation by any of the Sheriff's Office defendants (who have all been dismissed), a § 1983 municipal-liability claim against the County and/or the Sheriff's Department is clearly subject to dismissal.

> In short, it is hard to see how any of these defendants could have been "personally involved" in any conduct actionable under § 1983, let alone how any § 1983 claim against them would survive a straightforward application of qualified immunity.

Dkt. No. 214. Accordingly, plaintiff was given twenty-one days in which to Show Cause, in writing, why the § 1983 retaliation claims should not be dismissed against the County defendants. *Id.*

Thereafter, plaintiff requested a two-week extension of time to respond and permission to file a twenty-page memo of law in support of his remaining § 1983 claim against the County defendants. Dkt. No. 215. That request was denied. Dkt. No. 216.

**\*3** Plaintiff soon filed a second letter motion, this time seeking only a one-week extension of time. Dkt. No. 217. In this second letter, plaintiff insisted that "[j]ustice in this matter cannot be had without a few more days" and "promise[d] [ ] a very cogent and compelling analysis of the constitutional infractions involved as well as a clear explanation as to why qualified immunity does not apply." Dkt. No. 217. Accordingly, this second letter motion was granted. Dkt. No. 218.

On March 27, 2024, plaintiff filed an 816-page response to the Show-Cause Order. Dkt. No. 219. Upon review, the Court will decide the matter on the basis of the submissions without a response from the County defendants.

## II. BACKGROUND

For reasons discussed in more detail *infra*, this background is taken solely from plaintiff's statement of material facts, Dkt.

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 233 of 427

No. 219-2, to the extent that each fact is supported by record evidence cited in that document.

In October of 1990, the Sheriff's Department hired plaintiff as a deputy road patrol officer. Pl.'s Facts ¶¶ 1–2. Plaintiff was promoted to the rank of road patrol sergeant in February of 2000. *Id.* ¶ 2. In that role, plaintiff's job duties were to review the work of his deputies, to ensure that the Sheriff's Department's policies and procedures were being followed, and to make sure that criminal investigations were followed up on. *Id.* ¶¶ 3–4. During his time as a sergeant, plaintiff became aware of several "improprieties" in the Sheriff's Department. *Id.* ¶ 5. He reported them to his supervisors. *Id.* ¶ 6. According to plaintiff:

> 1. He became "concerned" that a medical director at the jail had withheld certain medical records. Pl.'s Facts ¶ 7. He reported it to his supervisor. *Id.* He also reported it to the County Attorney's Office and the District Attorney's Office. *Id.* According to plaintiff, "[d]efendants" retaliated against him by removing him from the investigation and "bringing charges," but he was later cleared of any wrongdoing. *Id.* ¶ 9.

> 2. He learned that a citizen complaint involving the "illegal" use of a taser had been mishandled by an investigating sergeant. Pl.'s Facts ¶ 10. He learned about the issue, followed up on the matter, completed the investigation, and made an arrest. *Id.*

> 3. He reported to the Sheriff about the improper use of holding cells at the jail. Pl.'s Facts ¶¶ 11–12. According to plaintiff, the use of these cells violated law and policy. *Id.*

> 4. He learned about an unconstitutional blood draw, which he also reported to his supervisors. Pl.'s Facts ¶ 13. According to plaintiff, this could have been avoided by following certain recommendations. *Id.* ¶ 14. But "defendants" blamed him for it. *Id.* ¶ 15.

Plaintiff says he was denied a promotion for making these reports. Pl.'s Facts ¶ 16. Plaintiff also says he was ordered not to do certain police work by Captain Dickinson, who has already been dismissed. *Id.* ¶¶ 17–18.

On November 16, 2018, New York Fifth Judicial District Administrative Judge James Tormey composed a letter to DA Fitzpatrick accusing plaintiff of possible misconduct. Pl.'s Facts ¶¶ 20–22. Judge Tormey's letter, which also referenced this federal lawsuit, "ask[ed] for a[n] investigation as to whether any 'criminal improprieties' occurred." *Id.* ¶¶ 23, 28. According to plaintiff, DA Fitzpatrick met with Sheriff Conway a few days later. *Id.* ¶ 29.

Thereafter, DA Fitzpatrick, with the assistance of ADA Luczka and ADA Carden, authored a letter stating that plaintiff abused his power and should not have been involved in a certain incident (that plaintiff does not describe in any detail in his current statement of material facts) because "his wife was involved." Pl.'s Facts ¶¶ 30–34, 41, 42, 45.

 **\*4** DA Fitzpatrick's letter "threaten[ed]" to place plaintiff on the so-called "Giglio list." Pl.'s Facts ¶ 36. But DA Fitzpatrick ultimately "decline[d] to prosecute" plaintiff. *Id.* ¶ 37. Instead, DA Fitzpatrick "recommend[ed]" that plaintiff "not be assigned to handle any significant case." *Id.* ¶ 38. According to plaintiff, ADA Luczka and her supervisor, ADA Carden, knew there was no probable cause to charge plaintiff with any crime. Pl.'s Facts ¶¶ 43, 46. But they tried to "blame" plaintiff anyway. Pl.'s Facts ¶ 47. Plaintiff retired from the Sheriff's Department in January of 2020. *Id.* ¶ 19.

### III. LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted). Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

### IV. DISCUSSION

As an initial matter, plaintiff's filings raise two housekeeping matters that impact the legal analysis. The Court's Show-Cause Order included some explicit instructions:

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 234 of 427

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

3. Plaintiff's evidentiary submission must conform to Local Rule 56.1, which governs a party's statement of material facts; *i.e.*, each fact on which plaintiff relies to establish his claim against one or more of these defendants must be supported by a specific citation to the record that would be sufficient to establish the cited fact at a trial;

4. Plaintiff may also submit a memorandum of law, not to exceed ten pages in length, in response to this Order to Show Cause[.]

Dkt. No. 215 at 5–6.

First, plaintiff did not submit any memorandum of law in accordance with paragraph number four. Instead, he has just filed a letter explaining that he "elected not to" file a supporting memo of law, but that it has "occur[red] to [him] that the Court may wish" to hear some legal analysis "having now seen the evidence." Dkt. No. 220. That invitation will be declined. Plaintiff had an opportunity to file a supporting memo of law, was given an extension of time, and still elected not to do so. There is no reason to second-guess this decision by plaintiff's counsel.

Second, plaintiff's statement of material facts does not precisely conform with Local Rule 56.1 in accordance with paragraph number three. Although plaintiff's submission matches the *form* of Local Rule 56.1, it does not appear to offer a complete version of the events relevant to his § 1983 claim; *i.e.*, it does not set forth "each fact on which plaintiff relies to establish his claim against one or more of these defendants."

This makes the analysis more difficult. On summary judgment, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

**\*5** But in order to answer that bottom-line question, the Court needs to know what plaintiff's version of the proof at trial would be. To that end, Local Rule 56.1 instructs a party to put their version of events into a single document: "a statement of material facts." That document, in turn, must be supported by evidence that substantiates each fact being offered. Importantly, though, the statement of material facts should really be self-contained: it is supposed to "streamline the consideration of summary judgment motions

by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Plaintiff's statement of material facts presents only a haphazard recitation of salient events. Dkt. No. 219-2. The first half of the document refers to events that presumably involved his former employer, former supervisors, and/or former colleagues. Pl.'s Facts ¶¶ 1–19. But the § 1983 retaliation claims against those defendants have already been dismissed. Dkt. No. 213.

The second half of plaintiff's statement of material facts does a little better job in the sense that it actually mentions three of the remaining defendants; *i.e.*, DA Fitzpatrick and ADAs Luczka and Carden, but it appears to be telling only half of a story: it jumps around from topic to topic without establishing a coherent thread between any specific instances of plaintiff's protected activity and any specific misconduct that could be attributed to one or more of the remaining individual defendants. Pl.'s Facts ¶¶ 20–53.

Presumably, that narrative thread could have been developed in a memo of law. But plaintiff chose not to file one. Alternatively, the Court could steel its nerve and wade into the "voluminous records" that plaintiff submitted in support of his statement of material facts. Dkt. Nos. 219 (exhibits 1 through 49). [1] But that would defeat the explicit instructions given in the Show-Cause Order, which told plaintiff to put his own version of the relevant events into a statement of material facts that conformed with Local Rule 56.1.

After all, the Show-Cause Order emphasized that plaintiff seemed to treat the County defendants as an afterthought: there was little indication that DA Fitzpatrick or the two ADAs were "personally involved" in conduct actionable under § 1983. This Show-Cause Order did not impose any page limit on the statement of material facts. The idea was simple: give plaintiff a full and fair opportunity to tell his own, complete version of relevant events to see if it would sustain his burden at trial against one or more of these defendants.

Plaintiff did not do that. Instead, plaintiff has told a partial version of the story in his statement of material facts, Dkt. No. 219-2, and invited the Court to delve into the other 810 pages of material to try to make heads or tails of the rest of the narrative. That invitation must also be declined. Instead,

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 235 of 427

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

the Court will confine the legal analysis to the documents requested in the Show-Cause Order: plaintiff's statement of material facts, Dkt. No. 219-2, and a memorandum of law, which plaintiff elected <u>not</u> to file, *see* Dkt. No. 220.

### A. First Amendment Retaliation

**\*6** "To succeed on a First Amendment claim brought pursuant to Section 1983, a plaintiff must be able to demonstrate that (1) the conduct at issue was constitutionally protected, (2) the alleged retaliatory action adversely affected his constitutionally protected conduct, and (3) a causal relationship existed between the constitutionally protected conduct and the retaliatory action." *Wrobel v. County of Erie*, 692 F.3d 22, 27 (2d Cir. 2012) (citing *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003)).

As an initial matter, though, plaintiff has not identified evidence from which a rational trier of fact could conclude that one or more of the remaining defendants were "personally involved" in conduct actionable under § 1983:

Commissioner Hummel. Plaintiff's statement of material facts does not make a single reference to Commissioner Hummel.

DA Fitzpatrick. Plaintiff's statement of material facts establishes that Judge Tormey, a non-party, sent a letter to DA Fitzpatrick that requested an "investigation" into plaintiff's possible misconduct. Plaintiff's statement of material facts establishes that DA Fitzpatrick later released a written determination in which he stated that plaintiff had abused his power and recommended that plaintiff not be assigned to "any significant case." But nowhere does this statement of material facts establish that DA Fitzpatrick exercised any control over the terms and conditions of plaintiff's employment or subjected him to any specific adverse action beyond the letter itself.

ADAs Luczka and Carden. Plaintiff's statement of material facts establish that ADAs Luczka and Carden assisted DA Fitzpatrick in this work. Again, however, nowhere does this statement of material facts establish that either of these two ADAs exercised any control over the terms and conditions of plaintiff's employment or subjected him to any specific adverse action.

### 1. Plaintiff's Speech of Expressive Conduct

Even assuming that DA Fitzpatrick and/or ADAs Luczka or Carden were "personally involved," plaintiff's § 1983 claims

against them would still fail because the only speech or expressive conduct identified by plaintiff in his statement of material facts occurred in his capacity as a public employee.

First in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and again in *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court sought to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Connick*, 461 U.S. at 140 (quoting *Pickering*, 391 U.S. at 568).

On one hand, "[a] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). "On the other hand, a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Id.*

More recently, though, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court "narrowed [its] jurisprudence in the area of employee speech by further restricting the speech activity that is protected." *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010) (cleaned up). In particular, *Garcetti* held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 746 F.3d at 421.

**\*7** Under *Garcetti*, public employees speak as public employees, and *not* as private citizens, when they "make statements pursuant to their official duties." 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22. Instead, "[i]t simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422.

In *Weintraub*, the Second Circuit explained that "[t]he objective inquiry into whether a public employee spoke 'pursuant to' his or her official duties is 'a practical one.' " 593 F.3d at 202 (quoting *Garcetti*, 547 U.S. at 424); *see also Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012) ("The inquiry

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 236 of 427

into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.").

To conduct this practical inquiry, "[c]ourts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross*, 693 F.3d at 306. "Other contextual factors, such as whether the complaint was also conveyed to the public, may properly influence a court's decision." *Id.* For example, speech may be considered "pursuant to" an employee's official responsibilities if it is "part-and-parcel of [the employee's] concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (cleaned up). The same is true if the speech in question lacks a "citizen analogue"; *i.e.*, a "relevant analogue to speech by citizens who are not government employees." *Id.* at 203.

"Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25 (rejecting "the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions").

Likewise, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Instead, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

Upon review, the application of *Garcetti* to the factual narrative set out in plaintiff's statement of material facts compels the conclusion that the speech or expressive conduct actually identified by plaintiff was unprotected as a matter of law. Even viewed in the light most favorable to him, plaintiff's complaints, reports, and notifications, which were made to his supervisors about improprieties within the Sheriff's Department that he learned about in his capacity as an employee, were made pursuant to his job obligations and responsibilities as a sergeant. Pl.'s Facts ¶¶ 3–18. Thus, because all of this activity occurred during his employment and was required by his role as a sergeant, this speech occurred "pursuant to" his official duties as a matter of law.

Accordingly, plaintiff's § 1983 claim is subject to dismissal on this basis.

#### 2. Adverse Action

Even assuming that plaintiff's speech were protected under this general body of law, plaintiff's § 1983 claims would still fail because the facts set forth in his statement of material facts fail to establish that any of the named defendants took any qualifying "adverse action" against him.

**\*8** "[T]he proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)). "In the First Amendment retaliation context, '[a]dverse employment actions include discharge, demotion, refusal to hire, refusal to promote, and reprimand.' " *Fotopoulous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 364–65 (E.D.N.Y. 2014) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)).

Importantly, though, "a combination of seemingly minor incidents [may also] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citation omitted). As the Second Circuit has explained:

> [T]o prove a First Amendment retaliation claim in a situation other than the classic examples of termination, refusal to hire or promote, demotion, reduction in pay, and reprimand, a plaintiff must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Amato*, 936 F. Supp. 2d at 433 (citation omitted).

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 237 of 427

Murphy v. Onondaga County, Not Reported in Fed. Supp. (2024)

Plaintiff has not established a triable issue of fact on the "adverse action" element of a § 1983 retaliation claim. Plaintiff's statement of material facts establishes that DA Fitzpatrick received a letter from Judge Tormey that requested plaintiff be investigated. Pl.'s Facts ¶¶ 20–31. Although plaintiff's statement of material facts does not bother to explain the incident that led to Judge Tormey's letter (though the Court is aware that it formed the basis of other disputes earlier in this case), plaintiff complains that DA Fitzpatrick issued a written determination in response to Judge Tormey's letter that wrongfully accused plaintiff of "an outrageous abuse of power," "threaten[ed]" to place him on the Giglio list, "recommend[ed]" that he not be assigned to any significant case, but ultimately declined to prosecute him. *Id.* ¶¶ 32–51.

Even viewed in the light most favorable to him, plaintiff cannot show that he suffered an "adverse action" as a result of these events. Plaintiff's statement of material facts establishes that DA Fitzpatrick's investigation led to a non-prosecution decision. Pl.'s Facts ¶ 37. Absent some articulable basis on which to conclude otherwise, there is no indication that the fact of this investigation (conduct by an entity *other* than plaintiff's employer), or the resulting non-prosecution decision, might qualify as an "adverse" action.

Beyond the fact of this investigation and the issuance of the letter itself, the "adverse actions" identified by plaintiff might be (a) the letter's threat that plaintiff could be placed on the Giglio list, *id.* ¶ 36; and (b) the letter's recommendation that plaintiff should no longer be assigned to any significant cases, *id.* ¶ 38.

But as noted elsewhere, DA Fitzpatrick was not plaintiff's employer and there is no meaningful indication that plaintiff suffered direct consequences (employment-related or otherwise) as a result of the letter. Notably, while the statement of material facts says that plaintiff was ordered not to perform certain of his job duties, Pl.'s Facts ¶ 51, plaintiff's own version of events says that this no-work order occurred after the ill-defined "incident" (rather than after the issuance of DA Fitzpatrick's letter).

**\*9** Perhaps plaintiff's best argument is that Judge Tormey issued his letter as retaliation for plaintiff's decision to file this lawsuit. But Judge Tormey is not (and never was) a party to this action. And there is no indication in the statement of material facts that DA Fitzpatrick initiated this investigation

for any reason *other* than Judge Tormey's letter requesting that he do so.

### 3. Adverse Action
Further, even if one or more of these defendants' actions could be considered "adverse," there is no indication of any causal relationship between any of this conduct and any of plaintiff's identified speech or expressive activity.

To demonstrate causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)).

Even assuming that one or more of these above-referenced actions were sufficiently "adverse" under more generous First Amendment standard, there is still no evidence of causation between these events and the "improprieties" about which plaintiff complained to his supervisors.

The alleged protected activity identified by plaintiff in his statement of material facts occurred in November of 2008, Pl.'s Facts ¶ 6, May of 2015, *id.* ¶ 10, and in April of 2016, *id.* ¶¶ 11, 13. But the letter from Judge Tormey was not issued until November 16, 2018, *id.* ¶ 21, which means any conduct by DA Fitzpatrick or the two ADAs occurred at some point after that. A span of over two years between these events is far too attenuated to create a jury question on causation.

### 4. The County & Sheriff's Department
In sum, plaintiff's § 1983 First Amendment retaliation claims fail against Commissioner Hummel, DA Fitzpatrick, ADA Luczka, and ADA Carden. In the absence of an underlying constitutional violation against one or more of these defendants, these § 1983 claims must be dismissed against the County and the Sheriff's Department too.[2] *See, e.g., Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006).

### B. State-Law Claims
Plaintiff's remaining claims arise under state law. Because the parties are not diverse and jurisdiction is based on the

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 238 of 427

presence of a federal question, the Court has "supplemental jurisdiction" over these state-law claims. 28 U.S.C. § 1367(a). But supplemental jurisdiction is discretionary. Where, as here, a plaintiff's federal claims have been dismissed before trial, the district court should decline to exercise this supplemental jurisdiction absent exceptional circumstances. Because there are no exceptional circumstances presented in this case, these state-law claims will be dismissed without prejudice.

## V. CONCLUSION

Plaintiff's § 1983 First Amendment retaliation claims against the DA, two of his assistant prosecutors, and Commissioner Hummel seemed unlikely to be viable. Out of an abundance of caution, the Court issued the Show-Cause Order to give plaintiff an opportunity to establish that a jury trial on this claim was warranted against one or more of these defendants. In seeking a second request for an extension of time, plaintiff "promise[d] [the Court] a very cogent and compelling analysis of the constitutional infractions involved as well as a clear explanation as to why qualified immunity does not apply."

 **\*10**  But plaintiff did not deliver. Instead, he declined to file a supporting memo of law with any legal analysis, compelling or otherwise. So the Court has reviewed the statement of material facts to see whether, assumed true and viewed in the light most favorable to plaintiff, his evidentiary showing might warrant a jury trial on the § 1983 claims. It does not.

Therefore, it is

ORDERED that

1. Plaintiff's (a) § 1983 First Amendment retaliation claims against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Three and Four) are DISMISSED with prejudice;

2. Plaintiff's (b) state-law claims for defamation, defamation per se, libel, and slander, and conspiracy to commit those state-law torts, against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Counts Eight and Nine); (c) state-law claim for intentional infliction of emotional distress against the County, the Sheriff's Department, and Commissioner Hummel (Count Ten); and (d) state-law claim for negligent infliction of emotional distress against the County, the Sheriff's Department, Commissioner Hummel, DA Fitzpatrick, ADA Carden, and ADA Luczka (Count Eleven) are DISMISSED without prejudice; and

3. Plaintiff's letter motion (Dkt. No. 220) is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1614327

## Footnotes

1       Rather than use an attorney declaration, plaintiff has elected to introduce all of these exhibits through his own affidavit. Dkt. No. 219. This document contains legal argument by a non-attorney. This document also purports to introduce exhibits to which plaintiff would seem to lack personal knowledge. This is an unusual approach. But under modern summary judgment practice, documents need only be presented in a form that, if authenticated, *could be* admissible at trial.

2       The Sheriff's Department is just an administrative department of the County.

End of Document                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 239 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

**2024 WL 2159852**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Devanand PERSAUD, Plaintiff,
v.
CITY OF NEW YORK et al., Defendants.

22-cv-2919 (AS)
|
Signed May 14, 2024

**Attorneys and Law Firms**

Matthew Brian Weinick, Famighetti & Weinick, PLLC, Melville, NY, for Plaintiff.

Zachary Ellis, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

**BACKGROUND**

**\*1** Plaintiff Devanand Persaud worked for the New York City Department of Finance (DOF) for nearly five years before he was fired. Dkt. 70 ¶ 2. He says he was fired because of his speech. Compl. ¶ 90, Dkt. 1. So he has sued Defendants New York City and three of the DOF's top brass for First Amendment retaliation under 42 U.S.C. § 1983. *Id.* ¶¶ 91–93. Defendants have moved for summary judgment.

This case stems from a Facebook comment. Persaud is Guyanese, and he commented on a Guyanese newspaper's Facebook post that linked to one of its articles. *Id.* ¶ 9; Dkt. 70 ¶¶ 4–6.[1] The article was titled "Gutter work." Dkt. 70 ¶ 4; Dkt. 67-13 at 138. It recounted and commented on an "interesting story [that had] appeared on social media." Dkt. 67-13 at 138. In that story, "a young man who said he was from the ghetto" was "approached by a person who offered him a job of cleaning gutters. He considered the offer disrespectful. After all, according to him, Guyana is now an oil producer and he wanted to know why the ghetto youths should not be getting jobs pumping oil." *Id.* "[M]ost interesting," according to the article, was "not his narration

of the incident, ... but rather the responses which his story attracted." *Id.*

The article laid out the two sides: One set of responses "said the offer typifies how some view the ghetto—as being fit only for certain types of work and how making these offers would not ... help to elevate people in the ghetto." *Id.* "The second set of responses was to the effect that there is nothing wrong with doing ... manual labour such as cleaning gutters." *Id.* "The two sets of responses typify two approaches to work in Guyana." *Id.* The article then commented on the balance between a job's prestige and pay while canvassing various jobs available in Guyana. *Id.* It concluded by noting that the issue "boils down to one's philosophy of work," but, ultimately, "[a]ll work should be valued[,] whether it is cleaning the gutter or pumping oil." *Id.*

Persaud commented on the Facebook post from his personal account, "where he identifies himself by name and discloses his professional affiliation with the DOF." Dkt. 70 ¶ 3. He staked out a third, less optimistic, and more insulting position:

> That is [the] only work suitable for those ghetto rats! Oil jobs are for decent, hardworking, respectable people who vote for democracy and progress! The oil money belongs to supporters of democracy!

> Those who didn't vote democracy on March 2, 2020 elections should not get one cent of benefit from oil wealth or oil jobs!

> **\*2** Let those ghetto rats go to Granger and Harmon for jobs!

Dkt. 67-13 at 144.

Defendants say the DOF's webmaster got "four complaints from members of the public" about Persaud's comment. Dkt. 70 ¶ 8. The complainants seem to have been living in Guyana: When the webmaster replied to one of the messages and noted that each complainant "used the same exact graphic," the complainant responded, "We have been trying our best to clamp down on this sort of behaviour across the board so locally our citizens have been on high alert for these sort of derogatory remarks and we've been letting persons know that whether the[y] are based here or abroad, we will NOT condone it." Dkt. 67-13 at 7. The rest of the complaints simply sent a screenshot of Persaud's comment accompanied by a short message or no message at all. *See id.* at 3–24.

The comment was ultimately brought to the attention of both the DOF's Department Advocate (one of its top lawyers) and the DOF's Equal Employment and Opportunity (EEO) Office. ¶ 9. The EEO Office opened an investigation. *Id.* It sent Persaud a Notice of Investigation and told him to contact the Office within three days. ¶ 15. When he failed to do so, the Office told him that his cooperation was "required" and that if he didn't participate, "the matter will be reviewed without your input." ¶ 16. How exactly Persaud responded is disputed, but he ultimately didn't sit for an interview or provide a written account of his side of the story. ¶ 17.

A few months later, the Office issued its final report. ¶ 22. It found that Persaud "engaged in misconduct by posting derogatory comments relating to the protected category of national origin." *Id.* It also "recommended that the matter be referred to the DOF's Department Advocate for further action." *Id.* The Department Advocate's office told Persaud (several times) that he needed to "appear and testify" about a "confidential, non-public disciplinary matter." ¶¶ 28–30. Persaud eventually responded, saying he would "NOT be participating" in any investigation unless it involved "misconduct ... in performance of [his] official duties." Dkt. 67-13 at 114 (emphasis omitted).

Persaud kept his word, never appearing or testifying for the Department Advocate's investigation. Dkt. 70 ¶ 32. The Department Advocate then filed six disciplinary charges against Persaud. ¶ 34. Based on his Facebook comment, Persaud was charged with violating the DOF's code of conduct by (1) "perform[ing] an act ... that might arouse hatred ... on the basis of" race or national origin (among other categories), (2) "engaging in conduct that is likely to bring the City or agency into disrepute," (3) "engaging in conduct that was prejudicial to good order and discipline," and (4) violating the DOF's social-media policy. Dkt. 67-10 at 6–7. The two other charges were based on Persaud's failure to cooperate with the investigation. *Id.*

The charges were then heard by a state administrative-law judge (ALJ). Dkt. 70 ¶ 49. Persaud again declined to testify, but he "presented documentary evidence" and (because he chose to represent himself) cross-examined the DOF's witnesses. ¶¶ 50–51. The ALJ ruled for the DOF on all six charges and recommended firing Persaud. ¶ 53. The recommendation was sent to the Commissioner of the DOF, who accepted the recommendation and fired Persaud. ¶¶ 54–57.

## LEGAL STANDARDS

**\*3** "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

### I. The retaliation claim survives

"To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by bringing forth evidence showing that (1) he has engaged in protected First Amendment activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action." *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (cleaned up).

"Once the plaintiff makes out a prima facie retaliation claim, a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Id.* at 119 (internal quotation marks omitted). The government has a defense if it (a) would have taken the adverse action "even in the absence of the protected conduct" (under *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)) or (b) justifiably took the action because the speech's disruption outweighed the speaker's interest (under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). *Id.*

### A. Persaud engaged in protected First Amendment activity

"The first prong—whether an employee's speech was entitled to First Amendment protection from retaliation—requires a two-part inquiry." *Barzilay v. City of New York*, 610 F. Supp.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 241 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

3d 544, 574 (S.D.N.Y. 2022) (footnote omitted). "[T]he First Amendment protects speech uttered by an employee [1] in his or her capacity as a citizen [2] regarding a matter of public concern." *Smith*, 776 F.3d at 118; *see also Barzilay*, 610 F. Supp. 3d at 574–76. Here, Defendants don't contest that Persaud was speaking in his personal capacity. But they do argue that the speech was not on matters of public concern. This argument fails.

"Whether an employee's speech addresses a matter of public concern" is a question of law, "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 & n.7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (cleaned up). The target audience may be "narrow" so long as the speech "addresses *matters* that concern the public." *Heim v. Daniel*, 81 F.4th 212, 228 (2d Cir. 2023) (citation omitted).

The speech here easily clears this bar. Persaud expressed his views on labor, economic development, democracy, and class in Guyana. To be sure, he expressed them caustically. But the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). And though Defendants try to isolate "ghetto rats," the statement must be taken in context. *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. Nor does Persaud's focus on a foreign country make a difference. *See Boos v. Barry*, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (describing domestic protests of foreign governments as "classically political speech"). So Persaud's "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick*, 461 U.S. at 145, 103 S.Ct. 1684.

**\*4** Defendants don't fight this reasoning. Instead, they argue that Persaud's speech was unprotected because "Defendants had a good-faith belief that [the speech] w[as] constitutionally unprotected." Dkt. 65 at 13 (emphasis omitted). This argument seems too good to be true, and indeed it is. Defendants rely on *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), and *Heffernan v. City of Paterson*, 578 U.S. 266, 136 S.Ct. 1412, 194 L.Ed.2d 508

(2016). But neither case says an employer can get away with a mistake of First Amendment law.

Rather, both cases were about an employer's mistake of fact. *Waters* "decide[d] whether [*Pickering* balancing] should be applied to what the government employer thought was said, or to what the trier of fact ultimately determines to have been said." 511 U.S. at 664, 114 S.Ct. 1878 (plurality opinion). It held that the employer must make a "reasonable" investigation, and then a court should evaluate the speech as the employer reasonably believed it to be. *Id.* at 678–79, 114 S.Ct. 1878. That understanding of *Waters* was repeated in *Heffernan*, which held "that, as in *Waters*, the government's reason for demoting [the employee] is what counts ... even if ... the employer makes a factual mistake about the employee's behavior." 578 U.S. at 273, 136 S.Ct. 1412.

*Waters* and *Heffernan* make a difference in cases like the following: Employee A and Employee B have a conversation in the workplace. Employee B reports the conversation to their employer but leaves out some critical details. As a legal matter, what Employee A *actually* said is constitutionally protected, but the speech that Employee B *reported* is not. After a reasonable investigation, the employer mistakenly (but reasonably) believes Employee B's account. *Waters* and *Heffernan* hold that the relevant unit of analysis for a retaliation suit is what the employer reasonably understood the speech to be (Employee B's account in the example above); the factfinder does not separately determine what was actually said. *See Washington v. Nat'l R.R. Passenger Corp.*, 2003 WL 22126544, at \*5 (S.D.N.Y. Sept. 12, 2003) ("The Supreme Court has directed that where there is a dispute regarding such things as 'what the speech was, in what tone it was delivered, [or] what the listener's reactions were,' a court is to accept 'the facts as the employer reasonably found them to be.' ") (quoting *Waters*, 511 U.S. at 677, 114 S.Ct. 1878 (plurality opinion)).

Here, by contrast, there is no question about what was said. Persaud's comment is in writing and undisputed. The only questions are whether Defendants fired Persaud because of the speech and, if so, whether they were justified in doing so. *Waters* and *Heffernan* don't apply to a situation like this one.

### B. Persaud suffered adverse actions

Next, Persaud must show an adverse employment action. "For purposes of the First Amendment, an adverse employment action is one that would deter a similarly situated individual

of ordinary firmness from exercising his or her constitutional rights." *Specht v. City of New York*, 15 F.4th 594, 604 (2d Cir. 2021) (cleaned up). Here, Persaud claims there were three adverse actions: investigating, charging, and firing. Defendants don't address this element at all. So for purposes of this motion, the Court will accept that the investigation, charges, and firing are each independent adverse actions.

### C. Persaud has made a prima facie showing of causation

The last element is causation. "To show causation, a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." *Heim*, 81 F.4th at 222 (internal quotation marks omitted). "For a number of retaliation claims, establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward. Indeed, some of [the Supreme Court's] cases in the public employment context have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other, shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive." *Nieves v. Bartlett*, 587 U.S. 391, 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1 (2019) (internal quotation marks omitted).

**\*5** Here, Persaud's theory of causation is straightforward. "The plain language of several of the disciplinary charges at the heart of the adverse actions directly implicates not only the fact that [Persaud] had engaged in protected speech, but also the content of that speech." *Smith*, 776 F.3d at 121. "Those charges state that" Persaud spoke "in a manner tending to bring discredit to the [DOF]. The Department thereby both characterized the content of the speech and cited that characterization as the basis for several disciplinary charges." *Id.* (citations omitted) And the ALJ's decision recommending termination recited these charges and the DOF's policies. *See* Dkt. 67-11 at 2. That is "direct evidence" from which "a reasonable juror could conclude that the [DOF's] actions were motivated, at least in part, by a retaliatory animus." *Smith*, 776 F.3d at 121–22. Because the Court holds Persaud's "direct evidence of retaliatory intent sufficient to survive summary judgment, [it] [need] not pass upon the sufficiency of his indirect evidence." *Id.* at 121 n.3.

### D. Genuine disputes of material fact underlie the *Mount Healthy* defense

"[Persaud] having presented a prima facie case of First Amendment retaliation, [the Court] now turn[s] to whether defendants are nonetheless entitled to summary judgment in their favor by showing that the Department would have taken the same adverse actions in the absence of the protected speech." *Id.* at 122 (cleaned up). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1722. "The operative question is whether defendants have demonstrated that a reasonable jury would have to find by a preponderance of the evidence that the [DOF] would have investigated," charged, and fired Persaud "absent his ... speech." *Smith*, 776 F.3d at 122.

Defendants argue that the charges and firing were products of Persaud's refusal to cooperate with the investigation, not his speech. Yet the investigation was prompted by the complaints reacting to his speech. And the matter was referred to the Department Advocate for charges because the investigation found that Persaud had "engaged in misconduct by posting derogatory comments." Dkt. 70 ¶ 22. The fact that the whole process was kicked off by the investigation into his speech might be enough to conclude that the speech was a but-for cause of the charges and firing too. That is, if not for the investigation, Persaud never would've had the chance to not cooperate. So the failure to cooperate was not "misconduct that is separate and distinct from the incidents of speech," and the "disciplinary wheels were [not] in motion before the Department ever learned about [Persaud's] protected speech." *Smith*, 776 F.3d at 123–24. The parties simply haven't addressed whether that connection is a sufficient "chain of causation," *Hartman v. Moore*, 547 U.S. 250, 259, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), or whether Persaud's failure to cooperate is a "superseding cause, breaking the causal chain," *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017); *see also Taylor v. Ways*, 999 F.3d 478, 488 n.4 (7th Cir. 2021) (collecting cases).

In any event, the charges themselves reveal mixed motives, listing both the speech and failure to cooperate. And the evidence Defendants produce to break that tie is not exactly showstopping. They rely largely on their own statements. *See* Dkt. 65 at 15–16. For example, the Department Advocate testified that Persaud "would not have been terminated, but for his failure to engage." Dkt. 67-3 at 31:21–22. But "a plaintiff's injury can have multiple 'but-for' causes, each

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 243 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

one of which may be sufficient to support liability .... The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts[.]" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013). Not to mention, whether to credit a defendant's self-interested, on-the-nose testimony is up to the jury.

 **\*6** Defendants also point out that the charges were drafted on the day Persaud refused to appear (which Persaud disputes). Dkt. 70 ¶¶ 34–35. But that date was only thirteen days after his speech, the investigation was prompted by his speech, and the charges were mostly about his speech. *See Smith*, 776 F.3d at 124. Although many cases look to timing when a defendant's motives are unclear, there were two explicit, close-in-time motives here. The only question is whether the impermissible motive was a but-for cause. That is disputed.

"Put simply, the evidence of record ... permits only inferences. Those inferences may be drawn [by the jury] in either party's favor, and [the law] require[s] more than inferences from an employer seeking summary judgment based on the *Mount Healthy* defense." *Id.* at 125. So Defendants have failed to carry their burden on this defense at this stage.

### E. Genuine disputes of material fact underlie the *Pickering* defense

"The government can also avoid liability under what is commonly referred to as the *Pickering* balancing test. Under this defense, a government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) (cleaned up). In other words, assuming that Persaud's speech was the basis for the adverse actions, *Pickering* asks whether the government was justified.

"As a general rule, the application of the balancing test is a question of law which is properly performed by the district court." *Gorman-Bakos v. Cornell Co-op Extension*, 252 F.3d 545, 557 (2d Cir. 2001). But when, "[a]mong other items, the parties disagree as to ... whether the ... speech disrupted, or had the potential to disrupt, the [employer's] functioning" and whether "plaintiffs were in fact not dismissed because of

the disruption, but because of the content of their speech," then those questions are "to be answered by the jury prior to the court's application of the *Pickering* balancing test." *Id.* (citation omitted). "Accordingly, after these underlying factual disputes are decided by a factfinder, the district court should consider the factual findings to come to its own legal conclusions about whether the employer's interest in efficiency or the employee's interest in free speech is paramount." *Id.* at 558.

Here, genuine disputes of material fact underlie both the DOF's prediction of disruption and whether the DOF took the adverse actions because of those predictions. So the Court need not balance the interests on this motion.

### *1. The government's interest*

In evaluating the government's interest, the Supreme Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. "[T]he manner, time, and place of the employee's expression are [also] relevant." *Id.* At bottom, the government's core interest as employer is in the "efficiency and effectiveness [of] government service." *Heffernan*, 578 U.S. at 270, 136 S.Ct. 1412 (cleaned up).

 **\*7** "[T]he disruption need not be actual; the Government may legitimately respond to a reasonable prediction of disruption." *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006). And courts do give some "deference to government predictions of harm used to justify restriction of employee speech." *Waters*, 511 U.S. at 673, 114 S.Ct. 1878 (plurality opinion). Yet even when the employer has "special expertise ..., the deference to their conclusions has never been complete." *Id.* at 677, 114 S.Ct. 1878. And "the government has the burden to show that the employee's activity is disruptive to the internal operations of the governmental unit in question." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 197 (2d Cir. 2003).

Here, Defendants rely on predicted disruption. But they don't argue that Persaud's statement would affect discipline by superiors,[2] that his job involves loyalty or confidence, or that the statement interferes with his ability to do his

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 244 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

job. Instead, they rely on coworker harmony and the DOF's operations. Defendants assert that Persaud's job "required him to work collaborative[ly] with his co-workers" and was "public facing." Dkt. 65 at 21. They also point to several cases emphasizing the need for the "appearance of impartiality," arguing that Persaud's comment "risked creating the impression that members of racial minorities might not receive adequate services due to racial hostility." *Id.* at 19, 21 (citation omitted). And on manner, time, and place, Defendants note that the statement was made harshly, publicly, and during work hours.

"There is reason to question whether the employer's prediction of the disruption that [Persaud's speech] will cause is reasonable." *Barzilay*, 610 F. Supp. 3d at 600 (internal quotation marks omitted). At this stage, it suffices to say that Defendants' account is genuinely disputed. On the coworker point, there is no evidence that any coworkers saw the post, let alone reacted to it. Although the Court respects Defendants' predictions, they have no evidence of or arguments for potential disharmony beyond their say-so. They haven't shown that Persaud was Facebook friends with coworkers, that his profile was public, that similar situations in the past have caused disruption, or anything similar. And though "ghetto rats" could certainly offend some, it's not obvious that Persaud's acerbic take on Guyanese political economy would pique the DOF's accountants. *Cf. Bennett v. Metro. Gov't*, 977 F.3d 530, 540 (6th Cir. 2020) (case in which the jury was asked whether the employee's "Facebook comment [using a racial slur] was reasonably likely to have a detrimental impact on close working relationships" in her workplace (emphasis omitted)).

As for public perception, Defendants' only evidence is the four "complaints." As noted, it's unclear who the complainants were, but the little available evidence suggests that they were not going to request the DOF's services any time soon. And though Defendants' charges and briefs are focused on potential perceptions of ethnic or racial bias, that take on Persaud's comment is not reasonable. Everyone mentioned in the article is Guyanese, and there is no mention of race. Disparaging people on the basis of class or other background characteristics could also matter, but Defendants haven't made that argument on this motion.

**\*8** Nor is there much reason to think that Persaud's comment would meaningfully reflect on the DOF. True, he listed his affiliation on his Facebook page. But again, Defendants haven't produced any evidence about the reach of Persaud's

comment. And his job's "public facing" elements didn't really face the "public." Defendants say Persaud worked with "bank officials" and "outside auditors." Dkt. 65 at 21. Those people are hardly the kind to be scared off—they have to work with the DOF. As Persaud puts it, his main work was "reconciling bank accounts and reviewing employee timesheets." Dkt. 68 at 22. At the very least, the evidence does not clearly show that the government's interest is more than "minimal":

> [I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails. Where, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.

*Rankin*, 483 U.S. at 390–91, 107 S.Ct. 2891.

Similarly, the cases about the "appearance of impartiality" are inapt. In fact, they provide a useful foil. Those cases involved "the unique relationship between a police department and the public it serves." *Locurto*, 447 F.3d at 178. Persaud's role as a DOF accountant is a far cry from a police officer, perhaps the most public-facing job in government and the one where real or perceived bias can be most harmful. *See id.* The other cases Defendants cite also involve more disruption, jobs that are more public-facing, or both. *See Bennett*, 977 F.3d at 540–41 (911 operator whose use of a racial slur on Facebook "prompted a 'nonstop conversation' in the office that lasted for days" and caused her coworkers to lose trust in her judgment); *McCullars v. Maloy*, 369 F. Supp. 3d 1230, 1240–41 (M.D. Fla. 2019) (court clerk whose criticism of the state attorney on Facebook caused "public outcry" that was "immediate and overwhelming"); *Finn v. N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.*, 2011 WL

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 245 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

4639827, at *21 (S.D.N.Y. Oct. 6, 2011) (food-service worker who posted "threatening, rude, and offensive" flyers in his workplace), *aff'd*, 489 F. App'x 513 (2d Cir. 2012).

Finally, the manner, time, and place arguments don't do much to move the needle. Although harshness and publicity might increase the risk of disruption, they are not enough on their own. And the work-hours argument doesn't make a difference because Defendants haven't presented any evidence linking the time of a social-media post to its effect on the workplace or public perception of the post.

Viewing the record in the light most favorable to Persaud, "Defendants are not entitled to take advantage of the *Pickering* defense at this juncture, and a jury should have the opportunity to resolve whether their concern about disruption was reasonable." *Barzilay*, 610 F. Supp. 3d at 601 (internal quotation marks omitted).

### *2. The government's motivation*

The defense fails for another reason too. Because Defendants focused on the *Mount Healthy* defense (and, to some extent, conflated it with the *Pickering* defense) in their briefs, they cited little to no evidence that Defendants were motivated by the risk of disruption. Instead, they put nearly all of their eggs in the failure-to-cooperate basket. So "even if the potential disruption to the office outweighs the value of the speech," Defendants have not shown that Persaud was fired "only *because of* the potential disruption, and *not because of* the speech. That is to say, it matters not that the potential disruption outweighs the value of the speech if the employer subjectively makes the speech the basis of his termination decision: such 'retaliatory' discharge is always unconstitutional." *Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir. 1996).

## II. The *Monell* claim survives

### A. The City's official policies were the moving force behind the individual defendants' actions

**\*9**  Defendants also say that even if the individual defendants can be held liable, the City cannot. To hold the City liable for a constitutional tort under § 1983, the "execution of [the City's] policy or custom" must "inflict[ ] the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). " '[L]ocal governing bodies [like the City of New York] can be sued directly' (1) when 'the action

that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers' or (2) for 'constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.' " *Bernshtein v. City of New York*, 496 F. App'x 140, 144 (2d Cir. 2012) (alterations in original) (quoting *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018). In other words, "a plaintiff must demonstrate that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (citation omitted).

Here, the DOF's code of conduct and social-media policy are formal policies.[3]  *See* Dkt. 70 ¶¶ 24–25; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("To be sure, 'official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time."); *Lopez v. Bay Shore Union Free Sch. Dist.*, 668 F. Supp. 2d 406, 417 (E.D.N.Y. 2009) ("[T]he actual policies of the [defendant], including the defendant's code of conduct ..., necessarily form the basis for potential *Monell* liability.").

And as noted, Persaud's firing was the result of "implement[ing] or execut[ing]" the City's policy. *Monell*, 436 U.S. at 690, 98 S.Ct. 2018; see Dkt. 67-10 at 6–7. Although the policies don't require an employee's firing, the City doesn't argue that this fact sufficiently dilutes the policy's role as the "moving force" behind the firing. So to the extent that there are genuine disputes over the underlying retaliation claim, there are also genuine disputes preventing summary judgment over whether a "municipal policy ... cause[d] [Persaud] to be subject to ... the deprivation of a constitutional right." *Agosto*, 982 F.3d at 97.

### B. Confusion over what *Monell* requires

### *1. Final policymaker*

Defendants make three arguments in response. The first two reflect some confusion about what *Monell* requires. First, they say Persaud was not fired by a final policymaker. And it's true that the "Supreme Court has said that a municipality may be liable for the acts of a single official—but only if that official

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 246 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

is someone whose edicts or acts may fairly be said to represent official policy for the entire municipality." *Agosto*, 982 F.3d at 98. Recent, thoughtful opinions in this district have come out differently as to whether the head of a municipal agency is acting as a "policymaker" when she fires an employee. *Compare Barzilay*, 610 F. Supp. 3d at 618–19, *with Buchanan v. City of New York*, 556 F. Supp. 3d 346, 362–64 (S.D.N.Y. 2021). Fortunately, the Court need not address that question; identifying a policymaker's direct involvement is sufficient, not necessary. Indeed, the policymaker-ratification theory is typically a backup for situations where, unlike here, there is no official, written policy. *See, e.g.*, *Agosto*, 982 F.3d at 98 ("Rather than argue that there is a written municipal policy ... [the plaintiff] pursues *Monell* liability on the theory that [the defendant's] individual actions represent official policy for the entire Department[.]" (cleaned up)). (And as noted above, the City doesn't contest that the policies here are official policies formulated by a policymaker.)

### 2. *"Unconstitutional" policies and "single incidents"*

**\*10** Second, they say there is no "evidence that the DOF's code of conduct or its social-media policy are themselves unconstitutional" and that a "single incident of unconstitutional activity is not sufficient." Dkt. 75 at 2 (internal quotation marks omitted). These arguments are misguided.

Start at the beginning. *Monell* held that a municipality counts as a "person" under § 1983. 436 U.S. at 691–92, 98 S.Ct. 2018. So a municipality is liable if, "under color of some official policy," it "subject[s], or cause[s] to be subjected, any person ... to the deprivation of any rights ... secured by the Constitution." *Id.* (internal quotation marks omitted). *Monell* ruled out the municipality's liability as an employer, or a "*respondeat superior* theory." *Id.* at 691, 98 S.Ct. 2018. That is, it must be the municipality's choices (as manifested through its policies and policymakers) that "inflict[ ] the injury" rather than its employees' mere "accidents." *Id.* at 693–94, 98 S.Ct. 2018.

Here, the City relies on one of *Monell*'s progeny, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). *Tuttle* involved a plaintiff seeking to hold a municipality "liable for a 'policy' of 'inadequate training' based merely upon evidence of a single incident of unconstitutional activity," one use of excessive force. *Id.* at 813, 105 S.Ct. 2427 (plurality opinion); *see also id.* at 814

n.2, 105 S.Ct. 2427 ("The actual 'question presented' in the petition for certiorari is: 'Whether a single isolated incident of the use of excessive force by a police officer establishes an official policy or practice of a municipality sufficient to render the municipality liable for damages under 42 U.S.C. § 1983.' " (citation omitted)).

The Court rejected this theory, and the plurality contrasted this "policy" with that at issue in *Monell*. In *Monell*, a municipal department had a formal policy that expressly burdened only pregnant employees. *Id.* at 822, 105 S.Ct. 2427. "Obviously, it requires only one application of a policy such as this to satisfy fully *Monell*'s requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Id.* The policy in *Tuttle*, by contrast, was "far more nebulous, and a good deal further removed from the constitutional violation." *Id.* Whether the city "consciously chose[ ]" a policy of inadequate training could not be proven by one constitutional violation. *Id.* at 823, 105 S.Ct. 2427. And an attenuated causal chain (such as attributing the constitutional violation to the " 'policy' of establishing a police force") would render *Monell*'s limit on liability "a dead letter." *Id.*

Following this discussion, the plurality opinion concluded with this paragraph, which seems to be the source of the confusion here:

> Here the instructions allowed the jury to infer a thoroughly nebulous "policy" of "inadequate training" on the part of the municipal corporation from the single incident described earlier in this opinion, and at the same time sanctioned the inference that the "policy" was the cause of the incident. Such an approach provides a means for circumventing *Monell*'s limitations altogether. Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 247 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation. Under the charge upheld by the Court of Appeals the jury could properly have imposed liability on the city based solely upon proof that it employed a non-policymaking officer who violated the Constitution.

**\*11** *Id.* at 823–24, 105 S.Ct. 2427 (footnotes omitted).

In context, this paragraph is simply applying *Monell*'s requirements to the case's less-straightforward claim. A plaintiff must show either that his injury resulted directly from the enforcement of the municipality's policy or by showing a pattern demonstrating some kind of deliberate, unstated "policy" (in *Monell*'s words, "custom") that caused the injury. *See Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. A "single incident" does not establish that pattern. *Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427. The footnote that appears toward the end of the paragraph reinforces this message. *Id.* at 824 n.8, 105 S.Ct. 2427 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue.").

But the phrases "unconstitutional municipal policy" and "single incident" have spawned some confusion. Indeed, even Justice Brennan's controlling concurrence noted that he did "not understand, nor ... see the necessity for, the metaphysical distinction between policies that are themselves unconstitutional and those that cause constitutional violations. If a municipality takes actions ... that cause the deprivation of a citizen's constitutional rights, § 1983 is available as a remedy." *Id.* at 833 n.8, 105 S.Ct. 2427 (Brennan, J., concurring in part and concurring in the judgment) (citation omitted).

A few years later, in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court revisited the question whether "only unconstitutional policies are actionable under [§ 1983]." *Id.* at 387, 109 S.Ct. 1197. Like *Tuttle*, *Harris* was also an "inadequate training" case. And it held "that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability." *Id.* In deciding what "degree of fault must be evidenced," the Court again looked to *Monell*'s "admonition ... that a municipality can be liable ... only where its policies are the moving force behind the constitutional violation." *Id.* at 388–89, 109 S.Ct. 1197 (cleaned up). As such, liability was permitted "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. 1197. Zooming out, the Court again confirmed (as it did in *Tuttle*) that the key questions were whether inadequate training could fairly be considered a city "policy" and whether that policy "caused" the constitutional violation. *Id.* at 389–92, 109 S.Ct. 1197.

In applying *Tuttle* and *Harris*, at least one court in this circuit has used the shorthand (which the City seems to adopt here) that "[t]he policy must be either facially unconstitutional, [under *Tuttle*], or unconstitutional as applied because of the municipality's 'deliberate indifference' to the rights of persons with whom municipal employees may encounter [under *Harris*]." *Knicrumah v. Albany City Sch. Dist.*, 241 F. Supp. 2d 199, 206 (N.D.N.Y. 2003); *see also Bennett v. Town of Riverhead*, 940 F. Supp. 481, 490 (E.D.N.Y. 1996).

**\*12** This articulation might work for some cases, like the failure-to-train claims at issue in *Tuttle* and *Harris*. But it misses a wide swath of *Monell*'s heartland: constitutional violations caused by a policy's *proper* "implement[ation] or execut[ion]." Neither *Tuttle* nor *Harris* purported to cabin or overturn this part of *Monell*. Instead, they mapped *Monell* onto a difficult landscape in which it was unclear what the municipality's decisions were and whether they really caused the tort. In *Harris*, there could be no municipal liability when "one of its employees *happened to* apply [its] policy in an unconstitutional manner." 489 U.S. at 387, 109 S.Ct. 1197 (emphasis added). But if an official policy specifically directs or authorizes an unconstitutional action, the municipality has made a choice for which it may be held liable. And in that application of the policy, the policy is "itself unconstitutional" as *Tuttle* meant it. *Cf. Tuttle*, 471 U.S. at 820, 105 S.Ct. 2427 ("Respondent did not claim ... that Oklahoma City had a 'custom' or 'policy' of authorizing its police force

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 248 of 427

to use excessive force in the apprehension of suspected criminals[.]"); *id.* at 821, 105 S.Ct. 2427 ("[T]he origins of *Monell*'s 'policy or custom' requirement should make clear that, at the least, that requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed to municipal decisionmakers.").

So the logic of *Monell*, *Tuttle*, and *Harris* confirms that the City's policy need not be facially unconstitutional so long as it causes the unconstitutional act. Their language does too. *Monell* itself framed the "cause[s] to be subjected" inquiry in several ways: whether the "action *pursuant to* official municipal policy of some nature caused a constitutional tort," whether the municipality, "under color of some official policy, '*causes*' an employee to violate another's constitutional rights," whether "*execution* of a government's policy or custom ... inflicts the injury," and whether "official policy [is] the *moving force* of the constitutional violation." 436 U.S. at 691–92, 694, 98 S.Ct. 2018 (emphasis added). *Tuttle* echoes *Monell* in emphasizing the need for an "affirmative link" between the policy and the injury, 471 U.S. at 824 n.8, 105 S.Ct. 2427, and *Harris* does the same in requiring that they be "closely related," 489 U.S. at 391, 109 S.Ct. 1197.

This reading of *Monell*, *Tuttle*, and *Harris* is also most consistent with *Monell*'s later progeny. One of the Court's more recent in-depth looks at *Monell* summarized it this way:

> In sum, in *Monell* the Court held that "a municipality cannot be held liable" solely for the acts of others, *e.g.*, "*solely* because it employs a tortfeasor." 436 U.S. at 691, 98 S.Ct. 2018. But the municipality may be held liable "when execution of a government's *policy or custom* ... inflicts the injury." *Id.*, at 694, 98 S.Ct. 2018 (emphasis added).

*Los Angeles County v. Humphries*, 562 U.S. 29, 36, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010); *see also Connick v. Thompson*, 563 U.S. 51, 60–61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (similar); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."); *id.* at 404, 117 S.Ct. 1382 ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."); *id.* at 417, 117 S.Ct. 1382 (Souter, J., dissenting) ("[T]he policy requirement ... is certainly met when the appropriate officer or entity promulgates a generally applicable statement

of policy and the subsequent act complained of is simply an implementation of that policy."); *Pembaur*, 475 U.S. at 479, 106 S.Ct. 1292 ("The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (Brennan, J., concurring in the judgment) ("Where [the municipality's] agents act in accordance with formal policies ... we naturally ascribe their acts to the municipalities themselves and hold the latter responsible for any resulting constitutional deprivations."); *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (similar); *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("[I]solated acts ... are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy[.]" (citations omitted)); *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[I]nherent in the principle that 'a municipality can be liable under § 1983 only where its policies are the moving force [behind] the constitutional violation,' is the concept that the plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " (quoting *Harris*, 489 U.S. at 385, 389, 109 S.Ct. 1197 (alteration in original))); *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005) ("The express policy theory applies, as the name suggests, where a policy explicitly violates a constitutional right when enforced."); *Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1280 (10th Cir. 2009) ("If a governmental entity makes and enforces a law that is unconstitutional as applied, it may be subject to liability under § 1983."); *Right-Now Recycling, Inc. v. Ford Motor Credit Co.*, 2015 WL 1197671, at *5 (S.D. Ohio Mar. 16, 2015) ("[I]t has been recognized that a municipality may be liable under § 1983 when a written policy as applied in a straightforward manner results in a constitutional violation."), *aff'd*, 644 F. App'x 554 (6th Cir. 2016).

**\*13** Not to mention, requiring facial unconstitutionality would lead to strange results. To start, requiring a plaintiff to prove that a policy is facially unconstitutional flips the usual order of operations on its head:

> It is not the usual judicial practice, however, nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied. Such a course

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 249 of 427

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws. Moreover, the overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires determination whether the statute's overreach is substantial, not only as an absolute matter, but "judged in relation to the statute's plainly legitimate sweep," and therefore requires consideration of many more applications than those immediately before the court. Thus, for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

*Bd. of Trustees v. Fox*, 492 U.S. 469, 484–85, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (citation omitted).

And consider this hypothetical: A city's official policy instructs police to use pepper spray whenever an arrestee fails to follow police commands. That policy has some constitutionally permissible applications (and is outside the First Amendment context), so it isn't facially unconstitutional. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). For example, if a suspect refuses to raise his hands and instead reaches for a weapon, pepper spray likely isn't excessive force. But an officer following that policy would also plainly be using unconstitutionally excessive force in many situations. For instance, if a suspect is already handcuffed and simply declines to seat himself in the backseat of the police car (without physically resisting), using pepper spray could be excessive. *See Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010). Yet under the City's theory, so long as it drew its policy broadly enough to sweep in some constitutional applications, it could never be held liable for unconstitutional acts that it caused. That theory is plainly inconsistent with both *Monell* (indeed, it would essentially nullify it) and § 1983's application to acts that "cause[ ] [any person in the United States] to be subjected" to a constitutional tort.

Returning to the facts here, it should be clear that this case is classic *Monell*. There is no question about how many grains of unconstitutional action add up to a pile of "policy." So *Tuttle*'s analysis of "single incident[s]" is inapt. Nor is there a complicated web of causation to untangle. Instead, applying the DOF's code of conduct and social-media policy led directly to the investigation of Persaud, the charges leveled against him, and his firing (subject to the causation disputes

discussed above). So there is at least a triable issue of fact whether those policies were the "moving force" behind the individual defendants' actions. *See Inendino v. Lightfoot*, 2023 WL 2349909, at *6 (N.D. Ill. Mar. 3, 2023) (holding that a city employee's firing pursuant to a social-media policy that prohibited posts that "can be deemed offensive" supports an official-policy claim under *Monell*).

### C. The summary-judgment standard

**\*14**  Defendant's third argument is that the Court should not have raised the official-policy issue sua sponte. Dkt. 75 at 1. For background, Defendants' summary-judgment brief argued mainly that no final policymaker was involved, and Persaud's summary-judgment brief addressed only that argument. Yet the Court was left puzzled because the City's formal policies were discussed in the briefs. So the Court ordered the parties to submit supplemental letter briefs on the question whether the code of conduct and social-media policy were official policies that could support the *Monell* claim. Dkt. 74.

Defendants don't cite any authority suggesting that the Court acted outside its powers, and it didn't. Under Federal Rule of Civil Procedure 56(e), "[i]f a party ... fails to properly address another party's assertion of fact ... the court may ... give an opportunity to properly support or address the fact ... or ... issue any other appropriate order." Here, Defendants asserted that "Plaintiff has adduced no evidence of any unconstitutional municipal policy." Dkt. 65 at 23. Persaud failed to address that assertion, but to be fair, Defendants also failed to grapple with the relevance of the code of conduct and social-media policy that their own briefing mentioned. So the Court gave both sides an opportunity to address this issue specifically.

Similarly, Rule 56(f)(3) empowers the Court to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." Here, the Court identified the fact that the code of conduct and social-media policy may be official policies that caused the adverse action, and it gave the parties notice and a week to respond. Dkt. 74. Having received those responses, it has considered summary judgment on its own and will deny it. Under either provision, the Court may solicit arguments that might result in denying summary judgment.

More generally, Rule 56 permits the Court relatively wide discretion to ensure that all issues are aired. For example, Rule 56(c)(3) empowers the Court to consider uncited materials

Persaud v. City of New York, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 250 of 427

in the record. And under Rule 56(f)(2), the Court may *grant* summary judgment on "grounds not raised by a party" so long as it gives "notice and a reasonable time to respond." Although that provision doesn't expressly authorize denying the motion on grounds not initially raised, courts are generally permitted far greater leeway in denying motions than in granting them. *Cf. Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 217–18 (2d Cir. 2024) (distinguishing between sua sponte denials and grants of summary judgment when converting pre-motion letters to motions).

### III. The collateral-estoppel issues are irrelevant to this motion

Finally, Defendants argue that a number of the ALJ's "factual findings are entitled to preclusive effect." Dkt. 65 at 7 (capitalization omitted). In particular, Defendants say that "[t]his Court is bound by" the ALJ's findings that (1) the DOF's webmaster received four complaints, (2) Persaud (rather than his dad) wrote the comment, (3) Persaud "was guilty of all of the misconduct with which he was charged," and (4) that misconduct "warranted his termination." *Id.* at 8.

As an initial matter, the motion-to-dismiss opinion in this case already rejected Defendants' issue-preclusion arguments with respect to other facts supposedly found by the ALJ. *Persaud v. City of New York*, 2023 WL 2664078, at *3–4 (S.D.N.Y. Mar.

28, 2023) (Vyskocil, J.). The opinion specifically noted that the purported findings must have been *necessary* to the ALJ's judgment. *Id.* Yet Defendants have again failed to explain why these facts were necessary to the ALJ's decision.

**\*15** In any event, none of these facts matters for this motion. The first is undisputed. The second is irrelevant. *See* note 1, *supra*. And the third and fourth refer to "misconduct," but the ALJ's own description of Persaud's "misconduct" includes both his "post[ing] derogatory content" and his "refusal to cooperate." Dkt. 67-11 at 8. The whole issue here is identifying which one caused the adverse actions.

### CONCLUSION

For these reasons, Defendants' motion for summary judgment is DENIED. The Clerk of Court is directed to close Dkt. 64. By May 17, 2024, the parties shall provide availability for trial in July, August, and September 2024.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2024 WL 2159852

---

### Footnotes

1    There is some dispute over whether *he* commented. Persaud says it was actually his dad who posted the comment through Persaud's account. Dkt. 70 ¶ 7. Persaud has no evidence of that beyond his say-so. *Id.* Regardless, Persaud agrees that the true speaker's identity doesn't change the legal analysis for this motion. *See* Dkt. 68 at 20; *Heffernan v. City of Paterson*, 578 U.S. 266, 273, 136 S.Ct. 1412, 194 L.Ed.2d 508 (2016) (holding that an employee may sue for First Amendment retaliation even if the employee didn't in fact engage in protected speech). So the Court will simply refer to the comment as his speech.

2    Defendants briefly mention that permitting Persaud to defy the investigation would harm discipline. But that framing conflates the *Mount Healthy* and *Pickering* defenses. The question here is whether the speech itself would interfere with discipline.

3    The parties don't address this issue, but it seems that claims based on the DOF's policies are properly brought against the City. *See Bey v. City of N.Y. Dep't of Fin.*, 2012 WL 441258, at *2 (E.D.N.Y. Feb. 10, 2012). Similarly, the City doesn't challenge that the DOF's policies are the City's policies.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 185880
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Betty POSNER, Plaintiff,
v.
CITY OF NEW YORK et al., Defendants.

No. 11 Civ. 4859(JMF).
|
Jan. 16, 2014.

*OPINION AND ORDER*

JESSE M. FURMAN, District Judge.

**\*1** Plaintiff Betty Posner brings this action, pursuant to Title 42, United States Code, Section 1983, against the City of New York (the "City") and various members of the New York City Police Department (the "NYPD" and, together with the City, "Defendants") alleging violations of her constitutional rights. In particular, Plaintiff brings claims for false arrest, malicious prosecution, malicious abuse of process, and failure to intervene, as well as a claim against the City for municipal liability. Defendants move, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, for summary judgment on all of Plaintiff's claims. For the reasons stated below, Defendants' motion is GRANTED, and the Complaint is dismissed.

### BACKGROUND

The following facts, taken from the Complaint and the admissible materials submitted by the parties, are viewed in the light most favorable to Plaintiff, as she is the non-moving party. *See, e.g., Gould v. Winstar Commc'ns, Inc.,* 692 F.3d 148, 157–58 (2d Cir.2012).

**A. The Investigation**
On July 15, 2007, the NYPD began investigating the Hot Lap Dance Club ("HLDC"), a night club on the fifth floor of a building located in midtown Manhattan, based on complaints regarding, among other things, prostitution and narcotics sales. (Pollack Decl. (Docket No. 41), Ex. A at 2; Pollack Decl., Ex. B at 1; Passeser Decl. (Docket No. 52), Ex. O).

The investigative team ultimately determined that HLDC operated as an unlicensed all-nude strip club and was the site of narcotics sales and prostitution. (Pollack Decl., Ex. B at 1). Specifically, in the course of the investigation, undercover police officers, while visiting HLDC, were sold narcotics nine times and made several positive agreements for prostitution with HLDC dancers. (*Id.*).

More relevant for present purposes, during the course of their investigation of HLDC, investigators examined various business records. Among other things, they found that HLDC's Internet domain name was registered to a corporate entity called "Web Access, Inc," which had been dissolved for failure to pay franchise taxes on June 27, 2001. (Pollack Decl., Ex. H at 9). Investigators discovered that, in or about January 2004, Web Access had applied for and obtained a contract to accept credit card charges in payment for services as an existing corporate entity, even though it was not one at the time. (*Id.*). In or about September 2005, Web Access also opened a bank account in its name at what is now Sovereign Bank, listing Plaintiff as its Owner and President and Louis Posner as its Vice President. (*Id.* at 10). Plaintiff signed papers submitted to the bank that did not mention that the corporation had been dissolved. (*Id.*).

The investigation also revealed that the credit card application submitted by Web Access stated that the company was doing business as "Voter March," selling "T shirts, tapes, books and event admissions" through the website "votermarch.com." (*Id.* at 9). Investigators learned that Voter March itself had been incorporated as a not-for-profit corporation on February 4, 2002, and that Louis Posner was listed as its agent for service of process. (*Id.* at 10). In February 2007, Voter March opened its own corporate bank account at Commerce Bank; a document submitted to the bank (labeled a "Corporate Banking Resolution (For Deposit Account)") listed Louis Posner as President and Plaintiff as Secretary. (*Id.*). The document, which was signed by both Plaintiff and Louis Posner, falsely listed Voter March as a "for profit" corporation. (*Id.*). According to Plaintiff, the document was prepared by a bank representative. (Posner Aff. (Docket No. 46) ¶ 74). In addition, she alleges that Voter March's certificate of incorporation—identifying it as a non-profit corporation—was attached to the document. (Posner Aff. ¶ 75 & Exs. H–I).

**\*2** Finally, to the extent relevant here, the investigators learned that, on December 12, 2007, "HLD Entertainment Corp."—which was not an actual corporation—applied for

and obtained a contract to process credit card companies with First Data Corporation. (Pollack Decl., Ex. H at 12). The application, which listed Plaintiff as the company's contact person, stated falsely that the company had been legally incorporated, that it had been in business for one year, and that its business was "miscellaneous food stores." (*Id.*). On March 3, 2008, HLD Entertainment Corp. also opened a corporate checking account with Sovereign Bank, listing Plaintiff as President and Louis Posner as Vice President and stating that the nature of its business was "catering." (Pollack Decl., Ex. C). Checks from that bank account were used to pay the rent for HLDC's loft space and were written to persons working at HLDC who were involved in prostitution agreements with undercover officers. (Pollack Decl., Ex. H at 11). Additionally, credit card receivables were deposited into Plaintiff's personal account and then moved to HLD Entertainment' Corp's Sovereign Bank checking accounts. (*Id.* at 12).

During the investigation, an analyst for the New York County District Attorney's Office ("the D.A.'s Office") specializing in investigating prostitution businesses and money laundering schemes examined the records of thirteen bank accounts in the control of Plaintiff, Louis Posner, and the entities described above. (*Id.* at 13). Among other things, the analyst concluded that, dating back to April 2007, Plaintiff and Louis Posner had made unexplained transfers in excess of $260,000.00. (*Id.*). Further, he uncovered a pattern that, in his judgment, revealed intent to structure transfers to avoid federal currency transaction reporting laws. (Pollack Decl., Ex. F at 201–07; *see also* Pollack Decl., Ex. H at 13).

**B. The Arrest and Prosecution**

On the evening of July 17, 2008, almost exactly one year after the investigation had begun, the NYPD Vice Enforcement Division executed a search warrant at the home of Plaintiff and Louis Posner. (Pollack Decl., Ex. D at 1). The NYPD arrested Betty Posner there and she was charged later the same day, in a criminal complaint signed by Defendant Sergeant Christopher Koch, with promoting prostitution in the third degree, in violation of New York Penal Law Section 230.25(1); money laundering in the second degree, in violation of New York Penal Law Section 470.15(3); and falsifying business records in the first and second degrees, in violation of New York Penal Law Sections 175.10 and 175.05(3). (Pollack Decl., Ex. H at 1). The NYPD arrested and charged Louis Posner with the same charges. (*Id.*).

Plaintiff was brought to Manhattan Central booking, arraigned on July 19, 2008, and, unable to post bail, incarcerated thereafter. (Posner Aff. ¶¶ 18, 20–21, 24). On July 23, 2008, she was released because the grand jury had not yet indicted her. (*Id.* ¶ 33). On September 4, 2008, however, a second grand jury returned an indictment against both Plaintiff and Louis Posner. (Pollack Decl., Ex. I). The indictment charged Plaintiff with six counts of falsifying business records in the second degree, in violation of New York Penal Law Section 175.05(1). (Pollack Decl., Ex. I at 9–11). It also charged Louis Posner with one count of promoting prostitution in the third degree; six counts of money laundering in the second degree; two counts of falsifying business records in the first degree; and five counts of falsifying business records in the second degree. (*See* Pollack Decl., Ex. I).

**\*3** On December 10, 2008, Plaintiff filed an omnibus motion in New York State Supreme Court seeking, among other things, to dismiss the indictment on the grounds that the evidence against her was insufficient as a matter of law. (Pollack Decl., Ex. K at 1). She raised three arguments in the motion: (1) that the relevant documents were not business records (*id.* 4–5); (2) that the falsifications were not made for monetary gain (*id.* at 8); and (3) that the alleged misstatements were "innocuous" and immaterial (*id.* at 12). On June 11, 2009, the Honorable Michael Obus, New York State Supreme Court Justice, denied her motion. (Pollack Decl., Ex. L). Based on a review of the "extensive testimony and myriad documents introduced before the Grand Jury," the Court held that there was sufficient evidence to return an indictment against Plaintiff for falsifying business records in the second degree and "that the proceedings were properly conducted." (*Id.* at 2–3 & n. 1).

More specifically, Justice Obus concluded that the grand jury had a sufficient basis to determine that the documents at issue were business records because, "in submitting documents which falsely portrayed their companies' own identity, nature and existence, defendants knew that the bank and credit card companies would maintain the documents containing such relevant information to evidence the banks' and processing companies' own activities, and that defendants would thereby cause those companies to maintain false business records." (*Id.* at 8). Second, he determined that the evidence was sufficient to find that the banks and credit card companies were "cheated" of "their right to decline to transact business with [Plaintiff and Louis Posner]," which is all the law required. (*Id.* at 8–12). And third, he found that the

evidence supported a conclusion that the misstatements were material because "the statements at issue had misled the banks and credit card companies to engage in transactions with defendants." (*Id.* at 9). Representatives of those companies, Justice Obus noted, had testified "that they would never have transacted business with defendant's entities had they known that those entities did not presently exist" and that knowing the business of clients' companies was important to credit card companies "because they sought to avoid those whose criminal or other behavior posed a risk that the processing companies would be abandoned with unpaid charges ." (*Id.* at 12–13).

On March 23, 2010, Louis Posner pleaded guilty to promoting prostitution in the third degree. (Gould Aff. (Docket No. 48) ¶¶ 42, 48; Pollack Decl., Ex. J). (Plaintiff impugns the validity of Louis Posner's plea (*see, e.g.,* Gould Aff.), but there is no reason to address the issue here.) On April 22, 2010, the D.A.'s Office dismissed the charges against Plaintiff (Posner Decl, Ex. B), and the State Court sentenced Louis Posner to probation for five years. (Passeser Decl., Ex. Q at 4)

## SUMMARY JUDGMENT STANDARD

**\*4** Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir.2012) (per curiam). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citing *Celotex,* 477 U.S. at 322–23); *accord PepsiCo, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004). To defeat a motion for summary judgment, however, the non-moving party must advance more than a "scintilla of evidence," *Anderson,* 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir.1996) (citation omitted).

## DISCUSSION

As noted, Defendants move for summary judgment on all of Plaintiff's claims. The Court will address the false arrest and false imprisonment claims first, then turn to the claims for malicious prosecution and malicious abuse of process, before concluding with the failure-tointervene and municipal liability claims.

**A. False Arrest and False Imprisonment**

First, Defendants challenge Plaintiff's false arrest and false imprisonment claims on the grounds that there was probable cause to believe that she had falsified business records, the charge on which she was later indicted. (Defs.' Mem. Law Supp. Mot. Summ. J. ("Defs.' Mem. Law") (Docket No. 38) 3–14; Pollack Decl., Ex. I at 9–11). To prevail on a claim of false arrest or false imprisonment, a plaintiff must establish that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003). Probable cause to arrest is "an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006); *accord Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir.2013). Moreover, a police officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). That is, a false

arrest claim turns on whether there was probable cause as to *some* offense, and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly,* 439 F.3d at 152; *accord Zellner v. Summerlin,* 494 F.3d 344, 369 (2d Cir.2007).

**\*5** As a general matter, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez,* 728 F.3d at 155 (emphasis omitted) (internal quotation marks omitted). The inquiry is limited to "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest ." *Jaegly,* 439 F.3d at 153.[1] Although "an officer need not have concrete proof of each element of a crime to establish probable cause for an arrest, probable cause means more than bare suspicion." *Gonzalez,* 728 F.3d at 155 (internal quotation marks and citations omitted). And, as the Second Circuit has emphasized, "it certainly means more than suspicion of some generalized misconduct: no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *Id.* (internal quotation marks omitted).

Applying those standards here, the Court easily finds that, at the time of Plaintiff's arrest, there was probable cause to arrest her for falsifying business records.[2] Under New York law, a person is guilty of falsifying business records in the second degree when he or she, "with intent to defraud, ... omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position...." N.Y. Penal Law § 175.05(3). As Justice Obus concluded in holding that the evidence before the grand jury was sufficient to support Plaintiff's indictment for that offense, there was a "sufficient basis" to believe that Plaintiff and her husband submitted documents to banks and credit card processors that "falsely portrayed their companies' own identity, nature and existence" and that they "knew that the bank and credit card companies would maintain the documents ... thereby caus [ing] those companies to maintain false business records." (Pollack Decl., Ex. L at 8).[3] Further, a reasonable officer could certainly have concluded that, had the banks and credit card companies "known of the true nature and condition of [the relevant] business entities—*i.e.,* whether those business presently existed, and whether they provided lap dances and prostitutes in addition to a buffet—they would not have conducted business with those entities." (*Id.* at 9).[4]

Based on the totality of circumstances, officers also had reason to believe that Plaintiff acted with intent to defraud. In fact, a reasonable officer aware of HLDC's activities could have inferred from the nature of the false information itself that Plaintiff and her husband intended to deceive the banks and credit card companies into believing that the relevant entities were properly incorporated and involved in innocuous activities. Despite Plaintiff's assertion to the contrary (Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J. ("Pl.'s Mem. Law") (Docket No. 49) 10), even the false statement that Voter March was a for-profit entity rather than a non-profit entity could have been understood as motivated by an intent to defraud. As Justice Obus explained, one could reasonably "conclude that the misdescription was necessary to explain to [the bank] why such large amounts of money flowed through the coffers of an otherwise dormant, politicalaction or public-interest styled corporation." (Pollack Decl., Ex. L at 13 n. 3).[5] Furthermore, as noted, an analyst who specialized in investigating prostitution businesses and money laundering schemes found more than $260,000 in unexplained transfers "in a pattern of evincing an intent to 'structure' the transfers to avoid federal currency transaction reporting laws." (Pollack Decl., Ex. H at 13; *see also* Pollack Decl., Ex. F at 205). That evidence—particularly in the context of the broader investigation into the illegal activities of, and taking place at, HLDC—was sufficient to give a reasonable officer probable cause to believe that Plaintiff was falsifying business records with an intent to defraud. *See, e.g., Hall v. Brown,* 489 F.Supp.2d 166, 173–174 (N.D.N.Y.2007) (finding, on summary judgment, that there was probable cause to arrest Plaintiff for falsifying business records based on the investigators' study of Plaintiff's business records and behavior that matched allegations).

**\*6** Plaintiff's arguments to the contrary are unavailing. Many —if not most—of Plaintiff's arguments rely on facts that were not known to Defendants at the time of her arrest or on alternative explanations for the facts that were known at the time. For instance, Plaintiff asserts that her husband did not know that Web Access had been dissolved (Pl.'s Mem. Law 6), and that "[e]very bank application or signature card and every merchant credit application was completed by [her] husband ... and [her] involvement, if any, was in signing a few documents at his request" (Posner Aff. ¶ 50). Further, she insists that it is "common practice for gentlemen's clubs to list their business type as something other than a gentlemen's

club or strip club" to protect the privacy of their employees, many of whom "are professional white collar workers by day." (Pl.'s Mem. Law 12–13). The fact that Plaintiff has innocent explanations for the information that was known to Defendants, however, does not mean that they lacked probable cause; it merely means that she might have had viable arguments and defenses to the charges at trial. *See, e.g., Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) ( "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.").

Plaintiff's other arguments are similarly unpersuasive. First, she contends that any charges relating to the September 2005 bank document submitted for Web Access were time barred under New York law. (Pl.'s Mem Law 9 (citing N.Y.Crim. Proc. Law § 30.12(c))). That may be true, but Defendants were nevertheless entitled to consider the conduct in evaluating whether there was probable cause as to the other documents at issue. *Cf., e.g., United States v. DeFiore,* 720 F.2d 757, 764 (2d Cir.1983) (holding that evidence establishing "intent, as well as the preparations and plans that went into the scheme to defraud" were admissible against the defendant under Rule 404(b) of the Federal Rules of Evidence, "even though it antedate[d] the limitations period").

Finally, Plaintiff contends that it was not false to identify Web Access as a corporation—and, conversely, that it *was* false of Sergeant Koch to suggest otherwise in the criminal complaint against her—because it was "still permitted to conduct business as a de facto corporation in New York State." (Pl.'s Mem. Law 7). It is true that, under New York law, "a company lacking formal corporate status but nonetheless operating as a corporation may be considered a de facto corporation and those who treat the entity as a corporation in regular business dealings may not later deny its corporate status." *L–Tec Elecs. Corp. v. Cougar Elec. Org., Inc. .,* 198 F.3d 85, 87 (2d Cir.1999) (per curiam). But more recent authority than that on which Plaintiff relies in her memorandum of law indicates that the doctrine is inapplicable where, as here, a corporation was dissolved for failure to pay franchise taxes. *See, e.g., Conte v. Cnty. of Nassau,* No. 06–CV–4746 (JFB) (ETB), 2013 WL 3878738, at *24 n. 36 (E.D.N.Y. July 26, 2013) (citing cases). Further, the doctrine applies only in the absence of fraud. *See, e.g., Lodato v. Greyhawk N. Am., L.L.C.,* 10 Misc.3d 418, 807 N.Y.S.2d 818, 824 (N.Y.Sup.Ct.2005) (citing cases). Regardless, the *de facto*

corporation doctrine is a doctrine of estoppel; it does not follow that one who represents an entity as a valid corporation when it has actually been dissolved as matter of law is making a truthful statement. And it *certainly* does not follow that Sergeant Koch's statement in the criminal complaint that Web Access had been dissolved and no longer existed "was a false, misleading, and an incomplete description of the corporation." (Pl.'s Mem. Law 7).

**\*7** In short, based on the undisputed evidence in the record, the Court finds that Defendants had probable cause to arrest Plaintiff for falsifying business records in the second degree.[6] As that is a complete defense to Plaintiff's claims of false arrest and false imprisonment, Defendants are entitled to summary judgment on those claims, and the Court need not reach the question of whether Defendants also had probable cause to arrest Plaintiff for promoting prostitution or money laundering. *See, e.g., Jaegly,* 439 F.3d at 152; *Zellner,* 494 F.3d at 369.

**B. Malicious Prosecution and Malicious Abuse of Process**

Next, Defendants challenge Plaintiff's claims for malicious prosecution and malicious abuse of process. (Defs.' Mem. Law 14–17, 21–22). To succeed on a claim of malicious prosecution, a plaintiff must demonstrate: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino,* 331 F.3d at 75. The existence of probable cause as to one offense does not defeat a malicious-prosecution claim as to another offense. *See, e.g., Posr v. Doherty,* 944 F.2d 91, 100 (2d Cir.1991) ("[W]here the issue is whether the officers had probable cause to commence proceedings against [Plaintiff], not with whether the charges were terminated in plaintiff's favor, [there is a] need to separately analyze the charges claimed to have been maliciously prosecuted."). A malicious-abuse-of-process claim, on the other hand, "lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Courts in this Circuit appear to be divided on whether the existence of probable cause defeats a claim for malicious abuse of process. *Compare, e.g., Mangino v. Inc. Vill. of Patchogue,* 814 F.Supp.2d 242, 248 (E.D.N.Y.2011) ("[I]f plaintiff can demonstrate the elements of abuse of process ... without relying on an inference from a lack of

probable cause, then [a malicious-abuse-ofprocess] claim can survive even with probable cause."), *with Widget v. Town of Poughkeepsie,* No. 12 Civ. 3459(ER), 2013 WL 1104273, at *13 (S.D.N.Y. Mar.18, 2013) (holding that probable cause is a defense not only to a malicious prosecution claim, but also to a malicious abuse of process claim).

In this case, both sets of claims fail for the same reason: Plaintiff has pointed to no admissible evidence whatsoever of malice or intent to do harm without excuse or justification. Plaintiff asserts that Defendants "willfully provided false information in the criminal court complaint." (Pl.'s Mem. 19). [7] But there is little or no evidence of falsity (as discussed above, most of the information that Plaintiff identifies as "false" depends on facts that were not known to Defendants at the time or alternative explanations that Defendants were not required to credit), and no evidence whatsoever of willfulness. Plaintiff does insist that the charges against her were brought solely to pressure her husband into pleading guilty because Defendants "had a very weak case against [him]" (Pl.'s Mem. 24); that her arrest was "politically motivated" because her arrests were "fodder for the conservative media" (Posner Aff. ¶ 96 (citing a post about Louis Posner written by Ann Coulter on her personal blog)); and that Defendants' goal was "to embarrass and humiliate plaintiff." (Pl.'s Mem. 24). Plaintiff, however, has no evidence to support any of those claims beyond her own speculation, which is insufficient to avoid summary judgment. *See, e.g., D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998) ("The nonmoving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."). [8] Plaintiff also claims that her prosecution was brought in retaliation for her husband's refusal to pay a bribe to members of the NYPD Vice Squad. (Pl.'s Mem. Law 24). But that claim is premised on inadmissible double hearsay— namely, an affidavit recounting Louis Posner's statement to the affiant that he had been advised by two members of the security staff about the alleged bribe attempt. (Aslan Decl. (Docket No. 47) ¶¶ 82–93, 97). Regardless, even if Louis Posner did refuse to pay a bribe, Plaintiff cites no evidence tying the prosecution of her to that refusal.

 **\*8** In sum, there is no admissible evidence to support Plaintiff's conclusory assertions that Defendants acted with malice and or intent to do harm without excuse or justification. Accordingly, her claims of malicious prosecution and malicious abuse of process fail as a matter of law and must be dismissed.

### D. Failure To Intervene and Municipal Liability

Finally, Defendants seek dismissal of Plaintiff's failure-to-intervene and municipal liability claims. (Defs.' Mem. Law 20, 22–25). Because Defendants are entitled to summary judgment on Plaintiff's primary claims that they violated her constitutional rights, it follows that they are entitled to summary judgment on her failure-to-intervene and municipal liability claims as well. *See, e.g., Matthews v. City of New York,* 889 F.Supp.2d 418, 443–44 (E.D.N.Y.2012) (noting that failure to intervene claims are "contingent upon the disposition of the primary claims underling the failure to intervene claim"); *Harper v. City of New York,* No. 10 Civ. 7856(SAS), 2011 WL 3463156, at *8 (S.D.N.Y. Aug.5, 2011) ("Because plaintiff's *Monell* claim is contingent on the existence of an independent constitutional violation, and this Court has dismissed all of plaintiffs' claims for violations of their constitutional rights, the claims against the City cannot be sustained."). Furthermore, even if there were evidence to support Plaintiff's primary claims, she has adduced no evidence that the violation or violations of her constitutional rights resulted from a municipal policy, custom, or practice, as required to hold the City liable. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). She does not, for example, "provide any expert testimony, training manuals, or individual evidence relating to an absence of training in [money laundering and prostitution]." *Brown v. Cnty. of San Joaquin,* No. CIV. S–04–2008 FCD PAN, 2006 WL 1652407, 12 (E.D.Cal. June 13, 2006). Instead, she relies solely on the passing testimony of several Defendants that they did not receive specific training from the NYPD on the elements of money laundering or prostitution. (Hazan Decl. (Docket No. 45) ¶ 14; Hazan Decl., Exs. 9, 10, 11). But the evidence (including that same testimony) makes clear that there is some training on these issues. (Hazan Decl., Ex. 10, at 64; Hazan Decl. Ex. 11, at 35). Moreover, the testimony does not suffice to "create a triable issue of fact in regards to [a] *Monell* claim based upon a failure to train." *Brown,* 2006 WL 1652407, at * 12 (citing *Ramirez v. Cnty. of Los Angeles,* 397 F.Supp.2d 1208, 1228 (C.D.Cal.2005)).

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED, and the Complaint is

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 257 of 427

dismissed in its entirety. The Clerk of Court is directed to close the case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 185880

---

### Footnotes

1     As Defendants correctly note (Defs.' Mem. Law 10–13), the Court's "assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone." *Husbands ex rel. Forde v. City of N.Y.,* 335 F. App'x 124, 127 (2d Cir.2009) (summary order) (citing *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000)); *see also Calamia v. City of N.Y.,* 879 F.2d 1025, 1032–33 (2d Cir.1989) (applying the "collective knowledge doctrine" to an Assistant District Attorney who participated in the investigation). Plaintiff does not argue otherwise.

2     The parties disagree about whether Plaintiff's later indictment for falsifying business records creates a presumption of probable cause for purposes of her false arrest and false imprisonment claims. (*Compare* Defs.' Mem. Law 5–6 (citing *Walker v. Sankhi,* 494 Fed. App'x 140, 142–43 (2d Cir.2012) (summary order); *Manganiello v. City of New York,* 612 F.3d 149, 162 (2d Cir.2010)), *with* Pl.'s Mem. Law 5 (citing *McClellan v. Smith,* 439 F.3d 137, 145 (2d. Cir.2005); *Savino,* 331 F.3d at 75; *Cook v. Sheldon,* 41 F.3d 73, 77–79 (2d Cir.1994))). The Court need not resolve the issue, however, as there was probable cause to arrest her independent of any presumption that the grand jury's indictment may have created.

3     Justice Obus's decision does not have preclusive effect with respect to Plaintiff's false arrest and false imprisonment claims. First, the precise question of whether there was probable cause at the time of arrest was not "actually litigated" in the state court proceeding. *See, e.g., Katz v. Katz,* 312 F.3d 568, 573–74 (2d Cir.2002). Second, Plaintiff did not have an opportunity to appeal Justice Obus's decision because the charges against her were eventually dismissed. *See, e.g., Johnson v. Watkins,* 101 F.3d 792, 793 (2d Cir.1996). Nevertheless, Justice Obus's reasoning is helpful in analyzing the issue presented here.

4     As Justice Obus noted, representatives of the credit card processing companies testified that "they strove to accurately assess the business of their client companies, because they sought to avoid those whose criminal or other behavior posed a risk that the processing companies would be abandoned with unpaid charges." (Pollack Decl., Ex. L at 12–13). Even in the absence of testimony on that point, an officer could reasonably have believed that the false information in the documents discussed above would have been important to the banks and credit card companies.

5     Plaintiff's assertion that Voter March's certificate of incorporation identifying it as a non—profit corporation was attached to the bank document—an assertion the Court credits for purposes of this motion—does make the issue a closer one. (Pl.'s Mem. Law. 10). But Plaintiff has introduced no evidence suggesting that Defendants knew that the certificate of incorporation was attached to the bank document. And, given the totality of the circumstances known to Defendants, a reasonable officer could still have believed that the false statement on the document itself was part of a fraud scheme. That Plaintiff might have had a strong argument at trial, or that the fraud scheme was bound to fail, does not change that.

6     Defendants would be entitled to summary judgment on Plaintiff's false arrest and false imprisonment claims even if the evidence known to Defendants prior to Plaintiff's arrest fell short of creating probable cause. That is because there was, at a minimum, "arguable probable cause to arrest." *See, e.g., Hart v. City of New York,* No. 11 Civ. 4678(RA), 2013 WL 6139648, at *7 (S.D.N.Y. Nov.18, 2013) ("In the false arrest context,

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 258 of 427

'an arresting officer is entitled to qualified immunity ... if he can establish that there was arguable probable cause to arrest. Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " (quoting *Ackerson v. City of White Plains,* 702 F.3d 15, 21 (2d Cir.2012) (per curiam) (alterations omitted) (citation omitted))).

7       Plaintiff's malicious prosecution claim with respect to the falsifying business records charges fails for two other reasons. First, as discussed above, Defendants had probable cause to arrest Plaintiff for falsifying business records, and no facts were discovered between the time of arrest and the time of charging that made apparent " 'the groundless nature of the charges.' " *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996); *see also Stansbury v. Wertman,* 721 F.3d 84, 94–95 (2d Cir.2013) ("[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." (internal quotation marks omitted)). Second, Plaintiff's indictment by the grand jury creates a presumption of probable cause with respect to falsifying business records, and she has not rebutted the presumption with "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Stansbury,* 721 F.3d at 95 (internal quotation marks omitted).

8       The NYPD Case Synopsis, prepared nine days before the arrest, does mention the possibility of media coverage, but wholly unrelated to Louis Posner. The Case Synopsis predicted media coverage because "[t]here ha[d] been previous media coverage involving a patron who was injured when a stripper struck him in the eye with a high heeled shoe .... [and had] threatened litigation against the owner/operator." (Pollack Decl., Ex. B at 3).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 6420181
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jose M. QUINONES, Plaintiff,
v.
Captain Adam ROLLISON, Shield No. 192,
Correction Officer Eric Wilson, Shield No. 11616,
Correction Officer Kenny Rochez, Shield No. 5196,
Correction Officer Sammy Fernandez, Shield No.
5335, and Captain Carlos Blackwood, Defendants.

18-cv-1170 (AJN)
|
Signed 11/01/2020

**Attorneys and Law Firms**

Ezra Spilke, Law Offices of Ezra Spilke, PLLC, Brooklyn, NY, for Plaintiff.

Joseph Peter Zangrilli, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

ALISON J. NATHAN, District Judge:

**\*1** In 2016, Plaintiff Jose Quinones was detained at the George R. Vierno Center on Rikers Island. On his first day at that facility, another inmate violently attacked him, and a corrections officer subsequently used pepper spray to break up the altercation. Plaintiff now claims that Defendants, a number of Department of Corrections staff, used excessive force against him in breaking up the fight and were deliberately indifferent to his safety. Defendants have moved for summary judgment on both claims. For the reasons that follow, Defendants' motion is GRANTED.

## I. BACKGROUND

### A. The Facts

The following facts are undisputed: In November 2016, the New York Police Department arrested Plaintiff Jose Quinones. Dkt. No. 104 ¶ 3; *see also* Dkt. No. 93 Ex. D. For about two weeks, Plaintiff was incarcerated at the

Manhattan Detention Center, and he and two other inmates were subsequently transferred to the George R. Vierno Center (GRVC) on Rikers Island. Dkt. No. 104 ¶ 5. When he arrived at GRVC, Plaintiff asked a corrections offer which unit he was being placed in and which gang was in control of the unit. *Id.* ¶¶ 6–7. Plaintiff was informed that he was being placed in Unit 8A, and "that the Macballas controlled the unit." *Id.* ¶ 8. The parties agree that Plaintiff did not belong to the Macballas gang, but was instead affiliated with another gang. *Id.* ¶ 9. Plaintiff testified that he was a member of the Bloodhound Brims, which is affiliated with the Bloods. *See* Quinones Dep., Dkt. No. 93 Ex. C., at 40:9–13, 45:21–46:1. The two other inmates that came with Plaintiff from MDC were affiliated with other gangs. Quinones Dep. 29:6–11 (noting that these individuals were members of the Ape and Gorilla gangs); *see also* Dkt. No. 104 ¶ 12. [1] Plaintiff and the other inmates "notified the officer that their gangs had problems with the Macballas and that plaintiff expected he would be attacked." Dkt. No. 104 ¶ 13. Nonetheless, Plaintiff and the other two individuals were all placed in Unit 8A. *Id.* ¶ 15. Plaintiff did not inform other Department of Corrections staff members that he was concerned for his safety. *Id.*

The next morning, Plaintiff was let out of his cell and spoke with a man named Mike, who he knew from his time living in Harlem. *Id.* ¶ 19. Mike informed Plaintiff that Unit 8A housed members of the Macballas and Patria gangs, and that there were "two other Blood gang members also inside the housing unit." *Id.* ¶¶ 20–21. Plaintiff then spoke with these "other Blood gang members" and learned that "the Bloods shared one of the Macballas' phones and were allowed to use it at certain times of the day." *Id.* ¶ 22. Later that day, after confirming with other Blood members that he could use the phone, Plaintiff made a phone call. *Id.* ¶ 24. On that call, he informed the individual with whom he was speaking that "he rejected an offer" from Department of Corrections officers "to go into protective custody ... because he was trying to look cool." *Id.* ¶ 25.

**\*2** While on the phone, at about 9 AM, Plaintiff was "slashed by another inmate." *Id.* ¶ 26. Specifically, "an inmate sliced Mr. Quinones in the cheek and neck, leaving a five-inch gash." Dkt. No. 105 ¶ 14. The parties disagree about the exact details of what happened next, but here's the (undisputed) gist: Officer Sammy Fernandez, a defendant in this action, was working in Unit 8A at the time. Dkt. No. 104 ¶ 28. Officer Fernandez described his job as "basically walk[ing] around and monitor[ing] the housing area." Fernandez Dep., Dkt. No. 93-8, at 25:2–47. Unit 8A contains two levels of

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 260 of 427

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

cells, and Officer Fernandez was on the higher level at the time. *Id.* 25:11–13, 29:17–30:3 ("I was on the top tier of the housing area ... I was letting inmates out of their cells."). After Plaintiff was attacked, Officer Fernandez ran to the stairwell, came downstairs, and "pushed his Personal Body Alarm immediately after he saw blood on the plaintiff." Dkt. No. 104 ¶ 30.

Plaintiff admits that after he "was cut he turned in an aggressive manner towards his assailant." *Id.* ¶ 31. The assailant and the Plaintiff continued to fight—though the parties dispute who "threw the first punch." *See id.* ¶ 32. Officer Fernandez "ordered the plaintiff and other inmate to stop," and Plaintiff admits that Officer Fernandez said "stop" while looking at him. Dkt. No. 104 ¶ 34. Officer Fernandez further informed both inmates "that he would utilize his chemical agent if they continued to fight." *Id.* ¶ 35. Plaintiff subsequently threw a garbage can in the direction of the inmate who had cut him and others who had gathered on the scene. *Id.* ¶ 36. Officer Fernandez then used a "two-second burst of chemical agent," and both Plaintiff and his assailant were sprayed. *Id.* ¶ 37; *see also* Fernandez Dep. 55:1-16. After Officer Fernandez sprayed the chemical agent, "the fight stopped and the inmates dispersed throughout the housing area." *Id.* ¶ 39. A "probe team" then arrived and escorted both inmates out of the housing unit. *Id.* ¶ 40; *see also id.* ¶ 43 ("Approximately five minutes after the incident the plaintiff was escorted out of the unit."). Defendants have also provided undisputed video footage of this entire incident. Def. Ex. G.

Plaintiff was soon seen in the GRVC clinic by a doctor, and was then "referred to Urgi-Care where his laceration wound was treated with Dermabond/Sterile strips." *Id.* ¶¶ 41–42. A subsequent Department of Corrections investigation determined "that the plaintiff had been slashed by an inmate who belonged to the Trinitarian gang," not the Macballas. *Id.* ¶ 46. [2]

### B. Procedural History

In February 2018, Plaintiff filed this action under 42 U.S.C. § 1983. More than a year later, he filed a fourth amended complaint, which is the operative pleading in this matter. Dkt. No. 88. He named as defendants several Department of Corrections staff, such as Officer Fernandez and the officers who conducted his intake into GRVC. *Id.* ¶¶ 5–8. [3] Plaintiff alleged that Defendant Fernandez had violated his

constitutional rights by using excessive force. And Plaintiff alleged that the other Department of Corrections Staff, whom the parties refer to as the "Intake Defendants," violated the Fourteenth Amendment's Due Process Clause by placing him into Unit 8A even though he expressed that he was not a Macballas member, thereby acting with deliberate indifference to his safety. *See id.*

**\*3** After lengthy discovery, Defendants have moved for summary judgment on all counts. That motion is now before the Court.

### II. LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). Moreover, if the evidence for the nonmoving party is a mere scintilla or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50. A fact is "material" only if it will affect the outcome of the suit under applicable law, and such facts "properly preclude the entry of summary judgment." *Id.* at 248. Disputes over irrelevant facts will not preclude summary judgment. *Id.* The goal is to "isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex*, 477 U.S. at 325. "It is ordinarily sufficient for the movant to point to a lack of evidence ... on an essential element of the non-movant's claim.... [T]he nonmoving party must [then] come forward

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 261 of 427

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

with admissible evidence sufficient to raise a genuine issue of fact for trial...." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party ... must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

## III. DEFENDANTS' MOTION IS GRANTED

### A. Plaintiff's Excessive-Force Claim against Officer Fernandez Fails

The Court begins with Plaintiff's claim that Fernandez's use of pepper spray constituted constitutionally excessive force, in violation of the Fourteenth Amendment. Section 1983 imposes liability on individuals who, while acting under color of state law, deprive a plaintiff of a federal right. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "A pretrial detainee who is subjected to excessive force may bring a claim under § 1983." *Cunningham v. Rodriguez*, No. 01-cv-1123 (DC), 2002 WL 31654960, at *4 (S.D.N.Y. Nov. 22, 2002). Because the Eighth Amendment's protection from cruel and unusual punishment does not apply " 'until after conviction and sentence,' the right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). "The Second Circuit applies the same standard to excessive force claims brought under the Fourteenth Amendment as under the Eighth Amendment." *Virella v. Pozzi*, No. 05-cv-10460 (RWS), 2006 WL 2707394, at *3 (S.D.N.Y. Sept. 20, 2006).

 *4  To establish a violation of the "right of pretrial detainees to be free from excessive force amounting to punishment," a pretrial detainee must show that the force used against him was "objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). This inquiry is "context specific, turning upon 'contemporary standards of decency.' " *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (quoting *Hudson v. McMillan*, 503 U.S. 1, 8 (1992)). "Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

The Second Circuit has long made clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In other words, "plaintiff must show that the harm incurred was more than de minimis." *Berry v. City of New York Dep't of Corr.*, No. 12-cv-7819 (RWS), 2014 WL 2158518, at *5 (S.D.N.Y. May 22, 2014), *aff'd sub nom. Berry v. New York City Dep't of Correction*, 622 F. App'x 10 (2d Cir. 2015). The use of pepper spray "constitutes a significant degree of force" and can in certain cases form the basis of a constitutional violation. *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) ("Unquestionably, infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects...."); *see Berry*, 2014 WL 2158518, at *5. However, if the force was "applied in a good-faith effort to maintain or restore discipline, it is unlikely to be repugnant to the conscience of mankind, and will not amount to excessive force under Second Circuit law." *Adilovic v. Cnty. of Westchester*, No. 08-cv-10971 (PGG), 2011 WL 2893101, at *6 n. 12 (S.D.N.Y. July 14, 2011) (internal citation omitted) (quoting *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000)); *accord Berry*, 2014 WL 2158518, at *5.

The Court concludes that, on the undisputed facts, no reasonable jury could conclude that Officer Fernandez's use of force was objectively unreasonable. *See Kingsley*, 576 U.S. at 397. To begin, the amount of force used was small. It is undisputed that Officer Fernandez used only a two-second burst of pepper spray against Mr. Quinones. Dkt. No. 104 ¶ 37. He used a similar, seconds-long spray to subdue the assailant, and the parties agree that the "plaintiff and his assailant were both sprayed *one time* [each] by Officer Fernandez." *Id.* ¶ 38 (emphasis added); *see also* Def. Ex. G (surveillance video demonstrating that pepper spray was used only for seconds). This case is thus a far cry from *United States v. Praisner*, in which the pretrial detainee alleged that he had been "sprayed six times on four separate occasions over approximately 40 minutes, and was not decontaminated during that period." No. 09-cr-264 (MRK), 2010 WL 2574103 (D. Conn. Apr. 27, 2010).

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 262 of 427

Moreover, even reading the record most favorably to Plaintiff, Officer Fernandez's use of force was proportional to the need for force. Plaintiff does not dispute, and the surveillance video of the incident clearly demonstrates, that Officer Fernandez employed the two-second burst of pepper spray against two inmates who were in the midst of a violent fight involving a dangerous weapon, had been warned to stop their conduct, had nonetheless continued fighting, and had been specifically warned that failure to do so would result in the use of pepper spray. Dkt. No. ¶¶ 34–35.; Def. Ex. G. Plaintiff's conduct posed a risk to other inmates, himself, Officer Fernandez, and other prison staff. The parties agree that this limited force was sufficient to achieve the desired end: "After the chemical agent was utilized the fight stopped and the inmates dispersed throughout the housing area." Dkt. No. 104 ¶ 39; *see also* Ex. G. And Officer Fernandez's repeated warnings speak to his efforts "to temper or to limit the amount of force ... and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397; *accord Beauvoir v. Falco*, 345 F. Supp. 3d 350, 369 (holding that this factor favored summary judgment because "Defendants tried multiple times to convince Plaintiff to follow their orders ... before resorting to use of force"). Indeed, despite Fernandez's warnings, Dkt. No. 104 ¶¶ 34–35, Plaintiff continued his involvement in the fight and threw a garbage can at his assailant and other inmates. *Id.* ¶ 36. Though Plaintiff contends that the garbage can was thrown in self-defense, and thus the Court should disregard this fact, Plaintiff's subjective state of mind is irrelevant—the Court must determine if Fernandez's actions, in response to these circumstances, was objectively reasonable. *See Kingsley*, 576 U.S. at 396–97.

**\*5** Plaintiff contends that he has established a genuine dispute on his excessive-force claim because the pepper spray entered his fresh wound. However, as the Supreme Court has repeatedly admonished, a "court must make [the objective-reasonableness] determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. It is undisputed that Officer Fernandez had just come onto the first floor of Unit 8A and was the only officer on the scene, and had seconds to assess the situation before acting. *See* Ex. G; Dkt. No. 104 ¶¶ 28–29. Given the violent fight occurring before him between two inmates, using the two-second burst of pepper spray was not objectively unreasonable. This is true even though Plaintiff had suffered a serious, though not-life threatening, injury, and the pepper spray irritated his wound until he shortly thereafter received medical treatment. Dkt. No. 104

¶ 41. Indeed, Officer Fernandez had seconds to observe that injury, and he still used only proportionate force to "ensure compliance of an uncooperative ... inmate," *Adilovic*, 2011 WL 2893101, at \*6. Crucially, unlike in *Tracy*, there is no evidence that Officer Fernandez "applied pepper spray after [the plaintiff] had already been handcuffed and was offering no physical resistance of police commands." 623 F.3d at 98–99. To the contrary, Officer Fernandez quickly desisted from using pepper spray after his initial burst ended the confrontation. *See* Dkt. No. 104 ¶ 37 (Plaintiff concedes that Fernandez used a "two-second burst"); *id.* ¶ 39; Ex. G. And within one hour of the incident, Plaintiff was seen and treated by medical staff. *Id.* ¶ 41.

In sum, Officer Fernandez is entitled to summary judgment because Plaintiff has not established a material issue of fact as to the objective element of his excessive-force claim. *Accord Beauvoir*, 345 F. Supp. 3d at 369 (granting defendants summary judgment in a § 1983 case because the "use of the pepper spray ... was permissible in the context of needing to maintain a baseline of order in the prison system," *even though* plaintiff "was not behaving belligerently or threateningly," in part because "Plaintiff repeatedly resisted multiple officers' orders"); *Berry*, 2014 WL 2158518, at \*\*5–6 (finding evidence that defendant officer used pepper spray to break up a violent fight between inmates insufficient to raise a genuine dispute about excessive force, and thus granting defendants summary judgment); *see also Perry v. Stephens*, 659 F. Supp. 2d 577, 582–83 (S.D.N.Y. 2009).

### B. Officer Fernandez is Also Entitled to Qualified Immunity

Plaintiff's excessive-force claim also fails because Officer Fernandez is entitled to qualified immunity. In other words, even if a reasonable jury could find that Fernandez violated the Fourteenth Amendment by using excessive force, he would still be entitled to summary judgment because he did not violate a *clearly established* constitutional right.

An officer may take advantage of qualified immunity, and thereby avoid liability for civil damages and the burdens of a lawsuit, if he demonstrates that his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (internal quotation marks omitted). " 'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 263 of 427

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted). "[E]xisting law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (quotation omitted). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted). Moreover, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 590 (quotation omitted). In other words, "the clearly established right must be defined with specificity." *City of Escondido, Cal. v. Emmons*, 149 S. Ct. 500, 501 (2019) (finding that defining the clearly established as "the right to be free of excessive force" was too general). It is a "constitutional right[ ] of which a reasonable person would have known" and "reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam) (internal citations and quotations omitted). Summary judgment should be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

**\*6** Plaintiff contends that "no reasonable officer in the Second Circuit could have believed that he was entitled to use pepper spray on the fresh, open facial cut of the victim of an ongoing attack by another inmate." Dkt. No. 100 at 7. This conclusory statement, however, is not enough to defeat summary judgment on this ground, as Plaintiff points to no Supreme Court or Second Circuit authority to this effect. Moreover, Plaintiff omits from this statement myriad, undisputed facts in the record. As noted, even reading the record most favorably to Mr. Quinones, Officer Fernandez was the sole DOC staff member that responded to an inmate-on-inmate altercation involving a dangerous weapon, observed Plaintiff and his assailant engaging in a fight, told Plaintiff to "stop" (which Plaintiff concedes he heard), told Plaintiff that failure to do so would result in the use of chemical agent against him, and observed Plaintiff move in an aggressive manner and throw a garbage can. Dkt. No. 104 ¶¶ 30–38. Only then did Fernandez spray a two-second burst

of pepper spray to stop the conduct. Plaintiff has pointed to no authority—let alone binding authority—and the Court has found none suggesting that this proportionate use of non-deadly force to regain control of a violent situation in a prison constitutes unconstitutionally excessive force. *See Wesby*, 138 S. Ct. at 589.

To the contrary, the Second Circuit has stated that "the use of entirely gratuitous force is unreasonable and therefore excessive ... no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d at 99 n.5. Yet here, the undisputed facts establish that Officer Fernandez's use of force was *not* gratuitous, Plaintiff was *not* restrained, and Plaintiff *continued* his violent conduct after twice being warned to desist. Similarly, in *Rodriguez v. City of New York*, the plaintiff's complaint survived a Rule 12 motion because plaintiff alleged that the corrections officers sprayed pepper spray in an indiscriminate manner against him after assaulting another inmate. Case. No. 14-cv-8647 (PGG) (S.D.N.Y.), Dkt. No. 38, at 2–3, 9, 13. Yet here, it is undisputed that Fernandez used pepper spray in a targeted and limited manner. *See* Def. Ex. G. On summary judgment, Plaintiff must offer more than allegations that Defendants' conduct constituted excessive force—yet even reading the record favorably to him, no reasonable jury could conclude that Fernandez's use of pepper spray was or gratuitous. Because Officer Fernandez did not violate a clearly established right, he is entitled to qualified immunity on Plaintiff's excessive-force claim. *Accord Berry*, 2014 WL 2158518, at \*\*6–7 (granting qualified immunity on similar facts in this posture), *aff'd*, 622 F. App'x at 11 (holding that defendants were "entitled to qualified immunity"); *Beauvoir*, 345 F. Supp. 3d at 375–76 (same).

### C. Defendants Are Entitled to Summary Judgment on Plaintiff's Deliberate-Indifference Claim

The Court next considers Mr. Quinones's claim that the Intake Defendants—Defendants Rochez, Wilson, Rollison, and Blackwood—were deliberately indifferent to the risk of harm that other inmates posed to him. Specifically, Plaintiff claims that the Intake Defendants "were notified of a credible threat to Mr. Quinones' safety," as it is undisputed that upon intake to GVRC that Plaintiff and the two other inmates informed the Intake Defendants that they could not be placed in Unit 8A, because the Macballas controlled that unit and that "their gangs had problems with the Macballas and that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 264 of 427

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

plaintiff expected he would be attacked." Dkt. No. 104 ¶¶ 10–13. Because the Intake Defendants nonetheless placed him in Unit 8A, Plaintiff claims that "they recklessly failed to act with reasonable care to mitigate that threat." Dkt. No. 100 at 9–10.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Therefore, "[a]llowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009). However, not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety. *See Farmer*, 511 U.S. at 834. Instead, an official must act with " 'deliberate indifference' to a substantial risk of serious harm to an inmate." *Id.* at 828. When such claims are made by a pretrial detainee such as Mr. Quinones, they "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment," which as discussed above applies only to convicted prisoners. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

 **\*7** To state a claim for deliberate indifference, plaintiff's allegations must satisfy a two-prong test, referred to as the "objective prong" and the "subjective prong" (better understood as the mens rea or mental element prong). *See id.* at 30–32; *Taylor v. City of New York*, No. 16-cv-7857 (NRB), 2018 WL 1737626, at \*\*11–12 (S.D.N.Y. Mar. 27, 2018). Under the first prong, the inmate must show that the alleged violation was "sufficiently serious to constitute objective deprivations of the right to due process." *Darnell*, 849 F.3d at 29. The second prong requires the defendant's deliberate indifference to the objective deprivation. *See id.* at 32. Specifically, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. As the Second Circuit explained, "[i]n other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." *Id.* Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding also applies to failure-to-protect claims. *See id.* at 33 n.9 ("[D]eliberate indifference means the same thing for each

type of claim under the Fourteenth Amendment."); *Taylor*, 2018 WL 1737626, at \*12.

Here, the undisputed facts show that Plaintiff has failed to establish a genuine dispute as to either prong. At best, the record evidence shows that Plaintiff informed a still-unidentified intake officer that he could not be housed with Macballas gang members, in part because of "his knowledge that Macballas did not let anyone else live with them while inside correctional facilities." Dkt. No. 104 ¶ 14. However, Plaintiff did not inform "any of the officers in Unit 8A about his safety concerns." *Id.* ¶ 18. And another inmate in the unit, Mike, whom Plaintiff knew from his time living in Harlem, informed Plaintiff that "two other Blood gang members" also lived in the housing unit. *Id.* ¶ 21. Indeed, Plaintiff admits that he "spoke with other Blood gang members" and was informed that the Macballas permitted Blood members use one of the telephones in the unit at certain times of the day. *Id.* ¶ 22. It is therefore undisputed that there were multiple Blood gang members—as well as the other inmates who were not affiliated with the Macballas, such as the two individuals with whom Plaintiff's intake was processed—also housed in Unit 8A, and that these individuals were not attacked by Macballas. *Id.* ¶ 21.

Moreover, Plaintiff did not inform the Intake Defendants (nor does he now contend) that there was a more specific threat against him, such as one made by a specific Macballa member. *Cf. Rennalls v. Alfredo*, 2015 WL 5730332, at \*4 (S.D.N.Y. Sept. 30, 2015) ("A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by [a] plaintiff to be separated from the attacker."); *Velez v. City of New York*, No. 17-cv-9841 (GHW), 2019 WL 3495642, at \*4 (S.D.N.Y. Aug. 1, 2019) ("Those cases which have found officers potentially liable for failing to prevent an attack involved clear and specific threats against an inmate.") (collecting cases). Given these undisputed facts, Plaintiff has failed to establish a genuine dispute that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 135; *accord Velez*, 2019 WL 3495642, at \*4 (S.D.N.Y. Aug. 1, 2019) ("a number of courts in this district have found that an inmate informing an officer about a nebulous or untethered fear does not put an officer on notice that the inmate is at risk of attack") (collecting cases); *see, e.g.*, *Desulma v. City of New York*, No. 98-cv-2078 (RMB), 2001 WL 798002, at \*7 (S.D.N.Y. July 6, 2001) (although prison official knew that the plaintiff

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 265 of 427

Quinones v. Rollison, Not Reported in Fed. Supp. (2020)

feared certain inmates and had requested protective measures, "given the lack of prior history of violence between [plaintiff] and [his attackers,]" there was no reason for him "to infer the existence of a threat of harm").

**\*8** For the same reason, no reasonable jury could conclude that the Intake Defendants "act[ed] intentionally to impose the alleged condition, or recklessly fail[ed] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. There are certainly no facts in the record, and Plaintiff does not point to any, suggesting that the Intake Defendants intentionally exposed Plaintiff to harm. And given the number of non-Macballas housed in Unit 8A and the generality of Plaintiff's comment made to a single corrections officer, Plaintiff has not established a genuine dispute that the Intake Defendants acted recklessly. *See* Dkt. No. 104 ¶¶ 16–18. Moreover, a Department of Corrections report created after the incident identifies the assailant as a Trinitarian gang member, not a Macballas member. *See* Def. Ex. K. It is undisputed that Plaintiff never raised concerns about any gang other than the Macballas, and thus even with Plaintiff's statement, the Intake Defendants were not reckless in placing him in Unit 8A, which was controlled by the Macballas. *See* Dkt. No. 104 ¶ 46. In sum, Defendants are also entitled summary judgment on Plaintiff's deliberate-indifference claim.[4] *Accord Anselmo v. Kirkpatrick*, No. 19-cv-0350 (TJM), 2019 WL 2137469, at *4 (N.D.N.Y. May 16, 2019) ("[A]n inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." (quoting *Ross v. City of New York*, No. 12-CV-8545, 2014 WL 3844783, at *8 (S.D.N.Y. 2014) and collecting cases).

### IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment, Dkt. No. 91, is GRANTED. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2020 WL 6420181

---

### Footnotes

1       Plaintiff admits this fact "to the limited extent that Plaintiff believed the two other inmates to be members of the Gorilla gang." Dkt. No. 104 ¶ 12. However, this proposition is conclusory, not supported by any citations to the record, and indeed contradicted by the record. The same is true for other facts contained in Plaintiff's Response to Defendants' 56.1 Statement and Plaintiff's Rule 56.1 statement. Plaintiff has therefore failed to raise a genuine dispute as to certain facts. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); Local Civil Rule 56.1(c)–(d).

2       Plaintiff contends that Defendants' Exhibit K, a New York City Department of Corrections incident report, is inadmissible because it constitutes hearsay. However, this incident report satisfies all requirements for the business-record exception to hearsay, and the Court can thus consider it on summary judgment. *See* Federal Rule of Evidence 803(6); *United States v. Kaiser*, 609 F.3d 556, 574–75 (2d Cir. 2010).

3       Plaintiff also named as Defendant Correction Officer Jane or John Doe, Dkt. No. 88 ¶ 5, but he subsequently consented to "dismissal of the John or Jane Doe defendants," Dkt. No. 99 ¶ 2.

4       For the same reasons, Plaintiff has not shown that the Intake Defendants violated a clearly established constitutional right. They have pointed to no cases, let alone binding authority, holding "with specificity" that such conduct constitutes a violation of the Fourteenth Amendment. *See City of Escondido, Cal. v. Emmons*,

149 S. Ct. 500, 501 (2019). The Intake Defendants, like Officer Fernandez, are therefore also entitled to qualified immunity.

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4463459
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marcos RODRIGUEZ, Plaintiff,
v.
Dr. Mikhail GUSMAN, Defendant.

9:22-CV-181 (GTS/MJK)
|
Signed July 24, 2024

**Attorneys and Law Firms**

MARCOS RODRIGUEZ, Plaintiff, pro se.

MARK G. MITCHELL, Asst. Attorney General, for Defendant.

ERIN P. MEAD, Asst. Attorney General, for Defendant.

**REPORT-RECOMMENDATION**

MITCHELL J. KATZ, United States Magistrate Judge

 **\*1**  TO THE HONORABLE GLENN T. SUDDABY, United States District Court Judge:

In this *pro se* civil rights action, plaintiff alleges that he was denied constitutionally adequate medical care while he was an inmate in the custody of Eastern Correctional Facility ("Eastern C.F."). Presently before this court is plaintiff's motion for partial summary judgment as to liability only (Dkt. No. 65), and defendant Dr. Gusman's cross-motion for summary judgment (Dkt. No. 71). Also before the court is plaintiff's motion to compel discovery pursuant to Fed. R. Civ. P. 37(a)(1) (Dkt. No. 70), and motion to defer consideration of defendant's cross-motion for summary judgment (Dkt. No. 84).

This matter has been referred to me for Report and Recommendation by United States District Court Judge Glenn T. Suddaby, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule ("Local Rule") 72.3(c). For the following reasons, this court recommends that defendant Dr. Gusman's cross-motion for summary judgment be granted, that plaintiff's motion for partial summary judgment be denied, that plaintiff's motion to compel discovery be denied, and that plaintiff's motion to defer consideration of defendant's cross-motion for summary judgment be denied.

**DISCUSSION**

**I. PROCEDURAL HISTORY**

Plaintiff commenced this action on February 28, 2022 by filing a complaint. (Dkt. No. 1). On July 7, 2022, plaintiff filed an amended complaint (Dkt. No. 17), which is the operative complaint in this action. On December 16, 2022, defendants filed a motion to dismiss for failure to state a claim. (Dkt. No. 26). United States Magistrate Judge Andrew T. Baxter issued a Report-Recommendation which was accepted and adopted in its entirety by United States District Court Judge Glenn T. Suddaby on May 4, 2023, dismissing plaintiff's section 1983 claims against defendant Dr. Bhavsar with prejudice, and dismissing plaintiff's state law claims without prejudice but without leave to amend. (Dkt. Nos. 39, 40). Defendants' motion to dismiss the amended complaint as against defendant Dr. Gusman was denied. Thus, what remains is plaintiff's cause of action against Dr. Gusman for alleged Eighth Amendment violations.

On November 21, 2023, Judge Baxter issued a text order resetting the discovery deadline to February 22, 2024. (Dkt. No. 54). Local Rule 16.2 provides in relevant part that "[p]arties shall file and serve motions to compel discovery no later than fourteen (14) days after the discovery cut-off." Plaintiff filed his Motion To Compel Discovery (Dkt. No. 70) on March 22, 2024, twenty-nine days after the discovery deadline.

**II. FACTS**

  **A. Defendant's Contentions**

Dr. Gusman was employed as a physician at Eastern C.F. from October 1999 until his retirement in June 2021. (Def.'s Stmt. of Mat. Facts ¶ 3) (Dkt. No. 71-1). Dr. Gusman returned to working at Eastern C.F. in September 2021, on a per diem basis. (*Id.* ¶ 4). Plaintiff was incarcerated at Eastern C.F. from December 2013 to March 2022. (*Id.* ¶ 11).

On February 25, 2014, plaintiff complained of difficulty urinating and requested a medical call out to be seen by a physician. (Def.'s Stmt. of Mat. Facts ¶ 14; Dkt. No. 73-1 at 337). [1] On March 6, 2014, plaintiff was evaluated by Dr. Bhavsar [2] for "urinary issues," at which time Dr. Bhavsar observed plaintiff's prostate to be enlarged upon a digital rectal examination ("DRE"). (Def.'s Stmt. of Mat. Facts ¶¶

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 268 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

15-16; Dkt. No. 73-1 at 334). Dr. Bhavsar thereafter ordered a Prostate Specific Antigen ("PSA") test for plaintiff. (Def.'s Stmt. of Mat. Facts ¶ 18; Dkt. No. 73-1 at 334). "A PSA test is a blood test used to screen for prostate cancer ... [and] measures the amount of PSA in the patient's body." (Gusman Decl. ¶¶ 13-14; Dkt. No. 72-3). The results of plaintiff's test showed that his PSA level was 2.44 ng/ml, which was "within normal range." (Gusman Decl. ¶¶ 13-14; Dkt. No. 73-1 at 72). According to Dr. Gusman, "[t]he normal range for PSA varies depending on age; the normal range for PSA for men 50-59 years old is a result less than 3.5 ng/ml and less than 4.5 mg/ml for men 60-69 years old." (Gusman Decl. ¶ 14). [3] Dr. Bhavsar diagnosed plaintiff with Benign Prostatic Hyperplasia ("BPH"), "or an enlarged prostate," and prescribed Tamsulosin (generic for Flomax) to treat the symptoms associated with this condition. (Def.'s Stmt. of Mat. Facts ¶¶ 24-25; Dkt. No. 73-1 at 334).

**\*2** Approximately one year later, on February 4, 2015, plaintiff complained of difficulty urinating during a call out, and a PSA test was ordered. (Def.'s Stmt. of Mat. Facts ¶ 29; Dkt. No. 73-1 at 311). At that time, plaintiff reported that the Tamsulosin was helpful, and a new prescription was provided. (*Id.* ¶ 30; Dkt. No. 73-1 at 311). The PSA test was performed on March 10, 2015 and indicated results within the normal range at 2.71 ng/ml. (Def.'s Stmt. of Mat. Facts ¶ 31; Dkt. No. 73-1 at 90). Thereafter, routine PSA tests were performed to monitor plaintiff's prostate, and Tamsulosin continued to be prescribed for symptoms associated with plaintiff's enlarged prostate. (Def.'s Stmt. of Mat. Facts ¶¶ 32-33).

In 2016, plaintiff was seen for pain in his right testicle and an ultrasound was performed. (Gusman Decl., ¶ 17; Dkt. No. 73 at 224, 237, 248, 250). Plaintiff was diagnosed with hydrocele (swelling caused by fluid). (*Id.*). Plaintiff also complained of groin pain in 2016 which was diagnosed as a hernia after an ultrasound was performed. (Gusman Decl., ¶ 18; Dkt. No. 73 at 257-258; Dkt. No. 73-3 at 901). On August 29, 2016, plaintiff reported that he was able to urinate without difficulty. (Gusman Decl., ¶ 19; Dkt. No. 73 at 249). Another PSA test was performed on January 10, 2017 and was reported at 2.43 ng/ml, within the normal range. (Gusman Decl., ¶ 21; Dkt. No. 73-1 at 389).

On May 9, 2017, plaintiff was seen by a urologist at Eastern C.F. who ordered a PSA test, the result of which was within the normal range at 2.71 ng/ml. (Gusman Decl., ¶ 21; Dkt. No. 73 at 220; Dkt. No. 73-2 at 654; Dkt. No. 73-3 at 956). Plaintiff was seen again by a urologist in July 2017 for a hernia

and continued complaints of right testicular pain. (Gusman Decl., ¶ 22; Dkt. No. 73 at 218; Dkt. No. 73-3 at 955). During the July 2017 exam, plaintiff's prostate was noted to be "benign." (*Id.* ¶ 22; Dkt. No. 73 at 218).

On October 17, 2017 and April 12, 2018, plaintiff reported normal urination. (Def.'s Stmt. of Mat. Facts ¶¶ 41-42; Dkt. No. 73 at 195, 209). An additional PSA test performed on November 27, 2018 was within normal range at 2.81 ng/ml (Gusman Decl., ¶ 24; Dkt. No. 73-1 at 401). On March 19, 2019, plaintiff again reported normal urination. (Def.'s Stmt. of Mat. Facts ¶ 45; Dkt. No. 73 at 165). Plaintiff's December 27, 2019 PSA test result was within normal range at 2.02 ng/ml (Gusman Decl., ¶ 25; Dkt. No. 73-1 at 412).

On October 6, 2020, plaintiff was evaluated by Dr. Gusman for complaints of pain in the penis, incontinence, and blood in his urine. (Def.'s Stmt. of Mat. Facts ¶ 49; Dkt. No. 73 at 133). This was the first time Dr. Gusman saw plaintiff for these symptoms, and the first time plaintiff complained of issues with urination since February 2015. (Def.'s Stmt. of Mat. Facts ¶¶ 50-51). Dr. Gusman "performed a [Digital Rectal Exam] and noted two nodes in [plaintiff's] prostate." (*Id.* ¶ 52). Dr. Gusman prescribed antibiotics, ordered a PSA test, and referred plaintiff for a urology consultation. (Gusman Decl., ¶ 27; Dkt. No. 73 at 133). Referral requests made by physicians are electronically sent to the facility's Scheduling Unit which obtains the necessary approval and handles the scheduling of the referral upon approval. (Def.'s Stmt. of Mat. Facts ¶ 56). Plaintiff's PSA test result came back on October 21, 2020 within normal range at 2.2 ng/ml. (Gusman Decl., ¶ 30, Dkt. No. 73-1 at 503).

While treating plaintiff for an unrelated medical issue on February 16, 2021, Dr. Gusman noted that plaintiff's urology referral was still pending. (Gusman Decl., ¶ 32; Dkt. No. 73 at 126). On May 21, 2021, plaintiff was seen by urologist Dr. Janis, who performed a Digital Rectal Exam confirming Dr. Gusman's findings. (Def.'s Stmt. of Mat. Facts ¶ 61; Dkt. No. 73-1 at 526). Dr. Janis ordered a PSA test and a biopsy of plaintiff's prostate. (Gusman Decl., ¶ 33; Dkt. No. 73-1 at 526, 533-34). Dr. Gusman "had no control over when the biopsy was performed." (Def.'s Stmt. of Mat. Facts ¶ 62). Plaintiff's PSA test result was reported on June 10, 2021 at 2.46 ng/ml, within the normal range. (Def.'s Stmt. of Mat. Facts ¶ 63; Dkt. No. 73-1 at 426). Plaintiff's biopsy was performed on August 17, 2021 and he was instructed to follow up in one month for the results. (Def.'s Stmt. of Mat. Facts ¶¶ 64-65).

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 269 of 427

**\*3** Plaintiff's biopsy results returned on August 31, 2021, indicating the presence of prostate cancer. (Def.'s Stmt. of Mat. Facts ¶ 66; Dkt. No. 73 at 110; Dkt. No. 73-1 at 518-19). Plaintiff's Gleason score, "a grading system used by pathologists for prostate cancer," was "6," which is the lowest grade of prostate cancer and indicates that the cancer is "stage 1 with very low to low risk (group 1), ... slow moving and unlikely to spread, and is treatable ...." (Def.'s Stmt. of Mat. Facts ¶¶ 67-69). Plaintiff had a follow up appointment with Dr. Janis on October 8, 2021 at which time they discussed plaintiff's diagnosis and treatment options. (*Id.* ¶ 73; Dkt. No. 73 at 104; Dkt. No. 73-1 at 524). In November 2021, plaintiff advised Dr. Gusman that he wanted to proceed with radiation therapy. (Def.'s Stmt. of Mat. Facts ¶ 76; Dkt. No. 73 at 98). Dr. Gusman submitted a referral for plaintiff to see a radiologist on November 16, 2021. (*Id.*). Plaintiff's radiology consultation took place on December 2, 2021, with radiation therapy beginning on December 21, 2021 and concluding on January 28, 2022. (Def.'s Stmt. of Mat. Facts ¶ 77; Dkt. No. 73 at 70, 79, 96; Dkt. No. 73-1 at 461-64). Plaintiff's treatment was successful, rendering him "cancer-free" upon completion. (Def.'s Stmt. of Mat. Facts ¶ 78; Dkt. No. 73-2 at 645).

### B. Plaintiff's Contentions

Plaintiff asserts that his PSA test results reflected in the clinical reports he received on April 7, 2014, March 10, 2015, January 10, 2017, May 26, 2017, July 11, 2017, November 27, 2018, December 27, 2019, October 22, 2020, June 9, 2021 (Pl.'s Stmt. Of Mat. Facts ¶¶ 5, 8, 11, 14, 16, 21, 23, 27, 30) were not within normal range as Dr. Gusman contends. In support of his contention, plaintiff relies on the following language found on his reports:

> The PSA assay should not be the only test used for diagnostic purposes. Additional evaluation using DRE, ultrasound, TUR or similar procedures may be used for this purpose. Predictions of disease recurrence should not be based solely upon values obtained from serial PSA values obtained on the patient.

(Dkt. 65-1 at 11).

Plaintiff further claims that he had trouble urinating even while taking Tamsulosin, and that he would not be able to do so at all if he did not take it. (Plaintiff Aff., ¶ 6). Plaintiff further claims that he reported instances of pain in various parts of his body from 2017 through 2020. (Plaintiff's Aff. Generally).

## III. SUMMARY JUDGMENT

### A. Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Jeffreys*, 426 F.3d at 554 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 270 of 427

**\*4** In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obligated to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

### B. Local Rule 56.1

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a Statement of Material Facts with a specific citation to the record where the fact is established. L.R. 56.1(a). "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." *Id.* In turn, Local Rule 56.1(b) mandates that the party opposing a motion for summary judgment "file a separate Response to the Statement of Material Facts. The opposing party's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs." L.R. 56.1(b). "Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.*; *see also Lee v. City of Troy*, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact."). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." L.R. 56.1(b) (emphasis omitted).

Here, Dr. Gusman filed and served an 81-paragraph Rule 56.1 Statement of Material Facts. (Dkt. No. 71-1). In opposition, plaintiff filed a Response To Defendant's Statement of Material Facts in which he denied 27 of the 81 assertions in Dr. Gusman's Statement of Material Facts. (Dkt. No. 92 at 10-29). Plaintiff's failure to provide a response in accordance with Local Rule 56.1(b) to the remaining 54 factual assertions in Dr. Gusman's Statement of Material Facts permits this court to deem admitted Dr. Gusman's properly supported facts that plaintiff does not specifically controvert. *See* L.R. 56.1(b); *see also T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citations omitted) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

## IV. STATUTE OF LIMITATIONS

### A. Legal Standard

"The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case, is the three-year period for personal injury actions under New York State law." *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *see also Owens v. Okure*, 488 U.S. 235, 250-51 (1989); N.Y.C.P.L.R. § 214(5). Unless the limitations period is tolled for some reason, a plaintiff must file his Section 1983 civil rights action within three years of the accrual of each cause of action.

**\*5** "Federal law governs the question of when a [Section 1983] claim accrues." *M.D. v. Southington Bd. of Educ.*, 334 F.3d 217, 221 (2d Cir. 2003) (quoting *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (citations omitted).

Although federal law determines when a Section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *See Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997). A single violation with continuing "consequences" does not extend the accrual of the statute of limitation. *See Melendez v. Schneiderman*, No.13-CV-622 (GLS/ATB), 2014 WL 2154536, at *12 (N.D.N.Y. May 22, 2014) (citing, inter alia, *Doe v. Blake*, 809 F. Supp. 1020, 1025 (D. Conn. 1992) (a "continuing violation" which would change the accrual date is occasioned by continuing unlawful acts, not by continued ill effects from the original violation)).

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 271 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

In "rare and exceptional" cases, the doctrine of equitable tolling may apply to defeat an argument that the action was not timely filed. *See Abbas,*480 F.3d at 642; *see also Veltri v. Bldg. Serv. 32B-J Pension Fund,* 393 F.3d 318, 322 (2d Cir. 2004) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). "Equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances." *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). To apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)).

### B. Analysis

Plaintiff filed this action on February 28, 2022. [4] (Dkt. No. 1). This court previously ruled that absent equitable or other tolling, any claim which accrued prior to February 23, 2019 is time-barred. (Dkt. No. 39 at 6). In his motion papers, plaintiff appears to concede that "claims of [d]eliberate indifference before February 23 rd 2019 are time barred." (Pl. Mem. Of Law at 7). As set forth below, plaintiff has failed to raise a material question of fact establishing Dr. Gusman's deliberate indifference to his medical care after February 2019, and summary judgment is warranted. [5]

### V. DENIAL OF MEDICAL CARE

#### A. Legal Standard

**\*6**  Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must ensure that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *See Smith v. Carpenter*, 316 F.3d 178, 183-84

(2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* (citing *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996)).

#### 1. Objective Element

To meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin,* 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 834). "Determining whether a deprivation is an objectively sufficiently serious deprivation entails two inquiries." *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).

However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Salahuddin*, 467 F.3d at 280.

#### 2. Subjective Element

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 272 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300, (1991)). To satisfy the second element, a plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835-37). Instead, a plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839-40).

 **\*7**  To rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). The defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. The court in *Salahuddin* stated that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

"The totality of an inmate's medical care must be considered in order to determine whether a prison official has acted with deliberate indifference to serious medical needs." *Wandell v. Koenigsmann,* 99-CV-8652, 2000 WL 1036030, \*3 (S.D.N.Y. 2000). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir. 1986). Medical decisions will constitute "indifference" only when they are contrary to accepted medical standards. *See Harding v. Kuhlmann,* 588 F. Supp. 1315, 1316 (S.D.N.Y. July 19, 1984). It is well established that an inmate who disagrees with his physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is adequate. *See Chance,* 143 F.3d at 703.

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing

of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble,* 429 U.S. 97, 107 (1976)). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is incarcerated. *Id.*; *see also Daniels v. Williams,* 474 U.S. 327 (1986) (noting that negligence is not actionable under Section 1983); *Palacio v. Ocasio,* No. 02-CV-6726, 2006 WL 2372250, at \*11 (S.D.N.Y. Aug. 11, 2006), *aff'd,* 345 Fed. App'x 668 (2d Cir. 2009) ("It is well settled that the negligent failure to diagnose a serious medical condition does not create a cause of action under 42 U.S.C. § 1983."). "To succeed in showing deliberate indifference, [the plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir. 1998); *see also Cuoco v. Moritsugu,* 222 F.3d 99, 107 (2d Cir. 2000) ("Mere medical malpractice is not tantamount to deliberate indifference, but it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm.") (citations omitted).

### B. Analysis

Plaintiff's Eighth Amendment claim against Dr. Gusman is based on the following allegations of deliberate indifference to medical needs: a) ignoring complaints of difficulty urinating; b) improperly prescribing Tamsulosin; c) ignoring plaintiff's allegedly abnormal PSA test; d) failing to "oversee" the care and treatment provided by other physicians; e) delay in having plaintiff examined by a urologist; f) delay in scheduling a biopsy; and g) failing to advise plaintiff of his biopsy results for six weeks. (Dkt. Nos. 17, 65).

 **\*8**  All of plaintiff's claims are belied by the record which supports a recommendation that plaintiff's motion for partial summary judgment be denied and that Dr. Gusman's cross-motion for summary judgment be granted.

### 1. Objective Element

Plaintiff cannot demonstrate that he was actually deprived of adequate medical care or that the purported inadequacy was "sufficiently serious." *Salahuddin,* 467 F.3d at 279. As set forth below, the record establishes that the care provided

to plaintiff by Dr. Gusman was reasonable, and, therefore, adequate under the Eighth Amendment.

First, plaintiff's allegations that his complaints of difficulty urinating from 2014 to 2020 were ignored and not properly treated are not factually accurate and are therefore without merit. The medical records establish that after March 2014, plaintiff only complained of difficulty urinating on one other occasion, February 4, 2015, in response to which a PSA test was ordered and a new prescription for Flomax was written. (Gusman Decl., ¶ 16; Dkt. No. 73-1 at 12). In fact, after February 4, 2015, plaintiff reported normal urination on numerous occasions. (Dkt. No. 73 at 166, 196, 210, 250).

It was not until October 6, 2020, more than five and a half years after plaintiff's last complaint, that he again complained of difficulty urinating. (Gusman Decl., ¶ 26). Considering its efficacy, Dr. Gusman continued prescribing Tamsulosin for plaintiff's symptoms. Plaintiff's unsubstantiated lay opinion to the contrary is without merit and is tantamount to nothing more than a disagreement with Dr. Gusman's medical judgment which does not give rise to an Eighth Amendment claim for medical indifference. *See Reyes v. Gardener,* 93 Fed. App'x 283, 285 (2d Cir. 2004) ("[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition.").

Next, plaintiff incorrectly claims that his consistently "abnormal" PSA test results evidenced a sufficiently serious condition for which Dr. Gusman deprived him care. Plaintiff's contention that his PSA levels of 2.44 ng/ml on April 7, 2014 (Dkt. No. 73-1 at 72), 2.71 ng/ml on March 10, 2015 (Dkt. No. 73-1 at 75), 2.43 ng/ml on January 10, 2017 (Dkt. No. 73-1 at 90), 2.71 ng/ml on May 9, 2017 (Dkt. No. 73 at 221), 2.81 ng/ml on November 27, 2018 (Dkt. No. 73-1 at 102), 2.02 ng/ml on December 27, 2019 (Dkt. No. 73-1 at 113) and 2.22 ng/ml on October 22, 2020 (Dkt. No. 73-1 at 204) all support a finding of medical indifference in violation of his Eighth Amendment rights is without merit. However, the repeated PSA screenings, without more, negate plaintiff's contention that he was deprived of adequate medical care, and evidence that his condition was in fact being monitored by his health care providers. Furthermore, plaintiff does not advance any evidence refuting Dr. Gusman's statement that further testing was not medically indicated given plaintiff's PSA results, lack of positive findings upon performing a Digital Rectal Exam, and lack of symptomology. (Gusman Decl. ¶ 67). Plaintiff's unsubstantiated lay opinion that Dr. Gusman should have

ordered additional testing or referred him to a urologist sooner based on the PSA results is conclusory and at best, seems to be based upon the benefit of hindsight which is insufficient to implicate the Eighth Amendment "and is not properly the subject of a Section 1983 action." *Groves v. Davis*, 11-CV-1317 (GTS/RFT), 2012 WL 651919, at *5 n. 9 (N.D.N.Y. Feb. 28, 2012).

**\*9** Nor does plaintiff's perceived delay in Dr. Gusman having diagnosed and/or treated his prostate cancer raise any genuine issues of material fact sufficient to defeat defendants' cross-motion for summary judgment. Insofar as there is no medical evidence, notwithstanding regular medical care, in the record suggesting that plaintiff suffered from prostate cancer before October 2020, the court cannot find a corresponding delay in diagnosing and/or treating the same. To the contrary, the record establishes that prior to October 2020, Dr. Gusman adequately treated plaintiff's complaints and chose a course of treatment which, in his professional medical opinion, was supported based on plaintiff's symptomology and presentation. In response to Dr. Gusman's uncontroverted medical opinion (*see* Gusman Decl., generally) and the evidence contained in the medical records (Dkt. Nos. 73, 73-1, 73-2, 73-3), plaintiff presents no evidence other than his own self-serving and conclusory statements to establish that he had cancer prior to October 6, 2020 and that Dr. Gusman should have prescribed a different course of treatment. *See Scott v. Koenigsmann*, 12-CV-1551 (MAD), 2016 WL 1057051, at *12 (N.D.N.Y. Mar. 14, 2016) (The record lacked facts supporting plaintiff's contention that her condition was "fast degenerating," "life threatening"); *see also Abreu v. Farley*, 11-CV-06251, 2019 WL 1230778 at *12 (W.D.N.Y. Mar. 15, 2019) (plaintiff's contention that he suffered a "sufficiently cardiovascular event" rejected where "plaintiff faile[d] to provide any evidence, medical or otherwise", ... "to associate his alleged symptoms with any other cardiovascular health-related issues").

In any event, plaintiff's assertion that Dr. Gusman should have diagnosed plaintiff's cancer sooner, without more, does not support plaintiff's Section 1983 claim. *See Whitfield v. O'Connell*, 402 Fed. App'x 563, 566 (2d Cir. 2010) (determining that "even assuming that Whitfield's earlier laboratory reports suggested that he might be suffering from a urinary tract infection, any failure on the part of the Defendants to properly diagnose this condition would not constitute deliberate indifference, but rather, at worst, medical malpractice."), *cert. denied*, 563 U.S. 952 (2011); *Haynes v. City of New York*, 19-CV-1925, 2020 WL 4926178, at *11

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 274 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

(S.D.N.Y. August 20, 2020) (observing that "allegations of negligent misdiagnosis ... do not suggest that the defendant acted with a conscious disregard to inmate health or safety").

As to plaintiff's claim based on the purported delay in being seen by a urologist following his October 6, 2020 visit with Dr. Gusman, the record clearly establishes that Dr. Gusman made a referral request for plaintiff to see a urologist that same day. (Gusman Decl. ¶ 71). Dr. Gusman and Nurse DePalo assert that, after having made the referral request, Dr. Gusman was no longer involved in the referral process. (Gusman Decl., ¶ 3); see also Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002); see also Burton v. Lynch, 664 F. Supp. 2d 349, 359–60 (S.D.N.Y. 2009). Nurse DePalo further stated that seven months for an inmate to wait for an appointment with a urologist during COVID-19 was not unreasonable. (Dkt. No. 72-5, ¶¶ 6, 7).

In opposition to Dr. Gusman's contention that he is not liable for any alleged delay in plaintiff seeing a urologist after the October 6, 2020 examination, plaintiff relies on Loyd v. Lee, 570 F.Supp. 2d 556 (S.D.N.Y. August 14, 2008) (motion to dismiss denied where the amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of treatment being prescribed was ineffective and declined to do anything to improve plaintiff's submission beyond resubmitting MRI request forms), Hathaway v. Coughlin, 37 F.3d 63 (2d. Cir. 1994) (court held that a prison doctor could be found to have been deliberately indifferent to a prisoner's serious medical needs because of constant complaints and failure to make a referral to a specialist until after the lawsuit was commenced), Stevens v. Goord, 535 F.Supp. 2d. 373 (S.D.N.Y. 2008) (the court concluded that the doctor's decision not to pursue a course of treatment given plaintiff's pain and discomfort for approximately eight months served as a basis for plaintiff's constitutional claim), Price v. Reilly, 697 F.Supp. 2d. 344, 362 (E.D.N.Y. March 8, 2010) (a rational jury could find that the defendants acted with deliberate indifference to plaintiff's serious medical needs where there was at least a nine month delay in arranging a kidney transplant test despite plaintiff's repeated requests and defendant's statement that they had "other priorities right now"), Harrison v. Barkley, 219 F.3d 132, 138 (2d Cir. 2000) (court reversed grant of summary judgment, holding that a rational jury could find that the named defendants were deliberately indifferent to plaintiff's serious medical needs where plaintiff's cavity was left untreated for one year in the absence of a court order or plaintiff's consent to the extraction of the non-implicated tooth). Plaintiff's reliance on these cases is misplaced, as the facts in this case are easily distinguishable.

**\*10** Unlike the plaintiffs in *Loyd, Hathaway, Stevens, Price,* and *Barkley* who either complained of continuing pain for a prolonged period of time before receiving further treatment, did not see a specialist despite numerous requests until after an action was commenced, or repeatedly inquired about the status of their medical testing, Dr. Gusman referred plaintiff to a urologist **the same day** that he had cause to believe that plaintiff needed additional medical care.

Moreover, although plaintiff did seek medical attention between October 6, 2020 and May 21, 2021, while waiting to be seen by the urologist, he did not report a continuation, let alone a worsening, of the symptoms which necessitated plaintiff's October 6, 2020 examination in the first instance. Rather, plaintiff sought medical attention for prescription refills (Dkt. No. 73 at 123, 124, 125, 126, 127, 128, 132, 133), COVID testing (Dkt. No. 73 at 130; Dkt. No. 73-1 at 424, 459), blood work (Dkt. No. 73-1 at 425, 426), back pain (Dkt. No. 73 at 123; Dkt. No. 73-1 at 484), and wrist pain (Dkt. No. 73 at 132; Dkt. No. 73-2 at 737). Only on February 16, 2021 during a sick call to discuss a medication dosing, did plaintiff inquire about the status of his urology referral. (Dkt. No. 73 at 127). The record does not evidence that plaintiff reported any pain or other symptoms related to his prostate condition at any of his encounters with the medical staff during this timeframe. (Dkt. No. 73 at 127). Notably, when plaintiff was finally seen by the urologist and received a diagnosis for prostate cancer, it was noted to be at the lowest risk category, and, as evidenced by the record, treatable. The cancer was diagnosed because of the care provided to plaintiff. Based on these facts, even if there was objectively any avoidable delay between October 6, 2020 and May 21, 2021 (noting the impact of the Covid pandemic), the delay was not "substantially serious," and plaintiff has not raised a genuine issue satisfying the objective factor. *See Motta v. Wright,* No. 9:06-CV-1047 (NAM/GJD), 2009 WL 1437589, at \*16 (N.D.N.Y. May 20, 2009) (finding alleged three-and-a-half year delay in treatment did not satisfy objective factor of Eighth Amendment analysis where defendants presented evidence that delay was not "substantially serious," including evidence of the slow progression of the disease and the minimal effect of the delay on plaintiff's condition).

Similarly, the court finds that there was no actionable delay in performing the biopsy ordered by Dr. Janis following

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 275 of 427

plaintiff's May 21, 2021 consultation. The biopsy ordered was performed on August 17, 2021, less than three months after the May 21, 2021 consultation. The record establishes that Dr. Gusman neither ordered the biopsy nor had any control over when it was performed, precluding imposing any liability on him for lack of any personal involvement. Dr. Gusman retired from DOCCS in June 2021, shortly after the May 21, 2021 consultation with Dr. Janis and before the biopsy was performed. (Gusman Decl., at ¶ 1).

Finally, plaintiff's claim that his Eighth Amendment rights were violated because of a perceived delay in communicating his biopsy results to him is not supported by the record. Dr. Gusman was still retired when plaintiff's biopsy results were received on August 31, 2021 by Dr. Loricchioandola at Eastern C.F. and therefore, Dr. Gusman cannot be held liable. (Declaration of Dr. Gusman at ¶¶ 1, 77). Upon receipt of plaintiff's biopsy results, a follow-up appointment was scheduled for plaintiff to see Dr. Janis on October 8, 2021 to discuss the same. In November 2021, plaintiff advised Dr. Gusman, who had returned from retirement in September 2021 on a per diem basis, that he wanted to treat his prostate cancer with radiation (Gusman Decl., at ¶¶ 37-38). Dr. Gusman promptly submitted a referral request for plaintiff to see a radiologist. (Gusman Decl., at ¶¶ 37-38). Plaintiff's radiation therapy began on December 21, 2021 and concluded on January 28, 2022. (Gusman Decl., ¶ 38).

### 2. Subjective Element

 **\*11**  Even if plaintiff were found to have satisfied the objective prong of deliberate indifference, the record does not support a finding that Dr. Gusman acted recklessly with respect to a known risk of harm, or that he "was subjectively aware that his conduct created a substantial risk of harm to the inmate." *Gazzola v. Cnty of Nassau*, 16-CV-909, 2022 WL 2274710, \*8 (E.D.N.Y. June 23, 2022). Having been diagnosed with an enlarged prostate in March 2014 (Gusman Decl., ¶ 12; Dkt. No. 73-1 at 5), plaintiff's routine PSA test results were recorded on an approximate yearly basis. At all times, plaintiff's PSA test results were within the normal range. Plaintiff was also prescribed Tamsulosin which plaintiff acknowledged alleviated his urination difficulties. (Dkt. No. 73 at 165, 195, 209, 249). He also received digital rectal exams when medically indicated.

Plaintiff's misunderstanding of his laboratory result does not support a finding that Dr. Gusman knew that the course

of treatment he provided to plaintiff was ineffective or that Dr. Gusman disregarded "an excessive risk to [plaintiff's] health or safety." *Farmer*, 511 U.S. at 827. Plaintiff's lay interpretation of his PSA lab reports was sufficiently explained by Dr. Gusman who, unlike plaintiff, has the requisite training and education to properly interpret such results. (Gusman Decl., ¶ 7).

Nor could a jury conclude on this record that Dr. Gusman's purported failure to ensure that plaintiff was seen for a urology consultation earlier than seven months after his original referral constituted deliberate indifference. As previously discussed, Dr. Gusman continued to treat plaintiff between October 2020 and May 2021, during which time plaintiff failed to complain of any exacerbation of his symptoms. Plaintiff has failed to otherwise advance what substantial risk of serious harm Dr. Gusman purportedly knew of and disregarded while the referral was pending. Absent any indication that Dr. Gusman was reckless in failing to ensure that plaintiff was seen any sooner for his urology consultation, plaintiff's claim cannot survive summary judgment. *See Kemp v. Wright*, No. 01-CV-562 (JG), 2005 WL 893571, at \*6 (E.D.N.Y. Apr. 19, 2005) ("Dr. Halko's failure to follow-up sooner on the referral did not 'evince[ ] a conscious disregard of a substantial risk of serious harm.' ") (citing *Hernandez*, 341 F.3d at 144); *Oh v. Saprano*, No. 3:20-CV-237, 2020 WL 4339476, at \*6 (D. Conn. July 27, 2020) ("Even if RN Tutu should have followed up on [plaintiff's] requests to ensure that [he received his referral], her failure to do so, at most, constituted negligence, which cannot support an Eighth Amendment deliberate indifference claim.").

The record is clear that Dr. Gusman treated plaintiff and responded to his complaints. The record does not indicate that Dr. Gusman ignored, or left untreated, any complaints of acute pain or symptom exacerbation relative to plaintiff's condition. Plaintiff received frequent medical care, as his voluminous medical records demonstrate. Based on this record, plaintiff cannot satisfy the state of mind prong of an Eighth Amendment claim, as he cannot show that Dr. Gusman "acted intentionally to impose the alleged condition or recklessly failed to act with reasonable care." *Darnell*, 849 F.3d at 35. **Even if** Dr. Gusman "misdiagnosed" plaintiff, which the court is not suggesting occurred, and that misdiagnosis caused plaintiff unintended harm, or if Dr. Gusman failed to seek out some other course of treatment, such conduct was at most negligent, as the record indicates he had no reason to suspect that plaintiff had prostate cancer prior to October 6, 2020.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 276 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

The court concludes that there is no genuine dispute of material fact with respect to either the objective or subjective prongs of plaintiff's Eighth Amendment deliberate indifference claim. Accordingly, it is recommended that plaintiff's motion for summary judgment be denied and that Dr. Gusman's cross-motion for summary judgment be granted.

## VI. Qualified Immunity

**\*12** Dr. Gusman contends that if the court were to find that his actions violated plaintiff's Eighth Amendment rights, he is nevertheless shielded from liability by the doctrine of qualified immunity. (Def. Mem. of Law at 23-25). Inasmuch as the court is recommending that Dr. Gusman's cross-motion for summary judgment be granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

## VII. Motion to Compel [6]

On November 21, 2023, Judge Baxter issued a text order resetting the discovery deadline to February 22, 2024. (Dkt. No. 54). Local Rule 16.2 provides in relevant part that "[p]arties shall file and serve motions to compel discovery no later than fourteen (14) days after the discovery cut-off." Plaintiff filed his Motion To Compel Discovery (Dkt. No. 70) on March 22, 2024, twenty-nine days after the discovery deadline. Plaintiff's motion is therefore untimely. [7]

Even if timely filed, plaintiff's Fed. R. Civ. P. 37 motion to compel, which the court will treat as a motion pursuant to Fed. R. Civ. P. 56(d), is nevertheless denied. Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). District courts have discretion over discovery rulings, including under Rule 56. *See Moccia v. Saul,* 820 F. App'x 69, 70 (2d Cir. 2020) (summary order); *see also Walden v. Sanitation Salvage Corp.,* No. 14-CV112, 2015 WL 1433353, at \*2 (S.D.N.Y. Mar. 30, 2015) (same). "A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials 'must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegations is in the hands of the defendant is insufficient.'

" *Alphonse Hotel Corp. v. Tran,* 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, plaintiff has made no showing that he has been deprived of any information that is germane to the prosecution of his motion for partial summary judgment or to the defense of Dr. Gusman's cross-motion for summary judgment. Absent from plaintiff's submissions is any plausible explanation as to how the information he seeks is relevant to the alleged deprivation of his constitutional rights and how Dr. Gusman was indifferent to his medical needs. The information plaintiff seeks production of is not material to whether Dr. Gusman knew or should have known that plaintiff was suffering from prostate cancer and/or intentionally failed to treat him, let alone evidence that Dr. Gusman delayed treatment to punish plaintiff, or intentionally ignored a life-threatening condition. Instead, the record shows that as soon as plaintiff presented with symptoms suggestive of prostate cancer on October 6, 2020, he was properly examined, tested, and referred to a urologist for consultation. *See Taft v. Fricke,* 17-CV-0346 (GTS/CFH), 2019 WL 5197180, at \*14 (N.D.N.Y. July 26, 2019) (holding that even if the plaintiff was misdiagnosed and that the misdiagnoses caused the plaintiff unintended harm, and the defendant doctor was negligent, the subjective element is still lacking since the defendant doctor had no reason to suspect that the plaintiff had diabetes).

**\*13** **WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 65) be **DENIED IN ITS ENTIRETY**, and it is

**RECOMMENDED,** that defendant's cross-motion for summary judgment (Dkt. No. 71) be **GRANTED IN ITS ENTIRETY**, and it is

**RECOMMENDED,** that plaintiff's motion to compel discovery (Dkt. No. 70) and motion to defer consideration of defendant's cross-motion for summary judgment (Dkt. No. 84) be **DENIED IN THEIR ENTIRETY**, and it is

**RECOMMENDED** that plaintiff's Amended Complaint (Dkt. No. 17) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 277 of 427

Rodriguez v. Gusman, Not Reported in Fed. Supp. (2024)

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4463459

---

**Footnotes**

1    All page references are to CM/ECF's pagination system except for the medical records (Dkt. Nos. 73, 73-1, 73-2, 73-3), which are to the bates numbers located on the bottom of each page.

2    As previously set forth, Dr. Bhavsar was terminated as a defendant from this action pursuant to Judge Suddaby's May 4, 2023 Decision and Order. (Dkt. No. 40).

3    Plaintiff was fifty years old in March 2014.

4    In *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds*, 25 F.3d 81 (2d Cir. 1994), the Second Circuit discussed the prison-mailbox rule, in which the court deems a pro se prisoner's complaint filed on the date that the prisoner delivered the complaint to prison officials for transmittal to the court.

5    Even if the allegations preceding February 23, 2019 were subject to tolling and not time-barred, there is no material question of fact as to whether Dr. Gusman was deliberately indifferent *prior* to February 2019, and plaintiff's amended complaint should still be dismissed in its entirety.

6    On April 18, 2024, plaintiff filed a Motion to Defer Consideration of Defendant's Cross-Motion for Summary Judgment (Dkt. No. 89) which the court will also treat as motion pursuant to Fed. R. Civ. P. 56(d) even though it is arguably duplicative of plaintiff's motion to compel.

7    Plaintiff's Motion To Compel is perplexing considering the sequence in which it was filed. Plaintiff filed his motion for partial summary judgment on February 1, 2024, approximately seven weeks prior to filing his discovery motion. Having filed a motion for partial summary judgment, logic dictates that plaintiff must have determined that he did not require any additional information to advance his legal and/or factual arguments.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 278 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2021 WL 3293504
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Anthony RUCANO, Plaintiff,
v.
Anthony ANNUCCI, et al., Defendants.

No. 9:18-CV-218 (GTS/CFH)
|
Signed 05/19/2021

**Attorneys and Law Firms**

Anthony Rucano, Plaintiff pro se.

MATTHEW D. WAGONER, ESQ., The Wagoner Firm PLLC, 150 State Street, Suite 504, Albany, New York 12207, Attorneys for defendants, D. Venettozzi, A Rodriguez, Michael Kirkpatrick, D. Uhler, Lt. Durkin, R. Bishop, P. Devlin, G.T. King, J. Breyette, C.O. Tucker.

VINCENT M. MIRANDA, ESQ., JAMES PETER BLENK, ESQ., Lippes Mathias Wexler Friedman LLP, 50 Fountain Plaza, Suite 1700, Buffalo, New York 14202, Attorneys for defendant J. Kowalowski.

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Anthony Rucano ("plaintiff"), who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants, DOCCS Director of Special Housing/Inmate Disciplinary Program, Donald Venettozzi ("Venettozzi"); DOCCS Acting Director of Special Housing/Inmate Disciplinary Program, Anthony Rodriguez ("Rodriguez"); Superintendent of Clinton Correctional Facility ("Clinton C.F."), Michael Kirkpatrick ("Supt. Kirkpatrick"); Superintendent of Upstate Correctional Facility ("Upstate C.F."), Donald Uhler ("Supt. Uhler"); Clinton C.F. correctional lieutenant ("Lt."), Charles Durkin ("Lt. Durkin"); Clinton C.F. correction captain ("Capt."), Reginald Bishop ("Capt. Bishop"); Clinton C.F. correction captain, Patrick Devlin ("Capt. Devlin"); Clinton C.F. correction sergeant ("Sgt."), Gregory T. King ("Sgt.

King"); Clinton C.F. correction officer ("C.O."), Jamie Breyette ("C.O. Breyette"); Clinton C.F. correction officer, Cory Tucker ("C.O. Tucker")—who, at all relevant times were employed by DOCCS—and Clinton C.F. Recreation Program Leader II, J. Kowalowski ("Kowalowski")—a civilian civil service employee—violated his constitutional rights under the First Amendment. See Dkt. No. 25 ("Amen. Compl."). [2]

Presently pending before the Court is (1) the motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 filed by Venettozzi, Rodriguez, Supt. Kirkpatrick, Supt. Uhler, Capt. Bishop, Capt. Devlin, Sgt. King, C.O. Breyette, C.O. Tucker (collectively, where appropriate, "defendants"), see Dkt. No. 178; and (2) the separate motion for summary judgment pursuant to Fed. R. Civ. P. 56 filed by Kowalowski, see Dkt. No. 179. Plaintiff filed a response in opposition to defendants' motion, see Dkt. No. 193, and filed a separate response in opposition to Kowalowski's motion, see Dkt. No. 194. Defendants filed a reply to plaintiff's response opposition of their motion, see Dkt. No. 195, and Kowalowski filed a separate reply to plaintiff's response in opposition to his motion, see Dkt. No. 196. For the reasons that follow, it is recommended that defendants' motion for summary judgment (Dkt. No. 178) be granted in its entirety, Kowalowski's motion for summary judgment (Dkt. No. 179) be granted in its entirety, and plaintiff's Amended Complaint (Dkt. No. 25) be dismissed with prejudice in its entirety.

**I. Background**

**A. Plaintiff's Factual Assertions and Claims** [3]

**1. February 2016 Disciplinary Proceeding**

**\*2** The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II.A., infra.

In November 2015, while incarcerated at Clinton C.F., plaintiff was elected as the new Secretary of the Inmate Liaison Committee ("ILC"). See Amen. Compl. at 12 ¶ 43. In this role, plaintiff "was in charge of maintaining financial records, ILC agendas and other ILC related paperwork." Id. Plaintiff states that, at "the ILC's first meeting with ILC Staff Advisor [ ]Kowalowski in November of 2015, [Kowalowski]

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 279 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

issued the ILC members a warning, 'You all have a target on your back, be careful!" Id. at ¶ 44.

Plaintiff alleges that his "first act" as ILC Secretary "was to address problems with the inmate population receiving showers per [DOCCS] Directive # 4009." Amen. Compl. at 13 ¶ 48. Plaintiff drafted a memorandum, dated December 9, 2015 ("the December 9, 2015 memorandum"), in which he addressed the issues concerning Clinton C.F.'s inmate shower policy and his proposed solutions. See id. Plaintiff sent the December 9, 2015 memorandum to, among others, New York State Assemblyman Daniel O'Donnell. See id. at 13-14 at ¶ 48; Dkt. No. 25-1 at 85-88. Following the December 2015 ILC meeting, plaintiff sent a similar, but more detailed, proposal to Clinton C.F. executive staff. See id. at 14 ¶¶ 50, 51.

On December 16, 2015, plaintiff submitted a proposed ILC agenda, which outlined "five assaults on inmates by staff, violations of [DOCCS] Directive # 4803 (inappropriate removal from job), Directive # 2771 ([failure of the Clinton C.F. accountant to reconcile deposits from inmate fundraiser sales]), and the request to review and implement one of the various proposed solutions ... to address the problems concerning inmate showers." Amen. Compl. at 14 ¶ 54 (internal citations omitted); see id. 10 ¶ 33. Plaintiff alleges that, "[a]t the next weekly ILC meeting[,] Kowalowski told [him]" that " '[i]f [he] submitted this [a]genda [plaintiff] would go to Upstate Box for 270 days[.]" Id. at 15 ¶ 55. Based on the "angry tone of [Kowalowski's] voice[,]" plaintiff perceived "this as a threat, and was coerced to submit a 'watered down' ILC [a]genda ...." Id. Plaintiff submits both versions of the proposed December 2015 agenda, the first of which, dated December 16, 2015, is five pages long, and raises the above-mentioned issues. See Dkt. No. 25-1 at 115-19. The second version of the agenda, dated December 23, 2015, is a one-page document that omits the complaints of assaults by staff, but includes condensed versions of the remaining issues raised in the originally proposed agenda. See id. at 121.

At the January 6, 2016 ILC meeting, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed ... new proposed TV channels," and stated, "I took it, so what. You are not as important as you think you are." Amen. Compl. at 15 ¶ 56. On January 11, 2016, plaintiff wrote a letter to New York State Assemblyman Daniel J. O'Donnell in which he explained "the ILC Agenda [he] submitted and the abusive treatment [he] was subjected to by [ ]Kowalowski

since then[,]" and that he "feared retaliation because Clinton is known throughout the State, weapon thrown in your cell, imaginary assault on staff charges, etc." Id. at ¶ 57 (citing Dkt. No. 25-1 at 123). Plaintiff further states that, in his role as Facility Media Review Committee ("FMRC") co-chair, Kowalowski "made numerous disputed rulings on some [of plaintiff's] adult magazines ..., which [plaintiff] appealed to" to Central Office Media Review Committee ("COMRC"). Id. at 16 ¶ 59. On January 15, 2016, Director of Education Linda Hollmen ("Hollmen") responded to a series of three letters dated December 16, 17, and 23, 2015, relating to plaintiff's COMRC appeal. See id. at ¶ 60; Dkt. No. 25-1 at 147. Hollmen explained that the COMRC determined that the two editions of Cheri magazine at issue contained models that "may be portrayed as being under age, appealing to a prurient interest and therefore may promote the sexual performance of a minor." Dkt. No. 25-1 at 147.

*3 In a letter dated January 23, 2016, plaintiff responded to Hollmen's January 15, 2016 letter, and "using the same [ ]DOCCS letterhead [he] had been using for over a year (with law library Supervisor Officer Tedfords knowledge), ... asked for the ILC Supervisors [sic] name in Albany." Amen. Compl. at 16 ¶ 60. On January 29, 2016, plaintiff "sent [ ]Kowalowski a copy [of this letter] via internal mail." Id. Plaintiff alleges that, within "a few hours after mailing [a copy of his letter] to [ ]Kowalowski, [Kowalowski] went to the Captains [sic] Office with a copy of the letter that he had just received and, upon information and belief, spoke to Capt. Bishop." Id. at ¶ 61. Plaintiff contends that Kowalowski and Capt. Bishop "conspired to cover-up embezzlement of ... ILC funds and other improprieties revealed in the December [ ] 2015 Agenda." Id. Moreover, plaintiff avers, "[i]n furtherance of this conspiracy, Capt. Bishop directed Sgt. King to write [plaintiff] a false [misbehavior report] for forgery" for using DOCCS letter head on the letter he addressed to the COMRC. Id.

On January 29, 2016, Sgt. King issued plaintiff a misbehavior report ("the January 29, 2016 misbehavior report"), charging plaintiff with violations of five DOCCS rules, including that plaintiff "forged letterhead depicting a state form from [DOCCS] ... that he had created ... on a computer in the law library[,]" which he used in "a letter of personal nature ...." Dkt. No. 25-1 at 155. Plaintiff avers that "Kowalowski [i]nitiat[ed] [r]etaliation – The January 29[ ], 2016" misbehavior report. Amen. Compl. at 16. Plaintiff states that he was placed on keeplock status pending his disciplinary hearing. See id. at 17 ¶ 62.

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 280 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Plaintiff's Tier III disciplinary hearing relating to the January 29, 2016 misbehavior report began on February 4, 2016 ("the February 2016 disciplinary hearing"). See Amen. Compl. at 17 ¶ 64. Plaintiff states that the "regularly assigned Tier III Hearing Officer," non-party Lt. Miller, did not preside over his case, but rather, Supt. Kirkpatrick "designated" Lt. Durkin to preside over his Tier III hearing. Id. Plaintiff alleges that Lt. Durkin did not normally preside over such hearings and that he "was unfamiliar with the procedures and stopped frequently to read from instructions on how to hold the hearing." Id. Plaintiff contends that "[t]hese circumstances let [him] know that [he] was about to be railroaded and revealed an ongoing conspiracy now involving Supt. Kirkpatrick[,] Lt. Durkin ..., and Capt. Bishop ... to insure a finding of guilt regardless of the facts." Id. (internal quotation marks omitted). Plaintiff alleges that, "off-the-record and before the hearing, [Lt. Durkin] agree[d] the [January 29, 2016 misbehavior report wa]s problematic." Id. at 18 ¶ 65. On February 5, 2016, "[t]he day after the hearing started[,]" plaintiff states that Kowalowski visited his cell "because ... Lt. Durkin[ ] told him that [plaintiff] accused him of threatening [plaintiff] with retaliation." Id. at ¶ 66. Plaintiff avers that, during this meeting, "Kowalowski told [him that] if [he] had come to the ILC meeting at 10 AM on January 29[ ], 2016, hours before [plaintiff] received the [January 29, 2016 misbehavior report], he would have 'squashed' th[at misbehavior report]." Id.

Plaintiff alleges that, on the last day of the hearing, his "boss [at the Clinton C.F. law library], [non-party] Officer Tedford, testified that he was aware [that plaintiff] was using [DOCCS] letterhead and had no problem with [him doing] as long as it was being used for communication with [ ]DOCCS employees." Id. at 19 ¶ 70. At the conclusion of the hearing on February 11, 2016, "despite ... Tedford['s] testi[mony]" and plaintiff's "non-existent disciplinary history [for his] entire incarceration," he was found guilty and sentence to 90 days in the Clinton C.F. Special Housing Unit ("SHU"). Id. at ¶ 71. On February 15, 2016, plaintiff administratively appealed Lt. Durkin's disciplinary determination. See id. at 20 ¶ 72; Dkt. No. 25-1 at 168-70. On March 15, 2016, Rodriguez reduced plaintiff's sanction to 45 days of SHU confinement and loss of packages, commissary, and phone. See id. at 21 ¶ 77; Dkt. No. 25-1 at 176. Plaintiff submitted a letter requesting reconsideration of his administrative appeal on March 16, 2016. See Dkt. No. 25-1 at 178-79. On April 6, 2016, Rodriguez reversed Lt. Durkin's February 11, 2016

disciplinary determination. See Amen. Compl. at 21 ¶ 78; Dkt. No. 25-1 at 181.

**\*4** Liberally construed, the Amended Complaint alleges that, based on the facts relating to the February 2016 disciplinary hearing, Kowalowski, Capt. Bishop, Sgt. King, Supt. Kirkpatrick, Lt. Durkin, and Rodriguez conspired to violate plaintiff's First Amendment rights by filing a false misbehavior report that resulted in SHU confinement in retaliation for plaintiff engaging in protected conduct relating to his service as ILC Secretary. See Amen. Compl. at 12-21, 69.

### 2. March 2016 Disciplinary Proceeding

On February 18, 2016, plaintiff filed an inmate grievance (CL-68902-16), alleging that he had been issued a false misbehavior report (the January 29, 2016 misbehavior report) in retaliation for his January 23, 2016 letter to Hollmen in which he requested the name of the ILC advisor in the Albany office. See Amen. Compl. at 20 ¶ 73; Dkt. No. 25-1 at 4-6. In particular, plaintiff requested that the Inmate Grievance Program ("IGP") "review and investigate the facts and circumstances of [his] grievance in conjunction with [the January 29, 2016] misbehavior report; reverse, dismiss and expunge ticket from [his] record, and restore [him] to [his] law library job and housing area." Dkt. No. 25-1 at 6. Plaintiff alleges that non-party IGP Supervisor Gregory filed his grievance incorrectly ...." Id. The Clinton C.F. Inmate Grievance Resolution Committee ("IGRC") denied plaintiff's grievance, explaining, as relevant here, that "[t]he grievance program can not be used as an additional substitute appeal mechanism. An individual decision or disposition resulting from a disciplinary proceeding is not grievable." Id. at 7. Plaintiff appealed the IGRC's response to the Superintendent on March 4, 2016. See id. On March 11, 2016, Supt. Kirkpatrick concurred with the IGRC's response. See id. at 8. On March 21, 2016, plaintiff appealed Supt. Kirkpatrick's decision. See id. On July 6, 2016, the Central Office Review Committee ("CORC") upheld Kirkpatrick's determination. See id. at 9.

On February 28, 2016, C.O. Breyette and C.O. Tucker came to plaintiff's cell in Clinton C.F.'s keeplock block to inform plaintiff that he was being transferred to Upstate C.F. and to pack up his belongings. See Amen. Compl. at 20 ¶ 74, 21 ¶ 79. Plaintiff "requested to see OMH when [he] was told [he] was being packed up on the draft to [Upstate C.F.]."

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 281 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Id. at ¶ 74. [4] Plaintiff states that, while C.O. Breyette and C.O. Tucker packed his belongings outside of his presence when he was in OMH, "an ice pick was allegedly recovered on the inside ledge of [his] cell above the bars." Id. at 21 ¶ 80. Plaintiff alleges that the ice pick was "planted in [his] cell ...." Id. at 20 ¶ 74. Capt. Bishop signed off on an unusual incident report ("UIR") concerning the weapon. See id. at 22 ¶ 84; see Dkt. No. 25-2 at 9-11 (Mar. 1, 2016 UIR, listing incident date for the discovery of the ice pick in plaintiff's cell as Feb. 28, 2016). Plaintiff has included, as an exhibit, the photograph, of the ice pick, which is dated February 29, 2016. See Dkt. No. 25-2 at 12. "On the morning of February 29[ ], 2016, while still in an OMH [o]bservation cell," plaintiff alleges that "Capt[.] Devlin, the security captain in charge of the secure evidence locker and logbooks, banged hard on [plainitff's] cell and said 'What the [f]uck are you still doing here?'" to which plaintiff replied, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?" Id. at ¶ 75. Plaintiff alleges that, "[a]s [Capt. Devlin] was walking away[,] he said 'You'll see.' " Id.

**\*5** On March 1, 2016, plaintiff was transferred from Clinton C.F. to Upstate C.F. and placed in SHU. See Amen. Compl. at 21 ¶ 80. On March 2, 2016, plaintiff received an inmate misbehavior report authored by C.O. Breyette, dated February 28, 2016 ("the February 2016 misbehavior report"), which charged him with possession of a weapon in violation of DOCCS Rule 113.10 based on the discovery of the ice pick in plaintiff's keeplock cell at Clinton C.F. See id. at 20 ¶ 74; Dkt. No. 25-2 at 7. Over the course of March 4, 22, and 29, 2016, a Tier III disciplinary hearing was held at Upstate C.F. relating to the February 2016 misbehavior report. See id. at 22 ¶ 82. Plaintiff alleges that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time ... Hearing Officer whose only job is to hold hearings." Id. Plaintiff further contends that "[t]his conspiracy involved insuring [sic] that [he] was found guilty of possessing the weapon planted in [his] cell in a continuing course of retaliation for [his] protected free speech conduct as a duly elected ILC representative," including reporting alleged wrongdoing by personnel at Clinton C.F. Id. at ¶ 83.

Plaintiff alleges that, on March 22, 2016, he "requested the E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016, multiple times ... and was told" by Capt. Bishop that he would be given "a copy of the ... log for the incident entry in the log book" but that the entries for "[t]he 29 th ... and March 1 st , [were] irrelevant ... [.]" Amen. Compl. at 23 ¶ 87 (quoting Dkt. No. 25-2 at 41-42). Plaintiff "objected" to this answer, stating that "there wasn't a weapon found in my cell that day[,]" February 28, 2016. Id. Over plaintiff's objection, Capt. Bishop instructed plaintiff that the log book entries from February 28, 2016, were "... all you get. That's all you're getting.' " Id. at 24 ¶ 89 (quoting Dkt. No. 25-2 at 44). Plaintiff also contends that Capt. Bishop told him, "I'm going to get you when the evidence was booked into evidence. That's what you're getting. Not getting the days before or the days after of any of it." Id. at 25 ¶ 95 (quoting Dkt. No. 25-2 at 56). Plaintiff "objected, stating 'I feel this evidence wasn't logged in on February 28, 2016, and without seeing the previous ... and the forward pages, I won't be able to identify whether or not it was logged in at the time. Specially [sic] since [ ] the evidence drop box log book [ ] doesn't have a date [ ] when the evidence was entered into the drop box ....' " id. at 24 ¶ 90 (quoting Dkt. No. 25-2 at 44-45). Plaintiff states that he was "asked if [he] ha[d] the chain of custody from the evidence drop box logbooks," to which he replied, " 'No.... The log book is missing a date that's supposed to be there for weapons entered into the ... drop box log book[,]' " and contends that this missing date "explained multiple inconsistencies showing [his] request [wa]s very relevant and material." Id. at ¶ 91 (quoting Dkt. No. 25-2 at 45).

Plaintiff further alleges that C.O. Tucker testified at the hearing by phone, and stated that C.O. Breyette had shown him the weapon recovered from plaintiff's cell on February 29, 2016, "but [that] [Capt. Bishop] refused to allow [plaintiff] to question C.O. Tucker about brining [plaintiff] an I-64 form (recording property packed up) to Mental Health Unit on February 29, 2016." Amen. Compl. at 25 ¶ 94 (citing Dkt. No. 25-2 at 52-54). Plaintiff further states that non-party Sgt. Baker testified by phone that he wrote a memorandum to non-party Lt. Menard "on the day of the incident, identified on the memo as February 29, 2016, not February 28, 2016, the date of the [misbehavior report]." Amen. Compl. at 24 ¶ 92. When plaintiff "questioned" this inconsistency, "Capt. Bishop stated, 'we'll look at that to see if it's a clerical error or not,' " but plaintiff avers that "no effort [wa]s made to question Sgt. Baker while he [wa]s still on the phone." Id. (quoting Dkt. No. 25-2 at 50). However, plaintiff states that he asked Sgt. Baker, "[d]id you drop the ... weapon in the box the same date that you ... wrote the memo?" to which Sgt. Baker replied, " 'It was on the same day.' " Id. at 24-25 ¶ 93 (quoting Dkt. No. 25-2 at 51). When Sgt. Baker testified again later in the proceeding, Capt. Bishop prevented plaintiff from eliciting an answer from Sgt. Baker as to whether he had ever

" 'secured evidence in the drop box in previous times[,]' " or if he " 'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence.' " Id. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74). Capt. Bishop then asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which Sgt. Baker replied, "Yes I did." Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75).

**\*6** Plaintiff alleges that Capt. Bishop's evidentiary rulings prevented him "from acquiring documents crucial to [his] retaliation defense," Amen. Compl. at 24 ¶ 91, and that he "was stopped from making a complete record." Id. at 23 ¶ 86 (citing Dkt. No. 25-2 at 42). In addition, plaintiff states that "[Capt.] Devlin ... failed to move the alleged weapon from ... the Evidence Drop Box to ... the Secured Evidence Locker for eight days, when the Directive requires it to be moved within 72 hours." Id. at 27 ¶ 103. Plaintiff posits that "[t]his lends further support to the fact that these log book entries, along with the [misbehavior report], were falsified and fabricated in retaliation against [him]." Id. Based on the foregoing, plaintiff contends that, on "February 29[ ], 2016, [ ]Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report], which is supported by the picture of the weapon ... recorded in the [UIR] as being photographed on February 28[ ], 2016, but was recorded by [non-party] C.O. Stiles as being photographed on February 29[,] 2016." Id. at 23 ¶ 87 (citing Dkt. No. 25-2 at 12).

On March 29, 2016, plaintiff was found guilty of possession a weapon and sanctioned to 120 days in SHU with 30 days suspended and four months loss of good time credit. See Amen. Compl. at 28; Dkt. No. 25-2 at 110. On April 11, 2016, plaintiff appealed Capt. Bishop's disciplinary determination. See id. at 32 ¶ 132; Dkt. No. 25-2 at 117-23. On June 13, 2016, Venettozzi modified Capt. Bishop's disciplinary determination, reducing plaintiff's sanctions to 90 days in SHU and expunged the four months of loss of good time credit. See id. at 34 ¶ 138; Dkt. No. 25-2 at 148. On August 15, 2016, plaintiff commenced a proceeding pursuant to N.Y. C.P.L.R. article 78 challenging the March 29, 2016 Tier III hearing determination in New York State court. See id. at 40-41 ¶¶ 164, 166; Dkt. No. 25-3 at 4-6. On July 10, 2017, after both parties had submitted briefs state court, Rodriguez [5] administratively reversed and expunged Capt. Bishop's March 29, 2016 Tier III hearing determination on the basis that "circumstances surrounding the incident raise question to inmate's culpability." Dkt. No. 25-3 at 40; see id. at 41; Amen. Compl. at 42 ¶ 173.

Liberally construed, the Amended Complaint alleges that Capt. Bishop, C.O. Breyette, C.O. Tucker, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Rodriguez, and Venettozzi conspired to retaliate against plaintiff in violation of his First Amendment rights by filing a false misbehavior report and brining a disciplinary proceeding against him, which resulted in SHU confinement and loss of privileges, for his protected conduct relating to his service as ILC Secretary. See Amen. Compl. at 20-42, 70. Further, plaintiff alleges that Capt. Bishop violated his Fourteenth Amendment procedural due process rights by depriving him of an impartial hearing officer, and denying him documentary and testimonial evidence, which prevented plaintiff from mounting a full defense. See id. at 24-27, 70.

## II. Present Motions

### A. Arguments and Evidence in Support of Defendants' Motion for Summary Judgment (Dkt. No. 178)

#### 1. First Amendment Retaliation Claims—Both Disciplinary Hearings

Defendants aver that plaintiff's First Amendment retaliation claims must fail "because there is no direct evidence of retaliatory motive." Dkt. No. 178-2 at 17. In particular, defendants posit, no causal connection exists between defendants' actions of issuing plaintiff misbehavior reports, conducting disciplinary hearings, or the resulting sanctions and plaintiff's constitutionally protected activities relating to his service on the ILC. See id. Defendants contend that plaintiff's "conclusory allegations to the contrary cannot raise a genuine factual dispute." See id. Rather, defendants argue, the issuance of misbehavior reports and the resulting disciplinary hearings and sanctions were done in furtherance of defendants' job duties and to "ensure that DOCCS policies were followed and [to] ensure the safety of the officers and inmates." Id. at 18. To the extent that DOCCS policies were not followed, defendants state, "these errors were harmless and did not violate the Constitution." Id. at n. 8. Moreover, defendants contend, plaintiff cannot establish that Lt. Durkin, C.O. Tucker, C.O. Breyette, and Supt. Uhler acted with retaliatory animus, because those defendants "did not even know that [plaintiff] was a member of the ILC." Id.; see Dkt. No. 178-7 at 1 ¶ 4 (Sworn affidavit of Lt. Durkin stating, that "I was not aware that [plaintiff] served on the ILC and

did not know of any activities he engaged in as a part of that involvement until the hearing on February 4, 2016, .... Nor did I ever discuss [plaintiff's] involvement in the ILC with any other [d]efendant."); Dkt. No. 178-10 at 1 ¶ 3 (Sworn affidavit of C.O. Tucker, stating that, "[a]t the time of the events in question, I did not know that [plaintiff] was a member of the [ILC]. Nor did I know [plaintiff] had written letters or agendas with regard to activities on ILC, or engaged in any other constitutionally protected activities."); Dkt. No. 178-5 at 1 ¶ 3 (Sworn affidavit of C.O. Breyett, stating "I did not know that [plaintiff] was a member of Clinton's [ILC], nor did I know about any activities he undertook with respect to the ILC."); Dkt. No. 178-11 at 2 ¶ 4 (Sworn affidavit of Supt. Uhler, stating that, "[a]t the time of the events in question, I was not aware that [plaintiff] had been a member of the [ILC] at Clinton, as I did not work at that facility. I was not aware that [plaintiff] had engaged in any constitutionally protected behavior.").

**\*7** Similarly, defendants contend that, although "Capt. Devlin, Sgt. King, and Capt. Bishop" were aware that plaintiff was on the Clinton C.F. ILC, they "did not know that plaintiff authored the Dec. 9 Memo, or the Dec. 16 Agenda." See Dkt. No. 178-2 at 18; Dkt. No. 178-6 at 2 ¶ 4 (Sworn affidavit of Capt. Devlin, stating "I was aware that [plaintiff] was a member of the [ILC] at Clinton but did not know that he authored a memo on December 9, 2015, regarding the adverse effects of Clinton's shower policy. Nor did I know that on December 16, 2015, he drafted the memo outlining assaults on inmates, inappropriate removal from jobs, and a request to review and implement issues with the showers, or that he ultimately submitted a 'watered down' version of this agenda."); Dkt. No. 178-8 at 1 ¶ 2 (Sworn affidavit of Sgt. King, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda); Dkt. No. 178-4 at 1, 2 ¶¶ 4, 5 (Sworn affidavit of Capt. Bishop, acknowledging that he knew of plaintiff's involvement on the Clinton ILC, but had no knowledge of the December letter or agenda).

Defendants also contend that "[n]o inference of retaliation arises from the facts in this case." Dkt. No. 178-2 at 18. First, defendants aver, no inference of retaliation arises from the administrative reversal of plaintiff's March 2016 disciplinary determination during the pendency of his N.Y. C.P.L.R. article 78 proceeding. See id. In particular, defendants argue that "[t]he evidence shows that [ ]Venettozzi and [ ]Rodriguez acted because they wanted to do their jobs and ensure that no constitutional violations had occurred[,]" and that plaintiff's

"speculative allegations to the contrary cannot raise a genuine issue of fact." Id. Defendants assert that plaintiff's filing of a voluminous amount of letters, some of which were only sent to Venettozzi and some of which were only sent to Rodriguez, "overwhelmed their usual review process and caused confusion about the status of his requests." Id. at 18-19. Defendants submit the sworn affidavit of Venettozzi, which explains that, "[a]t the time of the events in question, [he] was the Director of Special Housing/Inmate Disciplinary Program employed by [DOCCS,]" and that his "job duties include[d] reviewing and deciding administrative appeals from Tier III disciplinary hearings." Dkt. No. 178-12 at 1 ¶ 2. Venettozzi states that he "did not work at Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report ... in this case. Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Id. at ¶ 3. Further, Venettozzi explains that, "[a]side from Acting Director Rodriguez, who works in the same office ..., [he] never spoke with any of the other defendants about this case during the relevant time period[,]" and that he has "no memory of speaking with ... Rodriguez about this case during the relevant time period." Id. at 1-2 ¶ 3. Venettozzi also denies having knowledge that plaintiff "had engaged in constitutionally protected activity at the time the [misbehavior reports] were issued, or the hearings were held." Id. Venettozzi explains that plaintiff "filed numerous letters and requests with [his] office" and that, "[a]s an administrative matter, it was difficult to keep track of them all, especially since some" letters from Venettozzi's and Rodriguez's office "crossed in the mail with some of [plaintiff's] requests, and [because plaintiff] sent multiple requests regarding the same matters." Id. at 2 ¶ 5. Venettozzi indicates that, "[u]pon information and belief, ... Rodriguez reviewed some of [plaintiff's] letters, and [he] reviewed others[,]" but that neither of he nor Rodriguez "knew about the correspondence that was reviewed by the other[,]" and denies retaliating against plaintiff or conspiring with any other defendant to do so. Id.; see id. at ¶ 4.

Venettozzi states that, on September 28, 2016, his office sent plaintiff a letter in response to a September 22, 2016 letter that plaintiff submitted requesting reconsideration of the March 2016 disciplinary determination, "informing [plaintiff] that, because the matter was currently the subject of litigation, [Venettozzi's office] would not reconsider the issue at that time." Dkt. No. 178-2 at 5 ¶ 25. However, Venettozzi further explains that, on July 10, 2017, Rodriguez issued the decision that administratively reversed and expunged plaintiff's March 2016 disciplinary determination. See id.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 284 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

at ¶¶ 26-27. Venettozzi states that, "[u]pon information and belief, ... Rodriguez issued [the] reversal because he was reviewing part of the correspondence from [plaintiff], without realizing that [Venettozzi] had reviewed another part[,]" and that Rodriguez "was not aware that [Venetozzi had issued the September 28, 2016 letter putting [plaintiff's] requests for reconsideration of the [March 2016 disciplinary determination] on hold." Id. at ¶ 27. Venettozzi also states that Rodriguez was not aware that plaintiff had commenced a N.Y. C.P.L.R. article 78 proceeding. See id. However, Venettozzi posits that none of the actions taken by his office were done in retaliation for plaintiff's ILC activities, and, in fact, were all favorable to plaintiff. See id. at 5-6 ¶ 28.

 **\*8** Defendants also submit Rodriguez's sworn affidavit in support of their motion for summary judgment. See Dkt. No. 178-9. Rodriguez, like Venettozzi, states that he has no memory of speaking with Venettozzi about plaintiff's case, did not discuss the case with any other defendants in this action, and denies conspiring or retaliating against plaintiff. See id. at 2 ¶ 3. He further explains that he was not even aware that plaintiff engaged in constitutionally protected activity at the time DOCCS personnel issued either misbehavior report. See id. Rodriguez reiterates Venettozz's explanation that, given plaintiff's large volume of submissions, it became difficult to keep track of plaintiff's requests, especially given that plaintiff "made multiple requests regarding the same matters." Id. at ¶ 4. Like Venettozzi, Rodriguez believes that Venettozzi reviewed some of plaintiff's submissions, while he reviewed others. See id. at ¶ 6. Further, Rodriguez explains that, he "was not aware that ... Venettozzi had issued" his September 28, 2016 letter putting plaintiff's request for reconsideration of the March 2016 disciplinary determination on hold pending the article 78 proceeding. Id. at 5 ¶ 28. Rather, Rodriguez "believed, based on correspondence from [plaintiff] that [he] had reviewed, [that plaintiff] was merely considering bringing such an action. Additionally, the case was not in [Rodriguez's] list of urgent cases, as [plaintiff] had already served his sentence." Id. Rodriguez explains that, on July 10, 2017, he issued the decision administratively reversing and expunging the March 2016 disciplinary determination, because he "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon [where it was recovered in plaintiff's cell], not [plaintiff]." Id. at ¶ 29. However, Rodriguez submits that, "had [he] known that an Article 78 proceeding was pending, [he] would not have issued a decision until the proceeding was complete." Id. at 6 ¶ 30. Moreover, Rodriguez indicates he did not take any action concerning plaintiff's case in retaliation for

plaintiff's ILC activities and, in any event, "all of the actions that [he] and [his] office took were *favorable* to [plaintiff]." Id. at ¶ 31.

Further, defendants argue that, plaintiff's assertion that an inference of retaliation arises from Captain Devlin's alleged comments, " 'What the fuck are you still doing here?' and [ ] 'You'll see,' in response to [plaintiff's] inquiry ... about his [February 2016 disciplinary determination,]" lacks force. Dkt. No. 178-2 at 19. Defendants submit Capt. Devlin's affidavit in which he acknowledges that he saw plaintiff in his cell "at some point," but "vehemently den[ies] that [he] ever said" either of those comments or "ever threaten[ed] him or otherwise imply[ied] that anyone was about to go after him." Dkt. No. 178-6 at 2 ¶ 8. "Thus," defendants aver, "the only evidence in this case illustrates that the event never happened." Dkt. No. 178-2 at 19. In any event, defendants contend that these "benign and ambiguous" comments fail to establish that Capt. Devlin acted with retaliatory animus because plaintiff does not allege having any prior interactions with Capt. Devlin, and Capt. Devlin was unaware of plaintiff's ILC activities. Id. at 20; see Dkt. No. 178-6 at 2 ¶ 4.

### 2. Section 1983 Conspiracy Claims

#### a. February 2016 Disciplinary Proceeding

Defendants aver that, contrary to plaintiff's allegation that Supt. Kirkpatrick, Lt. Durkin, and Capt. Bishop conspired to have Lt. Durkin assigned as the hearing officer at the February 2016 disciplinary proceeding, "the evidence establishes that they never discussed Lt. Durkin's appointment with one another and, thus, could not have conspired." Dkt. No. 178-2 at 21. Rather, defendants aver, Supt. Kirkpatrick independently appointed Lt. Durkin to preside over the hearing without discussing the appointment with either Lt. Durkin or Capt. Bishop. See id. Defendants point to Supt. Kirkpatrick's affidavit in which he indicates that his "decision to assign [Lt.] Durkin as the hearing officer on the first [misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt. No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[ ] Durkin as the hearing officer .... was appropriate as he had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8.

In his sworn affidavit, Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9. Lt. Durkin states that he was not "unfamiliar with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions[,]," "did not state that the [February 2016 misbehavior report] was 'problematic[,]' " or "inform Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 11, 12, 13. Moreover, Lt. Durkin states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business," namely for "try[ing] to obtain adult magazines of a sexual nature," was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff. Id. at ¶ 15. As stated above, Lt. Durkin denies having knowledge that plaintiff served on the Clinton C.F. ILC or of his specific activities as secretary of that body, and never discussed plaintiff's involvement on the ILC with any other defendant. See id. at 2 ¶ 4.

**\*9** In addition, defendants submit Capt. Bishop's affidavit in which he explains that, "on or around January 26, 2016, [he] believe[s] [he] read a letter that [plaintiff] had written on DOCCS letterhead[,]" which "was not regarding official government business[,]" but instead consisted of "personal correspondence regarding an adult magazine with sexual content that [plaintiff] wished to obtain." Dkt. No. 178-4 at 2 ¶ 9. Capt. Bishop states that such use of DOCCS letterhead "was ... inappropriate ..., and a clear violation of [DOCCS] Directive No. 0008." Id. He further notes that, on January 29, 2016, Sgt King issued plaintiff a misbehavior report based on plaintiff's improper use of DOCCS letterhead, but states that he "did not direct Sgt. King to write this [misbehavior report]" and states that he "did not have any personal involvement in the issuance of th[is] misbehavior report or the [February 2016 disciplinary] hearing." Id. at 2-3 ¶¶ 10, 11.

Finally, defendants contend that Rodriguez was not involved with the first misbehavior report or the February 2016 disciplinary proceeding and, therefore, did not engage in any conspiracy. See Dkt. No. 178-2 at 21; Dkt. No. 178-9 at 1-2 ¶ 3. In his sworn affidavit, Rodriguez states, "I did not work at ... Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report ... in this case. Nor was I involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any

other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with ... Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3.

### b. March 2016 Disciplinary Proceeding

Defendants argue that the evidence establishes that no conspiracy existed with respect to the February 2016 misbehavior report and March 2016 disciplinary proceeding. See Dkt. No. 178-2 at 22. Defendants argue that plaintiff's contention that, because the handwritten date on the last page of the UIR under the photograph of the weapon is February 29, 2016, rather than February 28, 2016, fails to demonstrate that Capt. Bishop and Capt. Devlin engaged in a conspiracy. See id. Defendants posit that the date contained on this document, at most, establishes a harmless ministerial error. See id. Defendants also aver that C.O. Breyette "had no contact with either Capts. Devlin or Bishop." Id. In support of this contention, defendants cite C.O. Breyette's affidavit, which states that he "did not communicate about this incident with any other defendant in this case, other than [C.O.] Tucker, who searched [plaintiff's] cell with him." See id. (citing Dkt. No. 178-5 at 2 ¶ 11). C.O. Tucker also stated in his affidavit that he "had no communications with anyone about the events underlying [C.O. Breyette's misbehavior report], other than [C.O.] Breyette ...." Dkt. No. 178-10 at 2 ¶ 10.

Defendants contend that the record evidence establishes that, contrary to plaintiff's allegations, Supt. Kirkpatrick independently assigned Capt. Bishop to preside as the H.O. at the March 2016 disciplinary hearing without ever discussing his decision with either Capt. Bishop or Supt. Uhler. See Dkt. No. 178-2 at 22. Defendants explain that, because the discovery of the weapon that gave rise to the second misbehavior report occurred at Clinton C.F., Supt. Kirkpatrick was responsible for assigning the H.O. to preside over the disciplinary hearing, and neither Capt. Bishop nor Supt. Uhler had any involvement in that decision. See id. at 22-23. In his affidavit, Supt. Uhler explains that, "[a]t the time of the events in question, [he] was employed ... as the Superintendent of Upstate [C.F.]" and that, he neither appointed Capt. Bishop as the hearing officer for the March 2016 disciplinary proceeding, or discussed his appointment with anyone, including Supt. Kirkpatrick. Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6. "In fact," Supt. Uhler states, he "did not have any other role in the [March 2016 disciplinary] hearing, other than the fact that [he] (or [his] designee) conducted a

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 286 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

review of the hearing to ensure that all proper procedures were followed, as is done for all hearings held at Upstate [C.F.]" Id. Supt. Kirkpatrick indicates in his sworn affidavit that "[i]t is common procedure and courtesy to have a hearing officer from the facility where the incident occurred [conduct the hearing] if the inmate has been transferred from that facility before the hearing takes place." Dkt. No. 178-13 at 3 ¶ 13. Supt. Kirkpatrick states that he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler." Id. at 2 ¶ 11. Moreover, defendants reassert that Rodriguez and Venettozzi "never discussed this case with any of the other [d]efendants[ ]" and, therefore, did not engage in a conspiracy. Dkt. No. 178-2 at 23.

### 3. Procedural Due Process Claim Against Capt. Bishop Relating to the March 2016 Disciplinary Proceeding

**\*10**  Defendants argue that plaintiff had no constitutionally protected liberty interest with respect to his due process claims relating to the March 2016 disciplinary hearing "because his sentence of 120 days in SHU does not constitute an atypical hardship since there were no other adverse conditions of confinement." Dkt. No. 178-2 at 25 (citations omitted). Indeed, defendants contend, plaintiff served only 92 days for both of his SHU sentences. See id. at 26. Defendants also posit that the imposition of loss of packages, commissary, and phone privileges does not constitute adverse conditions such that plaintiff's SHU sanction was atypical. See id.

Further, defendants submit that, contrary to plaintiff's argument, he was afforded all process due. See Dkt. No. 178-2 at 26. In this regard, defendants argue that Capt. Bishop was a fair and impartial hearing officer. See id. at 27. In particular, defendants point to Capt. Bishop's sworn affidavit in which he stated that he was properly appointed to preside over the March 2016 disciplinary hearing because he did not investigate the February 28, 2016 incident, and because his name appears on the UIR only as a matter of form. See id. Capt. Bishop explained that he "did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course, the [c]aptain's name was listed on all UIRs." Dkt. No. 178-4 at 3 ¶ 14. Supt. Kirkpatrick corroborated Capt. Bishop's explanation, explaining that Capt. "Bishop did not investigate the incident giving rise to the March 2016 misbehavior report]." Dkt. No. 178-13 at 3 ¶ 16. Supt. Kirkpatrick stated that Capt. Bishop's "name is listed on the UIR simply because the Captain's name is listed on the UIR as

a matter of course" and that his "own name is [also] listed on the UIR, not because [he] investigated the incident [or] ha[d] personal knowledge of the events described in the document, but simply because [he] was the Superintendent of the facility at the time the UIR was issued, and [his] name [wa]s listed as a matter of course." Id. Supt. Kirkpatrick further explained the procedure for how a UIR is filed:

> The UIR initial paperwork is written by the line officer, who submits the paperwork to the Sergeant for review. The Sergeant then reviews and submits it to the Watch Commander, who reviews and electronically files the UIR and submits all paperwork related to the UIR. The Watch Commander then submits it to the Captain, who reviews and makes sure the paperwork is complete and in order. The Captain then submits it to the Superintendent.

Id. at ¶ 17. Supt. Kirkpatrick corroborated Capt. Bishop's statement that he did not investigate the March 2016 incident by explaining that, "[n]one of these individuals, aside from the line officer and Sergeant, are considered to have 'investigated' the incident merely by being part of this chain of review." Id. Thus, defendants urge, plaintiff's due process claim in this regard lacks merit and must be dismissed. See Dkt. No. 178-2 at 27.

Next, defendants contend that plaintiff's due process rights were not violated when he was not provided all of the drop box logbook dates that he requested. See Dkt. No. 178-2 at 27. Defendants urge that plaintiff was afforded all process to which he was due because he was provided access to the February 28, 2016 logbook entries and allowed to question Sgt. Baker, the individual who had photographed the weapon, who confirmed that the weapon had been recovered and photographed on that date. See id. Defendants posit that the additional pages plaintiff requested (i.e. the pages spanning from February 29, 2016, to March 1, 2016), were not relevant to the March 2016 disciplinary hearing and, therefore, Capt. Bishop did not violate his due process rights by denying plaintiff access to those log book entries. See id. at 27-28.

**\*11**  With respect to plaintiff's contention that defendants violated DOCCS evidence rules when the weapon recovered

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 287 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

from his cell on February 28, 2016, was not purged from the evidence drop box for approximately eight days instead of within 72 hours, as required pursuant to DOCCS Directive 4910A, defendants posit that such a mistake constitutes, at most, harmless error and did not violate plaintiff's due process rights. See Dkt. No. 178-2 at 28. Capt. Bishop explained in his sworn affidavit that he determined that, although the failure to purge the evidence drop box within the time required under Directive 4910A constituted "a procedural violation," he "it was harmless because no one accessed the dropbox during those 8 days." Dkt. No. 178-4 at 5 ¶ 25. Relying on Capt. Devlin's sworn affidavit, defendants posit that, because no one accessed the evidence drop box during the eight days the weapon remained there, that evidence was "unaltered." Dkt. No. 178-2 at 28; see Dkt. No. 178-6 at 3 ¶ 10 (Capt. Devlin's affidavit stating, although the weapon was not removed from the evidence drop box within 72 hours, as contemplated under DOCCS Directive 4910A, "no one accessed the drop box during this time.").

Moreover, citing Capt. Bishop's affidavit, defendants argue that the incorrect handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the second misbehavior report. See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22. Capt. Bishop explained that, on March 29, 2016, the last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated that the correct date on which the weapon was recovered and photographed was February 28, 2016, and that the handwritten date contained on the photograph was a "clerical error." Id. at 5 ¶ 23. Capt. Bishop noted that, between the second and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his attendance records, which indicated that he was not working on February 29, 2016, but was working on February 28, 2016, and that he had photographed the weapon; therefore, Capt. Bishop "concluded that the 28th" was the correct date, "and the handwritten date was an error." See id. at ¶ 24. In any event, defendants contend, "[t]he date on the photograph did not impact the [h]earing [d]ecision." Dkt. No. 178-2 at 29.

#### 4. Defendants' Remaining Arguments

In addition, defendants contend that the Amended Complaint should be dismissed as to all defendants with respect to plaintiff's First Amendment retaliation and Section 1983 conspiracy claims for lack of personal involvement. See Dkt.

No. 178-2 at 10-16. In this regard, defendants rely exclusively on their arguments and evidence as to the merits of plaintiff's First Amendment and Section 1983 conspiracy claims. See id. Similarly, drawing exclusively on their arguments on the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, defendants aver that they are entitled to qualified immunity. See id. at 29-32.

### B. Arguments and Evidence in Support of Kowalowski's Motion for Summary Judgment (Dkt. No. 179)

#### 1. First Amendment Retaliation

Kowalowski first argues that his statements, which plaintiff alleges constituted "threats," do not constitute adverse action and are not causally related to plaintiff's constitutionally protected activities on the ILC. See Dkt. No. 179-4 at 7. First, with respect to Kowalowski's statement that ILC members "have a target on their backs" and therefore, must "be careful," Kowalowski argues that the context in which he made this statement establishes that it was not meant as a threat, but rather, as advice. See id. In particular, Kowalowski explains that he made this statement to the entire class of ILC inmates, as he did to every new class of ILC members, and "meant this as a truthful warning to the ILC members." Dkt. No. 179-3 at 2 ¶ 7. Kowalowski states, it "was clear from the context of the conversation," that he gave this advice because "inmates tend to see ILC members as the scapegoat for jail conditions that frustrate inmates" and "tensions can arise between security and staff and ILC members." Id. at 2 ¶¶ 8, 9, 10. Therefore, Kowalowski argues that, understood in the proper context and notwithstanding plaintiff's conclusory assertions to the contrary, this statement cannot constitute adverse action to support plaintiff's First Amendment retaliation claim. See Dkt. No. 179-4 at 7. In addition, Kowalowski contends that no causal connection exists between this statement and plaintiff's constitutionally protected ILC activities, as "[t]here is no indication that [p]laintiff had even made a constitutionally-protected statement in the meeting prior to Kowalowski, let alone a statement that actually motivated Kowalowski to express this 'threat.'" Id. at 8-9. Indeed, Kowalowski argues, plaintiff did not even perceive this statement as a threat at the time it was made and only later viewed the statement in this light based on "hearing second-hand accounts of the fate of other [ILC] members ...." Id. at 8.

**\*12** Next, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for the content contained in plaintiff's proposed December 2015 ILC agenda. See Dkt. No. 179-4 at 9. Kowalowski points out that, at deposition, plaintiff only recalled that Kowalowski objected to the length of the proposed agenda. See id. (citing Dkt. No. 179-2 at 63 (Deposition Transcript). Plaintiff testified at deposition that, while he could not recall "exactly why [Kowalowski] said he wasn't going to submit" the proposed December 2015 ILC agenda, Dkt. No. 179-2 at 61, plaintiff watered the agenda down to omit "issues expressed about the assaults by staff." Id. at 62. While plaintiff did not recall whether Kowalowski took issue with the inclusion of complaints of assault by staff, plaintiff stated that "there had to be some discussion about that, because it was removed. And it wouldn't be removed without there being some discussion about it not being appropriate for the agenda." Id. at 63. Plaintiff also testified that he "remember[ed] loosely, very vaguely, that there was a conversation that a lot of th[e] stuff [included in the proposed agenda] c[ould] be taken care of off the record." Id. Kowalowski also points to plaintiff's January 11, 2016 letter to New York State Assemblyman O'Donnell, noting that plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names. See id. In particular, plaintiff's January 11, 2016, letter to Assemblyman O'Donnell, states that Kowalowski informed him that he could not submit his proposed five-page agenda because it was "too long[ ] and [plaintiff] highlighted their (administration's) names." Dkt. No. 25-1 at 124. In his letter to Assemblyman O'Donnell, plaintiff posits that "the real reason why [Kowalowski] was upset" is because the proposed agenda "talk[ed] about misrepresentation and/or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771." Id. Further, Kowalowski states that, upon observing the length of the proposed agenda, he simply relayed a directive from Supt. Kirkpatrick to plaintiff that the Clinton C.F. administration would no longer accept ILC agendas longer than one page or containing more than four or five individual items. See Dkt. No. 179-3 at 4 ¶ 21. Kowalowski states that he did not comment on or direct plaintiff to "water down" the content of the proposed agenda. Id. at 4-5 ¶¶ 26-28. "In fact," Kowalowski states, he "did not review the agenda in any detail before counseling [plaintiff] regarding its length." Id. at 5 ¶ 28. At most, Kowalowski states, he believed that submitting an agenda longer than one page would have resulted in Clinton C.F. cancelling the ILC meeting, but not a SHU sanction for any ILC member. See id. at 5-6 ¶ 27. Thus, Kowalowski argues, his instruction regarding the length of the proposed agenda did not constitute a threat, and no causal connection exists between the alleged threat and the constitutionally protected contents of the proposed agenda. See Dkt. No. 179-4 at 10, 11.

Further, Kowalowski contends that plaintiff's allegation that he "snatched" a piece of paper from plaintiff's hand, which contained a list of proposed television channels, and stating, "You are not as important as you think you are" does not constitute a threat sufficient to support a First Amendment retaliation claim. Dkt. No. 179-4 at 13 (quoting Amen. Compl. at 15 ¶ 56). In particular, Kowalowski contends that, even assuming that he took the piece of paper and made these comments, his actions do not rise to the level of adverse action. See id. Kowalowski avers, plaintiff's allegations amount to, at most, "generalized discourtesy," which is not actionable under Section 1983. Id. at 14.

Kowalowski also argues that plaintiff has failed to establish a First Amendment retaliation claim against him based on his alleged involvement with the January 29, 2016 misbehavior report relating to plaintiff's use of DOCCS letter head. See Dkt. No. 179-4 at 14-17. Kowalowski explains that he is the co-chair of the FMRC, which is an entirely separate role from his position as ILC Advisor. See Dkt. No. 179-3 at 5, 6 ¶¶ 35, 36. Kowalowski contends that plaintiff received a magazine that was flagged by civilian mail staff and referred to the FMRC, a member of which ultimately determined that the magazine contained prohibited pornographic content. See Dkt. No. 179-4 at 14. Kowalowski explains that, although he did not personally review plaintiff's magazine, in his role as co-chair of the FMRC he "sign[s] all determinations made by members of the FMRC." Dkt. No. 179-3 at 6 ¶ 36; see id. at ¶ 39. When plaintiff "approached [Kowalowski] about the status of his magazine, [Kowalowski] told him that he was entitled to appeal the FMRC decision to the COMRC in Albany." Id. at ¶ 42. Plaintiff testified at his deposition that "[t]here was nothing untoward about" the way Kowalowski presented this message to him and that "[t]here was no feelings on [sic] animosity about it[,]" and that plaintiff "didn't take it personally in any way. [Kowalowski] was doing his job." Dkt. No. 179-2 at 104. Plaintiff appealed the FMRC's determination and the COMRC affirmed the FMRC's determination on appeal. See Dkt. No. 179-3 at 6 at ¶ 41. Kowalowski notes that, on January 23, 2016, plaintiff sent a memorandum, drafted on official DOCCS interdepartmental communication letterhead, to Hollmen in which he objected to the terminology and reasoning the COMRC used in its decision affirming the FMRC's determination. See Dkt. No. 25-1 at 149-52.

Kowalski states that, "[i]n January of 2016, [Capt.] Bishop summoned [him] to his office[,]" where they met with non-party Deputy Superintendent Bell ("Deputy Supt. Bell"). Dkt. No. 179-3 at 6 ¶ 43. Capt. Bishop informed Kowalowski that he and Deputy Supt. Bell "had learned that [plaintiff] had been using certain letterhead in his correspondence." Id. at ¶ 44. Capt. Bishop and Deputy Supt. Bell showed Kowalowski the letterhead, which Kowalowski "recognized ... from other correspondence that [he] had seen from [plaintiff]." Id. However, Kowalowski "do[es] not know the substance of the correspondence that [Capt.] Bishop showed [him]." Id. at ¶ 45. "Capt. Bishop asked [Kowalowski] if [he] would be willing to write a misbehavior report against [plaintiff] for his use of the letterhead." Id. at 7 ¶ 47. Although Kowalowski "understood [Capt.] Bishop's objection, [he] refused his request." Id. at ¶ 48. Kowalowski explains that, although he "understood the letterhead to be an issue for the security administration[, i]t did not relate to [his] role as Resident Coordinator or ILC Advisor[ ]" and Kowalowski "had no special knowledge or awareness of the relevant facts" concerning plaintiff's letter. Id. Kowalowski further states that, "[a]t the time of [his] meeting with [Capt.] Bishop and [Deputy Supt.] Bell, [he] was not aware of any connection between the review of [plaintiff's] magazine and the letterhead." Id. at ¶ 50. Moreover, Kowalowski states that, although he "subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 2016 misbehavior report. See Dkt. No. 179-4 at 17. Thus, Kowalowski contends, the record evidence does not establish a claim of retaliation against him with respect to the issuance of the January 29, 2016 misbehavior report, because he did not issue the misbehavior report or otherwise have any involvement in the issuance of that misbehavior report, and no causal connection exists between plaintiff's ILC activities and Kowalowski's "tangential involvement" with the FMRC review of plaintiff's magazine and the January 29, 2016 misbehavior report and subsequent sanction. See id. at 17-19.

### Section 1983 Conspiracy

**\*13**  Kowalowski first argues that, for the reasons set forth above, plaintiff's Section 1983 conspiracy claim lacks

merit. See Dkt. No. 179-4 at 22. Alternatively, Kowalowski contends that plaintiff's conspiracy claim should be dismissed because all of the alleged conduct complained of occurred while defendants were acting within the scope of their employment. See id. at 22-23.

### C. Plaintiff's Responses in Opposition

#### 1. Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 193)

Plaintiff first controverts defendants' contention that he failed to establish their personal involvement, arguing that, "when the defendants retaliated against [him] for [his] constitutionally conduct as an ILC member submitting an [a]genda in accordance with DOCCS Directive #4002 ..., setting forth grievances on behalf of the inmate population, they became personally involved in the constitutional violations against [him]." Dkt. No. 193-2 at 10-11. He also posits that "[n]umerous [i]nferences of [r]etaliation are [a]pparent from the [f]acts of [t]his [c]ase." Id. at 20. He also avers that Lt. Durkin's "retaliation and conspiracy against [him] was apparent when he violated [his] Due Process rights in the [February 2016 disciplinary] hearing." Id. Plaintiff argues that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9 $^{th}$ letter or the Dec. 16 $^{th}$ Agenda, as his lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating ...." Id. (internal citation omitted).

Plaintiff contends that "Kowalowski's statement that he was summoned to Capt. Bishop's office, ... and was asked by Capt. Bishop if he would be willing to write a misbehavior report ..., provides a strong causal connection/inference that once Capt. Bishop was unable to have Kowalowski write the [January 2016 misbehavior report, he instead directed Sgt. King to write it." Id. Plaintiff avers that C.O. Breyette's and C.O. Tucker's lack of knowledge of plaintiff's ILC activities "did not prevent them from conspiring with other defendants ... to retaliate against [him]." Id. at 15. Plaintiff also asserts that contrary to Capt. Devlin's assertion, he did make the statements, "What the fuck are you still doing here" and "You'll see[,]" and that Capt. Devlin was aware of the December 9 letter and December 16 Agenda. Id. at 16. Further, plaintiff avers that the wrong date contained on the photograph of the weapon, along with Capt. Devlin's

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 290 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

statements "shows the big picture," and raises an inference that Capt. Devlin retaliated against him. Dkt. No. 193-2 at 21. Moreover, plaintiff avers that Supt. Kirkpatrick "conspired with [Capt.] Bishop and [Supt.] Uhler when he assigned [Capt.] Bishop to be [the] hearing officer ...." Id. at 16. Plaintiff urges that this assignment was "irregular" and, along with the fact that he signed the UIR, evidences that Supt. Kirkpatrick conspired with Capt. Bishop and Supt. Uhler to retaliate against him. Id. In addition, plaintiff contends that the "multiple failures of ... Rodriguez and ... Venettozzi in the processing, handling and decision making of [his second administrative] appeal is indicative of the IDP Directors [sic] inability to promulgate the Policies, Procedures and Practices properly for all inmates in the ... custody ... of [ ]DOCCS." Id. at 20. Plaintiff posits that Venettozzi's and Rodriguez's contentions that plaintiff's submission of an "exorbitant number of letters" confused the review process and that they reviewed his requests without each other's knowledge are "weak excuse[s]." Id.

**\*14** Plaintiff further argues that he "can provide a factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end result of retaliation against [him] for [his] activities on the ILC." Dkt. No. 193-2 at 22. Plaintiff posits that defendants' affidavits constitute "unsupported allegations that they did not discuss [his] claims," which "lack[ ] substance and merit." Id. For instance, plaintiff contends, "Capt. Bishop clearly directed Sgt. King to write the first [misbehavior report] after he tried, and failed, to have Kowalowski do so." Id. at 23. He states that Capt. "Bishop's sworn affidavit that he had nothing to do with the [first misbehavior report] is highly doubtful, being that he tried to have Kowalowski do so and failed." Id. "In furtherance of this conspiracy," plaintiff states, Supt. "Kirkpatrick assigned Lt. Durkin ... to be [his] hearing officer," rather than non-party "Lt. Miller, who was the person regularly assigned to handle such hearings, left for the day." Id. Plaintiff states that defendant have failed to provide him proof that Lt. Miller was "overwhelmed" to justify Lt. Durkin's appointment, therefore strongly implying "that Lt. Durkin was assigned with the specific purpose of finding [him] guilty[.]" Id. at 12. Thus, plaintiff avers, the February 2016 disciplinary hearing was the result of a conspiracy. See id. at 23.

Plaintiff contends that the March 2016 disciplinary hearing was also the result of a conspiracy because "it is disputed that [C.O.] Breyette, as author of the misbehavior report, did not discuss this case with anyone else, with said

discussions ... in tacit agreement to achieve the unlawful end of retaliation against [him] for [his] protected conduct ... as a member of the ILC." Dkt. No. 193-2 at 23 (internal citations omitted). Plaintiff contends that Supt. Kirkpatrick's act of assigning Capt. Bishop as the hearing officer at the March 2016 disciplinary hearing is "taken outside the scope of his employment duties," and that Capt. Bishop's and Supt. Uhler's "tacit agreement" to allow Capt. Bishop to preside over the hearing "resulted in their participation in retaliation against [him]." Id. at 24. Plaintiff also opposes Venettozzi's and Rodriguez's assertions that they did not collaborate in reviewing plaintiff's requests, and states that their statements, "together with the facts asserted in [his] Verified Complaint[,] provides admissible proof ... that they tacitly agreed to conspire and obstruct justice by delaying the timely reversal of [his] administrative appeal during it's [sic] initial review, as opposed to one year later." Id. (internal citations omitted).

In addition, plaintiff opposes defendants' arguments concerning his Fourteenth Amendment due process claims. See Dkt. No. 193-2 at 24. He contends that his SHU constituted "atypical and significant hardship" because he "was left in [his] cell for 4 days without [his] high blood pressure medication and without no [sic] clothing but what [he] was wearing." Id. at 25. Plaintiff contends that Capt. Bishop violated his procedural due process rights by preventing him from eliciting testimony about the chain of custody of the weapon from non-party Sgt. Baker. See id. at 27-28. He also contends that the date contained on the photograph of the weapon was "not a clerical error by Sgt. Baker, but just another fantasy of the defendants that finds absolutely zero support in the record[,] a far cry from harmless error." Id. at 28 (emphasis omitted). Further, plaintiff reasserts that he was denied due process because Capt. Bishop was a partial hearing officer based on his involvement with the UIR and his alleged involvement in a conspiracy with Supt. Kirkpatrick and Supt. Uhler. Id. at 27-29. Finally, plaintiff contends that defendants are not entitled to qualified immunity, because "there is no objectively reasonable view of the facts that show that defendants believed that their actions were not intentional and did not violate [his] clearly established constitutional rights." Id. at 29.

### 2. Plaintiff's Response in Opposition to Kowalowski's Motion for Summary Judgment (Dkt. No. 194)

In opposition to Kowalowski's motion for summary judgment, plaintiff first argues that "there is overwhelming

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 291 of 427

evidence that Kowalowski engaged in adverse actions which were ... causally ... related to [his] constitutionally protected conduct as a member of the ILC[.]" Dkt. No. 194-1 at 11. Plaintiff premises this argument on the fact that he has established "that Kowalowski and the defendants he conspired with have previously engaged in this same retaliatory conduct with ILC members serving before [him]." Id. He further contends that "it is not a coincidence that [Kowalowski] threatened [him] with 270 days in SHU" because Emerenciano, another inmate at Clinton C.F., "received 270 days in SHU for a misbehavior report written by Kowalowski." Id. at 13. Plaintiff avers that Kowalowski's statement that ILC inmates have " 'a target on [their] backs,' considered together with [Capt.] Bishop requesting that [Kowalowski] (once again, like he did to Emerenciano) write the [misbehavior report] against [plaintiff], show a causal connection between [plaintiff's] protected conduct ... and the adverse action [of the] false [misbehavior report] and confinement." Id. at 14. Plaintiff avers that "[i]t is of no moment that Kowalowski chose not to write the [misbehavior report] against [him]," because "it only reveals his attempt to shield himself from being identified as part of the conspiracy against the ILC." Id. Moreover, plaintiff argues that, because the revised agenda did not contain "items about assaults by staff, and other serious issues," Kowalowski's statement that he did not read the contents of the proposed agenda is false. Id. at 15. In addition, plaintiff contends that Kowalowski's act of "violently snatch[ing]" a piece of paper out of his hand "represented the 'final straw' that compelled [him], through fear, to ... document this violent act[,]" which he suggests establishes that Kowalowski's threats did, in fact, "dissuade" his First Amendment activities. Id. In this regard, plaintiff contends that his letter to Assemblyman O'Donnell provides documentary support for his claims against Kowalowski. See id. at 16. As a final matter, plaintiff reiterates his argument that he has "provided a factual basis supporting a meeting of the minds of Kowalowski with [Supt.] Kirkpatrick and [C.O.] Bishop showing that they entered into an agreement, whether expressly or tacitly, to achieve the unlawful end of retaliation against [him] for [his] constitutionally protected conduct as a member of the ILC reporting the atrocities [at Clinton C.F.]." Id. at 19.

### D. Defendants' Reply to Plaintiff's Opposition (Dkt. No. 195)

**\*15** Defendants aver that they have met their burden of proving that no genuine issue of fact exists as to plaintiff's claims, in opposition to which, plaintiff has failed to "produce evidence" demonstrating otherwise, as required pursuant to Rule 56.1(b) of the Federal Rules of Civil Procedure. Dkt. No. 195 at 6. Further, defendants posit, to the extent that plaintiff has failed to "cite hard evidence" in opposition, "the [C]ourt should deem [his] unsupported 'disputed' facts admitted." Id. With respect to plaintiff's retaliation and conspiracy claims relating to the February 2016 disciplinary hearing, defendants contend that plaintiff offers no evidence to controvert their entitlement to summary judgment, and instead relies solely an unsupported "multi-step inferential chain" to show that defendants conspired to retaliate against him for his activities on the ILC. Id. at 9. Further, defendants contend, even assuming arguendo that plaintiff could establish retaliatory motive, he would have received the same punishment because "there is no dispute that ... plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Id. at 8 (internal quotation marks and citations omitted)). Defendants contend that plaintiff "admitted on multiple occasions that he used DOCCS letterhead to obtain a magazine that" included prohibited sexual content. Id. Defendants also oppose, as belated, plaintiff's argument, contained in his declaration in opposition, that the January 6, 2016 letter did not contain DOCCS letterhead because it did not contain a certain logo. See Dkt. No. 193 at 3 ¶ 12; Dkt. No. 195 at 9.

### E. Kowalowski's Reply to Plaintiff's Opposition (Dkt. No. 196)

In reply to plaintiff's opposition, Kowalowski asserts that, even if the Court accepts plaintiff's allegations against Kowalowski as true, the alleged "threats" do not constitute adverse action. See Dkt. No. 196 at 3. Kowalowski further argues that plaintiff has failed to proffer evidence to establish that he "ever commented on, let alone, veto[ed]," any specific "topic" contained in the December 2016 ILC agenda. Id. Moreover, Kowalowski contends plaintiff's assertions pertaining to inmate Emerenciano are irrelevant, fail to establish any causal connection between any adverse action and plaintiff's protected activities, and "are of no evidentiary value[.]" Id. at 6. In any event, Kowalowski contends that the Emerenciano case is factually distinguishable from the present matter, Emerenciano filed a grievance against Kowalowski before Kowalowski wrote a misbehavior report against that inmate; therefore, unlike plaintiff, Kowalowski avers, "Emerenciano had an actual, individualized conflict

**Rucano v. Annucci, Not Reported in Fed. Supp. (2021)**

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 292 of 427

with Kowalowski before a misbehavior report [was] issued." Id. at 6.

Kowalowski also contends that plaintiff's allegation that Kowalowski was involved in the decision to instruct Sgt. King to file the January 2016 misbehavior report relating to plaintiff's use of letterhead based on his attendance at the meeting with Capt. Bishop and Deputy Supt. Bell is "wholly speculative" and "based on no competent evidence." Dkt. No. 196 at 6. Kowalowski avers that plaintiff's reliance on his January 11, 2016 letter to Assemblyman O'Donnell establishes only plaintiff's "ability to document the minute indignities he perceived and to speculate ... about malfeasance by DOCCS employees," but not Kowalowski's participation in the January 2016 misbehavior report. Id. at 7. Furthermore, as with his retaliation claims, Kowalowski argues that the "facts" plaintiff relies on in support of his conspiracy allegations against him are, in fact, plaintiff's "own conclusory statements about what he believes occurred." Id. at 8. In the alternative, Kowalowski avers that plaintiff's conspiracy claim against him "must fail under the intracorporate conspiracy doctrine." Id. at 9.

### III. Discussion [6]

### A. Legal Standard

Summary judgment may be granted only if the submissions of the parties taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

*16 Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). A plaintiff's verified complaint is to be treated as an affidavit. [7] See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...."). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se*

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 293 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

## B. First Amendment Retaliation

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... *objectively*[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

**\*17** "Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*18 (N.D.N.Y. Mar. 28, 2014) (citation omitted); see Scott v. Coughlin,

344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

"[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at \*3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at \*3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at \*3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

Here, it is undisputed that plaintiff's ILC activities constitute constitutionally protected activity. See Dolan v. Connolly, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "filing or voicing grievances on behalf of a prison population as a member of an inmate grievance body, such as the ILC," constitutes constitutionally protected activity); Dkt. No. 178-2 at 17 (Defendants' memorandum of law in support of motion for summary judgment, acknowledging that plaintiff's "activities on the ILC meet the first prong of the [First Amendment] retaliation test."); Dkt. No. 179-4 at 5 (Kowalowski's memorandum of law in support of motion for summary judgment, acknowledging same). However, as defendants and Kowalowski have established through

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 294 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

admissible evidence that no retaliatory motive or causal connection exists between plaintiff's protected activities on the ILC and the alleged adverse action, plaintiff's First Amendment retaliation claims must be dismissed.

### 1. February 2016 Disciplinary Proceeding

#### a. Sgt. King

Defendants have established entitlement to summary judgment dismissing plaintiff's First Amendment retaliation claim against Sgt. King based on the allegedly false January 2016 misbehavior report. As an initial matter, "[i]t is well settled that filing false or unfounded misbehavior charges against an inmate does not give rise to a per se constitutional violation actionable under section 1983." Burroughs v. Petrone, 138 F. Supp. 3d 182, 205 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). Indeed, the Second Circuit has made clear that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997).

 *18  It is well settled that "[a]llegations of adverse actions alone ... are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. See id. (citing Colon, 58 F.3d at 872-73). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, although the purported adverse action of Sgt. King's issuance of the allegedly false January 29, 2016 misbehavior report occurred within close temporal proximity to plaintiff's submissions of the December 9, 2015 memorandum and the December 16, 2015 proposed ILC agenda, it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Further, defendants have proffered admissible evidence establishing that plaintiff's submission of the December 2016 memorandum and proposed agenda was not "a substantial or motivating factor" in Sgt. King's decision to issue the January 29, 2016 misbehavior report. Burton, 664 F. Supp. 2d at 367. In his sworn affidavit, Sgt. King acknowledges that, although he was aware that plaintiff was a member of the Clinton C.F. ILC, he did not have knowledge of plaintiff's December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2016 proposed ILC agenda, and that his issuance of the misbehavior report "was not motivated by a desire to retaliate against [plaintiff] for his activities on [the ILC], or for any other constitutionally protected activity." See Dkt. No. 178-8 at 1 ¶ 3, 2 ¶ 8; see also Van Dunk v. Brower, No. 11-CV-4564 (ER), 2013 WL 5970172, at *9 (S.D.N.Y. Nov. 7, 2013) ("To prove a causal connection, the plaintiff must demonstrate that the individuals who engaged in retaliation had knowledge of the protected conduct."); Henson v. Gagnon, No. 9:13-CV-0590 (GTS/TWD), 2015 WL 9809874, at *12-13 (N.D.N.Y. Dec. 10, 2015) (granting summary judgment and dismissing a pro se inmate's First Amendment retaliation claim against a correction officer for failure to establish causation where the correction officer submitted a sworn statement that he had

no knowledge of the plaintiff's grievance against him at the time he conducted a cell search and issued the plaintiff a misbehavior report, and the plaintiff offered no evidence to refute the correction officer's sworn statement), report and recommendation adopted, No. 9:13-CV-0590 (GTS/TWD), 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016). Further, plaintiff does not aver, and the record does not indicate, that Sgt. King ever had any prior dealings with plaintiff, or made any statements evidencing that Sgt. King had any retaliatory animus against plaintiff. See Baskerville, 224 F. Supp. 2d at 732. Moreover, although the February 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal, "no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false." LeBron v. Selsky, No. 9:05-CV-0172 (GTS/DRH), 2010 WL 1235593, at *5 n.9 (N.D.N.Y. Mar. 31, 2010).

**\*19** In any event, the admissible evidence establishes that Sgt. King issued the January 2016 misbehavior report because he reasonably believed that plaintiff had abused his position as a law library clerk by using DOCCS letterhead for personal correspondence, in violation DOCCS Directive No. 0008, in order to obtain sexually explicit adult magazines—not for any retaliatory purpose. See Dkt. No. 178-8 at 2 ¶ 6. Defendants proffer, as an exhibit to Sgt. King's affidavit, a copy of DOCCS Directive No. 0008, which explicitly provides, in relevant part, that "Official Department stationary will only be used for the transaction of official governmental business." Id. at 6. Plaintiff's own documentary evidence—namely, the copy of his January 23, 2016 memorandum to Hollmen—demonstrates that he used DOCCS interdepartmental communication letterhead for his correspondence with the COMRC concerning the FMRC's decision to prohibit plaintiff from obtaining two issues of Cheri magazine. See Dkt. No. 25-1 at 149-52. Indeed, plaintiff does not deny that he used DOCCS letterhead for personal use, and contends only that he did so with the permission of his boss in the law library. See Amen. Compl. at 19 ¶ 70. However, plaintiff relies entirely on his own self-serving statements, and cites no evidence in support of his contention that his boss's alleged permission provided a valid exception to official DOCCS rules concerning the use of department letterhead. Consequently, defendants have established through admissible evidence that Sgt. King would have issued plaintiff the January 2016 misbehavior report regardless of whether he harbored retaliatory animus against plaintiff. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL

1292232, at *18 (citation omitted). Plaintiff's shifting [8] and conclusory assertions to the contrary fail to raise a genuine issue of material fact as to his First Amendment retaliation claim against Sgt. King and are insufficient to overcome defendants' documentary case. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) ("[M]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (internal quotation marks and citation omitted), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002); Zembko v. Northwestern Mut. Life Ins. Co., No. 3:05-CV-918 (AHN), 2007 WL 948323, at *4 n.1 (D. Conn. Mar. 26, 2007) ("[A] nonmovant's self-serving conclusory statements that dispute the movant's evidence cannot create material issues of fact to avoid summary judgment." (internal quotation marks and citation omitted)). Based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim against Sgt. King be dismissed.

#### b. Capt. Bishop

Plaintiff's First Amendment retaliation claim against Capt. Bishop based on the January 2016 misbehavior report and resulting sanctions is premised exclusively on his speculative assertion that Capt. Bishop instructed Sgt. King to issue the misbehavior report after he allegedly consulted with Kowalowski. See Amen. Compl. at 16 ¶ 61.

Defendants' admissible documentary evidence establishes that Capt. Bishop, although aware that plaintiff was a member of the ILC, had no knowledge of the December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015 proposed ILC agenda; had not read either document; never discussed either document with Kowalowski; and did not instruct Sgt. King to issue the January 2016 misbehavior report. See Dkt. No. 178-4 at 1 ¶ 4, 2-3 ¶¶ 5, 6, 10. Further, the record is devoid of facts or evidence indicating that Capt. Bishop made any statements to plaintiff or anyone else evidencing a retaliatory motive with respect to the January 2016 misbehavior report. See Baskerville, 224 F. Supp. 2d at 732. Moreover, plaintiff's conclusory and speculative assertion that Capt. Bishop directed Sgt. King to issue plaintiff the misbehavior report—a contention that both Capt. Bishop and Sgt. King deny—is insufficient to support a First Amendment retaliation claim against Capt. Bishop with respect to the January 2016 misbehavior report. See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6 (Sgt. King's affidavit stating, "Capt[.] Bishop did not direct me to write the IMR

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 296 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

and .... I did not discuss the 1st IMR with Capt[.] Bishop before I wrote it or thereafter."); see also Henson, 2015 WL 9809874, at *12 ("[C]onclusory statements are not sufficient to support causation on retaliation claims; the claims must be supported by specific facts."). In addition, Kowalowski's declaration, in which he states that Capt. Bishop asked him to write plaintiff a misbehavior report based on plaintiff's use of DOCCS letterhead does not establish that Capt. Bishop instructed Sgt. King to issue the January 2016 misbehavior report, or that Capt. Bishop had retaliatory motive relating to plaintiff's December 2015 ILC activities. See Dkt. No. 179-3 at 6-7 ¶¶ 43-48. Rather, Kowalowski's declaration establishes, at most, that Capt. Bishop objected to plaintiff's use of official DOCCS letterhead, see id. at 7 ¶ 47, which, as explained above, defendants reasonably believed that plaintiff had used in violation of DOCCS rules for personal purposes. See Dkt. No. 178-8 at 2 ¶ 6.

**\*20** Plaintiff's contention in opposition that Capt. Bishop "conceded" that he was involved in the issuance of Sgt. King's January 2016 misbehavior report because Capt. Bishop stated in his affidavit that he "d[id] not believe [he] ever discussed [the proposed ILC agenda] with any other defendant in this case" fails to raise a genuine issue of material fact. Dkt. No. 193-2 at 12. This cherry-picked statement is taken out of context, and fails to account for Capt. Bishop's and Sgt. King's statements that Capt. Bishop did not instruct Sgt. King to issue plaintiff the January 2016 misbehavior report. See Dkt. No. 178-4 at 2-3 ¶ 10; Dkt. No. 178-8 at 2 ¶ 6. Plaintiff does not proffer any other evidence, admissible or otherwise, in opposition. See Riehl v. Martin, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *4 (N.D.N.Y. Mar. 31, 2014) ("The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."). Accordingly, it is recommended that plaintiff's First Amendment claim against Capt. Bishop based on the January 2016 misbehavior report and February 2016 disciplinary hearing be dismissed.

### c. Lt. Durkin

Defendants submit Lt. Durkin's sworn affidavit in which he states that his determination that plaintiff was guilty of using "DOCCS letterhead for a purpose that was unrelated to official government business" for "try[ing] to obtain adult magazines of a sexual nature" was based on his understanding of DOCCS regulations, and not to retaliate against plaintiff. Dkt. No. 178-7 at 3 ¶ 15. Further, Lt. Durkin's sworn affidavit

explains that he "did not request to be appointed [as] the hearing officer" at the February 2016 disciplinary hearing or "discuss being appointed the hearing officer with any other [d]efendant." Id. at 2 ¶¶ 4, 9. Moreover, Lt. Durkin states that, contrary to plaintiff's contention, he was not "unfamiliar with the hearing procedures, as [he] had previously served as a hearing officer on 22 occasions." Id. at 3 ¶ 11. In addition, Lt. Durkin denies stating off the record that "the [February 2016 misbehavior report] was 'problematic[,]' " or "inform[ing] Kowalowski that [plaintiff] had accused him of retaliation." Id. at 3 ¶¶ 12, 13. Plaintiff's conclusory allegation that Lt. Durkin "railroaded" him by finding him guilty in retaliation for his December 2015 ILC activities finds no support in the record and fails to establish that Lt. Durkin acted with a retaliatory animus against plaintiff. Amen. Compl. at 17 ¶ 64. Plaintiff's conclusory assertions in opposition are insufficient to raise a genuine issue of fact to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Therefore, it is recommended that plaintiff's First Amendment retaliation claim against Lt. Durkin be dismissed.

### d. Supt. Kirkpatrick

Defendants submit Supt. Kirkpatrick's sworn affidavit, which explains that, contrary to plaintiff's contention, his decision to assign Lt. Durkin to preside over the February 2016 hearing was not unusual or inappropriate, as Lt. Durkin "had not taken part in investigating the incidents underlying the [January 2016 misbehavior report], ... he had served as hearing officer on 22 hearings," and was "not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC, or for any other constitutionally protected activity." Dkt. No. 178-3 at 2 ¶ 8, 4 ¶ 19. Plaintiff's conclusory allegations to the contrary fails to rebut Supt. Kirkpatrick's sworn affidavit, which is corroborated by Lt. Durkin's sworn affidavit. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact."). Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Supt. Kirkpatrick based on his decision to assign Lt. Durkin as the hearing officer at the February 2016 disciplinary hearing be dismissed.

### e. Rodriguez

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 297 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Defendants proffer Rodriguez's sworn affidavit, in which he states that "[n]one of [his] actions were motivated by an intent to retaliate against [plaintiff], nor did [he] retaliated against [plaintiff]. In fact, [he] was not aware that [plaintiff] had engaged in a constitutionally protected activity at the time the" misbehavior reports were issued, or the hearings were held. Dkt. No. 178-9 at 2 ¶ 3. Thus, as defendants have submitted admissible documentary evidence that Rodriguez did not have knowledge of plaintiff's constitutionally protected activity at the time he made his determinations with respect to plaintiff's administrative appeal, defendants have demonstrated that no causal connection exists between the protected conduct and Rodriguez's actions. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. Moreover, the record is devoid of evidence, such as prior interactions or statements made by Rodriguez to plaintiff or other defendants to Rodriguez indicating that Rodriguez harbored any retaliatory animus against plaintiff. See Baskerville, 224 F. Supp. 2d at 732. As defendants contend, plaintiff's conclusory and speculative assertions to the contrary do not raise a genuine issue of material fact sufficient to defeat defendants' documentary case. See Dkt. No.178-2 at 17; Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Rodriguez based on the February 2016 disciplinary hearing and subsequent administrative appeal, be dismissed.

### 2. March 2016 Disciplinary Proceeding

#### a. C.O. Breyette and C.O. Tucker

**\*21** The sworn affidavits of C.O. Breyette and C.O. Tucker constitute admissible documentary evidence that establishes that those defendants had no knowledge of plaintiff's involvement with the Clinton C.F. ILC or that he had engaged in constitutionally protected activity in his role as ILC secretary. See Dkt. No. 178-5 at 1 ¶ 3; Dkt. No. 178-10 at 1 ¶ 3. Therefore, defendants have established that neither C.O. Breyette nor C.O. Tucker had the requisite knowledge of plaintiff's constitutionally protected activities to sustain a First Amendment retaliation claim against them. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. Further, plaintiff does not allege that he had any prior interaction with C.O. Breyette or C.O. Tucker, or that either of those defendants made any statements or took any previous actions evidencing a retaliatory motive. See Baskerville, 224 F. Supp. 2d at 732. In addition, more than two months passed

between plaintiff's constitutionally protected December 2015 ILC activities, C.O. Breyette's and C.O. Tucker's February 28, 2016 search of plaintiff's cell and resulting misbehavior report; thus, "[p]laintiff has not made a strong showing temporal proximity in support of his retaliation claim" against these defendants. Pierrot v. Hahn, No. 9:15-CV-1415 (DNH/CFH), 2017 WL 4221117, at *8 (N.D.N.Y. July 28, 2017), report and recommendation adopted, No. 9:15-CV-1415 (DNH/CFH), 2017 WL 4221072 (N.D.N.Y. Sept. 21, 2017); see Webster v. Fischer, 694 F. Supp. 2d 163, 183-84 (N.D.N.Y.) (holding that it was "questionable whether the disciplinary action followed [the] plaintiff's complaints close enough in time to raise an inference of retaliation" where "at least two months passed between plaintiff's complaints and the April 14, 2006 misbehavior reports and the resulting determination that [the] plaintiff was guilty of the charges, which was issued at the conclusion of disciplinary hearing on April 19, 2009"), aff'd, 398 F. App'x 683 (2d Cir. 2010).

Moreover, although Rodriguez reversed plaintiff's guilty determination on administrative appeal because he "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," Dkt. No. 178-9 at ¶ 29—"no admissible record evidence exists indicating that the reversal was based on a finding that the misbehavior report in question was intentionally false or even unintentionally false." LeBron, 2010 WL 1235593, at *5 n.9. Indeed, defendants have established that C.O. Breyette would have issued plaintiff the misbehavior report regardless of improper retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). C.O. Breyette and C.O. Tucker explain that they conducted a search of plaintiff's cell together on February 28, 2016 because plaintiff "was scheduled to be transferred to a different facility" and "[i]t is protocol to search [an] inmate's room when it is being packed." Dkt. No. 178-5 at 2 ¶¶ 5, 6; Dkt. No. 178-10 at 2 ¶¶ 4, 5. C.O. Breyette and C.O. Tucker both state that, during the cell search, they discovered "weapon on the ledge above the metal bars of the cell. It was a long, thin piece of metal, 7 inches long and 1/8 inches wide with a sharp point on one end and a handle on the other[, which] looked a bit like an ice pick." Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7. C.O. Breyette explains that he issued plaintiff the February 2016 misbehavior report because an inmate "possessing a weapon is a serious violation of the DOCCS policy that endangers officers and other inmates[,]" and both he and C.O. Tucker explain that they "were not motivated by a desire to retaliate against him for his activities on [the ILC], or for any other

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 298 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

constitutionally protected activity[,]" but rather "to maintain a safe and secure environment at Clinton for both officers and inmates." Dkt. No. 178-5 at ¶ 13; Dkt. No. 178-10 at 2 ¶ 11. Thus, "[t]he record ... establishes that the misbehavior report was issued not with retaliatory intent, but simply because contraband ... was in fact recovered from [p]laintiff's cell during that search." LeBron, 2010 WL 1235593, at *5. Aside from plaintiff's conclusory allegation in his unverified Amended Complaint that an unidentified person "planted" the ice pick in his cell, he advances no arguments and proffers no evidence, admissible or otherwise, in opposition to defendants' motion in this regard. Amen. Compl. at 20 ¶ 74; see Dkt. No. Dkt. No. 193-2 at 14-15. Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Breyette and C.O. Tucker be dismissed.

### b. Capt. Devlin

**\*22** As an initial matter, defendants have submitted Capt. Devlin's sworn affidavit in which he acknowledges that he was aware that plaintiff was a member of the Clinton C.F. ILC, but was unaware that plaintiff authored the December 9, 2015 memorandum to Assemblyman O'Donnell or the December 16, 2015 proposed ILC agenda. See Dkt. No. 178-6 at 2 ¶ 4. Further, Capt. Devlin denies banging on plaintiff's OMH cell; saying, 'What the [f]uck are you still doing here?" or "You'll see," in response to plaintiff's statement, "Why did I get 90 days, the maximum sentence for my first non-violent Tier III [misbehavior report]?" Id. at 2 ¶¶ 7-8; Amen. Compl. at 20 ¶ 75. Thus, defendants have established, through admissible evidence, that, "[a]t the time of the events in question," Dkt. No. 178-6 at 1 ¶ 2, 2 ¶ 4, Capt. Devlin lacked knowledge of plaintiff's constitutionally protected December 2015 ILC activities, such that he did not make the purported statements in retaliation for plaintiff's protected conduct. See Henson, 2015 WL 9809874, at *12-13; Van Dunk, 2013 WL 5970172, at *9. In any event, courts in this circuit have held that more explicit threats than the vague statements alleged here do not rise to the level of adverse action sufficient to support a First Amendment retaliation claim. See Kemp v. LeClaire, No. 03-CV-844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (holding that threats from official that the plaintiff's "day [was] coming," that he would "be sent to [his] mother in a black box," and that he would "get [his] ass kicked" were insufficient to establish adverse action to support a First Amendment retaliation claim); Bartley v. Collins, No. 95-CIV-10616 (RJH), 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (holding that verbal threats such as "we going to get

you, you better drop the suit" do not rise to level of adverse action).

Further, Capt. Devlin's lack of knowledge of plaintiff's constitutionally protected ILC activities undercuts plaintiff's allegation that Capt. Devlin did not remove the ice pick from the evidence dropbox within 72 hours so that the February 2016 misbehavior report could be "fabricated" in retaliation for plaintiff's constitutionally protected ILC activities. Amen. Compl. at 23 ¶ 87; See Henson, 2015 WL 9809874, at *12-13Van Dunk, 2013 WL 5970172, at *9. Indeed, contrary to plaintiff's conclusory allegations, the record is devoid of facts or evidence supporting plaintiff's contention that Capt. Devlin's failure to remove the ice pick from the dropbox within the time period required pursuant to DOCCS Directive 4910A occurred for any reason aside from administrative oversight. See Amen. Compl. at 23 ¶ 87. Moreover, as Capt. Devlin explains in his sworn affidavit, the fact that the ice pick was not removed from the evidence dropbox within 72 hours had no impact on plaintiff's March 2016 disciplinary hearing because "no one accessed the dropbox during th[at] time." Dkt. No. 178-6 at 3 ¶ 10. Thus, the admissible evidence demonstrates that Capt. Devlin's failure to remove the icepick from the evidence drop box within the 72 hour-period contemplated under DOCCS's policy does not constitute adverse action and is not causally related to plaintiff's constitutionally protected activities. In opposition, plaintiff's speculative and conclusory allegations that the photograph of the weapon, along with Capt. Devlin's statements to him on February 29, 2016 "shows the big picture," and raises an inference that Capt. Devlin retaliated against him, Dkt. No. 193-2 at 21, fail to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1. Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Devlin be dismissed.

### c. Capt. Bishop

Plaintiff's First Amendment retaliation claims against Capt. Bishop relating to the March 2016 disciplinary hearing are conclusory and belied by defendants' admissible evidence. Capt. Bishop's sworn affidavit states that "[n]one of the actions that [he] took with regard to [plaintiff] had anything to do with his participation as a member of the ILC[,]" and "were not motivated by a desire to retaliate against him for his activities on [the ILC], or any other constitutionally protected activity." Dkt. No. 178-4 at 5 ¶ 27. Further, as discussed

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 299 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

above, the March 2016 Tier III hearing and resulting sanctions occurred more than two months after plaintiff had engaged authored the December 9, 2015 memorandum to Assemblyman O'Donnell or drafted the proposed December 16, 2015 ILC memorandum and, therefore, the timeline does not raise a strong inference of retaliation. See Webster, 694 F. Supp. 2d at 183-84; Pierrot, 2017 WL 4221117, at *8. Further, the record is devoid of statements Capt. Bishop made to plaintiff that could evidence that Capt. Bishop found plaintiff guilty of weapons possession based on a retaliatory animus. See Baskerville, 224 F. Supp. 2d at 732. Moreover, although Capt. Bishop's March 2016 Tier III disciplinary decision was ultimately reversed on plaintiff's administrative appeal because Rodriguez "believed, based upon the location of where the weapon was found, that it was possible that someone else had placed the weapon there, not [plaintiff]," the record is devoid of evidence indicating that Rodriguez reversed that determination because a review of the proceeding evidenced that Capt. Bishop's determination was influenced by or premised on a retaliatory motive. Indeed, the sworn affidavits of C.O. Breyette and C.O. Tucker establish, the icepick was recovered from plaintiff's cell on February 28, 2016, see Dkt. No. 178-5 at 2 ¶ 8; Dkt. No. 178-10 at 2 ¶ 7, and, based on that evidence, Capt. Bishop concluded that plaintiff was guilty of possessing a weapon in violation of DOCCS rule 113. Dkt. No. 178-4 at 5 ¶ 27. Therefore, defendants have established that Capt. Bishop would have found plaintiff guilty of the charges in the February 2016 misbehavior report and imposed the resulting sanctions regardless of any retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). Thus, aside from plaintiff's conclusory allegations, nothing before the undersigned suggests that plaintiff's constitutionally protected ILC activities were "a substantial or motivating factor" in any of Capt. Bishop's actions relating to the March 2016 disciplinary hearing and resulting sanctions. Burton, 664 F. Supp. 2d at 367.

 **\*23** Similarly, no inference of retaliation concerning Capt. Bishop may be inferred based on plaintiff's filing of Grievance CL-68902-16. Plaintiff's grievance challenged the guilty determination from his February 2016 Tier III disciplinary hearing relating to his use of DOCCS letterhead. See Dkt. No. 25-1 at 4-6. Plaintiff only mentions Capt. Bishop in this grievance for the proposition the January 2016 misbehavior report was issued in error, as purportedly evidenced by the fact that Capt. Bishop, along with other DOCCS personnel, had "received letters from [plaintiff] on various topics, on [DOCCS] letterhead" prior

to plaintiff using that letterhead in his correspondence with Hollmen. Dkt. No. 25-1 at 5. Plaintiff does not allege any wrongdoing against Bishop in the grievance, which was lodged against Kowalowski for his alleged involvement with the first misbehavior report "in retaliation for [plaintiff] requesting the name of the ILC Advisor in Albany Central Office while responding to [the] letter from ... Hollmen." Id. at 4. Indeed, the only relief sought through that grievance was reversal and expungement of his February 2016 disciplinary determination. Id. at 4. As the IGRC's decision denying the grievance made clear, plaintiff's grievance was not an appropriate "substitute appeal mechanism. An individual decision or disposition resulting from a disciplinary proceeding is not grievable." Id. at 7. Moreover, the record is devoid of facts that would allow the Court to draw the "legitimate inference" that Capt. Bishop retaliated against plaintiff based on his grievance filed against Kowalowski. Espinal, 558 F.3d at 130; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer); see also Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." (internal quotation marks and citation omitted)). In any event, plaintiff does not allege that Capt. Bishop was aware that he was mentioned in the grievance, or that he took adverse action based on that grievance, but instead, conclusorily alleges that "[j]ust two (2) days" after his grievance was filed by IGP Supervisor Gregory on February 26, 2016, some unidentified individual(s) "planted" the icepick in his cell. See Amen. Compl. at 20 ¶ 74. Accordingly, it is recommended that plaintiff's First Amendment retaliation claim against Capt. Bishop relating to the March 2016 disciplinary hearing be dismissed.

### d. Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez

Even affording the Amended Complaint the most liberal construction possible, plaintiff does not allege any specific claims of retaliation against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez. See Amen. Compl. at 20-42. Rather, plaintiff's retaliation claims insofar as asserted against these defendants, are premised exclusively on their purported involvement in the alleged conspiracy against him based on his December 2015 ILC activities. See id. Thus, as plaintiff has only conclusorily alleged that Supt. Kirkpatrick, Supt.

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 300 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Uhler, Venettozzi, and Rodriguez retaliated against him, he has failed to meet his "heightened burden" in establishing a First Amendment retaliation claim because has not pleaded his claim against these defendants "with particularity." Green, 2006 WL 846272, at *3 (citing Brown, 41 F. Supp. 2d at); Williams, 111 F. Supp. 2d at 290. Moreover, as discussed in detail below, plaintiff's Section 1983 conspiracy claims lack merit and are belied by defendants' admissible evidence. Consequently, it is recommended that plaintiff's First Amendment retaliation claims based on the March 2016 disciplinary hearing against Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez be dismissed.

### 3. Kowalowski

Kowalowski is entitled to summary judgment dismissing plaintiff's First Amendment retaliation claim. As to plaintiff's contention that Kowalowski retaliated against him through his comment that ILC inmates "all have a target on your back, be careful," Kowalowski has established through his sworn declaration that he made that comment to the entire ILC, as he did with each new ILC class, in order to give them awareness that their status could draw heightened attention from staff and other inmates. Amen. Compl. at 12 ¶ 44; see Dkt. No. 179-3 at 2 ¶ 7. Further, to sustain a First Amendment retaliation claim, a plaintiff's constitutionally protected conduct must be a "a substantial or motivating factor in the prison official's decision to take action against him." Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted). Here, however, Kowalowski's comment at the November 2015 ILC meeting was, "by definition—unconnected to" plaintiff's constitutionally protected ILC conduct that took place in December 2015—as Kowalowski made the comment before plaintiff had engaged in that conduct. Richard v. Fischer, 38 F. Supp. 3d 340, 357 (W.D.N.Y. 2014) (internal quotation marks and citation omitted); see Dkt. No. 179-4 at 8-9. Moreover, plaintiff's allegation that, on January 6, 2016, "Kowalowski violently snatched a piece of paper out of [plaintiff's] hand which listed ... new proposed TV channels," and stated, "I took it, so what. You are not as important as you think you are[,]" Amen. Compl. at 15 ¶ 56, fails to establish a claim of First Amendment retaliation. Even accepting plaintiff's allegations as true, Kowalowski's actions and comments in this regard amount to, at most, "harassing comments and hostile behavior [that] do not constitute adverse actions sufficient to state a retaliation claim." Quezada v. Roy, No. 14-CV-4056(CM), 2015 WL

5970355, at *21 (S.D.N.Y. Oct. 13, 2015) (citation and internal quotation marks omitted). In any event, plaintiff's own documentary evidence belies his assertion. Specifically, plaintiff submits the January 8, 2016 ILC's letter to Supt. Kirkpatrick, in which the ILC complains that Kowalowski would not show the ILC Clinton C.F.'s contract with Charter Cable, but does not raise any complaints concerning Kowalowski's purported threats and plaintiff does not contend that he ever filed a grievance or made any other complaint about this incident. See Dkt. No. 25-1 at 143.

**\*24** Further, Kowalowski denies threatening plaintiff with SHU confinement in retaliation for plaintiff including complaints about assault by staff in his proposed December 2015 ILC agenda. See Dkt. No. 179-4 at 9. Plaintiff's claim in this regard fails for several reasons. First, Kowalowski states, in his sworn affidavit, that he never read the contents of the proposed ILC agenda, and that when he instructed plaintiff not to submit the proposed agenda, he was simply relaying a directive from Supt. Kirkpatrick that the Clinton C.F. administration would no longer accept ILC agendas longer than one page or containing more than four or five individual items. See Dkt. No. 179-3 at 4 ¶ 21. He explains that he did not threaten plaintiff with 270 days in SHU, as he believed, at most, plaintiff's submission of a five-page ILC agenda would result in Clinton C.F. cancelling the ILC meeting. See id. at 5-6 ¶ 27. Next, plaintiff's own documentary evidence belies his claim. For instance, in his January 11, 2016 letter to Assemblyman O'Donnell, plaintiff stated only that Kowalowski objected to the proposed agenda's length and the highlighting of prison administrator's names, and indicated that "the real reason why [Kowalowski] was upset" was because the proposed agenda "talk[ed] about misrepresentation and/or misappropriation of $10,000 in ILC fundraiser money, violating [DOCCS] Directive 2771." Dkt. No. 25-1 at 124. Conspicuously missing from plaintiff's January 11, 2016 letter is any mention that Kowalowski objected to the contents of the proposed agenda, and makes no mention of Kowalowski taking issue with plaintiff's inclusion of complaints against staff or instructing plaintiff to "water down" the agenda. Dkt. No. 179-3 at 4-5 ¶¶ 26-28 (citing Amen. Compl. at 15 ¶ 55); see Dkt. No. 25-1 at 123-26.

Moreover, the evidence in the summary judgment record establishes that Kowalowski did not issue the January 2016 misbehavior report, was not involved with Sgt. King's decision to issue the misbehavior report relating to plaintiff's use of DOCCS letterhead, and did not participate in the February 2016 disciplinary hearing. See Dkt. No. 179-3 at

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 301 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

7 ¶¶ 47-48, 53, 54. Indeed, Kowalowski "did not personally review [plaintiff's] magazine[ ]" in his capacity as co-chair of the FMRC, and did not approve the FMRC's decision concerning plaintiff's magazine in retaliation for plaintiff's ILC activities, but rather, because the magazine at issue contained prohibited content. Id. at 6 ¶ 39; see id. at ¶¶ 36, 40. Plaintiff's conclusory assertions in opposition are insufficient to defeat Kowalowski's documentary case in support of summary judgment. Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at *4 n.1.

In addition, the undersigned concludes that plaintiff's reliance on inmate Emerenciano's SHU sentence and lawsuit against Kowalowski is unpersuasive. As Kowalowski avers, see Dkt. No. 196 at 5,6, plaintiff has not proffered any evidence to establish a causal connection between underlying facts of inmate Emercenciano's case and the present action. Indeed, Kowalowski's sworn declaration establishes that he did not threaten plaintiff with 270 days in SHU, see Dkt. No. 179-4 at 5-6 ¶ 27, and the uncontroverted evidence establishes that plaintiff never received a 270-day SHU sentence. Although plaintiff has sought to supplement his pleadings in his response in opposition, his speculative and conclusory assertions fail to rebut Kowalowski's admissible evidence. See Perez v. New York City Dep't of Corr., No. 10-CV-2697 (RRM/RML), 2012 WL 3704744, at *3 (E.D.N.Y. Aug. 27, 2012) (rejecting the plaintiff's reliance on incidents involving other inmates to support a constitutional claim against the New York City Dept. of Corrections, reasoning that the plaintiff had not "allege[d] anything other than his own conclusory statements to suggest that there [wa]s any causal connection between the alleged incidents and the alleged deprivation of [the] plaintiff's constitutional rights." (citation omitted)). Consequently, it is recommended that plaintiff's First Amendment retaliation claims against Kowalowski be dismissed.

### C. Section 1983 Conspiracy - February 2016 Disciplinary Proceeding

In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of

conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-00146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325. Where "there is no underlying constitutional violation, there can be [no] § 1983 cause of action for conspiracy." Bibeau v. Soden, No. 8:08-CV-0671 (LEK/RFT), 2009 WL 701918, at *8 (N.D.N.Y. Mar. 13, 2009); see also Taylor v. New York Dep't of Corr. Servs., No. 9:10-CV-140 (MAD/RFT), 2012 WL 913678, at *9 (N.D.N.Y. Feb. 23, 2012) ("[T] he failure of a plaintiff to show an underlying constitutional violation on which to base a section 1983 conspiracy claim means the conspiracy claims fails as a matter of law."), report and recommendation adopted sub nom. Taylor v. New York Dep't of Corr., No. 9:10-CV-140 (MAD/RFT), 2012 WL 913564 (N.D.N.Y. Mar. 16, 2012).

**\*25** First, as plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the January 2016 misbehavior report and February 2016 disciplinary hearing, he has "failed to show an underlying constitutional violation on which to base his section 1983 conspiracy claim" and, therefore, his "conspiracy claim fails as a matter of law." Taylor, 2012 WL 913678, at *9; Bibeau, 2009 WL 701918, at *8. Alternatively, even assuming plaintiff could establish a retaliation claim, the Amended Complaint and supporting documentary evidence is bereft of "facts tending to show agreement and concerted action." Anilao, 774 F. Supp. 2d at 512-13. Indeed, as set forth in detail above, plaintiff's claims in this regard consist exclusively of "bare allegations of a conspiracy," McRae, 2018 WL 3432743, at *6, which he fails to support with any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which ... defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the February 2016 disciplinary proceeding. Avent v. Reardon, No. 1:19-CV-1565 (GTS/CFH), 2020 WL 7705938, at *7 (N.D.N.Y. Dec. 28, 2020).

Capt. Bishop's, Sgt. King's, Lt. Durkin's, Supt. Kirkpatrick's, and Rodriguez's sworn affidavits, and Kowalowski's sworn declaration establish that those defendants did not enter into

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 302 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

an agreement to act in concert to retaliate against plaintiff —which no evidence in the summary judgment record controverts. See Ciambriello, 292 F.3d 307, 324-25. Plaintiff's allegations that Capt. Bishop directed Sgt. King to issue the January 2016 misbehavior report is belied by defendants' admissible evidence. In his sworn affidavit, Sgt. King states that

> Capt[.] Bishop did not direct me to write the IMR and I did not use a "false" [misbehavior report] because Capt[.] Bishop told me to. I authored a truthful [misbehavior report] because I believed (and still believe) that [plaintiff] violated DOCCS policy by attempting to use his status as a law library clerk to use DOCCS letterhead for personal correspondence.... I did not discuss the [January 2016 misbehavior report] with Capt[.] Bishop before I wrote it or thereafter.

Dkt. No. 178-8 at 2 ¶ 6. Capt. Bishop's sworn affidavit corroborates Sgt. King's sworn affidavit, as Capt. Bishop explains that he "did not direct Sgt. King to write this [misbehavior report]" and he "did not have any personal involvement in the issuance of th[is] misbehavior report or the [February 2016 disciplinary] hearing." Dkt. No. 178-4 at 2 ¶ 9.

Further, plaintiff's contention that Supt. Kirkpatrick conspired with Lt. Durkin to find plaintiff guilty of the charges in the January 2016 misbehavior report fails. Supt. Kirkpatrick's states in his sworn affidavit that his "decision to assign [Lt.] Durkin as the hearing officer on the [January 2016 misbehavior report] was not motivated by a desire to retaliate against [plaintiff] for his participation on the ILC," Dkt. No. 178-13 at 4 ¶ 19, and that his "assign[ment of] Lt.[ ] Durkin as the hearing officer .... was appropriate as [Lt. Durkin] had not taken part in investigating the incidents underlying the [first misbehavior report], and had served as hearing officer on 22 hearings." Id. at 2 ¶ 8. Lt. Durkin states that he never discussed plaintiff's involvement on the ILC with any other defendant in this action, and that he "did not request to be appointed [as] the hearing officer" or "discuss being appointed the hearing

officer with any other [d]efendant." Dkt. No. 178-7 at 2 ¶¶ 4, 9.

Moreover, Rodriguez's sworn affidavit establishes that he "did not work at ... Clinton [C.F.] and was not personally involved with the issuance of either Inmate Misbehavior Report ... in this case. Nor was [he] involved with the hearings, other than to review [plaintiff's] appeals from their decisions." Dkt. No. 178-9 at 1-2 ¶ 3. Rodriguez also denies discussing this case with any other defendant aside from Venettozzi, who worked in the same office, and posits that he has "no memory of speaking with ... Venettozzi about this case during the relevant time period." Id. at 4 ¶ 3. In addition, although Kowalowski states that Capt. Bishop discussed plaintiff's use of letterhead with him during a January 2016 meeting, Kowalowski states that, while he "subsequently learned that [Sgt.] King wrote a misbehavior report against [plaintiff] relating to the letterhead[,]" he did not encourage Sgt. King or any other DOCCS personnel to write a misbehavior report, did not participate in any way in the February 2016 Tier III disciplinary hearing, id. at ¶ 53, and was not referenced in the January 29, 2016 misbehavior report. See Dkt. No. 179-4 at 17.

**\*26** In opposition, to the extent plaintiff attempts to controvert defendants' admissible evidence concerning his conspiracy allegations relating to the February 2016 disciplinary hearing, plaintiff advances only conclusory assertions. Plaintiff's contention that "[t]he fact that Sgt. King conspired and retaliated against [him] is not defeated because Sgt. King did not know about the Dec. 9th letter or the Dec. 16th Agenda, as his lack of knowledge of this memo and agenda did not prevent him from conspiring and retaliating[,]" Dkt. No. 193-2 at 12, is wholly conclusory and unsupported by any admissible evidence. Thus, plaintiff has failed to raise a genuine issue of material fact sufficient to defeat defendants' documentary case. See Flaherty, 713 F.2d at 13; Zembko, 2007 WL 948323, at \*4 n.1. Accordingly, it is recommended that plaintiff's Section 1983 conspiracy claim against Capt. Bishop, Sgt. King, Lt. Durkin, Supt. Kirkpatrick, and Rodriguez relating to the February 2016 disciplinary hearing be dismissed.

### D. Procedural Due Process Claims Against Capt. Bishop Relating to the March 2016 Disciplinary Hearing

"To state a claim for procedural due process, there must first be a liberty interest which requires protection." Lewis

v. Murphy, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)). To establish a procedural due process claim under § 1983, a plaintiff must show that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process. See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). As to the first factor, "[t]he prevailing view in this [C]ircuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement." Liao v. Malik, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). As to the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998). Although there are no bright-line rules for this inquiry, the Second Circuit has advised district courts that SHU confinements of fewer than 101 days, "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or [the] record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004); see Ortiz, 380 F.3d at 654 ("To be sure, with respect to 'normal' SHU confinement, we have held that a 101–day confinement does not meet the *Sandin* standard of atypicality." (quoting Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir. 1999)).

Here, defendants aver—and plaintiff does not dispute—that plaintiff served a total of 92 days in SHU as a result of both the February and March 2016 disciplinary determinations. See Dkt. No. 178-2 at 26; Dkt. No. 178-12 at 2 ¶ 12; see id. at 7-8 (exhibit A to Supt. Kirkpatrick's, listing a chronological history of plaintiff's SHU confinement). Thus, plaintiff's SHU confinement, alone, is insufficient to establish atypicality. See Ortiz, 380 F.3d at 654. Where, as here, the SHU confinement "was not long enough to constitute an atypical and significant deprivation by itself," the undersigned must "look to the conditions of confinement" to determine whether a due process violation has occurred. Smith v. Hamilton, 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting Palmer, 364 F.3d at 66).

**\*27** In opposition to defendants' motion for summary judgment—citing only to his unverified Amended Complaint—plaintiff contends that his 92-day stint in SHU constituted "atypical and significant hardship" because, for the first four days, he did not have his high blood pressure medicine or a change of clothes, and was "denied a time cut and PIMS level 2." Dkt. No. 193-2 at 25. As defendants aver, see Dkt. No. 195 at 14, the portion of the Amended Complaint that plaintiff relies on in support of his contention that he was deprived his blood pressure medicine and a change of clothes, demonstrates that these alleged deprivations occurred prior to the February 2016 disciplinary hearing and relate, instead, to plaintiff's placement in a keep-lock cell on January 29, 2016—not as a result of the February 2016 misbehavior report or March 2016 disciplinary hearing. See Amen. Compl. at 16, 17 ¶¶ 61, 62. Therefore, plaintiff cannot establish a due process claim relating to his January 2016 keeplock confinement based on Capt. Bishop's guilty determination at the March 2016 disciplinary hearing. Further, insofar as plaintiff contends that he was denied a PIMS level two classification, his due process claim fails "[b]ecause the PIMS ..., like any security classification ... does not create a liberty interest protected by due process." Cicio v. Williams, No. 9:11-CV-1196 (TJM), 2013 WL 3101692, at *5 (N.D.N.Y. June 18, 2013). In any event, plaintiff has offered no evidence in support of these belated and conclusory allegations—made for the first time in opposition to defendants' motion for summary judgment; therefore, plaintiff has failed to establish that he experienced atypical and significant hardship during his 92-day confinement in SHU. See Palmer, 364 F.3d at 65; see also Kerzer, 156 F.3d at 400 ("Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact."); Cusamano v. Sobek, 604 F. Supp. 2d 416, 492 (N.D.N.Y. 2009) ("[W]hile special solicitude permits a *pro se* plaintiff to effectively amend the allegations of his complaint while responding to a motion to dismiss for failure to state a claim (which, typically, comes relatively early in an action), it does not permit him to do so while responding to a motion for summary judgment (which, typically, comes relatively late in an action, for example, where, as here, after the defendants have completed discovery based on the allegations contained in the plaintiff's complaint.").

In addition, it is well settled that the loss of packages, commissary, and phone privileges does not establish an atypical or significant hardship. See Vega v. Artus, 610 F. Supp. 2d 185, 200 (N.D.N.Y. 2009) (" '[T]he loss of phone, package, and commissary privileges does not give rise to a

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 304 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

protected liberty interest under New York law.' " (internal quotation marks and citation omitted)); McEachin v. Selsky, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall 'within the expected parameters of the sentence imposed by a court of law.' ") (quoting Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996)); see also Borcsok v. Early, No. 9:03-CV-395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. 2007) (holding that a 90–day confinement in SHU alone with 90–day loss of packages, commissary and telephone privileges was insufficient to raise a liberty interest where plaintiff made no showing that the conditions of confinement were atypical or constituted a significant hardship). Consequently, as plaintiff has failed to establish that the conditions of his confinement in SHU constituted an atypical and significant hardship, it is recommended that plaintiff's due process claims be dismissed on that basis alone.

Moreover, defendants are entitled to summary judgement dismissing plaintiff's specific procedural due process claims relating to Capt. Bishop's conduct as the hearing officer at the March 2016. The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

The constitutionally mandated due process requirements for prison disciplinary hearings include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. See Wolff v. McDonald, 418 U.S. 539, 564-70 (1974); Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004).

**\*28** The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citing Wolff, 418 U.S. at 570-71). "Due process in this context requires only that the hearing officer's decision not be 'arbitrary.' " Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 WL 12836864, at *4 (N.D.N.Y. Oct. 21, 2014) (quoting Wolff, 418 U.S. at 571), report and recommendation adopted, No. 9:13-CV-100 (FJS/TWD), 2016 WL 660919 (N.D.N.Y. Feb. 18, 2016). A decision is not "arbitrary" if it is supported by "some evidence." Superintendent v. Hill, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied 'if there is any evidence in the record that supports' the disciplinary ruling." Sira, 380 F.3d at 69 (quoting Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " Id. at 76 (quoting Luna, 356 F.3d at 488). "The subsequent modification of [plaintiff's] determination during the administrative appeals process ... does not impact the due process analysis," and "[t]he outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred." Alexander v. Fischer, No. 9:14-CV-548 (GLS/ATB), 2015 WL 10568892, at *4 (N.D.N.Y. Dec. 21, 2015) (citing Walker v. Bates, 23 F.3d 652, 657 (2d Cir. 1994) (additional citations omitted), report and recommendation adopted, No. 9:14-CV-548(GLS/ATB), 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016).

Here, plaintiff does not allege that he did not receive timely written notice of the charges against him; was not offered employee assistance to prepare for his Tier III disciplinary hearing; or that Capt. Bishop did not issue a written decision that included the evidence he relied on and his reasoning for his ultimate disposition. See Amen. Compl. at 22-23. Therefore, plaintiff's claims are limited to whether Capt. Bishop acted impartially; deprived plaintiff of certain evidence he requested at the March 2016 disciplinary hearing; erred in reaching certain conclusions based on the evidence elicited at the hearing. See id. at 22 ¶ 84, 23 ¶ 87.

Plaintiff's Amended Complaint, read liberally, contends that Capt. Bishop was not an impartial hearing officer because he was involved in the underlying incident giving rise to the March 2016 disciplinary hearing he presided over as hearing officer since his name appears on the UIR relating to the discovery of an icepick in plaintiff's cell on February 28,

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 305 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

2016. See Amen. Compl. 22 ¶ 84. Plaintiff also relies on his retaliation claim that Capt. Bishop "conspired with [Supt.] Ulher of [Upstate C.F.], a former [c]aptain of [s]ecurity at [Clinton C.F.] in 2008[,] to be assigned as the hearing officer at [Upstate C.F.] to hold [the] hearing, even though [Upstate C.F.] employs a full-time ... Hearing Officer ..." to establish that Capt. Bishop was not a fair and impartial hearing officer. Id. However, defendants proffer Capt. Bishop's sworn affidavit in which he states that [he] did not draft [the] UIR or investigate the claims within it" and that his "name was listed on the UIR as the 'person reporting' because, as a matter of course, the Captain's name was listed on all UIRs." Dkt. No. 178-4 at 3 ¶ 14. Supt. Kirkpatrick's sworn affidavit further explains that "Bishop did not investigate the incident giving rise to the March 2016 misbehavior report,]" and that Capt. Bishop's "name is listed on the UIR simply because the [c]aptain's name is listed on the UIR as a matter of course." Dkt. No. 178-13 at 3 ¶ 16. Moreover, Supt. Kirkpatrick's sworn affidavit establishes the paperwork procedure for how UIRs are processed. See id. at ¶ 17. In particular, Supt. Kirkpatrick's sworn affidavit establishes that a captain reviews the UIR forms to make sure they are properly completed, but that the captain is not "considered to have 'investigated' the incident merely by being part of this chain of review." Id. Moreover, Supt. Kirkpatrick's and Capt. Bishop's sworn affidavits establishes that it was "common procedure and courtesy" for Capt. Bishop to preside over the March 2016 disciplinary hearing even though the hearing was held at Upstate C.F., because the incident giving rise to the proceeding—the discovery of the icepick in plaintiff's cell —occurred at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-4 at 3 ¶ 16. In addition, the sworn affidavits of Supt. Kirkpatrick, Capt. Bishop, and Supt. Uhler, establish that Supt. Kirkpatrick, as part of his duties as superintendent of Clinton C.F., independently assigned Capt. Bishop to serve as the hearing officer at the March 2016 disciplinary hearing —without engaging any prior discussions of the assignment with Capt. Bishop or Supt. Uhler. See id.; see Dkt. No. Dkt. No. 178-11 at 2 ¶ 6; Dkt. No. 178-4 at 13 ¶ 16. Thus, defendants have established through admissible evidence that Capt. Bishop was not appointed to serve as hearing officer for the purpose of ensuring a finding of guilt and that he was not involved in the investigation relating to the charges contained in the February 2016 misbehavior report. Plaintiff's conclusory arguments in opposition, which amount to only reassertions of the claims contained in his unverified Amended Complaint, see Amen. Compl. 22 ¶ 84; Dkt. No. 193-2 at 21, fail to raise a genuine issue of material fact.

**\*29** Next, plaintiff alleges that Capt. Bishop violated his procedural due process rights by declining to grant him access to "requested ... E-Block (Unit) log book entries from 9:00 a.m. on February 28, 2016, until 5:00 p.m., on March 1, 2016," and provided him only with log book entries from February 28, 2016. Amen. Compl. at 23 ¶ 87; see id. at 24 ¶ 89. Plaintiff notes that the handwritten date contained on the photograph of the icepick recovered from his cell on February 28, 2016, was dated February 29, 2016, and that non-party C.O. Stiles recorded the weapon "as being photographed on February 29[,] 2016." Id. at 23 ¶ 87. Plaintiff believes that the logbook entries for the days before and after February 28, 2016, were relevant to his defense at the hearing because "the evidence drop box log book [ ] [did not] have a date [ ] when the evidence was entered into the drop box," and he "feel[s] this evidence wasn't logged in on February 28, 2016, and [that] without seeing the previous ... and the forward pages, [he was not] able to identify whether or not it was logged in at the time." Id. at 24 ¶ 90. Plaintiff relies on the inconsistency between the date of the February 28, 2016 misbehavior report and the date on the photograph of the weapon in support of his contention that, on "February 29[ ], 2016, [ ]Capt[.] Devlin conspired with Capt. Bishop to fabricate the [February 28, 2016 misbehavior report]." Id. at 23 ¶ 87.

Capt. Bishop's sworn affidavit establishes that the handwritten date of February 29, 2016, contained under the photograph of the weapon, was due solely to a clerical error and is not relevant to the weapons charge that formed the basis of the February 2016 misbehavior report. See Dkt. No. 178-2 at 28; Dkt. No. 178-4 at 4 ¶ 22. As plaintiff acknowledges, he "questioned" the inconsistency at the hearing by asking Sgt. Baker, "[d]id you drop the ... weapon in the box the same date that you ... wrote the memo?" to which Sgt. Baker replied, " 'It was on the same day.' " Amen. Compl. at 24-25 ¶ 93 (quoting Dkt. No. 25-2 at 51). As Capt. Bishop explains, on March 29, 2016, the last day of the March 2016 disciplinary hearing, he questioned Sgt. Baker, who stated that the correct date on which the weapon was recovered and photographed was February 28, 2016, and that the handwritten date contained on the photograph was a "clerical error." Id. at 5 ¶ 23. Moreover, Capt. Bishop noted that, between the second and third days of the March 2016 disciplinary hearing, Sgt. Baker reviewed his attendance records, which indicated that he was not working on February 29, 2016, but was working on February 28, 2016, and that he had photographed the weapon; therefore, Capt. Bishop "concluded that the 28th" was the correct date, "and the handwritten date was an error." See id. at ¶ 24. Thus, as defendants aver, Capt. Bishop

did not deprive plaintiff procedural due process based on his decision not to provide plaintiff with the additional log book dates because those pages were irrelevant, as it was established that the date contained on the photograph of the icepick was a mere scrivener's error that had no impact on the outcome of the hearing. See Torres v. Selsky, No. 9:02-CV-0527 (DNH/DEP), 2005 WL 948816, at *7 (N.D.N.Y. Apr. 25, 2005) ("Evidence considered to be irrelevant or unnecessary to the issues truly in contention may, in a hearing officer's discretion, properly be excluded in such a proceeding." (citation omitted)).

Similarly, plaintiff's contention that Capt. Bishop violated his due process by preventing plaintiff from asking Sgt. Baker whether he had ever " 'secured evidence in the drop box in previous times[,]' " or if he " 'kn[e]w what [he was] supposed to do in the evidence drop box sign in sheet when [he] secure[d] evidence' " is meritless. Amen. Compl. at 26 ¶¶ 99, 100 (quoting Dkt. No. 25-2 73-74). As the record makes clear, Capt. Bishop asked Sgt. Baker if he had "secure[d]" the weapon "on [February 28,] 2016[,] in the evidence drop box[,]" to which Sgt. Baker replied, "Yes I did." Id. at ¶ 101 (quoting Dkt. No. 25-2 at 75). As discussed above, Sgt. Baker's testimony at the hearing established that the wrong date had been recorded on the photograph, but that he entered the weapon into evidence on February 28, 2016, the last day he worked before being off on February 29, 2016. Dkt. No. 178-4 at 5 ¶¶ 23, 24. Thus, the exclusion of plaintiff's proposed line of questioning was appropriate, as it was neither relevant nor necessary to plaintiff's defense at the hearing. See Tafari v. McCarthy, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (" 'A hearing officer does not violate due process by excluding irrelevant or unnecessary testimony.' " (quoting Kalwasinski v. Morse, 201 F.3d 103, 109 (2d Cir. 1999)).

 **\*30**  Further, plaintiff cannot establish a procedural due process claim based on Capt. Devlin's violation of DOCCS Directive 4910A by failing to remove the icepick from the evidence drop box within 72 hours. It is well established that "[v]iolations of state law do not give rise to claims under 42 U.S.C. § 1983 ...[, and, m]ore specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983." Tuitt v. Chase, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877439, at *10 (N.D.N.Y. Jan. 30, 2013) (internal citation omitted), report and recommendation adopted, No. 9:11-CV-0776 (DNH/TWD), 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013). In any event, defendants have established that, although the weapon remained in the evidence dropbox longer than contemplated under DOCCS

Directive 4910A, the evidence was not ultimately affected in any way, because "no one accessed the drop box during this time." Dkt. No. 178-6 at 3 ¶ 10. Thus, plaintiff's procedural due process claim in this regard fails. In addition, to the extent that plaintiff argues that the disciplinary hearing was the result of a false misbehavior report, see Amen. Compl. at 24-27, 70, his conclusory assertion does not alter the foregoing analysis. It is well settled that prison inmates have no constitutionally guaranteed immunity from being falsely or wrongfully accused of conduct for which they are subjected to a deprivation of a protected liberty interest provided that, as plaintiff was here, the prisoner was afforded sufficient procedural due process. See Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986). Similarly, to the extent that plaintiff relies on the July 2017 administrative reversal of the March 2016 disciplinary decision to establish that Capt. Bishop violated his procedural due process rights, his claim fails. See Alexander, 2015 WL 10568892, at *4 (citing Walker, 23 F.3d at 657 (additional citations omitted)). Based on the foregoing, it is recommended that plaintiff's procedural due process claims against Capt. Bishop be dismissed.

### E. Section 1983 Conspiracy – March 2016 Disciplinary Proceeding

Plaintiff has failed to establish a First Amendment retaliation claim against any defendant based on the February 2016 misbehavior report and March 2016 disciplinary hearing, and failed to establish that Capt. Bishop violated his due process rights at the March 2016 disciplinary hearing; therefore, as plaintiff has "failed to show an underlying constitutional violation on which to base his section 1983 conspiracy claim," his "conspiracy claim fails as a matter of law." Taylor, 2012 WL 913678, at *9; Bibeau, 2009 WL 701918, at *8. In any event, plaintiff's Section 1983 conspiracy claims relating to the March 2016 disciplinary hearing are wholly conclusory and belied by defendants' admissible evidence. C.O. Breyette's and C.O. Tucker's sworn affidavits both state that they recovered a weapon from plaintiff's cell on February 28, 2016, which provided the basis for C.O. Breyette's misbehavior report. See Dkt. No. 178-5 at 2 ¶¶ 8, 10; Dkt. No. 178-10 at 2 ¶ 7. Both C.O. Breyette and C.O. Tucker state that he did not communicate about the incident with any other defendant in this action concerning the discovery of the weapon, and deny conspiring with anyone against plaintiff. See Dkt. No. 178-5 at 2 ¶ 11; Dkt. No. 178-10 at 2 ¶ 10. Further, Capt. Bishop's, Supt. Kirkpatrick's, and Supt. Uhler's sworn affidavits establish that Supt. Kirkpatrick appointed

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 307 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

Capt. Bishop to preside over the March 2016 disciplinary hearing without consulting with Capt. Bishop or Supt. Uhler, and that he appointed Capt. Bishop to preside as the hearing officer even though the hearing took place at Upstate C.F. following plaintiff's transfer pursuant to "common procedure and courtesy" because the underlying incident had occurred at Clinton C.F. Dkt. No. 178-13 at 3 ¶ 13; see Dkt. No. 178-11 at 1, 2 ¶¶ 2, 6; Dkt. No. 178-4 at 3 ¶ 16, 5 ¶ 27. Indeed, in his sworn affidavit, Supt. Kirkpatrick states that he "did not discuss the appointment with [Capt.] Bishop or [Supt.] Uhler." Dkt. No. 178-13 at 2 ¶ 11. Likewise, Capt. Devlin, Venettozzi, and Rodriguez all deny conspiring against plaintiff or discussing the February 2016 incident. See Dkt. No. 178-6 at 3 ¶¶ 12, 16; Dkt. No. 178-9 at 1-2 ¶ 3; Dkt. No. 178-12 at ¶ 4.

Plaintiff's contentions in opposition are devoid of any specific factual allegations, and plaintiff has not proffered any evidence to controvert defendants' sworn statements. See Dkt. No. 193 at 12, 13, 15, 16. Indeed, plaintiff has not advanced any specific facts or evidence demonstrating that defendants engaged in a meeting of the minds, "such as time, place, or manner in which ... defendants conspired against plaintiff" to violate his rights with respect to the events surrounding the March 2016 disciplinary proceeding. Avent, 2020 WL 7705938, at *7. Consequently, it is recommended that plaintiff's Section 1983 conspiracy claim against C.O. Breyette, C.O. Tucker, Capt. Bishop, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, Venettozzi, and Rodriguez based on the March 2016 disciplinary hearing be dismissed.

**\*31** In light of the foregoing recommendations that defendants are entitled to summary judgment dismissing plaintiff's First Amendment retaliation claims and Section 1983 conspiracy claims on the merits, the undersigned declines to address defendants' arguments regarding personal involvement [9] and qualified immunity.

## IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 178) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, that Kowalowski's Motion for Summary Judgment (Dkt. No. 179) be **GRANTED IN ITS ENTIRETY**, and it is further

**RECOMMENDED**, plaintiff's Amended Complaint (Dkt. No. 25) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [10]

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3293504

---

## Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Chief U.S. District Court Judge Glenn T. Suddaby, in a Decision and Order dated October 25, 2018, (1) accepted

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 308 of 427

Rucano v. Annucci, Not Reported in Fed. Supp. (2021)

plaintiff's Amended Complaint for filing only to the extent that it asserted (a) First Amendment retaliation and conspiracy claim against Capt. Bishop, Lt. Durkin, Sgt. King, Supt. Kirkpatrick, Rodriguez, and Kowalowski; and (b) First Amendment retaliation, Fourteenth Amendment due process, and conspiracy claims against Capt. Bishop, C.O. Breyette, Capt. Devlin, Supt. Kirkpatrick, Supt. Uhler, C.O. Tucker, Rodriguez, and Venettozzi; and (2) dismissed, without prejudice, the remaining claims asserted in plaintiff's Amended Complaint. Dkt. No. 35 at 18. The Court subsequently denied plaintiff's motion for reconsideration of the October 25, 2018 Decision and Order. See Dkt. Nos. 36, 48. Further, in a Decision and Order dated September 27, 2019, as relevant here, the Court denied plaintiff's motion for leave to file a second amended complaint, see Dkt. No. 87, and Ordered that plaintiff's Amended Complaint (Dkt. No. 25) remains the operative pleading. See Dkt. No. 106.

3     To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

4     Plaintiff's use of the acronym "OMH" refers to the Office of Mental Health.

5     Although Venettozzi's name appears on the document reversing and expunging the March 2016 disciplinary determination, see Dkt. No. 25-3 at 40, Rodriguez is the person that actually made the determination to reverse and expunge plaintiff's disciplinary sentence and Venetozzi's name is contained on the document based on internal DOCCS policy. See Dkt. No. 195-17 at 1 (Rodriguez's affidavit in further support of motion for summary judgment, explaining that, Venettozzi's name appears on the July 10, 2017 decision "because, whenever he's in the office, all correspondence goes out in his name.").

6     All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

7     Plaintiff's Amended Complaint in this case was not properly verified. See Amen. Compl. at 80.

8     The undersigned declines to consider plaintiff's contention, for the first time in opposition to defendants' motion for summary judgment, that the stationary he used in correspondence with the FMRC was not official DOCCS letterhead because it did not contain a certain logo. See Dkt. No. 193 at 3 ¶ 12; Lyman v. CSX Transportation, Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (affirming the district court's determination that it should not consider claims raised for the first time in opposition to summary judgment); Auguste v. Department of Corrections, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (holding that a plaintiff "cannot amend his complaint in his memorandum in response to [the] defendants' motion for summary judgment"). Nor is the undersigned inclined to recommend allowing plaintiff to further amend the complaint to add new allegations against the defendants at this late stage in the case. Regardless of whether plaintiff perfectly reproduced official DOCCS letterhead, the admissible evidence makes clear that plaintiff attempted to use official DOCCS letterhead for his personal correspondence—a violation of DOCCS rules. See Dkt. No. 178-8 at 6. Therefore, plaintiff's belated assertions in this regard do not impact the undersigned's analysis as to plaintiff's First Amendment retaliation claim against Sgt. King.

9     The undersigned notes that defendants' arguments regarding personal involvement are based exclusively on their arguments concerning the merits of plaintiff's First Amendment retaliation and Section 1983 conspiracy claims, while conceding Capt. Bishop's personal involvement with the alleged due process violations at the March 2016 Tier III disciplinary hearing. See Dkt. No. 178-2 at 10-16.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 309 of 427

**Rucano v. Annucci; Not Reported in Fed. Supp. (2021)**

10    If you are proceeding <u>pro</u> <u>se</u> and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. <u>Id.</u> § 6(a)(1)(C).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2026 Thomson Reuters. No claim to original U.S. Government Works.    32

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION**
To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is *GRANTED* **in part,** and *DENIED* **in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is *DENIED,* however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is *DISMISSED* as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

### Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Smith v. Collins,   S.D.N.Y.,   October 1, 2015

2006 WL 1133247

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jeff SMITH, Plaintiff,

v.

Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.

|

April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1**  Plaintiff, Jeff Smith, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 17, 2006, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied. (Docket No. 51). The plaintiff has filed objections to the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of the report and recommendations to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in whole. *See* 28 U .S.C. 636(b)(1). Accordingly, it is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of Practice for this Court. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional Facility-Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt ("Defendants")-violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff

has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord,*

*Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

Similarly, such an affidavit or verified complaint must not be conclusory. [9] Of course, an affidavit may be conclusory because its assertions are too general. [10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

Plaintiff's Legal Assistance to Inmate Peter Alcivar
and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's

pending federal civil rights action. [23] In pertinent part, the letter stated,

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter

concerning a <DEAD> man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods. [45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between

Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F. [46]

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002. [47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs

are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU. [68]

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence

exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

> B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)

(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. [76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." [78]

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12**  With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis"[85] in September of 2002 as a result of sleeping on a defective bed.[86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint,[88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[89]

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question.[91]

**\*13**  More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[94]

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

### 2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or

"tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his

bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

 **\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies

[not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the

PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

#### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

#### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year

of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

#### E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not

done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

### F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

 **\*18**  I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy

claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune

if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-

Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

## Footnotes

1       Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

2       A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

3       *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

4       *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

5       Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin,

C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

6    *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7    Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

9    *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10   *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between

the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers ***I have here"];*** Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to ***hold a copy of the complaint"*** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents ***being in my possession ...*** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

14    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

15    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

16 (Dkt. No. 5, ¶ 12 [Am. Compl.].)

17 (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl].)

18 (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ ¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

19 (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

20 (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

21 (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

22 (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

23 (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

24 (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

25 (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

26 (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

27 (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

28 (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

29 (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

30 (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

31 (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

32    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

33    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

34    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

35    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

36    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

37    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

38    (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

39    (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

40    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

41    (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

42    (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

43    (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

44    (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant

O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

45    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

46    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

47    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

48    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

49    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

50    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

51    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

52    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

55    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

57    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    (Id.)

59    (Id.)

60    (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61    (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

62    (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63    (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

64      (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

65      (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

66      (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

67      (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

68      (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

69      *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at *7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

70      (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71      (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72      (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged

"encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73 (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74 *(See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

75 (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

76 *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77 (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78 (Dkt. No. 5, ¶ 14 [Am. Compl.].)

79 *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80 *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

Smith v. Woods, Not Reported in F.Supp.2d (2006)

81 (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

82 (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83 I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84 *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

85 "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86 (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87 *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88 (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89 (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

90 (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

91 *(See, supra,* Statement of Fact No. 29.)

92 (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

93 *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at

58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

94 (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

95 *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

96 (Dkt. No. 5, ¶ 38 [Am. Compl.].)

97 *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

98 (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

99 *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

100 (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

101 *(See, supra,* Statement of Fact No. 24.)

102 (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

103 *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s

Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

104 *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

105 (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

106 (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

107 (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

108 (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

109 *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at *8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

110 *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at *7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at *7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

111 *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

112 *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

113 *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3438284
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Avion STINSON, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

18-CV-0027 (LAK)(BCM)
|
Signed 07/06/2021

**Attorneys and Law Firms**

Avion Stinson, Brooklyn, NY, Pro Se.

Adria Jasmine Bonillas, New York City Law Depart. Office of the Corporation Counsel, New York, NY, for Defendants.

**REPORT AND RECOMMENDATION
TO THE HON. LEWIS A. KAPLAN**

BARBARA MOSES, United States Magistrate Judge

**\*1** Plaintiff Avion Stinson filed this action on January 2, 2018, asserting claims against the City of New York (City); three high-ranking officials of the City's Department of Corrections (DOC) – former Commissioner Joseph Ponte, former Chief of Department Martin Murphy, and former Deputy Commissioner Michael Blake (the Supervisory Defendants); and various DOC Correction Officers, including three who were served and appeared in this action – Stanley Ambrose, Reginald Rothwell, and Gregory Lopez (the CO Defendants). Plaintiff's claims arise from a series of incidents on July 17, 2015, while she was detained at the Rikers Island jail complex. In her Amended Complaint (Am. Compl.) (Dkt. No. 33), plaintiff alleges that the Supervisory Defendants and the CO Defendants violated her constitutional rights under the First, Fourth, and Fourteenth Amendments by using excessive force, retaliating against her for complaining about unconstitutional practices, and denying her medical attention; and that the CO Defendants violated her constitutional rights under the Equal Protection Clause, as well as the New York State and City Human Rights Laws, because their conduct was motivated by animus on the basis of her sex, gender, and sexual orientation. Am. Compl. ¶¶ 61-77. [1] Plaintiff further alleges that the City is liable to her because it "permitted, tolerated, and was deliberately indifferent to" a pattern and practice of unconstitutional abuse at Rikers Island. *Id*. ¶ 79.

On March 6, 2020, defendants moved for summary judgment on all claims. (Dkt. No. 121.) For the reasons that follow, I recommend that the motion be granted as to CO Ambrose, the Supervisory Defendants, and the City. As to COs Rothwell and Lopez, I recommend that the motion be granted in part and denied in part.

**I. BACKGROUND**

**A. Facts**
The following facts, which unless otherwise noted are undisputed, are taken from (i) Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 (Def. 56.1 St.) (Dkt. No. 123); (ii) the underlying evidentiary materials, which are attached to the Declaration of Daniel Saavedra (Saavedra Decl.) (Dkt. No. 125), including plaintiff's complete deposition transcript (Pl. Dep. Tr.) (Saavedra Decl. Ex. A), portions of plaintiff's medical records from Rikers Island (*id*. Ex. B), and video footage from Rikers Island security cameras (*id*. Ex. C; Dkt. No. 150); (iii) plaintiff's declaration, dated May 13, 2020 (Pl. Decl.) (Dkt. 137), submitted in opposition to defendants' motion; (iv) additional video footage showing one of the alleged assaults on plaintiff, which neither side formally submitted in connection with the present motion but which plaintiff refers to and relies on in her deposition testimony and elsewhere (Dkt. No. 150); and (v) certain records and photographs submitted by plaintiff as exhibits to a document entitled "Evidence in Support of this Case in Support of Local Rule 56.2" (Pl. Evid. in Supp.) (Dkt. Nos. 106, 107.)

**\*2** On July 17, 2015, plaintiff was a pre-trial detainee housed at GMDC. Def. Rule 56.1 St. ¶ 1. During morning recreation, plaintiff experienced chest pains and was taken to the GMDC medical clinic. *Id*. ¶¶ 2-3; Pl. Dep. Tr. at 57:2-8. The clinic took her vitals, and finding nothing wrong, released her. Pl. Dep. Tr. at 57: 9-12. Officer Rothwell then escorted plaintiff from the clinic to the intake unit, where plaintiff believed she was going to be beaten by other inmates in retaliation for complaints she had recently made to "Prisoner's Rights" about CO Ambrose and others. Def. Rule 56.1 St. ¶¶ 4-5; Pl. Dep. Tr. at 57:14-58:2; Pl. Decl. at ECF page 3. [2]

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 339 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

### 1. The Intake Unit - Morning Incident

Upon arriving at the intake unit, shortly before 9:00 a.m., plaintiff overheard other inmates in the "pen" talking about assaulting someone and – fearing for her personal safety – refused to enter the intake holding cell. Def. Rule 56.1 St. ¶¶ 6-7; Pl. Dep. Tr. at 61:7-12. Officer Rothwell, joined by a female DOC captain, explained to plaintiff that she had to go through intake because she had been removed from "mental health housing," did not qualify for protective custody, and had to go to "GP" (general population). Def. Rule 56.1 St. ¶¶ 8-9; Pl. Dep. Tr. at 67:10-14. Plaintiff resisted being taken into the holding cell, compelling the officers, now numbering four or five (including Rothwell and Lopez), to carry her. Def. Rule 56.1 St. ¶¶ 10-11; Pl. Dep. Tr. at 68:4-7, 11-15. As the officers approached the holding cell, plaintiff grabbed the leg of a nearby table and refused to let go. Def. Rule 56.1 St. ¶ 12; Pl. Dep. Tr. at 68:8-10, 71:14-21. After gentler attempts to dislodge her failed, Officer Lopez twice deployed pepper spray on plaintiff, each time for about two seconds. Def. Rule 56.1 St. ¶ 13; Saavedra Decl. Ex. C; Pl. Dep. Tr. at 69:24-70:1, 72:2-5. Plaintiff continued to hold on, letting go of the table only after the officers flipped it over and "slid me off the leg." Def. Rule 56.1 St. ¶¶ 14-15; Saavedra Decl. Ex. C; Pl. Dep. Tr. at 72:21-24. [3]

Once removed from the leg of the table, plaintiff was placed on a stretcher. Def. Rule 56.1 St. ¶ 16; Pl. Dep. Tr. at 73:2-4, 22-23. At that point – while still in the intake unit – plaintiff states that she was assaulted by three to five officers who punched her in her face and chest with closed fists for about two minutes, which "knocked out my teeth." Def. Rule 56.1 St. ¶ 17; Pl. Dep. Tr. at 73:9-21, 75:2-5. However, plaintiff could not see which officers were punching her because of the pepper spray in her eyes. Def. Rule 56.1 St. ¶ 18; Pl. Dep. Tr. at 74:16-21. [4]

### 2. The GMDC Clinic

 **\*3**  Following this alleged assault, several officers escorted plaintiff back to the GMDC clinic. Def. Rule 56.1 St. ¶ 20; Pl. Dep. Tr. at 75:7-10, 16-17, 77:5-11. According to plaintiff, the nurses at the clinic refused to treat her because she had too much pepper spray on her body. Def. Rule 56.1 St. ¶ 21; Pl. Dep. Tr. at 77:23-78:1. Instead of taking her to wash off the

pepper spray, the officers left her on the stretcher in a clinic hallway. Def. Rule 56.1 St. ¶ 22; Pl. Dep. Tr. at 78:2-14.

While she was lying on the stretcher in the hallway, plaintiff states that she was again assaulted by unidentified correction officers, who punched her in the chest with closed fists for three or four minutes. Def. Rule 56.1 St. ¶¶ 22-23; Pl. Dep. Tr. at 75:24-76:3, 79:2-13. Plaintiff kept her eyes closed during this attack because she still had pepper spray in her eyes. Def. Rule 56.1 St. ¶ 24; Pl. Dep. Tr. at 79:3-4. According to plaintiff, the officers kept punching and hitting her until she acted like she was dead, at which point they left. Pl. Dep. Tr. at 79:3-13.

Plaintiff then noticed an open bathroom door. Def. Rule 56.1 St. ¶ 25; Pl. Dep. Tr. at 76:8-10, 79:14-16. Although her hands were cuffed behind her back and her feet were attached to the stretcher, plaintiff made her way to the bathroom to wash the pepper spray out of her eyes. Def. Rule 56.1 St. ¶ 26; Pl. Dep. Tr. at 76:12-15, 79:18-19. Because she was dragging the stretcher with her as she moved, her approach to the bathroom attracted the attention of COs Rothwell and Lopez, who entered the bathroom and, according to plaintiff, started hitting and kicking her. Def. Rule 56.1 St. ¶ 26-27; Pl. Dep. Tr. at 76:10-13, 18-22; 80:4-6, 82:7-12.

Following this second alleged assault inside the clinic, plaintiff waited for "a whole shift" before anyone gave her medical attention. Def. Rule 56.1 St. ¶ 28; Pl. Dep. Tr. at 80:7-14, 21-24, 82:14-19; *see also* Pl. Decl. at ECF page 3 ("I was denied any proper medical evaluation or attention."). According to plaintiff, her arms, hands, and face were bleeding; her right eyebrow was "gashed open"; and she had broken teeth, a black eye, and a "boot print on the side of my face which didn't go away for a week." Pl. Dep. Tr. at 80:25-81:16. The clinic doctor "recorded everything" but the medical staff "didn't do anything" other than take her vitals. *Id.* at 80:24, 81:11, 82:18-19. Plaintiff's testimony is at odds with the clinic's records, which reflect that she was treated at 11:53 a.m. by physician's assistant (PA) Esperance Ndayishimiye, who, in addition to taking her vitals, noted "NO VISIBLE SIGN OF INJURY." Def. Rule 56.1 St. ¶¶ 29-30; Saavedra Decl. Ex B, at ECF pages 23-24. [5]

### 3. The Intake Unit – Afternoon Cell Extraction

After being seen at the clinic, plaintiff was taken back to intake and placed in a cell, in handcuffs. Def. Rule 56.1 St. ¶

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 340 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

31; Pl. Dep. Tr. at 83:23-24. Plaintiff called out for medical treatment and continued to complain about the pepper spray on her body, Pl. Dep. Tr. at 84:23-85:3, until the (unidentified) captain on duty threatened to beat her if she kept yelling and screaming. *Id*. at 84:4-12. When the new shift started in the afternoon, a group of officers came into the cell, wearing "combat vests," to perform a cell "extraction." *See* Pl. Dep. Tr. at 86:7-21, 110:1-9; Saavedra Decl. Ex. B, at ECF page 19. According to plaintiff, these officers "were beating me up," "punching me with closed fists in my face, choking me," with "their hands over my face so I couldn't scream," "pulling my hair," and "kicking me in the head. Def. Rule 56.1 St. ¶¶ 32-33; Pl. Dep. Tr. at 85: 6-10, 87:8-13. During this episode, plaintiff states, the officers "cracked [her] jaw," broke her teeth, and left a boot print across her face. Pl. Dep. Tr. at 87:20-88:3.

**\*4**  None of the CO Defendants was physically present during the extraction, which began at approximately 4:15 p.m. on July 17. Def. Rule 56.1 St. ¶¶ 34-36; Pl. Dep. Tr. at 101:19-21, 110:1-9. Moreover, plaintiff's testimony is markedly at odds with the video record of the extraction, which begins with Captain Edwin Skepple stating that the "anticipated use of force" was authorized because plaintiff had refused to leave the main intake unit to be transported to "C-71" for a mental health evaluation. [6] The video then shows plaintiff repeatedly refusing to leave the cell or follow other CO directions. Told to "get up" from the bench she was on for transport to C-71, plaintiff repeatedly stated, "I'm not going," while remaining seated, accusing the officers of knocking her teeth out, and demanding the return of her "gold tooth" and (unspecified) property. Told again to "stand up," plaintiff instead sat on the floor of the cell, locking her legs under the bench. After plaintiff refused several additional orders to stand up, the officers entered the cell, removed her from the bench, dressed her (she had no pants on), put a spit hood on her head, placed her on a wheeled stretcher, and transported her back to the GMHC clinic. [7]

At the clinic, plaintiff was examined by PA Scott Parks, who took her vitals at 4:55 p.m. Def. Rule 56.1 St. ¶ 37; Pl. Dep. Tr. at 88:20-89:3; Saavedra Decl. Ex. B, at ECF pages 19-20. Plaintiff told Parks that her front tooth "was knocked out during the extraction." Saavedra Decl. Ex. B, at ECF page 19. Parks observed that plaintiff had a bruise on her right eyelid, for which she was given ice; irrigated her eyes, because she complained of burning; and noted that plaintiff was missing an upper central incisor (front tooth) and that another incisor was broken, but that there was no active bleeding and the

mandible (jaw) was "nontender." *Id*. at ECF pages 19-20. According to plaintiff, Parks recommended X-rays, but the officers refused to take her because they had orders to transfer her to another facility. Pl. Dep. Tr. at 90:8-20, 91:8-13. The clinic's records do not reflect this alleged exchange.

#### 4. Post-July 17 Medical Treatment

Following her afternoon visit to the clinic, plaintiff was taken to another housing unit, the Anna M. Kross Center (AMKC), where she alleges that a "Captain Thompson" (not named as a defendant herein) placed her in a holding cell and left her there for two days. Def. Rule 56.1 St. ¶ 41; Pl. Dep. Tr. at 93:1-3, 16-19. From there, plaintiff was moved to the C-71 mental health unit, also known as Hart Island, where she says she was left in an intake cell for five additional days with no medical attention. Def. Rule 56.1 St. ¶¶ 42, 44; Pl. Dep. Tr. at 94:23-25, 96:21-25. Plaintiff asserts that she waited a total of eight days before she received any treatment for the injuries suffered on July 17, 2015. Def. Rule 56.1 St. ¶ 44; Pl. Dep. Tr. at 83:3-5, 87:5-7. However, her medical records show that she was seen by medical staff at the AMKC clinic on July 19, July 21, and July 23, 2015. Def. Rule 56.1 St. ¶ 45; Saavedra Decl. Ex. B, at ECF pages 5-15. [8]

**\*5**  The July 19, July 21, and July 23 records do not reflect any complaint by plaintiff about the events of July 17, 2015. However, on July 30, 2015, plaintiff "made an allegation that [she] was assaulted by DOC staff on July 17, 2015, causing injury." Pl. Evid. in Supp. Ex. C, at ECF page 12. The resulting "Injury to Inmate" report, signed by correctional staff, medical staff, and plaintiff, recites that no injury was noted "visually on head, neck, chest [or] abdomen," and that plaintiff refused treatment. *Id*. [9] Photographs of plaintiff's head and face dated July 30, 2015, show no visible injuries. *Id*. Ex. A, at ECF pages 25, 34-35, 37. [10] Photographs of her mouth, also dated July 30, 2015, show multiple teeth missing, broken, and/or decayed, including a missing upper front tooth. *Id*., at ECF pages 26-28, 30-33. On October 1, 2015, a Rikers Island dentist, with plaintiff's consent, extracted three "painful, abscessed, and grossly carious" teeth. *Id*. Ex. B, at ECF page 20. The extracted teeth (#3, #13, and #14) are all still visible in the July 30 photographs. Pl. Evid. in Supp. Ex. A, at ECF pages 26-28, 30-33.

### B. Procedural History

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 341 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

Plaintiff filed this action, through counsel, on January 2, 2018. Her original Complaint named the City, the Supervisory Defendants, and COs Ambrose, Rothwell, and Lopez as defendants, and alleged that she was subjected to "a relentless campaign of harassment and violence at the hands of correction officers and fellow inmates" that "reached a crescendo on July 17, 2015, when throughout the day multiple correction officers beat [her] multiple times, in multiple locations within Riker's Island." Compl. (Dkt. No. 6) ¶¶ 57-59. In her first claim, asserted pursuant to 42 U.S.C. § 1983, plaintiff alleged that all of the individual defendants violated her constitutional rights under the First, Fourth, and Fourteenth Amendments by using excessive force, retaliating against her for complaining about unconstitutional practices, and denying her medical attention. Compl. ¶¶ 63-67. In her second claim, plaintiff alleged that the City was also liable to her, pursuant to § 1983, because it "permitted, tolerated, and was deliberately indifferent to" a pattern and practice of unconstitutional abuse, including "brutality," retaliation, and denial of medical care, at Rikers Island. Id. ¶¶ 68-71.

On January 19, 2018, the Honorable Lewis Kaplan, United States District Judge, referred this matter to me for general pretrial management and report and recommendation on dispositive motions. (Dkt. No. 8.) The defendants named in the original Complaint answered it on April 23, 2018. (Dkt. No. 23.) On July 10, 2018, following several months of written discovery, plaintiff filed her Amended Complaint, which added eleven additional individual defendants [11] and three new claims, alleging that the CO Defendants violated her constitutional rights under the Equal Protection Clause, as well as her rights under the New York State and New York City Human Rights Laws, because their conduct was motived by animus based on plaintiff's sex, gender, and sexual orientation. Am. Compl. ¶¶ 66-77. Additionally, plaintiff expanded her municipal liability claim to allege that the City "permitted, tolerated, and was deliberately indifferent to" a pattern and practice of discrimination on the basis of sex, gender, and sexual orientation. Id. ¶¶ 79-80.

 **\*6** On July 12, 2018, electronic summonses were issued as to the newly-named individual defendants. (Dkt. No. 37.) On September 11, 2018, I extended the deadline for service of process on those defendants to October 10, 2018. (Dkt. No. 40.)

On September 22, 2018, following the September 11, 2018 settlement conference, plaintiff's counsel moved to withdraw (Dkt. No. 43); in response, plaintiff requested that her counsel

"be relieved from this case" for "trying to squeeze me into taking a settlement I don't want." (Dkt. No. 48.) In connection with the withdrawal proceedings, I stayed discovery (Dkt. No. 42), as well as the time for service of the Amended Complaint on the newly-named defendants. (Dkt. No. 47.) On October 15, 2018, I granted counsel's motion to withdraw (Dkt. No. 52), and on October 25, 2018, plaintiff filed a Notice of Pro Se Appearance. (Dkt. No. 57.) On November 26, 2018, I lifted the stay on discovery and service and reminded plaintiff of her responsibility to comply with all of her discovery and other pretrial obligations, including service of process. [12] After several extensions, discovery closed on May 1, 2019. (Dkt. Nos. 87, 90, 91.) However, insofar as the record reflects, plaintiff made no effort to serve the Amended Complaint on any of the defendants first named therein, and none of them has appeared.

### 1. Defendants' First Summary Judgment Motion

On July 1, 2019, defendants filed a summary judgment motion, accompanied by a Rule 56.1 statement, a brief, a declaration of counsel, and a Notice to Pro Se Litigant, in accordance with Local Civil Rule 56.2, advising plaintiff of her obligation to "submit evidence" in opposition to the motion. (Dkt. Nos. 94-98.) Instead, after obtaining an extension of time to respond to the motion (Dkt. No. 101), plaintiff filed a 21-page document on August 13, 2019, entitled "As to Violation of Constitutional and Human Rights and of Any and All Law in Support of Plaintiff's Motion for Opposing Summary Judgment," in which she, *inter alia*, complained about her former attorneys, questioned the integrity of defendants' counsel, accused defendants of tampering with evidence, and listed in conclusory terms the various ways she contends her rights were violated, without identifying any record evidence to support her claims. (Dkt. No. 102.) Along with this document, plaintiff submitted a 4-page, unsigned declaration, recounting some of the events of July 17, 2015 and asserting that the evidence supporting her claims was "corrupted." (Dkt. No. 103.) On August 28, 2019, defendants submitted a reply brief in further support of their initial summary judgment motion. (Dkt. No. 105.)

On September 16, 2019, plaintiff submitted her unsigned "Evidence in Support," naming six witnesses who, she asserted, would support her claims. Pl. Evid. in Supp. at ECF page 6. No witness affidavits were attached. Plaintiff did attach, as Exhibits A-C, various Injury to Inmate reports (*id*. at ECF pages 9-15) [13]; the dental records reflecting her October

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 342 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

1, 2015 tooth extraction (*id.* at ECF pages 19-23); and the July 30, 2015 photographs of her face, head and mouth. *Id.* at ECF pages 25-37). The following day, she submitted an additional Exhibit D (apparently omitted inadvertently the day before), consisting of eight emails and one letter sent by the Legal Aid Society, on her behalf, to various DOC personnel from June through September 2015. (Dkt. No. 107.) [14] On October 7, 2019, I denied defendants' letter-application requesting that I "decline to consider" plaintiff's September 16 and 17 submissions. (Dkt. No. 110.)

**\*7** On January 28, 2020, I issued an order noting that defendants' pending motion was addressed to plaintiff's original Complaint, rather than the operative Amended Complaint. (Dkt. No. 111.) I directed the moving defendants to advise the Court in writing by January 31 whether they wished to stand on their pending motion or withdraw it without prejudice to refiling "a motion addressed to the claims framed by the Amended Complaint." *Id.* On January 31, 2020, defendants advised that they would withdraw their pending motion and proposed a briefing schedule for the motion they intended to refile, which I adopted. (Dkt. Nos. 112-13.)

### 2. Defendants' Second Summary Judgment Motion

On March 6, 2020, defendants filed an answer to the Amended Complaint (Dkt. No. 128) and the summary judgment motion which is now before the Court, accompanied by their Rule 56.1 statement; a brief (Def. Mem.) (Dkt. No. 124); the Saavedra Declaration; and a Notice to Pro Se Litigant once again advising plaintiff of her obligation to "submit evidence" in opposition to the motion. (Dkt. No. 122.) Defendants argue that they are entitled to summary judgment because (1) the Supervisory Defendants "were not personally involved in any alleged constitutional violations," Def. Mem. at 5-8; (2) plaintiff's excessive force claims fail as a matter of law, *id.* at 8-14, because (a) the use of force during the pepper spray incident was reasonable; (b) no rational juror could believe plaintiff's allegations as to the incident in the clinic bathroom, which is contradicted by clinic records showing that she had no visible injuries thereafter; and (c) plaintiff did not identify any of the three CO Defendants as her assailant in any of the remaining incidents alleged, concedes that Officer Ambrose was not present for any of them, and further concedes that Officers Rothwell and Lopez were not present for the cell extraction; (3) plaintiff's deliberate indifference claim fails as a matter of law, *id.* at 14-18, because (a) plaintiff did not suffer a "sufficiently

serious injury" to implicate the Constitution; (b) plaintiff concedes that she was given medical treatment on July 17 and her testimony about the lack of treatment thereafter is "directly contradicted by the medical records"; and (c) there is no evidence that any of the individual defendants had any responsibility for plaintiff's medical treatment after July 17; (4) plaintiff's municipal liability claim fails for lack of any underlying constitutional violation and for lack of evidence, *id.* at 18-27; (5) plaintiff's Equal Protection claim fails for lack of evidence of discriminatory intent on the part of any individual defendant, *id.* at 27-29; and (6) her state law claims fail with it. *Id.* at 30-31. In the alternative, defendants request that the Court "decline supplemental jurisdiction" over the state law claims. *Id.* at 31.

During a telephonic status conference on March 17, 2020, I explained to plaintiff her obligations to respond to the motion on time and with evidence, and directed her to do so by May 8, 2020, "in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1." (Dkt. No. 132.) Thereafter, plaintiff requested, and I granted, two extensions of her time to respond, ultimately giving her a deadline of July 24, 2020. (Dkt. Nos. 135, 140.)

On various dates in May and June, 2020, plaintiff filed what appears to be an opposing brief (Pl. Mem.) (Dkt. No. 136); two versions of her opposing declaration (Dkt. Nos. 137, 148) [15]; three copies of the "Evidence in Support" document first filed on September 16, 2019, without exhibits (Dkt. Nos. 138, 143, 144); and a two-page document entitled Plaintiff's Response [to] Defendants Local Rule 56.2 Notice (Dkt. No. 147), which states that plaintiff had already "submitted evidence in this case sufficient and overwhelming," but does not otherwise respond to defendants' moving papers. On July 24, 2020, defendants submitted a reply brief (Dkt. No. 149), urging the Court to deem their factual assertions and admitted and declare many of plaintiff's claims abandoned.

## II. LEGAL STANDARDS

### A. Summary Judgment

**\*8** A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l, Inc.,* 95 F.3d 123, 128-29 (2d Cir. 1996). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 343 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 322; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). In evaluating the record, the court must construe the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.,* 517 F.3d 76, 87 (2d Cir. 2008). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Frost v. New York City Police Dep't,* 980 F.3d 231, 242 (2d Cir. 2020) (quoting *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996)).

If the moving party meets its initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of material fact. *Celotex,* 477 U.S. at 322; *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). The non-moving party must present specific, admissible evidence in support of her contention that there is a genuine dispute as to the material facts. *Celotex,* 477 U.S. at 324; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553-54 (2d Cir. 2005); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful"). Furthermore, the evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 242, 248; *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.,* 875 F.3d 107, 113 (2d Cir. 2017) ("A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (internal quotation marks omitted). Thus, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996).

### B. Local Civil Rule 56.1

In Southern District of New York, the moving party must submit a "short and concise statement, in numbered paragraphs," of the material facts that the moving party contends to be undisputed, with citations to the underlying evidence. Local Civil Rule 56.1(a). The non-moving party must then respond in kind, with numbered paragraphs that correspond "to each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). To the extent not "specifically controverted" by the non-moving party, the statement of material facts submitted by the moving party

may be "deemed to be admitted for purposes of the motion." Local Civ. R. 56.1(c); *see also Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

### C. Pro Se Parties

Where, as here, the party opposing summary judgment is proceeding *pro se*, the court should read her papers "liberally," and "interpret them to raise the strongest arguments that they suggest." *Burgos,* 14 F.3d at 790 (2d Cir. 1994); *see also Mikinberg v. Baltic S.S. Co.,* 988 F.2d 327, 330 (2d Cir. 1993); *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). While "pro se litigants are 'not excused from meeting the requirements of Local Rule 56.1,' " *Diggs v. Volpe,* 2013 WL 4015758, at *1 n.1 (S.D.N.Y. Aug. 7, 2013) (quoting *Wali v. One Source Co.,* 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009)), the court has "broad discretion" to "overlook a [pro se] party's failure to comply with local court rules," and may exercise that discretion to "conduct an assiduous review of the record" even where – as here – the *pro se* party has failed entirely to file a statement complying with Local Civil Rule 56.1(b). *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir. 2000)); *accord Feelings v. Stukes,* 2017 WL 3601241, at *5 n.1 (S.D.N.Y. Aug. 21, 2017); *Cain v. Esthetique,* 182 F. Supp. 3d 54, 63 (S.D.N.Y. 2016), *aff'd sub nom. Cain v. Atelier Esthetique Inst. of Esthetics Inc.,* 733 F. App'x 8 (2d Cir. 2018); *Vann v. Fischer,* 2014 WL 4188077, at *6 (S.D.N.Y. Aug. 25, 2014). [16]

**\*9** The court is not obligated, however, to accept a *pro se* litigant's factual assertions where they contradict her own previous statements or are otherwise "beyond belief." *Shabazz v. Pico,* 994 F. Supp. 460, 470 (S.D.N.Y. 1998) (Sotomayor, D.J.) (quoting *Dawes v. Coughlin,* 964 F. Supp. 652, 657 (N.D.N.Y.1997)), *vacated on other grounds by* 205 F.3d 1324 (2d Cir. 2000). Nor need the court accept testimony which is so "blatantly contradicted" by the video evidence "that no reasonable jury could believe it." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

### D. Section 1983

Section 1983 permits civil suits against those who, acting "under color" of state law, have deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution" or laws of the United States. 42 U.S.C. § 1983. "Section 1983 does not create any federal rights;

rather, it provides a mechanism to enforce rights established elsewhere." *Soberanis v. City of New York,* 244 F. Supp. 3d 395, 400 (S.D.N.Y. 2017) (citing *Gonzaga Univ. v. Doe,* 536 U.S. 273, 285 (2002)). To state a claim under § 1983, "a plaintiff must allege that (1) the defendant was a state actor, i.e., acting under color of state law, when he committed the violation and (2) the defendant deprived the plaintiff of 'rights, privileges or immunities secured by the Constitution or laws of the United States.' " *Milan v. Wertheimer,* 808 F.3d 961, 964 (2d Cir. 2015) (citation omitted). Plaintiff Stinson seeks damages pursuant to § 1983 on four distinct theories: (1) that defendants violated the Fourth and Fourteenth Amendments by using excessive force against her on July 17, 2015; (2) that they violated the Due Process Clause of the Fourteenth Amendment by denying her adequate medical care on that date and for eight days thereafter; (3) that they violated the First and Fourteenth Amendments by mistreating her in retaliation for complaints she previously made about her treatment at Rikers Island; and (4) that the CO Defendants violated the Equal Protection Clause, because their misconduct was motivated by animus on the basis of her sex, gender, and sexual orientation. Am. Compl. ¶¶ 61-77.

### 1. Excessive Force

To prevail on an excessive force claim against jail officials, a pretrial detainee must show that the use of force was deliberate and that the degree of force used was "objectively unreasonable" under the circumstances, taking into account the "facts and circumstances of each particular case," and viewing the issue "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson,* 576 U.S. 389, 395-97 (2015) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)). Factors bearing on whether the use of force was reasonable or unreasonable include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley,* 576 U.S. at 397. "The factfinder must also "take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Frost,* 980 F.3d at 252 (quoting

*Kingsley*, 576 U.S. at 2474). "Additionally, an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Kingsley,* 576 U.S. at 400 (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)).

### 2. Deliberate Indifference

**\*10** Claims by pretrial detainees for inadequate medical care are analyzed under the Due Process Clause using a "two-pronged standard," *Lloyd v. City of New York,* 246 F. Supp. 3d 704, 717 (S.D.N.Y. 2017), to determine whether the defendant officials were "deliberately indifferent" to the detainee's "serious medical needs." *Id*. at 718. First, the plaintiff must show that the alleged deprivation of medical care was "sufficiently serious in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Yancey v. Robertson,* 828 F. App'x 801, 803 (2d Cir. 2020) (summary order) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted). Second, the plaintiff must show that the defendant official " 'knew, or should have known' that his or her conduct 'posed an excessive risk to health or safety.' " *Lloyd,* 246 F. Supp. 3d at 719 (quoting *Darnell v. Pineiro,* 849 F.3d 17, 35 (2d Cir. 2017)). *See also Charles v. Orange Cty.,* 925 F.3d 73, 86 (2d Cir. 2019) ("in *Darnell*, we clarified that deliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind.").

### 3. Retaliation

To prevail on a First Amendment retaliation claim, "a prisoner must show (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan v. Connolly,* 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gomez v. Cty. of Westchester,* 649 F. App'x 93, 96 (2d Cir. 2016) (summary order) (applying *Espinal* test to pretrial detainees). The causal connection must be clear, because "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 345 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

constitutionally proscribed retaliatory act." *Dolan, 794 F.3d at 295.* Thus, "courts in the Second Circuit 'approach prisoner retaliation claims with skepticism and particular care.' " *Williams v. King,* 2018 WL 565719, at *3 (S.D.N.Y. Jan. 24, 2018) (quoting *Dolan,* 794 F.3d at 295), *aff'd,* 763 F. App'x 36 (2d Cir. 2019). Even where there is evidence of a retaliatory motive, "a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir. 2003); *accord West v. Goord,* 2017 WL 3251253, at *7 (W.D.N.Y. July 31, 2017).

### 4. Equal Protection

"To prove an equal protection violation, [a plaintiff] must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citations omitted). "In other words, '[t]o prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.' " *Randle v. Alexander,* 960 F. Supp. 2d 457, 476 (S.D.N.Y. 2013) (quoting *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir. 2005) (citation omitted)); *see B. Braxton/ Obed-Edom v. City of New York,* 368 F. Supp. 3d 729, 740 (S.D.N.Y. 2019) (the plaintiff must show " 'that *similarly situated persons have been treated differently*' " (quoting *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir. 1994)). Additionally, in a prison setting, the plaintiff must demonstrate "that his treatment was not "reasonably related to [any] legitimate penological interests." *Phillips,* 408 F.3d at 129 (quoting *Shaw v. Murphy,* 532 U.S. 223, 225 (2001)). [17]

### 5. Supervisory Liability

**\*11** Regardless of the constitutional right involved, prison officials, like others acting under color of state law, can only be held liable for their own conduct. As the Supreme Court explained in *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009), "vicarious liability is inapplicable" to § 1983 suits. Consequently, a § 1983 plaintiff must both plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*; *see also Boley v. Durets,* 687 F. App'x 40, 41 (2d Cir. 2017) (summary order) ("[t]o establish a § 1983 claim, a plaintiff must show the defendants' personal involvement in the alleged

constitutional violation"); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" (internal quotation marks and citations omitted)), *abrogated on other grounds, Tangreti v. Bachmann,* 983 F.3d 609 (2d Cir. 2020).

Personal involvement must be demonstrated both for line officers, *see, e.g., McGrier v. City of New York,* 849 F. App'x 268, 272 (2d Cir. 2021) (summary order) (upholding grant of summary judgment to Rikers Island correction officer involved in cell extraction where there was "some evidence" that excessive force was used in the extraction but "no reasonable jury could find [the named officer] directly responsible for applying [the] unconstitutionally excessive force"), and for supervisory officials. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) (supervisory liability requires "a showing of more than the linkage in the prison chain of command [because] the doctrine of *respondeat superior* does not apply"). Moreover, after *Iqbal,* there is no "special test for supervisory liability." *Tangreti,* 983 F.3d at 616. In evaluating whether a supervisory official can be liable for injuries inflicted by others, the court must analyze the same elements that define the constitutional tort for direct actors. *Id.*; *see also Dumel v. Westchester Cty.,* 2021 WL 738365, at *7 (S.D.N.Y. Feb. 25, 2021) ("whatever the alleged constitutional violation may be, '[t]he violation must be established against the supervisory official directly' " (quoting *Tangreti,* 983 F.3d at 618)). Thus, for example, "for deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Tangreti,* 983 F.3d at 618.

### 6. Municipal Liability

Under the Supreme Court's decision in *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978), a municipality may be held liable under § 1983 only if the plaintiff shows the existence of a constitutional violation " 'that was caused by an official municipal policy or custom.' " *Frost,* 980 F.3d at 257 (quoting *Bellamy v. City of New York,* 914 F.3d 727, 756 (2d Cir. 2019)). "There are three elements to a *Monell* claim: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *McGrier,* 849 F. App'x at 272 (quoting *Lucente v. Cnty. of Suffolk,* 980 F.3d 284, 297 (2d Cir. 2020));

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 346 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

accord *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).

## III. DISCUSSION

### A. CO Ambrose

It is undisputed that CO Ambrose was not present for any of the events of July 17, 2015. He therefore cannot be liable for any excessive force used against her that day by other officers. *See Arminio v. Holder*, 2019 WL 176804, at *3 (S.D.N.Y. Jan. 11, 2019) (quoting *Russo v. DeMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012)) (a correction officer "is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so"); *Univ. Calvary Church v. City of New York*, 2000 WL 1538019, at *4 (S.D.N.Y. Oct. 17, 2000) (granting summary judgment to defendant Parrish because "[t]here is no showing that he was involved in or even present at the time the arrest or use of force occurred.").

 **\*12**  Similarly, plaintiff does not claim that Ambrose played any role in denying her medical care (or, for that matter, that he had any awareness of her alleged injuries). He therefore cannot be liable to her on a deliberate indifference theory. *See Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 444 (S.D.N.Y. 2016) ("Maslanka and Sisco are entitled to summary judgment on Simpson's deliberate indifference claim because, as stated above, the record shows that neither officer participated in Simpson's arrest or detention at the Warwick police station or Orange County jail. As such, there is no reason to believe that either officer was personally involved in, or even aware of, any alleged deprivation of medical care."); *Lara-Grimaldi v. Cty. of Putnam*, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim against Smith where there was no allegation that Smith "was involved in, aware of, or somehow permitted" the alleged deprivation of adequate care, nor even that he "interacted with Grimaldi or any of the PCCF employees responsible for making the screening recommendation for Grimaldi during the two days Grimaldi was ... incarcerated [at] PCCF").

Plaintiff's retaliation, equal protection, and discrimination claims should also be dismissed as against Ambrose. According to plaintiff, Ambrose threatened her on July 16, 2015, because she "got [him] suspended." Pl. Dep. Tr. at 59:7-24. "[T]he filing of prison grievances is a constitutionally protected activity," *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003), and I see no reason why a complaint made to an outside agency (like the Legal Aid Society) and relayed to prison authorities by email should be treated any differently. However, the retaliatory threat that Ambrose allegedly made – and that plaintiff says she believed – was that other inmates were going to beat her in the holding cell of the intake unit, Pl. Dep. Tr. at 63:9-11, where there were "no cameras." *Id*. at 68:9-10. That never happened. Instead, due to her fear of inmate-on-inmate violence, plaintiff refused to enter the cell at all, *id*. at 63:18-66:24, obliging the officers escorting her to carry her. She then "snatched loose from their grip," "grabbed a table," *id*. at 68:6-10, and refused to let go, requiring the officers, in turn, to use force to dislodge her. On this record, no reasonable jury could conclude that Ambrose was responsible for that use of force, much less that there was a "causal connection," *see Dolan*, 794 F.3d at 294, between plaintiff's allegedly protected speech and the "adverse action" she experienced at the hands of other officers, after repeatedly refusing to follow their orders, on July 17, 2015. *See Williams*, 2018 WL 565719, at *3-4 (granting summary judgment to defendant King where plaintiff had previously filed a grievance against King but produced no evidence suggesting that King assigned Mead to conduct plaintiff's disciplinary hearing in retaliation for that grievance, nor that King "had any reason to believe that Mead would conduct the disciplinary hearing in a biased manner").

Moreover, while plaintiff has testified to her belief that Ambrose's threat was retaliatory, she presents no evidence that it was discriminatory; that is, that it arose from any animus relating to her sex, gender, or sexual orientation. The fact that plaintiff presented as a gay man when the threat was made does not, standing alone, support an inference of animus on that basis. *See White v. City of New York*, 206 F. Supp. 3d 920, 931 (S.D.N.Y. 2016) (dismissing equal protection claim brought by transgender man against officers who, according to plaintiff, were insufficiently responsive to his request for police assistance, but did not otherwise display any "discriminatory animus"). [18] Nor does she point to any evidence that otherwise "similarly situated persons" of a different sex, gender, or sexual orientation were "treated differently" by Ambrose. *B. Braxton/Obed-Edom*, 368 F. Supp. 3d at 740. I therefore recommend, respectfully, that summary judgment be granted to CO Ambrose on all of plaintiff's claims.

### B. COs Lopez and Rothwell

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 347 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

## 1. Excessive Force

### a) The Intake Unit – Morning Incident

**\*13** The use of pepper spray "constitutes a significant degree of force" and can, in certain cases, form the basis of a constitutional violation. *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010); *Berry v. City of New York Dep't of Corr.*, 2014 WL 2158518, at \*5 (S.D.N.Y. May 22, 2014), *aff'd sub nom. Berry v. New York City Dep't of Correction*, 622 F. App'x 10 (2d Cir. 2015). However, if the force was "applied in a good-faith effort to maintain or restore discipline," it "will not amount to excessive force under Second Circuit law." *Adilovic v. Cnty. of Westchester*, 2011 WL 2893101, at \*6 n. 12 (S.D.N.Y. July 14, 2011) (internal citation omitted) (quoting *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000)); *accord Berry*, 2014 WL 2158518, at \*5; *see also Walton v. Lee*, 2019 WL 1437912, at \*6 (S.D.N.Y. Mar. 29, 2019) ("The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement.")

In this case, the facts surrounding Officer Lopez's use of pepper spray on plaintiff are undisputed, and the incident is clearly depicted on the video footage submitted by defendants, Saavedra Decl. Ex. C, which shows that: (1) plaintiff actively resisted efforts to deliver her to the intake holding cell, first by struggling as she was half-carried, half-dragged towards the door of the cell, [19] and then by twisting out of the officers' grip and anchoring herself to the leg of a large metal table; (2) plaintiff continued to disobey as the officers made efforts to obtain compliance without force [20]; and (3) after giving plaintiff what appeared to be a last warning, Officer Lopez delivered two short bursts of chemical spray towards plaintiff from at least six feet away. Even after being sprayed, plaintiff did not move. Several minutes later, it took a group of five officers to hold onto plaintiff while lifting the entire table up and out of her grip. Under these circumstances, the use of pepper spray was both justified – because "the subject was not cooperating with law enforcement," *Walton*, 2019 WL 1437912, at \*6 – and proportional. *See Kopy v. Howard*, 2010 WL 3808677, at \*3 (N.D.N.Y. Aug. 11, 2010) (correction officer was entitled to use pepper spray on detainee to "forcibly move[ ]" him after he "refused several direct orders to return to his cell"), *report and recommendation adopted,* 2010 WL 3807166 (N.D.N.Y. Sept. 21, 2010). [21] Moreover, although plaintiff complained

of burning eyes – treated later that day – she suffered no "long lasting injury" from the spray. *Walton*, 2019 WL 1437912, at \*6.

**\*14** Since no reasonable jury could find Officer Lopez's conduct "objectively unreasonable," *Kingsley*, 576 U.S. at 397, plaintiff's excessive force claim, to the extent arising from the use of pepper spray on her, must fail. *See Kopy*, 2010 WL 3807166, at \*1 (granting summary judgment to officer who used pepper spray to force detainee to return to his cell); *Casiano v. Ashley*, WL 281460, at \*4 (W.D.N.Y. Jan. 28, 2021) (granting summary judgment to deputies who used physical force, including pepper spray to the face, after plaintiff disobeyed orders to remove her clothing for a strip search and then refused to place both hands behind her back); *Quinones v. Rollison*, 2020 WL 6420181, at \*4 (S.D.N.Y. Nov. 1, 2020) (granting summary judgment to Rikers Island CO who used pepper spray to break up a fight between two prisoners after they disregarded his orders to stop); *Walton*, 2019 WL 1437912, at \*5-6 (granting summary judgment to Rikers Island CO who used pepper spray to "subdue" a detainee who "rushed past officers" when they opened his cell door and "continued to advance away from them").

Even assuming that Lopez used excessive force when he sprayed plaintiff, he would be entitled to qualified immunity as to this incident, because "there is no clearly established law forbidding [the] use [of pepper spray] against individuals who refuse to comply with officer instructions after a warning." *Taylor v. Nieves*, 2020 WL 7028907, at \*3 (S.D.N.Y. Nov. 30, 2020) (granting summary judgment, on qualified immunity grounds, to COs who sprayed plaintiff twice after he left his cell against instructions and after the COs' initial efforts "to cajole Taylor to return to his cell were ineffective"). *See also Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (affirming grant of summary judgment, on qualified immunity grounds, to police officer who used pepper spray to subdue a suspect who "refused to comply with the instructions to place her hands behind her back for handcuffing").

Plaintiff alleges that, after she was pepper-sprayed, separated from the table leg, and placed on the stretcher, she was assaulted again, this time by three or four officers who gratuitously punched her in her face and chest. Pl. Dep. Tr. at 73:9-21, 75:2-5. It is possible that Officers Lopez and Rothwell were among the group that remained with plaintiff after she was placed on the stretcher and restrained. [22] That possibility, however, is insufficient to defeat summary judgment as to this alleged incident. As noted above, plaintiff

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 348 of 427

could not be sure of *any* of the officers who remained with her for this episode, much less identify those who punched her. Def. Rule 56.1 St. ¶ 18; Pl. Dep. Tr. at 74:16-21. Thus, even assuming that her assertions are truthful, she has offered no evidence that COs Rothwell and Lopez, "as opposed to one of the other officers," punched her or otherwise used excessive force on her once she was on the stretcher. *McGrier v. City of New York*, 2019 WL 1115053, at *10 (S.D.N.Y. Mar. 11, 2019) (granting summary judgment to Officer Robles, who was part of a six-officer team that allegedly punched and kicked plaintiff while he was handcuffed during a cell extraction, because plaintiff "failed to offer *any* facts tending to show that it was Robles who punched or kicked him while he was handcuffed, other than Robles's presence at the scene") (emphasis in the original), *aff'd,* 849 F. App'x 268 (2d Cir. 2021); *Gutierrez v. New York*, 2021 WL 681238, at *6 (E.D.N.Y. Feb. 22, 2021) (granting summary judgment to three of the defendant police officers because, although it was "likely" they were involved in the arrest of a group of alleged robbers or the ensuring investigation, "there is no evidence that they participated in, and were therefore personally involved with, Plaintiff's arrest"). In the absence of any admissible evidence showing that Rothwell and Lopez were present for *and* personally participated in this alleged assault, plaintiff cannot maintain an excessive force claim against either of them with respect to any of the morning incidents in the intake unit.

### b) The GMDC Clinic

**\*15** For the same reason, plaintiff cannot maintain an excessive force claim against Rothwell and Lopez for beating her in the hallway of the GMDC clinic. By her own admission, plaintiff kept her eyes closed during this alleged attack, Pl. Dep. Tr. at 79:3-13, and there is no video footage of any such incident. Absent some admissible evidence showing that Rothwell and Lopez personally participated in this alleged assault, they are entitled to summary judgment. *McGrier*, 2019 WL 1115053, at *10.

Summary judgment would be inappropriate, however, with respect to the alleged assault in the clinic bathroom. As to this incident, plaintiff clearly identified Rothwell and Lopez as the officers who – in her telling – came inside the bathroom when she was washing her face and started hitting and kicking her. Pl. Dep. Tr. at 76:18-22 ("they both started kicking me real hard"), 80:4-6 (Rothwell "started kicking me and him and Lopez ... drug me to the mental health part [where] there [are]

no cameras"), 82:8-9 ("Lopez and Rothwell came and beat me up in the bathroom").

Defendants urge the Court to grant summary judgment as to this alleged incident because plaintiff's allegations are "fanciful" and "directly contradicted by the medical records" of her next clinic visit, "which show that plaintiff did not have any visible injuries." Def. Mem. at 13. Defendants primarily rely on *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), an excessive force case in which the Court of Appeals affirmed the grant of summary judgment against a plaintiff who "relie[d] almost exclusively on his own testimony, much of which [was] contradictory and incomplete," and *Shabazz,* 994 F. Supp. at 468-71, another excessive force case, in which then-District Judge Sotomayor granted summary judgment after noting the absence of any corroborating evidence in the record and highlighting the many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits. In both of those cases, however, the plaintiffs repeatedly contradicted themselves as to the basic facts of their claims, including both the way in which they were injured and the nature of their injuries.[23] Here, although plaintiff's allegations are both uncorroborated and inconsistent with the clinic's medical records (to the extent those records report that she had "no visible injuries" later that same morning, Saavedra Decl. Ex. B, at ECF pages 23-24, and only minor injuries that evening, after the cell extraction, *id*. at ECF pages 19-20), her own account has largely been consistent, beginning when she told PA Ndayishimiye that she was injured in an "attack by staff," *id.*, and she has clearly identified Rothwell and Lopez as her alleged assailants, explaining that she opened her eyes before she made her way to the bathroom. Pl. Dep. Tr. at 79:14-17. Moreover, there is no evidence directly contradicting her account of the assault itself. There was no video, and defendants did not submit any testimony from Rothwell, Lopez, or clinic personnel. *Cf. Jeffries*, 426 F.2d at 551-53 (summarizing contrary testimony of police officer defendants and medical expert).

**\*16** On this record, I cannot recommend that plaintiff's claims as to the alleged assault in the clinic bathroom be dismissed on summary judgment. In *Nielsen v. Rabin*, 746 F.3d 58 (2d Cir. 2014), the Court of Appeals held that the District Judge erred in relying on the contents of medical records (the accuracy of which was disputed) to deny leave to amend to a *pro se* plaintiff who sued two emergency room doctors for failing to properly diagnose and treat serious injuries that he claimed to have sustained during his arrest.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.   11

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 349 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

"In doing so," the appellate court explained, the trial court "inappropriately resolved questions of fact." *id.* at 63, because "[t]he medical records' description of his complaints is only the defendants' version of the events." *Id.* at 63 n.4. "By assuming that the records are true where they contradict the allegations in the complaint, the dissent turns the Rule 12(b)(6) standard on its head." *Id.*

Here, of course, the standard is supplied by Rule 56, which also prohibits the court – except in the "rare circumstances" presented in *Jeffries*, 426 F.3d at 554 – from weighing the evidence or assessing the credibility of witnesses. In an ordinary case, such as this one, those determinations "are within the sole province of the jury." *Frost*, 980 F.3d at 245-46 (characterizing *Jeffries* as a "narrow exception" to the rule against weighing the evidence on summary judgment and holding that although there were many reasons to be skeptical of a bare-bones declaration from a recanting witness, the district court "erred both in discrediting Vega's declaration at the summary judgment stage and in dismissing Frost's due process claim as a result"); *see also Gutierrez*, 2021 WL 681238, at *4 (although "[p]laintiff's version of events" was implausible, in that it conflicted with the records submitted by defendants, court declined to "discredit" that version on summary judgment, because plaintiff did not "sufficiently contradict[ ] himself to render [his] testimony incredible"); *Jeanty v. City of Utica*, 2021 WL 149051, at *22 (N.D.N.Y. Jan. 14, 2021) (denying summary judgment to police officer who allegedly fabricated evidence where plaintiff's account was "not 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit' his testimony" (quoting *Jeffreys*, 426 F.3d at 551)), *adhered to on reconsideration*, 2021 WL 2525061 (N.D.N.Y. Apr. 15, 2021).

Construing the evidence in the light most favorable to plaintiff, as I must, I conclude that although her account of the alleged assault in the clinic bathroom and her resulting injuries is materially inconsistent with the Rikers Island medical records submitted by defendants, her testimony – which is not otherwise contradicted by any of defendants' evidence – is neither internally self-contradictory nor inherently so far-fetched as to be "beyond belief," *Shabazz*, 994 F. Supp. at 470, as a matter of law. Moreover, if the attack occurred as plaintiff claims, and produced some or all of the injuries she describes, a rational juror could find that COs Rothwell and Lopez deliberately used a degree of force that was "objectively unreasonable" under the circumstances. *Kingsley*, 576 U.S. at 395-97. In my view, therefore, summary

judgment should not be granted to these defendants as to the incident in the clinic bathroom.

*c) The Intake Unit – Afternoon Cell Extraction*

Because plaintiff admits that Rothwell and Lopez were not present during the cell extraction after plaintiff was returned to the intake unit, her excessive force claims against them arising from this incident should be dismissed. *Univ. Calvary Church*, 2000 WL 1538019, at *4.

**2. Deliberate Indifference**

Officers Rothwell and Lopez cannot be liable to plaintiff for denying her adequate medical care during the morning of July 17, 2015, because they delivered her to the GMDC clinic after the morning incident in the intake unit (and then again, according to plaintiff, after the alleged assault in the clinic bathroom). *See* Pl. Dep. Tr. at 82:14-19. To be sure, plaintiff complains that the clinic staff "gave me half ass medical attention where they only did my vitals," and failed to record her injuries accurately, *id.* at 80: 13-24. However, since she does not allege (much less submit any evidence demonstrating) that Rothwell or Lopez had any personal involvement in directing her medical care or influencing the preparation of her medical records, they cannot be liable in damages for any substandard medical care by the clinic staff.

**\*17** Plaintiff was taken to the clinic again a few hours later, after the afternoon cell extraction. Even if she were not given prompt treatment, however, Rothwell and Lopez could not be liable on a deliberate indifference theory in relation to that incident, because it is undisputed that they were not present for the extraction, and thus could not have known that she needed additional medical attention. *Darnell*, 849 F.3d at 33. The same is true with respect to plaintiff's claims that she was denied adequate medical attention after she was transferred to AMKC. Since there is no evidence that Rothwell and Lopez ever "interacted" with plaintiff at AMKC, much less that they played some role in denying her medical attention, plaintiff's deliberate indifference claim should be dismissed against these defendants in its entirety. *Lara-Grimaldi*, 2018 WL 1626348, at *11; *see also Simpson*, 159 F. Supp. 3d at 444.

### 3. Retaliation

Plaintiff's retaliation claims should also be dismissed as against Rothwell and Lopez. There is no suggestion in the evidentiary record that plaintiff filed any grievances against these two officers (or complained about them to Prisoner's Rights), nor that they were aware of her complaints about Officer Ambrose. As to COs Rothwell and Lopez, therefore, plaintiff has presented no evidence as to two of the three necessary elements of a retaliation claim: (relevant) protected speech or conduct and a causal connection between the protected speech or conduct and the adverse action of which she complains. *Dolan*, 794 F.3d at 294; *Espinal*, 558 F.3d at 129.

### 4. Equal Protection, NYSHRL, and NYCHRL

Finally, COs Rothwell and Lopez are entitled to summary judgment on plaintiff's equal protection and state law discrimination claims, because there is no evidence in the record that either of these defendants harbored a discriminatory motive relating to plaintiff's sex, gender, or sexual orientation, nor that they treated plaintiff "differently than others similarly situated" on that basis. *Phillips*, 408 F.3d at 129; *see also Bradshaw v. Hernandez*, 788 F. App'x 756, 759 (2d Cir. 2019) (summary order) (affirming that "conclusory allegations ... do not support an Equal Protection claim" where the plaintiff has no "competent evidence that any of the individual defendants were motivated by ... discrimination").

### C. The Supervisory Defendants

Plaintiff does not so much as mention the Supervisory Defendants in her deposition, nor in any of the papers she submitted in opposition to summary judgment. Her claims against them may therefore be deemed abandoned. *See Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 418 (S.D.N.Y. 2012) (claim deemed abandoned where plaintiff failed to address it "in either of his affidavits in response to Defendants' motions for summary judgment").

Even if plaintiff did not intend to abandon her claims against the Supervisory Defendants, those claims would be subject to dismissal because there is no evidence, anywhere in the record, showing that former Commissioner Ponte, former Chief of Department Murphy, or former Deputy

Commission Blake was personally involved in the alleged use of excessive force by COs Rothwell and Lopez in the clinic bathroom on July 17, 2015. *See Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) ("[F]or a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). Nor, for that matter, is there any evidence showing that they were personally involved in any of the other constitutional violations alleged against the CO Defendants. The lack of such evidence is fatal, because every constitutional violation "must be established against the supervisory official directly," based on "what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). The Supervisory Defendants are therefore entitled to summary judgment on all of plaintiff's claims.

### D. Municipal Liability

**\*18** *Monell* liability, like supervisory liability, requires an underlying constitutional or statutory violation by a human officer. *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). It also requires proof that the underlying violation "was caused by an official municipal policy or custom." *Frost*, 980 F.3d at 257. "Where a plaintiff can show only 'misbehaving officers,' ... but has not offered proof of an official policy that led to the constitutional or statutory violation, his claim must fail." *Adilovic v. Cty. of Westchester*, 2011 WL 2893101, at \*8 (S.D.N.Y. July 14, 2011) (*Turpin v. Mailet,* 619 F.2d 196, 203 (2d Cir. 1980)).

Here, as in *Adilovic*, "the record contains no evidence of an official policy authorizing, sanctioning, encouraging, or promoting the use of excessive force against inmates." *Id.* Nor has plaintiff made any effort (beyond the allegations in her Amended Complaint) to posit the existence of such a policy. The City is therefore entitled to summary judgment on all of plaintiff's claims. *Id.* (in the absence of any evidence of a municipal policy or custom, "even if Adilovic's claims rose to the level of a constitutional violation, they indicate only 'a single incident of unconstitutional activity [which] is not sufficient to impose liability under *Monell*.'" (quoting *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 841 (1985))).

### IV. CONCLUSION

After an assiduous review of the record, which I have construed in the light most favorable to the plaintiff, I have

been unable to identify any triable issue of material fact that could defeat defendants' motion for summary judgment, with the exception of plaintiff's excessive force claim against COs Lopez and Rothwell arising out of the alleged incident in the bathroom of the GMDC medical clinic on the morning of July 17, 2015. Accordingly, I respectfully recommend that defendants' summary judgment motion be GRANTED in favor of individual defendants Ambrose, Ponte, Murphy, and Blake, and the City of New York, on all of plaintiff's claims. As to defendants Lopez and Rothwell, I recommend that the motion be GRANTED IN PART, and that all claims against them be dismissed except for the portion of plaintiff's First Claim seeking damages pursuant to § 1983 for the force that they allegedly used on her in the bathroom of the GMDC clinic.

I further recommend that plaintiff's claims against unserved defendants Black, Cardoza, Debianchi, Hall, Haynie, Kirkland, Lawrence, Monteforte, Saldana, Skepple, and Stevenson be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). *See Zapata v. City of New York*, 502 F.3d 192, 199 (2d Cir. 2007).

The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to the plaintiff.

**NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Kaplan. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3438284

---

**Footnotes**

1    Plaintiff identifies as transgender, Am. Compl. ¶ 54, and has referred to herself throughout this litigation as Ms. Stinson. The Court follows suit. However, while at Rikers Island, plaintiff was housed in units designated for males, including the George Motchan Detention Center (GMDC). On June 22, 2015, the Prisoner's Rights Project of the Legal Aid Society sent an email to the DOC asserting that "Mr. Stinson is a homosexual inmate who reports being subjected to continuous harassment from both inmates and officers" and requesting that plaintiff, who was then housed at GMDC, "be transferred to protective custody in another facility where other gay inmates are housed." (Dkt. No. 107.) The underlying records from Rikers Island consistently refer to plaintiff as "Mr. Stinson."

2    At deposition, plaintiff explained that her complaints had resulted in CO Ambrose being suspended for making "racial comments towards me." Pl. Dep. Tr. at 59:6-24. Plaintiff further testified that on July 16, 2015 (by which time Ambrose had "come off suspension"), he told her that "these things were going to happen on the 17th." *Id.* at 59:9; 65:2-10; *see also* Pl. Decl. at ECF page 3 (plaintiff was "threatened that it would happen by Officer Ambrose" on July 16, 2015). Defendants have neither confirmed nor denied the alleged disciplinary action against CO Ambrose. However, it is undisputed that Ambrose was not present for any of the incidents that took place on July 17, 2015. Def. Rule 56.1 St. ¶ 36; Pl. Dep. Tr. at 99:23-25, 101:19-21.

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

3      The summary judgment record includes video footage (lodged with the Clerk of Court under seal) which clearly captures this incident from two angles.

4      The video footage shows plaintiff being placed on a wheeled stretcher in the intake unit. It also shows plaintiff heaving herself off the stretcher, landing on the floor, being placed back on the stretcher, and then attempting to bite one of the correction officers as they restrain her. The video does not show any officers punching plaintiff in the face (or elsewhere). At deposition, plaintiff testified that defendants "didn't turn in that part of the video." Pl. Dep. Tr. at 77:16-17.

5      There is no video footage of the alleged assaults inside the clinic. Plaintiff explained at deposition that there are "no cameras" in that location, enabling Rothwell and Lopez to "have fun with me." Pl. Dep. Tr. at 78:19-20.

6      The video footage of the cell extraction, which was taken by a member of the extraction team using a handheld video camera, was produced in discovery and initially submitted to the Court in connection with a judicially supervised settlement conference that took place on September 11, 2018. Plaintiff never formally re-submitted the extraction footage in opposition to defendants' summary judgment motion. However, she repeatedly refers to that video in her deposition testimony, stating that the beating she received during the extraction was "on camera," Pl. Dep. Tr. at 85:13, and that "if you look at the video I cooperated with everything they said to do respectfully and you all still beat the shit out of me." *Id.* at 86:9-11; *see also id.* at 108:17-109:8 ("If you look at the video its clear as [to] what they said ... I followed [their] direct orders."). I conclude from this that plaintiff believes that the extraction video is in the record for summary judgment purposes and intends to rely on it in opposition to defendants' motion. Mindful of the "special solicitude" that "should be afforded pro se litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), I have lodged the extraction video with the Clerk of Court under seal and treated it, in accordance with plaintiff's intent, as part of the summary judgment record.

7      The video footage does not show the officers punching or kicking plaintiff's face, choking her, or pulling her hair during the extraction. However, the camera operator did not always have a clear view of plaintiff's head. At deposition, plaintiff stated that "they turned the camera towards my feet while they were beating up my head." Pl. Dep. Tr. at 86:12-13.

8      The July 19 visit was in connection with plaintiff's referral to "MO" (mental health observation) housing. Nurse Practitioner Stephanie English assessed plaintiff with schizoaffective disorder, bipolar type, and antisocial personality disorder, and continued plaintiff's prescriptions for Zoloft and Risperdal. Saavedra Decl. Ex. B, at ECF pages 12-14. At the July 21 visit, plaintiff complained that hot water was splashed on her body as a result of an "inmate-on-inmate fight," but denied that she was injured. *Id.*, at ECF page 8. No blisters were noted. *Id.*, at ECF page 9. The reason for the July 23 visit was another "injury report" resulting from an inmate-on-inmate fight, but plaintiff once again denied that she was injured, "nor assaulted by anyone," and no visible injuries were noted. *Id.* at ECF page 5.

9      This document, like others filed by plaintiff on September 16 and 17, 2019, as exhibits to her "Evidence in Support" submission, is unauthenticated. *See* Pl. Evid. in Supp. at ECF pages 3-7. However, in light of the "special solicitude" due to pro se litigants, *Graham*, 848 F.2d at 344, I have reviewed all of those exhibits and treated them as documentary evidence proffered in opposition to the present summary judgment motion.

10     Plaintiff states that this is because the photographs were "falsified," having actually been taken on October 1, 2015, after the injuries healed. Pl. Evid. in Supp at ECF pages 4-5.

11     The newly named defendants were Amanda Black, Akeem Cardoza, Derek Debianchi, Lawrence Hall, David Haynie, Hope Kirkland, Anthony Lawrence, Trudie Monteforte, Jacob Saldana, Edwin Skepple, and Edwin Stevenson. Am. Compl. ¶ 16.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 353 of 427

Stinson v. City of New York, Not Reported in Fed. Supp. (2021)

12    The Order Lifting Stay (Dkt. No. 63) stated, on page 1: "Plaintiff Stinson is reminded that even though she is proceeding pro se, she must still comply with all of her discovery and other pretrial obligations, including ... her obligation to effect service of process on the individual defendants first named in the Amended Complaint."

13    As relevant here, there are two such reports dated July 17, 2015, corresponding to plaintiff's visits to the GMHC clinic after the morning incident in the main intake unit and the afternoon cell extraction, and consistent with the medical records generated by the clinic and placed into evidence by defendants. Pl. Evid. in Supp. Ex. C, at ECF pages 14, 15. Another report, dated July 21, 2015, corresponds to plaintiff's visit to the AMKC clinic on that date and is consistent with the medical record of that visit placed into evidence by defendants. *Id.* at ECF page 13. The last relevant Injury to Inmate report is dated July 30, 2015, and – as noted above – documents plaintiff's allegation that she "was assaulted by DOC staff on July 17, 2015, causing injury," *id.* at ECF page 12, but also states that she "refused medical services" and that the PA who examined her could detect "no injury" to her head, neck, chest, or abdomen. *Id.*

14    None of the Legal Aid Society communications submitted by plaintiff makes any reference to the events of July 17, 2015.

15    Although the signature line on the fourth page of plaintiff's declaration is missing (Dkt. No. 137) or blank (Dkt. No. 148), plaintiff appears to have signed the first page of each version of the document before a notary public. Mindful of the Court's obligation to read the papers submitted by a *pro se* litigant "liberally," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), I have treated this document as I would a signed and sworn affidavit.

16    I have done so here, carefully reviewing plaintiff's entire deposition transcript, all the pleadings, letters, declarations, and other submissions (sworn and unsworn) that she filed in response to defendants' summary judgment motions, and a series of (unsworn) letters and other submissions that she filed prior to the first summary judgment motion (Dkt. Nos. 58, 59, 92, 93), to determine if there are genuinely contested issues of material fact that defendants have overlooked. I have also looked behind defendants' assertions of uncontested fact, accepting them only if they are supported by citations to admissible evidence. *See Holtz,* 258 F. 3d at 73 (the moving party's "allegations of uncontested fact cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"); *Giannullo,* 322 F.3d at 140 (reversing grant of summary judgment to defendants where "the record does not support certain critical assertions in the defendant's Rule 56.1 statement on which the district court relied"); *Cain,* 182 F. Supp. 3d. at 63 (the court "must be satisfied that the citation to evidence in the record supports the moving party's assertions").

17    Similarly, under the New York State Human Rights Law (NYSHRL) and the New York City Human Rights Law (NYCHRL), a plaintiff must show that the defendant engaged in "discriminatory acts," *Jong-Fwu Lee v Overseas Shipholding Group, Inc.*, 2002 WL 1929490, at *21 (S.D.N.Y. Aug. 21, 2002) (citations omitted), with a "discriminatory motive." *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) ("The plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."); *Tchatat v. City of New York,* 2015 WL 5091197 (S.D.N.Y. Aug. 28, 2015) ("As was the case for Plaintiff's [federal] claim, discriminatory motive is critical to state a claim under the NYCHRL."). The discriminatory motive may be established through evidence that the defendant treated the plaintiff "less well" than others "similarly situated." *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015) (citations omitted).

18    According to plaintiff, the misconduct for which she got Ambrose suspended was "making comments, racial comments towards me while I was on the phone with Prisoner's Rights." Pl. Dep. Tr. at 59:10-12. Plaintiff has not offered any other details about this incident.

19    Although plaintiff's feet were on the ground, she was being pulled toward the holding cell – with difficulty – by two correction officers who held her by the upper arms and, at times, by her shirt.

**Stinson v. City of New York, Not Reported in Fed. Supp. (2021)**

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 354 of 427

Although the video footage is silent, it shows that after Officer Lopez (wearing a mask and holding a cannister) got into position to administer the pepper spray, a senior officer gestured to Lopez to hold off, then walked over to plaintiff, touched her shoulder, and spoke with her for a few moments before walking away and permitting Lopez to proceed.

It could be argued – with the benefit of hindsight – that the officers should have attempted to lift up the table before using the pepper spray. However, that approach also involved considerable physical force, as well as considerable risk to the five officers it took to separate plaintiff (whose legs were not shackled) from the metal table. Moreover, the Court is required to view a claim of excessive force based on "what the officer[s] knew at the time, not with the 20/20 vision of hindsight." *Kingsley,* 576 U.S. at 395-97.

As plaintiff correctly notes, the video footage submitted by defendants ends shortly after she was secured on the stretcher. No punching, gratuitous or otherwise, is visible on the footage that was supplied.

In *Jeffries*, the plaintiff told multiple interviewers that he jumped out of a third-story classroom window, while burglarizing a school, in order to evade police officers who were at the door of the classroom. 426 F.3d at 552. Nine months later, he alleged for the first time that he surrendered to the police but was then beaten and thrown out the window by officers he could not identify or describe. *Id.* at 551. He also alleged, for litigation purposes, that he lost consciousness, although he told the EMTs who responded to the scene, as well as the physician who examined him hours later, that he had not. *Id.* at 553. Similarly, in *Shabazz*, the plaintiff's version of the events in question underwent "at least one significant revision," when he abandoned his allegations that he was beaten "outside the transfer van" and manhandled from that location into the Greenhaven Prison, where he was further abused, and asserted instead "that the beating occurred only *inside* the van." 994 F. Supp. at 470 (emphasis in the original). Moreover, Shabazz "changed his allegations regarding his injuries a number of times during the course of this litigation," several times alleging that he suffered serious physical injuries (uncorroborated by the relevant medical records, which he claimed to be inaccurate), but then testifying, at deposition, that "he suffer[ed] only from 'emotional and psychological scars.' " *Id.* at 469.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1585947
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Craig WASHINGTON and Norka Washington, Plaintiffs,

v.

The CITY OF NEW YORK, Sgt, Thomas Kehrli, Lt. Orsky, Deputy Insp. Salvatore Comodo, Sgt. Donald McMaster, Deputy Chief Joellen Kunkel, Capt. Edward Edwards, Lt. James Scully, Sgt. Robert Dowd, Capt. Pablo Martinez, Lt. Sean Jordan, Sgt. Thomas Rice, Det. Denis O'Sullivan, Chief Charles Campisi, Capt. Kenneth Donovan, Capt. Edward Thompson, And P.O.s John and Jane the N.Y.P.D. individually and in their Official capacities (the names of John and Jane the N.Y .P.D. being Fictitious, as the true names are Presently unknown), Defendants.

No. 05 Civ. 8884(LAP).
|
June 5, 2009.

**Opinion**

[LORETTA A. PRESKA](), District Judge.

**\*1** Plaintiffs Craig and Norka Washington bring this action pursuant to [42 U.S.C. § 1983]() ("[Section 1983]()") and [42 U.S.C. § 1981]() ("[Section 1981]()") alleging discrimination, false arrest, malicious prosecution, and malicious abuse of process in connection with criminal and disciplinary proceedings initiated against Mr. Washington in the summer of 2004. Mr. Washington further alleges illegal employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), [42 U.S.C. § 2000e *et seq.,*]() the New York Human Rights Law ("NYHRL"), [Executive law § 296 *et seq.,*]() and the Administrative Code of New York. Defendants now move for summary judgment on all claims. For the reasons below, the motion is granted with respect to all claims other than Mrs. Washington's claim of false arrest.

I. *BACKGROUND*

A. *The July 10, 2004 Incident*
Mr. Washington began working as a detective for the New York Police Department ("NYPD") in 1985. (Plaintiffs' 56.1 Statement of Material Facts in Dispute, ("Pl. 56.1 Stmt."), ¶ 2.) On July 10, 2004, non-party Iris Suarez telephoned the NYPD Internal Affairs Bureau ("IAB") and reported that Mr. Washington, who Suarez described as her "boyfriend", had assaulted her. (*See id.* at ¶ 6; Declaration of Isaac Klepfish in Support of Mo tion of Defendants for Summary Judgment, sworn to July 11, 2008 ("Klepfish Decl.") Ex. L ¶¶ 2, 4.). Because the alleged misconduct involved a police officer, Defendant Captain Edward Edwards, along with members of the Bronx Investigations Unit, interviewed Suarez. (Pl. 56.1 Stmt. at ¶¶ 10-11; Klepfish Decl. Ex. L ¶ 4.) Suarez said that two days earlier, a verbal dispute with Mr. Washington culminated in a physical altercation in which he threw her on the ground and stomped on her left calf, causing bruising. (Klepfish Decl. Ex. L ¶ 4.) [1] Mr. Washington admits that he met with Suarez on the day of the alleged assault, but denies her other allegations. (Pl. 56.1 Stmt ¶¶ 12-14.)

After Suarez's interview, Deputy Chief Joellen Kunkel suspended Mr. Washington from active duty. (Pl. 56.1 Stmt. ¶ 15.) At the time of his suspension, Mr. Washington surrendered his firearms, one of which he was later found to have kept in an unsecure location within a cardboard box in his automobile. (*Id.* at ¶ 17; Klepfish Decl. Exs. L ¶ 6, Z at 3). [2]

B. *The July 20, 2004 Incident*
On July 17, 2004, Mr. Washington filed a complaint with the NYPD alleging that Suarez was harassing him. (Affirmation of Counsel Walker G. Harman, Jr. in Opposition to Summary Judgment, sworn to August 22, 2008 ("Harman Aff."), Ex. A, Deposition of Craig Washington, taken February 7, 2008, ("C. Washington Dep."), 44:4-46:12.) Three days later, on July 20, 2004, Mr. and Mrs. Washington returned home to find Suarez waiting for them. (Klepfish Decl. Ex. O.) The Washingtons called 911, and two police officers soon arrived on the scene, followed by Defendant Sergeant Thomas McMaster. (*Id.*) Defendants contend, and Plaintiffs deny, that McMaster ordered Mr. Washington to accompany him to the police station to be interviewed but Mr. Washington angrily refused to comply. [3] (Pl. 56.1 Stmt. ¶ 20.)

i. *Mrs. Washington's Alleged Detention*
**\*2** Mr. Washington subsequently drove Mrs. Washington and their two-year-old son to the police station, where they remained for approximately eight hours. (Klepfish Decl. Ex. B., Deposition of Norka Washington, taken February 7,

2008, ("N. Washington Dep."), 6:13-7-8, 23:5-6; 26:18-27:1.) Mrs. Washington testified that she and her son were held in a separate room and although she repeatedly asked to leave, Sergeant McMaster and other officers yelled at her and refused to let her go. (N. Washington Dep., 4:21-5:19, 26:15-27:7.) Several officers interviewed Mrs. Washington for approximately one hour about the afternoon incident with Suarez. (*Id.* 6:1-7:24; 20:15-16.) Mrs. Washington and her son left when Mr. Washington's interview had been completed. (*Id.* 23:9-13.)

ii. *Suarez's Allegations and Washington's Arrest*
Defendant Captain Pablo Martinez and members of the Bronx Investigations Unit also questioned Suarez at the station house on July 20, 2004. (Pl. 56.1 Stmt., ¶ 21.) Suarez said she had been romantically involved with Mr. Washington and that he had lived with her family in June of 2004. (*See Id.* ¶ 25; Klepfish Decl. Ex. O, ¶ 4.) Suarez stated that her nine-year-old daughter, Alexis Wray, told Suarez that morning that Mr. Washington had sexually molested her when he stayed with them. (Pl. 56.1 Stmt. ¶ 22.) Specifically, Suarez said Alexis told her that Mr. Washington had touched her vagina while she slept. (*Id.* ¶ 23.)

Because of the serious nature of Suarez's allegations of sexual abuse, further investigation of the matter was referred to IAB and the Bronx Special Victims Squad ("SVU"). (*Id.* ¶ 24.) When interviewed by IAB and SVU, Suarez again asserted that Mr. Washington had sexually assaulted her daughter. (*Id.* ¶ 26.) IAB, SVU, and the Bronx County Assistant District Attorney's ("DA's") Office then scheduled a joint interview of Suarez and her daughter Alexis at the Montefiore Hospital on July 21, 2004. (*Id.* ¶¶ 27-31.) They also arranged for Alexis to be medically examined by Dr. Olga Jimenez. (*Id.* SI 29.) Both During the joint interview and when questioned by Dr. Jimenez, Alexis said Mr. Washington had lived with her mother and that during that time he had entered her bedroom and pretended to tuck her in while instead inserting his finger in her vagina. (Kerhli Dep. 57:14-22; Pl. 56.1 Stmt. ¶ 31.)

After the joint interview and medical examination, the Bronx District Attorney and the Head of IAB authorized Mr. Washington's arrest. (Pl. 56.1 Stmt. ¶ 32.)

C. *Procedural Background*

i. *Criminal Proceedings*

Mr. Washington was arrested on July 21, 2004 and charged with Sexual Abuse in the First Degree and Endangering the Welfare of a Child. (*Id.* ¶ 34.) He was also charged with Assault in the Third Degree and Harassment in the Second Degree in connection with the July 10, 2004 incident. (*Id.* ¶ 35.)

On August 19, 2004, Bronx Assistant District Attorney Michael O'Sullivan sought a grand jury indictment on the sexual misconduct charges. (*Id.* ¶ 40.) At the hearing, Mr. Washington's attorney introduced numerous taped messages Suarez had left on Mr. Washington's cell phone. (*Id.* ¶ 41.) In these recordings, Suarez variously asked for money, insulted and said she would contact Mrs. Washington, and threatened to fabricate charges against Mr. Washington. (*See* Klepfish Decl. Ex. Z at 4-5; Pl. 56.1 Stmt. ¶ 40.) Plaintiffs admit that neither IAB investigator Kehrli nor the DA knew about these tapes before Washington's attorney presented them to the grand jury. (Pl. 56.1 Stmt. ¶ 41.)

**\*3** On August 20, 2004, the grand jury voted no true bill on the sexual misconduct charges, which the DA's Office then dropped. (*Id.* ¶ 42.) The DA's Office dropped the remaining assault charges relating to the July 10, 2004 incident shortly thereafter. (*Id.* ¶ 43.)

ii. *NYPD Disciplinary Proceedings*
Mr. Washington was resuspended on or about the time he was arrested on the sexual misconduct and assault charges described above. [4] (*Id.* ¶ 37.) Two days after his arrest, the NYPD issued a set of Departmental Charges and Specifications charging him with (1) sexual assault on a nine-year old girl and (2) being discourteous to a superior officer in connection with the July 20, 2004 incident. (*Id.* ¶ 38.)

In mid-November of 2004, two months after the DA's Office dropped all criminal charges, the NYPD issued a second set of Departmental Charges and Specifications against Mr. Washington alleging that: (1) in June of 2004, he tried to give his firearm to Suarez, and said "you are ruining my life anyway, so kill me", (2) on July 8 of 2004, he had pushed or thrown Suarez down the stairs, (3) he pushed or threw Suarez in front of her young children, and (4) on July 10, 2004, he failed properly to safeguard his firearm. (Pl. 56.1 Stmt. ¶ 49; Klepfish Decl. Ex. Z at 2.)

On February 4, 2005, non-party David Green, the NYPD advocate, determined that he would not prosecute the sexual

misconduct and assault charges because IAB investigators, the DA's Office, and the advocate's office found them to be "unsubstantiated." (*See* Klepfish Decl. Ex. Z at 2, 8; Pl. 56.1 Stmt. ¶ 50, Harman Aff. Ex. C, Deposition of Thomas Kehrli, taken March 4, 2008, ("Kehrli Dep."), 94:17-95:6.) At a May 24, 2005 hearing on all Charges and Specifications against Mr. Washington before non-party John Grappone, Assistant Deputy Commissioner of Trials, Green formally moved to dismiss the assault and sexual misconduct charges. (*See* Pl. 56.1 Stmt. ¶ 52; Klepfish Decl. Ex. Z at 2-3.) Mr. Washington then pleaded guilty to the charge of improperly safeguarding his firearm, (*See* Pl. 56.1 Stmt. ¶ 53; Klepfish Decl. Ex. Z at 3), and the parties proceeded to trial on the remaining charge of discourteous conduct to a superior officer (asserted in the first set of Charges and Specifications issued in July).

Grappone issued a decision on August 23, 2005 dismissing the sexual misconduct and assault charges and finding Mr. Washington guilty of the firearm charge and of discourteous conduct. (Pl. 56.1 Stmt. ¶ 55; Klepfish Decl. Ex. Z at 1, 3.) Grappone recommended that Mr. Washington forfeit the forty-four days he previously served on suspension. (Pl. 56.1 Stmt. ¶ 56; Klepfish Decl. Ex. Z at 19.) NYPD Commissioner Raymond Kelley adopted Grappone's recommendation on September 23, 2005. (Pl. 56.1 Stmt. ¶ 57; Klepfish Decl. Ex. Z at 19.)

Mr. Washington remained on modified assignment until he filed for retirement on November 30, 2005. (C. Washington Dep. 72:16-19.) He alleges that because he retired while on modified assignment, his pension was reduced. (Second Amended Complaint ("Compl.") ¶ 40.)

### iii. *Mr. Washington's EEOC Charges*

 **\*4**  On January 20, 2004, nearly six months prior to the July 10, 2004 incident, Mr. Washington filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Sergeant Kevin O'Konnor the NYPD discriminated against him because he is African American by refusing to allow Mr. Washington to be promoted to a different unit. (Pl. 56.1 Stmt. ¶¶ 63-64.) Mr. Washington named none of the Defendants in the instant action in his 2004 EEOC filing. (*Id.* ¶ 65.)

More than a year later on April 25, 2005, Mr. Washington filed another charge of discrimination with the EEOC alleging that several of the Defendants unlawfully retaliated against him by filing criminal and departmental charges against him.[5]

(Klepfish Decl. Ex. DD; *see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp.Mem.") at 5.)

### iv. *The Instant Suit*

Plaintiffs initiated this action on October 19, 2005, and now bring nine claims against the City of New York and individual officers who were allegedly involved in Mr. Washington's arrest and the attendant disciplinary proceedings. In Counts I, II, and IV, both Plaintiffs assert claims under Section 1983 for general deprivation of federal rights, false arrest, and malicious abuse of process. Count V alleges that the City of New York's "customs, policies, usages, practices, and procedures" violated their constitutional rights. (Compl.¶ 75.) Mr. Washington alone asserts Count III alleging malicious prosecution in violation of Section 1983, Counts VI, VIII, and IX alleging retaliation in violation of Title VII, the NYHRL and the Administrative Code, and Count VII alleging racially motivated deprivation of his rights in violation of Section 1981.

## II. *DISCUSSION*

### A. *Summary Judgment Standard*

Defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. Proc. 56(c)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Overton v. New York. State Div. of Military and Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004).

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002). As movants, Defendants bear the initial burden of providing the basis for the motion and identifying the evidentiary materials, if any, supporting their position. *See Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 559 (2d Cir.1997.) Plaintiffs must then "come forward with specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e). Mere speculation and conjecture will not suffice. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.,* 315 F.3d 171, 175 (2d Cir.2002).

B. *Analysis*

i. *Mr. Washington's Claims*

**\*5** Mr. Washington makes virtually no effort to preserve any of his claims other than his retaliation claim.[6] Therefore, Defendants' motion will be granted with respect to his false arrest, malicious prosecution, abuse of process, and discrimination claims so long as they have met their threshold burden of production. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 241 (2d Cir.2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.")

a. *False Arrest*

Mr. Washington cannot prevail on his false arrest claim if Defendants show they had probable cause to arrest him. *See DevenPeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Jaegly v. Couch,* 439 F.3d 149, 151-54 (2d Cir.2004) (probable cause is an absolute defense to a false arrest claim under Section 1983); *see also Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003) (same). An officer has probable cause to arrest when "he or she has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Jaegly,* 439 F.3d at 152 (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).

Here, Defendants have produced ample undisputed evidence demonstrating probable cause for Mr. Washington's arrest on charges of assault and sexual misconduct based not only on IAB and DA interviews with Suarez but also on an interview and medical examination of her daughter, who said that Mr. Washington had molested her. (*See* Kehrli Dep. 51:7-22, 52:10-53:11, 56:5-58:16; Klepfish Decl. Ex. O). The fact that these charges were later dropped does not negate the existence of probable cause at the time of the arrest, particularly given that, as Mr. Washington concedes, neither the DA nor IAB knew about the exculpatory cell phone tapes before they were played to the grand jury. *See Smith v. Ortiz,* 2006 U.S. Dist. LEXIS 34153, \*12, 2006 WL 1458404 (S.D.N.Y.2006)

(subsequent acquittal does not negate validity of arrest); (Pl. 56.1 Stmt. ¶ 41).

Furthermore, even if the Defendant Officers lacked probable cause to arrest Mr. Washington, they are entitled to qualified immunity if they had "arguable probable cause to arrest" him. *Guerrero v. Scarazzini,* No. 06-5016-cv, 2008 U.S.App. LEXIS 8785, at \*4, 2008 WL 1817245 (2d Cir. Feb. 23, 2008). Defendants had arguable probable cause if (i) it was objectively reasonable to believe there was probable cause to arrest Mr. Washington or (ii) officers of reasonable competence could disagree as to whether the probable cause test was met. *Id.* Here, Plaintiff does not contest that the IAB and DA interviews gave probable cause, much less arguable probable cause, to arrest Mr. Washington. Accordingly, Defendants' motion for summary judgment is granted with respect to Mr. Washington's false arrest claim.

b. *Malicious Prosecution*

**\*6** Mr. Washington's malicious prosecution claim must also fail. It is well-settled that the existence of probable cause supporting an arrest "precludes plaintiffs from establishing a malicious prosecution claim unless they can point to facts uncovered after the arrest that negated that probable cause by making apparent the 'groundless nature of the charges.' " *Rodriguez v. City of New York,* 535 F.Supp.2d 436, 443 (S.D.N.Y.2008) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996). As discussed above, Defendants have supplied uncontested evidence of probable cause supporting Mr. Washington's arrest. Furthermore, Plaintiff does not deny that the DA dropped the sexual misconduct charges upon hearing the tapes calling Suarez's credibility into question and the assault charges stemming from Suarez's July 10 allegations shortly thereafter. (Pl. 56.1 Stmt. ¶¶ 42-43.) Defendant's motion for summary judgment with respect to Mr. Washington's malicious prosecution claim is therefore granted.

c. *Malicious Abuse of Process*

Mr. Washington asserts that his arrest and abortive prosecution constitute malicious abuse of process in violation of Section 1983. To establish such a claim, he must show that the Defendants "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Here, Defendants have introduced evidence

that Mr. Washington was arrested and charged pursuant to an investigation into serious allegations against him by civilian non-parties. Mr. Washington has provided neither facts nor argument beyond the general and conclusory allegations in his Complaint to support his claim that Defendants arrested him without justification to achieve an illegitimate objective. (*See* Compl. ¶¶ 67-70.) Accordingly, this claim fails as a matter of law. *See Mohawk Power,* 315 F.3d 171, 175 (2d Cir.2002) (conclusory assertions do not create an issue of fact for trial).

#### d. *Discrimination*

Defendants are also entitled to summary judgment on Mr. Washington's direct race discrimination claims under Section 1981 and Title VII because he has not established a *prima facie* case of discrimination and, even if he had, they have introduced non-discriminatory reasons for the allegedly discriminatory behavior which Mr. Washington has not shown to be pretextual. To establish a *prima facie* case of employment discrimination, Mr. Washington must show that (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action, and (iv) the circumstances of the adverse action "give rise to an inference of discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). Should he succeed, the burden shifts to the Defendants to "to articulate a legitimate, non-discriminatory reason for the adverse action." *Id.* If Defendants meet this burden, they are entitled to summary judgment unless Mr. Washington can show that the Defendants' non-discriminatory explanation is merely a pretext for discrimination. *Mario v. P & C Food Mkts.,* 313 F.3d 758, 767 (2d Cir.2002); *Cedeno v. N.Y. City Transit Auth.,* No. 01-9049, 2002 U.S.App. LEXIS 23106, at *3 (2d Cir. November 5, 2002); *see also Bickerstaff v. Vassar College,* 354 F.Supp.2d 276, 280n.2 (2d Cir.2004) (noting that Title VII and Section 1981 claims "are analyzed under the same framework").

**\*7** Here, Mr. Washington has not shown circumstances giving rise to an inference of discrimination. To the contrary, he flatly concedes that "none of the defendants in this action ever said something to [him] which evidenced animus against [his] race." (Pl. 56.1 Stmt. ¶ 67.) Mr. Washington has offered nothing other than speculation that Defendants' actions were motivated by race-based animus and he has made no serious response to Defendants extensive argument in favor of summary judgment on this point. (*See* Memorandum of Law of City Defendants in Support of Their Motion for Summary Judgment, ("Def.Mem."), at 13-18.); *see also Sharif v. Buck,* No. 04-5789-cv, 2005 U.S.App. LEXIS

22363, *3, 2005 WL 2650070 (2d Cir. Oct. 17, 2005) (no inference of discrimination where plaintiff offered only conclusory allegations to support claim); *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000) (dismissing Section 1983 and Section 1981 claims for inadequate allegations of discriminatory intent).

Furthermore, Mr. Washington has made no attempt to show that the Defendants' non-discriminatory reasons for taking disciplinary action, namely the serious allegations Suarez, a non-party, leveled against him, his admitted failure to properly safeguard his firearm on July 10, 2004, and the finding that he was disrespectful to a superior officer on July 20, 2004, were pretextual. (*See* Def. Mem. at 16-18.) Accordingly, Mr. Washington's direct discrimination claims under Title VII and Section 1981 fail as a matter of law.

#### e. *Retaliation*

Mr. Washington actively opposes the instant motion only with respect to his retaliation claim under Title VII and the NYHRL. To establish a *prima facie* case of retaliation, he must show that (1) he was engaged in a protected activity, (2) Defendants knew of the activity, (3) he suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (citing *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988).[7] As with the direct discrimination claims, should Mr. Washington establish a *prima facie* case of retaliation, the burden shifts to Defendants to provide a legitimate, nondiscriminatory reason for their actions, which he must then show to be pretextual. *Thomas v. S.E.A.L. Security, Inc.,* NO. 04 Civ. 10248, 2007 U.S. Dist. LEXIS 63841, *38, 2007 WL 2446264 (S.D.N.Y. August 30, 2007).

Mr. Washington has not established a *prima facie* case because he has proffered no evidence showing a causal connection between his protected activity and the allegedly retaliatory conduct. He contends that Defendants effectuated his arrest and initiated disciplinary proceedings against him in retaliation for his January 20, 2004 and April 25, 2005 EEOC filings. He argues that the temporal proximity between these filings and his arrest and suspension, standing alone, constitutes sufficient circumstantial evidence to support an inference of causation. (Opp.Mem.7.)

**\*8** This contention is untenable. While courts may infer a causal link in the absence of direct evidence of discrimination where the alleged retaliation occurred shortly after a plaintiff engaged in protected activity, too much time elapsed between Mr. Washington's January 20, 2004 filing and his suspension following Suarez's initial assault complaint in mid-July to warrant such an inference here. *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (dismissing retaliation claim on summary judgment where there was a three-month lapse between the protected activity and the alleged retaliation); *Lewis v. Snow,* No. 01 Civ. 7785, 2003 WL 22077457, at \*8 (S.D.N.Y. Sept.8, 2003) (same). Indeed, Mr. Washington cites only cases in which the adverse action occurred within two to three months of participation in a protected activity. *See Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001) (twenty-day time lapse); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998) (less than two-month time lapse); *Parrish v. Sollecito,* 258 F.Supp.2d 264, 269 (S.D.N.Y.2003) (one to three month lapse); *Santos v. Costco Wholesale, Inc.,* 271 F.Supp.2d 565, 575 (S.D.N.Y.2003) (three-month lapse). Here, however, there is an almost six-month gap between Mr. Washington's initial EEOC filing and his suspension and subsequent arrest.

Mr. Washington's temporal proximity argument with respect to his April 25, 2005 EEOC Charge is even more tenuous. He contends that a causal link may be inferred between the April filing and the decision to keep him on modified assignment until he retired. (Opp. Mem. at 7-8.) However, mere continuation of an adverse employment condition initiated long before the protected activity in question does not, without more, logically support an inference that the protected activity prompted retaliation. *See Chamberlain v. Principi,* No. 06-1291-cv, 2007 U.S.App. LEXIS 21829, at \*6, 2007 WL 2692339 (2d Cir. Sept. 12, 2007) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") (quoting *Slattery v. Swiss Reinsurance Am.,* 248 F.3d 87, 95 (2d Cir.2001)). Here, Mr. Washington was placed on modified assignment more than six months before he filed the April 25,2005 EEOC charge, and there is simply no support for Mr. Washington's conclusion that he continued to be on modified assignment after that time due to retaliation for that filing.[8] Nor, as Defendants observe, is there any evidence that Mr. Washington ever asked to be removed from modified assignment before he retired. (Reply Memorandum of Law of City Defendants in Support of Their Motion for Summary Judgment ("Reply Mem."), at 6.)

Finally, even if Mr. Washington had established a *prima facie* case of retaliation, he has not shown that Defendants' proffered non-discriminatory reasons for his arrest and the disciplinary actions taken against him, already discussed in connection with his direct discrimination claims, are pretextual. (*See* Part II(B) (i)(d).) In this regard, Mr. Washington simply asserts that the IAB did an inadequate investigation of Suarez's allegations before disciplining him.[9] (Opp. Mem. at 9.) However, he does not provide even a conclusory argument as to how the supposedly inadequate investigation was prompted by either of Mr. Washington's EEOC charges, the first of which, as he concedes, named none of the Defendants in this action. (*See* Pl. 56.1 Stmt. ¶ 65.) Accordingly, Mr. Washington's retaliation claim fails as a matter of law.

ii. *Mrs. Washington's claims*

**\*9** Mrs. Washington asserts claims under Section 1983 for false arrest and malicious abuse of process stemming from her alleged detention at the police station immediately following the Washingtons' July 20, 2004 encounter with Suarez. The parties agree that the fundamental question with respect to the false arrest claim is whether Mrs. Washington was taken into custody in violation of her Fourth Amendment right to be free from unreasonable seizure. (Def. Mem. at 23; Opp. Mem. at 11-12.) Resolution of this issue requires determination of "whether a reasonable person in [Mrs. Washington's] position would have understood [her]self to be subjected to the restraints comparable to those associated with a formal arrest." *Hicks v. City of Buffalo,* No. 03-6119, 2004 WL 2616750, at \*2 (2d Cir. Nov.18, 2004) (quoting *United States v. Newton,* 369 F.3d 659, 671 (2d Cir.2004)).

Defendants argue that Mrs. Washington was never taken into custody because she voluntarily accompanied her husband to the station. (Def. Mem. 23; N. Washington Dep., 6:13-7:11). They also rely on Defendant Dowd's deposition testimony that "Mrs. Washington was not under arrest" and "could leave at any time." (Def. Mem. 23; Klepfish Decl. Ex. F, Deposition of Robert Dowd, taken March 8, 2008 ("Dowd Dep."), 43:19-22.) Defendants posit that Mrs. Washington chose to remain at the station until her husband's interview had been completed because she is legally blind and did not want to drive herself home. (Def. Mem. at 23.)

Mrs. Washington does not dispute that she came to the station house with her husband rather than in a police car. However,

she asserts that she was then inexplicably placed in a room alone with her two-year-old son and told not to leave. (N. Washington Dep. 5:10-13). She repeatedly asked to go home, but Defendant McMaster yelled at her and told her to "stay there until I come get you." (*Id.* 5:12-13.) All told, she remained at the station house for more than eight hours. (*Id.* 6:13-7:8, 23:5-6; 26:18-27:7; Opp. Mem. at 3.)

Viewing the evidence in the light most favorable to Mrs. Washington, there is a material factual dispute as to whether a reasonable person in her position would have felt compelled by the authorities to remain in the station house under the circumstances as she describes them. Although Defendants present a compelling argument that she voluntarily awaited her husband's release, her testimony indicates otherwise. Should a jury find her account credible, it might conclude that a reasonable person in Mrs. Washington's position would have felt herself to be restrained in a fashion similar to a formal arrest. Accordingly, Defendants' motion for summary judgment on Mrs. Washington's false arrest claim is denied.

Mrs. Washington also asserts a malicious abuse of process claim. (Compl.¶¶ 67-70.) This claim fails because she has identified no "regularly issued legal process" used against her to obtain any sort of illegitimate collateral objective. *Cook, 41 F.3d at 80.*

### iii. *Joint Municipal Liability Claim*

 **\*10**  Both Plaintiffs assert that under *Monell v. Dep't of Soc. Servs. .,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the City of New York is vicariously liable for the alleged civil rights violations because of the City's unconstitutional "customs, policies, usages, practices, procedures, and rules." (Compl.¶ 73.) However, as Defendants correctly observe, Plaintiffs have not identified any improper action taken against them as a result of an unlawful municipal policy or practice. Accordingly, Defendants' motion is granted with respect to this claim and the City of New York is therefore dismissed from the action. *See Hicks,* 2004 WL 2616750 at \*1 (affirming summary judgment dismissal of *Monell* claim

"[b]ecause the record is here bereft of any unconstitutional custom or practice on the part of the City.")

### iv. *Joint "Deprivation of Federal Civil Rights"*

Although Defendants seek dismissal of all claims, neither party provides substantive argument regarding the "Deprivation of Federal Civil Rights" claim asserted in Count I of the Complaint. (Compl.¶¶ 43-48.) This ill-defined claim alleges generally that Defendants violated Plaintiffs' rights under the "First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution" in violation of Section 1983. (*Id.* ¶ 49.) Such general allegations, without supporting facts other than a clause incorporating an entire complaint by reference, are insufficient to withstand even a motion to dismiss because they do not give "fair notice of what the cl aim is and the grounds upon which it rests." *Sforza v. City of New York,* No. 07cv6122(DLC), 2009 WL 857496, at \*12 (S.D.N.Y. March 31, 2009) (quoting *Liebowitz v. Cornell University,* 445 F.3d 586, 591 (2d Cir.2006). Accordingly, this claim is dismissed. *See Diodati v. City of Little Falls,* No. 6:04-cv-446 (FJS/DEP), 2007 WL 189130 (N.D.N.Y. Jan. 22, 2007) (granting summary judgment dismissing general deprivation of federal rights claim where parties provided no substantive argument regarding the cause of action.)

### III. *CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment [dkt. No. 31] is GRANTED with respect to all claims asserted by Mr. Washington and Mrs. Washington's malicious abuse of process and municipal liability claims. The motion is DENIED with respect to Mrs. Washington's claim of false arrest in violation of Section 1983.

Counsel shall confer and inform the Court by letter no later than June 20 how they propose to proceed.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1585947

---

## Footnotes

1     In their Rule 56.1 statement, Plaintiffs admit that Suarez called IAB to complain about Mr. Washington, (16), but deny that Suarez made an assault allegation on the grounds that "Defendants cite no admissible evidence to support this claim", (¶ 12). However, while Plaintiffs object to the Court's consideration of some police

reports detailing the incident, (Klepfish Decl. Exs. G, H), and to consideration of photographs of Suarez's injured leg, (Klepfish Decl. Ex. K), on the grounds that these materials have not been authenticated, they do not object to Captain Edwards' report, dated July 10, 2004, (Klepfish Decl. Ex. L), which includes a summary of Suarez's statements to IAB investigators and her allegations of assault. (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ("Opp.Mem.") at 13-14.) Furthermore, the police reports are adequately authenticated by the deposition testimony of Defendant Thomas Kehrli, an IAB investigator, who said they were among materials he compiled in his case folder. (*See* Supplemental Declaration of Isaac Klepfish in Support of City Defendants' Motion for Summary Judgment, sworn to Sept. 16, 2008, ("Klepfish Reply Decl."), Ex. HH., Deposition of Thomas Kehrli, taken March 4, 2008, 12:14-13:20.) To the extent that Plaintiffs raise a hearsay objection, the purportedly objectionable material would undoubtedly be admitted at trial as public or business records, and in any event need not be considered for the truth of Suarez's statements but rather to show that she made them. *See Spanierman Gallery v. Merrit,* No. 00-cv5712 (LTS)(THK), 2003 U.S. Dist. LEXIS 22141, at *18-19, 2003 WL 22909160 (S.D.N.Y. Dec. 9, 2003).

2       Here, and in multiple instances throughout their Rule 56.1 Statement, Plaintiffs respond to Defendant's summation of the relevant facts by saying "Admit, but deny to the extent the statement cites to inadmissible evidence." *See, e.g.,* ¶¶ 15, 17, 28-30, 32, 38-39, 49-53, 55-56. The Court declines Plaintiffs' invitation to identify for them the factual statements to which they object. Where this occurs, the statement provided by Defendants is taken as true because Plaintiffs initial response in each instance is "Admit." Furthermore, the documents proffered by Defendant to each statement challenged in this fashion would undoubtedly be admissible at trial as public records or business records.

        Here, for example, Plaintiffs apparently object to consideration of Klepfish Decl. Exhibit Z, a Disciplinary Decision by Assistant Deputy Commissioner of Trials John Grappone dated August 23, 2005, for lack of authentication. (Pl. 56.1 Stmt. ¶ 17; Affirmation of Counsel Walker G. Harman, Jr. in Opposition to Summary Judgment, sworn to August 22, 2008, ("Harman Aff."), ¶ 5.) This document would be admissible at trial under Fed.R.Evid. 803(8)(C) as a public record, for which "the proponent is usually not required to establish ... admissibility through foundation testimony." Jack B. Weinstein & Margaret A Berger, Weinstein's Federal Evidence, § 803.10[2] (2d ed.2009). Furthermore, the document is self-authenticating under Fed.R.Evid. 902(1) as it bears the official seal of the NYPD and the signatures of both Grappone and Police Commissioner Raymond Kelly. *See CA, Inc. v. Simple, Inc.,* No. 02 Civ. 2748(DRH)(MLO), 2009 U.S. Dist. LEXIS 25241, at *263 (E.D.N.Y. March 5, 2009).

3       As discussed in Part I(C)(ii) below, Mr. Washington was subsequently found guilty of being discourteous to Sergeant McMaster in connection with this incident. (Klepfish Decl. Ex. Z, at 17-18.)

4       In all, Mr. Washington was suspended for forty-four days in connection with the July 10 and 20, 2004 incidents, after which he was placed on modified assignment (making him ineligible for overtime work and pay). (*See* C. Washington Dep., 71:1-72:10.)

5       The Second Amended Complaint incorrectly alleges that Washington filed this charge on July 22, 2005. (*Compare* Second Amended Complaint ¶ 41 *with* Opp. Mem. at 5.)

        Oddly, Mr. Washington objects to the Court's consideration of his April 25 EEOC complaint while at the same time, as discussed below, his assertion of unlawful retaliation claim hinges on it. (*See* Harman Decl. ¶ 5.) In any event, Mr. Washington's April 2005 EEOC charge would be admissible at trial as a party admission. Fed.R.Evid. 801(d)(2).

6       Indeed, as Defendants observe, the Conclusion of Plaintiffs' brief in opposition to the instant motion asserts only that:

> "there is sufficient evidence raising triable issues as to whether the disciplinary charges brought against Plaintiff Craig Washington in November 2004 were brought in retaliation for his January 2004 EEOC Charge, whether the refusal to restore Plaintiff Craig Washington to full-duty was carried out in retaliation for Plaintiff Craig Washington's April 2005 EEOC Charge, and whether Plaintiff Norka Washington was detained without the requisite probable cause or reasonable suspicion, pursuant to the Fourth Amendment."

(Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ("Opp.Mem.") at 14-15.

7    The same standard applies to Mr. Washington's NYHRL claims "because New York courts rely on federal law when determining claims under the New York Human Rights law." *Reed,* 95 F.3d 1170, 1177 (citations omitted)

8    In this regard, I note that Mr. Washington has not even alleged that any Defendants knew about either of his EEOC Complaints or even that he ever sought to be taken off of modified assignment.

9    Notably Mr. Washington does not address Defendants' observation that Mr. Washington pleaded guilty to having failed properly to secure his firearm and was found guilty after an evidentiary hearing of being discourteous to Sergeant McMaster. (Def.Mem.22.)

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 149981
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Xiaohui ZHAO-ROYO, Plaintiff,
v.
NEW YORK STATE EDUC. DEP'T, Defendant.

1:14-CV-0935(GTS/CFH)
|
Signed 01/13/2017

**Attorneys and Law Firms**

SOLOMON LAW FIRM, PLLC, 300 Great Oaks Blvd., Suite 313, OF COUNSEL: ARIEL E. SOLOMON, ESQ., Albany, New York 12203, Counsel for Plaintiff.

ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: JUSTIN L. ENGEL, ESQ., Assistant Attorney General, Albany, New York 12224, Counsel for Defendant.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this employment discrimination action filed by Xiaohui Zhao-Royo ("Plaintiff") against the New York State Education Department ("Defendant" or "NYSED"), is Defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 21.) For the reasons set forth below, Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Verified Complaint

Generally, in her Verified Complaint, Plaintiff alleges that, between approximately March 2013 and July 2013, she was subjected to discrimination, retaliation, and a hostile work environment during her employment with NYSED in numerous ways, including, but not limited to, the following: (1) abusive and berating language on a near-daily basis; (2) physical contact (specifically, ripping papers from her hands for no apparent reason); (3) knowingly false accusations of work-related mistakes and reprimands based on those false accusations; (4) attempts to destroy her work by the

intentional deletion of computer files containing information gathered in the course of her duties; (5) rules imposed against her only, including rules limiting her contact with a supervisor to e-mail, due to Plaintiff's accent, national origin, and her efforts to report other instances of discriminatory behavior toward her; (6) a failure by Defendant to take effective action to stop such harassment; and (7) termination of her probationary employment based on a false accusation that she acted in an inappropriate, intimidating, and insubordinate manner toward a male manager on an occasion when she sought to discuss falsehoods contained in her performance evaluation. (*See generally* Dkt. No. 1 [Plf.'s Verified Compl.].)

Based on these allegations, Plaintiff asserts three claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, set forth in a single "Cause of Action": (1) a claim that Defendant[1] discriminated against her on the basis of her race (Asian), national origin (Chinese), and sex; (2) a claim that Defendant subjected her to a hostile work environment on the basis of her race, national origin, and sex; and (3) a claim that Defendant retaliated against her for raising complaints about this discrimination. (*Id.* at ¶¶ 12-101.)

### B. Undisputed Material Facts

**\*2** Unless otherwise noted, the following facts were asserted and supported by Defendant in its statement of material facts and expressly admitted by Plaintiff in her response thereto.[2] (*Compare* Dkt. No. 21, Attach. 2 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 29, Attach. 1 [Plf.'s Rule 7.1 Response].)

Commencement of Plaintiff's Employment

1. Plaintiff was appointed as a Program Research Specialist 2 at salary grade 18 for NYSED, effective August 9, 2012.

2. Plaintiff's appointment was subject to a probationary period of 26 to 52 weeks. As a probationary employee, Plaintiff's services could be terminated at any time after the eighth week of her appointment and during the remainder of the maximum probationary period of 52 weeks.

3. The majority of probationary periods at NYSED last for 52 weeks (one year). Employees who are grade 13 or below and employees who are transferred or promoted are subject to a reduced probationary period of 26 weeks.[3]

**\*3**  4. The probationary period is considered to be the final step in NYSED's recruitment process, and provides an opportunity for both the employer and the employee to determine if the employee is a good fit.

5. Plaintiff was assigned to work in NYSED's Office of Information and Reporting Services ("OIRS"). [4]

6. OIRS is generally responsible for the collection and reporting of educational data for school districts, public schools, charter schools, and nonpublic schools in New York State. OIRS maintains educational data on NYSED's website and responds to data requests made by other departments within NYSED, other government agencies, the public, the legislature, and the media.

7. As a Program Research Specialist 2 in OIRS, Plaintiff was responsible for, among other things, assisting in the conducting of NYSED's data collection, reporting, and analysis activities.

8. Plaintiff's primary job duties were to produce reports on educational data and to respond to requests for educational information.

9. Work within OIRS was generally assigned to staff members (such as Plaintiff) in one of two ways. First, supervisors directly assigned certain requests for information to particular staff members to complete. Second, OIRS maintained a generic e-mail inbox, called Dataquest, which was used to transmit, and respond to, requests for information. Occasionally, staff members also received direct phone calls or e-mails from others within NYSED requesting information.

10. Generally, assignments that came through Dataquest were less comprehensive and complex than those assigned directly by supervisors. [5]

Plaintiff's Work Under Her First Supervisor, Ellen Martin

**\*4**  11. From the date of her appointment on August 9, 2012, until mid-April 2013, Plaintiff was supervised by Ellen Martin ("Martin"), an assistant data director for NYSED. [6]

12. Martin worked closely with Plaintiff during the first six months of Plaintiff's employment; as Martin testified in her deposition, she "mentor[ed]" Plaintiff and gave her work assignments that "were probably much more simple[.]" [7]

13. After the first six months of Plaintiff's employment, Martin began giving Plaintiff "more complex" projects that were to be completed independently. [8]

14. When Martin began assigning Plaintiff more complex projects, she observed deficiencies in Plaintiff's work performance. [9]

**\*5**  15. For example, Plaintiff failed to complete an assignment for the New York State Statistical Yearbook ("Yearbook") that was given to her in March 2013. More specifically, Martin became aware that the work was not being completed when she was contacted by the Yearbook editor and advised that the editor had not received any of the tables that were expected. [10]

16. When Martin questioned Plaintiff about her failure to complete the Yearbook assignment, Plaintiff responded that the deadline had passed and that she made the decision not to complete the work. However, the initial deadline was only a guideline, and the work had to be reassigned to several staff members in order to make up the time lost. [11]

17. In February 2013, Plaintiff was assigned a project related to a request from the National Assessment for Educational Progress ("NAEP"). Plaintiff did not make sufficient progress in completing the project tasks, but rather approached Martin about making changes to the methodology that was being used to handle the project. Ultimately, due to the lack of progress, Martin had to reassign the work to other employees to complete. [12]

18. On several occasions, Plaintiff complained that she was the only employee to be assigned work through Dataquest. However, Dataquest was used to assign work to all staff members. [13]

19. Moreover, Plaintiff increasingly made unreasonable demands on Martin's time. Plaintiff would not be able to disengage even after lengthy conversations, and Martin would tell Plaintiff that she had other tasks to attend to. On several occasions, Martin had to ask Plaintiff to leave her office. [14]

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 366 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

**\*6** 20. Plaintiff also made insulting remarks about Martin and at least one other coworker in Martin's presence. [15]

21. On one occasion, Martin asked Plaintiff to produce e-mail responses to work assignments that were in Plaintiff's Dataquest mailbox in order to show that Plaintiff had acknowledged receipt of those assignments that she was unable to complete right away. In response, Plaintiff told Martin that her reading skills were poor or inadequate (or something of that nature). [16]

22. On another occasion, Plaintiff insulted the intelligence of a coworker in the presence of other staff members. [17]

23. In short, based upon Martin's supervision of Plaintiff, she found that Plaintiff had difficulty accepting directions, did not have a positive working relationship with her co-workers, and was not a team player. [18]

### February-March 2013—Conflicts Between Plaintiff and Her Coworkers

24. Generally, for the first several months of Plaintiff's employment, her interactions with her coworkers were friendly.

25. Around February or March 2013, Plaintiff began having conflicts with certain coworkers. [19]

**\*7** 26. For example, in February 2013, Plaintiff asked Suzanne Holliday ("Holliday"), a calculations clerk, to put Plaintiff on the office calendar for a vacation of several weeks to China. When Holliday informed Plaintiff that Plaintiff needed to speak with her supervisor, Plaintiff stated that she had already been told that she did not have enough vacation time, but that she could, perhaps, take vacation time without pay. Plaintiff stated that she was being treated unfairly because another employee, Adeline Jebaraj, was allowed to take time to go to India, was not as qualified as Plaintiff, and held a "degree [that] was not worth as much." [20]

27. Plaintiff testified that Holliday yelled at her during their interaction and accused her of "digging [for] information."

28. On one occasion in March 2013, Plaintiff had an altercation with Cheryl Mitchell ("Mitchell"), an Education Program Aid for NYSED. More specifically, Plaintiff testified

in her deposition that she approached Mitchell and attempted to ask her clarifying questions about an assignment, and Mitchell became angry and yelled, "You are [a] statistician. I cannot do statistics. Why [do] you ask me?" [21]

29. At some other point in March 2013, Plaintiff and Mitchell had an extended conversation regarding Plaintiff's ideas and how OIRS "didn't do things in the most productive way." During that conversation, Mitchell stated several times that Plaintiff's ideas may be good but that Plaintiff should discuss them with management. [22]

### April 2013—Continuing Conflicts and Plaintiff's Contact With Human Resources Staff

30. On April 1, 2013, Mitchell sent Plaintiff an e-mail message stating that, while she felt that Plaintiff may have some good ideas, Plaintiff needed to address them with her supervisors. Mitchell also indicated that she was not comfortable with Plaintiff stating in any written documentation that she agreed with Plaintiff's ideas. [23]

**\*8** 31. Plaintiff testified in her deposition that she believed that Mitchell's e-mail was intended "to abuse [and] harass [her and] to make trouble."

32. In early April 2013, Plaintiff entered Mitchell's office area and "yelled at" Mitchell "for stealing her ideas and trying to take credit for her work." Mitchell asked Plaintiff to leave her office area, but Plaintiff initially refused. Plaintiff eventually left the third time that Mitchell asked her to leave. [24]

33. Plaintiff testified in her deposition that, during this incident, Mitchell yelled at her, changed subjects by accusing her of giving the wrong information to a customer, and told her to get out of Mitchell's office.

34. Martin was apparently on vacation during this incident. Upon returning from vacation, she was "made aware" by "multiple employees" that Plaintiff and Mitchell had a discussion in Mitchell's office, that the discussion "escalated" and "loud voices" were used, and that Mitchell asked Plaintiff "several" times to leave Mitchell's office. [25]

35. Martin met with Plaintiff and Mitchell separately and counseled them both about her expectations for professional behavior in the office and respect for coworkers. [26]

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 367 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

36. Despite this counseling, Plaintiff visited several other coworkers at their work stations and attempted to persuade them to take "her side" with respect to this incident during working hours, resulting in disruption to office dynamics and distraction in the workplace. [27]

 **\*9** 37. Moreover, after Martin counseled Plaintiff, she sent an e-mail to Martin and visited her office several times in an effort to further discuss her confrontation with Mitchell. [28]

38. For example, on April 2, 2013, Plaintiff sent Martin an e-mail asserting that she did not raise her voice or speak to any colleague "with an unreasonable, unprofessional manner." [29]

39. Martin responded that the point of the counseling "was to share with [Plaintiff], and with others, [Martin's] expectations for the office" and "to ensure a professional and collegial work environment for us all." Plaintiff replied to Martin's e-mail on the same day, and thanked Martin "for taking time to read [her] email and understand [her] better."

40. Plaintiff testified in her deposition that she believed that Martin treated her unfairly and "differently than the Caucasians employees" with regard to this incident. However, Plaintiff further testified that she did not know what Martin discussed with Mitchell in connection with this incident. [30]

41. According to Plaintiff, she was also subjected to harassment by Martin between April 2 and April 4, 2013. More specifically, Plaintiff testified in her deposition that, on these dates, Martin harassed her by repeatedly telling her that she had given incorrect information to a customer, and instructing her to send data to the customer. However, Plaintiff testified that she had not given incorrect information to the customer, and that she called the customer and verified that he or she had not actually requested any specific data. [31]

42. Plaintiff testified that there were "many" other instances between February 2013 and April 2013 during which she felt that she was being treated unfairly "because [she was] a Chinese," including (1) being "yelled at" for "ask[ing] a simple question," and (2) being "ignore[d]" by other employees who came to her office to speak with her officemate. However, Plaintiff was unable to identify any other incident with greater particularity. [32]

43. Plaintiff did not complain to Martin that she was being discriminated against or treated unfairly because of her race or national origin. [33]

 **\*10** 44. On April 4, 2013, Plaintiff called Defendant's human resources "general" number to express her concerns. Plaintiff was directed to David Mahoney ("Mahoney"), then an associate personnel administrator for NYSED. [34]

45. Mahoney referred Plaintiff to his supervisor, Steven Earle ("Earle"), Director of NYSED's Office for Diversity, Ethics and Access. On the same day, Plaintiff called Earle and made an appointment to meet with him. [35]

46. On April 4, 2013, following her initial conversation with Mahoney, Plaintiff sent him a follow-up e-mail complaining about the fact that Martin asked her to be professional in the office and made "unreasonable" demands of her after Martin spoke with Mitchell. In the e-mail, Plaintiff did not make an allegation of discrimination. [36]

47. Before her appointment with Earle, Plaintiff sent Earle a note reporting alleged "office harassment and power abuses behavior [*sic*]" by Mitchell and Martin. The note referred to the incident that had occurred on April 4, 2013, during which Martin had allegedly directed Plaintiff to send data to a customer who had not requested it. In the letter, Plaintiff did not allege that she had been subjected to discrimination. [37]

48. NYSED has a written nondiscrimination policy prohibiting it from discriminating on the basis of, *inter alia*, national origin, race, or gender. [38]

 **\*11** 49. Mr. Earle's responsibilities as Director of NYSED's Office for Diversity, Ethics and Access include, but are not limited to, addressing complaints of discrimination made by employees. Mr. Earle also serves as the "point person" for mediating issues between NYSED management and staff members, among other things. [39]

50. NYSED's Employee Handbook provides that, if an employee has a complaint that cannot be resolved through informal discussion with his or her supervisor or manager, the employee has the right to file a formal grievance. [40]

51. On April 8, 2013, Plaintiff met with Earle. During the meeting, Plaintiff discussed her complete professional history

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 368 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

before joining NYSED, as well as her current work situation at NYSED. The meeting, which Earle had scheduled for one hour, lasted for more than three hours. [41]

52. During the meeting, Plaintiff conveyed to Earle her perception that she was being harassed. Plaintiff stated that she got along well with Martin during the first six months of Plaintiff's employment, but that the relationship became strained after Plaintiff persisted in presenting suggestions for changes in the processing functions of the office, with which Martin (at least partially) disagreed. Plaintiff also stated to Earle that she had difficulties getting along with Mitchell during the same time period, and that Plaintiff's tension with Martin worsened after she began to complain about her interactions with Mitchell. [42]

**\*12** 53. Plaintiff testified in her deposition that she reported to Earle that she "was subjected to abuses, harassment, and many use[s of] their power to oppress me," that she was not listened to, and that "they" treated her differently than other employees. [43]

54. Plaintiff indicated to Earle that she felt that she could no longer trust or be supervised by Martin, and asked for a reassignment. Earle explained the reassignment process and to whom Plaintiff should direct her request. [44]

55. After the meeting with Earle, Plaintiff contacted the Deputy Commissioner's Office and requested a meeting to discuss her request to be assigned to a different supervisor and different office.

56. Ken Wagner, Ph.D. ("Wagner"), served as Deputy Commissioner for NYSED's Office of Curriculum, Assessment and Educational Technology at the time. Wagner asked Kathleen Moorhead ("Moorhead"), then the Data Systems Project Manager for NYSED and also a liaison to Wagner's Office, to address the issues raised by Plaintiff.

57. On April 9, 2013, Plaintiff met with Moorhead for more than two hours. During the meeting, Plaintiff complained that she was unhappy with her work environment and that Martin and Mitchell were confrontational and bully-like. She also indicated that she did not like the office or her current work assignments, and requested a transfer.

58. Moorhead then met with Martin and Mitchell. Martin and Mitchell provided an overview of their interactions with

Plaintiff and stated that Plaintiff was "very hostile and angry toward them." Moreover, Moorhead spoke with a number of other staff members who indicated that Plaintiff's description of an incident with Mitchell, in which Plaintiff alleged that Mitchell did not act professionally toward her, was "not accurate." [45]

**\*13** 59. During the meeting, Moorhead advised both Martin and Mitchell that they needed to maintain a professional work environment and that they should contact Moorhead immediately with any concerns.

The Decision to Assign Plaintiff to a New Supervisor

60. On April 10, 2013, Moorhead met with Martin and Kristen DeSalvatore ("DeSalvatore"), then a Coordinator of Education Plans & Reports for NYSED, to discuss Plaintiff's concerns. They agreed DeSalvatore, rather than Martin, would be Plaintiff's supervisor going forward.

61. On the same date, Moorhead told Plaintiff that, from that date forward, Plaintiff would be reporting to DeSalvatore rather than Martin.

62. Moorhead decided to assign Plaintiff to a new supervisor because, among other factors, there appeared to be a "personality conflict" between Plaintiff and Martin. [46]

63. Wagner testified in his deposition that it was "extremely unusual" for NYSED to assign an employee to a different supervisor "based on something other than the workload changing." Moreover, Wagner testified that the decision to transfer Plaintiff to a new supervisor was made in order to provide her with "an abundance of support" and "a fresh start." [47]

64. On April 10, 2013, Moorhead met with Plaintiff on two separate occasions to discuss the change in supervision. Initially, Plaintiff was not receptive and again requested a transfer. [48]

65. On April 11, 2013, Plaintiff sent an e-mail to Moorhead (and by copy to Wagner), in which she (1) stated that she felt that she could not continue to work in the office with Mitchell and Martin, and (2) asked that Moorhead consider moving Plaintiff to another office. Plaintiff also asserted that Mitchell and Martin had "repeatedly mistreated [her]

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 369 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

through harassing language, bullying, and power-abuse." Plaintiff identified the incident from April 4, 2013 as her reason for complaining to management. In her e-mail, did not expressly allege that she had been subjected to discrimination or retaliation. [49]

**\*14** 66. Dr. Wagner responded to Plaintiff's e-mail, advising Plaintiff that transferring her was "not an option at this time" and directing Moorhead to address Plaintiff's concerns. As a matter of general practice, NYSED does not "transfer people" to other jobs. [50]

67. In a responding e-mail, Plaintiff thanked both Wagner and Moorhead for their time and consideration, and, more particularly, thanked Moorhead for her "great and continuing efforts" and "the highly professional" and "caring and responsible" manner in which she attempted to "resolv[e] the matter[.]" [51]

68. Over the next several days, Moorhead met with Plaintiff several times to listen to, and discuss, Plaintiff's concerns. During these meetings, Plaintiff continued to raise issues regarding her past interactions with Martin and Mitchell. Moorhead advised Plaintiff that she should contact human resources personnel if she wanted to file a formal complaint or grievance. [52]

69. Plaintiff also contacted Dina Haggerty ("Haggerty"), a personnel administrator for P-12 Education at NYSED, regarding her reservations about being assigned to a new supervisor. Shortly thereafter, Haggerty met with Plaintiff for nearly two hours, during which Plaintiff related the entire history of her career. [53]

**\*15** 70. After her meeting with Plaintiff, Haggerty spoke with Earle about Plaintiff's concerns. Haggerty testified in her deposition that, based on their conversation, Haggerty and Earle determined that Earle should be the person to address Plaintiff's concerns that she was being harassed by her former supervisor (i.e., Martin) because he handled such allegations in his role as Diversity, Ethics and Access Officer for NYSED, and he had previously had contact with Plaintiff. [54]

71. During a phone call between Haggerty and Plaintiff on the day after they met in person, Plaintiff expressed concern about her probationary period being extended if she was assigned to a new supervisor. Haggerty referred Plaintiff to Earle with respect to her allegation that she was being harassed by Martin.

72. On April 15, 2013, Plaintiff indicated to Moorhead that she felt better and was willing to move forward under a new supervisor. At that point, Moorhead allowed DeSalvatore to handle things moving forward. [55]

73. However, Plaintiff continued to request to meet with her. Plaintiff asked to meet with her "sometimes up to 5 times a day," even after Plaintiff had discussed the topics she wished to raise with DeSalvatore. Moreover, Plaintiff attempted to discuss "issues that did not pertain to the current work environment or situation." [56]

74. Based on her interactions with Plaintiff, Moorhead concluded that Plaintiff was unable to respect other people's professional time. [57]

**\*16** 75. Plaintiff also contacted her union representative, Michael Tracy-Ireland ("Tracy-Ireland"), to discuss the fact that she was not allowed to transfer to another office. On April 16, 2016, Tracy-Ireland advised Plaintiff that she should make the best of her current situation until her probationary period ended.

76. In a subsequent e-mail to Tracey-Ireland, dated May 1, 2013, Plaintiff explained she had been transferred to the supervision of DeSalvatore, and that she "saw this as a positive change of prompt effort/action made ... Ken Wagner's office, to help [her]." [58]

Plaintiff's Work Under Her New Supervisor

77. DeSalvatore began supervising Plaintiff on April 12, 2013.

78. Under DeSalvatore's supervision, Plaintiff's "interpersonal relationships with [DeSalvatore] and fellow colleagues were typically difficult[.]" [59]

79. Plaintiff had a hard time finding closure on the events that led to the change in supervision, despite the fact that DeSalvatore and Moorhead explained several times that she needed to stop discussing it and move on. [60]

80. Plaintiff had continual difficulties having succinct conversations and bringing closure to conversations and would reiterate her points and repeat information she had already shared. [61]

81. Plaintiff also had difficulties with respect to engaging other colleagues. More specifically, if Plaintiff went to a colleague's desk and found that person away, on the telephone, or engaged in conversation, she would repeatedly return every five to ten minutes until she found the person available to speak. [62]

**\*17** 82. Plaintiff complained to DeSalvatore about office operations and what Plaintiff perceived as inefficiencies. Plaintiff also complained that she was being belittled and harassed by Mitchell.

83. DeSalvatore advised Plaintiff on several occasions to consult with human resources personnel if she felt that she was being bullied and harassed, as well as how to pursue filing a formal complaint. [63]

84. Based on her interactions with Plaintiff, DeSalvatore found that Plaintiff failed to understand "her role in OIRS as a data analyst and not as a manager of change and improved efficiency." DeSalvatore opined that Plaintiff "has good data analysis skills," but "lacks the interpersonal skills to work in a busy office with many different personalities, and ... was not respectful of other peoples' time or of management decisions that she did not agree with." [64]

#### Preparation of Plaintiff's Evaluation

85. In April 2013, after DeSalvatore became Plaintiff's supervisor, DeSalvatore began the probationary evaluation process.

86. DeSalvatore advised Martin that Plaintiff needed to be evaluated, and provided Martin with the evaluation form. DeSalvatore asked Martin to complete the evaluation form because Martin had been Plaintiff's supervisor up until that point.

87. The form applicable to probationary employees (including Plaintiff) required ratings in seven categories: (A) "Quality of Work"; (B) "Quantity of Work"; (C) "Work Habits"; (D) "Work Interest"; (E) "Relationship with Others"; (F) "Supervisory Skills (if applicable)"; and (G) "Attendance." The form provided further explanation of each of these categories, and there were four possible ratings for each category: "above average," "average," "below average," or "unsatisfactory." Space was provided for written comments with respect to each category. The form also included a section for an ultimate recommendation regarding the employee's services, with four possible choices: "permanently retained," "continued on probation," "continued on probation under the terms of the traineeship," or "terminated." [65]

88. Martin prepared a draft probationary evaluation report ("draft evaluation") covering the period that she had supervised Plaintiff (apparently either July 19 or August 19, 2012, through April 11, 2013) and shared it with DeSalvatore, Moorhead and Haggerty. The report was shared with others because it was unusual for a probationary employee to be assigned to a new supervisor during the course of the probationary period. [66]

**\*18** 89. Haggerty reviewed Plaintiff's draft evaluation and expressed concern that Martin's evaluation of Plaintiff's attendance (which Martin rated as "unsatisfactory") was "not fair" because Plaintiff's attendance was actually acceptable. Ultimately, the final evaluation report rated Plaintiff's attendance as average. [67]

90. DeSalvatore also provided comments on the draft evaluation. Specifically, after consulting with human resources staff, DeSalvatore advised that Martin's recommendation to terminate Plaintiff's employment should be changed, and she also provided "feedback on [the] time and attendance rating." [68]

91. DeSalvatore and human resources staff agreed that the time remaining in Plaintiff's probationary term (i.e., about four months) was sufficient for DeSalvatore to evaluate Plaintiff.

92. Wagner (who, as Martin's direct supervisor, was responsible for reviewing employee evaluations prepared by Martin) reviewed the draft evaluation as well, and requested that Plaintiff's rating in some of the categories be raised to a higher rating and that the ultimate recommendation be changed. Martin made the changes requested by Wagner.

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 371 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported In Fed. Supp. (2017)

93. The final probationary evaluation report recommended that Plaintiff be continued on probation. Although Wagner was in absolutely no way prepared to grant permanent status to Plaintiff, it seemed to him appropriate to "give her more time and to let these issues kind of settle down." [69]

94. It was the usual practice for a supervisor to discuss a performance evaluation with the subject employee and make recommendations for improvement if performance is less than satisfactory. However, Martin did not follow this practice with respect to Plaintiff because Martin was instructed by Moorhead that she should no longer have any personal interaction with Plaintiff once Plaintiff was assigned to DeSalvatore's supervision. [70]

**\*19** 95. Plaintiff's probationary term was scheduled to expire on August 8, 2013.

May 1, 2013—Altercation Between Plaintiff and Mitchell

96. On May 1, 2013, Haggerty advised Martin, via e-mail, that Martin should sign Plaintiff's probationary evaluation as her supervisor. Moreover, Haggerty explained that, as Plaintiff's former supervisor, Martin should evaluate Plaintiff up until the time that Plaintiff was reassigned, and that DeSalvatore, as Plaintiff's new supervisor, "would take over from that point." This was consistent with NYSED's standard practice when an employee was assigned to a new supervisor. [71]

97. Plaintiff saw this e-mail when she picked up materials that Mitchell had printed to a shared printer. Pursuant to her duties as Martin's assistant, Mitchell printed the e-mail for Martin, who was not in the office at the time, and planned to put it into a folder with a note for a response the next morning. [72]

98. Mitchell asserted in an affidavit that, after she discovered that her printed documents (including the e-mail at issue) were not at the printer, she (1) went to Plaintiff's office, (2) stated that she "believed [Plaintiff] may have picked up [Mitchell's] printing," (3) observed the e-mail sitting on Plaintiff's desk, (4) pointed out the e-mail to Plaintiff, and (5) "took it back to" her (Mitchell's) desk. Moreover, Mitchell asserted that, thereafter, Plaintiff entered Mitchell's office and "demanded to go through everything" that Mitchell printed. [73]

99. Plaintiff testified in her deposition that she inadvertently retrieved the e-mail with other documents from the printer outside of her office and that Mitchell screamed at her and snatched the documents out of her hands. [74]

100. Plaintiff reported the incident to DeSalvatore. DeSalvatore asserted in an affidavit that she "immediately spoke to [Mitchell] and instructed her to print her documents using a printer that [Plaintiff] did not use" and "instructed both [Mitchell] and [Plaintiff] that, should anything similar happen in the future, to not interact and to immediately seek assistance from a manager." [75]

**\*20** 101. Plaintiff testified in her deposition that, shortly after the printer incident, DeSalvatore called her into her office and "blame[d]" her by asking her why she had taken Mitchell's printed documents and refused to give them to Mitchell. Moreover, Plaintiff testified that she "felt" that DeSalvatore treated her differently than Caucasian employees in connection with this incident. However, Plaintiff also testified that she did know whether DeSalvatore spoke with Mitchell about the incident.

102. On May 3, 2013, Plaintiff sent a lengthy e-mail to Haggerty about the printer incident that had occurred with Mitchell, as well as her related discovery that Martin was preparing Plaintiff's probationary evaluation report. Plaintiff complained that the conduct of Mitchell and Martin constituted "continued harass[ment] and power-abuse" and that Martin intended to evaluate her as a "means of revenge and deliberate framing up." Plaintiff's e-mail did not expressly allege that she had been subjected to discrimination.

103. Haggerty responded to Plaintiff's e-mail on May 29, 2013, and advised Plaintiff that she had spoken with Earle and that they concurred that the incident with Mitchell did not constitute harassment. Haggerty also stated that nothing had been added to Plaintiff's personnel history file to date, and that Plaintiff could contact her with any questions when she received a formal evaluation.

May-June 2013—Plaintiff's Complaint Regarding Mitchell's Deletion of Plaintiff's E-Mails

104. Thereafter, Plaintiff requested and received a meeting with Moorhead, which was scheduled for May 31, 2013.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 372 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

105. On that date, Plaintiff sent Moorhead an e-mail "preview[ing]" the issues that she planned to discuss during their upcoming meeting. Plaintiff wrote that a few things were working better, namely, that she had less contact with Mitchell and Martin, and that DeSalvatore was "more open to ideas regarding" the Dataquest system.

106. Plaintiff also wrote, however, that there were still "many troubling issues." More specifically, Plaintiff cited the fact that Mitchell deleted e-mails from Plaintiff's Dataquest mailbox, DeSalvatore's failure to view this issue as a problem when it was reported to her, and the incident that had occurred with Mitchell's printouts. Plaintiff further indicated that she felt that her work environment was "toxic," and that there was insufficient attention given to "abusive behavior and misconduct[ ] such as bullying, yelling at people, creating troubling problems, power abuses, plotting frame-ups, and lying[.]" Plaintiff did not expressly use the word "discrimination" in her e-mail to Moorhead. [76]

107. During her meeting with Moorhead, Plaintiff reported that Mitchell was deleting her e-mails from her Dataquest mailbox. Plaintiff testified, however, that the work she had completed remained in her work folder on her computer.

108. Mitchell's job responsibilities included overseeing the Dataquest mailbox, which is the office's official mailbox. The office receives approximately 50-60 e-mails per day in the Dataquest mailbox. [77]

 **\*21**   109. Mitchell's responsibilities with respect to Dataquest required her to read each email, assign it to the appropriate staff member, and send the staff member an e-mail advising him or her that she had placed an assignment in his or her folder. If a staff member did not respond in a timely manner, Mitchell would send that staff member a reminder e-mail that an assignment was overdue. After a staff member had responded to an assigned item, the e-mail was deleted from the staff member's folder and the response was archived. [78]

110. It was office policy for Mitchell to delete completed Dataquest items from all staff members' Dataquest mailboxes. However, in response to Plaintiff's concerns, the office policy was reviewed and Mitchell was instructed that she should no longer delete or move anything out of Plaintiff's Dataquest mailbox. Instead, Plaintiff's co-worker, Jeff Schaffer, was given the responsibility of deleting Plaintiff's e-mails.

111. In an e-mail dated June 3, 2013, DeSalvatore informed Plaintiff that Mitchell had been notified that she should not delete or move anything out of Plaintiff's Dataquest folder.

112. Moorhead also advised Plaintiff by e-mail that changes to the Dataquest protocol were implemented to address her concerns about the deletions. Moorhead indicated that Plaintiff could contact Earle to discuss the possibility of filing an official grievance with respect to the other concerns she expressed in her May 31, 2013, e-mail and during their meeting on the same date.

113. Plaintiff responded to Moorhead and thanked her for organizing a meeting to review the Dataquest protocol and for attempting "to try to improve the situation and stop the problems."

### June 2013—Plaintiff's Meetings
### With DeSalvatore and Earle

114. DeSalvatore held a 30-minute "check-in" meeting every other week with all employees who report to her, the purpose of which was to discuss current work assignments, address any deficiencies with employees' work, and allow employees to bring up any issues or highlight any accomplishments.

115. On June 7, 2013, DeSalvatore had a regularly scheduled check-in meeting with Plaintiff at 1:00 p.m. During the meeting, Plaintiff informed DeSalvatore that Mitchell was "playing tricks" on her and that coworkers had been "improper" with her in conversation. When DeSalvatore attempted to address Plaintiff's constant "checking" behavior with her colleagues (i.e., repeatedly returning to a colleague's desk to see if they were present and available to talk), Plaintiff became upset and complained about people not respecting her. [79]

 **\*22**   116. DeSalvatore pointed out to Plaintiff that the meeting was 20 minutes over their scheduled time and that Plaintiff was not respecting her time. Plaintiff became more upset and stated that she was being treated unfairly. DeSalvatore ended the meeting at that point and advised that she would set up a meeting with Earle for the following week. [80]

117. On June 7, 2013, Plaintiff sent a lengthy e-mail to Earle, complaining about "abusive" incidents. Plaintiff asserted that Mitchell and Martin continued to "play tricks" and

"plot destroying" her, and that DeSalvatore defended their misconduct.

118. In her June 7, 2013, e-mail, Plaintiff did not make an allegation of racial, national origin, or gender discrimination, but rather stated, "I'm not bringing these issues to you as illegal issues at this stage. I'm bringing them to you as workplace abusive issues, toxic workplace environment issues as a Healthy Workplace Bill [*sic*]." [81]

119. DeSalvatore and Earle met with Plaintiff on June 11, 2013. During the meeting, they discussed the issues raised in the June 7, 2013, check-in meeting, Plaintiff acknowledged that she had some deficiencies with interpersonal relationships and she agreed to improve, and a plan was made for moving forward. [82]

### Plaintiff's Receipt of Her Evaluation and Altercation with Wagner

**\*23** 120. On June 21, 2013, Plaintiff's probationary performance evaluation was finalized and signed by Martin as Plaintiff's former supervisor and by Wagner as "reviewer."

121. Wagner's assistant, Carol Donnelly ("Donnelly"), provided the performance evaluation to Plaintiff on the same date. Donnelly asked Plaintiff if she would like an appointment with Wagner to discuss the evaluation. Plaintiff requested an appointment, and one was scheduled for Monday, June 24, 2013.

122. The signed probationary evaluation report ("final evaluation") provided to Plaintiff on June 21, 2013, contained ratings in each of the evaluation categories noted above, accompanied by comments. Plaintiff received an "average" rating in both the "Quality of Work" and "Attendance" categories. Plaintiff received a "below average" rating in the "Quantity of Work" category, with two comments: (1) "Employee has refused Supervisor's request to produce dated responses to work that has remained unanswered in employee's Dataquest inbox"; and (2) "NAEP statewide demographic data project was not completed in a timely manner and was re-assigned to another staff member." Plaintiff received a "below average" rating in the "Work Habits" category, with the following comments: "NYS Statistical Yearbook: employee presumed that since initial project deadline had passed that work was not required to be completed. Employee did not contact supervisor to confirm

but made unilateral decision not to do the work. Supervisor became aware that work was not being completed as assigned when the Yearbook publisher indicated that none of the work had been received. Tasks of other staff had to be realigned in order to complete this unfinished project." Plaintiff received a "below average" rating in the "Work Interest" category, with the following comment: "Employee complained that she believed that she had been singled out as the only staff member to be assigned work through Dataquest." Plaintiff received an "unsatisfactory" rating in the "Relationship with Others" category, with the following comments: "The employee has insulted a co-worker by making demeaning comments about the employee's intelligence. On a different occasion, the employee has insulted the supervisor. Both of these situations have taken place in the office within view and hearing of co-workers. The employee had to be assigned to another supervisor." The report ultimately recommended that Plaintiff's employment be "continued on probation" (i.e., not permanently retained, but also not terminated). [83]

123. Plaintiff visited Wagner's office suite several times at the end of the day on June 21, 2013, with the intention of speaking to Wagner about the final evaluation. Wagner's assistant, MaryAnn VanBlarcom ("VanBlarcom"), informed Plaintiff that he was in a meeting. [84]

124. Wagner's office was located in a separate suite on the same floor as the suite in which Plaintiff's office was located.

**\*24** 125. Wagner returned to his office from his meeting at around 6:00 p.m. VanBlarcom explained that Plaintiff had stopped by several times. VanBlarcom then left for the evening, and Wagner closed the external door to the office suite and began working at his desk in his internal office. [85]

126. At about 7:00 p.m., Plaintiff returned to Wagner's office and the two exchanged words. The parties dispute the nature of the exchange. Wagner testified in his deposition that, while he was working that evening, Plaintiff loudly "burst into [his] office and demanded to talk in a very kind of agitated and intimidating way"; in a "conversational voice," Wagner asked Plaintiff to leave and told her that they would speak at their scheduled meeting the following week; when Plaintiff continued to block his office doorway and demand to speak to him, Wagner repeated himself "in a very loud and firm voice that she needed to leave." [86] However, Plaintiff testified in her deposition that she returned to Wagner's office suite and "gently" knocked on his door, and Wagner "[i]nstantly ...

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 374 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

bl[e]w up," repeatedly "scream[ing] at [her]" to leave his office. [87]

127. Wagner testified in his deposition that Plaintiff refused to leave and remained positioned near the door, demanding to discuss her final evaluation immediately, while Wagner remained in the chair at his desk. [88] However, Plaintiff testified in her deposition that Wagner continuously "yell[ed] and scream[ed] at her, that she was "shocked," and that she could "hardly get a word [out]," until she turned to leave and stated that she would retain a lawyer to attend the meeting with her the following week. [89]

128. Wagner testified in his deposition that he felt threatened by Plaintiff's behavior and called out to Amrit Singh ("Singh"), who was working in another office within the same suite; Singh came to Dr. Wagner's office and remained there until Plaintiff eventually left. [90] However, Plaintiff testified that she was "completely scared" by Wagner, who kept yelling at her and "didn't give [her] ... a chance to respond" until, finally, she "left immediately." [91]

129. At some point during the altercation, Wagner told Plaintiff that her behavior was consistent with some of the areas of concern noted in her final evaluation, based on behavior that she had reportedly demonstrated with other people in the office. [92]

**\*25** 130. Shortly after Plaintiff left Wagner's office, Wagner e-mailed and called NYSED's Director of Human Resources, Annette Franchini, to report his version of the incident. [93]

131. After the incident on the evening of June 21, 2013, Plaintiff's probationary employment with NYSED was terminated.

132. Plaintiff called in sick on June 24, 2013, and indicated that she would be out for an extended period of time. Plaintiff thereafter provided a note from her doctor, and was granted sick leave up until the date of her termination.

133. Plaintiff was informed by letter dated June 28, 2013, that her probationary employment with NYSED would be terminated effective July 12, 2013. The reason for Plaintiff's termination, as set forth in the letter, was her "inappropriate, intimidating and insubordinate behavior on June 21, 2013[,] in an interaction with a manager in the Office of P-12 Education." More particularly, the letter explained that

Plaintiff "barged into the manager's office in a loud and aggressive manner and[,] despite repeated directives to leave, refused to do so." [94]

134. Wagner testified in his deposition that, to his knowledge and based on his understanding of Plaintiff's e-mails and other communications, Plaintiff felt that her coworkers"hated her" and were "mistreating her," but "she never mentioned that she felt [that] she was [subjected to] discriminat[ion]" based on her race or national origin. [95]

135. During her employment with NYSED, Plaintiff never filed a formal complaint or grievance. [96]

### Post-Termination Administrative Proceedings

**\*26** 136. On September 13, 2013, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that (1) she had been discriminated against because of her national origin, gender, and disability, and (2) that she had been subjected to retaliation for opposing the discrimination.

137. On February 19, 2014, Plaintiff filed an amended complaint with the NYSDHR, adding a claim that she had been subjected to racial discrimination.

138. NYSED opposed Plaintiff's complaint and amended complaint.

139. On March 12, 2014, the NYSDHR issued a determination dismissing Plaintiff's complaint. [97] The NYSDHR found that there was "insufficient evidence to support [Plaintiff's] claims of unlawful discriminatory actions due to her race, national origin, sex, temporary disability, or in retaliation for opposing discrimination."

140. On April 24, 2014, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR and issued Plaintiff a right-to-sue letter.

### December 2014—Plaintiff's Receipt of a Job Offer

141. In December 2014, Plaintiff received a job offer for a Program Research Specialist 2 position with the New York State Office of Primary Care and Health Systems

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 375 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Management Center for Health Care Facility Licensure, Planning and Finance. This position was for the same job title, and at the same salary grade, as Plaintiff's previous job with NYSED, and involved very similar responsibilities related to the collection and analysis of data.

142. On December 4, 2014, Plaintiff declined the job offer because she was "looking for a higher grade level position at this point in [her] career."

The Court notes that Plaintiff's Rule 7.1 Response also includes numerous separately numbered material facts that Plaintiff asserts are genuinely in dispute. (Dkt. No. 29, Attach. 1, at 1-8.) Some of the record evidence cited in support of Plaintiff's factual assertions also appear in Plaintiff's responses to Defendant's Rule 7.1 Statement, as set forth above. Familiarity with these purportedly disputed material facts is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### C. Summary of Parties' Arguments

#### 1. Defendant's Memorandum of Law

Generally, in its memorandum of law, Defendant advances four arguments. (Dkt. No. 21, Attach. 1 [Def.'s Memo. of Law].)

First, Defendant argues that Plaintiff's Title VII discrimination claim must be dismissed for the following reasons: (a) because her probationary evaluation report, denial of her requests to be transferred, and the fact that she was allegedly yelled at and blamed for mistakes that she did not commit do not constitute adverse employment actions, the only adverse employment action that she experienced was her termination in July 2013 (*id.* at 17-18); (b) she has not identified circumstances giving rise to an inference of discrimination because (i) there is no direct evidence that any employee of Defendant discriminated against her based on her race, national origin, or gender, (ii) she has not shown that she was treated differently than any similarly situated employees outside of her protected class, and (iii) the record evidence reflects that, when she complained of confrontations with her coworkers, her superiors listened to her concerns, addressed those confrontations by stating their expectations to everyone involved in the confrontations, and transferred Plaintiff to a new supervisor (i.e., from Martin to DeSalvatore)

(*id.* at 18-21); (c) the NYSDHR's decision dismissing her administrative complaint is persuasive evidence that she was not subjected to discrimination; and (d) Defendant has demonstrated that she was terminated for legitimate, nondiscriminatory reasons (particularly, her insubordinate conduct on June 21, 2013, when she accosted Wagner in his office after working hours and repeatedly demanded to discuss her evaluation), and Plaintiff has failed to rebut this showing (*id.* at 22-23).

**\*27** Second, Defendant argues that Plaintiff's Title VII hostile work environment claim must be dismissed for the following reasons: (a) the alleged incidents of hostility that form the basis of Plaintiff's claim (i) were not sufficiently severe to support such a claim, (ii) were not sufficiently pervasive to support such a claim, and (iii) constituted sparse, innocuous personality conflicts that were unrelated to her membership in any protected class (*id.* at 24-25); and (b) the alleged incidents cannot be imputed to Defendant because the record reflects that management (i) adequately addressed her complaints, based on the available information, by transferring her to another supervisor when she complained about Martin and Mitchell in early April 2013 and changing office procedures for deleting old e-mails when she complained about Mitchell allegedly destroying her work, and (ii) repeatedly advised her that she could file a formal complaint or grievance pursuant to NYSED policies, but she failed to do so (*id.* at 25-26).

Third, Defendant argues that Plaintiff's Title VII retaliation claim must be dismissed for the following reasons: (a) the record evidence demonstrates that she has not engaged in any protected activity of which Defendant was made aware because (i) she did not file a formal complaint or grievance at any point during her employment, (ii) her informal complaints to management and human resources personnel were generalized complaints of harassment and unfair treatment, but did not allege that this treatment was based on her race, national origin, or gender, and (iii) in one such informal complaint, directed to Earle, she expressly disclaimed that she was asserting any illegal conduct (*id.* at 27-29); (b) under the circumstances, her performance evaluation (which was "mixed," rather than "negative," and extended her probationary employment) did not constitute an adverse employment action for purposes of her retaliation claim (*id.* at 29-30); (c) the other alleged incidents, including the denial of her request for a transfer to another office and the occasions on which coworkers "yelled at her," constituted mere "trivial" harms rather than adverse employment actions

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 376 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

(*id.* at 30); (d) the record evidence does not support the conclusion that a causal connection existed between her first complaint on April 4, 2013, and the issuance of her final evaluation because (i) these two events occurred more than two-and-a-half months apart and (ii) in the interim, other attenuating events related to her complaints occurred, including her transfer to a new supervisor, changing the protocol for the deletion of Dataquest e-mails, significant time spent listening to and discussing her concerns, and elevating the ratings given to her on her probationary evaluation report to allow her to continue her employment (*id.* at 31-32); and (e) as argued with respect to her discrimination claim, Defendant has demonstrated that she was terminated for legitimate, nondiscriminatory reasons (*id.* at 32-34).

Fourth, and finally, Defendant argues that, to the extent that the Court denies its motion for summary judgment on the merits, the Court should hold that Plaintiff failed to mitigate her damages and, as a result, any recovery must be limited to the time period from July 12, 2013 (the date of her termination) until December 4, 2014 (the date on which she rejected an offer of comparable employment because she was seeking a "higher grade level position"). (*Id.* at 33-34.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff advances four arguments. (Dkt. No. 29 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff "withdraws" her claim that Defendant subjected her to a hostile work environment. (*Id.* at 3.)

Second, Plaintiff argues that her Title VII retaliation claim should not be dismissed for the following reasons: (a) she engaged in protected activity by (i) discussing her complaints of discrimination and retaliation with Earle and Moorhead in April 2013, and requesting that Moorhead transfer her to another office, (ii) discussing, with Haggerty, her belief that she was being treated differently than her Caucasian colleagues and subjected to a negative evaluation in retaliation for her complaints against Martin, to Haggerty, (iii) discussing her concerns "directly and indirectly" with Wagner, (iv) discussing, with DeSalvatore, her concerns about a sexual harassment incident and the fact that DeSalvatore was imposing "rules" upon her that did not apply to "Caucasian employees," and (v) discussing her concerns about Mitchell's discriminatory behavior toward her with

Martin (*id.* at 11-16); (b) Defendant's submissions to the NYSDHR (in response to Plaintiff's administrative complaint of discrimination) reflect that management understood Plaintiff's complaints to regard discrimination based on her national origin (*id.* at 13); (c) she was subjected to adverse employment actions when (i) she received her final evaluation and her term of probationary employment was extended (rather than being offered permanent employment) and (ii) she was terminated (*id.* at 16-17); and (d) an inference of retaliatory intent may reasonably be drawn from the record evidence based upon "the timing of conflicts involving her [c]omplaints of discrimination" (*id.* at 17-18).

 **\*28**  Third, Plaintiff argues that her Title VII discrimination claim should not be dismissed for the following reasons: (a) it is undisputed that (i) she is a member of a protected class and (ii) her termination constituted an adverse employment action (*id.* at 20); (b) the circumstances of her termination (specifically, that it followed her numerous informal complaints to multiple members of management and human resources personnel) give rise to an inference of discriminatory animus on the part of decision-makers (*id.* at 20-21); and (c) Defendant's argument that it had legitimate, nondiscriminatory reasons for terminating her employment (i.e., the fact that she was insubordinate and Wagner felt intimidated by her behavior) could reasonably be disbelieved by a jury and, in any event, she carried her burden in opposing Defendant's argument by relying on the evidence establishing her claim of discrimination (*id.* at 21-23).

Fourth, and finally, Plaintiff argues that the issue of whether she failed to properly mitigate her damages cannot be appropriately resolved on Defendant's motion for summary judgment and, in any event, the record evidence reflects that she was unable to accept the offer of comparable employment because it was available for only 40 minutes. (*Id.* at 23-24.)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant reiterates the arguments set forth in its memorandum of law and, moreover, argues as follows: (1) to the extent that Plaintiff has denied the facts set forth in Defendant's statement of material facts without a supporting citation to the record, the Court should deem those facts admitted (Dkt. No. 30 at 1-2 [Def.'s Reply Memo. of Law] ); [98] (2) in arguing that her discrimination claim should not be dismissed because decision-makers at NYSED had "knowledge" of her "allegations of discrimination," Plaintiff

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 377 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

conflates the elements that comprise a discrimination claim with the elements that comprise a retaliation claim (*id.* at 3); (3) with respect to Plaintiff's discrimination claim, she has failed (and has not even attempted) to identify any similarly situated comparators that were treated more favorably than she was (*id.* at 3-4); (4) with respect to Plaintiff's retaliation claim, the record evidence establishes that she did not complain about discrimination while employed by NYSED, but rather complained generally about "harassment" and "bullying" (*id.* at 6-7); (5) Plaintiff's final evaluation report did not materially affect the terms and conditions of her employment and this is not a "tenure denial" case (*id.* at 7-8); and (6) Plaintiff has cited no record evidence supporting her arguments that (a) her protected activity was a "but-for" cause for her termination and (b) her termination was pretextual, and temporal proximity between the protected activity and adverse employment action, by itself, is insufficient to establish pretext (*id.* at 8-9).

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [99] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**\*29** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [100]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [101]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [102] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standard Governing Plaintiff's Claims

**\*30** Because the parties have (in their memoranda of law) demonstrated an adequate familiarity with the legal standards governing Plaintiff's claims, the Court will not recite in detail

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 378 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

those legal standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the Court will discuss those legal standards only where necessary below, in Part III of this Decision and Order.

## III. ANALYSIS

### A. Whether Plaintiff's Title VII Discrimination Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendant's memoranda of law. (Dkt. No. 21, Attach. 1, at 16-23 [Def.'s Memo. of Law]; Dkt. No. 30 at 2-6 [Def.'s Reply Memo. of Law].) To those reasons, the Court adds the following analysis, which is intended to supplement, and not to supplant, those reasons.

As an initial matter, Defendant does not dispute that Plaintiff has established her membership in a protected class based on her gender, race, and national origin. Moreover, as Plaintiff correctly notes, Defendant also does not dispute that Plaintiff's termination constituted an adverse employment action for purposes of her discrimination claim. (Dkt. No. 29 at 20 [Plf.'s Opp'n Memo. of Law].) *See also Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) ("Employment actions that [the Second Circuit] ha[s] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.") (internal quotation marks omitted). Based upon a review of the record, the Court concludes that admissible record evidence exists establishing each of these two elements of Plaintiff's discrimination claim. [103]

The Court must next consider whether Plaintiff has adduced evidence from which a jury could reasonably draw an inference of discriminatory animus. "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.' " *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 [2d Cir. 2009]).

Liberally construing Plaintiff's Rule 7.1 Response and opposition memorandum of law (as well as her Complaint and deposition testimony), Plaintiff has identified the following incidents that, in her view, give rise to an inference of discrimination on the basis of her race, gender, and/or national origin: (1) she was the only employee to be assigned work assignments through Dataquest; [104] (2) in February 2013, Holliday, a clerk, "yelled" at her, and asked if she was "digging [for] information," when she asked if Holliday knew whether she could take vacation time before she had accrued it; [105] (3) in March 2013, she asked Mitchell clarifying questions about an assignment and Mitchell shouted at her and asked her, "Why [do] you ask me?"; [106] (4) in April 2013, Mitchell sent her an e-mail stating that she did not want Plaintiff to suggest to anyone else that Mitchell agreed with any of Plaintiff's ideas for improving the office's productivity or changing how the work was handled; [107] (5) in April 2013, Mitchell screamed at her, wrongly accused her of giving incorrect information to a customer, and demanded that she leave Mitchell's office; [108] (6) Martin treated her unfairly– and "differently than the Caucasian employees"–with respect to the incident in which Mitchell accused her of sending incorrect information to a customer by believing Mitchell's account of the incident, although Plaintiff admittedly did not know what Martin discussed with Mitchell with respect to the incident [109] ; (7) from April 2 to 4, 2013, Martin repeatedly told her that Plaintiff gave incorrect information to a customer and demanded that Plaintiff send the customer data, despite the fact that Plaintiff had answered the customer's inquiry and the customer did not actually request data; [110] (8) between February 2013 and April 2013, she felt that, "because [she was] a Chinese," she was "yelled at" for "ask[ing] a simple question" and "ignore[d]" by other employees who came to her office to speak with her officemate; [111] (9) Plaintiff was directed to contact a supervisor by e-mail only; [112] (10) on May 1, 2013, when Mitchell discovered that Plaintiff had inadvertently retrieved an email printed by Mitchell to a shared printer, she screamed at Plaintiff and snatched the document out of her hands; [113] (11) in relation to the same printer incident, DeSalvatore "blame[d]" Plaintiff for the altercation with Mitchell by asking Plaintiff why she had taken the printed document and refused to give it to Mitchell, and thereby (she "felt") treated her differently than Caucasian employees; [114] (12) Martin elected to complete a performance evaluation of Plaintiff nine months after Plaintiff's starting date merely as a "means of revenge

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 379 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

and deliberate framing up [*sic*]"; [115] (13) Mitchell deleted Plaintiff's e-mails from the Dataquest mailbox in an effort to undermine her and/or destroy her work; [116] (14) after DeSalvatore became her supervisor, Plaintiff reported to DeSalvatore that Mitchell continued "playing [unspecified] tricks" on Plaintiff, and other unidentified coworkers had been "improper" with her in conversation; [117] and (15) on June 21, 2013, when she attempted to discuss her final evaluation, Wagner "bl[e]w up" and repeatedly "scream[ed] at [her]" to leave his office. [118]

**\*31** Even fully crediting Plaintiff's account of each of these incidents (many of which Defendant disputes with supporting citations to record evidence), the Court concludes that Plaintiff has failed to identify circumstances justifying an inference that those incidents were actually related to Plaintiff's protected characteristics. The Court reaches this conclusion for four reasons. First, Plaintiff has identified no record evidence (and the Court has come across no evidence) that any employee of Defendant criticized Plaintiff, or her performance, in degrading terms related to her race, national origin, or gender. *See, e.g.*, *Chan v. NYU Downtown Hosp.*, 03-CV-3003, 2006 WL 345853, at \*5 (S.D.N.Y. Feb. 14, 2006) ("Plaintiff does not point to a single degrading remark made during her employment based on gender, race, or national origin.").

Second, Plaintiff has identified no record evidence (and, again, the Court has come across no evidence) that any employee of Defendant made invidious comments about Plaintiff or anyone else in Plaintiff's protected groups. The Court notes that, even if Plaintiff's assertions that Holliday, Mitchell, Martin, DeSalvatore, and/or Wagner unfairly yelled at her or blamed her for work-related mistakes that she did not commit are credited as true, no juror could reasonably infer that the abuse that Plaintiff suffered was the result of discriminatory animus. *See, e.g., Daniel v. T & M Protection Resources, LLC,* 87 F. Supp. 3d 621, 635 (S.D.N.Y. 2015) (concluding that while certain "statements ... may well be viewed as obnoxious ... they have no apparent link to Daniel's membership in a protected class[, and] Daniel has not provided any evidence to support an inference that these statements were made because of his race, national origin, or sex, or that employees with different demographic characteristics were not subjected to similarly obnoxious treatment"); *Gibbs v. New York State Dep't of Taxation and Fin.*, 04-CV-0905, 2009 WL 754307, at \*7 (E.D.N.Y. Mar. 20, 2009) (granting defendant's motion

for summary judgment where plaintiff "has alleged no such [invidious] comments [and, c]onsequently, there is no evidence whatsoever to suggest that [he] was suspended from work on account of his race").

Third, the Court finds that the sequence of events that culminated in Plaintiff's discharge also does not provide a basis from which a discriminatory motive may be reasonably inferred. Indeed, despite performance issues on certain work-related projects (the factual accuracy of which Plaintiff failed to properly controvert in opposition to Defendant's motion), Plaintiff's final evaluation provided that her probationary term was going to be extended: that is, until her altercation with Wagner hours after she received the final evaluation. This undisputed fact undermines any inference, based on the timing of these events, that Plaintiff was terminated due to her membership in a protected class.

Fourth, although Plaintiff's discrimination claim is cast as one arising from disparate treatment (*see, e.g.*, Dkt. No. 1 at ¶¶ 73, 75, 94, 99 [Plf.'s Verified Compl.]; Dkt. No. 29 at 4 [Plf.'s Opp'n Memo. of Law, noting that Plaintiff "disclosed to" Haggerty that she was being "harassed and treated in a disparate manner than [*sic*] her Caucasian colleagues"], 18-19 [setting forth the framework for "disparate treatment claims"] ), Plaintiff has not identified any similarly situated employees outside of her protected groups who were treated differently. "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]); *accord, Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997). Here, Plaintiff, has not even attempted to identify any similarly situated coworkers, probationary status or otherwise, much less established that any such coworker was subject to the same workplace standards, performed similar job functions, engaged in comparably serious conduct, or shared any other "objectively identifiable basis for comparability." *Graham*, 23 F.3d at 40 (internal quotation marks omitted); *accord, e.g., Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed.Appx. 413, 417-18 (2d Cir. 2011) (summary order) (noting that plaintiff "offer[ed] 'little more than conclusory statements' and 'sweeping allegations unsupported by admissible evidence' " that similarly situated male coworkers were treated differently). As a result, Plaintiff's repeated assertions in her deposition that she perceived that she was treated differently than Caucasian employees are conclusory and speculative. (Dkt.

No. 21, Attach. 4, at 45, 47, 57, 74, 82, 84-85, 89-90, 108, 115-16 [Plf.'s Depo. Tr.].) *See also* *Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999)* (noting that Plaintiff's reliance on her own deposition testimony, "in which she stated that she had experienced feelings of isolation, hostility, and disinterest in her work in Africana Studies," was unpersuasive because "feelings and perceptions of being discriminated against are not evidence of discrimination") (brackets and internal quotation marks omitted).

**\*32**  In sum, while Plaintiff has recited numerous events that, if fully credited, certainly suggest that her coworkers and supervisors were sometimes brusque, rude, and unfriendly, the Court concludes that she has failed to establish the existence of circumstances from which a reasonable juror could infer that these occasional actions were related to her protected status. Accordingly, for the reasons enumerated above (in addition to those set forth in Defendant's memoranda of law), Plaintiff's Title VII discrimination claim is dismissed.

### B. Whether Plaintiff's Title VII Retaliation Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative substantially for the reasons set forth in Defendant's memoranda of law. (Dkt. No. 21, Attach. 1, at 26-36 [Def.'s Memo. of Law]; Dkt. No. 30 at 6-9 [Def.'s Reply Memo. of Law].) To those reasons, the Court adds the following three points.

First, the Court finds it difficult to reasonably conclude that Plaintiff engaged in a protected activity of which Defendant was aware. Defendant correctly notes that, during her employment, Plaintiff never filed a formal complaint or grievance with NYSED regarding any discrimination to which she had allegedly been subjected. Moreover, as detailed above, Plaintiff sent numerous e-mails to Haggerty, Martin, Earle, and Wagner, informally complaining of her frustrations with her coworkers. However, the lack of any explicit reference in these e-mails to activities prohibited by Title VII (for example, by use of phrases such as "race," "national origin," "gender," "discrimination," or "retaliation") is so conspicuous as to appear intentional. (*See, e.g.,* Dkt. No. 21, Attach. 5, at 16-17 [Def.'s Depo. Ex. 10, Plf.'s e-mail to Haggerty related to the printer incident, dated 5/3/2013, in which Plaintiff stated that Martin continued "using her power in an abusing way," and to try to seek "revenge" against, and "frame," Plaintiff, and Mitchell committed acts of "abuse, bullying, and harassing behavior"]; *id.* at 9 [Def.'s Depo. Ex.

6, Plf.'s letter to Earle, dated 4/8/2013, in which Plaintiff explained that she was writing "about some office harassment and power abuses behavior [*sic*]" and the "extreme[ly] heinous behavior" exhibited by Mitchell and Martin on April 4, 2016]; *id.* at 11 [Def.'s Depo. Ex. 8, Plf.'s e-mail to Moorhead, dated 4/11/2013, in which Plaintiff requested a transfer to another office based on the "harassing language, bullying, and power-abuse [*sic*]" purportedly exhibited by Martin and Mitchell]; *id.* at 18 [Def.'s Depo. Ex. 11, Plf.'s e-mail to Moorhead, dated 5/31/2013, in which Plaintiff noted that the work environment was "toxic" and that insufficient attention was being given to "bullying, yelling at people, ... power abuses, plotting frame-ups, and lying"].) Indeed, in her e-mail to Earle on June 7, 2013, Plaintiff explicitly stated that she was "not bringing these issues to you a[s] illegal issues at this stage." (*Id.* at 21 [Def.'s Depo. Ex. 13, e-mail from Plaintiff to Earle, dated 6/7/2013].) Rather, Plaintiff made extensive reference to the "Healthy Workplace Bill" and explained that the office was a "toxic environment." (*Id.*) The distinction that Plaintiff drew in her June 2013 e-mail to Earle strongly suggests that (1) she had a basic understanding that workplace discrimination and retaliation on the basis of certain characteristics is prohibited, and (2) her other e-mails concerning her workplace difficulties were drafted with equal care. Plaintiff's e-mails predating June 2013, while unequivocally characterizing certain of her coworkers as having "brusque manner[s] and volatile temperament[s]," "would not have placed a reasonable employer on notice that [Plaintiff] thought the alleged mistreatment was motivated by [national origin,] race[,] or gender." *Douglass v. Rochester City Sch. Dist., 522 Fed.Appx. 5, 8 (2d Cir. 2013)* (summary order); *see also* *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)* ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."); *Hua Lin v. New York State Dep't of Labor*, 11-CV-1186, *2013 WL 5755386, at \*6 (N.D.N.Y. Oct. 23, 2013)* (Sharpe, C.J.) ("The speaker must make clear to the employer that she is complaining of unfair treatment due to her membership in a protected class and that she is not complaining merely of unfair treatment generally.").

**\*33**  Despite its doubts, however, the Court is mindful that Plaintiff is not an attorney and was not represented by counsel at the time of the events at issue. Moreover, Plaintiff testified in her deposition that English is her second language and that she "learned [the word] 'retaliation' later" (i.e., at some

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 381 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

point after her e-mail to Haggerty, dated May 3, 2013). (Dkt. No. 21, Attach. 4, at 126 [Plf.'s Depo. Tr.].) Plaintiff also testified that, "in every conversation [she] had with" human resources personnel, she "expressed" that she felt that she was being subjected to discrimination on the basis of her race and national origin. (*Id.* at 127.) In light of these considerations, and under the circumstances of this case, the Court concludes that Plaintiff has established (albeit barely) a genuine dispute of material fact as to whether her informal complaints in April and May 2013 constituted protected activities.

Second, for the reasons set forth in Defendant's memoranda of law, the Court concludes that Plaintiff's termination constituted an adverse employment action, but that her probationary evaluation report and her related continued employment on probationary status did not constitute adverse employment actions. (Dkt. No. 21, Attach. 1, at 29-30 [Def.'s Memo. of Law]; Dkt. No. 30 at 7-8 [Def.'s Reply Memo. of Law].) *See also, e.g., Smalls v. New York Hosp. Med. Ctr. of Queens*, 13-CV-1257, 2015 WL 5437575, at *7 (E.D.N.Y. Sept. 15, 2015) ("[T]he 2009 evaluation and ensuing three-month extension of a probationary period did not materially affect the terms and conditions of plaintiff's employment. Every new Assistant Supervisor is placed on probation, and though his probationary period was extended, plaintiff was still paid the same amount, retained the same title, worked the same hours, and held generally the same amount of responsibility while on probation. Moreover, there were no negative consequences because of this extension–it merely preserved the existing terms of [plaintiff's] employment.") (internal quotation marks omitted); *Hockeson v. New York State Office of Gen. Servs.*, 188 F. Supp. 2d 215, 221 (N.D.N.Y. 2002) (Kahn, J.) (concluding that, because there was "no firing, demotion, reassignment or change in [p]laintiff's responsibilities," plaintiff's allegations that "she received a poor evaluation from her supervisor that resulted in an extended probationary period" did not constitute an adverse employment action).

Third, the Court concludes that Plaintiff has failed to adduce admissible record evidence from which a rational fact-finder could conclude that Plaintiff's termination was causally connected to her informal complaints about her coworkers. "[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 [2013]).

" '[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.' " *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 [2d Cir. 2000]). In this case, Plaintiff first complained about Martin and Mitchell on or around April 4, 2013, and was advised that her employment was being terminated by letter dated June 28, 2013. *See, supra,* Fact. Nos. 44-47, 133 in Part I.B. of this Decision and Order. In arguing that her complaints were causally connected to her termination, Plaintiff relies upon the temporal proximity of these events. (Dkt. No. 29 at 18 [Plf.'s Opp'n Memo. of Law].) Although these events occurred somewhat close in time, there were "substantial intervening events" between Plaintiff's first complaint and her termination which dispel any inference of a causal connection. *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory discharge."); *accord, e.g. Li-Wei Kato v. Erie Cmty. Coll.*, 11-CV-0415, 2015 WL 3823719, at *12 (W.D.N.Y. June 19, 2015); *Joseph v. Marco Polo Network, Inc.*, 09-CV-1597, 2010 WL 4513298, at *18 (S.D.N.Y. Nov. 10, 2010) ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference.") First, Defendant took the remedial step of assigning Plaintiff to a new supervisor (DeSalvatore). *See, supra*, Fact. Nos. 60-64 in Part I.B. of this Decision and Order. Second, with respect to Plaintiff's complaint that Mitchell was deleting her Dataquest e-mails, Defendant altered its usual practices with respect to Dataquest by giving another coworker (Schaffer) responsibility for handling Plaintiff's Dataquest e-mails. *See, supra*, Fact. Nos. 106-111 in Part I.B. of this Decision and Order. Third, on June 21, 2013, Plaintiff was given her probationary evaluation report, which would have continued her probationary status. *See, supra*, Fact. Nos. 120-22 in Part I.B. of this Decision and Order. Only after Plaintiff's altercation with Wagner on the same date that she received her final evaluation was her employment terminated (rather than continued). The timing and sequence of these events does not reasonably support the conclusion that, despite taking steps to

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 382 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

attempt to address Plaintiff's complaints about her coworkers (and deciding to continue her probationary employment), her employment was suddenly terminated as a "but-for" cause of her earlier complaints. [119] *Zann-Kwan*, 737 F.3d at 845.

 **\*34** For each of these reasons, as well as those set forth in Defendant's memoranda of law, the Court concludes that Plaintiff has not presented sufficient evidence to satisfy the causation element of a claim for retaliation under Title VII. Plaintiff's Title VII retaliation claim is therefore dismissed.

### C. Whether Plaintiff's Title VII Hostile Work Environment Claim Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative. Plaintiff has unambiguously withdrawn her claim that she was subjected to a hostile work environment, and the Court finds such withdrawal appropriate under Fed. R. Civ. P. 41(a)(2). (Dkt. No. 29 at 3 [Plf.'s Opp'n Memo. of Law].) As an alternative basis for dismissal, the

Court concludes that this claim must also be dismissed for the reasons set forth in Defendant's memorandum of law, each of which are unopposed by Plaintiff and possess facial merit. (Dkt. No. 21, Attach. 1, at 23-26 [Def.'s Memo. of Law].) *See, supra,* Part II.A. of this Decision and Order. [120]

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 21) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Verified Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall issue a Judgment for Defendant and close this action.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 149981

---

## Footnotes

1  The caption of Plaintiff's Verified Complaint lists only NYSED as a defendant, but the "Parties" section of the Verified Complaint alleges that "Defendant ANTHONY LOFRUMENTO ... [w]as Secretary of [NYSED], and is being sued herein, in his official capacity as the agency head of [NYSED]...." (Dkt. No. 1 at ¶ 11.) Even if Lofrumento was named as a defendant in this case and received adequate notice of that fact, however, Plaintiff's claims against him must be dismissed because "Title VII does not impose liability on individuals[.]" *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); *accord*, *Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009); *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004).

2  With respect to many of Defendant's factual assertions, Plaintiff "[d]en[ies] that the statement[s are] relevant or material[.]" (*See, e.g.,* Dkt. No. 29, Attach. 1, at ¶¶ 2-10, 12-22 [Plf.'s Rule 7.1 Response].) It is axiomatic that a party may not be awarded summary judgment on the basis of undisputed *immaterial* facts. As a result, a party opposing a motion for summary judgment may certainly object that particular facts (disputed or undisputed) are immaterial to the motion. However, a non-movant denying a movant's factual assertion in a statement of facts is required to support that denial by "set[ting] forth a specific citation to the record where the *factual* issue arises." N.D.N.Y. L.R. 7.1(a)(3) (emphasis added). Moreover, "[t]he Court shall deem admitted any properly supported facts set forth in the [moving party's] Statement of Material Facts that the [non-moving] party does not specifically controvert." *Id.* Simply stated, regardless of whether some or all of the facts to which Plaintiff responds as set forth above are immaterial for purposes of Defendant's motion for summary judgment, the issue of whether those *facts* are properly *disputed* is a separate matter. As for materiality, the materiality of an assertion of fact on a motion for summary judgment is a legal conclusion to be made by the Court. *See, e.g., Davis v. United States*, 11-CV-1211, 2015 WL 11142426, at \*2, n.2 (N.D. Ga. March 31, 2015) ("[M]ateriality ... [is] ... a legal conclusion to be made by the Court...."); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material.").

As a result, where a non-movant has merely objected to the materiality of a fact, and the Court has concluded that the fact is material, the fact will be deemed admitted. *See, e.g., Newmark v. Lawrence Hosp. Ctr.*, 07-CV-2861, 2008 WL 5054731, at *8, n.7 (S.D.N.Y. Oct. 20, 2008) (finding two material facts admitted where the non-movant merely objected to the materiality of the facts); *accord, Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934, 938 (7th Cir. 1993); *Lee v. Univ. Underwriters Ins. Co.*, 12-CV-3540, 2014 WL 11858159, at *1 (N.D. Ga. June 25, 2014); *Cunningham v. Enter. Rent-a-Car Co.*, 07-CV-1615, 2010 WL 724507, at *2, n.3 (W.D. Pa. Mar. 1, 2010).

3    Plaintiff purports to "deny that the assertions set forth [in paragraph 3 of Defendant's statement of material facts] are uncontroverted, material facts," but then concludes her response by stating "otherwise, admit," and cites no record evidence in support of her initial (nonspecific) denial. (Dkt. No. 29, Attach. 1, at ¶ 3 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted for each of two reasons. First, Plaintiff's ultimate response is to "admit" the fact asserted by Defendant, notwithstanding the inclusion of any additional legal argument in her response. *Cf. Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' "). Second, even if Plaintiff could be understood to deny Defendant's factual assertion, she has failed to cite record evidence supporting her denial or controverting the fact asserted. *See Aktas v. JMC Dev. Co., Inc.*, 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiff's Rule 56.1 statement but declined to provide record citations in support).

4    Plaintiff's response to Defendant's factual assertion (1) purports to "[d]eny that [the factual assertion] is relevant or material," (2) refers the Court to the record evidence cited by Defendant "for the specific contents thereof," (3) concludes with the words "but otherwise admit," and (4) provides additional citations to record evidence that neither support nor controvert the fact asserted by Defendant. (Dkt. No. 29, Attach. 1, at ¶ 5.) Unless otherwise noted in this Decision and Order, the Court will deem admitted any facts asserted by Defendant (with citation to supporting record evidence) which Plaintiff's response "admit[s]," notwithstanding its inclusion of superfluous commentary, legal argument, inaccurate record citations, or improperly asserted additional facts.

5    Plaintiff purports to deny Defendant's factual assertion and cites "the record in its entirety" in support of both her denial and her related assertion that "[a] searching review of the record ... establishes that these assertions are not sufficiently supported to warrant a finding that they constitute uncontroverted material facts." (Dkt. No. 29, Attach. 1, at ¶ 10 [Plf.'s Rule 7.1 Response].) In light of the record evidence cited by Defendant in support of its factual assertion (which, by its own terms, addresses only "[g]enerally" the relative comprehensiveness and complexity of work assignments originating from Dataquest), including Plaintiff's own deposition testimony, the Court finds that Defendant has sufficiently supported its factual assertion. (Dkt. No. 21, Attach. 2, at ¶ 10 [Def.'s Rule 7.1 Statement].) Mindful that Fed. R. Civ. P. 56 "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute," *Morales v. New York State Dep't of Labor Div. of Emp't Servs.*, 530 Fed.Appx. 13, 14 (2d Cir. 2013) (summary order), the Court further finds that Plaintiff's (counseled) citation to "the record in its entirety" is insufficient to controvert Defendant's factual assertion. (*Id.*) *See also* N.D.N.Y. L.R. 7.1(a)(3) ("Each denial shall set forth a *specific* citation to the record where the factual issue arises.") (emphasis added).

6     Plaintiff purports to deny this fact to the extent that it asserts that, "after April 2013[, Martin] did not continue to have some supervisory responsibilities with respect to [Plaintiff's] employment," but "otherwise admit[s]" the fact. (*Compare* Dkt. No. 21, Attach. 2, at ¶ 11 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 11 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted for each of two reasons. First, to the extent that Plaintiff may be understood to deny a fact merely *implied* by Defendant, her denial is insufficient to create a genuine dispute with respect to the fact that Defendant actually asserts. *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"). Second, even if Plaintiff had properly denied any portion of the fact asserted by Defendant, she has failed to cite any record evidence, supporting or otherwise, as required by Local Rule 7.1(a)(3). *See, supra,* note 3 of this Decision and Order.

7     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 12 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 12 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

8     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 13 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 13 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

9     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 14 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 14 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

10     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 15 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 15 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord, e.g.,* Dkt. No. 21, Attach. 7, at 112 [Martin Depo. Tr.].) *See also, supra*, note 6 of this Decision and Order.

11     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 16 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 16 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

12     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 17 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 17 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

13     (*Compare* Dkt. No. 21, Attach. 2, at ¶ 18 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 18 [Plf.'s Rule 7.1

WESTLAW   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 385 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported In Fed. Supp. (2017)

Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See, supra*, note 6 of this Decision and Order.

14 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 19 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 19 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See, supra*, note 6 of this Decision and Order.

15 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 20 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 20 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See, supra*, note 6 of this Decision and Order.

16 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 21 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 21 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

17 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 22 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 22 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

18 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 23 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 23 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

19 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 25 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 25 [Plf.'s Rule 7.1 Response, denying that above-stated fact is "relevant or material," and then purporting to "admit" a fact not asserted by Defendant (i.e., that Defendant "treated [her] in an adverse and hostile manner") without citation to record evidence].)

20 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 26 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 26 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

21 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 28 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 28 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 4, at 48 [Plf.'s Depo. Tr.].) *See also, supra*, note 6 of this Decision and Order.

22 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 29 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 29 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

23 In response to this factual assertion, Plaintiff "admit[s that] Mitchell sent [her] an email on April 1, 2013." (Dkt. No. 29, Attach. 1, at ¶ 30 [Plf.'s Rule 7.1 Response].) To the extent that Plaintiff may be understood to deny

this factual assertion in part, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted. Rather, Plaintiff refers the Court to the e-mail message at issue, which is consistent with the characterization of the e-mail message set forth in Defendant's factual assertion. (Dkt. No. 21, Attach. 2, at ¶ 30 [Def.'s Rule 7.1 Statement].)

24 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 32 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 32 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 18, at NYSED000074 [Mitchell Aff.].) *See also, supra*, note 6 of this Decision and Order.

25 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 34 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 34 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

26 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 35 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 35 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

27 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 36 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 36 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

28 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 37 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 37 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].)

29 (Dkt. No. 21, Attach. 5, at 7 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 5].)

30 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 40 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 40 [Plf.'s Rule 7.1 Response, purporting to "admit only" a fact not asserted by Defendant (i.e., that Plaintiff also testified that she believed that Martin credited Mitchell's allegedly false account of the incident, in which Mitchell purportedly blamed Plaintiff for the "noise" of their confrontation) ]; *accord*, Dkt. No. 21, Attach. 4, at 75 [Plf.'s Depo. Tr.].)

31 (Dkt. No. 21, Attach. 4, at 76-80 [Plf.'s Depo. Tr.].)

32 (Dkt. No. 21, Attach. 4, at 84-87 [Plf.'s Depo. Tr.].)

33 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 43 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 43 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Martin "was not aware of" Plaintiff's allegations of discrimination against Martin) ].) *See also Yetman*, 2015 WL 4508362, at *10 (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity*, 51 F. Supp. 3d at 418 (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 387 of 427

or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts").

34    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 44 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 44 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff's allegations "amount only to 'concerns about her interactions with coworkers and her supervisor' ") ].) *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

35    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 45 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 45 [Plf.'s Rule 7.1 Response, purporting to admit that Plaintiff "contacted Mr. Earle in his capacity as the individual who handled complaints of discrimination"].) To the extent that Plaintiff may be understood to deny any portion of the fact asserted by Defendant, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact that Defendant actually asserts. Moreover, to the extent that Plaintiff may be understood to deny a fact merely *implied* by Defendant (i.e., that Plaintiff contacted Earle for a purpose exclusive of any complaints of discrimination), her denial is insufficient to create a genuine dispute with respect to the fact that Defendant actually asserts. *See Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

36    (Dkt. No. 21, Attach. 22, at 1 [Plf.'s E-mail to Mahoney, dated 4/4/2013].)

37    (Dkt. No. 21, Attach. 5, at 9 [Def.'s Depo. Ex. 6].)

38    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 48 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 48 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that "Defendants" were trained in how to follow, and followed, the policy) ].) *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

39    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 49 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 49 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff "contacted [Earle] in any capacity other than [as] the person 'specializing' in complaints of discrimination") ].) *See also Yetman*, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

40    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 50 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 50 [Plf.'s Rule 7.1 Response, purporting to "admit that there is a NYSED Employee Handbook regarding formal grievances"]; *accord*, Dkt. No. 21, Attach. 19, at NYSED000131].) To the extent that Plaintiff may be understood to deny any portion of the fact asserted by Defendant, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact that Defendant actually asserts.

41    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 51 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 51 [Plf.'s Rule 7.1

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 388 of 427

Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact].) *See also, supra*, note 6 of this Decision and Order.

42    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 52 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 52 [Plf.'s Rule 7.1 Response, purporting to "admit only" that she contacted Earle "regarding her perception that she was being harassed by Martin and Mitchell [due to] her [n]ational [o]rigin"].) To the extent that Plaintiff may be understood to deny the fact asserted by Defendant, that denial is ineffective because (1) it does not specify what part of the fact is denied as required by Local Rule 7.1(a)(3), and (2) it is not supported by a record citation that actually supports the denial.

43    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 53 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 53 [Plf.'s Rule 7.1 Response, purporting to "admit" a fact not asserted by Defendant (i.e., that "among [Plaintiff's] allegations [to Earle] were complaints of discrimination because of her national origin") and failing to deny above-stated fact].)

44    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 54 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 54 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit [that] Plaintiff requested a reassignment only"].) To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied a required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted.

45    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 58 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 58 [Plf.'s Rule 7.1 Response, "[d]eny[ing]" above-stated fact but failing to provide a specific citation to record evidence supporting the denial or controverting the fact asserted; citing, instead, Plaintiff's 216-page deposition transcript in its entirety]; *accord*, Dkt. No. 21, Attach. 18, at NYSED000036 ¶ 2 [Moorhead Aff.].)

46    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 62 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 62 [Plf.'s Rule 7.1 Response, denying that "the conflict was limited to a 'personality conflict' "].) *See also* Yetman, 2015 WL 4508362, at *10; *Baity*, 51 F. Supp. 3d at 418.

47    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 63 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 63 [Plf.'s Rule 7.1 Response, denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord*, Dkt. No. 21, Attach. 14, at 67-68, 84-85 [Wagner Depo. Tr.].) *See also, supra*, note 6 of this Decision and Order.

48    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 64 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 64 [Plf.'s Rule 7.1 Response, failing to respond in any manner to the fact asserted].)

49    (Dkt. No. 21, Attach. 5, at 11-12 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 8].)

50    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 66 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 66 [Plf.'s Rule 7.1 Response, purporting to "admit [that] Moorhead was asked to address [P]laintiff's concerns"].) To the

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 389 of 427

extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). Third, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted.

51    (Dkt. No. 21, Attach. 5, at 11-12 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 8].)

52    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 68 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 68 [Plf.'s Rule 7.1 Response, purporting to deny a fact not asserted by Defendant (i.e., the implication that Plaintiff "met repeatedly with Moorhead after she was reassigned to DeSalvatore"), but failing to cite record evidence actually supporting denial, and in any event "otherwise admit[ting]" the fact asserted].) *See also Yetman,* 2015 WL 4508362, at *10; *Baity,* 51 F. Supp. 3d at 418.

53    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 69 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 69 [Plf.'s Rule 7.1 Response, purporting to "deny that the assertions ... are uncontroverted, material facts," but to "[a]dmit [that P]laintiff contacted Dina Haggerty"].) To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). Second, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted, as also required by Local Rule 7.1(a)(3).

54    (Dkt. No. 21, Attach. 2, at ¶ 70 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 70 [Plf.'s Rule 7.1 Response, purporting to "admit only" a fact not asserted by Defendant (i.e., that "Haggerty spoke with Earle concerning Plaintiff's allegations of discrimination and harassment") ]; *accord*, Dkt. No. 28, Attach. 2, at 26-28 [Haggerty Depo. Tr.].)

55    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 72 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 72 [Plf.'s Rule 7.1 Response, purporting to "deny that the assertions ... are uncontroverted, material facts," but to "[a]dmit only that [Plaintiff] was willing to attempt to move forward under a new supervisor and that she expressed her willingness to do so on April 15, 2013"].) To the extent that Plaintiff may be understood to deny this factual assertion in part, her partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). Second, Plaintiff has failed to cite any record evidence supporting her partial denial or controverting the fact asserted, as also required by Local Rule 7.1(a)(3).

56    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 73 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 73 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000037 ¶ 5 [Moorhead Aff].)

57    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 73 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 73 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].)

58    (Dkt. No. 21, Attach. 5, at NYSED001268 [Def.'s Depo. Ex. 9].)

59    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 78 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 78 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000049 [DeSalvatore Aff.].)

60    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 79 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 79 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit only" an additional fact not asserted by Defendant (i.e., that Plaintiff "made additional allegations of discrimination after DeSalvatore was assigned as [her] supervisor) and failing to cite record evidence actually supporting any denial].)

61    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 80 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 80 [denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000049 [DeSalvatore Aff.].) *See also, supra*, note 6 of this Decision and Order.

62    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 81 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 81 [denying above-stated fact and citing "the record in its entirety," but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.].) *See also, supra*, note 6 of this Decision and Order.

63    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 79 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 79 [Plf.'s Rule 7.1 Response, purporting to admit an additional fact not asserted by Defendant (i.e., that Plaintiff contacted Earle regarding her "allegations of discrimination") and "otherwise deny[ing]" the fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

64    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 84 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 84 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact]; *accord,* Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.].)

65    (Dkt. No. 21, Attach. 5, at 25 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 14].)

66    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 88 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 88 [Plf.'s Rule 7.1 Response, denying above-stated fact, but failing to cite record evidence actually supporting denial of above-stated fact].) The Court notes that Defendant asserts that Martin prepared a draft evaluation for the period beginning August 19, 2012; but Martin's e-mail attaching the draft evaluation states that the draft evaluation covers the period "7/19 – 4/11," and the draft evaluation itself reflects that Plaintiff's "Date Appointed" was July 19, 2012. (Dkt. No. 21, Attach. 9 [Plf.'s Ex. 10].) This factual assertion is in conflict with Defendant's Fact Number 1, above, which asserts that Plaintiff was appointed on August 9, 2012.

67    (Dkt. No. 28, Attach. 2, at 31-32 [Haggerty Depo. Tr.]; Dkt. No. 21, Attach. 18, at NYSED000077 [Haggerty Aff.].)

68    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 90 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 90 [Plf.'s Rule 7.1 Response, purporting to "Admit" facts not asserted by Defendant and failing to deny above-stated fact]; *accord,* Dkt. No. 21, Attach. 11, at 54 [DeSalvatore Depo. Tr.].) The Court notes that the copy of the

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 391 of 427

Zhao-Royo v. New York State Educ. Dep't, Not Reported In Fed. Supp. (2017)

draft evaluation cited by Defendant contains no recommendation as to whether Plaintiff's services should be retained, terminated, or continued on probation (in other words, that question is left blank). (Dkt. No. 21, Attach. 9, at NYSED000393].) However, the parties agree (and the record suggests) that Martin initially recommended terminating Plaintiff's employment. (*See, e.g.,* Dkt. No. 21, Attach. 7, at 35-36, 46 [Martin Depo. Tr.].)

69 (Dkt. No. 21, Attach. 14, at 105-06 [Wagner Depo. Tr.].)

70 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 94 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 94 [Plf.'s Rule 7.1 Response, denying above-stated fact in part (i.e., that Martin did not discuss the evaluation based on Moorhead's direction), but failing to provide specific record citation actually supporting partial denial of above-stated fact]; citing, instead, Moorhead's 35-page deposition transcript in its entirety].) Although Defendant asserts that "[i]t was usual practice for a supervisor to *dismiss* a performance evaluation ..." (Dkt. No. 21, Attach. 2, at ¶ 94 [emphasis added] ), Defendant's record citation makes clear that it intended to state "discuss," and Plaintiff's response reflects her understanding of that intention.

71 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 96 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 96 [denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

72 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 97 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 97 [purporting to admit a fact not asserted by Defendant (i.e., the implication that Mitchell "has access to [Plaintiff's] confidential probationary evaluation and that Plaintiff discovered this" when she picked up Mitchell's e-mail from the printer), but "otherwise den[ying]" above-stated fact without citation to record evidence actually supporting denial of above-stated fact].)

73 (Dkt. No. 21, Attach. 18, at NYSED000074 [Mitchell Aff.].)

74 (Dkt. No. 21, Attach. 4, at 112-14 [Plf.'s Depo. Tr.].)

75 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 100 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 100 [admitting only that "Plaintiff disclosed the incident to DeSalvatore" and otherwise denying above-stated fact, but failing to cite record evidence actually supporting partial denial of above-stated fact].)

76 (Dkt. No. 21, Attach. 2, at ¶ 106 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above stated-fact]; *with* Dkt. No. 29, Attach. 1, at ¶ 106 [Plf.'s Rule 7.1 Response, "[d]enying [that] Plaintiff did not make an allegation of discrimination" but failing to cite record evidence actually supporting partial denial and "otherwise admit[ting]" fact asserted].)

77 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 108 [Def.'s Rule 7.1 Statement, asserting above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 108 [purporting to admit a fact not asserted by Defendant (i.e., the implication that Mitchell's responsibility "was not to access Plaintiff's Dataquest mailbox") but failing to cite record evidence supporting a denial].)

78 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 109 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 109 [admitting that Mitchell was generally responsible for "overseeing Dataquest," but asserting that Mitchell's responsibility "was not to access Plaintiff's Dataquest mailbox"]; *accord*, Dkt. No. 21, Attach. 4, at 135 [Plf.'s Depo. Tr., in which Plaintiff stated that Mitchell's duties with respect to Dataquest included Plaintiff's Dataquest mailbox "before

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 392 of 427

the supervisor change," but that, thereafter, Mitchell "was specifically instructed not to touch [Plaintiff's] work and ... not to access anything"].)

79 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 115 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 115 [admitting "only that Plaintiff raised concerns about her working environment to DeSalvatore during the scheduled check-in meetings" and otherwise denying above-stated fact, but failing to cite record evidence actually supporting partial denial of above-stated fact].)

80 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 116 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 116 [denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) According to DeSalvatore, at the check-in meeting on June 7, 2013, Plaintiff "mentioned sexual harassment" but, when DeSalvatore "told her point blank that she was in no way encountering any sexual harassment here," Plaintiff "agreed." (Dkt. No. 21, Attach. 18, at NYSED000050 [DeSalvatore Aff.]; *accord,* Dkt. No. 21, Attach. 11, at 102 [DeSalvatore Depo. Tr.].) Because Plaintiff made reference to "sexual harassment," however, DeSalvatore "immediately" scheduled a meeting with Plaintiff and Earle. (Dkt. No. 21, Attach. 11, at 101-03 [DeSalvatore Depo. Tr.].) Although it is unclear to what Plaintiff was referring which she mentioned "sexual harassment" to DeSalvatore, Plaintiff testified in her deposition that she is not asserting a claim of sexual harassment in this action. (Dkt. No. 21, Attach. 4, at 202 [Plf.'s Depo. Tr.].)

81 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 118 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 118 [purporting to "[a]dmit" an additional fact not asserted by Defendant (i.e., that Plaintiff "specifically complained verbally about discrimination") and otherwise denying fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].) Plaintiff was apparently referencing a proposed bill that would create a state law civil cause of action for employees who were subjected to an "abusive work environment." N.Y. Assembly Bill No. A3250 (Jan. 22, 2015).

82 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 119 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 119 [purporting to "[a]dmit" an additional fact not asserted by Defendant (i.e., that DeSalvatore, Earle, and Plaintiff met to discuss "allegations of 'sexual harassment' ") and otherwise denying fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

83 (Dkt. No. 21, Attach. 5, at 25 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 14].)

84 (Dkt. No. 21, Attach. 18, at NYSED000059 [Wagner Aff.]; Dkt. No. 21, Attach. 14, at 111-12 [Wagner Depo. Tr.]; Dkt. No. 21, Attach. 4, at 180-82 [Plf.'s Depo. Tr.].)

85 (*Compare* Dkt. No. 21, Attach. 2, at ¶ 125 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 125 [denying above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

86 (Dkt. No. 21, Attach. 14, at 111-16 [Wagner Depo. Tr.].)

87 (Dkt. No. 21, Attach. 4, at 184-85 [Plf.'s Depo. Tr.].)

88 (Dkt. No. 21, Attach. 14, at 116 [Wagner Depo. Tr.].)

89 (Dkt. No. 21, Attach. 4, at 187 [Plf.'s Depo. Tr.].)

Zhao-Royo v. New York State Educ. Dep't, Not Reported in Fed. Supp. (2017)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 393 of 427

90    (Dkt. No. 21, Attach. 14, at 118 [Wagner Depo. Tr.].)

91    (Dkt. No. 21, Attach. 4, at 188 [Plf.'s Depo. Tr.].)

92    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 129 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 129 [Plf.'s Rule 7.1 Response, purporting to "[a]dmit only that Wagner alleged Plaintiff was acting in a manner consistent with the allegations in the probationary report" and "otherwise deny[ing]" fact asserted, but failing to cite record evidence actually supporting denial of above-stated fact].)

93    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 130 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 130 [denying above-stated fact to the extent that Defendant asserts that Wagner e-mailed Franchini "immediately" after Plaintiff left his office, but failing to cite record evidence actually supporting denial of above-stated fact, given that the e-mail was sent at 7:11 p.m.].)

94    (Dkt. No. 21, Attach. 5, at 30 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 17].)

95    (Dkt. No. 21, Attach. 14, at 138-140 [Wagner Depo. Tr.].)

96    (*Compare* Dkt. No. 21, Attach. 2, at ¶ 135 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 29, Attach. 1, at ¶ 135 [Plf.'s Rule 7.1 Response, admitting that Plaintiff "never filed a 'formal' complaint or grievance, and purporting to deny a fact not expressly asserted by Defendant (i.e., that "such a process was available for allegations of discrimination based on national origin ...") ].) The Court notes that, to the extent that Plaintiff asserts that Defendant's employee handbook does not *specifically* state that an employee may file a complaint or grievance regarding national origin discrimination, she appears to be correct. (Dkt. No. 21, Attach. 19, at NYSED128-30.) However, the employee handbook states that it is New York State policy to "provide for and promote equal opportunity employment, compensation, and other terms and conditions of employment without discrimination on the basis of age, race, color, religion, disability, *national origin* ..." (*Id.* at NYSED128 [emphasis added].) A separate section of the employee handbook, titled "Complaints and Grievances," discusses employees' right to file a complaint and/or grievance about "working conditions, perceived out-of-title duties or other things related to your job" that cannot be resolved by a discussion with the employee's manager or supervisor. (*Id.* at NYSED000131.)

97    Although the NYSDHR's determination states that Plaintiff's "complaint" was ordered dismissed, the determination's discussion reflects that the NYSDHR also considered, and rejected, the claim in her amended complaint (i.e., racial discrimination). (*See* Dkt. No. 21, Attach. 18, at NYSED000109 [noting that Plaintiff's complaint "was amended to include race as a basis [of discrimination] and allegations of disparate pay"].)

98    Specifically, Defendant argues that Plaintiff has denied (in whole or in part) the following numbered material facts set forth in its statement of material facts, without citation to supporting record evidence: 10-23, 26, 28-29, 32, 34-38, 51, 63, 69, 72-74, 76, 80-81, 84, 95-96, and 100. (Dkt. No. 30 at 2 n.1.)

99    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

100    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

101 Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

102 *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

103 With respect to her Title VII *retaliation* claim, Plaintiff argues that the extension of her probationary period of employment (as opposed to permanent retention) also constituted an adverse employment action. (Dkt. No. 29 at 17 [Plf.'s Opp'n Memo. of Law].) However, the only adverse employment action that she identifies with respect to her Title VII *discrimination* claim is the termination of her employment. (*Id.* at 20.)

104 Fact No. 18 in Part I.B. of this Decision and Order.

105 Fact No. 27 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 4, at 48 [Plf.'s Depo. Tr.].)

106 Fact No. 28 in Part I.B. of this Decision and Order.

107 Fact Nos. 29-31 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 4, at 67-68 [Plf.'s Depo. Tr.].)

108 Fact No. 33 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 4, at 63-65 [Plf.'s Depo. Tr.].)

109 Fact No. 40 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 4, at 75 [Plf.'s Depo. Tr.].)

110 Fact No. 41 in Part I.B. of this Decision and Order.

111 Fact No. 42 in Part I.B. of this Decision and Order.

112 (Dkt. No. 1 at ¶¶ 71-72 [Plf.'s Verified Compl.].)

113 Fact No. 99 in Part I.B. of this Decision and Order.

114 Fact No. 101 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 4, at 111-15 [Plf.'s Depo. Tr.].)

115 (Dkt. No. 21, Attach. 5, at 17 [pagination generated by CM/ECF] [Def.'s Depo. Ex. 10].)

116 Fact Nos. 106-07 in Part I.B. of this Decision and Order.

117 Fact No. 115 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 21, Attach. 11, at 139-140 [DeSalvatore Depo. Tr.].)

118 Fact Nos. 126-28 in Part I.B. of this Decision and Order.

119 Although Plaintiff disputes Wagner's account of their altercation in Wagner's office suite on the evening of June 21, 2013, Plaintiff's version of the altercation does not suggest that she engaged in any additional protected activity which might have served as a basis for the termination of her employment shortly thereafter.

According to Plaintiff, she could "hardly get a word [out]," and she left Wagner's office upon his repeated demands that she do so. (Dkt. No. 21, Attach. 4, at 187-88 [Plf.'s Depo. Tr.].)

120   As noted above, Defendant also argues that, if Plaintiff's claims are not dismissed, the Court should hold that Plaintiff has failed to mitigate damages for at least a portion of the period of time for which she seeks to recover. (Dkt. No. 21, Attach. 1, at 34-35.) Although Defendant's argument appears to have merit, the Court has no occasion to reach it.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 396 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

2020 WL 3038275
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

No. 9:17-CV-375 (TJM/CFH)
|
Signed 01/24/2020

**Attorneys and Law Firms**

Nicholas Zimmerman, 02-A-1663, Wende Correctional Facility, P.O. Box 1187, Alden, New York 14004, Plaintiff pro se

Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General

**REPORT-RECOMMENDATION AND ORDER** [1]

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Nicholas Zimmerman ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants former Superintendent of Clinton Correctional Facility ("Clinton") Steven Racette ("Supt. Racette"); former Deputy of Security at Clinton Brown ("Brown"); current Superintendent of Clinton Michael Kirkpatrick ("Supt. Kirkpatrick"); Current Deputy of Programs at Clinton Macintosh ("Mcintosh"); Clinton Special Housing Unit ("SHU") Director Donald Venettozzi ("Venettozzi"); Clinton Deputy Zerniak ("Deputy Zerniak"); Lieutenant ("Lt.") Rief ("Lt. Rief"); Sergeant ("Sgt.") Mark Orzech ("Sgt. Orzech"); Sgt. Kevin Randall ("Sgt. Randall); Sgt. Justin Delisle ("Sgt. Delisle"); Correction Officer (C.O.) Jimmy Mailloux ("C.O. Mailloux"); [2] C.O. Christopher Gadway ("C.O. Gadway"); C.O. Chad Stickney ("C.O. Stickney"); C.O. Richard Lee ("C.O. Lee"); C.O. Stephen Beaudette ("C.O. Beaudette"); C.O. P. Devlin ("C.O. Devlin"); J. Miller ("Miller"); Deputy Supt. Keysor ("Keysor"); former

Clinton doctor Richard Adams ("Dr. Adams"); New York State Office of Mental Health (OMH) doctor Sohail Gillani ("Dr. Gillani"); [3] Clinton Senior Librarian Kristen Delisle ("Librarian Delisle"); and DOCCS investigator Lisa J. Clemons ("Clemons"), violated his constitutional rights under the First and Eighth Amendments. See Dkt. No. 14 ("Amen. Compl."). [4]

**\*2** Presently pending before the Court is defendants' motion for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. See Dkt. No. 68. Plaintiff opposed the motion. See Dkt. No. 75. [5] Defendants filed a reply. See Dkt. No. 80. For the reasons that follow, it is recommended that defendants' motion for partial summary judgment be granted.

## I. Background

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II.A., infra. At all relevant times, plaintiff was an inmate incarcerated at Clinton.

### A. Plaintiff's Recitation of the Facts [6]

#### 1. Plaintiff's Property

On April 14, 2014, plaintiff was transferred from Attica Correctional Facility ("Attica") to Clinton. See Dkt. No. 14-1 at 2 ¶ 2. On April 25, 2014, C.O. Mailloux escorted plaintiff from his cell to the "property area" to allow plaintiff to take inventory of his property that had been mailed from Attica to Clinton. Id. at 7 ¶ 11. At the direction of Sgt. Orzech, when C.O. Mailloux let plaintiff out of his cell, he informed plaintiff that allowing him to inventory his property was a "privilege and if [plaintiff] g[a]ve [him] a hard time, [he would] put [plaintiff] back in [his] cell." Id. Once they arrived at the property area, plaintiff was given only some of his property bags, which had been transferred from Attica to Clinton. See id. at 2 ¶ 3. Sgt. Orzech informed plaintiff that the Inspector General's ("IG") Office was holding his additional property bags. See id. At plaintiff's request, see id., Sgt. Orzech noted, in writing, on plaintiff's property transfer form that the IG was holding plaintiff's remaining property bags and indicated, "not all property received by Attica C.F. (late bags held by IG per phone message from Attica)." Dkt. No. 14-4 at 1. The

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 397 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

property transfer form also contains a checked box which states "I am not leaving active legal case materials behind and have been instructed to include all active legal materials in my 4-bag limit." Id. (capitalization omitted).

 **\*3** At some point while plaintiff was in the property area, C.O. Mailloux and plaintiff had a verbal disagreement and plaintiff told C.O. Mailloux that he "always like[d] to work with staff before filing a grievance about an issue." Id. at 7. In response to plaintiff's statement, C.O. Mailloux escorted plaintiff back to his cell "without being able to inspect [or] inventory" his property. Id. at 7 ¶ 12. "Hours later, [C.O. Mailloux] came to [plaintiff's] cell and gave [him] portions of [his] property ..., which did not include [his] legal, political, business[,] and personal documents/book. All of these materials were kept in storage for [plaintiff's] entire three[-]year stay at Clinton." Id. at 7. Plaintiff filed a grievance against Sgt. Orzech and C.O. Mailloux on April 25, 2014, concerning the foregoing events and his missing property. See Dkt. No. 14-4 at 5. He filed two additional grievances on May 16 and May 20, 2014, regarding his missing property. See id. at 6-8. In addition, plaintiff requested, pursuant to the Freedom of Information Law ("FOIL"), video and audio recordings of his conversations with Clinton correctional staff regarding his property. See Dkt. No. 14-1 at 4 at 10-18. Plaintiff paid for the recordings, which were copied onto a compact disk, but before the disk was "mailed to [plaintiff's] paralegal assistant," Sgt. Orzech "destroyed" the disk by "put[ting] a stable in the bottom of [it]." Dkt. No. 14-1 at 5.

### 2. Transfer to 13 Cell

On April 27, 2014, plaintiff spoke to Sgt. Randall about his missing property. See Dkt. No. 14-1 at 8 ¶ 14. Sgt. Randall stated, "[o]h now you wanna [sic] talk to me[?] You have stopped every [c]aptain, [d]eputy[,] and [s]uperintendent about your property, but you have not said anything to me about it. This is my ... unit and you must come to me first." Id. at 9 ¶ 14 (parenthesis omitted). Plaintiff replied that he "had not come to [Sgt. Randall] because he told [plaintiff] that [plaintiff] was a 'needy inmate' and that [plaintiff] should not 'stop him every[ ]day.' " Id. Approximately one hour after speaking to Sgt. Randall, plaintiff was taken to the property area and given "two more bags of [his] property." Id. After plaintiff obtained his property bags, he was "transferred to the infamous 13 Cell." Id. (internal quotation marks and parenthesis omitted). Plaintiff describes 13 Cell as "a dirty,

filthy cell that is never cleaned by porters, feces stuck to the base of the toilet, urine soaked mattress, thick sheets of dust on the floor, no broom or cleaning supplies, no desk, no light, no music-tv outlet, etc....." Id. at ¶ 15 (parenthesis omitted). Plaintiff states that 13 Cell is only used for inmates who "file litigation or utilize mental health services." Id. at ¶ 15. Plaintiff filed a grievance against Sgt. Randall alleging that his transfer to 13 Cell was done "in retaliation for [plaintiff] exercising [his] rights." See Dkt. No. 14-4 at 21.

The Inmate Grievance Program ("IGP") denied plaintiff's grievance against Sgt. Randall and clarified that plaintiff had "received a total of six bags of property. Four bags were received on 4/23/14 and two bags were received on 4/26/14. During the processing of the property [plaintiff] became agitated with an aggressive demeanor and it was determined that [plaintiff] was to be removed and returned back to his cell." Id. at 22. Further, the IGP noted that plaintiff

> "was housed in accordance with facility and DOCCS policy and directives, as well as space availability. [13 C]ell was and is in normal use in unit #14. Plaintiff is afforded the opportunity for cleaning and supplies [ ]on Tuesdays, Thursdays[,] and Saturdays weekly. The cell is equipped with an ear jack and [plaintiff] did sign for and has an ear headphone." Id.

The Central Office Review Committee ("CORC") unanimously denied plaintiff's appeal of the IGP determination, as without merit. See id. at 23. CORC explained that "four bags of [plaintiff's] property were received on 4/23/14 and two additional bags were received on 4/26/14. It appears that one bag was inadvertently misplaced." Id. at 23. CORC further noted that C.O. Mailloux stated that plaintiff "became uncooperative while viewing his property on 4/25/14, and that he was escorted back to the housing unit" and that he issued plaintiff "all legal materials and 20 letters[ ] in accordance with [DOCCS] Directive #4933." Id. Moreover, CORC observed that plaintiff was "moved [to 13 Cell] due to his behavior," which "was in normal use, has an ear jack, that headphones were issued to [plaintiff,]" and that plaintiff was afforded cleaning supplies on Tuesdays, Thursdays[,] and Saturdays." Id.

### 3. Cell Searches

 **\*4** Plaintiff states that, on April 30, 2014, C.O. Gadway "ramsacked [sic] [his] cell, stole-confiscated-and destroyed [his] legal-personal and business documents and wrote

two misbehavior reports charging [plaintiff] with violating" several DOCCS rules, including using his correspondence to solicit funds and conduct a business while in custody. Dkt. No. 14-1 at 12 ¶ 19. In his April 30, 2014 misbehavior report,[7] C.O. Gadway "claimed to have searched [plaintiff's] cell and confiscated documents that show[ed plaintiff] was running a business." Id. at ¶ 20. However, plaintiff states, he "was not in possession of any business documents" on April 30, 2014, as his property "bag #7 ... which contained [his] business documents was allegedly lost or in the possession of the I.G." Id. (internal quotation marks and parenthesis omitted). Rather, to acquire plaintiff's business documents, plaintiff states that C.O. Gadway "went into [plaintiff's] alleged lost bags of property, grabbed a bunch of documents[,] and issued the [misbehavior] report" for the "sole purpose" of "rid[ding plaintiff] of [his] important business and legal documents" and "stop [plaintiff] from exercising [his] [F]irst [A]mendment rights." Id. at 13 ¶ 20.

On July 18, 2014, C.O. Gadway again "ramsack[ed]" plaintiff's cell, confiscated documents, and issued a misbehavior report, which stated that "upon inspection of [plaintiff's] cell and ... personal property[, C.O. Gadway] found [plaintiff] to be in possession of several documents [and] letters, providing evidence that [plaintiff wa]s running Madison Ave. Entertainment Group[ ] while incarcerated" and using his correspondence privileges to solicit funds in violation of DOCCS rules. Id. at 14; Dkt. No. 14-4 at 24. "This time around [plaintiff] did have business documents in [his] cell, but Clinton's mailroom and Media Review Committee had reviewed them and allowed [him] to possess them." Dkt. No. 14-1 at 14 ¶ 21. "[A]ll documents [C.O. Gadway] confiscated and ultimately destroyed were adverse to [DOCCS'] public image." Id. Plaintiff states that C.O. Gadway "threw thousands of pages of doc[uments] all around [his] cell, ripping some pages," "ripped up photos, threw some documents on [plaintiff's] toilet, poured grape juice on [plaintiff's] sheets, put dirty books on [plaintiff's] clean clothes, and took [plaintiff's] pen so [he] couldn't write." Id. at 17 ¶ 23. Moreover, plaintiff states that, as "the A-man for the SHU, [C.O. Gadway] would have access to all complaints filed by SHU prisoners," and that his misbehavior reports were written in retaliation for plaintiff exercising his constitutional rights. Id. at 17 ¶ 24. Plaintiff filed a grievance against C.O. Gadway based on the July 18, 2014 cell search, which Supt. Racette denied. See Dkt. No. 14-1 at 25-26, 34.

In May 2015, C.O. Lee conducted a search of plaintiff's cell and confiscated and threw away two of three copies of

plaintiff's issue of Entrepreneur Magazine, allowing plaintiff to retain one copy. See Dkt. No. 14-1 at 31 ¶ 42. Plaintiff filed a grievance regarding C.O. Lee's actions, see Dkt. No. 14-4 at 36, which Supt. Kirkpatrick denied. See id. at 40. On June 19 and July 12, 2015, C.O. Lee searched plaintiff's cell and "threw away a neatly stacked folder of magazine articles that [plaintiff had] been collecting to use as exhibits in [his] civil action to support [his] argument that prisoners have a First Amendment [r]ight to run a business." Dkt. No. 14-1 at 32 ¶ 42. C.O. Lee issued plaintiff contraband receipts for the documents he threw away, which he labeled as "excess garbage" and characterized as a "fire hazard" and "possibl[y] gang related." Dkt. No. 14-4 at 41, 42; see Dkt. No. 14-1 at 32 ¶ 43. With respect to the July 12, 2015 cell search, C.O. Lee confiscated 49 magazines and 11 books, and advised plaintiff that he "had to send them home because [he] was over the property limits." Dkt. No. 14-1 at 35 ¶ 47. Accordingly, plaintiff "filled out form 2068 and chose to send [the magazines] home through [a] visitor." Id. When plaintiff next went to the visiting room, he was informed that no bags were available for pickup. See id. Plaintiff "became extremely irate" and "decid[ed] that it was time to harass[,] bully[,and] mental[ly] tortur[e]" C.O. Lee. Dkt. No. 14-1 at 33 ¶ 45. In October 2015, plaintiff filed a grievance and letter concerning his "missing magazines." See id. at ¶ 48; Dkt. No. 14-5 at 14. Supt. Kirkpatrick denied plaintiff's grievance and informed him that the magazines were destroyed pursuant to DOCCS Directive # 4911 when the visitor plaintiff listed "never showed up for the visit." Dkt. No. 14-5 at 16. CORC upheld Supt. Kirkpatrick's determination. See id. at 17.

**\*5** With respect to the July 12, 2015 cell search, C.O. Lee issued plaintiff three misbehavior reports. See id. at 43, 44, 45. One misbehavior report stated that, during the July 12, 2015 cell search, plaintiff began screaming at C.O. Lee that he was "gonna [sic] violate [C.O. Lee] every chance [he] got." Id. at 43. C.O. Lee's misbehavior report states that he informed his area supervisor of plaintiff's threat, and that plaintiff was removed from his cell and placed in a cell with a plexiglass shield on the door. See id. The "shield order" was reevaluated three times, once upon review by Sgt. Delisle and twice upon review by Sgt. Orzech, and authorized by a higher ranking DOCCS official. See Dkt. No. 14-4 at 46, 47, 48. Another misbehavior report stated that, during the July 12, 2015 cell search, C.O. Lee discovered typed documents demonstrating that plaintiff was attempting to solicit money through a pen pal program in violation of DOCCS Rules 103.20 (soliciting) and 180.11 (facility correspondence). See id. at 45. In a third misbehavior report, C.O. Lee stated that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 399 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

plaintiff harassed him by calling him a "cracker ass bitch whenever he would make a round" and that plaintiff sounded a false alarm. Id. at 44 (internal quotation marks omitted). Plaintiff states that C.O. Lee "requested that a cell plexi-glass shield be placed on [plaintiff's] cell door (which prevents all air circulation) because of the 'I'm gonna violate you' statement." Dkt. No. 14-1 at 33 ¶ 45. He contends, however, that his statement was mischaracterized because he told C.O. Lee only that he was going to "verbally violate him." Dkt. No. 14-1 at 34 ¶ 46. Following a disciplinary hearing, plaintiff was found guilty of creating a disturbance, harassment, and threats in violation of DOCCS Rules 104.13, 107.11, and 102.10, respectively. See Dkt. No. 14-4 at 53. However, plaintiff was found not guilty of solicitation, violating correspondence policies, possessing flammable materials, interference with an employee, or sounding a false alarm. See id. at 53, 54.

In October 2015, plaintiff "started a non-violent, progressive, litigious, writing campaign labeled 'The Clean Up The Clinton SHU Campaign.' " Dkt. No. 14-1 at 50 ¶ 68. "The actions of the campaign was [sic] to file grievances, write to reporters-legislators-legal organizations, etc., post petitions on line, pass out flyers in the streets and ultimately, if all else failed, file a massive Class-Action lawsuit." Id. In November 2015, Clinton SHU inmates "started filing grievances." Id. In retaliation for the Clean Up The Clinton SHU Campaign, "Sgt. Delisle and his SHU staff started to retaliate against [SHU inmates] by performing an increase in the destructive cell searches, denying [them] hot showers, hot food, mail, etc." Id. at 50-51 ¶ 70.

On November 24, 2015, C.O. Beaudette instructed nonparty C.O. Myers to deny plaintiff a shower in retaliation for plaintiff's grievances. See Dkt. No. 14-1 at 45 ¶ 63; Dkt. No. 14-6 at 39. Plaintiff knew C.O. Beaudette was responsible for the denial of his shower when he found out that C.O. Beaudette was operating the mechanism that opens inmates' cell doors and, two or three days after the incident, C.O. Beaudette told plaintiff "I hear you was [sic] whining and bitching about your shower the other day. More grievances equal less showers." Dkt. No. 14-1 at 45 ¶ 63. On March 5, 2016, C.O. Beaudette took all of the food out of plaintiff's cell and placed dirty books on plaintiff's bed in retaliation for plaintiff's "Clean Up The Clinton SHU Campaign." Dkt. No. 14-6 at 38. On April 13, 2016, C.O. Beaudette searched plaintiff's cell, confiscated plaintiff's stamps, and issued plaintiff a misbehavior report for possessing "excessive stamps" in retaliation for plaintiff's filing of grievances. Dkt. No. 14-1 at 46 ¶ 65. C.O. Beaudette's misbehavior report

charged plaintiff with violating DOCCS Directive #4422 and DOCCS Rule 113.16, which allow an inmate to have a maximum of $22.50 worth of stamps in his cell. Dkt. No. 14-6 at 48. C.O. Beaudette specified that, upon searching plaintiff's cell, he discovered an "envelope with 132 stamps in it," left plaintiff with 50 stamps, and confiscated the additional 82 stamps. See id. Plaintiff states that C.O. Beaudette "did[not] realize at the time" that plaintiff was allowed to have $24.50 worth of stamps, "not the $22.50 as stated in the ticket," and that because the stamps C.O. Beaudette confiscated "were .20¢ and .01¢ stamps," the amount of stamps in plaintiff's possession was "well below the $24.50 limit." Dkt. No. 14-1 at 46 ¶ 65 (parenthesis omitted). Plaintiff states that C.O. Beaudette engaged in the foregoing conduct in "retaliation for [plaintiff] exercising [his] [First] Amendment rights." Id.

"On April 25, 2016[,] Sgt. Delisle and C.O. Stickney searched [plaintiff's] cell and confiscated all of [his] personal, business and legal documents." Id. at 51 ¶ 71. Sgt. Delisle and C.O. Stickney each issued plaintiff two misbehavior reports. See Dkt. No. 14-6 at 21-24. C.O. Stickney's first misbehavior report cited plaintiff for solicitation and correspondence violations based on the discovery of documents indicating that plaintiff was attempting to solicit "individuals/businesses for funds to assist him in the operation of multiple businesses," including "Black Entrepreneur Media Group, Brand Ambassador for Madison Avenue Entertainment Group ("MAEG"), Families Oppressed [b]y [t]he Criminal Justice System ("FOCIS"), and The FOCIS Movement Paralegal Services." Id. at 21 (internal quotation marks omitted). C.O. Stickney noted that plaintiff "represented [that he was] running these businesses and requesting funds for the services he is stating he will provide once paid." Id. C.O. Stickney also issued plaintiff a misbehavior report for possessing a list of names and identification numbers for inmates who were known gang members, which plaintiff had "concealed in [his] legal paperwork." Id. at 22. Sgt. Delisle issued plaintiff two misbehavior reports, which explained that plaintiff had composed duplicative grievances which he was "distributing to other [SHU] inmates" "that he had solicited or offered his services to[ ] sign" in violation of DOCCS Directive Nos. 4040 and 701.7, which require that inmate grievances be personal and prohibit SHU inmates as serving as advisors with respect to grievances. Id. at 23, 24. In particular, Sgt. Delisle noted that one document recovered from plaintiff's cell on April 25, 2016, stated that plaintiff was "the executive director of ... FOCIS Paralegal & Advocacy Group" and that he was "collecting an initial fee

of $20.00 that is applied to [a] $350.00 filing fee" and that plaintiff "offered these services to file the ... grievances he manufactured for several other inmates." Id. Plaintiff filed a grievance concerning the April 25, 2016 cell search, which Supt. Kirkpatrick denied. See Dkt. No. 14-6 at 26.

### 4. Library Services

**\*6** In March 2015, plaintiff "submitted requests for internet research [directly] to the Clinton-Essex-Franklin County Library." Dkt. No. 14-1 at 50 ¶ 58. His request was forwarded to Clinton Librarian Delisle. See id. On March 27, 2015, Librarian Delisle informed plaintiff that his requests "must be sent to the Facility General Library" and that "[f]rom there, the request will be forwarded to the correct location." Dkt. No. 14-5 at 23. In April 2015, plaintiff sent Librarian Delisle two letters inquiring about certain e-books. See id. at 24, 25. In response, Librarian Delisle informed plaintiff that, "[o]n the book cart in SHU, there is a list of available books. E[-]books are not permitted in a correctional facility." Id. at 27. Plaintiff filed a grievance claiming that he was being denied library services by Librarian Delisle, including, among other things, denying him access to books and research. See id. at 31. Supt. Racette denied plaintiff's grievance. See id. at 30. Plaintiff then sent a letter to Deputy Commissioner for Program Services at Clinton, Jeff McKoy ("McKoy"), who directed plaintiff that his "complaints [we]re being address through the [IGP]," that his grievance was "currently in process," and "recommended that [plaintiff] allow the grievance procedure to continue to await the decision." Id. at 32.

### 5. Mail Watch Order

In February 2017, Clinton engaged Clemons to perform an investigation into plaintiff's business activities. See Dkt. No. 14-1 at 60 ¶ 86. On February 16, 2017, plaintiff received a misbehavior report authored by Clemons charging him with 10 counts of solicitation in violation of DOCCS Rule 103.20. See id.; Dkt. No. 14-7 at 40. The charges were based on a series of 10 pieces of outgoing mail plaintiff sent between December 22 and December 29, 2016, for the purpose of, among other things, promoting plaintiff's website and businesses, including MAEG; advertising salaries to prospective employees of MAEG; creating a blog, crowd-funding website, and social media pages; and obtaining promotional material for his businesses. See Dkt. No. 14-7 at 40-41. Plaintiff states that Clemons read his outgoing mail

without first obtaining a "mail[ ]watch order." Dkt. No. 14-1 at 61 ¶ 86.

### 6. Medical Care

#### a. Dr. Adams

"Within a few weeks of arriving at Clinton," plaintiff met Dr. Adams for "an initial medical interview." Dkt. No. 14-1 at 22 ¶ 32. When plaintiff requested medical boots, lotion, and a permit for clippers, Dr. Adams told plaintiff that his "time [wa]s up" and led him out of the room. Id. After his initial visit to Dr. Adams, plaintiff wrote a letter to Deputy Supt. Keysor requesting Magic Shave Cream because he gets "terrible razor bumps." Dkt. No. 14-4 at 60. Plaintiff also sent a letter addressed to Supt. Racette and Simpson on July 21, 2014 requesting medical boots. See id. at 24 ¶ 33; Dkt. No. 14-4 at 61. In a July 24, 2014 letter, Simpson informed plaintiff that his "concerns regarding foot[ ]ware may be addressed at [his] next provider callout which ha[d] been scheduled." Id. at 62. On July 29, 2014, plaintiff "was called to the hospital to see [Dr.] Adams, apparently for the medical boots." Dkt. No. 14-1 at 24 ¶ 33. When Dr. Adams asked plaintiff what he could do for him, plaintiff responded "I don't know[, d]id someone place me on a callout?" Dkt. No. 14-4 at 63. In response, Dr. Adams "started yelling and screaming [at plaintiff]" and "kicked [him] out of the office because [plaintiff] did[n't] know why [he] was there." Dkt. No. 14-1 at 24 ¶ 33. Following his July 29, 2014 visit, plaintiff filed a grievance against Dr. Adams alleging medical malpractice. See Dkt. No. 14-4 at 63-64. On August 8, 2014, plaintiff received a letter from Dr. Adams that stated, "[d]ue to the fact that I do not and did not know of your alleged foot problem, we will arrange for you to come to the hospital for the same. Should you require any special foot[wear] we will do our best to accommodate you." Id. at 65. Plaintiff then filed a grievance concerning the availability of Magic Shave Cream to SHU inmates. See id. at 69.

In September 2014, Supt. Racette denied plaintiff's grievance concerning medical footwear, stating that "[t]he investigation ... revealed that[plaintiff] was reviewed by his provider for medical foot ware and provider determined that the medical boot requested was not justified at this time and that he will be glad to discuss this issue with [plaintiff] on the next callout to provider." Id. at 67. CORC upheld Supt. Racette's determination. See id. at 68. Supt. Racette

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 401 of 427

also denied plaintiff's grievance concerning the availability of Magic Shave Cream to SHU inmates. See id. at 71-72.

**\*7** In October 2014, Dr. Adams prescribed plaintiff Fluocinonide for plaintiff's skin and determined that there was no medical need for a facial clipper permit. See Dkt. No. 14-1 at 24, 29; Dkt. No. 14-4 at 68. In March 2016, plaintiff again visited Dr. Adams and requested that Dr. Adams take photos of his skin and x-rays of his feet, which Dr. Adams declined to do. See Dkt. No. 14-1 at 26 ¶ 35. Plaintiff then filed a grievance against Dr. Adams alleging "harassment, retaliation, bias, discrimination, cruel and unusual punishment[,] and unfair treatment." Dkt. No. 14-5 at 4 (emphasis added). Plaintiff also complained that Dr. Adams would not "issue [him] a medical permit to purchase a pair of facial electronic clippers or Magic Shave Shaving Cr[eam]." Id. at 5. Plaintiff stated that Dr. Adams refused his requests "based largely (or probably solely) on [his] refusal to discuss [his case concerning Sing Sing] with him." Dkt. No. 14-1 at 26 ¶ 36. Supt. Kirkpatrick denied plaintiff's grievance. See Dkt. No. 14-5 at 8. CORC upheld Supt. Kirkpatrick's determination, explaining that, following his March 2016 visit, plaintiff saw Dr. Adams in June 2016 for his skin and that plaintiff had been "issued Hydrocortisone, Fluocinonide[,] and Clindamyacin since early 2015." Id. at 9. Moreover, CORC observed that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated." Id. CORC also noted that Dr. Adams "denie[d] making inappropriate comments[ ] and state[d] that [plaintiff] did not raise concerns regarding razor bumps during [his] March 2016 visit]." Id.

### b. Dr. Gillani

In April 2014, due to "everything that was happening to [his] property, [plaintiff] became suicidal and was transferred [from 13 Cell] to the mental health unit ["MHU"] under Dr. Gillani's care" from April 27, 2014, until May 1, 2014. Dkt. No. 14-1 at 10 ¶ 17. Plaintiff told Dr. Gillani "[e]very[ ]day ... throughout [his] stay" in the MHU that he "would commit suicide if [he] was forced to go back to 13 Cell." Id. On May 1, 2014, Dr. Gillani released plaintiff from the MHU and plaintiff was sent back to 13 Cell. See id. "On [May 5, 2014,] an officer found [plaintiff] fixing a noose around [his] neck and sent [him] back to the [MHU]." Id. at 10-11 ¶ 17. Plaintiff was again discharged from the MHU and sent back to 13 Cell on May 7, 2014. See id. Plaintiff states that Dr. Gillani "purposely ignored [his] plans for suicide and twice

sent [him] back to 13 Cell to kill [him]self." Id. at 11 ¶ 17. At deposition, plaintiff testified that he attempted suicide on two separate occasions after being examined by Dr. Gillani, but could not recall the dates of those alleged incidents. See Dkt. No. 68-13 at 30, 37-42.

### B. Plaintiff's Arguments

Liberally construing the Amended Complaint, plaintiff asserts numerous First Amendment claims. Plaintiff alleges that C.O. Mailloux violated his First Amendment rights by denying him his property in retaliation for threatening to file grievances against him. See Dkt. No. 14-1 at 7 ¶ 12, 65 ¶ 93. Plaintiff also alleges that Sgt. Randall violated his First Amendment rights by transferring him to 13 Cell in retaliation for plaintiff filing grievances concerning his missing property. See id. at 8 ¶ 14 ("Sgt. Randall retaliate[ed] against [plaintiff] for exercising his right to inform the Clinton administration about [his] missing property."); id. at 65 ¶ 94. Plaintiff contends that Sgt. Orzech is liable for C.O. Mailloux's and Sgt. Randall's allegedly retaliatory actions because he "failed to remedy," "allowed," "directed[,] and encouraged" C.O. Mailloux to deny plaintiff his property and Sgt. Randall to transfer plaintiff to 13 Cell. Id. at 64 ¶ 92, 65 ¶ 93, 66 ¶ 94.

Further, plaintiff alleges that C.O. Gadway violated his First Amendment rights by filing a false misbehavior report, ransacking his cell, and confiscating and destroying his property in retaliation for plaintiff filing grievances. Dkt. No. 14-1 at 17 ¶ 24, 66-67 ¶ 96. Plaintiff also alleges that C.O. Lee violated his First Amendment rights by destroying his property, issuing him a false misbehavior report, and placing a shield order on plaintiff's cell in retaliation for plaintiff stating that he was going to "violate" C.O. Lee and filing grievances against him. Id. at 33 ¶ 45; see id. 68-69 ¶ 100. He contends that Sgt. Orzech is liable for Lee's conduct because he "failed to remedy the problem when learning about it." Id. at 69 ¶ 100.

**\*8** Plaintiff argues that C.O. Beaudette denied him a shower, took food from plaintiff's cell, placed dirty books on plaintiff's bed sheets, and confiscated his stamps in retaliation for plaintiff filing grievances and the Clean Up The Clinton SHU Campaign. See id. at 45 ¶ 63, 46 ¶ 65, 70 ¶ 103; Dkt. No. 14-6 at 38-39. Plaintiff also contends that Sgt. Delisle and C.O. Stickney retaliated against him for his Clean Up The Clinton SHU Campaign by conducting destructive cell searches, confiscating his property, and issuing him misbehavior reports. See Dkt. No. 14-1 at 51 ¶ 71, 71 ¶

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 402 of 427

105; Dkt. No. 14-6 at 21-24. Moreover, plaintiff avers that Librarian Delisle violated his rights "to access information [and] freedom of speech ... by denying [him] the research and books [he] requested." Dkt. No. 14-1 at 69 ¶ 101. Finally, plaintiff alleges that Dr. Adams violated his First Amendment rights by denying him adequate medical care in retaliation for filing grievances against him and for refusing to discuss his prior lawsuit concerning Sing Sing. See Dkt. No. 14-1 at 23 ¶ 32, 67-68 ¶ 98.

Plaintiff also asserts a First Amendment mail tampering claim against Clemons, alleging that she viewed 10 pieces of his outgoing mail without first obtaining a valid mail watch order. See Dkt. No. 14-1 at 61 ¶ 86. Moreover, plaintiff argues that Dr. Gillani violated his Eighth Amendment rights by exhibiting deliberate indifference to his serious medical needs when he twice released plaintiff back to 13 Cell from the MHU, despite plaintiff informing him of his "plans for suicide." Id. at 11 ¶ 17, 66 ¶ 95.

### C. Defendants' Motion for Partial Summary Judgment [8]

#### 1. Plaintiff's First Amendment Claims

##### a. Sgt. Orzech and C.O. Mailloux

Defendants first argue that plaintiff's First Amendment retaliation claims against Sgt. Orzech and C.O. Mailloux fail because "the withholding of plaintiff's property was an administrative error, rather than based on any improper motive." Dkt. No. 68-3 at 10. Defendants support their argument with Sgt. Orzech's declaration and two interdepartmental communications between Sgt. Orzech and Lt. Reif, dated May 12, 2014, and May 19, 2014. See Dkt. No. 68-31 at 1, 2. In his declaration, Sgt. Orzech denies withholding plaintiff's property or destroying the C.D. in retaliation for plaintiff's grievances. See Dkt. No. 68-30 at 2 ¶ 3, 4 ¶¶ 15-16. Sgt. Orzech explains that, on April 17, 2014, four of plaintiff's property bags were received from Attica and that the bags were "tagged with two inconsistent sets of tags, one set indicating that [p]laintiff had a total of seven bags, the other set indicating that he had a total of five bags." Id. at 2 ¶ 5; see Dkt. No. 68-31 at 1 ("The tags were numbered as I recall[:] 1 of 7, 2 of 7, and 5 of 7 [and] also tagged with a second set of plain tags that were numbered 1, 2, 3, and 4 of 5. No additional paperwork was delivered with these four bags."). Plaintiff informed Sgt. Orzech that "he believed [he

had] about seven bags." Dkt. No. 68-31 at 1; see Dkt. No. 68-30 at 2 ¶ 5; Dkt. No. 14-4 at 5.

**\*9** Sgt. Orzech declares that, after another Clinton staff member contacted "Attica ... by telephone, [he] was informed that the [I.G.]'s staff at Attica had detained some of [p]laintiff's property." Dkt. No. 68-30 at 2 ¶ 6; see Dkt. No. 68-31 at 1. He states that, on April 25, 2014, while plaintiff was present in the property processing area, he instructed C.O. "Mailloux to advise [p]laintiff that watching his property being processed was a privilege and subject to revocation." Id. at 3 ¶ 7; see Dkt. No. 68-31 at 1. When Sgt. Orzech informed plaintiff that Clinton had received only four bags of his property and that the remainder were being detained by the IG at Attica, plaintiff "became agitated and aggressive." Id. at ¶ 9; see Dkt. No. 68-31 at 1. Sgt. Orzech determined that plaintiff's "continued presence could pose a threat to the safety and security of the facility," so he "had him removed to his cell in accordance with [DOCCS] Directive # 4933." Id. at ¶ 9; see Dkt. No. 68-31 at 1.

Sgt. Orzech declares that, on April 26, 2014, Clinton received two more of plaintiff's property bags, which were "processed and returned to [p]laintiff on April 27, 2014." Id. at ¶ 10; see Dkt. No. 68-31 at 1. Thereafter, Clinton staff emailed Attica to inquire about any remaining property, in response to which "Attica ... reported that [it] had sent seven bags to Clinton." Id. at ¶ 11; see Dkt. No. 68-31 at 2. Sgt. Orzech informed Lt. Reif that he was unable "to make further progress locating the seventh bag during [his] investigation." Dkt. No. 68-31 at 2; see Dkt. No. 68-30 at 3 ¶ 11. Sgt. Orzech states that Brown made "another phone call to Attica ... on [his] behalf," and that Brown "informed [Sgt. Orzech] that no investigation by IG was ongoing at [that] time." Dkt. No. 68-31 at 2; see Dkt. No. 68-30 at 3 ¶ 12. Sgt. Orzech informed Lt. Reif that he was "unaware as to why the original information received indicated IG involvement." Id.; see Dkt. No. 68-30 at 3 ¶ 12.

Defendants also offer C.O. Mailloux's declaration in support of their motion for summary judgment. See Dkt. No. 68-29. C.O. Mailloux declares that, on April 25, 2014, "at the direction of Sgt. Orzech, [he] escorted [p]laintiff from his cell to the holding area where [plaintiff's] property was to be processed [and] advised [p]laintiff that watching his property being processed was a privilege ... subject to revocation." Id. at 2 ¶ 4. C.O. Mailloux states that he "did not confiscate any letters or any other documents from [p]laintiff's property." Id. at ¶ 6. Further, he states that Sgt. Orzech "directed [him]

to escort [plaintiff] back to his cell" after plaintiff "became aggressive during the processing of his property." Id. at ¶ 7.

### b. Sgt. Randall

Defendants next contend that "plaintiff has failed to establish ... that any of his complaints had any bearing upon [Sgt.] Randall's actions[ ] and, as such, has failed to make out a claim against him." Dkt. No. 68-3 at 10. In his declaration in support of defendants' motion for partial summary judgment, Sgt. Randall denies retaliating against plaintiff by placing him in 13 Cell on April 27, 2014, and states that his "actions in dealing with [p]laintiff ... were not motivated by [plaintiff's] informing Clinton administration about his missing property." Dkt. No. 68-32 at 2 ¶ 8. He states that "[p]laintiff was housed in ... 13-[C]ell in accordance with DOCCS and facility policy and directives and ... availab[ility]." Dkt. No. 68-32 at 2 ¶ 4. He states that "[p]laintiff was ... placed in ... SHU based upon his behavior, and was held in that location until his behavior dictated a change and another cell became available." Id. at ¶ 5. Sgt. Randall declares that, "[c]ontrary to [p]laintiff's allegations concerning the cleanliness of [13 C]ell, it is a cell in normal use in Unit-14 SHU and is regularly maintained." Id. at ¶ 6. He explains that "[i]f a[SHU] inmate is not satisfied with the condition of his cell, he is afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly." Id. at ¶ 6.

### c. Sgt. Delisle, C.O. Stickney, C.O. Gadway, C.O. Lee, C.O. Beaudette, and Clemons

**\*10** Defendants argue that plaintiff's admission to running a business and possessing business documents in knowing violation of DOCCS policy—the subject of the misbehavior reports issued by C.O. Gadway, C.O. Stickney, Sgt. Delisle, and Clemons—entitles those defendants to summary judgment as to plaintiff's First Amendment retaliation claims insofar as asserted against them. See Dkt. No. 68-3 at 9. Similarly, defendants contend that plaintiff's First Amendment retaliation claims against C.O. Beaudette should be dismissed, as he "confiscated plaintiff's stamps, which were over the limit allowed to plaintiff and, ... plaintiff admits [that the stamps] were being used for a business purpose." Id. [9] Thus, defendants argue, C.O. Gadway, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, C.O. Lee, and Clemons are entitled to summary judgment as to plaintiff's First Amendment retaliation claims insofar as asserted against

them because plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report[s]." See Dkt. No. 68-3 at 10 (quoting Brooks v. Rock, 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at \*24 (N.D.N.Y. Mar. 28, 2014) (internal quotation marks and citation omitted)).

Defendants submitted the declaration of C.O. Gadway, who states that, on April 30, 2014, and July 18, 2014, he conducted "authorized cell frisk[s] of plaintiff's cell." Dkt. No. 68-23 at 2 ¶¶ 4, 5. On both occasions, C.O. Gadway discovered documents and letters in plaintiff's cell, which "provid[ed] evidence that [plaintiff] was running a business named [MAEG]." Id. at ¶ 4; see id. at ¶ 5. C.O. Gadway explains that he confiscated these materials and placed them in a contraband locker. See id. at ¶ 4. "Because it is prohibited for an inmate to run a business while incarcerated, or to use correspondence privileges to solicit money, [he] issued [p]laintiff ... misbehavior reports charging him with violating Rules 103.20 (Soliciting) and 180.11 (Facility Correspondence)" on both occasions. Id. at ¶ 4; see id. at ¶ 5.

Similarly, Sgt. Delisle declares that, on April 25, 2016, while plaintiff was confined in SHU, he and C.O. Stickney conducted a search of plaintiff's cell to search for and remove any contraband. See Dkt. No. 68-17 at 2 ¶¶ 4-5. "The order to search [p]laintiff's cell came from the CIU (Crisis Intervention Unit) in Albany, which tracks high-profile inmates." Id. at ¶ 6. Upon searching plaintiff's cell, Sgt. Delisle and C.O. Stickney confiscated papers, "including gang-related material being used by [p]laintiff in writing a book about his life on the street[,] which was not authorized without permission." Id. at ¶ 7. Sgt. Delisle and C.O. Stickney also confiscated "documents connected with the running of several businesses." Id. "All ... contraband material was placed in the contraband locker[ ] and [p]laintiff was given a contraband receipt." Id. at ¶ 8. C.O. Stickney submitted a declaration, which contains a materially identical account of the April 25, 2016 search of plaintiff's cell, and specifies that possession of gang material is a violation of DOCCS Rule 105.13 and possession of documents related to running a business is a violation of DOCCS Rule 103.20. See Dkt. No. 68-33 at 3. Sgt. Delisle and C.O. Stickney both deny taking any action against plaintiff motivated by retaliation. See id.; see Dkt. No. 68-17 at 3 ¶ 9. Moreover, C.O. Stickney submitted a contraband receipt dated April 25, 2016, which states, "multiple pieces of paper, hand written and typed[c]ontaining business material, legal material, gang material, and other documentation" was confiscated and that "no property [was] damaged during search." Dkt. No. 68-34.

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 404 of 427

**\*11**  Moreover, C.O. Beaudette declares that, upon conducting a "daily cell frisk on [p]laintiff's cell" on April 13, 2016, "as ordered by the Deputy Superintendent for Security," he "found an envelope with 132 stamps in it, and other excess property and food stores in [plaintiff's] cell." Dkt. No. 68-15 at 2 ¶ 5. C.O. Beaudette states that he "left 50 stamps in [p]laintiff's cell[,] secured 82 stamps in a contraband locker," and issued plaintiff a misbehavior report for, among other infractions, violating 7 N.Y.C.R.R § 113.16 and DOCCS Directive No. 4422, which prohibit inmates from possessing greater than \$22.50 worth of stamps. See id. at ¶¶ 7, 8. C.O. Lee declares that he "conducted several authorized random searches of [p]laintiff's cell" while plaintiff was housed in SHU, and discovered that plaintiff had magazines and books in excess of that allowed pursuant to DOCCS Directive 4933 section 302.2(e)(2)(xvii), which "permits an inmate to have a maximum of 5 books, magazines[,] and newspapers in his cell." Dkt. No. 68-27 at 2 ¶¶ 5, 6. Concerning plaintiff's possession of multiple copies of the same magazine, C.O. Lee states that "there is no provision for an inmate to receive multiple copies of identical books, magazines[,] or periodicals." Id. at ¶ 8. Therefore, C.O. Lee states, he "returned the duplicate magazines to the mail room and issued [p]laintiff a contraband receipt." Id. at 3 ¶ 9. C.O. Lee explains that, "[o]n August 14, 2015, [he] ... recorded that [p]laintiff had 49 magazines and 5 books beyond the prescribed limit," and notes that plaintiff chose to have the excess magazines and [three] books sent out via a visitor [and] to have [two] of the books destroyed." Id. at ¶¶ 11, 12, 13. However, because the visitor plaintiff listed to pick up his excess property never arrived on the scheduled date, his excess property was destroyed on September 3, 2015. See id. at ¶¶ 14-15. C.O. Lee denies acting with any retaliatory motive for plaintiff filing grievances against him or other Clinton staff. See id. at ¶ 16.

In addition, Clemons declares that, "[b]etween December 7, 2016[,] and January 17, 2017, [she] conducted an official investigation of [p]laintiff's correspondence." Dkt. No. 68-16 at 2 ¶ 5. She further states that "[c]ontrary to [p]laintiff's claim, on December 7, 2016, [she] submitted to [Supt.] Kirkpatrick a request for a 60-day MAIL WATCH of all incoming and outgoing non-privileged correspondence be initiated on [plaintiff's] mail[, which Supt. Kirkpatrick] approved ... on December 9, 2016." Id. at 2 ¶ 7 (internal quotation marks omitted). Supt. Kirkpatrick "also approved [her] notice to [c]orrespondence staff, dated December 8, 2016, ... that ALL mail for [plaintiff], except legal and privileged mail, be delivered to the [s]ecurity [o]ffice for

a period of 60 days." Id. at ¶ 8 (internal quotation marks omitted).

### d. Librarian Delisle

With respect to Librarian Delisle, defendants contend that plaintiff's deposition testimony "effectively nullified any" First Amendment retaliation claim asserted against her." Dkt. No. 68-3 at 9. Defendants point out that plaintiff made clear at deposition that his claim against Librarian Delisle was premised on her denial of access to library searches and research materials "because Clinton did not want [him] to have any more information related to running a business." See id. at 10 (quoting Dkt. No. 68-13 at 78). However, "[w]hen asked whether [Librarian] Delisle retaliated against him because he had filed grievances against her husband, [Sgt. Delisle,] plaintiff stated 'I can't say that because I don't know.' " Id. (quoting Dkt. No. 68-13 at 79). Librarian Delisle declares that she denied plaintiff's requests for internet research based on DOCCS Directive # 4470, which explicitly provides that, "[f]or security reasons, DOCCS prohibits offender access to the Internet, and access for Librarians and other library staff in the library." Dkt. No. 68-18 at 2-3 ¶ 7 (quoting Dkt. No. 68-22 at 6).

### e. Dr. Adams

Defendants argue that the record does not support plaintiff's contention that Dr. Adams denied him medical care in retaliation for plaintiff's filing of grievances against him; rather, defendants posit, the record establishes that plaintiff "was not in need of the medical treatment he alleges Dr. Adams denied him" and, therefore, that plaintiff's claim amounts only to a "disagreement over the proper treatment," which "[does] not create a constitutional claim." Dkt. No. 68-3 at 11 (quoting Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)). Dr. Adams submitted a sworn declaration in support of defendants' partial motion for summary judgment in which he states that his "denial of plaintiff's requests for medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs," that "[i]n [his] estimation, the boots and medications requested were unnecessary," and that he "never ... withh[e]ld medications as a means of retaliation for [plaintiff's] filing of grievances." Dkt. No. 68-14 at 2 ¶¶ 6, 8.

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 405 of 427

### 2. Eighth Amendment Deliberate Medical Indifference Claims Against Dr. Gillani

**\*12** Defendants argue that "[p]laintiff's deliberate indifference claim against [Dr.] Gillani must be dismissed because plaintiff cannot establish that [Dr. Gillani] acted with deliberate indifference toward any objectively serious medical need." Dkt. No. 68-3 at 12. Defendants rely on Dr. Gillani's declaration in which he explains that, "[o]n May 1, 2014, [he] examined plaintiff at the Residential Treatment Program Center ("RCTP") at Clinton" after "[p]laintiff was admitted to the RCTP [for] having expressed threats of self-harm." Dkt. No. 68-25 at 2 ¶ 12, 2 ¶ 13. Dr. Gillani states that he "was informed by staff that plaintiff had not engaged in any self-harming gestures." Id. at 3 ¶ 15. Further, Dr. Gillani declares that plaintiff "expressed to [him] that he did not want to return to [SHU]." Id. at ¶ 16. "[S]taff informed [Dr. Gillani] that[,] while in the RCTP, plaintiff had been eating and sleeping well without any problems." Id. at ¶ 17. Dr. Gillani notes that "[p]laintiff informed [him] that he would be happy if he could be released into [g]eneral [p]opulation so that he could move freely in the prison and visit the law library whenever he wanted"; "denied [feeling] any mood, psychotic, or anxiety symptoms"; and "denied any suicidal or homicidal ideas." Id. at ¶¶ 18-20.

Moreover, Dr. Gillani states that, "[u]pon review of plaintiff's risk factors, [plaintiff] had a history of substance abuse and engaging in self-harming gestures only; plaintiff had no history of in-patient psychiatric treatment." Dkt. No. 68-25 at ¶ 21. In addition, "[p]laintiff was noted as facing sanctions in the SHU, but presented with no hopelessness, helplessness, feelings of being trapped, or other indications of a state of mind that would lead to suicidal behavior." Id. at ¶ 22. "After reviewing ... plaintiff," Dr. Gillani concluded "that there was no evidence that plaintiff had evidence of any psychiatric illness"; "appeared to be presenting with environment-related agenda[,] specifically, seeking to be released from the SHU"; and "that plaintiff's complaints did not stem from mental illness, but rather, were calculated toward an effort to be released from his confinement in the SHU." Id. at ¶¶ 23-25. "Based on the foregoing, [Dr. Gillani] released plaintiff on May 1, 2014." Id. at ¶ 26. Attached to Dr. Gillani's declaration are his psychiatric progress notes for plaintiff dated May 1, 2014, which corroborate the statements and conclusions contained in his declaration. See Dkt. No. 68-26 at 1-2.

### D. Plaintiff's Opposition

In opposition to defendants' motion for partial summary judgment, plaintiff "disagree[s]" with the factual recitation and arguments set forth by defendants. See Dkt. Nos. 75-1 at 1-2, Dkt. No. 75-2 at 1-3. Concerning his Eighth Amendment medical indifference claim, plaintiff argues that, contrary to Dr. Gillani's assessment, his "mood was not normal" and that he "was clearly depressed and suicidal." Dkt. No. 75-2 at 2 ¶ 10. He also contends that his "immediate problem was not that [he] wanted to get out of the SHU, it was that [he] wanted out of 13 Cell." Id. Further, plaintiff "disagree[s]" that his claims against Librarian Delisle should be dismissed on the basis that he testified at deposition that " '[he] [didn't] know' if [Librarian] Delisle denied [him] law library resources as retaliation for [his] litigation" because "what [he] feel[s] is irrelevant." Dkt. No. 75-1 at 2 ¶ 2. Plaintiff also "disagree[s]" that his claims concerning the destructive cell searches and withholding of property should be dismissed on the basis that he "admitted to running a business." Id. Moreover, plaintiff disagrees that he "had stamps in [his] cell to run [his] business" and states that "[his] stamps were to send out legal, personal, [and] political mail as well." Id. at 1 ¶ 2.

### E. Defendant's Reply [10]

In reply to plaintiff's opposition, defendants reassert their argument that plaintiff's First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams should be dismissed. See Dkt. No. 79 at 9-11. Defendants contend that plaintiff has failed to establish that he was retaliated against for engaging in protected activity. See id. at 9. In particular, defendants argue that plaintiff, in fact, alleges that all of defendants' retaliatory acts were committed based on plaintiff engaging in the operation of a business—which is not protected activity—and not based on the filing of grievances. See id. 9-10. Further, defendants posit that the declarations of Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams establish "a non-retaliatory basis for the actions alleged against them." Id. at 10. Moreover, defendants posit that plaintiff's opposition, in which he "identified ... things he 'disagreed' with, ... fail[s] to ... creat[e] an issue of material fact." Id. (quoting Dkt. No. 75-1 at 1, 2).

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 406 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

**\*13** Defendants also reassert their argument that plaintiff's Eighth Amendment medical indifference claim against Dr. Gillani should be dismissed because the record evidence establishes "that Dr. Gillani's assessment (that [p]laintiff was motivated by an 'environmental-related agenda') was accurate" and that plaintiff's indications that he was suicidal were "calculated toward an effort to be released from his confinement in the SHU." Id. at 7 (quoting Dkt. No. 68-25 at 3 ¶ 24, 25). Defendants note that plaintiff expressly stated in his opposition that his "immediate problem" when he was in the Clinton M.H.U. was that he "wanted out of 13 Cell." Id. at 7 (quoting Dkt. No. 68-25 at 3 ¶ 24, 25; Dkt. No. 75-2 at 2 ¶ 10). Finally, defendants contend that plaintiff's First Amendment claim against Clemons should be dismissed because, contrary to plaintiff's contention, Clemons' sworn declaration establishes that she obtained a mail watch order from Supt. Kirkpatrick prior to investigating his outgoing mail. See id. at 9. Defendants argue that plaintiff's "disagree[ment]" with the foregoing is insufficient to establish an issue of material fact. Id. at 9, 10.

## II. Discussion [11]

### A. Legal Standard

Summary judgment may be granted only if the submissions of the parties taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists." Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL 4146276, at \*4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson, 477 U.S. at 248. A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (internal quotation marks omitted). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. See Salahuddin, 467 F.3d at 273. The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. See Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted); see also Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) ("[A]ffidavtis must be based upon concrete particulars, not conclusory allegations." (internal quotation marks and citation omitted)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

**\*14** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 407 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. First Amendment Retaliation

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and (3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[I]n the prison context ... adverse action" is "defined ... *objectively*[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Id. With respect to the third element of the test, although " '[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' [s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (quoting Espinal, 558 F.3d at 129).

"Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct." Brooks, 2014 WL 1292232, at *18 (citation omitted); see Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003) ("Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." (italics omitted)).

**\*15** "[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Thus, "a plaintiff asserting such a claim bears a heightened burden of proof and must plead the claim with particularity." Green v. Phillips, No. 04-CV-10202 (TPG), 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (citing Brown v. Middaugh, 41 F. Supp. 2d 172, 191 (N.D.N.Y. 1999)). Consequently, a plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. See Green, 2006 WL 846272, at *3; see also Williams v. Goord, 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) ("In recognition of the reality that retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial." (internal quotation marks and citation omitted)). Allegations, although specific, "may still be deemed conclusory if [they are] (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Smith v. Woods, No. 9:03-CV-480 (DNH/GHL), 2006 WL 1133247, at *3 (N.D.N.Y. Apr. 24, 2006) (internal quotation marks and citations omitted).

#### 1. Sgt. Orzech and C.O. Mailloux

As an initial matter, it appears that plaintiff's April 25, 2014 grievance concerning his missing property was the first grievance he filed at Clinton in connection with the present lawsuit. See Dkt. No. 14-4 at 5. Consequently, it is impossible that Clinton personnel retaliated against plaintiff for filing grievances prior to that date. To the extent the Amended Complaint may be read as alleging that Sgt. Orzech and C.O. Mailloux retaliated against plaintiff for filing the April 25, 2014 grievance and subsequent grievances concerning his property by withholding plaintiff's property bags, his claim fails, as defendants have established through admissible evidence that the receipt of plaintiff's property was delayed

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 408 of 427

due to administrative error, not out of retaliation, see Dkt. No. 30 at 2 ¶¶ 3, 4, 15-16; Dkt. No. 68-31 at 1-2, and plaintiff's conclusory allegations to the contrary fail to raise a triable issue of fact.

"To prevail on a [First Amendment] retaliation claim [based on lost or destroyed property, an inmate] must show both (1) that [the defendants] intentionally or deliberately lost or destroyed his property, and (2) that they were personally involved in doing so." Key v. Toussaint, 660 F. Supp. 2d 518, 526 (S.D.N.Y. 2009) (internal quotation marks and citations omitted). For example, in Key, the court awarded summary judgment in favor of the defendant correction officers and dismissed the plaintiff's First Amendment retaliation claim alleging intentional loss or destruction of his property where "[t]here [wa]s no evidence that [the defendants] were the exclusive custodians of the property after they took possession of it" prior to the plaintiff's transfer to another correctional facility and "[t]he mechanism for storing [the plaintiff's] property and its chain of custody [wa]s simply unknown." Id. Further, observing that the defendants returned three of the plaintiff's four property bags, the court reasoned that "[t]he return of a portion of his property further suggest[ed] that there was no intentional act on any particular person's part to lose or destroy his property." Id.

Here, Sgt. Orzech's sworn declaration and accompanying interdepartmental communications with Lt. Reif establish that Clinton received four of plaintiff's property bags on April 23, 2014, which were labeled with inconsistent sets of numbering tags, indicating that plaintiff had either a total of five or seven property bags. See Dkt. No. 68-30 at 2 ¶ 5; Dkt. No. 68-31 at 1. The first four of plaintiff's bags to arrive at Clinton were issued to him on April 25, 2014. See Dkt. No. 68-31 at 1. Further, it is undisputed that Clinton received two more of plaintiff's property bags on April 26, 2014, which were issued to plaintiff on April 27, 2014; thus, as of April 27, 2014, plaintiff was in possession of six of his seven property bags. See Dkt. No. 68-31 at 2; Dkt. No. 14-4 at 2. Therefore, the fact that Clinton personnel issued plaintiff six of his property bags as they arrived at the facility from Attica within a two-day period, the evidence "suggests that there was no intentional act on any particular person's part to lose ... his property." Key, 660 F. Supp. 2d at 526. In fact, the evidence demonstrates the opposite, as defendants have established that Clinton personnel, including Sgt. Mailloux, made efforts to locate plaintiff's missing property including making numerous phone calls and emailing Attica. See Dkt. No. 68-30 at 2 ¶ 6, 3 ¶¶ 11-12. Moreover, there is no

evidence that either Sgt. Orzech or C.O. Mailloux were the exclusive custodians of any of plaintiff's property bags, and the precise chain of custody between Attica and Clinton is simply unknown. See Dkt. No. 68-31; see also Key, 660 F. Supp. 2d at 526. Indeed, all of plaintiff's property transfer forms indicate that C.O. Lee or C.O. Comya—not Sgt. Orzech or C.O. Mailloux—packed his incoming property. See Dkt. No. 14-4 at 1-4. In addition, it is undisputed that Attica was the entity which had custody over plaintiff's property bags prior to his transfer to Clinton—and his conclusory assertions that Clinton personnel received his bags but intentionally lost or withheld them are factually unsupported by the record evidence.

**\*16** Plaintiff's reliance on the fact that personnel at Attica initially informed Clinton personnel that plaintiff's property was being held pending an IG investigation, but later stated that "no investigation by IG was ongoing at th[at] time," fails to raise any issue of material fact as to whether Sgt. Orzech or C.O. Mailloux were ever in exclusive custody of plaintiff's property and/or intentionally withheld it. Dkt. No. 68-31 at 2. At most, this establishes only that Attica personnel provided incorrect or outdated information to Clinton personnel regarding the status of the remaining three property bags—two of which were received at Clinton only four days after the receipt of the initial four bags. See id. at 1. In any event, plaintiff's own documentary evidence appears to establish that Clinton received the seventh bag in July 2014, for which plaintiff signed the property transfer sheet. See Dkt. No. 14-4 at 4 (personal property transfer sheet of one property bag dated July 2014 and containing plaintiff's signature). Finally, Sgt. Orzech has sworn that he has "never damaged a CD by putting a staple through it," and plaintiff offers only speculative allegations to the contrary. Id. at 3 ¶ 14. Thus, plaintiff's allegations concerning Sgt. Orzech's and C.O. Mailloux's alleged retaliatory loss or withholding of his property bags or damage to his property are conclusory as they are "unsubstantiated by any other direct evidence" in the record, and his general disagreements fail to raise an issue of material fact. Smith, 2006 WL 1133247, at \*3. Accordingly, plaintiff's First Amendment retaliation claim, insofar as asserted against Sgt. Orzech and C.O. Mailloux based on the alleged intentional loss or withholding of his property bags, must be dismissed.

Plaintiff's claim that C.O. Mailloux violated his First Amendment rights by removing him from the property area in retaliation for threatening to file a grievance must also be dismissed. Courts in this Circuit have held that

an inmate's threat to file a grievance against a correction officer can constitute protected activity for purposes of a First Amendment retaliation claim. See Smith, 2006 WL 1133247, at *10 ("I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order); see also Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint against a prison guard sufficient to establish protected activity). However, defendants have established that plaintiff would have been removed from the property area regardless of any retaliatory motivation by C.O. Mailloux, because Sgt. Orzech determined that plaintiff had become aggressive and agitated when he was informed that only four of his property bags had arrived at the facility, and that plaintiff's "continued presence could pose a threat to the safety and security of the facility." Dkt. No. 68-30 at 3 ¶ 9; see Dkt. No. 68-29 at 2 ¶ 7. Therefore, even assuming plaintiff could demonstrate retaliatory motive, defendants have established that C.O. Mailloux's action of removing plaintiff from the property holding area at the direction of Sgt. Orzech "would have occurred" "even without the improper motivation" and were done for the purpose of maintaining safety and order at the facility. Scott, 344 F.3d at 287; see Brooks, 2014 WL 1292232, at *18. Moreover, to the extent that plaintiff states that he will controvert defendants' assertion that he became aggressive by "submitting a DVD to prove otherwise," no such evidence has been submitted to the Court as of the filing of plaintiff's opposition on July 22, 2019; the deadline for filing opposition papers has expired; and plaintiff's general disagreement with defendants' documentary evidence fails to raise a genuine issue of material fact. Dkt. No. 75-1 at 1. Accordingly, it is recommended that defendants' motion for partial summary judgment be granted and plaintiff's First Amendment retaliation claims against Sgt. Orzech and C.O. Mailloux be dismissed insofar as they arise out of plaintiff's alleged retaliatory removal from the property holding area on April 25, 2014.

### 2. Sgt. Randall

Plaintiff's First Amendment retaliation claim against Sgt. Randall fails. It is undisputed that plaintiff has established that he engaged in protected activity by filing grievances against Sgt. Orzech and C.O. Mailloux concerning his missing property on April 25, 2014. See Dkt. No. 14-4 at 5; see, e.g., Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003)

("the filing of prison grievances is a constitutionally protected activity"). However, plaintiff's transfer to 13 Cell did not constitute adverse action. Contrary to plaintiff's allegations, defendants have established, though admissible evidence that, 13 Cell is "a cell in normal use in Unit-14 SHU and is regularly maintained." Dkt. No. 68-32 at ¶ 6. In addition, the documentary evidence establishes that plaintiff was "afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly" if he was unhappy with the cleanliness of his cell. Id. In any event, even assuming that plaintiff established that Sgt. Randall's act of transferring him to 13 Cell was done with a retaliatory motive and constituted adverse action, defendants have established that plaintiff would have been transferred to SHU regardless of any personal animus Sgt. Randall harbored against him "based upon his behavior," and that plaintiff was placed in 13 Cell based on "availab[ility]." Dkt. No. 68-32 at 2 ¶ 5; see Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18.

**\*17** Alternatively, plaintiff cannot demonstrate any causal connection between the filing of his April 25, 2014 grievance against Sgt. Orzech and C.O. Mailloux and his cell transfer. To plausibly allege causation, a plaintiff "must allege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's decision to take action against him." Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotations, brackets, and citations omitted). It is well settled that "[a]llegations of adverse actions alone ... are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." Baskerville v. Blott, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Factors indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. See id. (citing Colon, 58 F.3d at 872-73). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cty, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 410 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted).

Here, although the alleged adverse action of plaintiff's transfer to 13 Cell occurred within close temporal proximity to the filing of his April 25, 2014 grievance, it is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Further, the record is devoid of facts establishing that plaintiff's filing his April 25, 2014 grievance against Sgt. Orzech and C.O. Mailloux was "a substantial or motivating factor" in Sgt. Randall's decision to transfer plaintiff to 13 Cell. Burton, 664 F. Supp. 2d at 367. In support of his claim, plaintiff alleges only that Sgt. Randall stated, "[o]h now you wanna [sic] talk to me[?] You have stopped every [c]aptain, [d]eputy[,] and [s]uperintendent about your property, but you have not said anything to me about it. This is my ... unit and you must come to me first." Id. at 9 ¶ 14 (parenthesis omitted). In response, plaintiff allegedly informed Sgt. Randall that he "had not come to [Sgt. Randall] because [Sgt. Randall] told [plaintiff] that [he] was a 'needy inmate' and that [plaintiff] should not 'stop him every[ ]day.' " Id. Even assessing these statements in the light most favorable to plaintiff as the non-moving party, they are insufficient to support "an inference of a causal connection between" plaintiff's April 25, 2014 grievance and Sgt. Randall's act of transferring plaintiff to 13 Cell, as they do not make any mention of plaintiff filing complaints against

other Clinton correctional staff. Baskerville, 224 F. Supp. 2d at 732.

Indeed, plaintiff does not allege—let alone provided factual support—to suggest that Sgt. Randall was even aware of plaintiff's April 25, 2014 grievance such that his act of transferring plaintiff to 13 Cell on April 27, 2014, was retaliatory. See Baskerville, 224 F. Supp. 2d at 732. Rather, it is undisputed that plaintiff did not file a grievance against Sgt. Randall prior to April 27, 2019, and the record is devoid of facts that would allow the Court to draw the "legitimate inference" that Sgt. Randall retaliated against plaintiff based on his grievance filed against other correctional personnel. Espinal, 558 F.3d at 130; see Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a retaliation claim against a correction officer where the only alleged basis for retaliation was a complaint written against another officer); see also Burroughs v. Mitchell, 325 F. Supp. 3d 249, 282 (N.D.N.Y. 2018) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." (internal quotation marks and citation omitted)). In fact, plaintiff's own documentary evidence establishes that his grievance against Sgt. Orzech and C.O. Mailloux, dated April 25, 2014, was not received by the inmate grievance supervisor until May 6, 2014—after the alleged adverse action of plaintiff's transfer to 13 Cell on April 27, 2014. See Dkt. No. 14-4 at 5. Thus, the alleged adverse action of transferring plaintiff to 13 Cell preceded plaintiff's constitutionally-protected conduct and, therefore, does not establish the requisite causal nexus to support his retaliation claim against Sgt. Randall. See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney). In opposition, plaintiff's general disagreement with defendants' arguments and documentary evidence is conclusory and "insufficient to defeat [defendant's] properly supported motion for summary judgment. See Bickerstaff, 196 F.3d at 452.

**\*18** Finally, to the extent that plaintiff contends that Sgt. Orzech is liable for Sgt. Randall's conduct, his claim fails because the record is bereft of facts from which the Court could infer that Sgt. Orzech was in any way in a position of authority over Sgt. Randall such that he could have controlled Sgt. Randall's actions or remedied any alleged wrongs committed with respect to the transfer. See Farrell

v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). In any event, as defendants have established that Sgt. Randall did not violate plaintiff's constitutional rights by transferring him to 13 Cell, plaintiff cannot establish liability pursuant to Section 1983 against Sgt. Randall's superiors based thereon. See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003) (holding that, absent an underlying constitutional violation, a supervisor cannot be held liable for the actions or omissions of a subordinate under Section 1983). Accordingly, plaintiff's First Amendment retaliation claim against Sgt. Randall and Sgt. Orzech based on his transfer to 13 Cell must be dismissed.

### 3. C.O. Gadway

Plaintiff's claim that C.O. Gadway violated his First Amendment rights by conducting a "destructive" cell search and issuing a false misbehavior report on April 30, 2014, in retaliation for plaintiff filing grievances against other correctional staff fails because, as with his claim against Sgt. Randall, the record lacks facts that would allow the Court to draw the "legitimate inference" that C.O. Gadway retaliated against plaintiff based grievances he filed against other Clinton correctional personnel. Espinal, 558 F.3d at 130; see Wright, 554 F.3d at 274; see Burroughs, 325 F. Supp. 3d at 282. Aside from plaintiff's conclusory allegations that, as "the A-man for the SHU, [Gadway] would have access to all complaints filed by SHU prisoners," Dkt. No. 14-1 at 17 ¶ 24, there are no facts to support "an inference of a causal connection between" plaintiff's filing of grievances and C.O. Gadway conducting destructive cell searches and issuing false misbehavior reports. Baskerville, 224 F. Supp. 2d at 732. Further, defendants have established, through admissible evidence, that C.O. Gadway conducted an authorized search of plaintiff's cell on April 30, 2014, and discovered documents indicating that plaintiff was running MAEG from his cell and using his prison correspondence to solicit funds—both violations of DOCCS rules. See Dkt. No. 68-23 at 3 ¶ 4. Thus, defendants have established that C.O. Gadway would have taken the action complained of regardless of any personal animus he held against plaintiff. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18.

In opposition, plaintiff offers only his conclusory and self-serving allegations that, because he was not in possession of his seventh property bag as of the April 30, 2014 cell

search, he was not in possession of any business documents. See Dkt. No. 14-1 at 12 ¶ 20. Plaintiff would have the Court believe that the only bag containing documents relating to MAEG or his other businesses was being intentionally withheld by Clinton staff and that, to retaliate against plaintiff for filing grievances, C.O. Gadway went to wherever his seventh property bag was purportedly being hidden, found incriminating documents, and issued a misbehavior report based thereon. See id. at 12-13 ¶ 20. Plaintiff's contentions in this regard are "unsubstantiated by any other direct evidence and ... so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations." Smith, 2006 WL 1133247, at *3 (internal quotation marks and citation omitted).

Moreover, concerning C.O. Gadway's July 18, 2014 cell search and misbehavior report, which was also issued for his possession of documents indicating that plaintiff was running MAEG from his cell and using his prison correspondence to solicit funds, plaintiff admits to possessing such documents and engaging in such activities. See Dkt. No. 14-1 at 14 ¶ 21. Therefore, as defendants aver, as plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report," defendants have established that the July 18, 2014 misbehavior report would have been issued regardless of any retaliatory animus on the part of C.O. Gadway. Brooks, 2014 WL 1293343, at * 25; see Scott, 344 F.3d at 287-88. [12] Consequently, it is recommended that plaintiff's claims against C.O. Gadway be dismissed.

### 4. C.O. Lee

**\*19** Defendants are entitled to summary judgment as to plaintiff's First Amendment retaliation claims against C.O. Lee. Plaintiff engaged in constitutionally-protected conduct by filing his May 19, 2015 misbehavior report against C.O. Lee based on C.O. Lee's May 2015 cell search. See Dkt. No. 14-4 at 36; Davis, 320 F.3d at 352-53. Further, courts in this Circuit have held that "[t]he retaliatory destruction of an inmate's personal property can constitute an adverse action." Roseboro, 791 F. Supp. 2d at 374; see Smith v. City of New York, 03-CV-7576 (NRB), 2005 WL 1026551 at *3 (S.D.N.Y. May 3, 2005) (stating that the "retaliatory destruction of a prisoner's personal property has ... been found substantial enough to qualify as an adverse action."). Here, however, defendants have established that the property C.O. Lee confiscated from plaintiff's cell during the June

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 412 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

and July 2015 cell searches was destroyed in September 2015 pursuant to DOCCS Directive #4911 because the visitor plaintiff selected to receive that property never visited the facility within the specified time-frame—not out of retaliation for plaintiff filing his May 2015 grievance. See Dkt. No. 14-5 at 16, 17. Indeed, plaintiff signed the Authorization for Disposal of Personal Property form on August 14, 2015, which explicitly provided that "[t]he items [would] be held a maximum of 14 days pending arrival of a visitor," and plaintiff did not select an alternative choice for disposition of his property in the event the visitor did not accept his property. Dkt. No. 68-28 at 1. Therefore, defendants have established that plaintiff's excess magazines and books would have been destroyed regardless of any retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). [13]

Further, insofar as plaintiff suggests that the cell shield order violated his First Amendment rights, defendants have established that the shield order was a direct result of plaintiff screaming at and threatening C.O. Lee that that he would "violate" him, and not in retaliation for plaintiff engaging in protected conduct. See Dkt. No. 14-1 at 43. In any event, nothing in the record indicates that C.O. Lee was responsible for the shield order. See Farrell, 449 F.3d at 484 ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Rather, the record evidence establishes only that (1) plaintiff was placed in a cell with a shield after C.O. Lee informed his area supervisor of plaintiff's threatening statements; (2) Sgt. Delisle and Sgt. Orzech recommended renewing the shield order on three separate occasions because "monitoring indicate[d] that the threat to staff ... ha[d] not lessened" and "continuation of th[e shield] order for staff protection [wa]s warranted at th[ose] time[s]"; and (3) the shield order was authorized by higher ranking Clinton personnel. Dkt. No. 14-4 at 46, 47, 48. In addition, to the extent plaintiff attempts to argue that C.O. Lee retaliated against him by filing a false misbehavior report for plaintiff threatening to "violate" him, plaintiff admits to making this threat, although now attempts, unpersuasively, to argue that he qualified his threat by stating that he would "verbally violate" Lee. Dkt. No. 14-1 at 34 ¶ 46. Therefore, as defendants contend, plaintiff "admit[s] to engaging in the conduct that formed the basis of the misbehavior report," and defendants have established that the July 2015 misbehavior report concerning plaintiff's threatening statement would have been issued regardless of any retaliatory animus on the part of C.O. Lee. Brooks, 2014 WL 1293343, at *25; see Scott,

344 F.3d at 287-88. Moreover, plaintiff's blanket allegation that Sgt. Orzech is liable for C.O. Lee's actions fails, as plaintiff proffers no factual support to establish Sgt. Orzech was in a position of authority over C.O. Lee or personally involved in any of C.O. Lee's conduct. See Farrell, 449 F.3d at 484. In any event, as discussed, C.O. Lee did not violate plaintiff's constitutional rights. See Hernandez, 341 F.3d at 145. Accordingly, plaintiff's First Amendment retaliation claim against C.O. Lee and Sgt. Orzech based on C.O. Lee's alleged filing of false misbehavior report based on plaintiff's threat to "violate" him and the implementation of a shield order, must be dismissed.

*20  To the extent plaintiff asserts that C.O. Lee retaliated against him for filing his May 2015 grievance by issuing a false misbehavior report in July 2015, which charged plaintiff with possessing materials indicating that he was soliciting funds and violating facility correspondence rules, defendants are entitled to partial summary judgment. See Dkt. No. 14-1 at 32. As addressed above, plaintiff's filing of the May 2015 grievance constitutes constitutionally-protected activity. See Davis, 320 F.3d at 352-53. Further, a sufficient causal connection appears to exist, as C.O. Lee's alleged retaliatory action of filing a false misbehavior report occurred in close temporal proximity—approximately two months—after plaintiff filed his May 2015 grievance, and plaintiff was ultimately vindicated at the disciplinary hearing insofar as he was found not guilty of solicitation or violating facility correspondence rules. See Baskerville, 224 F. Supp. 2d at 732.

Notwithstanding the foregoing, the evidence does not support a finding of adverse action; therefore, plaintiff's claim fails to satisfy the second element of a First Amendment retaliation claim. See Espinal, 558 F.3d at 128. To constitute adverse action, the "retaliatory conduct" must be such that it "would deter a similarly situated individual of ordinary firmness form exercising ... constitutional rights." Gill, 389 F.3d at 381 (internal quotation marks and citation omitted). "Conduct that is de minimis does not provide this deterrent effect and does not give rise to actionable retaliation." Lunney v. Brureton, No. 04-CV-2438 (LAK/GWG), 2007 WL 1544629, at *20 (S.D.N.Y. May 29, 2007) (citation omitted). Although it is well settled that prison inmates do not have a general constitutional protection from being falsely accused in a prison misbehavior report, see Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (citing Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)), the Second Circuit has held that the filing of a false misbehavior report may constitute an

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 413 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

adverse action for purposes of an inmate's First Amendment retaliation claim. See Gill, 389 F.3d at 384.

However, in Freeman, the Second Circuit held that the Constitution merely guarantees inmates "the right not to be deprived of a protected liberty interest without due process of law." Freeman, 808 F.2d at 951. In Franco v. Kelly, the Second Circuit made clear that, "[a]s long as prison officials grant the inmate a hearing and an opportunity to be heard, the 'filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983.' " Franco v. Kelly, 854 F.2d 584, 587 (2d Cir. 1988) (quoting Freeman, 808 F.2d at 953). Furthermore, courts within this Circuit have held that "[t]he filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary do not constitute adverse action because they are *de minimis."* Gantt v. Lape, No. 9:10-CV-0083 (GTS/TWD), 2012 WL 4033729, at *8 (N.D.N.Y. July 31, 2012) (internal quotation marks and citation omitted); see also Bartley v. Collins, No. 95-CV-10161(RJH), 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary ... do not constitute adverse action because they were *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights.").

Here, plaintiff was not found guilty of solicitation and violating facility correspondence rules, as charged C.O. Lee's July 12, 2015 misbehavior reports. See Dkt. No. 14-4 at 45, 54; Dkt. No. 14-1 at 34 ¶ 46. Consequently, no penalty was imposed upon him based on those charges; therefore, even if C.O. Lee issued a false misbehavior report in retaliation for plaintiff filing grievances, the conduct was *de minimis*, as plaintiff suffered no harm as a result. See Lunney, 2007 WL 1544629, at *20; cf. Gantt, 2012 WL 4033729, at *8; Bartley, 2006 WL 1289256, *7. Based on the foregoing, defendants' motion for partial summary judgment dismissing plaintiff's claims against C.O. Lee must be granted.

### 5. C.O. Beaudette

**\*21** Plaintiff's First Amendment retaliation claims against C.O. Beaudette must be dismissed. Insofar as plaintiff claims that C.O. Beaudette retaliated against him for filing grievances and spearheading the Clean Up The Clinton SHU

Campaign by denying plaintiff a shower on one occasion in November 2015, and taking food out of plaintiff's cell and placing dirty books on plaintiff's sheets during a cell search in March 2016, these isolated acts constitute *de minimis* conduct and do not amount to adverse action. See Lunney, 2007 WL 1544629, at *21 ("Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation."); Snyder v. McGinnis, No. 03-CV-0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); see also Smith, 2017 WL 2172318, at *4 ("That [the defendant correction officer] allegedly threw out the [p]laintiff's food and bed linen is not a substantial enough [injury] to deter legitimate grievances against prison officers." (internal quotation marks and citation omitted)); Phillips v. LaValley, No. 9:12-CV-609 (NAM/CFH), 2014 WL 1202693, at *9 (N.D.N.Y. Mar. 24, 2014) ("the adverse action of removing photos off of a cell wall is so *de minimis*, that it falls outside the ambit of constitutional protection") (internal quotation marks and citations omitted)).

Insofar as plaintiff contends that C.O. Beaudette retaliated against him in violation of his First Amendment rights by confiscating 82 of his 132 stamps, defendants have established through admissible evidence that C.O. Beaudette would have taken this action regardless of any retaliatory animus because plaintiff was in violation of DOCCS Rule 113.16, which prohibits inmates from "be[ing] in possession of stamps in excess of $22.50 in value." 7 N.Y.C.R.R. § 270.2; see Dkt. No. 68-15 at ¶¶ 7, 8; see also Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18 (citation omitted). In any event, aside from plaintiff's conclusory assertions, nothing suggests that leaving plaintiff with 50 stamps, as opposed to 132 stamps, deterred or prevented him from exercising his constitutional rights. See generally Gill, 389 F.3d 379, at 381. Thus, the conduct complained of is "*de minimis* and therefore "outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001) (citations omitted), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). Moreover, plaintiff's entire argument in this regard is based on his erroneous belief that inmates are entitled to possess stamps in value up to $24.50—which is clearly belied by the plain language of 7 N.Y.C.R.R. § 113.16. See Dkt. No. 14-1 at 46 ¶ 65. Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against C.O. Beaudette be dismissed.

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 414 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

### 6. Sgt. Delisle and C.O. Stickney

As defendants correctly argue, plaintiff's First Amendment retaliation claims against Sgt. Delisle and C.O. Stickley must be dismissed because plaintiff has "admitted to engaging in the conduct that formed the basis of the misbehavior reports." See Dkt. No. 68-3 at 9 (quoting Brooks, 2014 WL 1292232, at *24). Defendants have established that Sgt. Delisle's and C.O. Stickney's allegedly retaliatory actions would have occurred regardless of whether they acted with an improper retaliatory motive. See Scott, 344 F.3d at 287-88; Brooks, 2014 WL 1292232, at *18. In issuing plaintiff misbehavior reports for possessing documents indicating that plaintiff was operating a business from his cell, including using his facility correspondence to solicit funds from other inmates in order to draft grievances on their behalf, and possessing identification numbers of inmates who were known gang members, Sgt. Delisle and C.O. Stickney charged plaintiff with violations of numerous DOCCS Rules, including Rules 103.20 (solicitation), 180.11 (correspondence), 105.13 (Gangs), 103.10 (Extortion), 103.20 (Extortion/Soliciting). See Dkt. No. 14-6 at 21-24. Indeed, as defendants contend, plaintiff admitted at his deposition to engaging in the unauthorized operation of several businesses while incarcerated. See Dkt. No. 68-13 at 19-20. Moreover, to the extent that plaintiff contends that Sgt. Delisle and C.O. Stickney retaliated against him by denying him showers and meals, his allegations are unsupported by any specific facts and, therefore, do not survive summary judgment. See generally Kerzer, 156 F.3d at 400; Smith, 2006 WL 1133247, at *3. Accordingly, it is recommended that plaintiff's First Amendment retaliation claims against Sgt. Delisle and C.O. Stickney be dismissed.

### 7. Librarian Delisle

*22 Defendants are entitled to summary judgment dismissing plaintiff's First Amendment claims against Librarian Delisle. Plaintiff conceded at deposition that he has no factual basis to allege that Librarian Delisle retaliated against him in violation of his First Amendment rights by denying his library requests because he filed grievances against her husband, Sgt. Delisle. See Dkt. No. 68-3 at 9-10. Indeed, in response to defense counsel's question whether plaintiff was "alleging that [Librarian Delisle's] actions had anything to do with the fact that [plaintiff] had filed grievance against her husband," plaintiff replied "I can't say that because

I don't know." Dkt. No. 68-13 at 79. Further, in response to defense counsel's inquiry as to whether it was "fair to say that [plaintiff's] allegation against [Librarian] Delisle is not that she retaliated against [plaintiff] because [he had] fil[ed] grievances against her husband[, but] generally because people at Clinton didn't want [plaintiff] to have the information that could help [him] build a case or ... run a business," plaintiff stated "that is my allegation." Id. at 80 (emphasis added). Moreover, the Amended Complaint is devoid of any facts or allegations in support of a retaliation claim against Librarian Delisle. See Dkt. No. 14-1 at 40-44 ¶¶ 58-61. Thus, as plaintiff made clear that he did not intend to allege a First Amendment retaliation claim against Librarian Delisle and, in fact, stated that he had no factual basis to do so, defendants are entitled to summary judgment dismissing any purported First Amendment retaliation claim against Librarian Delisle. See Salahuddin, 657 F. Supp. at 377 ("One of the prime purposes of the summary judgment rule 'is to isolate and dispose of factually unsupported claims or defenses.' " (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986))). In opposition, plaintiff fails to raise any genuine issue of material fact through his conclusory statement that his claims against Librarian Delisle should not be dismissed on the basis that he testified at deposition that "[he] [didn't] know' if [Librarian] Delisle denied [him] law library resources as retaliation for [his] litigation" because "what [he] feel[s] is irrelevant." Dkt. No. 75-1 at 2 ¶ 2; see Kerzer, 156 F.3d at 400.

In any event, to the extent that plaintiff contends that Librarian Delisle wrongfully denied him access to requested internet-based research materials, including e-books, his claim lacks merit and is belied by the record, including Librarian Delisle's declaration in which she makes clear that she followed DOCCS directives in denying plaintiff's requests for internet related materials. See Dkt. No. 68-18 at 2-3 ¶ 7. Indeed, defendants have established that, pursuant to DOCCS Directive No. 4470, Librarian Delisle was not authorized to provide plaintiff with such materials. See id. Accordingly, it is recommended that plaintiff's claims against Librarian Delisle be dismissed.

### 8. Dr. Adams

Defendants are entitled to summary judgment as to plaintiff's claim that Dr. Adams retaliated against him in violation of his First Amendment rights for filing grievances against him by providing plaintiff with inadequate medical treatment. See

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 415 of 427

Dkt. No. 68-3 at 11. As an initial matter, it is unclear whether plaintiff even bases his First Amendment retaliation claim against Dr. Adams on his filing of grievances against Dr. Adams, as he explicitly argues that Dr. Adams refused him medical treatment "based largely (or probably solely) on [his] refusal to discuss [his] case [concerning Sing Sing] with him." Dkt. No. 14-1 at 26 ¶ 36. However, even assuming plaintiff does premise his retaliation claim against Dr. Adams on his constitutionally-protected conduct of filing grievances against him, see Davis, 320 F.3d at 352-53, defendants are still entitled to summary judgment.

Plaintiff's own documentary evidence establishes that, contrary to his contention, Dr. Adams did, in fact, examine plaintiff and proscribe various medications to treat his skin condition, including "Hydrocortisone, Fluocinonide[,] and Clindamyacin." Dkt. No. 14-5 at 9; Dkt. No. 14-4 at 68. In addition, plaintiff's documentary evidence establishes that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated" and that there was "no medical indication for medical boots." Dkt. No. 14-5 at 8; Dkt. No. 14-4 at 68. Dr. Adams' declaration, in which he states that his "denial of plaintiff's requests for medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs"; that "[i]n [his] estimation, the boots and medications requested were unnecessary"; and that he "never ... with[e]ld medications as a means of retaliation for [plaintiff's] filing of grievances," corroborates plaintiff's documentary evidence. Dkt. No. 68-14 at 2 ¶¶ 6, 8. Plaintiff's conclusory allegations to the contrary, including that the skin prescriptions do not work, see Dkt. No. 14-1 at 29 ¶ 38, fail to raise a genuine issue of material fact, are unsupported by the record, and amount only to a personal disagreement with Dr. Adams' treatment based on his professional medical judgment— which fails to support a constitutional claim. See Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Dr. Adams be dismissed.

"The First Amendment protects an inmate's right to send and receive both legal and nonlegal mail, although prison officials may regulate that right if the restrictions they employ are 'reasonably related to legitimate penological interests.' " Abreu v. Travers, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 6127510, at *10 (N.D.N.Y. Oct. 20, 2016) (quoting Thornburgh v. Abbott, 490 U.S. 401, 409 (1989) (additional quotation marks and citation omitted); see Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006) (per curiam). Legal mail is entitled to greater protection from interference than nonlegal mail. See Johnson, 445 F.3d at 534 (citing Davis, 320 F.3d at 351). "A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." Burroughs, 138 F. Supp. 3d at 210 (citation omitted). "Rather, the inmate must show that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " Davis, 320 F.3d at 351 (quoting Cancel v. Goord, No. 00-CV-2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001)).

Here, plaintiff premises his claim against Clemons on his conclusory and self-serving allegation that she issued her misbehavior report based on a review of his outgoing mail without first obtaining a valid mail watch order. See Dkt. No. 14-1 at 61 ¶ 86. However, as defendants establish through admissible evidence, Clemons did obtain a 60-day mail watch order for all of plaintiff's incoming and outgoing non-privileged correspondence, which Supt. Kirkpatrick approved on December 9, 2016. See Dkt. No. 68-16 at 2 ¶ 7. Moreover, as discussed above, plaintiff does not deny that he engaged in the unauthorized use of his correspondence to operate business ventures while incarcerated—the very source of the solicitation charges of Clemons misbehavior report. See Dkt. No. 68-13 at 51-52; Dkt. No. 14-7 at 40-41. In opposition, plaintiff asserts only that he "disagree[s] that Clemons had a properly authorized mail watch order supported by probable cause," Dkt. No. 75-1 at 2, which is belied by the record and fails to raise a genuine issue of material fact. See Kerzer, 156 F.3d at 400. Accordingly, it is recommended that plaintiff's First Amendment mail interference claim against Clemons be dismissed.

### C. First Amendment Mail Interference Claim Against Clemons

**\*23** Plaintiff's claim against Clemons, properly characterized as a First Amendment mail interference claim, should be dismissed.

### D. Eighth Amendment Medical Indifference Claim Against Dr. Gillani

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 416 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

deliberately indifferent to a serious medical need. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).

The objective component of an Eighth Amendment medical indifference claim "requires that 'the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.' " Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). "[I]n the context of suicide, jailers are not required to safeguard every inmate; only those presenting a strong likelihood of suicide are entitled to protection." Allah v. Kemp, No. 9:08-CV-1008 (NAM/GHL), 2010 WL 5860290, at *7 (N.D.N.Y. Nov. 9, 2010) (internal quotation marks and citation omitted), report and recommendation adopted, No. 9:08-CV-1008 (NAM/GHL), 2011 WL 705210 (N.D.N.Y. Feb. 22, 2011); see Helijas v. Corr. Med. Care, Inc., No. 115-CV-1049 (GTS/DJS), 2016 WL 5374124, at *13 (N.D.N.Y. Sept. 26, 2016) ("With respect to the objective prong of an Eighth Amendment claim, courts have found that depression with suicidal ideation, or severe anxiety attacks are sufficiently severe conditions to meet the objective element of the deliberate indifference standard." (internal quotation marks and citation omitted)). "[T]o establish a strong likelihood of suicide, a[n inmate] must have made a previous threat of or an earlier attempt at suicide." Allah, 2010 WL 5860290, at *7 (internal quotation marks and citation omitted).

**\*24** Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " Chance, 143 F.3d at 703 (quoting Hathaway, 99 F.3d at 553). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). "[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." Chance, 143 F.3d at 703 (citation omitted). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Chance, 143 F.3d at 702 (quoting Farmer, 511 U.S. at 137).

"In an inmate suicide context, there are two scenarios where deliberate indifference may exist." Allah, 2010 WL 5860290, at *8. "First, officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies." Id. (internal quotation marks and citation omitted). "Second, officials could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide." Id. (internal quotation marks and citation omitted). "The second scenario focuses on the adequacy of preventive measures." Id. (internal quotation marks and citation omitted). Concerning the adequacy of preventative measures, even if a medical defendant's "treatment decision was erroneous, deliberate indifference cannot be inferred [where] the decision was not such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Sims v. Gorman, No. 09-CV-6643 (MAT), 2012 WL 566875, at *6 (W.D.N.Y. Feb. 21, 2012) (internal quotation marks and citation omitted).

Upon careful review of the evidence, the undersigned concludes that no reasonable juror could conclude that Dr. Gillani acted with deliberate indifference to plaintiff's serious medical needs. It is undisputed that plaintiff was placed in the MHU on April 27, 2014, where he stayed until May 1, 2015, because he expressed threats of self-harm. See Dkt. No. 14-1 at 10 ¶ 17; Dkt. No. 68-25 at 3 ¶ 13. Plaintiff told Dr. Gillani "[e]very[ ]day ... throughout [his] stay" in [MHU] that he "would commit suicide if [he] was forced to go back to 13 Cell and live under such inhumane conditions." Dkt. No. 14-1 at 10 ¶ 17; see Dkt. No. 68-13 at 39. Thus, plaintiff's stated intention to commit suicide establishes the objective element of the deliberate medical indifference test. See Allah, 2010 WL 5860290, at *8.

As defendants argue, however, the record establishes that Dr. Gillani did not act with deliberate indifference. See Dkt. No. 68-3 at 13-14. Dr. Gillani's sworn declaration and treatment notes establish that he conducted an evaluation of plaintiff on May 1, 2014, and concluded that plaintiff was not suffering from any psychiatric illness, but rather, exhibiting an "environment-related agenda" designed at being "released from the SHU" and "that plaintiff's complaints did not stem from mental illness, but rather, were calculated toward an effort to be released from his confinement in the SHU." Dkt. No. 68-25 at 3 ¶¶ 23-25. Dr. Gillani based his conclusion on numerous factors, including that he had been informed that

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 417 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

plaintiff had not engaged in self-harming behavior prior to his April 2014 transfer to MHU, his statements to Dr. Gillani that he did not wish to return to SHU and that he would prefer to return to general population to use the law library, and his denial of having suicidal ideas. See id. at 3 ¶¶ 15-16, 19. Dr. Gillani also observed that plaintiff had been eating and sleeping normally, denied having psychotic or anxiety symptoms, and had a history of engaging in "self-harming gestures" but no history of in-patient psychiatric treatment. Id. at ¶ 21; see id. at ¶¶ 17, 19. Dr. Gillani's May 1, 2014 conclusions are bolstered by plaintiff's deposition testimony in which he stated that, "[a]t one point, [he] couldn't take the smell [of 13 Cell] so [he] attempted suicide to get out of the cell so that they going to move [him] to [MHU] so that [he] didn't ... have to take the smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr. Gillani's analysis, following his release back to SHU, on May 5, 2014, plaintiff alleges only that he engaged in the self-harming gesture of "fixing a noose around [his] neck," but does not allege in his Amended Complaint that he engaged in any actual suicide attempt on that date. See Dkt. No. 14-1 at 10 ¶ 17. Based on the foregoing, "deliberate indifference cannot be inferred" from Dr. Gillani's decision to discharge plaintiff back to SHU on May 1, 2015, as the evidence before the Court does not establish that his decision "was ... such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Dr. Gillani] did not base [his] decision on such a judgment." Sims, 2012 WL 566875, at *6.

**\*25** Moreover, plaintiff's allegations, made for the first time at deposition, that he made two suicide attempts shortly after being examined by Dr. Gillani on two unspecified occasions, are uncorroborated by the record and do not defeat defendants' properly supported motion for partial summary judgment as to his Eighth Amendment medical indifference claim. See Dkt. No. 68-13 at 30, 37-42. Plaintiff's deposition testimony that he actually attempted suicide by hanging on two occasions is wholly self-serving and directly contradicts the allegations made in the Amended Complaint, which state only that he "became suicidal," expressed "suicidal plans and ideations" prior to being admitted to MHU in April 2014; "fix[ed] a noose to his neck" after being released on March 5, 2014; and that he "told [Dr.] Gillani of [his] suicidal plans if [he] returned to 13 Cell." Dkt. No. 14-1 at 10 ¶ 17, 66 ¶ 95 (internal quotation marks omitted). Indeed, when asked whether he "kn[e]w the dates" of his two suicide attempts, plaintiff responded "I don't. They're listed in the complaint." Dkt. No. 68-13 at 30. However, no such dates or events are mentioned in the Amended Complaint, and the record is devoid of any evidence corroborating these belated and self-serving allegations. See Dkt. No. 14-1 at 10-11 ¶ 17, 66 ¶ 95. Thus, although plaintiff's pro se submissions are to be construed to raise the strongest arguments they suggest, a party opposing summary judgment "may not rely merely on allegations ... in its own pleading; rather, it[ ] must ... set out specific facts showing a genuine issue for trial." Green v. Gunn, No. 06-CV-6248 (CJS), 2009 WL 1809932, at *5 (W.D.N.Y. June 24, 2009) (internal quotation marks and citation omitted). Plaintiff has failed to make such a specific factual showing to raise a genuine issue for trial concerning Dr. Gillani's conduct. Accordingly, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claim against Dr. Gillani be dismissed.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 68) be **GRANTED IN ITS ENTIRETY** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams;

(2) First Amendment claim against Librarian Delisle;

(3) First Amendment mail tampering claim against Clemons; and

(4) Eighth Amendment medical indifference claim against Dr. Gillani; and it is further,

**RECOMMENDED**, that the action be **TERMINATED** as to Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons; and it is further,

**ORDERED**, that the Clerk of the Court revise the docket to reflect the correct spelling of C.O. Mailloux's and Dr. Gillani's names; and it is further,

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [14]

**All Citations**

Not Reported in Fed. Supp., 2020 WL 3038275

---

## Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The Clerk of the Court is respectfully directed to modify the docket to reflect that the correct spelling of this defendant's name is "Mailloux," not "Mallioux." See Dkt. No. 68-29.

3    The Clerk of the Court is respectfully directed to modify the docket to reflect that the correct spelling of this defendant's name is "Gillani," not "Galanie." See Dkt. No. 68-25.

4    Following initial review of plaintiff's Amended Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. 1915A(b), Senior District Judge Thomas J. McAvoy dismissed 26 causes of action without prejudice and 23 defendants from the action. See Dkt. No. 17 at 59-60, 61. The Court held that the following claims survived *sua sponte* review: plaintiff's (1) Eighth Amendment claims against Sgt. Randall, Lt. Rief, and Brown related to his conditions of confinement in SHU Cell number 13; (2) Eighth Amendment claims against C.O. Lee, Sgt. Orzech, and Sgt. Delisle related to a Shield Order; (3) Eighth Amendment claims against Deputy Zerniak, Miller, and Venettozzi related to the length of plaintiff's SHU confinement at Clinton; (4) Eighth Amendment deliberate medical indifference claim against Dr. Gillani; (5) First Amendment claims against C.O. Gadway, C.O. Lee, and Clemons related to mail tampering; and (6) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, Dr. Adams, Supt. Racette, Brown, Keysor, Devlin, Macintosh, and Supt. Kirkpatrick. See id. at 60-61.

5    Plaintiff styled his responsive submission as a "Summary Judgment and Preliminary Injunction Motion." See Dkt. No. 75 at 1. However, upon careful consideration, the Court concludes that plaintiff's "Summary Judgment" motion is simply a typed reiteration of his hand-written Affidavit in Support of his Amended Complaint, as the facts and arguments set forth therein are the same in both filings. See Dkt. No. 14-1; Dkt. No. 75. In addition, as plaintiff's submission does not contain a Statement of Material Facts, it does not comply with N.D.N.Y.L.R. 7.1(a)(3). Further, the Court concludes that plaintiff's "Preliminary Injunction Motion" is merely a reiteration of the relief requested in the Amended Complaint. See Dkt. No. 75 at 67; Dkt. No. 14-1 at 73-74 (requesting identical relief in his Affidavit in support of his Amended Complaint to that stated in his "Preliminary Injunction Motion."). In fact, plaintiff's current "Preliminary Injunction Motion" is identical to the preliminary injunction motion that the Court previously denied on its initial review of the Amended Complaint. See Dkt. No. 16 at 1-2; Dkt. No. 17 at 62. Moreover, the only new documents contained in plaintiff's filing in Dkt. No. 75 are his responses in opposition to defendants' motion. See Dkt. Nos. 75-1, 75-2. Accordingly, the

Case 9:23-cv-00578-ML Document 165 Filed 03/24/26 Page 419 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Court will treat plaintiff's submission as a response in opposition to defendants' motion for partial summary judgment and not as a cross motion for summary judgment or preliminary injunction motion.

6    Defendants' partial motion for summary judgment requests dismissal of only plaintiff's: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams; (2) First Amendment mail tampering claim against Clemons; and (3) Eighth Amendment medical indifference claim against Dr. Gillani. See Dkt. No. 68-3 at 6-12. Accordingly, only the facts relevant to those claims will be recited herein. In addition, to the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the Amended Complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." (internal quotation marks and citations omitted)).

7    Although plaintiff refers to the misbehavior report issued by Gadway on April 30, 2014 as "Exhibit E," no such document is contained in plaintiff's list of exhibits. See Amen. Compl. at 12 ¶ 20.

8    As stated supra at 4 n.6, defendants seek dismissal of only: plaintiff's (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mallioux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Stickney, Sgt. Delisle, C.O. Beaudette, Librarian Delisle, and Dr. Adams; (2) First Amendment mail tampering claim against Clemons; and (3) Eighth Amendment medical indifference claim against Dr. Gillani. See Dkt. No. 68-3 at 6-12. The Court denied defendants' request to submit supplemental briefing—made nearly five months after expiration of the dispositive motion deadline—in which they sought to include arguments in support of dismissal of plaintiff's additional causes of action. See Dkt. Nos. 76-78. Notwithstanding the Court's order, defendants filed a reply to plaintiff's opposition that includes arguments in support of dismissal of plaintiff's additional causes of action. See Dkt. No. 79. Although the Second Circuit has clarified that a district court has discretion to consider a belatedly-asserted argument, see Ruggiero v. Warner–Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005), the Court declines to exercise that discretion here "in light of [p]laintiff's pro se status and the fact that [he] did not have an opportunity to respond" to the arguments advanced in defendants' reply brief. Byrd v. New York State Fingerlakes Developmental Disabilities Servs. O.P.W.D.D., No. 6:14-CV-06470 (MAT), 2018 WL 3305423, at *2 (W.D.N.Y. July 5, 2018).

9    Defendants' motion for partial summary judgment states that C.O.s "Lee and Beaduette confiscated plaintiff's stamps," and asserts that plaintiff's admission to possessing an unauthorized amount of stamps relieves both of these defendants from liability as to plaintiff's First Amendment retaliation claims. Dkt. No. 68-3 at 7. However, upon review of the pleadings, plaintiff does not base his First Amendment retaliation claim against C.O. Lee on C.O. Beaudette's confiscation of stamps. See Dkt. No. 14-1 at 31-33 ¶¶ 42-45. Therefore, defendants appear to have erroneously included C.O. Lee in their analysis of plaintiff's claims asserted against C.O. Beaudette. Accordingly, the Court will construe defendants' argument insofar as it pertains to C.O. Lee as arguing, generally, that plaintiff's First Amendment retaliation claim against him fails because plaintiff admits to engaging in the conduct for which C.O. Lee issued him misbehavior reports. See Dkt. No. 68-3 at 7.

10   As discussed supra at 17 n.8, the Court will not address defendants' arguments—raised for the first time in reply to plaintiff's opposition—concerning plaintiff's additional claims.

11   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

12   Plaintiff also appears to allege that C.O. Gadway violated his constitutional rights by confiscating certain items of his property because "the mailroom and Media Review Committee allowed [him] to possess them,"

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 420 of 427

**Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)**

and by failing to submit the confiscated items to the Media Review Committee. Dkt. No. 14-1 at 13 ¶ 20. His claims in this regard are conclusory in that they are unsupported by any record evidence and, therefore, do not defeat defendants' motion for partial summary judgment. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). To the extent plaintiff alleges that C.O. Gadway violated DOCCS media review procedures, such claims were previously dismissed by the Court's November 2017 Order on initial review. See Dkt. No. 17 at 55-56, 60.

13    To the extent plaintiff argues that his property was destroyed as a result of C.O. Lee neglecting to follow DOCCS "Directive [No.] 4913, Section III(D)(1)(C)" by failing to instruct him to select a second disposition option, such claim was previously dismissed by the Court's November 2017 Order on initial review because the alleged violation of a DOCCS Directive does not give rise to a constitutional claim actionable under Section 1983. See Dkt. No. 17 at 55-56.

14    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

2020 WL 1329138
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nicholas ZIMMERMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

No. 9:17-CV-375
|
Signed 03/23/2020

**Attorneys and Law Firms**

Nicholas Zimmerman, Auburn, NY, pro se.

Brian W. Matula, New York State Attorney General, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge

### I. INTRODUCTION

 **\*1**  This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for report and recommendation. Magistrate Judge Hummel issued a Report-Recommendation and Order on January 24, 2020 which addresses Defendants' motion for partial summary judgment (Dkt. No. 68). *See* 1/24/20 Rep.-Rec. & Ord. (Dkt. No. 83) ("Rep. Rec."). Magistrate Judge Hummel recommends that Defendants' motion for partial summary judgment be granted and that the following claims be dismissed with prejudice: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams; (2) First Amendment claim against Librarian Delisle; (3) First Amendment mail tampering claim against Clemons; and (4) Eighth Amendment medical indifference claim against Dr. Gillani. Rep. Rec. at 71-72. Magistrate Judge Hummel also recommends that the following defendants be terminated from this action: Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons. *Id.* at 72. Plaintiff filed objections to these recommendations. Pl. Obj., Dkt. No. 86.

### II. STANDARD OF REVIEW

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)(The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *Machicote v. Ercole*, 2011 WL 3809920, at \* 2 (S.D.N.Y., Aug. 25, 2011)(citations and interior quotation marks omitted); *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp.2d 333, 340 (S.D.N.Y. 2009)(same).

General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey*, 554 F. Supp. 2d 301, 306 n. 2 (N.D.N.Y. 2008); *see Fisher v. Miller*, No. 916CV1175GTSATB, 2018 WL 3854000, at \*3 (N.D.N.Y. Aug. 14, 2018)("[W]hen an objection merely reiterates the same arguments made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a clear error review."); *Alaimo v. Bd. of Educ.*, 650 F. Supp. 2d 289, 291 (S.D.N.Y. 2009)(same); *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 187 (E.D.N.Y. 2015)(same). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

### III. DISCUSSION

 **\*2**  The Court presumes familiarity with Magistrate Judge Hummel's Report-Recommendation and Order. To the extent Plaintiff makes general objections to the report and recommendation, the Court finds no clear error and therefore these general objections are overruled. The majority of Plaintiff's other objections appear to be re-arguments that were presented to Magistrate Judge Hummel and rejected, and the Court considered these arguments under plain error review and finds none.

To the extent that Plaintiff challenges Magistrate Judge Hummel's recommendations on the asserted grounds that

material questions of fact exist that must be determined by a jury, Plaintiff fails to recognize - as pointed out by Magistrate Judge Hummel - that on a motion for summary judgment once the moving party establishes a *prima facie* basis for dismissal, the burden shifts to the nonmovant to establish by admissible evidence that a disputed question of material fact exists. *See* Rep. Rec. at 35-36. This burden may not be satisfied by "simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998); *see* Rep. Rec. at 36-37. [1] Further, although a court must afford a *pro se* litigant special solicitude, this special solicitude does not exempt a *pro se* litigant from compliance with relevant rules of procedural and substantive law. Rep. Rec. at 37. It is also important to note that the Second Circuit requires courts to examine prisoners' claims of retaliation "with skepticism and particular care" because prisoner retaliation claims are easily fabricated. Rep. Rec. at 39-40.

Plaintiff's argument that a question of fact exists as to whether all seven of his bags of property were transferred from Attica Correctional Facility to Clinton Correctional Facility on April 17, 2014, and whether at least one of his bags was hidden and later accessed by Clinton staff to obtain incriminating evidence against him, is insufficient. Obj. 2-6, 9. His contention that the defendants lied that the bags were transmitted in three parts is a broad conclusory allegation insufficient to contest the Defendants' properly supported contentions to the contrary. *See e.g.*, Dkt. 68-31. Similarly, Plaintiff presents nothing other than a broad conclusory allegations that C.O. Gadway went to a hidden bag to obtain incriminating evidence against him. Obj. at 9. Further, Plaintiff's objection to Magistrate Judge Hummel's "findings that Gadway's violation of media review guidelines was unsupported and previously denied by court (pg. 52)" as being "a lie," Obj. at 10, misunderstands Magistrate Judge Hummel's finding. In footnote 12 on page 52, Magistrate Judge Hummel wrote:

> **\*3** Plaintiff also appears to allege that C.O. Gadway violated his constitutional rights by confiscating certain items of his property because "the mailroom and Media Review Committee allowed [him] to possess them," and by failing to submit the confiscated items to the Media Review Committee. Dkt. No. 14-1 at 13 ¶ 20. His claims in this regard are conclusory in that they are unsupported by any

record evidence and, therefore, do not defeat defendants' motion for partial summary judgment. See *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). To the extent plaintiff alleges that C.O. Gadway violated DOCCS media review procedures, such claims were previously dismissed by the Court's November 2017 Order on initial review. *See* Dkt. No. 17 at 55-56, 60.

Rep. Rec. at 52, n. 12.

Magistrate Judge Hummel did not find that C.O. Gadway's violation of Media Review Guidelines was unsupported but rather that, even if C.O. Gadway's conduct violated the Media Review Guidelines this conduct did not arise to a constitutional violation. Indeed, this was precisely the determination made by the Court in the November 2017 Order on initial review that Magistrate Judge Hummel referenced in footnote 12. Plaintiff's objection in this regard is without merit and is overruled.

Plaintiff's objections to Magistrate Judge Hummel's recommendation to dismiss certain claims based upon Plaintiff's unsupported belief as to what actually occurred with regard to his bags and as to what material he possessed in his cell, *see* Obj. at 2-6, 8-9, are insufficient and overruled. The Court adopts Magistrate Judge Hummel's recommendations relative to dismissal of the First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, and C.O. Gadway for the reasons stated in the Report Recommendation at pages 40-45 and 50-52.

Plaintiff's argument that he was denied due process because he did not receive his property from his transferred bags in a timely fashion, Obj. at 5, was not presented to Magistrate Judge Hummel and will not be considered on these objections. *See Monroe v. Kocienski*, No. 9:17-CV-1050 (GTS/DEP), 2019 WL 409412, at *2 (N.D.N.Y. Feb. 1, 2019)("[A] district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance.")(citing *Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at *1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 423 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

before the magistrate but were not.") (internal quotation marks omitted)); *Charlot v. Ecolab, Inc.*, 97 F. Supp. 3d 40, 51 (E.D.N.Y. 2015)("[A] district court generally will not consider new arguments raised for the first time in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.")(citing cases); *Santiago v. City of New York*, No. 15-cv-517, 2016 WL 5395837, at *1 (E.D.N.Y. Sept. 27, 2016), *aff'd*, 697 F. App'x 36 (2d Cir. Sept. 6, 2017) ("[C]ourts ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.")(quotations and citation omitted)).

Despite being allowed discovery in this matter, Plaintiff offers only a broad conclusory allegation to counter Sgt. Orzech's sworn statement that he did not damage a CD by putting a staple thru it. *See* Obj. at 13 ("What do you think he gonna [*sic*] say? That he did it? Yeah right! Orzech was last [*sic*] person in possession of the CD and I have a letter from a witness that says a staple was in it when they got it. So unless the Post Office did it, it was Orzech!"). Plaintiff's objection on this ground is overruled.

**\*4** Plaintiff's broad conclusory allegations, Obj. at 7, also do not overcome Defendants' evidence that 13 Cell is "a cell in normal use in Unit-14 SHU and is regularly maintained," Dkt. No. 68-32 at ¶ 6, that Plaintiff was "afforded the opportunity for additional cleaning supplies Tuesdays, Thursdays, and Saturdays weekly" if he was unhappy with the cleanliness of his cell, *id.*, and that he was placed in 13 Cell based upon his behavior and cell availability. *See* Rep. Rec. at 45-46. [2] Furthermore, Plaintiff does not overcome Magistrate Judge Hummel's alternative basis to dismiss the First Amendment retaliation claim against Sgt. Randall. *See* Rep. Rec. at 46-49. Accordingly, the objections in this regard are overruled and the Court adopts Magistrate Judge Hummel's recommendation to dismiss the First Amendment retaliation claim against Sgt. Randall. *Id.*

As to Plaintiff's claims against C.O. Lee, Plaintiff's contention that C.O. Lee had no basis for a cell shield order because Plaintiff said that he was going to "verbally violate" C.O. Lee as opposed to violate him in some physical sense is of no moment because Magistrate Judge Hummel found that there was nothing in the record to indicate C.O. Lee was responsible for the shield order. Rep. Rec. at 54. Plaintiff's conclusory and unsupported contention to the contrary, *see* Obj. at 10 ("Lee was directly responsible for the cell shield order

because he requested it and provided the false information to obtain it.") is insufficient to satisfy Plaintiff's burden on the summary judgment motion. *See* Rep. Rec. at 54. [3] Likewise, there is no basis to find that C. O. Lee issued a retaliatory false misbehavior report because Plaintiff admits that he said he was going to "violate" C.O. Lee. Whether this was a contention that he would verbally violate C.O. Lee or violate Lee is some other sense still provides a basis to conclude that Plaintiff threatened C.O. Lee. Plaintiff's objection based upon the nomenclature of his threat does not create a material issue of fact warranting denial of the motion in this regard.

**\*5** Furthermore, Plaintiff does not overcome Magistrate Judge Hummel's conclusion that C.O. Lee's conduct in issuing July 12, 2015 misbehavior reports caused no adverse action as required to satisfy the second element of a First Amendment retaliation claim because Plaintiff suffered no harm as a result. Rep. Rec. at 56-57. Accordingly, Plaintiff's objection in this regard is overruled.

Regarding the claim that C.O. Lee retaliated against Plaintiff by destroying his books and papers, Magistrate Judge Hummel wrote:

> [D]efendants have established that the property C.O. Lee confiscated from plaintiff's cell during the June and July 2015 cell searches was destroyed in September 2015 pursuant to DOCCS Directive #4911 because the visitor plaintiff selected to receive that property never visited the facility within the specified time-frame—not out of retaliation for plaintiff filing his May 2015 grievance. *See* Dkt. No. 14-5 at 16, 17. Indeed, plaintiff signed the Authorization for Disposal of Personal Property form on August 14, 2015, which explicitly provided that "[t]he items [would] be held a maximum of 14 days pending arrival of a visitor," and plaintiff did not select an alternative choice for disposition of his property in the event the visitor did not accept his property. Dkt. No. 68-28 at 1. Therefore, defendants have established that plaintiff's excess magazines and books would have been destroyed regardless of any retaliatory motive.

Rep. Rec. at 53 (case citations omitted). Plaintiff's conclusory allegation that "it does not matter which visitor showed up on his visit because the package room said they had no packages for me to send out anyway! Lee had already destroyed everything!" is insufficient to overcome the evidence submitted by the Defendants and relied upon by Magistrate Judge Hummel in rejecting this claim. The objection in this regard is overruled.

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 424 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Plaintiff's objection to Magistrate Judge Hummel's determination regarding the First Amendment retaliation claim against C.O. Beaudette is overruled. *See* Obj. at 11. Magistrate Judge Hummel correctly determined that C.O. Beaudette's actions resulted in *de minimus* deprivations to Plaintiff, and that 7 N.Y.C.R.R. § 113.16 prohibits an inmate for processing stamps in excess of $22.50 in value. *See* Rep. Rec. at 57-59. Plaintiff's objections in this regard are overruled.

Plaintiff's objections to Magistrate Judge Hummel's determination regarding the First Amendment retaliation claims against Sgt. Delisle and C.O. Stickney are overruled. Regardless of whether Plaintiff had a First Amendment right to "publish and promote [his] book, [his] website, [his] literature, [his] company, and the Clean up the Clinton SHU Campaign," Obj. at 11, he "admitted at his deposition to engaging in the unauthorized operation of several businesses while incarcerated." Rep. Rec. at 60. (citing Dkt. No. 68-13 at 19-20). Thus, there was a legitimate basis to dismiss the operative claims against Sgt. Delisle and C.O. Stickney.

Plaintiff's objection to the magistrate judge's recommendation regarding the First Amendment retaliation claim against Dr. Adams is overruled. After the Court's initial review of Plaintiff's Amended Compliant, it found that the only claim that survived against Dr. Adams was a First Amendment retaliation claim. *See* Dkt. No. 17 at 60-61. In addressing this claim, Magistrate Judge Hummel wrote:

  **\*6** [I]t is unclear whether plaintiff even bases his First Amendment retaliation claim against Dr. Adams on his filing of grievances against Dr. Adams, as he explicitly argues that Dr. Adams refused him medical treatment "based largely (or probably solely) on [his] refusal to discuss [his] case [concerning Sing Sing] with him." Dkt. No. 14-1 at 26 ¶ 36. However, even assuming plaintiff does premise his retaliation claim against Dr. Adams on his constitutionally-protected conduct of filing grievances against him, *see Davis*, 320 F.3d at 352-53, defendants are still entitled to summary judgment. Plaintiff's own documentary evidence establishes that, contrary to his contention, Dr. Adams did, in fact, examine plaintiff and proscribe various medications to treat his skin condition, including "Hydrocortisone, Fluocinonide[,] and Clindamyacin." Dkt. No. 14-5 at 9; Dkt. No. 14-4 at 68. In addition, plaintiff's documentary evidence establishes that Dr. Adams "determined that an electric shaver and Magic Shave [we]re not medically indicated" and that there

was "no medical indication for medical boots." Dkt. No. 14-5 at 8; Dkt. No. 14-4 at 68. Dr. Adams' declaration, in which he states that his "denial of plaintiff's requests for medical boots, lotion, blood pressure and other medications was based on [his] professional evaluation of [p]laintiff's medical needs"; that "[i]n [his] estimation, the boots and medications requested were unnecessary"; and that he "never ... with[e]ld medications as a means of retaliation for [plaintiff's] filing of grievances," corroborates plaintiff's documentary evidence. Dkt. No. 68-14 at 2 ¶¶ 6, 8. Plaintiff's conclusory allegations to the contrary, including that the skin prescriptions do not work, *see* Dkt. No. 14-1 at 29 ¶ 38, fail to raise a genuine issue of material fact, are unsupported by the record, and amount only to a personal disagreement with Dr. Adams' treatment based on his professional medical judgment—which fails to support a constitutional claim. *See Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."). Consequently, it is recommended that plaintiff's First Amendment retaliation claim against Dr. Adams be dismissed.

Rep. Rec. at 63-64.

Plaintiff objects to this recommendation because, he contends, he "never said anything about grievances," and "said it was because [Plaintiff] wanted to talk to [Dr. Adams] about [Plaintiff's] case." Obj. at 12. Plaintiff asserts that "Adams only prescribed the medications in question after three complaints and it was the wrong medication! [*sic*]" *Id.* He argues that a jury "needs to decide if Dr. Adams [*sic*] actions is [*sic*] that of a normal doctor or acceptable standards of practice." *Id.* Plaintiff's objection is merely a re-argument of that presented to and rejected by Magistrate Judge Hummel, and supports the magistrate judge's conclusion that Plaintiff fails to raise a viable constitutional claim because his claim amounts only to a personal disagreement with Dr. Adams' treatment based on Dr. Adams' professional medical judgment. Plaintiff's objection in this regard is overruled.

Plaintiff asserts in conclusory fashion that Defendant Clemons did not obtain a valid mail watch order and that such an order "doesn't even state what the probable cause is." Obj. at 12. However, this conclusory contention does not overcome Magistrate Judge Hummel's finding that "defendants establish through admissible evidence [that] Clemons did obtain a 60-day mail watch order for all of plaintiff's incoming and outgoing non-privileged correspondence, which Supt. Kirkpatrick approved on

December 9, 2016." Rep. Rec. at 65 (citing Dkt. No. 68-16 at 2 ¶ 7). For reasons discussed above regarding Plaintiff's burden in opposing a properly supported motion for summary judgment, this objection is overruled.

As to Plaintiff's Eighth Amendment medical indifference claim against Dr. Gillani, Magistrate Judge Hummel wrote:

> Upon careful review of the evidence, the undersigned concludes that no reasonable juror could conclude that Dr. Gillani acted with deliberate indifference to plaintiff's serious medical needs. It is undisputed that plaintiff was placed in the [mental health unit ("MHU")] on April 27, 2014, where he stayed until May 1, 2015, because he expressed threats of self-harm. *See* Dkt. No. 14-1 at 10 ¶ 17; Dkt. No. 68-25 at 3 ¶ 13. Plaintiff told Dr. Gillani "[e]very[ ]day ... throughout [his] stay" in [MHU] that he "would commit suicide if [he] was forced to go back to 13 Cell and live under such inhumane conditions." Dkt. No. 14-1 at 10 ¶ 17; *see* Dkt. No. 68-13 at 39. Thus, plaintiff's stated intention to commit suicide establishes the objective element of the deliberate medical indifference test. *See Allah*, 2010 WL 5860290, at *8.
>
> As defendants argue, however, the record establishes that Dr. Gillani did not act with deliberate indifference. *See* Dkt. No. 68-3 at 13-14. Dr. Gillani's sworn declaration and treatment notes establish that he conducted an evaluation of plaintiff on May 1, 2014, and concluded that plaintiff was not suffering from any psychiatric illness, but rather, exhibiting an "environment-related agenda" designed at being "released from the SHU" and "that plaintiff's complaints did not stem from mental illness, but rather, were calculated toward an effort to be released from his confinement in the SHU." Dkt. No. 68-25 at 3 ¶¶ 23-25. Dr. Gillani based his conclusion on numerous factors, including that he had been informed that plaintiff had not engaged in self-harming behavior prior to his April 2014 transfer to MHU, his statements to Dr. Gillani that he did not wish to return to SHU and that he would prefer to return to general population to use the law library, and his denial of having suicidal ideas. *See id.* at 3 ¶¶ 15-16, 19. Dr. Gillani also observed that plaintiff had been eating and sleeping normally, denied having psychotic or anxiety symptoms, and had a history of engaging in "self-harming gestures" but no history of in-patient psychiatric treatment. *Id.* at ¶ 21; see id. at ¶¶ 17, 19. Dr. Gillani's May 1, 2014 conclusions are bolstered by plaintiff's deposition testimony in which he stated that, "[a]t one point, [he] couldn't take the smell [of 13 Cell] so [he] attempted

suicide to get out of the cell so that they going to move [him] to [MHU] so that [he] didn't ... have to take the smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr. Gillani's analysis, following his release back to SHU, on May 5, 2014, plaintiff alleges only that he engaged in the self-harming gesture of "fixing a noose around [his] neck," but does not allege in his Amended Complaint that he engaged in any actual suicide attempt on that date. *See* Dkt. No. 14-1 at 10 ¶ 17. Based on the foregoing, "deliberate indifference cannot be inferred" from Dr. Gillani's decision to discharge plaintiff back to SHU on May 1, 2015, as the evidence before the Court does not establish that his decision "was ... such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [Dr. Gillani] did not base [his] decision on such a judgment." *Sims*, 2012 WL 566875, at *6.

 **\*7** Moreover, plaintiff's allegations, made for the first time at deposition, that he made two suicide attempts shortly after being examined by Dr. Gillani on two unspecified occasions, are uncorroborated by the record and do not defeat defendants' properly supported motion for partial summary judgment as to his Eighth Amendment medical indifference claim. *See* Dkt. No. 68-13 at 30, 37-42. Plaintiff's deposition testimony that he actually attempted suicide by hanging on two occasions is wholly self-serving and directly contradicts the allegations made in the Amended Complaint, which state only that he "became suicidal," expressed "suicidal plans and ideations" prior to being admitted to MHU in April 2014; "fix[ed] a noose to his neck" after being released on March 5, 2014; and that he "told [Dr.] Gillani of [his] suicidal plans if [he] returned to 13 Cell." Dkt. No. 14-1 at 10 ¶ 17, 66 ¶ 95 (internal quotation marks omitted). Indeed, when asked whether he "kn[e]w the dates" of his two suicide attempts, plaintiff responded "I don't. They're listed in the complaint." Dkt. No. 68-13 at 30. However, no such dates or events are mentioned in the Amended Complaint, and the record is devoid of any evidence corroborating these belated and self-serving allegations. *See* Dkt. No. 14-1 at 10-11 ¶ 17, 66 ¶ 95. Thus, although plaintiff's *pro se* submissions are to be construed to raise the strongest arguments they suggest, a party opposing summary judgment "may not rely merely on allegations ... in its own pleading; rather, it[ ] must ... set out specific facts showing a genuine issue for trial." *Green v. Gunn*, No. 06-CV-6248 (CJS), 2009 WL 1809932, at *5 (W.D.N.Y. June 24, 2009) (internal quotation marks and citation omitted). Plaintiff has failed to make such a specific factual showing to

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

Case 9:23-cv-00578-ML    Document 165    Filed 03/24/26    Page 426 of 427

raise a genuine issue for trial concerning Dr. Gillani's conduct. Accordingly, it is recommended that plaintiff's Eighth Amendment deliberate medical indifference claim against Dr. Gillani be dismissed.

Rep. Rec. at 68-71.

In his objections addressed to this claim, Plaintiff argues first that "even if Gillani concluded on May 1, 2014, that I was not suffering from any psychiatric illness, but rather exhibiting an environment-related agenda, he still should not have set me back to the SHU to kill myself! I don't know any other doctor that would, except the ones that work for MHU of course!" Obj. at 13. This objection is based upon a disagreement with Dr. Gillani's medical opinion and does provide a sufficient basis to reject Magistrate Judge Hummel's recommendation.

Plaintiff argues next that Dr. Gillani's affidavit "is not acceptable because it is based on third-party hearsay" that he had been informed that Plaintiff had not engaged in self-harming behavior prior to his April 2014 transfer to MHU. Medical opinions are often based upon the representations of third parties as to a patient's conduct or exhibition of symptoms, and as Magistrate Judge Hummel indicates, Dr. Gillani's opinion was based upon a number of factors including what Plaintiff himself told the doctor about his aversion to returning to 13 Cell in the SHU, and Dr. Gillani's observation that Plaintiff had been eating and sleeping normally, denied having psychotic or anxiety symptoms, and had a history of engaging in self-harming gestures but no history of in-patient psychiatric treatment. The reference to third-party representations was not the central basis of Dr. Gillani's opinion and is not a basis to reject that opinion or Magistrate Judge Hummel's recommendation to dismiss this claim based on Plaintiff's failure to demonstrate deliberate indifference related to the decision to discharge Plaintiff back to SHU on May 15, 2015. Plaintiff's current contention that he never told Dr. Gillani that he was not having suicidal ideations, or that he was eating and sleeping normally, appear to be issues raised for the first time in the objections and therefore failed to provide a sufficient basis to reject the magistrate judge's thorough opinion. Moreover, as Magistrate Judge Hummel stated, Dr. Gillani concluded that Plaintiff was not suffering from any psychiatric illness and had no history of in-patient psychiatric treatment, but rather was exhibiting an "environment-related agenda" designed to avoid being released from the MHU to the SHU. Further, as also stated by

the magistrate judge, Dr. Gillani's May 1, 2014 conclusions are bolstered by Plaintiff's deposition testimony in which he stated that, "[a]t one point, [he] couldn't take the sm ell [of 13 Cell] so [he] attempted suicide to get out of the cell so that they going to move [him] to [MHU] so that [he] didn't ... have to take the smell inside of [13 C]ell." Dkt. No. 68-13 at 23. Moreover, consistent with Dr. Gillani's analysis, following his release back to SHU on May 5, 2014, Plaintiff alleges only that he engaged in the self-harming gesture of "fixing a noose around [his] neck," but does not allege in his Amended Complaint that he engaged in any actual suicide attempt on that date. Plaintiff's current contention that he was "depressed and suicidal out of mind" does not provide a sufficient basis to conclude that the magistrate judge should have rejected Dr. Gillani's opinion and found that Dr. Gillani acted with deliberate indifference to Plaintiff's well-being. Plaintiff's objections in this regard are overruled.

## IV. CONCLUSION

**\*8** For the reasons discussed above, the Court **ACCEPTS and ADOPTS** the recommendations in the January 24, 2020 Report-Recommendation and Order, Dkt. No. 83, for the reasons stated therein. Thus, it is hereby

**ORDERED** that Defendants' motion for partial summary judgment, Dkt. No. 68, is **GRANTED,** and the following claims are **DISMISSED with prejudice**: (1) First Amendment retaliation claims against Sgt. Orzech, C.O. Mailloux, Sgt. Randall, C.O. Gadway, C.O. Lee, C.O. Beaudette, Sgt. Delisle, C.O. Stickney, and Dr. Adams; (2) First Amendment claim against Librarian Delisle; (3) First Amendment mail tampering claim against Clemons; and (4) Eighth Amendment medical indifference claim against Dr. Gillani, and it is further

**ORDERED** that the following defendants are **TERMINATED from this action**: Dr. Gillani, Dr. Adams, Librarian Delisle, C.O. Mailloux, C.O. Beaudette, C.O. Gadway, C.O. Stickney, and Clemons.

## IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2020 WL 1329138

Case 9:23-cv-00578-ML   Document 165   Filed 03/24/26   Page 427 of 427

Zimmerman v. Racette, Not Reported in Fed. Supp. (2020)

**Footnotes**

1       Magistrate Judge Hummel wrote after discussing *Matsushita* and *Kerzer*:

        A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (internal quotation marks and citation omitted); *see also Schwapp v. Town of Avon,* 118 F.3d 106, 111 (2d Cir. 1997) ("[A]ffidavtis must be based upon concrete particulars, not conclusory allegations." (internal quotation marks and citation omitted)). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 452 (2d Cir. 1999). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.' " *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005) (brackets omitted) (quoting *Anderson,* 477 U.S. at 252).

        Rep. Rec. at 36-37 (emphasis added by Magistrate Judge Hummel).

2       Plaintiff asserts in his objections that he has a recorded conversation between himself and Randall that allegedly indicates that his behavior did not warrant being placed in 13 Cell. *See* Obj. at 7. To the extent this references a DVD that Plaintiff claims to have that shows his interactions with correction officers in the property area, Magistrate Judge Hummel notes that Plaintiff stated that he could controvert Defendants' assertion that he became aggressive in the property area but that "no such evidence has been submitted to the Court as of the filing of plaintiff's opposition on July 22, 2019; the deadline for filing opposition papers has expired; and plaintiff's general disagreement with defendants' documentary evidence fails to raise a genuine issue of material fact." Rep. Rec at 44. To the extent that Plaintiff's objection is based upon the same DVD, or is based on a different recording that was not presented to the magistrate judge, this evidence will not be considered on the objection. *See Monroe,* 2019 WL 409412, at *2("[A] a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance."). "[F]or the district judge to review new evidence or arguments would reduce the magistrate's work to something akin to a meaningless dress rehearsal," *Michalow v. East Coast Restoration & Consulting Corp.,* No. 09-cv-5475, 2018 WL 1559762, at * 6 (E.D.N.Y. Mar. 31, 2018)(quotations and citation omitted), and would frustrate the congressional objective behind § 636(b)(1) which is intended to alleviate the congestion of litigation in the district courts. *Cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n.3 (1980) ("[T]o construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term '*de novo*' does not indicate that a secondary evidentiary hearing is required.")).

3       ("[T]he record evidence establishes only that (1) plaintiff was placed in a cell with a shield after C.O. Lee informed his area supervisor of plaintiff's threatening statements; (2) Sgt. Delisle and Sgt. Orzech recommended renewing the shield order on three separate occasions because "monitoring indicate[d] that the threat to staff ... ha[d] not lessened" and "continuation of th[e shield] order for staff protection [wa]s warranted at th[ose] time[s]"; and (3) the shield order was authorized by higher ranking Clinton personnel. Dkt. No. 14-4 at 46, 47, 48.")

**End of Document**                                              © 2026 Thomson Reuters. No claim to original U.S. Government Works.